N0. 01-14-01004-CV

IN THE
FIRST COURT OF APPEAL
AT HOUSTON

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
10/22/2015 4:44:20 PM
CHRISTOPHER A. PRINE
Clerk

_____

Kevin CAMPBELL,

Apellant

v.

Catherine N. WYLIE and M. Brandon MAGGIORE

Appelees

_____

On appeal from the Galveston County Statutory Probate Court

Galveston County, Texas

Trial Court Case Number PR-74571

APELLEES INDEX

Respectfully submitted,

M. Brandon Maggiore
State Bar No.:  24078901
Maggiore Law Firm, PLLC
2442 S. Downing Street, Suite 100
Denver, CO 80210
Telephone:  (713) 239.3347
Facsimile:   (713) 581.1894
brandon@maggiorelawfirm.com
GUARDIAN   AD   LITEM   FOR
LONNIE    PHILLIPS,    JR.,    AN
INCAPACITATED PERSON

**Trial court orders**

01/30/2014 - Application for Temp. Guardian Pending Contest ...................... Tab 1

01/30/2014 - Order Appointing Temp. Guardian Pending Contest ................. Tab 2

03/13/2014 - Standards for Court Approval of Appointee Fee Petitions.......... Tab 3

03/28/2014 - Motion and/or Notice to Withdraw Guardianship and Close

   Estate................................................................................. Tab 4

12/20/2014 - Order Authorizing Appointee Fees............................................ Tab 5

12/31/2014 - Order Appointing Guardian Ad Litem....................................... Tab 6

08/05/2015 - Application for as is Sale of Real Property................................ Tab 7

08/28/2015 - Order Authorizing Sale of Real Property ................................. Tab 8

09/08/2015 - Motion for Instructions (regarding a Do Not Resuscitate Order) Tab 9

09/21/2015 - Amended Application for as is Sale of Real Property ............... Tab 10

10/07/2015 - Order on Amended Application for As is Sale of Real PropertyTab 11

**Statutes**

Tex. Est. Code Ann. §  1054.001 (West 2014) ............................................. Tab 12

Tex. Est. Code Ann. § 1051.055 (West 2014) .............................................. Tab 13

Tex. Est. Code Ann. § 1051.104 (West 2014) .............................................. Tab 14

Tex. Est. Code Ann. § 1051.104(a) (West 2014) .......................................... Tab 15

Tex. Est. Code Ann. § 1051.104(c) (West 2014). ......................................... Tab 16

Tex. Est. Code Ann. § 1051.106 (West 2014) .............................................. Tab 17

Tex. Est. Code Ann. § 1051.153 (West 2014) ................................................ Tab 18

Tex. Est. Code Ann. § 1054.055 (West 2014) ................................................ Tab 19

Tex. Est. Code Ann. § 1054.201 (West 2014) ................................................ Tab 20

Tex. Est. Code Ann. § 1104.101 (West 2014) ................................................ Tab 21

Tex. Est. Code Ann. § 1104.102 (West 2014) ................................................ Tab 22

Tex. Est. Code Ann. § 1104.354. (West 2014) ............................................... Tab 23

Tex. Est. Code Ann. § 1105.251. (West 2014) ............................................... Tab 24

Tex. Est. Code Ann. § 1152.001 (West 2014) ................................................ Tab 25

Tex. Est. Code Ann. § 1158.051 (West 2014) ................................................ Tab 26

Tex. Est. Code Ann. § 1158.255 (West 2015) ................................................ Tab 27

Tex. Est. Code Ann. § 1251.007 (West 2014) ................................................ Tab 28

Tex. Est. Code Ann. § 1251.051 (West 2014) ................................................ Tab 29

Tex. Est. Code Ann. § 1251.052 (West 2014) ................................................ Tab 30

**Cases**

Bridgman v. Moore, 183 S.W. 2d 705 (Tex. 1944) ....................................... Tab 31

Camarena v. Tex. Employment Comm'n, 754 S.W.2d 149 (Tex.1988) ......... Tab 32

Canton-Carter v. Baylor College of Medicine, 271 S.W.3d 928 (Tex.App.—
    Houston [14th Dist. 2008, no pet.) ............................................................. Tab 33

Casteel-Diebolt v Diebolt, 912 S.W.2d 302 (Tex. App—Houston [14th
    Dist.] 1995, no writ) ................................................................................. Tab 34

City of Arlington v. State Farm Lloyds, 145 S.W.3d 165 (Tex. 2004) ........... Tab 35

City of San Antonio v. Longoria, 04–04–00063–CV, 2004 WL 2098074
(Tex.App.-San Antonio Sept. 22, 2004, no pet.) (mem. op.)........................ Tan 36

Daniel v. Falcon Interest Realty, Corp., 190 S.W.3d 177 (Tex.App.—
Houston [1st  Dist.] 2005, no pet.)................................................................ Tab 37

Ex parte R.D.N., 918 So.2d 100 (Alabama 2005)............................................ Tab 38

Fed. Sign v. Tex. S. Univ., 951 S.W.2d 401 (Tex. 1997) ............................... Tab 39

Hamilton County v. Cooper, No. 05–07–00307–CV, 2007 WL 2774166,
(Tex.App.-Dallas Sept.25, 2007, no pet.) ...................................................... Tab 40

Heard v. Houston Post. Co., 684 S.W.2d 210 (Tex.App.—Houston [14th
Dist.] 1984, writ refused n.r.e.).................................................................... Tab 41

In re G.S., No. 14–14–00477–CV, 2014 WL 4699480 (Tex. App.—Houston
[14th Dist.] 2014, no pet.) (mem. op.) .......................................................... Tab 42

In re H.B.N.S., Nos. 14-05-004100-CV, 14-06-00102-CV, 2007 WL
2034913 (Tx.App—Houston [14th Dist. July 17, 2007, review denied)
(mem. op.)........................................................................................................ Tab 43

In re Leon, No. 14-13-01134-CV 2014 WL 953491 (Tex.App.—Houston
[14th Dist.] March 11, 2014, no pet.) (original proceeding)........................ Tab 44

In re Smith, No. 05–09–00913–CV, 2010 WL 4324434 (Tex. App—Dallas
Nov. 3, 2010, orig. proceeding, no pet.) (mem. op.).................................... Tab 45

In the Matter of J.B.K., 931 S.W.2d 581 (Tex.App.—El Paso 1996, no pet.) Tab 46

Jackson v. Fontaine's Clinics, Inc., 499 S.W.2d 87 (Tex. 1973).................... Tab 47

Manon v. Solis, 142 S.W.3d 390 (Tex.App—Houston [14th Dist. 2004,
review denied).................................................................................................. Tab 48

Parkway Hosp. Inc., v. Lee, 946 S.W.2d 580 (Tex.App.—Houston [14th
Dist.] 1997) (reversed on other grounds)...................................................... Tab 49

Pearland Capital Group, LP v. Horizon United Group International et al, No.
01-11-00324-CV 2011 WL 4611533 (Tex.App.—Houston [1st Dist.]
September 30, 2011, no pet.) (mem. op.)...................................................... Tab 50

Poland et al v. Grigoer et al, 249 S.W.3d 607 (Tex.—App. Houston [1st. Dist.] 2008) ............................................................................................ Tab 51

Riggins v. Hill et al, 461 S.W.3d 577 (Tex.App.—Houston [14th Dist.] 2014, pet. denied) ..................................................................................... Tab 52

Robinson v. Alief I.S.D., 298 S.W.3d 321 (Tex.App.–Houston [14th Dist.] 2009, pet. denied) ................................................................................... Tab 53

Scurlock Permian Corp. v. Brazos County et al, 869 S.W.2d 478 (Tex.App.—Houston [1st Dist.] 1993, writ denied) ................................ Tab 54

Simon v. York Crane & Rigging, Co., Inc., 739 S.W.2d 793 (Tex. 1987) ..... Tab 55

Sw. Constr. Receivables, Ltd. v. Regions Bank, 162 S.W.3d 859 (Tex.App.—Texarkana 2005, pet. denied) ................................................ Tab 56

Texas Dept. of Transp. v. Able et al, 35 S.W.3d 608 (Tex. 2000) ................. Tab 57

Thompson v. Ricardo, 269 S.W.3d 100 (Tex.App.–Houston [14th Dist.] 2008, no pet.) ...................................................................................... Tab 58

Till v. Thomas, 10 S.W.3d 730 (Tex.App.-Houston [1st Dist.] 1999, no pet.) Tab 59

Trimble v. Texas Department of Protective and Regulatory Services, 981 S.W.2d 211 (Tex.App—Houston [14th Dist.] 1998, no pet.) ..................... Tab 60

Warth v. Seldin, 422 U.S. 490 (1975) ............................................................. Tab 61

Weaver v. Sw. Nat'l Bank, 813 S.W.2d 481 (Tex. 1991). ............................. Tab 62

Whatley v. Walker, 302 S.W.3d 314 (Tex.—App.Houston [14th Dist.] 2009 pet. denied) .............................................................................................. Tab 63

Zipp v. Wuemling, 218 S.W.3d 71 (Tex. 2007, per curiam) .......................... Tab 64

**Other Authorities**

Op. Tex. Att'y Gen. No. H-410 (1974) ........................................................... Tab 65

CAUSE NUMBER PR-74571

| IN THE GUARDIANSHIP OF | § | IN THE PROBATE COURT |
| | § | |
| LONNIE PHILLIPS, JR., | § | GALVESTON |
| | § | |
| AN INCAPACITATED PERSON | § | GALVESTON COUNTY, TEXAS |

## APPLICATION FOR APPOINTMENT OF
## TEMPORARY GUARDIAN OF THE PERSON AND ESTATE
## PENDING CONTEST

**TO THE HONORABLE JUDGE OF SAID COURT:**

**NOW COMES**, M. Brandon Maggiore, Guardian Ad Litem, ("Applicant"), and makes and files this Application for Appointment of Temporary Guardian of the Person and Estate of Lonnie Phillips, Jr., an Adult, ("Proposed Ward") Pending Contest pursuant to Sec. 1251.051, Tex. Est. Code. Applicant is not related to the Proposed Ward. Applicant's address is 1001 Texas Avenue, Suite 1400, Houston, Harris County, Texas. Applicant would respectfully show the Court the following:

I.

The Proposed Ward is a male who is 87 years old, having been born on July 25, 1926. The Proposed Ward currently resides at 2800 East League City Parkway, #720, Texas City, Galveston County, Texas.

II.

There is an imminent danger that the Proposed Ward's physical well-being may be

impaired and Proposed Ward's estate may be wasted because Proposed Ward is unable to make reasonable, informed decisions concerning his health or his estate and litigation involving the Proposed Ward has been instituted without a Guardian being appointed to represent his legal and interests.

III.

A necessity exists for the appointment of a Temporary Guardian of the Person and Estate of Proposed Ward pending the contest of the Application for Appointment of a Permanent Guardian. Applicant requests that the Court appoint a Temporary Guardian of the Person, if it is needed, and a Temporary Guardian of the Estate of Proposed Ward, which Estate is valued at approximately $60,000.00, including any compensation, pension, insurance, or allowance to which the Proposed Ward may be entitled.

IV.

Applicant states to the Court that the dangers to the Person and Estate of the Proposed Ward which require immediate action include the immediate danger posed to the Proposed Ward's legal and pecuniary interests, which legal and financial matter's may place him in danger of loosing his current residence. The facts necessitating the guardianship are set out in further detail in Section VIII below.

//

V.

Applicant states that Lance Ervin Phillips, whose address is 2813 Moore Avenue, Bay City, Texas, holds a general power of attorney signed by the Proposed Ward, which Power of Attorney is attached as "Exhibit A."

VI.

Applicant requests that the powers granted Lance Ervin Phillips under the power of attorney be terminated on the qualification of the temporary guardian.

VII.

Applicant requests that if the Court appoints a Temporary Guardian, it grant him or her the powers and authority to represent the Proposed Ward's interests in any pending litigation; to initiate additional litigation if necessary to recovery the Proposed Ward's assets or to protect his assets, property, or well being; to review and any and all documents from his prior attorney for the last five years and for any time period for estate or incapacity planning documents; the right to retain litigation counsel if necessary to adequately act on any of the foregoing requested powers; the right to collect all the Ward's assets and property, both real and personal, wherever situated and by whomsoever held, including to become the payee for any pension, retirement, Social Security, or other income, retirement, or public benefit; to order any workmen or repair work being done to the Proposed Ward's residence either cease or continue; and to make monthly expenditures on the Ward's behalf from the Ward's Estate not to exceed an amount set by the Court.

//

VIII.

Applicant states to the Court that the facts and reasons which support the requested powers are The Proposed Ward's estate is in imminent danger of irreparable damage due to his lack of proper representation in the pending lawsuit against Paul Davis Restoration, 405th Judicial District Court, Galveston County Cause Number 14-CV-0027. In this cause, here is a discrepancy whether the Petitioners are acting pro se or are represented by Ms. Davis: The pleading states it was filed by two children of the Proposed Ward, Ava Phillips and Kevin Campbell, in an individual capacity and as next friend of the Proposed Ward. This Petition was drafted by Ms. Veronica Davis, signed for the Petitioners "with permission," but the Petition itself lists the Petitioner's as "pro se." The District clerk, however, lists Ms. Veronica Davis as lead Counsel and Ms. Davis signed the request for service of citation. This litigation was filed after the guardianship proceeding was initiated in this court.

Moreover, The Proposed Ward's assets are being spent by family members and Ms. Veronica Davis for repairs and materials, ostensibly for the repair of his home which was damaged by fire without a proper person to oversee that the expediters actually benefit the Proposed Ward and/or his Estate and that such expenditures are in the best interest of the Proposed Ward.

IX.

Applicant prays that a hearing on this Application be set; that the Court appoint a proper person Temporary Guardian of the Person and Estate of Lonnie Phillips, Jr., an Incapacitated Adult; that the Court Order appointing Temporary Guardian be effective upon the guardian taking the Oath and giving a bond as required by law; that upon the Temporary Guardian's

qualification, the Clerk of this Court shall so note such qualification on any certified copy of said Order; that the Court appoint an Attorney Ad Litem to represent the Ward's Person and Estate, if not already appointed; and that the Court enter any other Orders it deems necessary.

Respectfully submitted,

MAGGIORE LAW FIRM PLLC
1001 Texas Avenue, Suite 1400
Houston, TX 77002

M. Brandon Maggiore
Guardian Ad Litem, Applicant
State Bar No.: 2408901
E-mail: brandon@maggiorelawfirm.com

FILED

2014 JAN 30 PM 2:54

COUNTY CLERK
GALVESTON COUNTY. TEXAS

STATE OF TEXAS                              §
                                           §
COUNTY OF HARRIS                           §


        **BEFORE ME,** the undersigned authority, on this day personally appeared M. Brandon Maggiore, Guardian Ad Litem, Applicant in the foregoing Application for Appointment of Temporary Guardian of the Person and Estate of Lonnie Phillips, Jr., an Adult, Pending Contest known to me to be the person whose name is subscribed to the above and foregoing Application and stated under oath that such Application contains a correct and complete statement of the facts and matters to which it relates and all the contents thereof are true, complete and correct to the best of Applicant's knowledge.


                                              _____

                                              M. Brandon Maggiore, Guardian Ad Litem, Applicant


        **SWORN AND SUBSCRIBED TO BEFORE ME** on this the 30 day of January, 2014.

                                        _____

                                        Notary Public, State of Texas

KARISSA BETH MENDENHALL
Notary Public, State of Texas
My Commission Expires
December 11, 2016


FILED

2014 JAN 30 PM 2:54

COUNTY CLERK
GALVESTON COUNTY. TEXAS


Phillips, Lonnie - Application for Temporary Guardian Pending Contest        Page 6 of 6

"EXHIBIT A"

FILED

2014 JAN 30  PM 2:54

*Dwight D. Sullivan*
COUNTY CLERK
GALVESTON COUNTY, TEXAS

2012041328

077430

# POWER OF ATTORNEY — GENERAL

__Lonnie Phillips Jr.__ (the "Grantor") hereby grants to __Lance Ervin Phillips__ (the "Agent") a general power of attorney. As the Grantor's attorney in fact, the Agent shall have full power and authority to undertake any and all acts which may be lawfully undertaken on behalf of the grantor including but not limited to the right to buy, sell, lease, mortgage, assign, rent or otherwise dispose of any real or personal property belonging to the Grantor; to execute, accept, undertake and perform contracts in the name of the Grantor; to deposit, endorse, or withdraw funds to or from any bank depository of the Grantor; to initiate, defend or settle legal actions on behalf of the Grantor; and to retain any accountant, attorney or other advisor deemed by the Agent to be necessary to protect the interests of the Grantor in relation to such powers.

By accepting this grant, the Agent agrees to act in a fiduciary capacity consistent with the reasonable best interests of the Grantor. This power of attorney may be revoked by the Grantor at any time; however, any person dealing with the Agent as attorney in fact may rely on this appointment until receipt of actual notice of termination.

IN WITNESS WHEREOF, the undersigned grantor has executed this power of attorney under seal of as of the date stated above.

_____ (Seal)
Grantor

STATE OF __Texas__
COUNTY OF __Matagorda__

I certify that ~~Lance E. Phillips~~ who ☐ is personally known to me to be the person whose name is subscribed to the foregoing instrument ☐ produced _____ as identification, personally appeared before me on _____, 20_07_, and acknowledged the execution of the foregoing instrument.



ROBERT L. GREEN
MY COMMISSION EXPIRES
November 28, 2008

_____
Notary Public, State of
Notary's commission expires: __11/28/08__

I hereby accept the foregoing appointment as attorney in fact on __May 8__, 20_07_.

_____ (__Lance Ervin Phillips__)
Attorney in fact

**A CERTIFIED COPY**
Janet Hickl, County Clerk
Matagorda County, Texas
Page __1__ of __2__

03500177011001
Year: 2007  No: 077430  Type: PA

# FILED

2007 SEP 21 PM 3: 17

*Gail Denn*

COUNTY CLERK
MATAGORDA COUNTY, TEXAS

I, Janet Hickl, County Clerk, Matagorda County, Texas,
do hereby certify that this is a true and correct copy
as the same appears of record in my office. Witness
my hand and Seal of Office on

SEP 2 6 2011

*Janet Hickl*, County Clerk

By *_____* Deputy

STATE OF TEXAS          COUNTY OF MATAGORDA
I hereby certify that this instrument was FILED in File Number
Sequence on the date and at the time stamped hereon by me
and was duly RECORDED in the OFFICIAL RECORDS of
Matagorda County, Texas on

SEP 21 2007

*Gail Denn*

COUNTY CLERK, Matagorda County, Texas

A CERTIFIED COPY
Janet Hickl, County Clerk
Matagorda County, Texas
Page ___ of ___

FILED
2014 JAN 30 PM 2: 54

*Dwight R. Sullivan*
COUNTY CLERK
GALVESTON COUNTY, TEXAS

LANCE Phillips
PO BOX 942
BAY City TX 77404-942

CAUSE NUMBER PR-74,571

| IN THE GUARDIANSHIP OF | § | IN THE PROBATE COURT |
| | § | |
| LONNIE PHILLIPS, JR. | § | OF |
| | § | |
| AN INCAPACITATED PERSON | § | GALVESTON COUNTY, TEXAS |

## CERTIFICATE OF SERVICE

I, Matthew Brandon Maggiore, certify that the foregoing instrument was served on each attorney of record or party in accordance with the Texas Rules of Civil Procedure on January 30, 2014 as follows:

_____
Matthew Brandon Maggiore
Guardian Ad Litem

Veronica L. Davis
Attorney for Applicant
Texas Bar No. 05557300
226 N. Mattson
West Columbia, Texas 77486
Telephone: (979) 345-2953
Facsimile: (979) 345-5461

FILED

2014 JAN 30 PM 2: 54

COUNTY CLERK
GALVESTON COUNTY, TEXAS

| IN THE GUARDIANSHIP OF | § | IN THE PROBATE COURT |
|---|---|---|
| | § | |
| LONNIE PHILLIPS, JR., | § | GALVESTON |
| | § | |
| AN INCAPACITATED PERSON | § | GALVESTON COUNTY, TEXAS |

## ORDER APPOINTING TEMPORARY GUARDIAN
## PENDING CONTEST

On this day came on to be considered the Application of M. Brandon Maggiore, Guardian Ad Litem, for the Appointment of a Temporary Guardian Pending Contest of the Person and Estate of Lonnie Phillips, Jr., An Incapacitated Person, whose presence was determined to be not necessary by the Court. The Court, after having been advised that a contest to the appointment of a Guardian has been filed, and after having considered said Application for the Appointment of a Temporary Guardian Pending Contest and the evidence submitted, finds there is clear and convincing evidence that an imminent danger exists making it necessary for the Court to appoint a Temporary Guardian, pending contest, pursuant to Section 1251.051 of the Texas Estates Code; that _Catherine N. Wylie_ is eligible to act as such Temporary Guardian pending contest; that said appointment is in the best interest of the Proposed Ward; that Lonnie Phillips, Jr., is An Incapacitated Person and his Person and Estate

require immediate care; that this Court has jurisdiction over the subject matter and over the parties herein.

NOTICE TO ANY PEACE OFFICER OF THE STATE OF TEXAS: YOU MAY USE REASONABLE EFFORTS TO ENFORCE THE RIGHT OF A GUARDIAN OF THE PERSON OF A WARD TO HAVE PHYSICAL POSSESSION OF THE WARD OR TO ESTABLISH THE WARD'S LEGAL DOMICILE AS SPECIFIED IN THIS ORDER. A PEACE OFFICER WHO RELIES ON THE TERMS OF A COURT ORDER AND THE OFFICER'S AGENCY ARE ENTITLED TO THE APPLICABLE IMMUNITY AGAINST ANY CIVIL OR OTHER CLAIM REGARDING THE OFFICER'S GOOD FAITH ACTS PERFORMED IN THE SCOPE OF THE OFFICER'S DUTIES IN ENFORCING THE TERMS OF THIS ORDER THAT RELATE TO THE ABOVE-MENTIONED RIGHTS OF THE COURT-APPOINTED GUARDIAN OF THE PERSON OF THE WARD. ANY PERSON WHO KNOWINGLY PRESENTS FOR ENFORCEMENT AN ORDER THAT IS INVALID OR NO LONGER IN EFFECT COMMITS AN OFFENSE THAT MAY BE PUNISHABLE BY CONFINEMENT IN JAIL FOR AS LONG AS TWO YEARS AND A FINE OF AS MUCH AS $10,000.

**IT IS THEREFORE ORDERED**, that _Catherine N. Wylie_, whose address is _2211 Norfolk St. Ste 440, Houston, TX 77098_ and whose telephone number is _713 275. 8230_ is appointed Temporary Guardian of the Person and Estate of Lonnie Phillips, Jr., An Incapacitated Person, pending the trial on

the contest of appointment of a Guardian.

**IT IS FURTHER ORDERED**, that the Clerk shall attach a certificate to this Order showing compliance upon the Guardian taking her Oath and giving a bond in the sum of $ 13,000 , which is the proper sum hereby Ordered fixed in accordance with the requirements of law.

**IT IS FURTHER ORDERED**, by the Court that the Temporary Guardianship shall be enforced for a period of sixty (60) days from the date of original Application for Appointment of a Temporary Guardian Pending Contest, in accordance with Section 1251.151 of the Texas Estates Code, or at the conclusion of a trial on the contest, in accordance with Section 1251.051 of the Texas Estates Code, whichever is later.

**IT IS FURTHER ORDERED**, that the Temporary Guardian of the Person and Estate of Lonnie Phillips, Jr., An Incapacitated Person, shall have the powers and authority to represent the Proposed Ward's interests in any pending litigation; to initiate additional litigation if necessary to recovery the Proposed Ward's assets or to protect his assets, property, or well being; to obtain any and all documents from his prior attorney for the last five years and for any time period for estate or incapacity planning documents; the right to retain litigation counsel if necessary to exercise any of the foregoing powers.

**IT IS FURTHER ORDERED**, that the Temporary Guardian of the Person and Estate of Lonnie Phillips, Jr., An Incapacitated Person, shall have the right to collect all

the Ward's assets and property, both real and personal, wherever situated and by whomsoever held, including to become the payee for any pension, retirement, Social Security, or other income, retirement, or public benefit.

IT IS FURTHER ORDERED, that the Temporary Guardian of the Person and Estate of Lonnie Phillips, Jr., An Incapacitated Person, shall have the right to order any workmen or repairs being done on the Ward's property or on the Ward's behalf either cease or continue work.

IT IS FURTHER ORDERED, that the Temporary Guardian of the Person and Estate of Lonnie Phillips, Jr., An Incapacitated Person, is permitted to make monthly expenditures on the Ward's behalf from the Ward's Estate not to exceed $_____.

IT IS FURTHER ORDERED, that the Temporary Guardian shall not change the Ward's residence without first obtaining Court approval except to mitigate an immediate danger to the Ward's health, safety, or well being.

IT IS FURTHER ORDERED, that the powers granted under the Power of Attorney held by Lance Ervin Phillips be ~~terminated.~~ suspended until further notice from the Court. KS

SIGNED this 30th day of January, 2014.

Kimberly Sullivan
JUDGE PRESIDING

APPROVED: _____

M. Brandon Maggiore
Guardian Ad Litem

FILED

14 JAN 30 PM 3:43

GALVESTON TEXAS

PHILLIPS, LONNIE - ORDER APPOINTING GUARDIAN PENDING CONTEST    PAGE 4 OF 4

*Probate Court*

*of*

*Galveston County, Texas*

---

### Standards for Court Approval of Attorney Fee Petitions
Effective March 13, 2014

---

The Probate Court of Galveston County is committed to maintaining and improving the image of the legal profession. Enforcing reasonable fees is one way the Galveston County Probate Court can accomplish this goal. Exercise good ethical and moral responsibility, common sense, and professionalism in your billing. These standards are not absolute rules; the Court will make exceptions in particular circumstances as fairness and justice demand. In formulating and revision these standards, the Court has given consideration to the Texas Estates Code, the Texas Rules of Disciplinary Procedure, and applicable case law.[i]

## I. Attorney's Fees

It is the Courts' duty to ensure that estates of decedents and wards pay only for "reasonable and necessary" attorney's fees and expenses. *See* Estates Code §352.051 (decedent's estates) and §1155.054 (guardianship estates).[ii]

### A. Court-Approved Fees for a Fiduciary's Attorney

Below is a table setting forth what the Courts believe are appropriate rates for Court appointed fiduciaries' attorney's fees.[iii] This fee schedule does not apply to court appointed counsel for indigent parties (*see* paragraph 1.B.1 herein).

| Years of Practicing Probate And Guardianship Law | Court Approved Rate |
|---|---|
| 0 – 2 years | Up to $165/hour |
| 3 – 5 years | $165 - $195/hour |
| 6 – 10 years | $195 - $250/hour |
| 11 + years | $250 - $350/hour |

In determining how lawyers will be paid within the practice categories above, the Court will consider the extent of the lawyer's experience in the area of law involved as well as Board Certification in Probate and Estate Planning. In the 11+ category, the Court will pay the highest rate to those few lawyers whose experience and mastery of probate, estate planning, and guardianship law qualify them as experts in these areas.

---

### B. Attorney Ad Litem and Guardian Ad Litem Fees

Formulating standards for the compensation of reasonable attorney's fees for an attorney ad litem or guardian ad litem is challenging not only because of the variety of factors set forth in Rule 1.04 of the Texas Rules of Professional Conduct, but also because of certain factors over which the Court has limited control.

1. **Court Appointed Counsel for Indigent Parties.** The Court must heed Galveston County budgetary considerations. If an estate is unavailable or unable to pay fees, the Court approves fees under a budget approved and overseen by the Commissioners Court. Thus, attorneys who accept Court appointments in probate and guardianship cases with an indigent party should not expect to be reimbursed at their regular hourly rates because the Court's annual budget limits the amount it can pay for such services. Ordinarily, the Court compensates attorneys ad litem and guardians ad litem involved in county-pay cases at an hour rate of $75. If an attorney is willing to perform the duties of an attorney ad litem pro bono, he or she should notify the Court of that willingness.

2. **Court Appointed Counsel Involving A Solvent Estate.** The Courts award of reasonable attorney fees usually begins with the Court determining if the representation provided by, and reasonably required of, the ad litem is "typical' or "normal." In a "typical" or "normal" case, the Court ordinarily awards total fees of $300 to $750 to an attorney ad litem.[iv]

3. **Compensation Regarding a Deceased Ward.** In those rare instances wherein a proposed ward dies before a guardianship estate is established, but an ad litem appointment has been made, the Court normally would not expect a fee application to be made.

### C. Fees when an Attorney is also the Fiduciary

In those rare situations in which a Court appoints an attorney as a fiduciary in a guardianship or an administration, the attorney normally must elect either to seek payment calculated on the statutory probate or guardianship commission formula or to obtain reimbursement for attorney's fees. If the guardianship or administration is particularly complex, the Court may approve dual compensation upon request of the attorney, preferably at the time of appointment. Dual compensation would include payment at the appropriate hourly rate for legal work done in the case a separate commission for work done as personal representative or as a guardian under §352 *et. seq.* or §1155 *et. seq.* of the Estates Code, respectively. To be entitled to dual compensation, the attorney fiduciary must adhere to the following guidelines;

1. **Full disclosure.** There must be full disclosure of the attorney-fiduciary's request for dual compensation at the time of appointment or upon motion and hearing if the request for dual compensation is made after appointment. If the request is after the time of appointment, notice of the motion and hearing shall be given to all interested parties who have made an appearance in the case.

2. **Keep Records and Separate Legal and Non-Legal Work.** The attorney-fiduciary must keep meticulous time and expense records, carefully segregating legal and non-legal work. The attorney work should be submitted periodically just as an attorney would if representing a client. The non-legal work should be reflected on the regular bills for legal work, without a dollar extension, and with the notation

"PRC" for "Personal Representative Compensation." An example invoice is attached as Appendix A.

3. **Compensation for Legal and Non-Legal Services.** Under Texas law, an attorney-fiduciary must seek only fiduciary compensation for guardian or personal representative services and may seek attorney's fees only for legal services. Applications for attorney's fees should give a detailed account of the legal services he or she rendered to the probate or guardianship estate. Attorney-fiduciaries will not be paid attorney's fees for fiduciary services. Should the attorney believe that the statutory compensation formula as applied to a particular estate or guardianship is unreasonable low (*see* Estates Code §352 *et. seq.* and §1155 *et. seq.*), then he or she should submit, with the annual or final account, the total personal representative compensation time reported or contemporaneous time records of the fiduciary services for which additional hourly compensation is requested above the statutory fee. Note that the hourly fee approved by the court for attorney-fiduciary services (between $45-100 per hour) is significantly less that the Court approved legal rates for attorneys. If an attorney-fiduciary is submitting an application for higher compensation because the statutory compensation formula is unreasonably low, this must be set for a hearing with the Court.

4. **Quarterly Fiduciary Compensation.** Should the attorney-fiduciary find it a hardship to wait for the compensation as a fiduciary, a fee may be paid on a quarterly basis. The Court must find that a hardship exists for the attorney-fiduciary to be paid quarterly.

## II. Paralegal/Legal Assistant Charges

The Courts will reimburse an attorney for paralegal/legal assistant work at a rate between $45 and $100 depending upon the experience of the paralegal.[v] The Court does not pay for secretarial services at the paralegal rate even if such services are performed by paralegals. It is the Court's position that secretarial services are included in the attorney's overhead, for which an attorney is reimbursed at his or her hourly rate.

## III. Billing in Ongoing Guardianship and Estate Matters

Please observe the following guidelines when preparing fee applications.

### A. Form of Fee applications

1. **Period of Accounting.** Indicate the period covered by the application in the title or prominently in the body.

2. **Include Total Accumulated Fees.** Each application for fees should contain a statement indicating the total amount of attorney fees and expenses approved since the inception of the guardianship or estate administration.

3. **Include Affidavit.** Attach an affidavit by the applicant attorney swearing to the reasonableness of the fees and the necessity of the services and indicating the number of years he or she has practiced probate and guardianship law.

4. **Signature of Client.** The fiduciary who hired the attorney should sign the application.

5. **Fees Sought Should not be Preprinted on Order.** Attach an Order approving the fees containing a blank for the fees, expenses, and total amount, so the Judge may fill in the approved amounts.

B. *Invoice Accompanying Fee Application*

1. **Avoid Block Billing.** Itemize all unrelated activities separately, with their respective times and amount. Do not block bill for unrelated activities. Block billing is a practice whereby time entries contain several unrelated items with a single cumulative time and amount, rather than complete itemization.

2. **Include Descriptions.** Describe the topic or purpose for each telephone or office conference.

3. **Include Legend.** If it is not clear from the invoice for whom time is being billed, please include a Legend to indicate the name of the timekeeper, initials of the timekeeper, whether the timekeeper is an attorney or paralegal, and the years of probate experience of the timekeeper.

4. **Include all Time.** Include all the time you have spent on the file, even that time for which you are not charging, and indicate such fact with the following notations: "NO CHARGE" or "N/C."

5. **Justify Extraordinary Efforts.** If you believe that the time you have spent on an activity may be perceived as excessive, include a statement in brackets at the end of the entry as to why such extraordinary time was justified.

6. **Travel.** The Court does not reimburse for an attorney's or staff member's travel mileage or expenses inside Galveston County. Travel outside the county must be approved by the Court prior to travel/departure.

7. **Research.** The Court will only reimburse attorneys for costs associated with necessary and reasonable legal research conducted to address novel legal questions or to respond to legal issues posed by the Court or opposing counsel.[vi]

8. **Preparation of Fee Petitions.** The Court will not reimburse attorneys for the costs of preparing invoices and the standardized fee applications and orders that accompany them.[vii]

9. **Conversation with court Staff.** It is not appropriate to charge an estate for the time the Court spends providing the personal representative's attorney with assistance. Nor will the Court reimburse attorneys for time spent in discussions with an auditor aimed at correcting deficiencies in the client's accountings. Of course, if a member of the Court's staff requests an attorney provide information not ordinarily contained in properly drafted pleadings, the Court will reimburse the attorney for the time spent responding to that request. Or, if the fee petition reveals special circumstances requiring the attorney to seek guidance from the Court, the Court will award attorney's fees. For example, the Court will reimburse attorneys for communication with the Court regarding the need for corrective action when a guardian, administrator, or an attorney dies during an ongoing estate. In addition, the Court

will not reimburse attorneys from probate and guardianship estates for calls to the Clerk's office. [viii]

10. **Copies and Faxes.** The Court will reimburse attorneys up to $.15 per page for copies. Copies made by the Clerk's office will be reimbursed at the rate charged by the Clerk. The Court will not pay for facsimile transmissions. It will however, pay the long-distance charges associated with long-distance faxes in the same manner it reimburses long-distance phone calls.

11. **Deliveries.** In situations in which the Court deems hand delivery to be appropriate given the circumstances stated in the fee petition, the Court will approve the actual cost of hand delivery up to $25, regardless of whether an attorney, paralegal, secretary, or commercial courier service actually delivered the document.

12. **Costs Necessitated by Misfeasance or Malfeasance.** Estates should not be charged with any attorney time or mileage for resolving problems or attending hearings necessitated by the misfeasance or the malfeasance of the client or attorney. For instance, if a personal representative sells property without Court approval and there are attendant costs associated with rectifying the situation, the personal representative should be personally responsible for any added expense. Likewise, show-cause hearings fall within this exception, and the attorney or the client will be responsible for all costs associated with attendance at the hearing, including service and filing fees assessed by the Clerk.

13. **Itemized Invoice Should Accompany Fee Application.** Any time an attorney is making application for his or her fees to the Court, an invoice itemizing the time and expenses is required, even when the estate is solvent and the fee amount is agreed upon by all parties. However, when an attorney ad litem is appointed by the Court in an heirship or guardianship matter and the attorney ad litem's fee is agreed upon and totals less than $1000, an invoice is not required.

## IV. Court Action of Fee Applications

### A. When Hearing on Fee Application is Required

The Court holds all attorney-fee applications for 10 days to give other parties an opportunity to file objections to those applications. If no objections are filed, the Court will consider the applications on submission and without a hearing, unless the amount of fees requested is significant or the Court has questions about the propriety or reasonableness of the fees. In such cases, the Court will request that the application be set for hearing. As explained in Paragraphs I.C.1 and I.C.3 herein, a hearing is required if an attorney-fiduciary is seeking dual compensation after appointment or more than the statutory formula for compensation as a fiduciary.

### B. Hearing Required if Fee Request Filed as Claim

Fee Requests should be filed as applications for payment of fees or for reimbursement of fees (if paid already by the representative) and not as claims against the estate. If the representative chooses to disregard the Court's policy and files the fee application as a claim, the Court will in every case require a hearing under Estates Code §355.056 and §1157.056.

Signed this 13th day of March, 2014 and effective as of such date.

*Kimberly Sullivan*
Judge Kimberly Sullivan

## *End Notes*

<sup>i</sup> The Probate Court of Galveston County has promulgated guidelines concerning attorney fees for this respective Court. These guidelines essentially mirrored one another with some exceptions. The Probate Court has now formulated the following standards to assist attorneys with drafting fee petitions in probate and guardianship cases. By understanding how the Court evaluates fee petitions, attorneys will be better able to comply with Court standards, reducing the need for consultations between attorneys and Court personnel regarding problems with specific petitions.

<sup>ii</sup> The factors to be considered in determining the reasonableness of attorney's fees are set forth in Rule 1.04 of the Texas Rules of Professional Conduct. These include the time and labor involved in the case, the difficulty or novelty of the work performed, the customary hourly rate of the attorney requesting the approval of fees, and the customary hourly rates of attorneys with similar education and skills performing similar services.

<sup>iii</sup> Attorneys should be aware, however, that the Court may depart from these rates in certain circumstances. For example, a particularly difficult probate or guardianship matter may require special expertise that should be compensated at a rate higher than the attorney's standard rate under the Courts" guidelines. Similarly, the Court will adjust an attorney's rate in situations in which the estate is so small that the requested fee would consume most of the estate. Moreover, the Court will reduce an attorney's fee when the time expended by the attorney on a particular matter far exceeds the amount normally expended by attorneys on similar matters or, in those rare instances, when it comes to the Courts attention that a lawyer is not performing up to the standards of those licensed for an equivalent length of time. Be advised that it is a particular lawyer's experience in probate and guardianship law that determines his or her rate, not the number of years that the lawyer has been licensed.

<sup>iv</sup> In determining whether representation is "typical" or "normal," the Court considers matters such as the type of case, the complexity or potential complexity of the case in terms of the number of parties and issues involved, and any unusual circumstances. These factors determine the extent to which the fee allowed should be more than, equal to, or less than the typical or normal fee. In general, attorneys ad litem and guardians ad litem should expect to receive a fee that is less than the fee of the applicant's attorney unless special factors are present.

<sup>v</sup> In determining the appropriate billing rate for a paralegal, the Court considers the following factors: 1) certification as a paralegal by the NALA, or recognition as a PACE-Registered Paralegal, or successful completion of a legal assistant program or possession of a post-secondary degree (Associates degree or higher); 2) number of years experience in the probate, estate planning, and guardianship field; 3) certification in Estate Planning and Probate Law from the Texas Board of Legal Specialization; and 4) number on continuing legal education courses in probate, guardianship, and estate planning attended in the past three years.

<sup>vi</sup> The Courts expect attorneys who practice in Probate Court to be familiar with general probate and guardianship matters; therefore, the Court will not reimburse attorneys for basic legal research in these areas. The Court considers the contract costs of computerized legal research (such as Westlaw and

Lexis) to be part of an attorney's overhead, as are the costs of a hard-copy library. Consequently, the Court does not reimburse for those costs.

vii It is the general practice of attorneys to include in their overhead the cost of generating and reviewing billing invoices and of drafting and mailing the cover letters that accompany the invoices. Even though the Court is cognizant that Court authority must be obtained for the approval of fee petitions in certain circumstances, the Court believes that the estate of a decedent or ward should not be taxed with the attorney's billing costs.

viii The Courts staff is a vital source of information and assistance to the legal community. The Court attempts to answer questions and to provide guidance where appropriate. However, please attempt to resolve estate issues with your client, i.e. the personal representative, to minimize or obviate unnecessary use of court personnel. Likewise, the Court understands you may have questions for the Clerk's office, however, the Court does not believe that estates should be required to pay for the attorney's time spent addressing these situations. Moreover, the Court urges adherence to the common practice of attaching to all applications a copy of the proposed order and a self-addressed, stamped envelope. This step, coupled with payment of the correct filing and posting fee, if required, will help ensure that attorneys receive conformed copies of all proposed orders and will reduce the necessity for calls to the Clerk's office to check on the status of a particular order. Alternatively, the attorney can check the Probate Court records on the County Clerk's website at www.co.galveston.tx.us

FILED

2015 AUG 25 AM 8: 52

*Dwight R. Sullivan*
COUNTY CLERK
GALVESTON COUNTY, TEXAS

CAUSE NUMBER PR-74571

| IN THE GUARDIANSHIP OF | § | IN THE PROBATE COURT |
| | § | |
| LONNIE PHILLIPS, JR., | § | GALVESTON |
| | § | |
| AN INCAPACITATED PERSON | § | GALVESTON COUNTY, TEXAS |

## ORDER AUTHORIZING APPOINTEE FEES

On this the 9th day of December, 2014, the Application to Pay Attorney's Fees filed by Matthew Brandon Maggiore, Guardian Ad Litem, was considered by this Court and the Court finds that such attorney's fees and expenses are reasonable and just; that such fees were necessarily incurred in representing LONNIE PHILLIPS, JR. in this cause; that the said fees and expenses should be paid; and that such Application should be granted.

IT IS THEREFORE ORDERED that Matthew Brandon Maggiore, the Maggiore Law Firm, P.L.L.C., shall be paid legal fees in the amount of $5,346.00 and expenses in the amount of $13.59, for a total amount of $5,359.59 for the services and expenses of Matthew Brandon Maggiore, Guardian Ad Litem, for the time period of October 30th, 2013 through his discharge on October 3, 2014 by:

____X____ the Guardian of the Estate of LONNIE PHILLIPS, JR.

_____ Galveston County Treasurer out of county funds.

SIGNED this 9th day of December, 2014.

_____Kimberly Sullivan_____
JUDGE PRESIDING

mc

Approved as to form:

_____
M. Brandon Maggiore

FILED

'14 DEC 10 AM 9: 43

_Dwight D. Sullivan_
COUNTY CLERK
GALVESTON COUNTY, TEXAS

PHILLIPS_LONNIE _ ORDER TO PAY APPOINTEE FEES TO MLF

Page 129

| IN THE GUARDIANSHIP OF | § | IN THE PROBATE COURT OF |
|---|---|---|
| | § | |
| LONNIE PHILLIPS, JR., | § | |
| | § | |
| AN INCAPACITATED PERSON | § | GALVESTON COUNTY, TEXAS |

## ORDER APPOINTING GUARDIAN AD LITEM

On this date, the court became aware of the necessity for the court to appoint a Guardian Ad Litem to represent the best interest of **LONNIE PHILLIPS, JR.**.

It is therefore ORDERED that,

> Matthew Brandon Maggiore
> Maggiore Law Firm, PLLC
> 1001 Texas Avenue, Suite 1400
> Houston, TX 77002
> 713-239-3347 – Telephone
> 713-581-1894 – Facsimile
> **maggiore.law@gmail.com**

is hereby appointed pursuant to Section 645(a) of the Texas Probate Code, Guardian Ad Litem for **LONNIE PHILLIPS, JR.**to investigate the necessity of a guardianship and, if determined that one is needed, to prepare the guardians application and related matters for appointment of a Guardian of the Person of **LONNIE PHILLIPS, JR.**.

IT IS ORDERED that Matthew Brandon Maggiore, Guardian ad Litem, is to be given access to and shall review all of the Proposed Wards financial, medical psychological and intellectual testing records.

IT IS FURTHER ORDERED that Matthew Brandon Maggiore, the Guardian ad Litem is hereby authorized to discuss the Proposed Wards medical or psychological condition with any appropriate medical or health care personnel. This access is authorized by this Order, the Probate Code, and 45 CFR 164.512 (e) (1) (i), the Health Insurance Portability and Accountability Act (HIPAA), which authorizes covered entities to disclose protected health information in the course of any judicial or administrative proceeding when responding to an order of the Court.

Filed
3/28/2014 1:00:33 PM
Dwight D. Sullivan
County Clerk
Galveston County, Texas

NO. PR⁷⁴⁵⁷¹

| | | |
|---|---|---|
| IN THE MATTER OF THE | § | IN THE PROBATE COURT |
| GUARDIANSHIP OF | § | AT LAW NUMBER |
| LONNIE PHILLIPS, JR. | § | GALVESTON COUNTY, TEXAS |

## MOTION AND/OR NOTICE OF WITHDRAWAL OF APPLICATION FOR GUARDIANSHIP OF LONNIE PHILLIP, JR. AND APPLICATION TO CLOSE ESTATE

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, **KEVIN CAMPBELL** and **AVA PHILLIPS**, and withdraw the application for guardianship of Lonnie Phillips, Jr. And would show the court as follows:

**I.**

A guardianship is no longer necessary. The parties initially thought that a guardianship was necessary to resolve the issues pertaining to allocation of insurance and/or personal funds for the benefit of restoration of the home of Lonnie Phillips and how work should proceed on the home of Lonnie Phillips, Jr. The children of the proposed ward had a difference of opinion on how things should proceed.

Same is no longer at issue because the initial applicant has abandoned his desire to proceed as general contractor for the repair of the home which is a part of the proposed ward's estate. Moreover, work has proceeded on the house and all funds which were previously on hand for repair, remodel, and rebuild have either been spent or contracts are pending for. Upon completion of the remodel, no funds will remain.

**II.**

The parties did not request nor ever intended for a court to appoint a temporary guardian.

-1-

No basis existed for such an appointment. That action was requested by the guardian ad litem, after having assured the caretaker Ava Phillips that the parties would set a court date. Phillips finds the action to be contradictory to the intent of the parties and contrary to the statement A, attached and incorporated by reference, the same as if fully copied and set forth herein.

## III.

Applicant believes that the appointment of a guardian ad litem and attorney ad litem and temporary guardian would serve to delay the rebuilding, repair and restoration of the home and would divert funds from the repair process to pay the fees of ad litems, thereby making the home of Lonnie Phillips uninhabitable and would render the ward unable to return to his home. Moreover, having to seek approval of the ad litem to complete the work already begun would only delay said return. Funds currently on hand are insufficient to complete the restoration of the homestead of the ward. Therefore paying of ad litem fees to administer the estate would render completion of the home impossible. Attached as Exhibits A & B, are the positions of the application and caretaker for the ward, in connection therewith- same being attached and incorporated by reference, the same as if fully copied and set forth herein.

The applicant and caretaker had previously had concerns regarding whether to proceed with the guardianship and did not pay the additional fees, due to the concerns of moving forward with same.

## IV.

Applicant further believes that this guardianship was delayed for an inordinate amount of time when Davis attempted to work out a hearing date with the former ad litem. Instead of setting a date, he in turn sought the appointment of another ad litem. Now there appears to be

-2-

three- Maggiore, Drexlier, and Wylie. The Estate of Lonnie Phillips, Jr. does not warrant same.

The affidavits and/or statements of the applicant and caretaker for Lonnie Phillips,, Jr are attached manifesting their position regarding the withdrawal of this application.

## IV.

No property exists, but the homestead of the ward. A suit is currently pending for monies owed in connection with the fire which damaged the aforementioned home. Upon receipt of said funds, all such funds will be placed into home repair, as the funds currently on hand are insufficient to complete the restoration of same.

## V.

Because the family is fully capable of handling any remaining matters as it pertains to the rebuilding issues and costs in connection therewith, without court intervention, the application for appointment of a guardian is hereby withdrawn. Moreover, any issues regarding improper handling of the estate and control over repairs have been resolved and all issues pertaining thereto are now moot.

**WHEREFORE PREMISES CONSIDERED,** the applicant hereby withdraws its request for an application for the guardianship of Lonnie Phillips, Jr. and requests that this Honorable Court close this estate.

Respectfully submitted,

/s/ Veronica L. Davis

Veronica L. Davis
Attorney at Law
226 N. Mattson
West Columbia, Texas 77486
(979) 345-2953

-3-

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing Motion/Notice will be sent to Brandon Maggiore at 1001 Texas Avenue, Suite1400, Houston, Texas 77002 by certified mail or facsimile transmission (713) 581-1894; Dana Drexler 1010 Lamar, Suite 1450, Houston, Texas 77002 (713) 658-9408 (dvpdrexler@aol.cm and Catherine Wylie; 2211 Norfolrk, Suite 440, Houston, Texas 77098 (713) 275-8239 or email; on the 29th day of March, 2014.

/s/ Veronica L. Davis

_____

Veronica L. Davis

-4-

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing Motion/Notice will be sent to Brandon Maggiore at 1001 Texas Avenue, Suite1400, Houston, Texas 77002 by certified mail or facsimile transmission (713) 581-1894; Dana Drexler 1010 Lamar, Suite 1450, Houston, Texas 77002 (713) 658-9408 (dvpdrexler@aol.cm and Catherine Wylie; 2211 Norfolrk, Suite 440, Houston, Texas 77098 (713) 275-8239 or email; on the 27th day of March, 2014.

/s/ Veronica L. Davis

_____

Veronica L. Davis

-4-

## AMENDED CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing Motion to Withdraw will be sent to the following by certified mail, fax transmission, email, or efile notification on the 28th day of March, 2014:

Brandon Maggiore
1001 Texas Avenue, Suite 1400
Houston, Texas 77002
(713) 581-1894 (fax)

Dana Drexler
1010 Lamar, Suite 1450
Houston, Texas 77002
(713) 658-9408 (fax)
dvpdrexler@aol.com

Catherine Wylie
2211 Norfolk, Suite 1400
Houston, Texas 77098
(713) 275-8239 (Fax)

/s/ Veronica L. Davis

Veronica L. Davis

**EXHIBIT A**

3-11-2014

Veronica,

I know that Lisa faxed you an affidavit after meeting with the ad litem saying that she felt uncomfortable with going forward with the guardianship because she thought that it was too intrusive and that they might move Daddy.

When I got my copy of the affidavit, I know that she told me to put something in writing to withdraw the application. But I've been working a plant shut down and just have not gotten around to it.

Please make an application to the court on our behalf to withdraw the application. I see this as just a way for a people to get paid and use up the money set aside for getting Daddy back into the house.

Thanks,

Kevin

Kevin Campbell

**EXHIBIT B**

PB-74751

| IN THE GUARDIANSHIP OF | § | IN THE PROBATE COURT |
| LONNIE PHILLIPS, JR. | § | OF |
| AN INCAPACITATED PERSON | § | GALVESTON COUNTY, TEXAS |

On the 3rd day of February, 2014, came on before me a person made known to me to be Ava Phillips, who deposed on her oath and said:

"My name is Ava Phillips. I am over the age of eighteen years and am qualified to make this affidavit."

"I am the daughter of Lonnie Phillips, Jr. The proposed ward resides with me."

"On the 3rd day of Feburary, 2014, I was served with an Application for Appointment of Temporary Guardian of the Person and Estate Pending Contest."

" On Monday, January 27th, 2014, Ad Litem, came to my apartment to meet with my father, Lonnie Phillips, Jr. He also came one other time, probably one month earlier."

"I have the following concerns:

A)    During his first visit, he spent more time questioning me than checking on Dad. I felt very intimidated by the court investigator. Her demeanor was threatening and accusatory.

Therefore, on the second visit, I asked Ms. Davis to come. He spent more time concerning himself with finances, than my Dad. Of the 1 ½ hours that he spent there, probably only five- eight minutes was devoted to Dad.

B)    He was told that the guardianship was a means by which a checks and balance system would be used bu us to keep track of money spent and repairs made.

The money was turned over to attorney, Veronica L. Davis, by the

-1-



agreements of the three of us, prior to the guardianship for repairs. Repairs are being made. However, his application seems to suggest otherwise.

C)     Ms. Davis asked him for the second time for a date so that she could set a hearing on Kevin's application. During their conversation, she reminded him of what he said about an informal conference with the court first. He had not done so. He then told me that Dad was being well cared for and everything was fine and he would not try to have Lance appointed and he would recommend that Dad stay right where he was.

The very next day, I believe he must have filed this document.

D)     He asked Ms. Davis about the lawsuit against Paul Davis and this action. He seems to believe that we can not proceed pro se. Ms. Davis directly contradicted that and stated there was no statutory support for that, but she would represent my brother in the guardianship proceeding.

Again, his filing of this document seems contrary to what he said.

E)     He also mentioned that he spoke with the doctor. This document's statement of incapacity is self explanatory. Maybe he needed to verify that the doctor is who he says he is, however, he has also been provided with medical records.

It appears to me that a lot of this is busy work to inflate fees.

F)     He also said that he contacted Paul Davis about the lawsuit. I think that is outside the scope of what he is supposed to be doing. Kevin and I entered that contract and the breach occurred with us.

They did not accept service for a long time. I believe its because he advised them of the suit. I thought we might have to pay out more money for additional service. But they answered finally.

He has tried to question my brother about whether he signed it when it clearly says "by permission." His pleading indicates that Ms. Davis is counsel. Ms. Davis paid the filing fee on our behalf. It seems like he's trying to catch somebody in a lie and I don't like it.

-2-

If we weren't seeking to protect Dad's interests, we didn't need to file for the guardianship.

G) Our fourth amended Application shows that we have all signed in agreement that Kevin should be the guardian. He brought up an offense from when Kevin was eighteen years old. If that disqualifies Kevin, then the court is not taking into consideration the best interests of my Dad.

"We have waited on Brandon Maggiore to come back to have this hearing. It's been a month. Now Kevin is working a plant shut down and can't get off. So this last delay is not on us and I resent that it seems like it is our fault."

"If all funds and decisions are turned over to a third party, other than Kevin, we will never get back into the house. "

"If he is going to be allowed this much power to control every facet of our life, then we feel that the guardianship application should be withdrawn and we handle the matter in a fashion that is most expedient to getting back in the house."

"Frankly, I am confused by the pleadings. I am also confused by him saying one thing and doing another. I think he has taken more control than should be allowed to by law."

Further affiant sayeth not.

_A. J. Phillips_
Ava Phillips

SUBSCRIBED AND SWORN TO BEFORE ME A NOTARY PUBLIC, to certify my hand and seal of office on this the __3__ day of February, 20_14_ .

_Shanti Harper_
Notary Public in and for the State of Texas

__1-11-18__
My commission expires

ASHANTI HARPER
Notary Public, State of Texas
My Commission Expires
January 11, 2018

-3-

Filed
8/5/2015 2:06:02 PM
Dwight D. Sullivan
County Clerk
Galveston County, Texas

CAUSE NO. <u>PR-0074,571</u>

| | | |
|---|---|---|
| IN THE GUARDIANSHIP OF | § | IN THE PROBATE COURT |
| | § | |
| LONNIE PHILLIPS, JR., | § | OF |
| | § | |
| AN INCAPACITATED PERSON | § | GALVESTON COUNTY, TEXAS |

**APPLICATION FOR "AS IS" SALE OF REAL PROPERTY**
**UNDER SECTION 1158.451 OF THE ESTATES CODE**

**TO THE HONORABLE JUDGE OF SAID COURT:**

Catherine N. Wylie, Guardian of the Person and Estate of **LONNIE PHILLIPS, JR.,** an Incapacitated Person (the "Guardian" or the "Applicant") herein, furnishes the following information to the Court:

1. The Inventory, Appraisement and List of Claims of this Estate was filed on October 28, 2014, and approved by this Court on October 31, 2014.

2. A full legal description of the real properties sought to be sold and a description of the Estate's ownership interest in such property is as follows:

   a)      Address:      405 N. Fulton
                                     Texas City, Texas 77591
              Legal:         Abstract 2, Page 3, Lots 138 & 139
                                       Ollie Bell Subdivision

3. It is necessary and advisable to sell the Estate's interest in the aforementioned property for the following reasons:
   (a) The real property is currently vacant due to a fire which enabled the house to be inhabitable;
   (b) Family engaged a contractor to repair the home depositing approximately $33,000 of insurance funds with that contractor. Contractor performed no work, took the funds and has filed bankruptcy. The real property has been partially renovated but is not livable and the real property is subject to deterioration and vandalism as it is. The Guardian has filed claim in the bankruptcy court but it is unlikely that any proceeds will be returned;
   (c) There is approximately $60,000 (which includes funds for reimbursement of personal belongings) at Hartford Insurance;
   (d) Calvary Construction Co., has estimated the remaining repairs at a cost of $80,000 - $100,000;
   (e) The proceeds are needed to pay expenses of the Ward while in an assisted living facility. He is currently on Medicaid and all expenses for clothes, etc. has been paid for personally by the Guardian;

Application & Order for Sale of Real Property Under §1158.451 of the Estates Code
In the Guardianship of Lonnie Phillips, Jr.., an Incapacitated Person
Page 1 of 3

(f) Cost to complete renovation is more than the value of the real property;

(g) It is in the best interest of the Estate to sell the real property "As Is"; and

(h) Left vacant the real property poses a liability to the Estate.

3. It is the best interest of the Estate for the said property to be sold at a private sale for cash in as-is condition as the property is liable to perish, waste or deteriorate in value if left vacant and pose a liability to the Estate.

Applicant requests that <u>citation be issued</u> to all persons interested in the Estate, as required by law, and that, upon consideration or hearing on this Application, the Court enter an Order authorizing Guardian to sell the Estate's interest in the aforementioned property at a private sale "AS IS" and for cash, and such other orders as the Court may deem proper.

Respectfully submitted,

BY: _Catherine N. Wylie_

Catherine N. Wylie, Guardian of the Person and Estate of Lonnie Phillips, Jr., an Incapacitated Person

_Catherine N. Wylie_

Catherine N. Wylie
State Bar No. 24033479
The Wylie Law Firm
2211 Norfolk Street, Suite #440
Houston, Texas 77098
Telephone: 713-275-8230
Facsimile: 713-275-8239
Email: cwylie@wylielawfirm.com

Application & Order for Sale of Real Property Under §1158.451 of the Estates Code
In the Guardianship of Lonnie Phillips, Jr.., an Incapacitated Person
Page 2 of 3

Page 54

## VERIFIED EXHIBIT SHOWING CONDITION OF THE ESTATE

STATE OF TEXAS §
§
COUNTY OF GALVESTON §

BEFORE ME, the undersigned authority, on this day personally appeared **CATHERINE N. WYLIE**, Guardian of the Person and Estate, and after being duly sworn, stated that:

"I. **CATHERINE N. WYLIE** is the duly appointed and qualified Guardian of the Person and Estate of **LONNIE PHILLIPS, JR.**, an Incapacitated Person, and in support of the Application for Sale of Real Property, submits this exhibit to the Court to show fully and in detail the condition of the Estate:

"A. **Charges and Claims** - the following are all of the charges and claims against the Estate that have been approved or established by suit or have been rejected and may yet be established: None

"B. **Property Remaining on Hand** - The following is a full and complete list of all property owned by the Estate still remaining on hand and liable for the payment of the above charges and claims:

A. Address: 405 N. Fulton
Texas City, Texas 77591
Legal Desc: Abstract 2, Page 3, Lots 138 & 139
Ollie Bell Subdivision
Galveston County, Texas
100%
Interest: Per GCAD 2015 (Fully Repaired)
Value: $83,210.00

**TOTAL REAL PROPERTY BEING ADMINISTERED......$83,210.00**

**[Left Blank Intentionally]**

Exhibit A to Application for Sale of Real Property
In the Estate of Lonnie Phillips, Jr., Incapacitated Person
Page 1 of 3

Page 55

**CASH ON HAND**. The cash remaining on hand is deposited in the following account:

1)      Institution:          Frost Bank
           Account Type:      Checking
           Account No.        8417
           Value:              as of July 21, 2015        $15.00

**TOTAL CASH ACCOUNT…………………..$15.00**

**PERSONAL PROPERTY**. There is no personal property.

"**C.**    **List of Claims Owed to Estate** - The following claims are due or owing to the Estate: None

"**II.**    The sale sought in the foregoing Application For Sale of Real Property is necessary and advisable for the following reasons:

(a) The real property is currently vacant;
(b) The real property is subject to deterioration and vandalism while vacant and without use;
(c) The proceeds are needed to pay expenses of the ward while in an assisted living facility;
(d) The real property was damaged in a fire and is partially renovated, The Hartford Insurance Company is holding a check in the amount of $60,000.00 for the remaining repairs;
(e) Calvary Construction Co., has estimated the remaining repairs at a cost of $80,000-$100,000.00;
(f) Cost to complete renovation is more that the value of the real property;
(g) It is in the best interest of the Estate to sell the real property; and
(h) Left vacant the real property poses a liability to the Estate.

"I, **CATHERINE N. WYLIE**, Guardian of the Person and Estate of **LONNIE PHILLIPS, JR.**, an Incapacitated Person, do solemnly swear that the foregoing Verified Exhibit is a full and complete description of the condition of the property of this Estate."

Respectfully,

*Catherine N. Wylie*

Catherine N. Wylie, Guardian of the Persona and Estate of **LONNIE PHILLIPS, JR.**, an Incapacitated Person

Exhibit A to Application for Sale of Real Property
In the Estate of Lonnie Phillips, Jr., Incapacitated Person
Page 2 of 3

Page 56

STATE OF TEXAS          §
§
COUNTY OF GALVESTON     §

     **BEFORE ME**, the undersigned authority, on this day personally appeared **CATHERINE N. WYLIE**, the duly appointed, qualified, and acting Guardian of the Person and Estate of **LONNIE PHILLIPS, JR.**, an Incapacitated Person, and having been duly sworn, states that the foregoing Application for Sale of Real Property is true and correct in every respect.

     **SUBSCRIBED AND SWORN TO BEFORE ME BY CATHERINE N. WYLIE**, on this the _____4_____ day of ___August___, 2015, to certify which witness my hand and seal of office.

MELISSA GUEVARA
Notary Public, State of Texas
My Commission Expires
December 27, 2017

_____
Notary Public, State of Texas

Exhibit A to Application for Sale of Real Property
In the Estate of Lonnie Phillips, Jr., Incapacitated Person
Page 3 of 3

| | | |
|---|---|---|
| IN THE GUARDIANSHIP OF | § | IN THE PROBATE COURT |
| | § | |
| LONNIE PHILLIPS, JR., | § | OF |
| | § | |
| AN INCAPACITATED PERSON | § | GALVESTON COUNTY, TEXAS |

## <u>ORDER AUTHORIZING "AS IS" SALE OF REAL PROPERTY</u>

On this day the Court considered the *Application For "AS IS" Sale of Real Property Under Section 1158.451 of the Estates Code* (the "Applicant") filed by the Guardian of the Person and Estate of **LONNIE PHILLIPS, JR.,** an Incapacitated Person, was considered by the Court and after consideration of the evidence in support of the Application, the Court finds that citation has been issued and served as required by law; and after hearing the evidence in support of the Application, the Court finds that no additional bond shall be required at this time and that the real property sought to be sold in the Application should be sold at private sale, in as-is condition and without further delay because it is liable to perish, waste, deteriorate and/or cause liability to the Estate.

**IT IS THEREFORE ORDERED AND DECREED** that Catherine N. Wylie, Guardian of the Person and Estate of **LONNIE PHILLIPS, JR.,** an Incapacitated Person, shall sell the following described property, in as-is condition, promptly at a private sale for cash.

(a)　　Address:　　405 N. Fulton
　　　　　　　　　　Texas City, Texas 77591
　　　　Legal:　　　Abstract 2, Page 3, Lots 138 & 139
　　　　　　　　　　Ollie Bell Subdivision

SIGNED this the 27th day of *August*, 2015.

_____
**JUDGE PRESIDING**

**APPROVED AS TO FORM:**

*Catherine N. Wylie*
Catherine N. Wylie
State Bar No.: 24033479
The Wylie Law Firm
2211 Norfolk Street, Suite #440
Houston, Texas 77098
Telephone: 713-275-8230
Facsimile: 713-275-8239
Email: cwylie@wylielawfirm.com

Application & Order for Sale of Real Property Under § 1158.451 of the Estates Code
In the Guardianship of Lonnie Phillips, Jr.., an Incapacitated Person
Page 3 of 3

FILED
2015 AUG 28 AM 11: 16

COUNTY CLERK
GALVESTON COUNTY, TEXAS

CAUSE NO. <u>PR-0074571</u>

| | | |
|---|---|---|
| IN THE GUARDIANSHIP OF | § | IN THE PROBATE COURT |
| | § | |
| LONNIE PHILLIPS, JR., | § | OF |
| | § | |
| AN INCAPACITATED PERSON | § | GALVESTON COUNTY, TEXAS |

## MOTION FOR INSTRUCTION

TO THE HONORABLE JUDGE OF SAID COURT:

This Motion for Instruction is brought by Catherine N. Wylie, Guardian of the Person and Estate of Lonnie Phillips, Jr., an Incapacitated Person, (the "Movant") who requests the Court to grant an audience for clarification of instruction relating to a request made by Dr. Folasade Ojo, MD, CMD for the Guardian to execute a "Do Not Resuscitate" for Lonnie Phillips, Jr., (the "Ward").

1. Whereas Catherine N. Wylie was appointed by the Honorable Kimberly Sullivan on October 3, 2014 to serve as the Guardian of the Person and Estate for the Ward;

2. Ward was placed in Gulf Health Care Center in Texas City by his family prior to the guardianship.

3. Movant has been requested a couple of times to execute a "Do Not Resuscitate", (the "DNR") form on behalf of the Ward;

4. Dr. Ojo has formalized the request for the Guardian to execute the DNR and the original letter dated August 14, 2015 is attached hereto and made a part hereof as <u>Exhibit A</u>; and

5. Movant seeks instructions from this Court or authority from the Court to address the request from Dr. Ojo regarding the DNR.

THEREFORE, Movant prays that the Court enter an order setting a hearing whereupon such questions may be clarified or the DNR authorized for the Movant.

Respectfully submitted,

_Catherine N. Wylie_
Catherine N. Wylie
State Bar No.: 24033479
The Wylie Law Firm
2211 Norfolk Street, Suite #440
Houston, Texas 77098
Telephone: 713-275-8230
Facsimile: 713-275-8239
Email: cwylie@wylielawfirm.com
Guardian of the Person and Estate for
Lonnie Phillips, Jr., an Incapacitated Person

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this *Motion for Instruction* has been served upon the following parties by electronic filing on this 8th day of September 2015.

Ms. Veronica L. Davis                    Email: vld57aral@yahoo.com
Attorney at Law
226 N. Mattson
West Columbia, Texas 77486

Mr. Matthew Brandon Maggiore             Email: brandon@maggiorelawfirm.com
Maggiore Law Firm, PLLC
1001 Texas Avenue, Suite #1400
Houston, Texas 77002
Guardian Ad Litem

_Catherine N. Wylie_
Catherine N. Wylie

# Exhibit A


August 14, 2015

To Catherine Wylie:

RE: Lonnie Phillips

DOB: 05/03/1942

Mr. Lonnie Phillips DOB 07/25/15 has been under my care since 09/15/2015 when he was admitted to Gulf Health Care Center, Texas City.

He has moderate severe Dementia of Alzheimer's and now has difficulty swallowing. His Dementia is irreversible and prognosis at this point is poor. His is also not a good candidate for gastrostomy tube feeding. It would be beneficial for Mr. Phillips to be under palliative care with no aggressive treatment if he stops breathing or his heart stops. He should at this point, based on his moderately severe dementia be a DNR.

If you have any questions or concerns feel free to contact me at the address or telephone number above.

Yours sincerely,

Folasade Ojo, MD, CMD

CAUSE NO. <u>PR-0074,571</u>

| | | |
|---|---|---|
| IN THE GUARDIANSHIP OF | § | IN THE PROBATE COURT |
| | § | |
| LONNIE PHILLIPS, JR., | § | OF |
| | § | |
| AN INCAPACITATED PERSON | § | GALVESTON COUNTY, TEXAS |

### AMENDED APPLICATION FOR "AS IS" SALE OF REAL PROPERTY UNDER SECTION 1158.451 OF THE ESTATES CODE

**TO THE HONORABLE JUDGE OF SAID COURT:**

Catherine N. Wylie, Guardian of the Person and Estate of **LONNIE PHILLIPS, JR.,** an Incapacitated Person (the "Guardian" or the "Applicant") herein, furnishes the following information to the Court:

1. The Inventory, Appraisement and List of Claims of this Estate was filed on October 28, 2014, and approved by this Court on October 31, 2014.

2. A full legal description of the real properties sought to be sold and a description of the Estate's ownership interest in such property is as follows:

   a)      Address:      405 N. Fulton
   Texas City, Texas 77591
               Legal:         Abstract 2, Page 3, Lots 138 & 139
   Ollie Bell Subdivision

3. It is necessary and advisable to sell the Estate's interest in the aforementioned property for the following reasons:
   (a) The real property is currently vacant due to a fire which enabled the house to be inhabitable;
   (b) Family engaged a contractor to repair the home depositing approximately $33,000 of insurance funds with that contractor. Contractor performed no work, took the funds and has filed bankruptcy. The real property has been partially renovated but is not livable and the real property is subject to deterioration and vandalism as it is. The Guardian has filed claim in the bankruptcy court but it is unlikely that any proceeds will be returned;
   (c) There is approximately $60,000 (which includes funds for reimbursement of personal belongings) at Hartford Insurance;
   (d) Calvary Construction Co., has estimated the remaining repairs at a cost of $80,000 - $100,000;
   (e) The proceeds are needed to pay expenses of the Ward while in an assisted living facility. He is currently on Medicaid and all expenses for clothes, etc. has been paid for personally by the Guardian;

Amended Application & Order for Sale of Real Property Under §1158.451 of the Estates Code
In the Guardianship of Lonnie Phillips, Jr.., an Incapacitated Person
Page 1 of 3

(f) Cost to complete renovation is more than the value of the real property;

(g) It is in the best interest of the Estate to sell the real property "As Is"; and

(h) Left vacant the real property poses a liability to the Estate.

3.    It is the best interest of the Estate for the said property to be sold at a private sale for cash in as-is condition as the property is liable to perish, waste or deteriorate in value if left vacant and pose a liability to the Estate.

Applicant requests that <u>citation be issued</u> to all persons interested in the Estate, as required by law, and that, upon consideration or hearing on this Application, the Court enter an Order authorizing Guardian to sell the Estate's interest in the aforementioned property at a private sale "AS IS" and for cash, and such other orders as the Court may deem proper.

Respectfully submitted,

BY: _Catherine N. Wylie_____

Catherine N. Wylie, Guardian of the Person and Estate of
Lonnie Phillips, Jr., an Incapacitated Person
State Bar No. 24033479
The Wylie Law Firm
2211 Norfolk Street, Suite #440
Houston, Texas 77098
Telephone:  713-275-8230
Facsimile:  713-275-8239
Email:  cwylie@wylielawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this Amended Application for "As Is" Sale of Real Property has been served upon the following parties by electronic filing on this 21ˢᵗ day of September 2015.

Ms. Veronica L. Davis                    Email:  vld57aral@yahoo.com
Attorney at Law
226 N. Mattson
West Columbia, Texas 77486

Mr. Matthew Brandon Maggiore        Email:  Brandon@maggiorelawfirm.com
Maggiore Law Firm, PLLC
1001 Texas Avenue, Suite 1400
Houston, Texas 77002

Amended Application & Order for Sale of Real Property Under §1158.451 of the Estates Code
In the Guardianship of Lonnie Phillips, Jr.., an Incapacitated Person
Page 2 of 3

<u>**VERIFIED EXHIBIT SHOWING CONDITION OF THE ESTATE**</u>

STATE OF TEXAS §
§
COUNTY OF GALVESTON §

BEFORE ME, the undersigned authority, on this day personally appeared **CATHERINE N. WYLIE**, Guardian of the Person and Estate, and after being duly sworn, stated that:

"I.    **CATHERINE N. WYLIE** is the duly appointed and qualified Guardian of the Person and Estate of **LONNIE PHILLIPS, JR.**, an Incapacitated Person, and in support of the Application for Sale of Real Property, submits this exhibit to the Court to show fully and in detail the condition of the Estate:

"A.    **Charges and Claims** - the following are all of the charges and claims against the Estate that have been approved or established by suit or have been rejected and may yet be established: None

"B.    **Property Remaining on Hand** - The following is a full and complete list of all property owned by the Estate still remaining on hand and liable for the payment of the above charges and claims:

| | | |
|---|---|---|
| A. Address: | 405 N. Fulton | |
| | Texas City, Texas 77591 | |
| Legal Desc: | Abstract 2, Page 3, Lots 138 & 139 | |
| | Ollie Bell Subdivision | |
| | Galveston County, Texas | |
| | 100% | |
| Interest: | Per GCAD 2015 (Fully Repaired) | |
| Value: | | <u>$83,210.00</u> |

**TOTAL REAL PROPERTY BEING ADMINISTERED......$83,210.00**

**[Left Blank Intentionally]**

Exhibit A to Application for Sale of Real Property
In the Estate of Lonnie Phillips, Jr., Incapacitated Person
Page 1 of 3

Page 83

**CASH ON HAND**. The cash remaining on hand is deposited in the following account:

1) Institution: Frost Bank
   Account Type: Checking
   Account No. 8417
   Value: as of August 21, 2015 $52.69

**TOTAL CASH ACCOUNT.........................$52.69**

**PERSONAL PROPERTY**. There is no personal property.

"C. **List of Claims Owed to Estate** - The following claims are due or owing to the Estate: None

"II. The sale sought in the foregoing Application For Sale of Real Property is necessary and advisable for the following reasons:

(a) The real property is currently vacant;
(b) The real property is subject to deterioration and vandalism while vacant and without use;
(c) The proceeds are needed to pay expenses of the ward while in an assisted living facility;
(d) The real property was damaged in a fire and is partially renovated, The Hartford Insurance Company is holding a check in the amount of $60,000.00 for the remaining repairs;
(e) Calvary Construction Co., has estimated the remaining repairs at a cost of $80,000-$100,000.00;
(f) Cost to complete renovation is more that the value of the real property;
(g) It is in the best interest of the Estate to sell the real property; and
(h) Left vacant the real property poses a liability to the Estate.

"I, **CATHERINE N. WYLIE**, Guardian of the Person and Estate of **LONNIE PHILLIPS, JR.,** an Incapacitated Person, do solemnly swear that the foregoing Verified Exhibit is a full and complete description of the condition of the property of this Estate."

Respectfully,

_Catherine N. Wylie_

Catherine N. Wylie, Guardian of the Persona
and Estate of **LONNIE PHILLIPS, JR.,** an
Incapacitated Person

Exhibit A to Application for Sale of Real Property
In the Estate of Lonnie Phillips, Jr., Incapacitated Person
Page 2 of 3

STATE OF TEXAS §
§
COUNTY OF GALVESTON §

**BEFORE ME**, the undersigned authority, on this day personally appeared **CATHERINE N. WYLIE**, the duly appointed, qualified, and acting Guardian of the Person and Estate of **LONNIE PHILLIPS, JR.**, an Incapacitated Person, and having been duly sworn, states that the foregoing Application for Sale of Real Property is true and correct in every respect.

**SUBSCRIBED AND SWORN TO BEFORE ME BY CATHERINE N. WYLIE**, on this the ____21____ day of ____September____, 2015, to certify which witness my hand and seal of office.

MELISSA GUEVARA
Notary Public, State of Texas
My Commission Expires
December 27, 2017

_____
Notary Public, State of Texas

Exhibit A to Application for Sale of Real Property
In the Estate of Lonnie Phillips, Jr., Incapacitated Person
Page 3 of 3

Page 85

| IN THE GUARDIANSHIP OF | § | IN THE PROBATE COURT |
|---|---|---|
| | § | |
| **LONNIE PHILLIPS, JR.,** | § | OF |
| | § | |
| AN INCAPACITATED PERSON | § | GALVESTON COUNTY, TEXAS |

<u>ORDER ON AMENDED APPLICATION AUTHORIZING "AS IS" SALE OF REAL PROPERTY</u>

On this day the Court considered the *Application For "AS IS" Sale of Real Property Under Section 1158.451of the Estates Code* (the "Applicant") filed by the Guardian of the Person and Estate of **LONNIE PHILLIPS, JR.,** an Incapacitated Person, was considered by the Court and after consideration of the evidence in support of the Application, the Court finds that citation has been issued and served as required by law; and after hearing the evidence in support of the Application, the Court finds that no additional bond shall be required at this time and that the real property sought to be sold in the Application should be sold at private sale, in as-is condition and without further delay because it is liable to perish, waste, deteriorate and/or cause liability to the Estate.

**IT IS THEREFORE ORDERED AND DECREED** that Catherine N. Wylie, Guardian of the Person and Estate of **LONNIE PHILLIPS, JR.,** an Incapacitated Person, shall sell the following described property, in as-is condition, promptly at a private sale for cash.

(a)     Address:     405 N. Fulton
Texas City, Texas 77591
            Legal:     Abstract 2, Page 3, Lots 138 & 139
Ollie Bell Subdivision

SIGNED this the ___7th___ day of ___October___, 2015.

Kimberly Sullivan
**JUDGE PRESIDING**

**APPROVED AS TO FORM:**

Catherine N. Wylie
State Bar No.: 24033479
The Wylie Law Firm
2211 Norfolk Street, Suite #440
Houston, Texas 77098
Telephone: 713-275-8230
Facsimile: 713-275-8239
Email: cwylie@wylielawfirm.com

Amended Application & Order for Sale of Real Property Under §1158.451 of the Estates Code
In the Guardianship of Lonnie Phillips, Jr.., an Incapacitated Person
Page 3 of 3

FILED

2015 OCT -7 PM 2: 32

COUNTY CLERK
GALVESTON COUNTY, TEXAS

CAUSE NUMBER PR-74571

| IN THE GUARDIANSHIP OF | § | IN THE PROBATE COURT |
|---|---|---|
| | § | |
| LONNIE PHILLIPS, JR., | § | GALVESTON |
| | § | |
| AN INCAPACITATED PERSON | § | GALVESTON COUNTY, TEXAS |

## ORDER AUTHORIZING APPOINTEE FEES

On this the _9th_ day of _December_, 2014, the Application to Pay Attorney's Fees filed by Matthew Brandon Maggiore, Guardian Ad Litem, was considered by this Court and the Court finds that such attorney's fees and expenses are reasonable and just; that such fees were necessarily incurred in representing LONNIE PHILLIPS, JR. in this cause; that the said fees and expenses should be paid; and that such Application should be granted.

IT IS THEREFORE ORDERED that Matthew Brandon Maggiore, the Maggiore Law Firm, P.L.L.C., shall be paid legal fees in the amount of $ _5,346.00_ and expenses in the amount of $ _13.59_, for a total amount of $ _5,359.59_ for the services and expenses of Matthew Brandon Maggiore, Guardian Ad Litem, for the time period of October 30th, 2013 through his discharge on October 3, 2014 by:

_X_ the Guardian of the Estate of LONNIE PHILLIPS, JR.

_____ Galveston County Treasurer out of county funds.

SIGNED this _9th_ day of _December_, 2014.

_Kimberly Sullivan_
JUDGE PRESIDING

Approved as to form:

_____
M. Brandon Maggiore

mc

**FILED**

'14 DEC 10 AM 9: 43

_Dwight D. Sullivan_
COUNTY CLERK
GALVESTON COUNTY, TEXAS

PHILLIPS_LONNIE _ ORDER TO PAY APPOINTEE FEES TO MLF

| IN THE GUARDIANSHIP OF | § | IN THE PROBATE COURT OF |
|---|---|---|
| | § | |
| LONNIE PHILLIPS, JR., | § | |
| | § | |
| AN INCAPACITATED PERSON | § | GALVESTON COUNTY, TEXAS |

## ORDER APPOINTING GUARDIAN AD LITEM

On this date, the court became aware of the necessity for the court to appoint a Guardian Ad Litem to represent the best interest of **LONNIE PHILLIPS, JR.**.

It is therefore ORDERED that,

> Matthew Brandon Maggiore
> Maggiore Law Firm, PLLC
> 1001 Texas Avenue, Suite 1400
> Houston, TX 77002
> 713-239-3347 – Telephone
> 713-581-1894 – Facsimile
> **maggiore.law@gmail.com**

is hereby appointed pursuant to Section 645(a) of the Texas Probate Code, Guardian Ad Litem for **LONNIE PHILLIPS, JR.**to investigate the necessity of a guardianship and, if determined that one is needed, to prepare the guardians application and related matters for appointment of a Guardian of the Person of **LONNIE PHILLIPS, JR.**.

IT IS ORDERED that Matthew Brandon Maggiore, Guardian ad Litem, is to be given access to and shall review all of the Proposed Wards financial, medical psychological and intellectual testing records.

IT IS FURTHER ORDERED that Matthew Brandon Maggiore, the Guardian ad Litem is hereby authorized to discuss the Proposed Wards medical or psychological condition with any appropriate medical or health care personnel. This access is authorized by this Order, the Probate Code, and 45 CFR 164.512 (e) (1) (i), the Health Insurance Portability and Accountability Act (HIPAA), which authorizes covered entities to disclose protected health information in the course of any judicial or administrative proceeding when responding to an order of the Court.

IT IS FURTHER ORDERED that filing fees and costs will be waived until an estate is determined, if any.

SIGNED December _____29_____, 2014.

_____
JUDGE PRESIDING

FILED

'14 DEC 31 AM 10: 24

COUNTY CLERK
GALVESTON COUNTY. TEXAS

> Vernon's Texas Statutes and Codes Annotated
>   Estates Code (Refs & Annos)
>     Title 3. Guardianship and Related Procedures
>       Subtitle C. Procedural Matters
>         Chapter 1051. Notices and Process in Guardianship Proceedings in General
>           Subchapter B. Methods of Serving Citation or Notice; Persons to be Served

V.T.C.A., Estates Code § 1051.055
Formerly cited as TX PROBATE § 634

§ 1051.055. Service on Party's Attorney of Record

Effective: January 1, 2014
Currentness

(a) If a party is represented by an attorney of record in a guardianship proceeding, a citation or notice required to be served on the party shall be served instead on that attorney.

(b) A notice served on an attorney under this section may be served by:

(1) delivery to the attorney in person;

(2) registered or certified mail, return receipt requested; or

(3) any other form of mail that requires proof of delivery.

(c) A notice or citation may be served on an attorney under this section by:

(1) another party to the proceeding;

(2) the attorney of record for another party to the proceeding;

(3) an appropriate sheriff or constable; or

(4) another person competent to testify.

(d) Each of the following is prima facie evidence of the fact that service has been made under this section:

(1) the written statement of an attorney of record showing service;

(2) the return of the officer showing service; and

(3) the affidavit of a person showing service.

(e) Except as provided by Section 1051.105, an attorney ad litem may not waive personal service of citation.

**Credits**
Added by Acts 2011, 82nd Leg., ch. 823 (H.B. 2759), § 1.02, eff. Jan. 1, 2014.

V. T. C. A., Estates Code § 1051.055, TX EST § 1051.055
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
    Estates Code (Refs & Annos)
        Title 3. Guardianship and Related Procedures
            Subtitle C. Procedural Matters
                Chapter 1051. Notices and Process in Guardianship Proceedings in General
                    Subchapter C. Notice and Citation Required for Application for Guardianship

V.T.C.A., Estates Code § 1051.104
Formerly cited as TX PROBATE § 633(d), (d-1), (f)

§ 1051.104. Notice by Applicant for Guardianship

Effective: September 1, 2015
Currentness

(a) The person filing an application for guardianship shall mail a copy of the application and a notice containing the information required in the citation issued under Section 1051.102 by registered or certified mail, return receipt requested, or by any other form of mail that provides proof of delivery, to the following persons, if their whereabouts are known or can be reasonably ascertained:

(1) each adult child of the proposed ward;

(2) each adult sibling of the proposed ward;

(3) the administrator of a nursing home facility or similar facility in which the proposed ward resides;

(4) the operator of a residential facility in which the proposed ward resides;

(5) a person whom the applicant knows to hold a power of attorney signed by the proposed ward;

(6) a person designated to serve as guardian of the proposed ward by a written declaration under Subchapter E, Chapter 1104, if the applicant knows of the existence of the declaration;

(7) a person designated to serve as guardian of the proposed ward in the probated will of the last surviving parent of the proposed ward;

(8) a person designated to serve as guardian of the proposed ward by a written declaration of the proposed ward's last surviving parent, if the declarant is deceased and the applicant knows of the existence of the declaration; and

(9) each adult named in the application as an "other living relative" of the proposed ward within the third degree by consanguinity, as required by Section 1101.001(b)(11) or (13), if the proposed ward's spouse and each of the proposed ward's parents, adult siblings, and adult children are deceased or there is no spouse, parent, adult sibling, or adult child.

(b) The applicant shall file with the court:

(1) a copy of any notice required by Subsection (a) and the proofs of delivery of the notice; and

(2) an affidavit sworn to by the applicant or the applicant's attorney stating:

(A) that the notice was mailed as required by Subsection (a); and

(B) the name of each person to whom the notice was mailed, if the person's name is not shown on the proof of delivery.

(c) Failure of the applicant to comply with Subsections (a)(2)-(9) does not affect the validity of a guardianship created under this title.

**Credits**

Added by Acts 2011, 82nd Leg., ch. 823 (H.B. 2759), § 1.02, eff. Jan. 1, 2014. Amended by Acts 2013, 83rd Leg., ch. 161 (S.B. 1093), § 6.019, eff. Jan. 1, 2014; Acts 2015, 84th Leg., ch. 1031 (H.B. 1438), § 3, eff. Sept. 1, 2015.

**Editors' Notes**

**REVISOR'S NOTE**

**2014 Main Volume**

Section 633(d)(6), Texas Probate Code, refers to a written declaration under Section 679, Texas Probate Code. Section 679, along with Section 679A, Texas Probate Code, is revised in this code in Subchapter E, Chapter 1104. The revised law refers to Subchapter E, Chapter 1104, in its entirety because the entire subchapter deals with a written declaration to designate a guardian before the need arises.

V. T. C. A., Estates Code § 1051.104, TX EST § 1051.104
Current through the end of the 2015 Regular Session of the 84th Legislature

---

**End of Document** <span style="float:right">© 2015 Thomson Reuters. No claim to original U.S. Government Works.</span>

> Vernon's Texas Statutes and Codes Annotated
>   Estates Code (Refs & Annos)
>     Title 3. Guardianship and Related Procedures
>       Subtitle C. Procedural Matters
>         Chapter 1051. Notices and Process in Guardianship Proceedings in General
>           Subchapter C. Notice and Citation Required for Application for Guardianship

V.T.C.A., Estates Code § 1051.106
Formerly cited as TX PROBATE § 633(f)

§ 1051.106. Action by Court on Application for Guardianship

Effective: January 1, 2014
Currentness

The court may not act on an application for the creation of a guardianship until the applicant has complied with Section 1051.104(b) and not earlier than the Monday following the expiration of the 10-day period beginning on the date service of notice and citation has been made as provided by Sections 1051.102, 1051.103, and 1051.104(a)(1).

**Credits**

Added by Acts 2011, 82nd Leg., ch. 823 (H.B. 2759), § 1.02, eff. Jan. 1, 2014.

Notes of Decisions (4)

V. T. C. A., Estates Code § 1051.106, TX EST § 1051.106
Current through the end of the 2015 Regular Session of the 84th Legislature

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Estates Code (Refs & Annos)
    Title 3. Guardianship and Related Procedures
      Subtitle C. Procedural Matters
        Chapter 1051. Notices and Process in Guardianship Proceedings in General
          Subchapter D. Return and Proof of Service of Citation or Notice

V.T.C.A., Estates Code § 1051.153
Formerly cited as TX PROBATE § 632(i)

§ 1051.153. Proof of Service

Effective: January 1, 2014
Currentness

(a) Proof of service in each case requiring citation or notice must be filed before a hearing.

(b) Proof of service consists of:

  (1) if the service is made by a sheriff or constable, the return of service;

  (2) if the service is made by a private person, the person's affidavit;

  (3) if the service is made by mail:

    (A) the certificate of the county clerk making the service, or the affidavit of the guardian or other person making the service that states that the citation or notice was mailed and the date of the mailing; and

    (B) the return receipt attached to the certificate, if the mailing was by registered or certified mail and a receipt has been returned; and

  (4) if the service is made by publication, an affidavit that:

    (A) is made by the publisher of the newspaper in which the citation or notice was published or an employee of the publisher;

    (B) contains or to which is attached a copy of the published citation or notice; and

    (C) states the date of publication printed on the newspaper in which the citation or notice was published.

**Credits**

Added by Acts 2011, 82nd Leg., ch. 823 (H.B. 2759), § 1.02, eff. Jan. 1, 2014.

**Editors' Notes**

**REVISOR'S NOTE**

**2014 Main Volume**

(1) Section 632(i), Texas Probate Code, refers to service of notice or citation "by publication, posting, mailing, or otherwise." The methods of service specified in the quoted language include all methods authorized by the Texas Probate Code in guardianship matters. Because the specified methods of service do not exclude any method authorized under the code and therefore do not limit the applicability of the provision, the revised law omits the quoted language as unnecessary.

(2) Section 632(i), Texas Probate Code, refers to proof of the "time" of mailing of service of citation or notice. The revised law substitutes "date" for "time" for the reason stated in the revisor's note to Section 1051.052.

V. T. C. A., Estates Code § 1051.153, TX EST § 1051.153
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document**  © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
   Estates Code (Refs & Annos)
      Title 3. Guardianship and Related Procedures
         Subtitle C. Procedural Matters
            Chapter 1054. Court Officers and Court-Appointed Persons
               Subchapter A. Attorneys AD Litem and Interpreters

V.T.C.A., Estates Code § 1054.001

Formerly cited as TX PROBATE § 646(a)

§ 1054.001. Appointment of Attorney ad Litem in Proceeding for Appointment of Guardian

Effective: January 1, 2014

Currentness

In a proceeding under this title for the appointment of a guardian, the court shall appoint an attorney ad litem to represent the proposed ward's interests.

**Credits**

Added by Acts 2011, 82nd Leg., ch. 823 (H.B. 2759), § 1.02, eff. Jan. 1, 2014.

Notes of Decisions (4)

V. T. C. A., Estates Code § 1054.001, TX EST § 1054.001

Current through the end of the 2015 Regular Session of the 84th Legislature

---

Vernon's Texas Statutes and Codes Annotated
  Estates Code (Refs & Annos)
    Title 3. Guardianship and Related Procedures
      Subtitle C. Procedural Matters
        Chapter 1054. Court Officers and Court-Appointed Persons
          Subchapter B. Guardians AD Litem

V.T.C.A., Estates Code § 1054.055
Formerly cited as TX PROBATE § 645(b), (d)

§ 1054.055. Compensation and Expenses

Effective: January 1, 2014
Currentness

(a) A guardian ad litem is entitled to reasonable compensation for services provided in the amount set by the court, to be taxed as costs in the proceeding.

(b) The fees and expenses of a guardian ad litem appointed under Section 1104.354(1) are costs of the litigation proceeding that made the appointment necessary.

**Credits**

Added by Acts 2011, 82nd Leg., ch. 823 (H.B. 2759), § 1.02, eff. Jan. 1, 2014.

V. T. C. A., Estates Code § 1054.055, TX EST § 1054.055
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Estates Code (Refs & Annos)
    Title 3. Guardianship and Related Procedures
      Subtitle C. Procedural Matters
        Chapter 1054. Court Officers and Court-Appointed Persons
          Subchapter E. Qualifications to Serve as Court-Appointed Attorney

V.T.C.A., Estates Code § 1054.201
Formerly cited as TX PROBATE §§ 646(b), 647A(a), (b)

§ 1054.201. Certification Required

Effective: January 1, 2014
Currentness

(a) A court-appointed attorney in a guardianship proceeding, including an attorney ad litem, must be certified by the State Bar of Texas, or a person or other entity designated by the state bar, as having successfully completed a course of study in guardianship law and procedure sponsored by the state bar or the state bar's designee.

(b) The State Bar of Texas shall require three hours of credit for certification under this subchapter.

**Credits**
Added by Acts 2011, 82nd Leg., ch. 823 (H.B. 2759), § 1.02, eff. Jan. 1, 2014.

HISTORICAL AND STATUTORY NOTES

2014 Main Volume

Prior Laws:
    Acts 1977, 65th Leg., p. 1380, ch. 551, § 1.

    V.A.T.S. Probate Code, § 113A.

    Acts 1993, 73rd Leg., ch. 957, § 1.

    Acts 1995, 74th Leg., ch. 1039, §§ 22, 74.

    Acts 1999, 76th Leg., ch. 716, §§ 1, 2.

    V.A.T.S. Probate Code, §§ 646(b), 647A(a), (b).

CROSS REFERENCES
    Appointment of attorneys ad litem, see V.T.C.A., Estates Code § 53.104.
    Proceeding to appoint receiver, see V.T.C.A., Civil Practice & Remedies Code § 64.102.

LIBRARY REFERENCES

2014 Main Volume
    Guardian and Ward ☞13(1).
    Mental Health ☞133.
    Westlaw Topic Nos. 196, 257A.
    C.J.S. Guardian and Ward §§ 13, 28.
    C.J.S. Mental Health §§ 161 to 162.

RESEARCH REFERENCES

2014 Main Volume

Encyclopedias
TX Jur. 3d Guardianship and Conservatorship § 103, Appointment of Attorney Ad Litem--Term.
NOTES OF DECISIONS

   Construction and application 1

### 1 Construction and application

Proceeding concerning motion of guardian to resign as guardian was "guardianship proceeding," within meaning of statute requiring certification of any court-appointed attorney ad litem, with result that appointment of non-certified attorney ad litem in proceeding violated statute, regardless of argument of attorney that proceeding was not one in which guardianship was established in first instance; attorney was appointed to determine whether guardian should have been allowed to resign, and appointment required investigation into whether ward's interests would be protected. In re Guardianship of Marburger (App. 13 Dist. 2010) 329 S.W.3d 923. Guardian And Ward ☞ 23

A professional hired by the attorney ad litem to assist her in performing her duties in representing the ward of a guardianship proceeding is not required to be certified by the State bar as having successfully completed a course in guardianship law; rather, it is the attorney ad litem appointed by the court who is required to be certified. In re Guardianship of Glasser (App. 4 Dist. 2009) 297 S.W.3d 369, rehearing overruled. Attorney and Client ☞ 9

V. T. C. A., Estates Code § 1054.201, TX EST § 1054.201

Current through the end of the 2013 Third Called Session of the 83rd Legislature
(C) 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

---

**End of Document** <span style="float:right">© 2015 Thomson Reuters. No claim to original U.S. Government Works.</span>

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

Vernon's Texas Statutes and Codes Annotated
  Estates Code (Refs & Annos)
    Title 3. Guardianship and Related Procedures
      Subtitle C. Procedural Matters
        Chapter 1054. Court Officers and Court-Appointed Persons
          Subchapter E. Qualifications to Serve as Court-Appointed Attorney

V.T.C.A., Estates Code § 1054.201
Formerly cited as TX PROBATE §§ 646(b), 647A(a), (b)

§ 1054.201. Certification Required

Effective: September 1, 2015
Currentness

(a) An attorney for an applicant for guardianship and a court-appointed attorney in a guardianship proceeding, including an attorney ad litem, must be certified by the State Bar of Texas, or a person or other entity designated by the state bar, as having successfully completed a course of study in guardianship law and procedure sponsored by the state bar or the state bar's designee.

(b) The State Bar of Texas shall require four hours of credit for certification under this subchapter, including one hour on alternatives to guardianship and supports and services available to proposed wards.

**Credits**
Added by Acts 2011, 82nd Leg., ch. 823 (H.B. 2759), § 1.02, eff. Jan. 1, 2014. Amended by Acts 2015, 84th Leg., ch. 214 (H.B. 39), § 6, eff. Sept. 1, 2015.

Notes of Decisions (2)

V. T. C. A., Estates Code § 1054.201, TX EST § 1054.201
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document** <span>© 2015 Thomson Reuters. No claim to original U.S. Government Works.</span>

Vernon's Texas Statutes and Codes Annotated
  Estates Code (Refs & Annos)
    Title 3. Guardianship and Related Procedures
      Subtitle D. Creation of Guardianship
        Chapter 1104. Selection of and Eligibility to Serve as Guardian
          Subchapter C. Selection of Guardian for Incapacitated Person Other than Minor

V.T.C.A., Estates Code § 1104.101
Formerly cited as TX PROBATE § 677(a)

§ 1104.101. Appointment According to Circumstances and Best Interests

Effective: January 1, 2014
Currentness

The court shall appoint a guardian for an incapacitated person other than a minor according to the circumstances and considering the incapacitated person's best interests.

**Credits**
Added by Acts 2011, 82nd Leg., ch. 823 (H.B. 2759), § 1.02, eff. Jan. 1, 2014.

**Editors' Notes**

**REVISOR'S NOTE**

**2014 Main Volume**

Section 677(a), Texas Probate Code, refers to a court appointment of a guardian for a "person other than a minor." The revised law substitutes "incapacitated person" for the reference to "person" because under Sections 684 and 693, Texas Probate Code, the relevant parts of which are revised as Sections 1101.101, 1101.151, and 1101.152 of this code, a court may appoint a guardian for a person only if the court finds that the person is an incapacitated person.

V. T. C. A., Estates Code § 1104.101, TX EST § 1104.101
Current through the end of the 2015 Regular Session of the 84th Legislature

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
    Estates Code (Refs & Annos)
        Title 3. Guardianship and Related Procedures
            Subtitle D. Creation of Guardianship
                Chapter 1104. Selection of and Eligibility to Serve as Guardian
                    Subchapter C. Selection of Guardian for Incapacitated Person Other than Minor

V.T.C.A., Estates Code § 1104.102
Formerly cited as TX PROBATE § 677(a)

§ 1104.102. Appointment Preferences

Effective: January 1, 2014
Currentness

If the court finds that two or more eligible persons are equally entitled to be appointed guardian of an incapacitated person:

(1) the incapacitated person's spouse is entitled to the guardianship in preference to any other person, if the spouse is one of the eligible persons;

(2) the eligible person nearest of kin to the incapacitated person is entitled to the guardianship, if the incapacitated person's spouse is not one of the eligible persons; or

(3) the court shall appoint the eligible person who is best qualified to serve as guardian if:

(A) the persons entitled to serve under Subdivisions (1) and (2) refuse to serve;

(B) two or more persons entitled to serve under Subdivision (2) are related in the same degree of kinship to the incapacitated person; or

(C) neither the incapacitated person's spouse nor any person related to the incapacitated person is an eligible person.

**Credits**
Added by Acts 2011, 82nd Leg., ch. 823 (H.B. 2759), § 1.02, eff. Jan. 1, 2014.

Notes of Decisions (4)

V. T. C. A., Estates Code § 1104.102, TX EST § 1104.102
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Estates Code (Refs & Annos)
    Title 3. Guardianship and Related Procedures
      Subtitle D. Creation of Guardianship
        Chapter 1104. Selection of and Eligibility to Serve as Guardian
          Subchapter H. Grounds for Disqualification

V.T.C.A., Estates Code § 1104.354
Formerly cited as TX PROBATE § 681

§ 1104.354. Conflict of Interest

Effective: January 1, 2014
Currentness

A person may not be appointed guardian if the person:

(1) is a party or is a person whose parent is a party to a lawsuit concerning or affecting the welfare of the proposed ward, unless the court:

(A) determines that the lawsuit claim of the person who has applied to be appointed guardian is not in conflict with the lawsuit claim of the proposed ward; or

(B) appoints a guardian ad litem to represent the interests of the proposed ward throughout the litigation of the ward's lawsuit claim;

(2) is indebted to the proposed ward, unless the person pays the debt before appointment; or

(3) asserts a claim adverse to the proposed ward or the proposed ward's property.

**Credits**
Added by Acts 2011, 82nd Leg., ch. 823 (H.B. 2759), § 1.02, eff. Jan. 1, 2014.

**Editors' Notes**

**REVISOR'S NOTE**

**2014 Main Volume**

Section 681, Texas Probate Code, refers to "real or personal" property. The revised law omits the reference to "real or personal" as unnecessary because Section 311.005(4), Government Code (Code Construction Act), applicable to the revised law, defines "property" to mean real and personal property.

Notes of Decisions (2)

V. T. C. A., Estates Code § 1104.354, TX EST § 1104.354
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document**
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext® © 2015 Thomson Reuters. No claim to original U.S. Government Works. 2

| Vernon's Texas Statutes and Codes Annotated |
| --- |
| Estates Code (Refs & Annos) |
| Title 3. Guardianship and Related Procedures |
| Subtitle D. Creation of Guardianship |
| Chapter 1105. Qualification of Guardians |
| Subchapter F. New Bonds |

V.T.C.A., Estates Code § 1105.251

Formerly cited as TX PROBATE §§ 711, 712

§ 1105.251. Grounds for Requiring New Bond

Effective: January 1, 2014
Currentness

(a) A guardian may be required to give a new bond if:

(1) a surety on a bond dies, removes beyond the limits of this state, or becomes insolvent;

(2) in the court's opinion:

(A) the sureties on a bond are insufficient; or

(B) a bond is defective;

(3) the amount of a bond is insufficient;

(4) a surety on a bond petitions the court to be discharged from future liability on the bond; or

(5) a bond and the record of the bond have been lost or destroyed.

(b) A person interested in the guardianship may have the guardian cited to appear and show cause why the guardian should not be required to give a new bond by filing a written application with the county clerk of the county in which the guardianship proceeding is pending. The application must allege that:

(1) the bond is insufficient or defective; or

(2) the bond and the record of the bond have been lost or destroyed.

**Credits**

Added by Acts 2011, 82nd Leg., ch. 823 (H.B. 2759), § 1.02, eff. Jan. 1, 2014.

Notes of Decisions (2)

V. T. C. A., Estates Code § 1105.251, TX EST § 1105.251
Current through the end of the 2015 Regular Session of the 84th Legislature

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Estates Code (Refs & Annos)
    Title 3. Guardianship and Related Procedures
      Subtitle E. Administration of Guardianship
        Chapter 1152. Guardianship Pending Appeal of Appointment

V.T.C.A., Estates Code § 1152.001
Formerly cited as TX PROBATE § 655

§ 1152.001. Guardian to Serve Pending Appeal of Appointment

Effective: January 1, 2014
Currentness

Pending an appeal from an order or judgment appointing a guardian, the appointee shall continue to:

(1) act as guardian; and

(2) prosecute a pending suit in favor of the guardianship.

**Credits**

Added by Acts 2011, 82nd Leg., ch. 823 (H.B. 2759), § 1.02, eff. Jan. 1, 2014.

V. T. C. A., Estates Code § 1152.001, TX EST § 1152.001
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document**  <span style="float:right">© 2015 Thomson Reuters. No claim to original U.S. Government Works.</span>

Vernon's Texas Statutes and Codes Annotated
  Estates Code (Refs & Annos)
    Title 3. Guardianship and Related Procedures
      Subtitle E. Administration of Guardianship
        Chapter 1158. Sale or Partition of Ward's Property
          Subchapter B. Certain Estate Property Required to be Sold

V.T.C.A., Estates Code § 1158.051
Formerly cited as TX PROBATE § 812

§ 1158.051. Sale of Certain Personal Property Required

Effective: January 1, 2014
Currentness

(a) After approval of the inventory, appraisement, and list of claims, the guardian of the estate of a ward promptly shall apply for a court order to sell, at public auction or privately, for cash or on credit for a term not to exceed six months, all estate property that is liable to perish, waste, or deteriorate in value, or that will be an expense or disadvantage to the estate if kept.

(b) The following may not be included in a sale under Subsection (a):

  (1) property exempt from forced sale;

  (2) property that is the subject of a specific legacy; and

  (3) personal property necessary to carry on a farm, ranch, factory, or other business that is thought best to operate.

(c) In determining whether to order the sale of an asset under Subsection (a), the court shall consider:

  (1) the guardian's duty to take care of and manage the estate in the manner a person of ordinary prudence, discretion, and intelligence would manage the person's own affairs; and

  (2) whether the asset constitutes an asset that a trustee is authorized to invest under Subchapter F, Chapter 113, Property Code,[1] or Chapter 117, Property Code.

**Credits**
Added by Acts 2011, 82nd Leg., ch. 823 (H.B. 2759), § 1.02, eff. Jan. 1, 2014.

**Editors' Notes**

**REVISOR'S NOTE**

**2014 Main Volume**

Section 812(a), Texas Probate Code, refers to the approval of the "inventory and appraisement" of an estate. The inventory and appraisement is filed with a list of claims for the estate, as provided by Section 730, Texas Probate Code, revised as Section 1154.052 of this code, and approved with that list, as provided by Section 733, Texas Probate Code, revised as Section 1154.054 of this code. The revised law substitutes "inventory, appraisement, and list of claims" for "inventory and appraisement" for the reasons stated in the revisor's note to Section 1154.101 of this code.

Footnotes

1        V.T.C.A., Property Code § 113.171 et seq.

V. T. C. A., Estates Code § 1158.051, TX EST § 1158.051

Current through the end of the 2015 Regular Session of the 84th Legislature

---

**End of Document**                                 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Estates Code (Refs & Annos)
    Title 3. Guardianship and Related Procedures
      Subtitle E. Administration of Guardianship
        Chapter 1158. Sale or Partition of Ward's Property
          Subchapter F. Sale of Real Property: Application and Order for Sale

V.T.C.A., Estates Code § 1158.255
Formerly cited as TX PROBATE § 824A

§ 1158.255. Hearing on Application and Any Opposition

Effective: January 1, 2014
Currentness

(a) The clerk of the court in which an application for an order of sale is filed shall immediately call to the judge's attention any opposition to the sale that is filed during the period prescribed in the citation issued under Section 1158. 253. The court shall hold a hearing on the application if an opposition to the sale is filed during the period prescribed in the citation.

(b) A hearing on an application for an order of sale is not required under this section if no opposition to the application is filed during the period prescribed in the citation. The court may determine that a hearing on the application is necessary even if no opposition is filed during that period.

(c) If the court orders a hearing under Subsection (a) or (b), the court shall designate in writing a date and time for the hearing on the application and any opposition, together with the evidence pertaining to the application and any opposition. The clerk shall issue a notice of the date and time of the hearing to the applicant and to each person who files an opposition to the sale, if applicable.

(d) The judge, by entries on the docket, may continue a hearing held under this section from time to time until the judge is satisfied concerning the application.

**Credits**
Added by Acts 2011, 82nd Leg., ch. 823 (H.B. 2759), § 1.02, eff. Jan. 1, 2014.

V. T. C. A., Estates Code § 1158.255, TX EST § 1158.255
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Estates Code (Refs & Annos)
    Title 3. Guardianship and Related Procedures
      Subtitle G. Special Types of Guardianships
        Chapter 1251. Temporary Guardianships
          Subchapter A. Appointment of Temporary Guardian Generally

V.T.C.A., Estates Code § 1251.007
Formerly cited as TX PROBATE § 875(f)(5)

§ 1251.007. Motion for Dismissal of Application

Effective: January 1, 2014
Currentness

(a) Subject to Subsection (b), the proposed ward or the proposed ward's attorney may appear and move for the dismissal of the application for temporary guardianship.

(b) At least one day before making a motion under Subsection (a), the proposed ward or the proposed ward's attorney shall provide notice to the party who filed the application for temporary guardianship.

(c) If a motion is made for dismissal of the application for temporary guardianship, the court shall hear and determine the motion as expeditiously as justice requires.

**Credits**

Added by Acts 2011, 82nd Leg., ch. 823 (H.B. 2759), § 1.02, eff. Jan. 1, 2014.

V. T. C. A., Estates Code § 1251.007, TX EST § 1251.007
Current through the end of the 2015 Regular Session of the 84th Legislature

Vernon's Texas Statutes and Codes Annotated
 Estates Code (Refs & Annos)
  Title 3. Guardianship and Related Procedures
   Subtitle G. Special Types of Guardianships
    Chapter 1251. Temporary Guardianships
     Subchapter B. Temporary Guardianship Pending Challenge or Contest of Certain Guardianship Applications

V.T.C.A., Estates Code § 1251.051
Formerly cited as TX PROBATE § 875(k)

§ 1251.051. Authority to Appoint Temporary Guardian or Grant Restraining Order

Effective: January 1, 2014
Currentness

The court, on the court's own motion or on the motion of any interested party, may appoint a temporary guardian or grant a temporary restraining order under Rule 680, Texas Rules of Civil Procedure, or both, without issuing additional citation if:

(1) an application for a temporary guardianship, for the conversion of a temporary guardianship to a permanent guardianship, or for a permanent guardianship is challenged or contested; and

(2) the court finds that the appointment or the issuance of the order is necessary to protect the proposed ward or the proposed ward's estate.

**Credits**
Added by Acts 2011, 82nd Leg., ch. 823 (H.B. 2759), § 1.02, eff. Jan. 1, 2014.

V. T. C. A., Estates Code § 1251.051, TX EST § 1251.051
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

Vernon's Texas Statutes and Codes Annotated
    Estates Code (Refs & Annos)
        Title 3. Guardianship and Related Procedures
            Subtitle G. Special Types of Guardianships
                Chapter 1251. Temporary Guardianships
                    Subchapter B. Temporary Guardianship Pending Challenge or Contest of Certain Guardianship
                    Applications

V.T.C.A., Estates Code § 1251.052

Formerly cited as TX PROBATE § 875(l)

§ 1251.052. Qualification and Duration of Certain Temporary Guardianships

Effective: September 1, 2015

Currentness

(a) A temporary guardian appointed under Section 1251.051 must qualify in the same form and manner required of a guardian under this title.

(b) The term of a temporary guardian appointed under Section 1251.051 expires on the earliest of the following:

(1) the conclusion of the hearing challenging or contesting the application;

(2) the date a permanent guardian appointed by the court for the proposed ward qualifies to serve as the ward's guardian; or

(3) the nine-month anniversary of the date the temporary guardian qualifies, unless the term is extended by court order issued after a motion to extend the term is filed and a hearing on the motion is held.

**Credits**

Added by Acts 2011, 82nd Leg., ch. 823 (H.B. 2759), § 1.02, eff. Jan. 1, 2014. Amended by Acts 2015, 84th Leg., ch. 1031 (H.B. 1438), § 23, eff. Sept. 1, 2015.

**Editors' Notes**

**REVISOR'S NOTE**

**2014 Main Volume**

Section 875(l), Texas Probate Code, requires a temporary guardian to qualify in the same form and manner as a guardian under "this code," meaning the Texas Probate Code. The revised law substitutes a reference to "this title" for the reference to "this code" because the provisions of the Texas Probate Code that relate to qualification of guardians are revised in Title 3 of this code, and this chapter is included in that title.

Notes of Decisions (3)

V. T. C. A., Estates Code § 1251.052, TX EST § 1251.052
Current through the end of the 2015 Regular Session of the 84th Legislature

---

**End of Document**                                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Not Followed as Dicta**    Mowbray v. Avery,    Tex.App.-Corpus Christi, April 11, 2002

143 Tex. 250
Supreme Court of Texas.

BRIDGMAN

v.

MOORE.

No. A-185.    |    Nov. 22, 1944.
|    Rehearing Denied Dec. 20, 1944.

Error to Court of Civil Appeals of Ninth Supreme Judicial District.

Suit by Mrs. F. W. Bridgman against W. T. Moore for recovery of rent and damages, wherein the defendant filed a cross-action alleging ownership of an undivided interest in the land and seeking a partition thereof. A judgment of the Court of Civil Appeals, 180 S.W.2d 211, dismissed plaintiff's appeal from an adverse judgment, and plaintiff brings error.

Judgment of Court of Civil Appeals affirmed.

West Headnotes (9)

**[1]**     **Judgment**
    👉 Time for Application

    Where no motion for a new trial was filed before expiration of 30 days from the date of the judgment, such judgment became final and, if not void, could be set aside only by a bill of review. Rules of Civil Procedure, rule 330.

    8 Cases that cite this headnote

**[2]**     **Judgment**
    👉 Actions and Other Proceedings to Review Judgment

    A motion to set aside judgment theretofore rendered on account of numerous errors alleged to have occurred in the course of the trial and for judgment notwithstanding the verdict was insufficient and could not be treated as a bill of review. Rules of Civil Procedure, rule 330.

    2 Cases that cite this headnote

**[3]**     **Judgment**
    👉 Time for Application

    **Judgment**
    👉 Collateral nature of proceeding in general

    Where no motion for a new trial was filed before expiration of 30 days from date of judgment, a motion made after such 30-day period to set aside judgment and for judgment non obstante veredicto was a collateral attack upon judgment and court was unauthorized to set it aside unless it was void. Rules of Civil Procedure, rule 330.

    3 Cases that cite this headnote

**[4]**     **Judgment**
    👉 Invalidity of judgment in general

    The court has not only the power but the duty to vacate the inadvertent entry of a void judgment at any time, either during the term or after the term, with or without a motion therefor.

    10 Cases that cite this headnote

**[5]**     **Judgment**
    👉 Dismissal of action, nonsuit, or direction of verdict

    **Judgment**
    👉 Authority to enter

    Upon the entry of a general or directed verdict, the law determines what the judgment shall be, and the clerk may enter the judgment without further direction from the court. Vernon's Ann.Civ.St. art. 1899.

    2 Cases that cite this headnote

**[6]**     **Judgment**
    👉 Proceedings for entry

    In the case of a special verdict, it is necessary for court to announce the judgment thereon before clerk is authorized to enter judgment. Vernon's Ann.Civ.St. art. 1899.

Cases that cite this headnote

**[7]** **Judgment**

👉 Grounds for review

**Judgment**

👉 Defects in entry, form, and contents of judgment

The signing and approving of judgment on special verdict at judge's private residence without knowledge or presence of plaintiff or her counsel was irregular and, upon direct attack by bill of review, would have warranted equitable relief, but such irregularity did not render judgment void so as to warrant setting it aside on collateral attack. Vernon's Ann.Civ.St. art. 1899.

14 Cases that cite this headnote

**[8]** **Courts**

👉 Place for holding sessions

Under constitutional and statutory provisions requiring that district judge shall hold court only at the "county seat" of county, the quoted term means the place where the courthouse is situated. Vernon's Ann.Civ.St. arts. 1602, 1919; Vernon's Ann.St.Const. art. 5, § 7.

10 Cases that cite this headnote

**[9]** **Judgment**

👉 Place of rendition

Generally, judgment should be pronounced only in open court at the time and place appointed therefor.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*251** **\*\*705** David E. O'Fiel and C. W. Wiedemann, both of Beaumont, for petitioner.

John H. Land, of Beaumont, for respondent.

**Opinion**

FOLLEY, Commissioner.

This suit was filed by the petitioner, Mrs. F. W. Bridgman, against her brother, who is the respondent, W. T. Moore, seeking recovery for rents from, and damages to, certain lands in Jefferson county, which she alleged she owned and had leased to respondent. The respondent filed a cross action alleging that he was the owner of a 1/8 undivided interest in the land and sought partition thereof and recovery for certain improvements he had added to the property. Trial was had in the district court of Jefferson county beginning on June 16, 1942. Fact issues were submitted **\*\*706** to a jury and the jury's verdict was returned and filed June 20, 1942. On July 3, 1942, judgment was rendered on the jury's verdict and entered into the court's minutes. The court found that petitioner owned 7/8, and respondent **\*252** 1/8, of the land, and the decree awarded respondent a 1/8 interest, ordered the land partitioned, and, in keeping with the jury's verdict, allowed respondent a recovery against petitioner for $673.75, and denied petitioner any recovery for the rents and damages she sought.

No motion for new trial was filed within thirty days from the rendition and entry of the judgment. The term of the district court ended on Sunday, July 5, 1942. Such district court is governed by Rule 330, Texas Rules of Civil Procedure, which provides that judgments shall become final after the expiration of thirty days after the date of judgment or after a motion for a new trial is overruled, and that after the expiration of such time the judgment cannot be set aside except by bill of review for sufficient cause.

On August 6, 1942, as shown by supplemental transcript, petitioner filed a motion to set aside the judgment of July 3, 1942, and asked the court to render judgment in her behalf on her motion for judgment non obstante veredicto, theretofore filed by her on June 25, 1942. On August 13, 1942, she filed an amended motion seeking the same relief. On the latter date the court made and entered the following order:
'On the 13th day of August, 1942, came on to be heard the motion of Mrs. F. W. Bridgeman, et al, plaintiffs in the above consolidated cause, to set aside the Judgment entered in the minutes in this cause on the 3rd day of July, 1942, and issue being joined thereon, and the court having considered the motion together with the evidence adduced thereon is of the opinion that the said motion is well taken, and that same should be granted.

'It is therefore ordered, adjudged and decreed that the judgment entered by this court in this consolidated cause on the 3rd day of July, 1942, be and the same is hereby set aside.'

On September 18, 1942, the court approved a second judgment which was on that date entered in the minutes. The second judgment is identical with that of July 3, 1942. The petitioner attempted to appeal from the second judgment to the Court of Civil Appeals at Beaumont. That court dismissed the appeal holding that the entry of the second judgment did not vacate the first, and, in the absence of a bill of review, that the first judgment had become final since no motion was filed within thirty days from its date to set it aside. 180 S.W.2d 211.

**\*253** On the original submission the Court of Civil Appeals refused to order the district clerk to file a supplemental transcript containing an alleged bill of review against the first judgment. One of the points upon which we granted the writ of error was the alleged refusal of the Court of Civil Appeals to direct the filing of the supplemental transcript. However, the record reveals that prior to the overruling of the motion for rehearing in such court the supplemental transcript was filed and was presumably considered at the time the motion for rehearing was overruled. The only question remaining for our determination is whether the trial court's order of August 13, 1942, was effectual to set aside the judgment of July 3, 1942.

[1] [2] [3] [4] Since no motion for a new trial was filed by petitioner before the expiration of thirty days from the date of the judgment of July 3, 1942, under Rule 330(l), the same became final, and, if not void, could be set aside only by a bill of review. The petitioner contends that the motion upon which the court acted in purporting to set aside the first judgment is sufficient to be treated as a bill of review. We are not in accord with this contention. In such motion she merely seeks to set aside the former judgment on account of numerous errors alleged to have occurred in the course of the trial, and also asks that judgment be rendered for her notwithstanding the verdict. It is not an original proceeding filed as an independent action against respondent alleging a meritorious cause of action. It is therefore insufficient as a bill of review. Humphrey v. Harrell, Tex.Com.App., 29 S.W.2d 963; Hermann Hospital Estate v. Nachant, Tex.Com.App., 55 S.W.2d 505; Ridley v. McCallum, 139 Tex. 540, 163 S.W.2d 833; Hartel v. Dishman, 135 Tex. 600, 145 S.W.2d 865, and Nachant v. Monteith, 117 Tex. 214, 299 S.W. 888. Consequently, the attack made upon the former judgment is collateral, and unless the judgment is void the court was unauthorized to set it aside in the hearing upon the motion

for new trial. Halbrook v. Quinn, Tex.Civ.App., 286 S.W. 954; Buchanan v. Bilger, 64 Tex. 589; Roberts v. McCamant, 70 Tex. 743, 8 S.W. 543; **\*\*707** Bowers v. Chaney, 21 Tex. 363; Wright v. Shipman, Tex.Civ.App., 279 S.W. 296. However, the court has not only the power but the duty to vacate the inadvertent entry of a void judgment at any time, either during the term or after the term, with or without a motion therefor. Nevitt v. Wilson, 116 Tex. 29, 285 S.W. 1079, 48 A.L.R. 355; Wichita Falls, R. & Ft. W. R. Co. v. Combs, 115 Tex. 405, 283 S.W. 135. The question therefore arises as to whether the judgment is void and thus subject to the collateral attack.

**\*254** The only indication in the record of anything irregular as to the first judgment is contained in the allegations of petitioner in her amended motion for a new trial filed August 13, 1942. She alleged that on the first day of July, 1942, after the return of the verdict but before the entry of the judgment, respondent caused to be forwarded to petitioner and her attorney a draft of the judgment, and a motion to enter the same, with a statement that it was the judgment respondent was going to request the court to enter; that the trial judge was busy trying another case during the week of June 29, 1942, at which time he became ill and was obliged to discontinue the trial and remain at his home; that respondent, through his counsel, caused a draft of the judgment to be signed by the trial judge at his private residence, without a hearing, and not at the courthouse or in the courtroom, and without notification to petitioner or her counsel; that such judgment was entered and that neither petitioner nor her counsel were advised of its entry; and that petitioner and her counsel had no opportunity to be present in court and contest the granting of such judgment and thus had been deprived of a substantial right. In her petition for writ of error petitioner asserts that the above facts constituted equitable grounds for setting aside the judgment, which she alleges is void. Presumably the alleged vice in the judgment is that it was signed by the judge at his private residence. Petitioner contends that such fact vitiates the decree because it was not rendered in open court.

The order purporting to set aside the judgment recites that evidence was introduced on the hearing of the motion. Such testimony does not accompany the record. However, for the purpose of this opinion, we shall presume that the above allegations were established by the evidence. In the light of such assumption we must determine if the facts so assumed render the judgment void so as to subject it to this collateral attack.

[5] [6] Under the provisions of Art. 1899, Vernon's Ann.Civ.Stat., district clerks are required to keep a fair record of all of the acts done, and proceedings had, in their respective courts, and to 'enter all judgments of the court, under direction of the judge, * * * in record books to be kept for the purpose.' Upon the return of a general or directed verdict, under our practice, there is no need for any action by the court as the law determines what the judgment shall be, and the clerk may enter the judgment without further direction from the court; 'but, in case of special verdict, the facts being found by the jury, it is necessary for the court to announce the judgment, the legal conclusion thereon, because the law is not determined by the special verdict, nor **\*255** are the rights of the parties fixed thereby.' Carwile v. William Cameron & Co., 102 Tex. 171, 114 S.W. 100, 102; Lloyd v. Brinck, 35 Tex. 1. It therefore became necessary for the trial judge to make some sort of pronouncement of the law of this case before the clerk was authorized to enter the decree.

[7] The judgment in question was signed by the judge, filed and entered by the clerk, and recorded in the minutes of the court on July 3, 1942. There is no doubt that the signing and approving of the judgment at the private residence of the judge, without the knowledge or presence of petitioner or her counsel, was an irregular rendition of the judgment, and upon direct attack by bill of review would have constituted such error, under the facts of this case, as to warrant equitable relief. But we cannot concede that such irregularity rendered the judgment void. 32 C.J. 1065, s 23.

In Goldreyer v. Cronan, 76 Conn. 113, 117, 55 A. 594, 596, the Supreme Court of Errors of Connecticut said:

> 'A judgment, speaking generally, is the determination or sentence of the law, speaking through the court; and it does not exist, as a legal entity, until pronounced, expressed, or made known in some appropriate way. It may be expressed orally or in writing, or in both of these ways, in accordance with the customs and usages of the court in which the judgment is rendered.'

**\*\*708** In State v. Beaton, 190 Iowa 216, 178 N.W. 1, 180 N.W. 166, 167, the Supreme Court of Iowa stated:

> 'The form of a decree signed by the trial judge is one of the papers in a case, upon

filing of which memorandum should be made in the appearance docket. As noted in Martin v. Martin, supra (125 Iowa 73, 99 N.W. 719), it is merely a more specific direction as to the decision to be entered than an oral announcement or memorandum entered in the judge's calendar. Its sole purpose is that of prescribing the precise form of decree to be spread in the record book by the clerk. Thereupon it becomes the duty of the clerk to enter the decree of record.'

To the same effect are the following cases: Bulkeley's Appeal, 76 Conn. 454, 57 A. 112; Martin v. Martin, 125 Iowa 73, 99 N.W. 719; Roberts v. White, 7 Jones & S. 272, 274, 39 N.Y.Super.Ct. 272, 274; Coffey v. Gamble, 117 Iowa 545, 548, 91 N.W. 813.

**\*256** In Roberts v. White, supra, the Superior Court of New York held:

> 'Reducing the decision to writing concludes the trial and authorizes the judgment. No allocatur of the justice is required. The clerk on filing the decision enters the judgment strictly in conformity with the decision.'

[8] [9] Our Constitution and statutes require that a district judge shall hold court only at the county seat of the county, which means the place where the courthouse is situated. Turner v. Tucker, 113 Tex. 434, 258 S.W. 149; Sec. 7 of Art. 5, Constitution of Texas, Vernon's Ann.St.; Arts. 1602 and 1919, Vernon Ann.Civ.St. Although there is no specific law requiring it, it is also the general rule that judgment should be announced only in open court at the time and place appointed therefor. Aiken v. Carroll, 37 Tex. 73; Hunton v. Nichols, 55 Tex. 217; Hodges v. Ward, 1 Tex. 244; Sinclair Refining Co. v. McElree, Tex.Civ.App., 52 S.W.2d 679; Accousi v. G. A. Stowers Furniture Co., Tex.Civ.App. 83 S.W. 1104. However, we are of the opinion that a court's action in this respect may be such a substantial compliance with these rules that it may not be questioned in a collateral attack.

In Doeppenschmidt v. City of New Braunfels, Tex.Civ.App., 289 S.W. 425, writ refused, it was held, even in a direct attack, that in the absence of an objection it was immaterial

whether the court performed the act of rendering judgment in his private office or in the courtroom.

In Townsley v. State, 103 Tex.Cr.R. 508, 281 S.W. 1054, in another direct attack, the Court of Criminal Appeals held that the drawing of a special venire in the clerk's office was not invalid under a statute requiring it to be drawn by the clerk in the presence of the judge 'in open court.' Art. 592, Code Civ.Proc.

In Atwood v. State, 96 Tex.Cr.R. 249, 257 S.W. 563, 565, in still another direct attack, the same court, in construing the same statute, held that the drawing of a jury from a jury wheel in a room rented for the assessor across the street from the courthouse was not grounds for quashing the panel. In that case the court said that substantial compliance with the statute was all that was required, and that 'while the law in question requires the filling of the jury wheel, etc., to take place at the courthouse, we would not understand this to be literally binding in every case.'

**\*257** The judgment in question was in proper form and purported to adjudicate all questions of law and fact at issue between the parties. The petitioner and her counsel knew such judgment had been prepared for the approval of the court. They had received a copy of it from respondent's counsel with the statement that it was the judgment which he was going to request the court to enter. The court apparently

intended such instrument, with his signature and approval and its subsequent delivery to the clerk, to constitute his official pronouncement of the decree. The clerk must have understood such to be his intention, for the instrument was filed and entered by him as the judgment of the court. The only thing irregular about the judgment was the judge's approval of it at his private residence. All other acts with reference to it were regular in every respect. The delivery of the instrument to the clerk, his filing the same, and entering and recording it, obviously occurred in the usual manner and place. These acts were a matter of public record and were open and available for the inspection of petitioner and her counsel. Under these conditions we think such procedure, though irregular in the respect mentioned, was not of such nature as to completely nullify the judgment so as to subject it to collateral attack. Such decree thus stands in the record neither vacated nor appealed from, and the entry of the second judgment, which is a nullity under **\*\*709** the circumstances, does not vacate or affect the first. Mullins v. Thomas, 136 Tex. 215, 150 S.W.2d 83.

The judgment of the Court of Civil Appeals, dismissing the appeal, is affirmed.

Opinion adopted by the Supreme Court.

**All Citations**

143 Tex. 250, 183 S.W.2d 705

---

**End of Document**
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

 KeyCite Yellow Flag - Negative Treatment

**Distinguished by** [Texas State Bd. of Veterinary Medical Examiners v. Giggleman,](#) Tex.App.-Austin, August 22, 2013

754 S.W.2d 149
Supreme Court of Texas.

Roberto CAMARENA, et al., Petitioners,

v.

TEXAS EMPLOYMENT
COMMISSION, et al., Respondents.

No. C–5483. | July 6, 1988.

Farm workers brought suit challenging constitutionality of Texas Unemployment Compensation Act's agricultural exemption. The 201st District Court, Travis County, Harley Clerk, J., entered judgment in favor of farm workers, and Texas Employment Commission appealed. The Court of Appeals, [710 S.W.2d 665,](#) determined that judgment was moot, and held that attorney fees were barred by sovereign immunity. Farm workers appealed. The Supreme Court, Wallace, J., held that: (1) legislature's amendment of Act did not render the action moot, as "live" issue on attorney fees remained; (2) award of attorney fees was not barred by sovereign immunity; and (3) trial court could not order that costs of appeal be taxed equally between Texas Employment Commission and farm workers.

Affirmed in part, reversed in part.

West Headnotes (3)

**[1]** **Declaratory Judgment**

 Moot, Abstract or Hypothetical Questions

Legislature's amendment of Texas Unemployment Compensation Act did not moot farm workers' suit challenging the Act's constitutionality, as "live" controversy remained as to whether farm workers had legally cognizable interest in recovering their attorney fees and costs. [Vernon's Ann.Texas Civ.St. arts. 5221b–1](#) to [5221b–24.](#)

[144 Cases that cite this headnote](#)

**[2]** **States**

 Particular Actions

**States**

 Costs

Where agricultural exemption of Texas Unemployment Compensation Act was subsequently declared unconstitutional and Act was amended, actions of Texas Employment Commission in denying benefits pursuant to exemption were "prohibited" within meaning of statute permitting award of attorney fees arising out of state official's engagement in prohibited act, and thus farm workers who prevailed in constitutional challenge to exemption were entitled to attorney fees, and fees were not barred by sovereign immunity. [V.T.C.A., Civil Practice & Remedies Code § 106.001](#); [Vernon's Ann.Texas Civ.St. arts. 5221b–1](#) to [5221b–24.](#)

[23 Cases that cite this headnote](#)

**[3]** **States**

 Costs

Where farm workers prevailed in their constitutional challenge to Texas Unemployment Compensation Act's agricultural exemption, trial court could not order that costs of appeal be taxed equally between farm workers and Texas Employment Commission. [Vernon's Ann.Texas Civ.St. arts. 5221b–1](#) to [5221b–24](#); [Vernon's Ann.Texas Rules Civ.Proc., Rule 131.](#)

[7 Cases that cite this headnote](#)

**Attorneys and Law Firms**

**\*150** James C. Harrington, (Civil Liberties Union), Hector Uribe, (State Senator), Austin, Juan J. Hinojosa, McAllen, for petitioners.

Jim Mattox, Atty. Gen., Joseph W. Barbish, Jr., Asst. Atty. Gen., Austin, for respondents.

**Opinion**

WALLACE, Justice.

Roberto Camarena and other Texas farm workers appeal from the dismissal of their suit challenging the constitutionality of the Texas Unemployment Compensation Act [TUCA], TEX.REV.CIV.STAT.ANN. art. 5221b–1 to 24 (Vernon 1987 & Supp.1988), the denial of attorney's fees and the assessment of costs. 710 S.W.2d 665. In this suit the issues presented are threefold: (1) whether the farm workers' suit is moot due to the Legislature's subsequent amendment of the challenged statute, (2) whether the doctrine of sovereign immunity bars the farm workers from recovery of attorney's fees, and (3) whether costs have been properly assessed. We hold that the suit was not moot, that sovereign immunity does not preclude an award of attorney's fees and that all costs be assessed against the State.

 [1]    In 1984, farm workers sued the Texas Employment Commission (TEC) seeking to have the agricultural exemption of TUCA declared unconstitutional. The exemption denied unemployment benefits to most agricultural workers. The original suit was severed for trial into two suits: one suit on the claims of individual farm workers; and another suit on behalf of the class. This suit was defended under the provisions of Ch. 104 of the TEX.CIV.PRAC. & REM.CODE (Vernon 1986 & Supp. 1988) by the Attorney General.

In January 1985, the trial court granted declaratory relief in the individuals' suit. The court held that the exemption was an unconstitutional violation of the Texas Equal Rights Amendment, TEX. CONST. art. I, § 3a. The court further enjoined officials from enforcing the exemption. The trial court determined the amount of reasonable and necessary attorney's fees incurred by the farm workers, but found the award of such fees to be barred by sovereign immunity.

In May 1985, the Texas Legislature amended TUCA. The amendment provided farm workers with phased-in unemployment coverage. Subsequent to the Legislature's amendment, the trial court modified its judgment and held that the new legislation was constitutional. The court enjoined officials from enforcing anything less than the newly enacted law. In July 1985, the trial court rendered a similar judgment on behalf of the class.

TEC appealed the trial court's ruling, complaining that the judgment was moot. TEC did not contest the trial court's ruling as to the constitutionality of the statute. By way of cross-point, the farm workers asserted trial court error in failing to award attorney's fees. The court of appeals held

the trial court's judgment granting declaratory and injunctive relief to be moot, held that attorney's fees were barred **\*151** by sovereign immunity and additionally assessed the costs of appeal equally between TEC and the farm workers. From this judgment, the farm workers appeal.

In reference to the issue of mootness, it is axiomatic that appellate courts do not decide cases in which no controversy exists between the parties. *City of West University Place v. Martin,* 132 Tex. 354, 123 S.W.2d 638 (1939); *Texas Parks & Wildlife Dept. v. Texas Assoc. of Bass Clubs,* 622 S.W.2d 594 (Tex.App.—Austin 1981, writ ref'd n.r.e.). Generally, a case is determined to be moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Murphy v. Hunt,* 455 U.S. 478, 102 S.Ct. 1181, 71 L.Ed. 353 (1982), citing *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980), quoting *Powell v. McCormack,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969).

Clearly, a controversy exists between the farm workers and TEC. The "live" issue in controversy is whether or not the farm workers have a legally cognizable interest in recovering their attorney's fees and costs. The fact that the Legislature wisely undertook action to bring the farm workers within the scope of TUCA does not moot or void the workers' interest in obtaining attorneys fees and costs for the successful disposition of their claim. Contrary to the court of appeals' suggestion, the attorney's fees issue need not be severed in order to be considered; it is an integral part of the farm workers' claim and as such breathes life into the appeal. Due to the existence of the "live" issue of attorney's fees and costs, we hold that the suit was not moot.

In addition to the declaratory relief granted, the district court granted injunctive relief which enjoined TEC from any future action denying, prejudicing, or detrimentally affecting the benefits and protections afforded the farm workers under House Bill 32. The court of appeals held that the injunction was moot.

It is fundamental that a court has no jurisdiction to render an advisory opinion on a controversy that is not yet ripe. *City of Garland v. Louton,* 691 S.W.2d 603 (Tex.1985), citing *California Products, Inc. v. Puretex Lemon Juice, Inc.,* 160 Tex. 586, 334 S.W.2d 780 (1960). At the time of judgment, TEC had not attempted to deny, prejudge or detrimentally affect the benefits conferred by House Bill 32. Consequently, we hold that there was no ripe controversy before the district

court which mandated injunctive relief. Accordingly, we vacate the injunction. The trial court granted injunctive relief based on a hypothetical situation which might or might not arise at a later date. District courts, under our Constitution, do not give advice or decide cases upon speculative, hypothetical or contingent situations. *Coalson v. City Council of Victoria, 610 S.W.2d 744 (Tex.1980).*

 **[2]**    In regard to the second issue presented in this case, the trial court denied attorney's fees to the farm workers on the basis that such an award was barred by sovereign immunity. The court of appeals affirmed. However, the trial court did find that if sovereign immunity did not bar payment, then TEC would be liable for $36,810 in attorney's fees.

The Legislature has expressly provided for payment of judgments against state officials in TEX.CIV.PRAC. & REM.CODE, Ch. 104 as well as for the payment of attorney's fees and costs in suits arising from a State official's or State employee's engagement in a prohibited act. TEX.CIV.PRAC. & REM.CODE § 106.001 (Vernon 1986).

Section 106.001, in pertinent part provides:

§ 106.001. Prohibited Acts

(a) An officer or employee of the state or of a political subdivision of the state who is acting or purporting to act in an official capacity may not, because of a person's race, religion, color, sex, or national origin:

—————————

(4) refuse to permit the person to participate in a program owned, operated, or managed by or on behalf of the state or a political subdivision of the state;

 **\*152**  (5) refuse to grant a benefit to the person;

—————————

In the trial court's findings of facts and conclusions of law, it determined that minority agricultural workers were denied TUCA unemployment benefits and found illegal ethnic and racial discrimination in violation of the Texas Equal Rights Amendment, TEX. CONST. art. I, § 3a. The State, through TEC, refused to permit the farm workers to participate in the State operated unemployment compensation program. The freedom to participate in such a program is undeniably a benefit. Accordingly, TEC's actions fell within the ambit of

prohibited acts enunciated in subsections (4) and (5) of § 106.001.

The remedies afforded for a violation of § 106.001 are set forth in § 106.002:

§ 106.002 Remedies

(a) If a person has violated or there are reasonable grounds to believe a person is about to violate Section 106.001, the person aggrieved by the violation or threatened violation may sue for preventive relief, including a permanent or temporary injunction, a restraining order, or any other order.

(b) In an action under this section, unless the state is the prevailing party, the court may award the prevailing party reasonable attorney's fees as a part of the costs. The state's liability for costs is the same as that of a private person.

We hold that in compliance with Chapter 106, the farm workers, as prevailing parties, are entitled to attorney's fees and costs. We therefore hold that the lower courts erred in finding that sovereign immunity barred the State from liability and uphold the trial court's finding granting the farm workers $36,810 in attorney's fees.

 **[3]**    Finally, in reference to costs, the court of appeals ordered that the costs of appeal be taxed equally between TEC and the farm workers and remanded to the trial court for an assessment of the additional costs of the suit. We reverse the judgment of the court of appeals and order that all costs be assessed against the State. TEX.R.CIV.P. 131 provides that the successful party to a suit shall recover all costs incurred. "Taxing of costs against the successful party in the trial court is contrary to Rule 131 of the Texas Rules of Civil Procedure." *Martinez v. Pierce,* 31 Tex.Sup.Ct.J. 359 (April 30, 1988).

We reverse the judgment of the court of appeals. We affirm that part of the trial court's judgment granting declaratory relief but vacate the portion of the judgment granting injunctive relief. We reverse the portion of the trial court's judgment denying the farm workers recovery of attorney's fees and render judgment that the farm workers recover $36,810 in attorney's fees. We reverse the court of appeals' assessment of costs and order that all costs of the suit be assessed against the State.

**All Citations**

754 S.W.2d 149

© 2015 Thomson Reuters. No claim to original U.S. Government Works.



KeyCite Yellow Flag - Negative Treatment

**Distinguished by**    Strauss v. Belt,    Tex.App.-Austin,    July 23, 2010

271 S.W.3d 928
Court of Appeals of Texas,
Houston (14th Dist.).

Margie CANTON–CARTER, Appellant

v.

BAYLOR COLLEGE OF MEDICINE, Appellee.

No. 14–07–00351–CV.    |    Dec. 23, 2008.

**Synopsis**

**Background:** Patient brought suit against medical facility for injuries she allegedly sustained as a result of a hysterectomy. The 270th District Court, Harris County, 2007 WL 5490240, granted facility summary judgment. Patient appealed.

**Holdings:** The Court of Appeals, John S. Anderson, J., held that:

[1] patient did not allege trial court error in her appellate brief, or cite legal authority, or provide substantive analysis of the legal issues presented, and, thus, she waived her issues on appeal, and

[2] summary judgment evidence presented by patient was insufficient to raise a genuine issue of material fact.

Affirmed.

Kem Thompson Frost, J., concurred and filed opinion.

West Headnotes (11)

[1]    **Attorney and Client**
    ☞ Rights of Litigants to Act in Person or by Attorney

A *pro se* litigant is required to properly present her case on appeal, just as she is required to properly present her case to the trial court.

6 Cases that cite this headnote

[2]    **Attorney and Client**
    ☞ Rights of Litigants to Act in Person or by Attorney

A court will not make allowances for, or apply different standards, because a case is presented by a litigant acting without the advice of counsel.

2 Cases that cite this headnote

[3]    **Appeal and Error**
    ☞ References to Record

An appellate court has no duty, or even the right, to perform an independent review of the record and applicable law to determine whether there was error.

8 Cases that cite this headnote

[4]    **Appeal and Error**
    ☞ Failure to Urge Objections

In the review of a civil case, an appellate court has no discretion to consider an issue not raised in an appellant's brief.

9 Cases that cite this headnote

[5]    **Appeal and Error**
    ☞ Insufficient Discussion of Objections

Patient who brought pro se suit against medical facility for injuries she allegedly sustained as a result of a hysterectomy did not allege trial court error in her appellate brief, or cite legal authority, or provide substantive analysis of the legal issues presented, and, thus, patient waived her issues on appeal; appellate court could not review record, research law, and fashion legal argument for patient when she failed to do so. Rules App.Proc., Rule 38.1(f), (i).

16 Cases that cite this headnote

[6]    **Appeal and Error**
    ☞ Requisites and Sufficiency

An issue presented for appellate review is sufficient if it directs the reviewing court's attention to the error about which the complaint is made. Rules App.Proc., Rule 38.1(f).

10 Cases that cite this headnote

**[7]** **Appeal and Error**
    Form and Requisites in General

**Appeal and Error**
    References to Record

**Appeal and Error**
    Points and Arguments

An appellant's brief must contain a clear and concise argument that includes appropriate citations to legal authority and the appellate record; this requirement is not satisfied by merely uttering brief, conclusory statements unsupported by legal citations. Rules App.Proc., Rule 38.1(i).

9 Cases that cite this headnote

**[8]** **Appeal and Error**
    Insufficient Discussion of Objections

Failure of an appellant to cite legal authority or to provide substantive analysis of the legal issues presented on appeal results in waiver of the complaint. Rules App.Proc., Rule 38.1(i).

7 Cases that cite this headnote

**[9]** **Appeal and Error**
    References to Record

**Appeal and Error**
    Points and Arguments

It is not an appellate court's duty to review the record, research the law, and then fashion a legal argument for an appellant if she has failed to do so. Rules App.Proc., Rule 38.1(f), (i).

5 Cases that cite this headnote

**[10]** **Appeal and Error**
    Briefs

An appellate court may not consider documents attached to an appellate brief that are not part of the appellate record.

10 Cases that cite this headnote

**[11]** **Judgment**
    Torts

Timely filed summary judgment evidence presented by patient who brought pro se suit against medical facility for injuries she allegedly sustained as a result of a hysterectomy was insufficient to raise a genuine issue of material fact as to whether facility's alleged negligence caused patient's alleged injuries, and, thus, facility's no-evidence motion for summary judgment was properly granted. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(i).

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*930** Margie Canton–Carter, Missouri City, TX, pro se.

Joanna Walker Raynes, Peggy R. Ban, Houston, TX, for appellees.

Panel consists of Justices ANDERSON, FROST and HUDSON.[*]

[*]    Senior Justice Harvey Hudson sitting by assignment.

### MAJORITY OPINION

JOHN S. ANDERSON, Justice.

*Pro se* appellant, Margie Canton–Carter, appeals the trial court's granting of appellee, Baylor College of Medicine's motion for summary judgment. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Appellant filed suit against appellee, Dr. Alan Tita, and Dr. Erin L. O'Brien for injuries she allegedly sustained as a result of a hysterectomy performed on July 17, 2002. In May 2005, the trial court granted Dr. Tita's motion for summary judgment and dismissed with prejudice all of appellant's causes of action against Dr. Tita. The trial court eventually signed an order severing appellant's causes of action against Dr. Tita from the original lawsuit. On



September 14, 2005 appellant filed her notice of non-suit of Dr. O'Brien. On September 21, 2005, the trial court signed an order acknowledging appellant's non-suit of Dr. O'Brien and dismissing appellant's suit against Dr. O'Brien leaving appellee as the sole defendant in appellant's lawsuit. On February 6, 2007 appellee filed a hybrid no-evidence and traditional motion for summary judgment. The trial court granted appellee's motion without specifying the grounds. This appeal followed.

## DISCUSSION

**[1]** **[2]** The law is well established that *pro se* litigants are held to the same standards as licensed attorneys and must comply with all applicable rules of procedure. *Valadez v. Avitia,* 238 S.W.3d 843, 845 (Tex.App.-El Paso 2007, no pet.). A *pro se* litigant is required to properly present her case on appeal, just as she is required to properly present her case to the trial court. *Id.* If this were not the rule, *pro se* litigants would benefit from an unfair advantage over those parties who are represented by counsel. *Id.* Therefore, we will not make allowances for, or apply different standards, because a case is presented by a litigant acting without the advice of counsel. *Id.*

**[3]** **[4]** It is appellant's burden to discuss her assertions of error. *Id.* An appellate court has no duty, or even the right, to perform an independent review of the record and applicable law to determine whether there was error. *Id.* In the review of a civil case, an appellate court has no discretion to consider an issue not raised in an appellant's brief. *Id.*

**[5]** In her amended brief, appellant presents what purport to be eleven issues for appellate review.[1] In her first issue, appellant states: "no informed consent to **\*931** remove ovaries." In her second issue, appellant contends: "resident physicians, not experienced in major surgery of this nature, followed a medical path for resolution that was not warranted." Appellant's third issue, in its entirety provides: "failure to supervise residents (duty to regulate)." In issue four, appellant contends: "all Baylor residents (non-suited), were served prior to statute of limitations expiring." Appellant's fifth issue states simply: "plaintiff's attorney's withdrawal." Appellant's sixth issue provides: "defendants paid all of plaintiff's medical bills." In her seventh issue, appellant contends the "lower court failed to introduce pertinent evidence/medical records." Next, in issue eight, appellant asserts "all the defendants were timely served about

this lawsuit, with return receipts/response letters received from Baylor's Risk Management office, Jan. 30, 2003." In her ninth issue, appellant asserts: "material misrepresentations to plaintiff that raises a cross-point to pass sanctions on plaintiff's former Attorney Martin, and the defendants." Appellant's tenth issue provides, in its entirety: "resolution of plaintiff's claim for indigency." Finally, in an unnumbered issue, appellant contends appellee's expert witness affidavit lacks "authenticity due to the lack of Notary seal, signature of Affiant, and Notary Public not occurring on the same page." Even after examining the argument section of appellant's amended brief, we are unable to discern any complaint about an alleged trial court error.

[1]    Appellant filed her initial brief on May 22, 2008. She then requested leave to file an amended brief, which was granted. Appellant's amended brief was filed on June 26, 2008.

**[6]** The Texas Rules of Appellate Procedure control the required contents and the organization for an appellate brief. *Id.* (citing Tex.R.App. P. 38.1). One of those requirements is that an appellant's brief must concisely state all issues or points presented for review. *Id.* (citing Tex.R.App. P. 38.1(e) (now Rule 38.1(f))). An issue presented for appellate review is sufficient if it directs the reviewing court's attention to the error about which the complaint is made. *Id.* Appellant's issues on appeal do not meet this requirement as they do not point out any error allegedly committed by the trial court or even attack the merits of the trial court granting appellee's motion for summary judgment. It would be inappropriate for this court to speculate as to what appellant may have intended to raise as an error by the trial court on appeal. *Id.* To do so would force this court to stray from our role as a neutral adjudicator and become an advocate for appellant. *Martinez v. El Paso County,* 218 S.W.3d 841, 844 (Tex.App.-El Paso 2007, pet. stricken).

**[7]** **[8]** **[9]** **[10]** In addition to a concise statement of all issues presented for review, an appellant's brief must also contain a clear and concise argument that includes appropriate citations to legal authority and the appellate record. *Valadez,* 238 S.W.3d at 845 (citing Tex.R.App. P. 38.1(h)(now Rule 38.1(i))). This requirement is not satisfied by merely uttering brief, conclusory statements unsupported by legal citations. *Id.* Failure to cite legal authority or to provide substantive analysis of the legal issues presented results in waiver of the complaint. *Id.* Appellant has not met this requirement. Appellant's amended brief consists of a series of disjointed factual assertions and cryptic complaints.

Appellant did not provide any discussion of the appropriate standard of review for the appeal of a summary judgment, any citation of appropriate legal authority, or any analysis applying the appropriate legal authority to the facts of her case in such a manner as to demonstrate the trial court committed reversible error when it granted appellee's motion for summary judgment. [2] It is not **\*932** this court's duty to review the record, research the law, and then fashion a legal argument for appellant when she has failed to do so. *Urrutia v. Kysor Industrial Corp.,* No. 14–98–00577–CV, 2000 WL 1289318, at \*2 (Tex.App.-Houston [14th Dist.] Sept. 14, 2000, pet. denied) (not designated for publication). Because appellant's amended brief completely fails to comply with the requirements of Texas Rule of Appellate Procedure 38, she has waived her issues on appeal. *Valadez,* 238 S.W.3d at 845.

[2]  Appellant did include citation to documents in an appendix attached to her amended brief. The vast majority of these documents are not part of the appellate record. We may not consider documents attached to an appellate brief that are not part of the appellate record. *Ramex Construction Co. v. Tamcon Services, Inc.,* 29 S.W.3d 135, 138 (Tex.App.-Houston [14th Dist.] 2000, no pet.). With regard to those few documents in appellant's appendix that are found in the appellate record, appellant offers no argument as to how these documents establish the trial court erred when it granted appellee's motion for summary judgment.

[11]  To the extent appellant's issues on appeal can be construed as challenging the trial court's order granting appellee's hybrid motion for summary judgment, the result is the same. Appellant's timely filed summary judgment evidence is insufficient to raise a genuine issue of material fact as to whether appellee's alleged negligence caused appellant's alleged injuries. Because, under rule 166a(i), a trial court must grant a no-evidence motion for summary judgment unless the respondent produces summary judgment evidence sufficient to raise a genuine issue of material fact, which appellant failed to do, the trial court properly granted appellee's motion. Tex.R. Civ. P. 166a(i).

## CONCLUSION

We affirm the trial court's summary judgment.

KEM THOMPSON FROST, Justice, concurring.

The majority concludes that appellant Margie Canton–Carter has not assigned any error and that this court may resolve this entire appeal based on briefing waiver. Though both conclusions are incorrect, the court nonetheless reaches the right result because the timely filed summary-judgment evidence does not raise a genuine issue of material fact as to whether the alleged negligence of appellee Baylor College of Medicine proximately caused Canton–Carter's injury.

The majority applies the rules of appellate procedure too strictly and contrary to binding precedent of the Texas Supreme Court. In concluding that Canton–Carter has failed to assign any error, the majority improperly restricts consideration of the issues that Canton–Carter has presented to the issues stated in the "Issues Presented for Review" section of her brief. *See* TEX.R.APP. P. 38.1(e) [1] ("The brief must state concisely all issues or points presented for review. The statement of an issue or point will be treated as covering every subsidiary question that is fairly included."); *Perry v. Cohen,* 272 S.W.3d 585, 587–88, 2008 WL 4891677, at \*2–3 (Tex., 2008) (holding that court of appeals erred by concluding appellant failed to assign error and by failing to liberally construe the issues presented and the subsidiary questions fairly included therein in light of the assertions by appellant in the argument section of the brief). The majority does not discuss the issues that are fairly included in the issues presented by Canton–Carter. The majority does not mention that Canton–Carter asserts that this **\*933** court should reverse the trial court's summary judgment. Nor does the majority address Canton–Carter's arguments regarding the essential elements of her medical malpractice case. Appellate briefs are to be construed reasonably, yet liberally, so that the right to appellate review is not lost by waiver. *See Perry, at 587, 2008 WL 4891677, at \*2.* Appellate courts should reach the merits of an appeal whenever reasonably possible and should construe issues presented liberally to obtain a just, fair, and equitable adjudication of the rights of the litigants. *See id. at 587–88, at \*2–3.* Under this legal standard, Canton–Carter has assigned error as to whether the trial court erred in granting Baylor College of Medicine's motion for summary judgment.

[1]  Effective September 1, 2008, the relevant rule is Rule 38.1(f), although the language is the same as former Rule 38.1(e).

In the alternative, the majority disposes of this entire appeal and affirms the trial court's judgment based on briefing waiver under Rule 38.1(h). [2] However, under binding precedent, this

court cannot resolve all of the issues in an appeal based on briefing waiver. *See* TEX.R.APP. P. 44.3 ("A court of appeals must not affirm or reverse a judgment or dismiss an appeal for formal defects or irregularities in appellate procedure without allowing a reasonable time to correct or amend the defects or irregularities."); *Inpetco, Inc. v. Texas American Bank/Houston, N.A.,* 729 S.W.2d 300, 300 (Tex.1987) (per curiam) (stating that, under predecessor to Rule 44.3, a court of appeals cannot overrule all issues and affirm trial court's judgment based only on briefing waiver); *Elder v. Bro,* 809 S.W.2d 799, 802 (Tex.App.-Houston [14th Dist.] 1991, writ denied) (holding that appellate courts may overrule some of appellant's issues based on briefing waiver, but must not overrule all of them based on briefing waiver). Therefore, this court should not use briefing waiver to dispose of the entire appeal.

2    Effective September 1, 2008, the relevant rule is Rule 38.1(i), although the language is the same as former Rule 38.1(h).

Nonetheless, the timely filed summary-judgment evidence does not raise a genuine issue of material fact as to whether the alleged negligence of Baylor College of Medicine proximately caused Canton–Carter's injury. For this reason, the trial court's judgment should be affirmed.

Accordingly, though I do not join in the majority's opinion, I respectfully concur in the judgment.

**All Citations**

271 S.W.3d 928

---

**End of Document**
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

912 S.W.2d 302
Court of Appeals of Texas,
Houston (14th Dist.).

Cynthia CASTEEL–DIEBOLT, Appellant,

v.

Daniel DIEBOLT, Appellee.

No. 14–94–00229–CV.   |   Oct. 12,
1995.   |   Rehearing Overruled Dec. 14, 1995.

In connection with custody dispute, the 247th District Court, Harris County, Dean C. Huckabee, J., granted former husband sole managing conservatorship of minor children, and wife appealed. The Court of Appeals, Murphy, C.J., held that: (1) former wife waived challenge to sufficiency of jury charge; (2) there was no fundamental error absent showing that trial court lacked jurisdiction or that child custody state modifications were adversely affecting public interest; (3) former wife failed to preserve challenges to legal and factual sufficiency of evidence; and (4) sanctions were warranted against former wife for bringing appeal for purpose of delay without sufficient cause.

Affirmed.

West Headnotes (16)

**[1]**    **Appeal and Error**
 Necessity of Objection in General

**Appeal and Error**
 Necessity of Ruling on Objection or Motion

To preserve error in jury charge, party complaining on appeal must have made trial court aware of complaint and must have obtained ruling. Rules App.Proc., Rule 52(a).

2 Cases that cite this headnote

**[2]**    **Appeal and Error**
 Assent to Proceeding

If party agrees to submitted jury charge, party is estopped from taking different position on appeal by complaining that charge was defective. Rules App.Proc., Rule 52(a).

3 Cases that cite this headnote

**[3]**    **Appeal and Error**
 Necessity of Objections in General

Fundamental error exists only under rare circumstances in which record shows on its face that either trial court lacked jurisdiction or that public interest is directly and adversely affected as that interest is declared in statutes and Constitution of state.

2 Cases that cite this headnote

**[4]**    **Child Custody**
 Record

Absent anything in record to show that trial court lacked jurisdiction over action granting father sole managing conservatorship of minor children or that trial custody modifications were against public interest, there was no fundamental error.

1 Cases that cite this headnote

**[5]**    **Appeal and Error**
 Insufficient Discussion of Objections

Point of error not supported by authority is waived on appeal.

10 Cases that cite this headnote

**[6]**    **Appeal and Error**
 Points and Arguments

Court has no duty on appeal to search record without guidance from appellant to determine whether assertion of reversible error is valid.

11 Cases that cite this headnote

**[7]**    **Appeal and Error**
 References to Record

**Appeal and Error**
 Points and Arguments

Burden is on appellant to show that record supports contention and to make accurate references to record to support complaints on appeal.

11 Cases that cite this headnote

**[8]  Appeal and Error**
    References to Record

Failure to cite relevant portions of trial court record waives appellate review.

4 Cases that cite this headnote

**[9]  Evidence**
    Judicial Admissions in General

Where former wife had judicially admitted to material and substantial change in circumstances of children and that prior custody order had become unworkable under existing circumstances, she was precluded from challenging sufficiency of evidence to support change of conservatorship.

4 Cases that cite this headnote

**[10]  Child Custody**
    Discretion

Because provisions of family code with respect to attorney fees and costs are intended to supplant rules of civil procedure, ability to recover attorney fees and costs in custody matters is limited to reasonable attorney fees, as well as other costs, in suit affecting parent-child relationship, but decision to award fees and costs is within discretion of trial court.

1 Cases that cite this headnote

**[11]  Child Custody**
    Discretion

Absent showing of abuse of discretion, trial court's decision on attorney fees will not be reversed on appeal in child custody matter.

Cases that cite this headnote

**[12]  Child Custody**
    Determination and Disposition of Cause

Where trial court awarded attorney fees and costs only to attorney/guardian ad litem who was

appointed to represent minor children in custody dispute, there was nothing to show intent by trial court to award former husband costs or attorney fees and no reason to sever and remand issue of attorney fees and costs from other custody issues on appeal.

Cases that cite this headnote

**[13]  Costs**
    Nature and Form of Judgment, Action, or Proceedings for Review

Although sanctions may be granted against parent in custody dispute by reviewing court, rule will be applied with prudence, caution, and after careful deliberation and only showing that appeal was brought for delay and without sufficient cause. Rules App.Proc., Rule 84.

16 Cases that cite this headnote

**[14]  Costs**
    Nature and Form of Judgment, Action, or Proceedings for Review

For purposes of determining whether sanctions for bringing appeal for delay and without sufficient cause or warranty, focus of test is on whether appellant had reasonable expectation of reversal or whether he merely pursued appeal in bad faith; court would impose damages only if likelihood of favorable result is so improbable as to make appeal taken for delay and without sufficient cause. Rules App.Proc., Rule 84.

7 Cases that cite this headnote

**[15]  Costs**
    Nature and Form of Judgment, Action, or Proceedings for Review

Where former wife's appeal from custody dispute failed to preserve properly for review complaint as to charge, jury charge was submitted by agreement of parties, and wife was aware that challenge as to sufficiency of charge was groundless, sanctions for bringing appeal for purpose of delay and without sufficient cause were warranted. Rules App.Proc., Rules 50(d), 52(a), 74(f), 84.

1 Cases that cite this headnote

**[16]    Appeal and Error**
&#128273; Questions Involving Issues of Fact

Whether fraud has been committed is fact question to be determined by trier of facts and not by reviewing court.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*304**  John D. Payne, Houston, for appellant.

Jolene Wilson-Glah, Houston, for appellee.

Before MURPHY, C.J., and AMIDEI and ANDERSON, JJ.

**OPINION**

MURPHY, Chief Justice.

The appellant, Cynthia Casteel–Diebolt, appeals from an order granting the appellee, Daniel Diebolt, sole managing conservatorship of their two minor children. Appellant brings eleven points of error and appellee brings six cross points. We affirm.

In January 1991, the trial court signed an agreed order, providing that both appellant and appellee serve as joint managing conservators of their two children. Following several months of disharmony, including allegations made by appellant of sexual abuse committed by appellee and contempt proceedings brought by appellee against appellant for violating an agreed order, both parties sought modification of the joint managing conservatorship. *See* TEX.FAM.CODE ANN. § 14.081(d). A jury appointed appellee the sole managing conservator of the children.

In her first point of error, appellant contends the jury was not correctly charged. She argues the trial court should have included the enumerated factors in section 14.081(d) of the family code that are used to determine whether a joint managing conservatorship should be replaced with a sole managing conservatorship.

**[1]    [2]**    We do not reach the merits of the sufficiency of the jury charge, however, because appellant waived her complaint by failing to object at trial. TEX.R.APP.P. 52(a). To preserve error in a jury charge, the party complaining on appeal must have made the trial court aware of the complaint and must have obtained a ruling. *State Dep't of Highways v. Payne,* 838 S.W.2d 235, 241 (Tex.1992). Because appellant failed to comply with this rule, she has waived any error. Moreover, appellant agreed to the submitted jury charge. Appellant is now estopped from taking a different position on appeal by complaining the charge was defective. *See, e.g., Litton Indus. Products Inc. v. Gammage,* 668 S.W.2d 319, 322 (Tex.1984); *Marino v. Hartsfield,* 877 S.W.2d 508, 513 (Tex.App.—Beaumont 1994, writ denied); *Furnace v. Furnace,* 783 S.W.2d 682, 684 (Tex.App.—Houston [14th Dist.] 1989, dis'm w.o.j.); *Mullins v. Coussons,* 745 S.W.2d 50, 51 (Tex.App.—Houston [14th Dist.] 1987, no writ).

**[3]    [4]**    Appellant further contends the error was fundamental. Fundamental error exists only under rare circumstances in which the record shows on its face that either the trial court lacked jurisdiction or that the public interest is directly and adversely affected as that interest is declared in the statutes and constitution of this state. *Cox v. Johnson,* 638 S.W.2d 867, 868 (Tex.1982). Fundamental error is not present in this case. The record is devoid of any evidence that the trial court lacked jurisdiction or that the child custody modifications were a public interest. Accordingly, appellant's first point of error is overruled.

**[5]    [6]    [7]    [8]**    In points of error two through five, appellant contends: (1) inadmissible hearsay testimony was admitted; (2) an audio tape was admitted without the proper predicate; (3) leading questions were improperly allowed; and (4) deposition testimony was improperly used. Appellant, however, fails to support any of these points of error with legal authority, or with any accurate reference to the portions of the record upon which she relies. A point of error not supported by  **\*305**  authority is waived. *Trenholm v. Ratcliff,* 646 S.W.2d 927, 934 (Tex.1983); *Budd v. Gay,* 846 S.W.2d 521, 524 (Tex.App.—Houston [14th Dist.] 1993, no writ); *Elder v. Bro,* 809 S.W.2d 799, 801 (Tex.App.—Houston [14th Dist.] 1991, writ denied); *see also* TEX.R.APP.P. 74(f). This Court has no duty to search a voluminous record without guidance from appellant to determine whether an assertion of reversible error is valid. *Stevens v. Stevens,* 809 S.W.2d 512, 513 (Tex.App.—Houston [14th Dist.] 1991, no writ); *Most Worshipful Prince Hall v. Jackson,* 732 S.W.2d 407, 412 (Tex.App.—Dallas 1987, writ ref'd n.r.e.). Instead, the

burden is on appellant to demonstrate the record supports her contentions and to make accurate references to the record to support her complaints on appeal. *Elder,* 809 S.W.2d at 801. The failure to cite to relevant portions of the trial court record waives appellate review. *Tacon Mechanical Contractors v. Grant Sheet,* 889 S.W.2d 666, 671 (Tex.App.—Houston [14th Dist.] 1994, writ denied). Accordingly, appellant's points of error two through five are overruled.

 **[9]**    In points of error six through eleven, appellant challenges the legal and factual sufficiency of the evidence. As with points two through five, however, appellant failed to preserve error because her brief lacked authority and accurate references to the record. In addition, appellant judicially admitted to material and substantial changes in the circumstances of her children and that the prior custody order had become unworkable under the existing circumstances. Consequently, she is precluded from challenging the sufficiency of the evidence to support the change of conservatorship. *Thompson v. Thompson,* 827 S.W.2d 563, 566 (Tex.App.—Corpus Christi 1992, writ denied). Appellant's points of error six through eleven are overruled.

 **[10]**    **[11]**    Appellee has asserted six cross-points for our consideration. In cross-points one and three, appellee contends that because he substantially prevailed in his cross-motion to modify child custody, the trial court abused its discretion by failing to award him costs and attorney fees. Provisions of the family code with respect to attorney fees and costs are intended to supplant rules of civil procedure. *Gross v. Gross,* 808 S.W.2d 215, 221–222 (Tex.App.—Houston [14th Dist.] 1991, no writ). Thus, appellee's ability to recover attorney fees and costs is limited to section 11.18 of the family code, which provides for reasonable attorney fees, as well as other costs, in suits affecting the parent-child relationship. *In Interest of Pecht,* 874 S.W.2d 797, 803 (Tex.App.—Texarkana 1994, no writ); *In Interest of R.M.H.,* 843 S.W.2d 740, 742 (Tex.App.—Corpus Christi 1992, no writ). The decision to award attorney's fees and costs, however, is within the discretion of the trial court. *Pecht,* 874 S.W.2d at 803; *R.M.H.,* 843 S.W.2d at 742. Absent a showing of an abuse of discretion, we will not reverse the trial court's decision on attorney fees. *Cohen v. Sims,* 830 S.W.2d 285, 290 (Tex.App.—Houston [14th Dist.] 1992, writ denied). Upon thorough review of the record, we find no abuse of discretion by the trial court; therefore, cross-points one and three are overruled.

 **[12]**    In his fifth cross-point, appellee urges this Court to sever and remand the issues of attorney fees and costs because

these issues were not ruled on by the trial court. Appellee relies exclusively on *A.V.I., Inc. v. Heathington,* 842 S.W.2d 712, 718 (Tex.App.—Amarillo 1992, writ denied), in which the court severed and remanded the attorney fees issue. *Id.* In that case, the trial court disregarded the jury's findings as to attorney fees, but failed to enter on the judgment the amount of attorney fees to be awarded. *Id.* The Amarillo court reasoned that because the trial court intended to award some amount of attorney fees, severance and remand of the attorney fees issue was appropriate. *Id.*

In the present case, despite appellee's specific request for attorney fees and costs in his "Second Amended Cross Motion to Modify In Suit Affecting the Parent–Child Relationship," the trial court awarded attorney fees and costs only to the attorney/guardian ad litem who was appointed by the trial court to represent the minor children. Moreover, unlike *Heathington,* the record is devoid of any evidence of intent by the trial court to award the appellee costs or attorney fees. Therefore, **\*306** because we find the trial court neither intended to award the appellee attorney fees and costs, nor abused its discretion by failing to do so, appellee's fifth cross-point is overruled.

In appellee's second cross-point, he asserts the trial court erred in overruling his motion to quash appellant's motion for new trial. Appellee contends the trial court lacked plenary power when it denied appellant's motion for new trial, and thus, points of error two through eleven were not properly preserved for our review. Appellant's motion for new trial, however, was required to preserve only those points of error challenging legal and factual sufficiency. *See* TEX.R.CIV.P. 324(b). Because we have already determined that these points of error were waived by the appellant and not subject to our review, we find it unnecessary to reach the merits of this issue. Appellee's second cross-point is overruled.

 **[13]**    **[14]**    By his fourth cross-point, appellee requests sanctions against appellant. TEX.R.APP.P. 84. Although granting sanctions under this rule is within an appellate court's discretion, *Maronge v. Cityfed Mortgage Co.,* 803 S.W.2d 393, 396 (Tex.App.—Houston [14th Dist.] 1991, no writ), this rule should only be applied with prudence, caution, and after careful deliberation. *Exxon Corp. v. Shuttlesworth,* 800 S.W.2d 902, 908 (Tex.App.—Houston [14th Dist.] 1990, no writ). Rule 84 requires this court to ask first whether the appeal was brought "for delay and without sufficient cause." TEX.R.APP.P. 84. The focus of this test is whether appellant had a reasonable expectation of reversal or whether he merely

pursued the appeal in bad faith. *Francis v. Marshall, 841 S.W.2d 51, 54–55 (Tex.App.—Houston [14th Dist.] 1992, no writ)*. The "[c]ourt should impose damages only if the likelihood of a favorable result was so improbable as to make this an appeal taken for delay and without sufficient cause." *Francis, 841 S.W.2d at 55* (citing *Ambrose v. Mack, 800 S.W.2d 380, 383 (Tex.App.—Corpus Christi 1990, writ denied)*).

**[15]** Upon review of the record and in light of appellant's failure to comply with rules of appellate procedure 50(d), 52(a) and 74(f), we find that sanctions are warranted. First, Appellant readily admits in her brief that: (1) her complaint as to the charge was not properly preserved for appeal; and (2) the jury charge was submitted by agreement of the parties. Appellant was aware her challenge as to the sufficiency of the charge was groundless. Appellant, nonetheless, asserts this complaint in her first point of error, arguing that fundamental error by the trial court precluded waiver of her complaint, yet, appellant failed to cite to authority to show fundamental error existed. *See* TEX.R.APP.P. 74(f). Second, as to appellant's points two through eleven, she failed to cite to *any* authority or make *any* accurate references to the record to support her arguments. Under these circumstances, we are compelled to hold that appellant has taken this appeal for delay and without

sufficient cause. We, therefore, exercise our discretion to assess damages in the sum of two times the total taxable costs to be paid to appellee, Daniel Diebolt. *See* TEX.R.APP.P. 84. Because frivolous litigation should not go unsanctioned, appellee's fourth cross-point is sustained.

**[16]** In his sixth cross-point, appellee asks this court to sanction appellant's attorney for committing fraud during this appeal. However, whether a fraud has been committed is a fact question to be determined by the trier of facts. *Berquist v. Onisiforou, 731 S.W.2d 577 (Tex.App.—Houston [14th Dist.] 1987, no writ)*. Moreover, findings of fact are the exclusive province of the jury and trial court. *Bellefonte Underwriters Ins. Co. v. Brown, 704 S.W.2d 742, 744 (Tex.1986)*. Therefore, because this court has no authority to decide whether fraud was committed by appellant, appellee's sixth cross-point is overruled.

The judgment of the court below is affirmed and we assess sanctions against appellant in the amount of two times the total taxable costs.

**All Citations**

912 S.W.2d 302

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Declined to Extend by** Gammon v. Hodes, Tex.App.-Austin, April 24, 2015

145 S.W.3d 165
Supreme Court of Texas.

CITY OF ARLINGTON, Petitioner,

v.

STATE FARM LLOYDS, Respondent.

No. 03–0466. | Sept. 3, 2004.

**Synopsis**

**Background:** Homeowner's insurer brought subrogation action against city to recover payment for sewer backup. The 67th District Court, Tarrant County, entered judgment for insurer and denied motions for judgment notwithstanding the verdict (JNOV). City appealed, and insurer cross-appealed. The Fort Worth Court of Appeals, Jeff Walker, J., affirmed. Review was granted.

**Holdings:** The Supreme Court held that:

[1] the sewer backup was not a taking, and

[2] city was immune from liability on nuisance theory.

Reversed and rendered.

West Headnotes (5)

[1]    **Appeal and Error**
       Insufficient discussion of objections

       Appellant's failure to repeat record references in argument and authorities sections of appellate brief did not result in waiver; the brief included record references with page numbers in the statement of facts.

       5 Cases that cite this headnote

[2]    **Appeal and Error**
       Insufficient discussion of objections

Appellant's citations to the "entire record" did not waive argument that no evidence supported trial court's decision.

2 Cases that cite this headnote

[3]    **Appeal and Error**
       Extent of Review

       When a complete absence of evidence is alleged, the reviewing court must include the entire record within its scope of review.

       1 Cases that cite this headnote

[4]    **Eminent Domain**
       Drains and sewers

       Sewer backup into house was not a taking of homeowners' property by city; nothing indicated that the damage was substantially certain to result. Vernon's Ann.Texas Const. Art. 1, § 17.

       5 Cases that cite this headnote

[5]    **Municipal Corporations**
       Discharge of Sewage

       City was immune from liability on nuisance theory for homeowners' damage resulting from backup of sewer system; there was no clear waiver of governmental immunity.

       7 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*166** Frank Waite, Elizabeth Lutton, Asst. City Attys., Alan Dean Lathrom, Arlington, for Petitioner.

Michael W. Minton, Law Office of Michael W. Minton, PLLC, Dallas, for Respondent.

**Opinion**

PER CURIAM.

State Farm Lloyds (State Farm) brought a subrogation suit against the City of Arlington to recover monies it paid to an insured homeowner whose home was damaged by a sewage backup. The trial court awarded damages to State Farm, and

the court of appeals affirmed. Initially, we must determine whether the City adequately preserved its argument that there was no evidence to support essential elements of State Farm's nuisance and takings claims. Because we conclude that the City adequately supported its arguments in the court of appeals with record references and citation of authority, we hold that it preserved the argument. Based on this Court's decision in *City of Dallas v. Jennings,* 142 S.W.3d 310 (Tex.2004), we further conclude that the City of Arlington is not liable, as a matter of law, for the damages alleged in the underlying case. We therefore reverse the court of appeals' judgment and render judgment in favor of the City of Arlington.

Raw sewage backed up into the home of Michael and Sonia Bates on two occasions in 1997 and 1998, causing significant damage to their home. The Bateses' homeowners' insurer, State Farm, paid them $12,723.61 for the first occurrence and $85,582.96 for the second. State Farm brought a subrogation suit against the City of Arlington to recover the monies paid, alleging that the City's operation of the sewer lines constituted a nuisance and an unconstitutional taking under Article 1, Section 17 of the Texas Constitution. State Farm did not allege that the City operated the sewer improperly; instead, it argued that "backups of raw, noxious sewage into private residences" are "inherent in the nature" of sewer systems. State Farm argued that the City should be liable for the damage caused by the sewer system because "the City intentionally acted to maintain the system for the benefit [o]f its citizenry, knowing all the time that backups such as the one involved here are inherent" in the operation of sewer systems.

**\*167** At trial, a jury found that the sewer system "create[d] a nuisance" that proximately caused damages to the house, and that the second sewage flood (but not the first) constituted "a taking of property by the City of Arlington." The jury found that $42,916 would reasonably compensate the Bateses for the damage to their home from the second backup, and the trial court rendered judgment for that amount.

The City of Arlington appealed, arguing (1) that the City was immune from nuisance liability unless the nuisance amounted to a taking under Article I, Section 17 of the Texas Constitution; (2) that State Farm had put forward no evidence that the City acted with the requisite intent to support a takings claim under Article I, Section 17; (3) that State Farm had put forward no evidence that "the property [was] taken for, or applied to, a public use"; and (4) that the trial court erred by submitting questions of law to the jury.

Without considering the merits of the City's arguments, the court of appeals held that the City waived its issues by inadequate briefing because it failed to include specific citations to the record. 141 S.W.3d 216.

 **[1]**    We disagree that the City waived its issues. Contrary to the court of appeals' statements, the City did include record references with page numbers in its brief's Statement of Facts section to support each fact it asserted. Although it did not repeat the references under its Argument and Authorities section, we have held that "failure to restate the facts and record references under each point of error" will not waive the issues when the brief "contains all points of error relied upon, argument and authorities under each point of error, and all facts relied upon for the appeal with references to the pages in the record where those facts can be found." *Weaver v. Southwest Nat'l Bank,* 813 S.W.2d 481, 482 (Tex.1991). Because the City's brief met the requirements laid out in *Weaver,* we conclude that the City did not waive its issues by failing to restate the record references in its Argument and Authorities section.

 **[2]**    Nor do we agree that the City's citations to the "entire record" waived its no-evidence issues. For example, to support its assertion that "[t]here is no allegation or evidence that the [Bateses'] home was singled out or chosen by the City to facilitate an intentional sewage discharge," the City cited the "entire record." The court of appeals concluded that the City had waived its no-evidence points because it "failed to establish, with proper record references, what the evidence adduced at trial was and how that evidence supports its contentions on appeal" and concluded that "[m]erely asserting that no evidence supports the complained-of judgment will not suffice.... This court is not required to search a voluminous record, with no guidance from the City, to determine whether the record supports the City's contentions on appeal." 141 S.W.3d 216, 218. We disagree.

 **[3]**    If the City's no-evidence argument had been based on the strength of the evidence—for example, if the City argued that the evidence was "so weak as to do no more than create a mere surmise or suspicion"—then the City could, and should, detail the relevant parts of the record. *See* Robert W. Calvert, "*No Evidence" and "Insufficient Evidence" Points of Error,* 38 Tex. L.Rev. 361, 363 (1960). In this case, however, the City was not arguing about the strength of the evidence, but was instead arguing that there was a complete absence of evidence on critical elements of State Farm's claims. When

a complete absence of evidence is alleged, the reviewing court must include the entire **\*168** record within its scope of review. *See, e.g., Ford Motor Co. v. Miles,* 967 S.W.2d 377, 380 (Tex.1998) (noting that a no-evidence point will fail if there is "any probative evidence in the entire record.").

Furthermore, neither the facts nor the evidence were truly disputed in this case; instead, the parties essentially disagreed on the legal standards that should be applied to takings and governmental nuisance claims generally. For example, the parties in this case did not dispute whether there was evidence that the City intended to damage the Bateses' home; in fact, State Farm's attorney admitted during his closing argument that the City did not intend to damage the home. Instead, the parties disputed the appropriate legal standard by which to measure the intent required to support takings claims, with State Farm arguing that liability could be predicated on the fact that the City "intentionally operated the sewer system," and the City arguing that a heightened standard of intent should apply. Similarly, the parties did not truly dispute whether there was any evidence that the City's immunity had been waived; instead, they disputed whether, as a matter of law, the City could be held liable for a nuisance even in the absence of any waiver of immunity. Consequently, the crux of the dispute was whether State Farm's claims were barred as a matter of law, and whether the trial court should therefore have granted summary judgment in the City's favor. Both parties amply supported their legal arguments with citation to relevant authority. We conclude that these issues were not waived.

 **[4]** Because we determine that the issues were not waived, we turn to the merits of the City's appeal. Our recent opinion in *City of Dallas v. Jennings,* 142 S.W.3d 310 (Tex.2004), similarly dealt with a takings claim and a nuisance claim arising from a sewage backup and laid out the applicable legal standards for those claims. In that case, we held that a heightened intent standard is indeed necessary

to support a takings claim, and that the mere intentional operation of a sewer system is insufficient to support liability. Specifically, we held that takings liability may arise when the governmental entity "(1) knows that a specific act is causing identifiable harm; or (2) knows that the specific property damage is substantially certain to result from an authorized government action." *Jennings,* 142 S.W.3d at 314.

In this case, there was no evidence the City possessed such knowledge; in fact, State Farm's own witnesses agreed that, at most, after "an occurrence at a certain place" there "may be a way to collect enough information to maybe predict that it's going to happen," but State Farm never alleged that such a prediction was possible in this case. Based on this record, we hold that the City did not engage in an unconstitutional taking.

 **[5]** Our decision in *Jennings* similarly forecloses State Farm's nuisance claim. In *Jennings,* we noted that "[a] city is immune from liability for its governmental actions unless that immunity is waived," and that "[o]peration of a sewer system is a governmental function." *Id.* (citing Tex. Civ. Prac. & Rem.Code § 101.0215(a)(32)). We therefore concluded that "the City will not be liable for damage resulting from its operation of the sewer system without a clear waiver of governmental immunity." *Id.* We apply the same standard here, and note that State Farm has not pointed to any applicable waiver of immunity. We therefore hold that the City of Arlington retained immunity from the nuisance claim.

For the foregoing reasons, we hold that the court of appeals erred in affirming the trial court's judgment. Pursuant to **\*169** Rule 59.1 of the Texas Rules of Appellate Procedure, we grant the City's Petition for Review, and, without oral argument, render judgment that State Farm take nothing.

**All Citations**

145 S.W.3d 165, 47 Tex. Sup. Ct. J. 1170

---

2004 WL 2098074
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**
Court of Appeals of Texas,
San Antonio.

CITY OF SAN ANTONIO, Appellant
v.
Gilbert LONGORIA, Appellee.

No. 04-04-00063-CV.    |    Sept. 22, 2004.

From the 45th Judicial District Court, Bexar County, Texas, Trial Court No. 2003-CI-16266; Honorable John D. Gabriel, Jr., Judge Presiding.

**Attorneys and Law Firms**

Elsa Giron Nava, Asst. City Atty., San Antonio, for appellant.

Heidi L. Widell, David Van Os & Associates, P.C., San Antonio, for appellee.

Sitting: PAUL W. GREEN, Justice, KAREN ANGELINI, Justice, SANDEE BRYAN MARION, Justice.

**MEMORANDUM OPINION**

Opinion by SANDEE BRYAN MARION, Justice.

 **\*1**  This is an appeal from a judgment in which the trial court affirmed a hearing examiner's decision dismissing appellee's indefinite suspension and awarded appellee attorney's fees. We affirm.

**BACKGROUND**

Appellee, Gilbert Longoria, is a fire fighter with the San Antonio Fire Department. On December 21, 2001, Longoria received a bi-weekly paycheck in the net amount of $7,184.64. This amount represented approximately six times his average bi-weekly net pay of $1,196.89. Longoria deposited $6,000 of the check into his savings account, and deposited the balance into his checking account. On

June 21, 2002, Randy Corbin, Payroll Supervisor in the Finance Department for the appellant, City of San Antonio, notified Eleanor Bustamante, the fire department's Payroll Administrator, that Longoria had been overpaid. On June 22, 2002, Bustamante confirmed Corbin's finding. On June 24, 2002, Bustamante informed District Chief Noel Hardin, of the fire department, about the overpayment. On July 25, 2002, Longoria was asked to return the money, which he ultimately did. On January 10, 2003, Fire Chief Robert Ojeda indefinitely suspended Longoria.

Longoria appealed the suspension to an independent hearing examiner, and the dispute was heard on July 30, 2003. At the close of the City's case, Longoria moved to dismiss the Notice of Indefinite Suspension on the grounds that it violated the 180-day statute of limitations contained in section 143.052(h) of the Texas Local Government Code and in article 33 of the "Collective Bargaining Agreement between the City of San Antonio and Local 624 International Association of Fire Fighters" ("the CBA"). The hearing examiner granted the motion to dismiss, ordered Longoria's reinstatement, and awarded him back pay.

The City appealed the hearing examiner's decision to district court. The City alleged the hearing examiner's award was not supported by substantial evidence and was capricious, and that the hearing examiner exceeded his authority and/or jurisdiction. Longoria filed a motion for summary judgment in which he asserted the City could not establish that the hearing examiner exceeded his authority or jurisdiction when he issued the award. Longoria also asserted substantial evidence supported the hearing examiner's conclusion that the Notice of Indefinite Suspension was untimely. The trial court granted Longoria's motion, and awarded him attorney's fees in the amount of $11,760.00.

**HEARING EXAMINER'S AWARD**

In its first issue, the City asserts the trial court erred in granting Longoria's motion for summary judgment because the hearing examiner's ruling was outside his authority and jurisdiction, was capricious, and/or was not supported by substantial evidence. [1]

---

[1]    The City has not argued that the hearing examiner's award was procured by fraud, collusion, or other unlawful means.

**Standard of Review**

The Texas Legislature has set forth a statutory framework governing the rights and responsibilities of municipal officers seeking to challenge disciplinary suspensions. Under this scheme, an officer may appeal his suspension either to the civil service commission or to an independent third-party hearing examiner. TEX. LOCAL GOV'T CODE ANN. § 143.057(a) (Vernon 1999). Longoria exercised his right to have his appeal heard by an independent hearing examiner. A hearing examiner has the same duties and powers as the commission. *Id.* § 143.057(f). However, unlike the commission's decision, the decision of the hearing examiner is final and binding on all parties. *Id.* § 143.057(c). A district court may hear an appeal of a hearing examiner's award only on the grounds that: (1) the hearing examiner was without jurisdiction; (2) the hearing examiner exceeded his jurisdiction; or (3) the order was procured by fraud, collusion, or other unlawful means. *Id.* § 143.057(j).

 **\*2**  The standard set forth in section 143.057(j) has been interpreted as an "abuse of authority" standard. *See Nuchia v. Tippy,* 973 S.W.2d 782, 786 (Tex.App.-Tyler 1998, no pet.); *see also Lindsey v. Fireman's & Policeman's Civil Serv. Comm'n of the City of Houston,* 980 S.W.2d 233, 236 (Tex.App.-Houston [14th Dist.] 1998, pet. denied). An abuse of authority occurs when a decision is so arbitrary and unreasonable that it amounts to a clear and prejudicial error of law. *City of Carrollton Civil Serv. Comm'n v. Peters,* 843 S.W.2d 186, 188 (Tex.App.-Dallas 1992, writ denied). Governmental review of a hearing examiner's actions is a means to prevent the examiner from exercising his power unchecked. *City of Garland v. Byrd,* 97 S.W.3d 601, 607 (Tex.App.-Dallas 2002, pet. denied). The abuse of authority review fulfills this purpose. *Id* .

**Hearing Examiner's Jurisdiction and Authority**

In its Notice of Indefinite Suspension Without Pay, the City alleged Longoria violated certain specific civil service commission rules and certain specific fire department rules and regulations. The City alleged that the following acts violated these rules and regulations:

> On or about July 24, 2002, [Longoria] had in his possession money totaling approximately $8408.02 that belonged to the City of San Antonio and that had been, and which [Longoria] knew had been, mistakenly given to him in

a paycheck. Despite knowing that the money belonged to the City of San Antonio, and did not belong to him, [Longoria] neither advised the city he had been mistakenly given the money nor returned the money to the city until he was approached by representatives of the San Antonio Fire Department.

Because the underlying facts are not in dispute, Longoria's burden, as summary judgment movant, was to establish as a matter of law that no genuine issue of material fact existed regarding the absence of the hearing examiner's jurisdiction to render an award. *See Nuchia,* 973 S.W.2d at 786; *City of Carrollton v. Popescu,* 806 S.W.2d 268, 271 (Tex.App.-Dallas 1991, no writ).

In its response to Longoria's motion for summary judgment, the City asserted the hearing examiner's analysis was flawed because he determined it was required to take disciplinary action within 180 days of "learning" of the infraction. On appeal, the City expands this argument by contending that it relied on the following "first part" of Local Government Code section 143.052(h) in its notice of indefinite suspension: "In the original written statement and charges and in any hearing conducted under this chapter, the department head may not complain of an act that occurred earlier than the 180th day preceding the date the department head suspends the fire fighter or police officer." *See* TEX. LOC. GOV'T CODE ANN. § 143.052(h). According to the City, the hearing examiner ignored the City's notice of indefinite suspension and focused on the incorrect date, June 24, 2002, which is the date the City confirmed the discovery of the overpayment to Longoria. The City contends the correct date is July 24, 2002 because on that date Longoria had neither returned nor reported the overpayment. The City argues the examiner's decision "was not in accordance with" section 143.052(h) because the examiner erroneously relied on "another part" of section 143.052(h), which reads as follows: "If the act is allegedly related to criminal activity including the violation of a federal, state, or local law for which the fire fighter or police officer is subject to a criminal penalty, the department head may not complain of an act that is *discovered* earlier than the 180th day preceding the date the department head suspends the fire fighter or police officer. The department head must allege that the act complained of is related to criminal activity." *Id.* (emphasis added).

 **\*3**  The hearing examiner's award contradicts the City's argument. In his discussion and analysis, the examiner cited

twice to and considered controlling the very language upon which the City relies, that "the department head may not complain of an act that occurred earlier than the 180th day preceding the date the department head suspends the fire fighter or police officer." Therefore, the City's argument that the hearing examiner relied on the incorrect "part" of section 143.052(h) is without merit.

The City next argued the hearing examiner exceeded his authority and/or jurisdiction "in deciding that the SAFD had not taken disciplinary action in a timely fashion when, in fact, it had." [2] The City's more specific contention is that the hearing examiner incorrectly phrased the issue as whether it could have alleged that an infraction occurred on June 24, 2002. Instead, the City asserts the true issue is whether an infraction did, in fact, occur on July 24, 2002. The City contends the infraction occurred on July 24, 2002 because Longoria still had the over-payment in his possession, and had not returned or reported it. According to the City, Longoria was "obligated to act, each and every day, by the ordinary rules of good behavior observed by law abiding citizens and to return the money pursuant to the SAFD Rules." The City asserts it may consider acts outside the six-month period to explain the infraction, and it maintains that it referred to the June 24th over-payment only as a means of explaining Longoria's wrongful possession of money belonging to the City.

[2] The City also asserts the hearing examiner's application of the law is not supported by substantial evidence. The "substantial evidence" standard is applicable to a review of a decision by the commission. *See* TEX. LOC. GOV'T CODE ANN. § 143.015(b) (appeal is by trial de novo); *Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer,* 662 S.W.2d 953, 955 (Tex.1984) (interpreting "trial de novo" to mean review under the "substantial evidence rule"). This standard is not applicable to a review of a decision by a hearing examiner. *See* TEX. LOC. GOV'T CODE ANN. § 143.057(j); *Nuchia v. Tippy,* 973 S.W.2d 782, 786 (Tex.App.-Tyler 1998, no pet.) (noting that standard applied to decision by hearing examiner differs from standard applied to decisions by commission).

Acts or events outside the six-month period may be used to explain or evaluate "the propriety and gravity" of acts within the six-month period. *Plaster v. City of Houston,* 721 S.W.2d 421, 423 (Tex.App.-Houston [1st Dist.] 1986, no writ) (involving appeal from commission decision). However, the City's argument goes to the correctness of the hearing

examiner's ruling, and not to whether he lacked jurisdiction to rule or abused his authority such that he exceeded his jurisdiction in applying section 143.052(h) to the case before him. *See Lindsey,* 980 S.W.2d at 237.

Because no genuine issue of material fact remained that the hearing examiner lacked jurisdiction or exceeded his jurisdiction to render an award, the trial court properly granted Longoria's motion for summary judgment.

### ATTORNEY'S FEES

In its second issue, the City asserts the trial court erred in granting Longoria attorney's fees because the award was not supported by credible evidence.

In support of his request for attorney's fees, Longoria submitted a compilation of fees and costs, attached to which were the affidavits of the two attorneys who represented Longoria at the request of the International Association of Fire Fighters Local 624 ("the Union"). The compilation states that under the CBA, "[a] reasonable attorney's fee ... for the employee, shall not exceed that actual rate agreed and charged, not to exceed $100.00 per hour."

**\*4** On appeal, the City contends that the affiants did not state they are licensed attorneys in good standing in the State of Texas; no evidence was presented regarding their reputation, experience, or abilities; a foundation for the affiants to testify on the reasonableness of their fees was not established; and there is no evidence the fees are reasonable in Bexar County, Texas or that two attorneys were necessary at an arbitration. None of these complaints were raised before the trial court. In fact, the City lodged no objection to Longoria's request for attorney's fees in the amount of $11,760.

To preserve a complaint for appellate review, a party must present to the trial court a timely request, motion, or objection with sufficient specificity as to make the trial court aware of the complaint, unless the specific grounds are apparent from the context. *See* TEX.R.APP. P. 33.1(a); *see also City of Port Isabel v. Shiba,* 976 S.W.2d 856, 860-61 (Tex.App.-Corpus Christi 1998, pet. denied) (trial error regarding attorney's fees is not fundamental error and must be preserved by timely objection). Therefore, the City has waived this complaint on appeal.

## CONCLUSION

We overrule the City's issues on appeal and affirm the trial court's judgment.

**All Citations**

Not Reported in S.W.3d, 2004 WL 2098074

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

190 S.W.3d 177
Court of Appeals of Texas,
Houston (1st Dist.).

Guy J. DANIEL, Individually and d/
b/a Guy J. Daniel Construction Co.
and Lesha Daniel, Individually and d/
b/a Ja–Le & Associates, Appellants,

v.

FALCON INTEREST REALTY
CORPORATION, Appellee.

No. 01–03–00130–CV.  |  Dec. 29, 2005.

**Synopsis**
**Background:** General contractor brought claims for breach of fiduciary duty, conspiracy, fraud, and tortious interference with contractual and business relationships against its project manager/on-site superintendent for construction project, the wife of the project manager/superintendent, and the mother-in-law and father-in-law of the project manager/superintendent, alleging that project manager/superintendent had not disclosed that a subcontractor hired and paid by him was owned by his father-in-law and mother-in-law, and that defendants personally profited from the subcontractor's operations. General contractor reached pretrial settlement with mother-in-law and father-in-law. After a bench trial, the 151st District Court, Harris County, Caroline E. Baker, J., awarded general contractor $191,000 for breach of fiduciary duty, less a $70,000 settlement credit. Defendants appealed.

**Holdings:** The Court of Appeals, Terry Jennings, J., held that:

[1] project manager/on-site superintendent breached a fiduciary duty, even if general contractor was satisfied with subcontractor's work, and

[2] disgorgement of profits earned by defendants was an appropriate remedy.

Affirmed.

West Headnotes (19)

**[1]**  **Appeal and Error**
 Same Effect as Verdict

**Appeal and Error**
 Sufficiency of Evidence in Support

In an appeal of a judgment rendered after a bench trial, the trial court's findings of fact have the same weight as a jury's verdict, and the appellate court reviews the legal and factual sufficiency of the evidence used to support them, just as it would review a jury's findings.

22 Cases that cite this headnote

**[2]**  **Appeal and Error**
 Conclusiveness in General

When challenged, a trial court's findings of fact are not conclusive, if there is a complete reporter's record.

6 Cases that cite this headnote

**[3]**  **Appeal and Error**
 Findings of Court or Referee

When a party without the burden of proof at trial challenges the legal sufficiency of the evidence, the appellate court considers all of the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor, and if there is any evidence of probative force to support the finding, i.e., more than a mere scintilla, the appellate court will overrule the issue.

3 Cases that cite this headnote

**[4]**  **Fraud**
 Fiduciary or Confidential Relations

The term "fiduciary" generally applies to any person who occupies a position of peculiar confidence towards another, refers to integrity and fidelity, and contemplates fair dealing and good faith.

3 Cases that cite this headnote

**[5]**   **Principal and Agent**
   👉 Nature of Agent's Obligation

The agreement to act on behalf of the principal causes the agent to be a "fiduciary," that is, a person having a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with his undertaking.

1 Cases that cite this headnote

**[6]**   **Principal and Agent**
   👉 Nature of Agent's Obligation

**Principal and Agent**
   👉 Keeping and Rendering Accounts

**Principal and Agent**
   👉 Individual Interest of Agent

**Principal and Agent**
   👉 Duty of Agent to Account for Profits of Agency

**Principal and Agent**
   👉 Acting for Parties Adversely Interested

Among the agent's fiduciary duties to the principal is the duty to account for profits arising out of the employment, the duty not to act as, or on account of, an adverse party without the principal's consent, the duty not to compete with the principal on his own account or for another in matters relating to the subject matter of the agency, and the duty to deal fairly with the principal in all transactions between them. Restatement (Second) of Agency § 13 comment.

2 Cases that cite this headnote

**[7]**   **Labor and Employment**
   👉 Fiduciary Duty

When an employee has a fiduciary relationship with the employer, the employee has a duty to deal openly and to fully disclose to his employer information that affects his employer's business.

2 Cases that cite this headnote

**[8]**   **Fraud**

👉 Fiduciary or Confidential Relations

Even if general contractor was satisfied with quality of work performed by subcontractor, general contractor's project manager/on-site superintendent for construction project breached his fiduciary duties to general contractor as his employer, where project manager/superintendent used his position to hire and pay subcontractor, without disclosing to general contractor that project manager/superintendent and his wife were heavily involved in creating and operating the subcontractor, that subcontractor was owned by the mother-in-law and father-in-law of project manager/superintendent, and that project manager/superintendent and his wife were reaping substantial profit from subcontractor's work for general contractor.

2 Cases that cite this headnote

**[9]**   **Labor and Employment**
   👉 Fiduciary Duty

Courts must be careful in defining the scope of the fiduciary obligations an employee owes an employer when acting as the employer's agent in the pursuit of business opportunities.

1 Cases that cite this headnote

**[10]**   **Fraud**
   👉 Elements of Compensation

Disgorgement of profits that project manager/on-site superintendent employed by general contractor for construction project, and that wife of project manager/superintendent, earned because of the breach by project manager/superintendent of fiduciary duties he owed to general contractor as his employer, was appropriate remedy for the breach of fiduciary duties, relating to project manager/superintendent using his position to hire and pay subcontractor, without disclosing to general contractor that project manager/superintendent and his wife were heavily involved in creating and operating the subcontractor, that subcontractor was owned by the mother-in-law and father-in-law of project manager/

superintendent, and that project manager/superintendent and his wife were reaping substantial profits from subcontractor's work for general contractor.

3 Cases that cite this headnote

**[11] Fraud**
🔑 Fiduciary or Confidential Relations

**Fraud**
🔑 Measure in General

A fiduciary must account for, and yield to the beneficiary, any profit he makes as a result of his breach of fiduciary duty.

2 Cases that cite this headnote

**[12] Appeal and Error**
🔑 Particular Orders or Rulings Reviewable in General

Employee's appellate claim that trial court erred in denying employee's summary judgment motion which alleged that employee did not breach a fiduciary duty to employer presented nothing for appellate court to review; trial court, after denying the motion, found for employer at bench trial, the general rule was that when a party moved unsuccessfully for summary judgment and subsequently lost in conventional trial on merits then denial of summary judgment generally was not subject to review on appeal, and employee did not present an explanation to appellate court, nor did the record support an argument, as to why appellate court should not apply the general rule.

3 Cases that cite this headnote

**[13] Appeal and Error**
🔑 Particular Orders or Rulings Reviewable in General

When a party moves unsuccessfully for summary judgment and subsequently loses in a conventional trial on the merits, the denial of that motion generally is not subject to review on appeal.

3 Cases that cite this headnote

**[14] Appeal and Error**
🔑 Matters or Evidence Considered in Determining Question

Loss of entire clerk's record from trial court did not unduly burden employee as appellant, in employer's action for breach of fiduciary duty; even if docket sheets could have been located, and even assuming that the docket sheets had contained notations concerning calculation of damages, appellate court would not have accepted any such notations as findings of fact and conclusions of law, nor would it have considered any such information in its appellate review.

3 Cases that cite this headnote

**[15] Appeal and Error**
🔑 Matters or Evidence Considered in Determining Question

An appellate court may not consider docket entries made in the trial court, since they are made only for the court clerk's convenience and are usually unreliable.

4 Cases that cite this headnote

**[16] Estoppel**
🔑 Necessity

Equitable estoppel is an affirmative defense that must be pleaded. Vernon's Ann.Texas Rules Civ.Proc., Rule 94.

4 Cases that cite this headnote

**[17] Appeal and Error**
🔑 Ratification, Estoppel, Waiver, and Res Judicata

Employee did not preserve appellate review of an equitable estoppel defense, in employer's action for breach of fiduciary duty, where employee did not plead equitable estoppel as an affirmative defense in the trial court. Vernon's Ann.Texas Rules Civ.Proc., Rule 94.

3 Cases that cite this headnote

**[18]** **Appeal and Error**
   👉 Form and Requisites in General

**Appeal and Error**
   👉 Points and Arguments

The rule stating an appellate brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record, requires a party to provide the appellate court with such discussion of the facts and the authorities relied upon as may be requisite to maintain the point at issue. Rules App.Proc., Rule 38.1(h).

18 Cases that cite this headnote

**[19]** **Appeal and Error**
   👉 Form and Requisites in General

**Appeal and Error**
   👉 Points and Arguments

A party does not comply with the rule stating an appellate brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record, merely by uttering brief conclusory statements, unsupported by legal citations. Rules App.Proc., Rule 38.1(h).

14 Cases that cite this headnote

**Attorneys and Law Firms**

**\*180** Guy J. Daniel, Lesha A. Daniel, Katy, appellants pro se.

Shelley Bush Marmon, Crady, Jewett & McCulley, L.L.P., Houston, for appellee.

Panel consists of Justices NUCHIA, JENNINGS, and HIGLEY.

**OPINION**

TERRY JENNINGS, Justice.

Appellants, Guy J. Daniel, individually and doing business as Guy J. Daniel Construction Company, and Lesha Daniel, individually and doing business as Ja–Le & Associates (collectively, "the Daniels"), challenge the trial court's judgment, entered after a bench trial, in appellee, Falcon Interest Realty Corporation's ("Falcon"), breach of fiduciary duty suit against the Daniels. The trial court awarded Falcon $191,000, less a $70,000 settlement credit. In four issues, the Daniels contend that (1) the trial court erred in finding that they breached their fiduciary duty; (2) the trial court erred in denying their summary judgment motion; (3) the loss of the entire clerk's record unduly burdened them because "the trial court's docket sheet notes are crucial to appellate review"; and (4) Falcon is equitably estopped from recovering from the Daniels because Falcon profited from the acts of the Daniels.

We affirm.

**Factual and Procedural Background**

Jack Moss, Falcon's chief financial officer, testified that Falcon hired Guy to serve as the project manager and on-site superintendent of a construction project referred to by the parties as the "State of Texas Job." Falcon paid Guy a salary for serving as project manager and on-site superintendent. As project manager, Guy was responsible for locating subcontractors, soliciting bids, setting the scope of work for each subcontractor, reviewing the bids, and letting the contracts. As superintendent, Guy was responsible for overseeing people working on the project.[1] **\*181** Guy would normally select the subcontractor for each portion of the project and notify Falcon's president of construction. Guy would also receive invoices, approve them, and forward them to the accounting department.

[1]   Moss testified that, after its experience with Guy and the project, Falcon no longer employs the same person as the project manager and the on-site superintendent in order to avoid the situation where the person who is letting the contracts is also approving the payment of the invoices.

Near the completion of the project, and after Guy was "pulled off" the project, Falcon found approximately one million dollars worth of invoices in a drawer that had not been reported to Falcon. Falcon ended up losing over one million dollars on the project. After completion of the project,

Falcon learned that B & L Associates ("B & L"), one of the subcontractors that performed work on the project, was run by Guy's mother-in-law and father-in-law. Guy had not disclosed this information to Falcon. Falcon subsequently learned, after reviewing bank records, that Guy and his wife Lesha personally profited from the operation of B & L. Falcon had paid B & L approximately $373,000 for its work on the project, but, after learning of the relationship between Guy and B & L, did not pay B & L for the final $16,000 billed by B & L.

On cross-examination, Moss admitted that, at least in one other instance, a family member of a Falcon employee had worked as a subcontractor for Falcon, but Moss also noted that Falcon was aware of the relationship and that the Falcon employee did not receive any compensation as a result of this relationship.

Sharon Henry, a certified public account and an expert witness for Falcon, testified that she reviewed the records of bank accounts held in the names of B & L Associates and Ja–Le & Associates and that these accounts had received $372,945 from Falcon for the project. She also calculated disbursements from these accounts for, among other things, subcontractor expenses, wages, overhead, and insurance, and she determined that there had been a profit earned on the project "in the range of $200,000."

Beverly Laine, Guy's mother-in-law, testified that Guy approached her and her husband and asked them if they "would be interested in doing something on the side" so that they "could make some money" and he "could save Falcon money." In response, she and her husband formed B & L for the purpose of bidding on work on the project. Laine stated that she handled all the books and records for B & L, that she opened a bank account for B & L, and that she and her husband were the only signatories on the B & L bank account. She further stated that while B & L may have paid some of the labor costs associated with work performed by B & L on the project, she wired money, per Guy's instructions, to Guy's business account, held in the name of Ja–Le & Associates, and Guy made arrangements to pay employees and subcontractors for work on the project. After B & L completed its work on the project, Laine prepared and submitted the invoices to Falcon. On cross-examination, Laine stated that B & L completed all of its work on the project and that no one from Falcon complained about the quality of B & L's work. She further stated that B & L submitted bids on certain jobs that were not accepted by Falcon.

Lesha Daniel testified that, after marrying Guy, she created the assumed name of Ja–Le & Associates for the purpose of providing the Daniels "with additional income on some side jobs." She stated that Ja–Le had an agreement with B & L to provide labor and handle costs associated **\*182** with the project. After forming Ja–Le, she opened a bank account for Ja–Le, and stated that B & L had transferred money into the Ja–Le bank account. Funds in the Ja–Le bank account were used to pay employees and subcontractors who worked on the project, but Lesha and Guy also made withdrawals from the account, and Lesha and Guy used funds in the account for personal use. Falcon presented evidence that B & L had transferred approximately $277,000 to the Ja–Le bank account.

Guy presented evidence that, in obtaining bids for each portion of the project, he received bids from three different contractors, and that B & L's bids were less than some of the other bids submitted. Guy testified that Falcon paid B & L $372,945 for work on the project. Guy admitted making a profit off of Falcon through B & L of approximately $200,000, excluding a loan he made to a colleague, which he did not believe constituted a part of B & L's profits. Guy agreed that he helped oversee the B & L employees on the project. In closing, Guy contended that if he and Lesha were held liable by the trial court, "under existing case law," they benefitted $70,000, and that they would be entitled to offsets against this amount.

Falcon brought suit against the Daniels and Guy's mother-in-law and father-in-law, doing business as B & L, for breach of fiduciary duty, conspiracy, fraud, and tortious interference with contractual and business relationships. Falcon settled with Guy's mother-in-law and father-in-law, doing business as B & L, and proceeded to trial on its breach of fiduciary duty claim against the Daniels. After a bench trial, the trial court entered judgment, awarding Falcon $191,000, less a settlement credit of $70,000. The trial court also entered the following pertinent findings of fact:

2. [Guy] worked as a project site superintendent on a project for which [Falcon] was the general contractor. [Guy] also served as project manager for the same project.... The [project] became known as the State of Texas Job....

3. As part of [Guy]'s job function he received and reviewed proposals and bids from subcontractors. He was instrumental in determining which subcontractors

would be selected for work on the [project]. In some cases, he awarded subcontracts to subcontractors.

....

6. [Guy] and [Lesha] were instrumental in the creation, operation and work of [B & L], including the preparation of all bids and proposals for work ... on the [project]. However, the names associated with [B & L] in public records were that of [Guy's in-laws].

7. [Guy] did not inform the principals of [Falcon] about his connection with [B & L] and his involvement in the preparation and proposals for subcontracts on the [project] at the time they were submitted.

....

10. [B & L] opened a bank account ... (the "B & L Bank Account").

....

12. [Lesha] created the entity known as [Ja–Le]....

13. [Ja–Le] opened a bank account ... (the "Ja–Le Bank Account").

14. [Ja–Le] worked with [B & L] in performing the work on the subcontract for the [project]. [Ja–Le] paid the employees who performed the labor on the subcontract with Falcon....

....

**\*183** 21. [Guy] supervised the employees of [B & L] on the [project] site.

22. [Guy] ordered materials on behalf of [B & L] which were delivered to the [project].

23. [Guy] accepted delivery of materials ordered by [B & L] on the [project].

24. At all times [Guy] was performing services for [B & L], he was an employee of [Falcon].

25. [Guy] did not inform [Falcon] of his work for [B & L] on the [project] at the time the work was being performed.

....

27. [B & L] submitted invoices to [Falcon] in the amount of $389,447.

28. [Falcon] paid [B & L] $372,945.00.

29. [B & L] deposited all of the monies received from [Falcon] into the B & L Bank Account.

30. Subcontractors and invoices for materials used on the [project] were paid from both the B & L Bank Account and the Ja–Le Bank Account.

31. [B & L] transferred by wire transfer the sum of $277,000 for the B & L Bank Account to the Ja–Le Bank Account at the instruction of either [Lesha] or [Guy].

32. The actual cost of materials and labor incurred by [B & L] and/or [Ja–Le] for the subcontracting work performed on or materials purchased and delivered to the [project] was approximately $191,000.

33. The difference between the amount paid to [B & L] and/or [Ja–Le] and the amount actually incurred by [B & L] and/or [Ja–Le] in materials and labor was approximately $181,000.

34. But for approximately $11,000 paid to the principals of [B & L], the balance of the profit received on the [project] by [Ja–Le] was used by [Guy] and/or [Lesha] for their personal use.

35. [Lesha] withdrew $68,880 in cash from the Ja–Le Bank Account.

36. [Guy] withdrew $10,350 in cash from the Ja–Le Bank Account.

37. [Lesha] and/or [Guy] spent approximately $55,000 in money from the Ja–Le Bank Account for items such as furniture, cars, tires, computers, scuba equipment, groceries and credit card statements.

38. A relationship of trust and confidence existed between [Guy] and [Falcon].

39. [Lesha] knew of the relationship of trust and confidence between [Guy] and [Falcon].

40. The transactions between [B & L] and Falcon were not fair or equitable to [Falcon].

41. [Guy] used his position of confidence with [Falcon] to his personal advantage.

42. [Guy] did not act in good faith and did not exhibit honesty in his transactions with [Falcon] in connection with the subcontract awarded to [B & L].

43. [Guy] placed himself in a position where his self-interest conflicted with his obligations as a fiduciary to [Falcon].

44. [Guy] used his position to gain a personal benefit at the expense of Falcon.

45. [Guy] did not fully and fairly disclose all important information regarding [B & L] to [Falcon] in connection with the [project].

**\*184** 46. [Guy] made material omissions of fact and information in the course of his employment with [Falcon], which omissions cause[d] Falcon economic damage and resulted in the unjust enrichment of [Guy].

47. [Lesha] conspired with [Guy] in omitting information which was material to [Falcon] and which resulted in economic damage to [Falcon] and the unjust enrichment of [Lesha] and [Guy].

The trial court also entered the following conclusions of law:

1. [Guy] owed a fiduciary duty to [Falcon].

2. [Guy] breached his fiduciary duty to [Falcon].

3. [Guy's] breach of fiduciary duty was material.

4. [Guy's] profit as a result of his breach of fiduciary duty was approximately $191,000.

5. [Lesha] conspired with [Guy] to breach his fiduciary duty to [Falcon].

6. [Lesha] knowingly participated in the breach of fiduciary duty committed by [Guy].

7. [Guy] and [Lesha] are jointly liable to [Falcon] for the damages suffered as a result of the breach of fiduciary duty.

8. [Guy] and [Lesha] must disgorge the profit they received as a result of their breach of fiduciary duty owed to [Falcon]....

9. [Guy] and [Lesha] are entitled to a credit for settlement by the other ... joint tortfeasors.

## Standard of Review

 **[1]** **[2]** **[3]** In an appeal of a judgment rendered after a bench trial, the trial court's findings of fact have the same weight as a jury's verdict, and we review the legal and factual sufficiency of the evidence used to support them, just as we would review a jury's findings. *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994); *In re K.R.P.,* 80 S.W.3d 669, 673 (Tex.App.-Houston [1st Dist.] 2002, pet. denied). When challenged, a trial court's findings of fact are not conclusive if, as in the present case, there is a complete reporter's record. *In re K.R.P.,* 80 S.W.3d at 673; *Amador v. Berrospe,* 961 S.W.2d 205, 207 (Tex.App.-Houston [1st Dist.] 1996, writ denied). When a party without the burden of proof at trial challenges the legal sufficiency of the evidence, we consider all of the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor. *Assoc. Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 285–86 (Tex.1998). If there is any evidence of probative force to support the finding, *i.e.,* more than a mere scintilla, we will overrule the issue. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998). In our review of the factual sufficiency of the evidence, we must consider and weigh all of the evidence, and we will set aside a verdict only if the finding is so against the great weight and preponderance of the evidence, that it is clearly wrong and unjust. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex.1996). We review a trial court's conclusions of law de novo. *In re Moers,* 104 S.W.3d 609, 611 (Tex.App.-Houston [1st Dist.] 2003, no pet.). We independently evaluate a trial court's conclusions to determine their correctness, and we will uphold conclusions on appeal if the judgment can be sustained on any legal theory supported by the evidence. *Id.*

## Breach of Fiduciary Duty

In their first issue, the Daniels argue that the trial court erred in finding that **\*185** they breached their fiduciary duty and that disgorgement of profits was improper because "no position adverse to the employer existed in the transactions." Specifically, the Daniels note that Guy obtained three bids from three contractors on each portion of the project, that the bids submitted by B & L were less than some of the other

bids, that the quality of the work was acceptable to Falcon, and that Falcon saved money because of the Daniels' actions.

The Daniels do not clearly identify any specific findings of fact or conclusions of law that they contend were made in error. However, the Daniels' challenges concern the trial court's (1) findings of fact regarding Guy's breach of his fiduciary duty to Falcon, and (2) conclusion of law that the Daniels must disgorge the profits they received as a result of Guy's breach of his fiduciary duty to Falcon.

 **[4]**   **[5]**   **[6]**   The term "fiduciary" generally applies "to any person who occupies a position of peculiar confidence towards another," refers to "integrity and fidelity," and contemplates "fair dealing and good faith." *Kinzbach Tool Co. v. Corbett–Wallace Corp.,* 138 Tex. 565, 571, 160 S.W.2d 509, 512 (1942). In addressing the scope of a fiduciary duty in the context of an agency relationship, the Texas Supreme Court has observed

> The agreement to act on behalf of the principal causes the agent to be a fiduciary, that is, a person having a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with his undertaking. Among the agent's fiduciary duties to the principal is the duty to account for profits arising out of the employment, the duty not to act as, or on account of, an adverse party without the principal's consent, the duty not to compete with the principal on his own account or for another in matters relating to the subject matter of the agency, and the duty to deal fairly with the principal in all transactions between them.

*Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 200 (Tex.2002) (quoting RESTATEMENT (SECOND) OF AGENCY § 13, cmt. a (1958)).

 **[7]**   Citing *Johnson,* our Court has held that "[w]hen a fiduciary relationship of agency exists between employee and employer, the employee has a duty to act primarily for the benefit of the employer in matters connected with his agency." *Abetter Trucking Co. v. Arizpe,* 113 S.W.3d 503, 510 (Tex.App.-Houston [1st Dist.] 2003, no pet.). We also noted that an agent who serves as a fiduciary owes his

principal the duty not to compete with the principal on his own account in matters relating to the subject matter of the agency, as well as the duty to deal fairly with the principal in all transactions between them. *Id.* at 510. Additionally, a fiduciary has a duty to deal openly and to fully disclose to his employer information that affects his employer's business. *Id.; see also Kinzbach Tool Co.,* 160 S.W.2d at 513 ("It is the duty of a fiduciary to deal openly, and to make full disclosure to the party with whom he stands in such relationship."). Furthermore, an agent who uses his position to gain a business opportunity belonging to the employer commits an actionable wrong. *Abetter Trucking Co.,* 113 S.W.3d at 510 (citing *Bray v. Squires,* 702 S.W.2d 266, 270 (Tex.App.-Houston [1st Dist.] 1985, no writ)).

 **[8]**   **[9]**   Falcon presented evidence that Guy, who was hired to serve as a project manager and on-site superintendent for the project and who was responsible for soliciting bids, setting the scope of work for each subcontractor, reviewing the bids, letting the contracts, and overseeing people **\*186** working on the project, occupied a position of peculiar confidence towards Falcon and owed Falcon a fiduciary duty.[2] Falcon also presented evidence that, after Falcon hired Guy, Guy solicited his mother-in-law and father-in-law to form B & L to bid on and perform work for the project in order to "make money on the side," that Guy and Lesha were involved in the operation of B & L, that Guy approved bids and paid invoices submitted by B & L and supervised B & L employees at the project, and that Guy never disclosed his relationship with B & L to Falcon.

[2]   We recognize that the Texas Supreme Court has cautioned courts to "be careful in defining the scope of the fiduciary obligations an employee owes when acting as the employer's agent in the pursuit of business opportunities." *Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 201 (Tex.2002) (indicating that fiduciary relationship does not arise "merely [from an] employment relationship"). However, in this case, we conclude that the evidence establishes that, in his capacity as project manager and superintendent, Guy possessed a fiduciary relationship with Falcon.

After the project was completed, Falcon discovered that Guy received funds from B & L, and Falcon presented evidence that Guy and Lesha personally profited from the work B & L performed on the project in the amount of approximately $200,000. Moreover, Guy admitted to making a profit off of Falcon through B & L, and further admitted that the profit would amount to approximately $200,000, excluding

consideration of a loan that Guy contended should not be treated as a part of B & L's profits.

Guy's argument that his efforts were for the benefit of Falcon is misplaced. The record reveals that Guy formed B & L for the express purpose of personally profiting from the project, over and above the salary he was being paid by Falcon to serve as the project manager and superintendent. While Guy contends that he did this for the benefit of Falcon, he never disclosed his relationship with B & L. Additionally, Guy's argument that the quality of the work performed by B & L was acceptable to Falcon is irrelevant. As a fiduciary, Guy had the duty to act primarily for the benefit of Falcon, not himself, in matters connected with the project, and he also had the duty to deal fairly and openly with Falcon and to fully disclose to Falcon information affecting Falcon's business. Regardless of whether Falcon was satisfied with the quality of B & L's work, information that Guy would be required to disclose to Falcon would necessarily include that he and his wife were heavily involved in the creation and operation of B & L, including the preparation of bids and proposals for work to be performed on the project, and, more significantly, that he and his wife were reaping a substantial profit from such work.

 **[10]**    In regard to the trial court's conclusion of law that the Daniels must disgorge the profit they received as a result of Guy's breach of fiduciary duty owed to Falcon, the Daniels assert that Falcon did not complain about the quality of work performed by B & L and B & L was less costly than other bidders. The Daniels further assert that, in the trial court, Falcon "did not complain ... that the defendants benefitted, only the amount of the benefit" and that Falcon conceded, in closing argument, it would have "gladly paid them and paid a reasonable profit." [3]  Finally, the Daniels argue that Falcon does not have standing to sue for disgorgement **\*187**  because Falcon benefitted from the Daniels' actions by passing "the costs along to the ultimate user after marking the charges up by eight percent."

---

[3]    At trial, Falcon contended that a profit in the range of 15%–20% would have been reasonable, and that a profit of approximately 100% was unreasonable and out of line with industry standards. However, Guy testified that he had previously made 100% profit on other projects, and thus, contended that this amount of profit was not unreasonable.

 **[11]**    A fiduciary must account for, and yield to the beneficiary, any profit he makes as a result of his breach of fiduciary duty. *Int'l Bankers Life Ins. Co. v. Holloway,*

368 S.W.2d 567, 576–77 (Tex.1963). In *Kinzbach Tool Co.,* the Texas Supreme Court addressed, and disposed of, arguments similar to those presented by the Daniels. In that case, a competitor of Kinzbach Tool Company ("Kinzbach") contacted a "trusted employee" of Kinzbach and offered the employee a secret commission if he would negotiate the sale of the competitor's product to Kinzbach for a minimum price. 160 S.W.2d at 510–11. The competitor instructed the employee not to reveal to Kinzbach the minimum price that the competitor was willing to accept. *Id.* During negotiations, the employee never revealed to Kinzbach, his employer, the minimum price the competitor was willing to accept, nor did he reveal his commission arrangement with the competitor. *Id.* After the deal was consummated, Kinzbach learned of the commission, fired the employee, and brought suit against the employee and the competitor. *Id.* In finding for Kinzbach, the court stated

> It is beside the point ... to say that Kinzbach suffered no damages because it received full value for what it has paid and agreed to pay. A fiduciary cannot say to the one to whom he bears such relationship: You have sustained no loss by my misconduct in receiving a commission from a party opposite to you, and therefore you are without remedy. It would be a dangerous precedent for us to say that unless some affirmative loss can be shown, the person who has violated his fiduciary relationship with another may hold on to any secret gain or benefit he may have thereby acquired. It is the law that in such instances if the fiduciary takes any gift, gratuity, or benefit in violation of his duty, or acquires any interest adverse to his principal, without a full disclosure, it is a betrayal of his trust and a breach of confidence, and he must account to his principal for all he has received.

*Id.* at 514; *see also Siegrist v. O'Donnell,* 182 S.W.2d 403, 405 (Tex.Civ.App.-San Antonio 1944, writ ref'd) (holding that agent who agreed to accept $2,000 profit from person with whom he was dealing on behalf of his "unsuspecting principal" must disgorge that profit).

We hold that the evidence was legally and factually sufficient to support the trial court's finding that Guy owed a fiduciary duty to Falcon and that Guy breached that duty. Accordingly, we further hold that the trial court did not err in entering findings of fact that Guy breached his fiduciary duty to Falcon and conclusions of law requiring the Daniels to disgorge their profits resulting from Guy's breach of his fiduciary duty.

We overrule the Daniels' first issue.

### Appeal of Denial of Summary Judgment

[12] In their second issue, the Daniels contend that the trial court erred in denying their summary judgment motion on the ground that they did not breach a fiduciary relationship with Falcon. The Daniels note that Falcon never filed a response or controverting evidence in response to their summary judgment motion.

[13] When a party moves unsuccessfully for summary judgment and subsequently loses in a conventional trial on the merits, the denial of that motion generally is not subject to review on appeal. *Ackermann v. Vordenbaum,* 403 S.W.2d 362, 365 (Tex.1966); *Reese v. Duncan,* 80 S.W.3d 650, 665 (Tex.App.-Dallas 2002, pet. denied); **\*188** *Johns v. Ram–Forwarding, Inc.,* 29 S.W.3d 635, 638–39 (Tex.App.-Houston [1st Dist.] 2000, no pet.). The Daniels do not present an explanation, and the record does not support an argument, as to why this Court should not follow the application of the general rule in this case. Accordingly, we hold that the Daniels have presented nothing for our review on this issue.

We overrule the Daniels' second issue.

### Missing Docket Sheet

[14] In their third issue, the Daniels contend that the loss of the entire clerk's record unduly burdened them because "the trial court's docket sheet notes are crucial to appellate review." The Daniels assume that the docket sheets, if located, would include notes explaining the calculation of damages awarded to Falcon, and that "examination of the method of calculation of those damages is crucial to appeal."

[15] However, an "appellate court may not consider docket entries since they are only made for the clerk's convenience and are usually unreliable." *Rush v. Barrios,* 56 S.W.3d 88, 95

(Tex.App.-Houston [14th Dist.] 2001, pet. denied); *see also Miller v. Kendall,* 804 S.W.2d 933, 944 (Tex.App.-Houston [1st Dist.] 1990, no writ). Accordingly, even if the docket sheets could be located, and, even assuming that the sheets contain notations concerning the calculation of damages, we would not accept any such notations as findings of fact and conclusions of law, nor would we consider any such information in our appellate review.[4]

4     Courts have considered docket entries in limited circumstances, but none of those circumstances are presented here. *See Escobar v. Escobar,* 711 S.W.2d 230, 232 (Tex.1986) (considering docket sheets in determining whether court had authority to enter judgment nunc pro tunc); *Buffalo Bag Co. v. Joachim,* 704 S.W.2d 482, 483–84 (Tex.App.-Houston [14th Dist.] 1986, writ ref'd n.r.e.) (considering docket sheet entry in determining whether judgment had been rendered); *Pruet v. Coastal States Trading, Inc.,* 715 S.W.2d 702, 705 (Tex.App.-Houston [1st Dist.] 1986, no writ) (holding that, in determining whether judgment nunc pro tunc should be granted, evidence may be in form of "oral testimony of witnesses, written documents, the court's docket, and the judge's personal recollection").

We overrule the Daniels' third issue.

### Equitable Estoppel

In their fourth issue, the Daniels contend that Falcon is equitably estopped from recovering from the Daniels because Falcon profited from the acts of the Daniels. The Daniels assert that Falcon did not complain about the quality of work performed by the Daniels or the cost of such work. The Daniels further assert that, because Falcon has acted in "bad faith, committed fraud in the inducement, and further acts of wrongful conduct," Falcon is not entitled to the extraordinary equitable remedy of profit disgorgement. Finally, the Daniels assert that Falcon would be unjustly enriched if it was allowed to disgorge profits from the Daniels.

[16] [17] [18] [19] First, we note that equitable estoppel is an affirmative defense and must be pleaded. TEX.R. CIV. P. 94. The Daniels did not plead equitable estoppel in the trial court, and, accordingly, they may not assert it on appeal. *See City of Univ. Park v. Van Doren,* 65 S.W.3d 240, 251 (Tex.App.-Dallas 2001, pet. denied); *Trevino v. Houston Orthopedic Ctr.,* 831 S.W.2d 341, 344–45 (Tex.App.-Houston [14th Dist.] 1992, writ denied). Second,

even if the affirmative defense of equitable estoppel was tried by consent, as the Daniels assert in their reply brief, the Daniels have not properly briefed this issue. An appellate brief "must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to **\*189** the record." TEX.R.APP. P. 38.1(h). "Rule 38 requires [a party] to provide us with such discussion of the facts and the authorities relied upon as may be requisite to maintain the point at issue." *Tesoro Petroleum Corp. v. Nabors Drilling USA, Inc.,* 106 S.W.3d 118, 128 (Tex.App.-Houston [1st Dist.] 2002, pet. denied). "This is not done by merely uttering brief conclusory statements, unsupported by legal citations." *Id.* In their brief and reply brief, the Daniels do not provide citations to the relevant authorities nor do they provide citations to facts in the record in support of their affirmative defense of equitable estoppel or in support of their allegations that Falcon breached its "implied duty of good faith and fair dealing." Furthermore, the Daniels' limited citations to the record do not support the factual assertions they make.[5] Thus, the Daniels have waived this issue for our review.

[5]    For example, the Daniels assert in their briefing that Guy's supervisor testified that Falcon did not make Guy "aware of the poor financial condition of [the] project

before hiring [Guy], and that the conduct of [Guy] was necessary and justified in rectifying the wrongfully undisclosed condition of the project." However, there is no testimony in the record supporting this assertion. There is also no evidence to support Guy's assertion that Falcon "inflated the numbers," acted in "bad faith," or "committed fraud in the inducement."

Finally, we note that we have previously addressed, and rejected, the Daniels' contentions that their profits from the project cannot be disgorged because B & L's work was acceptable and Falcon conceded it would have paid a "reasonable profit" and because Falcon benefitted from the Daniels' actions by recovering its costs from a third party.

We overrule the Daniels' fourth issue.

## Conclusion

We affirm the judgment of the trial court.

**All Citations**

190 S.W.3d 177

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

🟨 KeyCite Yellow Flag - Negative Treatment
**Distinguished by** [Cooper v. Cooper,](#) Ala.Civ.App., August 15, 2014

918 So.2d 100
Supreme Court of Alabama.

Ex parte R.D.N.

(In re R.D.N.

v.

A.M.N.).

1030864. | March 4, 2005.

| Rehearing Denied May 20, 2005.

**Synopsis**

**Background:** Father filed post-divorce motion to modify custody. The Circuit Court, Marengo County, No. DR-96-44, [Eddie Hardaway, Jr.](#), J., denied motion and taxed all costs, including guardian ad litem fees, to father. Father appealed, and the Court of Civil Appeals affirmed, without opinion.

**Holdings:** On father's petition for certiorari review, the Supreme Court, Nabers, C.J., held that:

[1] trial court's consideration of guardian ad litem's ex parte recommendation that custody remain with mother violated father's due process rights, and

[2] father was entitled to evidentiary hearing to determine whether guardian ad litem's fee of $18,000 was reasonable and supported by evidence.

Reversed and remanded with directions.

On remand to, [Ala.Civ.App., 918 So.2d 106](#).

West Headnotes (8)

**[1]** **Child Custody**
👉 Hearing and Determination

**Constitutional Law**
👉 Child custody, visitation, and support

Guardian ad litem's ex parte communication with trial court which included recommendation that custody of child remain with mother, which recommendation was relied upon by trial court in denying father's motion to modify custody, violated father's due process right to respond with rebuttal evidence showing why guardian ad litem's recommendation should not be followed and to have motion decided on evidence presented at trial. [U.S.C.A. Const.Amend. 14](#); [Rules of Prof.Conduct, Rule 3.5](#); Canons of Jud.Ethics, Canon 3, subd. A(4).

[10 Cases that cite this headnote](#)

**[2]** **Appeal and Error**
👉 Province of trial court

Alabama appellate courts do not sit in judgment of disputed evidence presented ore tenus before the trial court.

[Cases that cite this headnote](#)

**[3]** **Appeal and Error**
👉 Findings of Court or Referee

**Appeal and Error**
👉 Conclusions of law

Questions of law are not subject to the ore tenus rule; therefore, the presumption of correctness in an ore tenus proceeding applies only to the trial court's findings of fact.

[Cases that cite this headnote](#)

**[4]** **Child Custody**
👉 Hearing

**Child Custody**
👉 Presumptions

Whether a guardian ad litem may communicate ex parte with the court in a child-custody case is a question of law, and the trial court's decision on a question of law is accorded no presumption of correctness.

[6 Cases that cite this headnote](#)

**[5]** **Child Custody**
👉 Trial de novo

The Supreme Court reviews the trial court's conclusion on question of law in ore tenus proceedings de novo.

Cases that cite this headnote

**[6]** **Attorney and Client**
👉 Persons subject to regulations

**Child Custody**
👉 Hearing

**Constitutional Law**
👉 Child custody, visitation, and support

If a guardian ad litem in a custody matter is to argue a case as any other attorney involved in the case, the rules of ethics applicable to lawyers and the fundamental principles of due process apply to the conduct of a guardian ad litem in a court proceeding. U.S.C.A. Const.Amend. 14.

7 Cases that cite this headnote

**[7]** **Constitutional Law**
👉 Trial

The decision of a court must be based on evidence produced in open court lest the guarantee of due process be infringed. U.S.C.A. Const.Amend. 14.

2 Cases that cite this headnote

**[8]** **Child Custody**
👉 Hearing

Father was entitled to evidentiary hearing to determine whether guardian ad litem's fee of $18,000 incurred in course of proceedings on motion to modify custody was reasonable and supported by evidence.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*101** Mavanee R. Bear, Birmingham, for petitioner.

K. Scott Stapp of Manley, Traeger, Perry & Stapp, Demopolis, for respondent.

K.L.S., Selma, guardian ad litem.

**Opinion**

NABERS, Chief Justice.

R.D.N. and A.M.N. were divorced in 1997 in Marengo County. They have one child who was born in 1993. The divorce judgment granted custody of the child to A.M.N. ("the mother") and granted R.D.N. ("the father") visitation rights. Two weeks after the divorce judgment was entered, the mother moved with the child to Florida to be near her family. As a result, the father was separated from his child by approximately 600 miles. Because of the move and alleged attempts by the mother to hinder his visitation rights, the father, on October 31, 1997, filed a petition to modify custody or, in the alternative, to modify visitation rights.

Beginning in November 1997 and continuing periodically over a two-and-one-half-year period, the father took the child to see a psychologist, Dr. Miriam Drummonds, in Birmingham. The mother also took the child to see a psychologist, Dr. Deborah Day, in Florida. In March 1998, the trial judge appointed a guardian ad litem for the child. On April 21, 1999, based on comments made by the child, the father filed a report with the Florida Department of Children and Families ("DCF") alleging that the maternal grandfather had sexually molested the child. On October 18, 1999, the Florida DCF wrote a letter to the trial judge recommending that the mother, the father, the child, and the maternal grandparents be evaluated by an independent, impartial psychologist. On April 25, 2000, upon motion by the father, the court appointed an independent psychologist, Dr. Kathryn Allen, to evaluate the parties.

On June 17, 2000, during a session with Dr. Drummonds, the child described an incident of sexual exploitation allegedly committed by his maternal grandfather. Dr. Drummonds made a mandatory report of alleged sexual exploitation of the child by the maternal grandfather to the Marengo County Department of Human Resources ("DHR") on June 19, 2000. During the summer of 2000, DHR investigated the report. The results of the DHR investigation were inconclusive as to sexual abuse; however, the child continued to make revelations of sexual exploitation by his maternal grandfather to Dr. Drummonds. At some point, Dr. Drummonds also provided a written report to Charlotte Webb of the Marengo County DHR expressing concern that the mother was trying to alienate the child from the father based on audiotapes of

several telephone conversations between the mother and the child.

On June 29, 2000, the trial court held a hearing at the request of DHR. Before the presentation of evidence, a colloquy took place between the trial judge, the guardian ad litem, [1] the parties' attorneys, and the attorney for DHR. The attorney for DHR explained that Dr. Drummonds had made a mandatory report in accordance with Ala.Code 1975, § 26–14–3, and that DHR **\*102** was required to investigate the report under Ala.Code 1975, § 26–14–7. The guardian ad litem made several statements critical of the father and of Dr. Drummonds and directed the following statement to the father's attorney, "I'm against your side of the case." The trial judge added, "I'm sick of this case...." The June 2000 hearing proceeded with both Dr. Drummonds and Charlotte Webb, the DHR investigator, testifying to evidence of sexual exploitation of the child by the maternal grandfather. Both testified that it was their opinion that the child had not been coached by the father to make the allegations.

[1]    The guardian ad litem participated in the colloquy by telephone.

On August 1, 2000, DHR recommended that the child have no contact with the maternal grandfather pending an investigation by the Florida DCF. On August 2, 2000, the trial judge ordered that the child return to Florida for school, but he directed that there be no unsupervised visitation with the maternal grandfather. The Florida DCF, which could not independently verify the allegations of sexual abuse, concluded on December 21, 2000, that the child was not being abused.

On December 11, 2001, the court-appointed psychologist, Dr. Allen, filed her custody evaluation in court. Dr. Allen reported that material changes had occurred since the original custody order was entered, that a change of custody would materially promote the child's best interest and welfare, that the good and positive results from the change would far outweigh the disruptive effect on the child of the change in custody, and that the child should reside with his father.

The hearing on the custody-modification petition was held on July 2–3, 2002. Extensive live and deposition testimony from experts, teachers, friends, and family was presented. The guardian ad litem made no recommendation to the court on the record regarding which parent should have custody of the child.

On July 26, 2002, the guardian ad litem submitted a detailed bill to the trial judge in the amount of $18,280.06 for her services as guardian ad litem. The guardian ad litem had not submitted a fee request or otherwise documented the hours spent, costs expended, or hourly rate for performing her duties as guardian ad litem. This bill was not a part of the official record; it was attached to a brief submitted by the guardian ad litem to this Court. In her brief to this Court, the guardian ad litem stated that she had had a private conference with the trial judge in the summer of 1999 and at that time recommended that custody of the child remain with the mother.

The court issued an order on October 2, 2002. Despite the recommendations of Dr. Allen, the court found that it was in the child's best interest not to change custody. The court made no changes to the visitation schedule. The court noted that the guardian ad litem's recommendation was that the child remain in the custody of the mother and that the bill submitted to the court by the guardian ad litem was reasonable. The court found the father's testimony to be not credible, his allegations that the child was being sexually exploited by the maternal grandfather to be unfounded, and his claims in that regard to be without merit. The court taxed substantially all of the guardian ad litem's fees and expenses ($18,000) and one-half of the mother's attorney fee ($14,000) to the father.

The father filed a motion to alter, amend, or vacate on October 28, 2002, which was denied by operation of law after 90 days. The father filed a notice of appeal on February 9, 2003. The Court of Civil Appeals affirmed the trial court's judgment without an opinion. *R.D.N. v.* **\*103** *A.M.N.* (No. 2020447, Feb. 20, 2004), 912 So.2d 1163 (Ala.Civ.App.2004)(table). No application for rehearing was filed. The father then filed a petition for a writ of certiorari on March 5, 2004, which this Court granted.

The first issue we address is whether, in a child-custody dispute, fundamental principles of due process are violated when a guardian ad litem communicates to the trial judge ex parte her recommendations regarding custody, without the knowledge or consent of the parties and without the parties' having an opportunity to contest those recommendations in open court.

**I.**

[1] In *C.J.L. v. M.W.B.,* 879 So.2d 1169 (Ala.Civ.App.2003), cited by the Court of Civil Appeals in their no-opinion affirmance in this case, the Court of Civil Appeals addressed C.J.L.'s arguments that the use of guardians ad litem in custody cases violates due-process rights and that the use of guardians ad litem should be abolished in such cases. The court held:

> "... Alabama law clearly permits the use of a guardian ad litem in a custody case. *See* Ala.Code 1975, § 12–15–1(12). The cases addressing the use of a guardian ad litem make it clear that a trial court may consider, although it is not bound to follow, a recommendation made by a guardian ad litem. *Moody v. Nagle,* 811 So.2d 546, 548 (Ala.Civ.App.2001).

>> " 'Moreover, the authority of a guardian ad litem to make a recommendation as to custody, and the trial court's ability to consider that recommendation, are inherent in the definition of a guardian ad litem. *See* § 12–15–1(12), Ala.Code 1975 (a guardian ad litem is "[a] licensed lawyer appointed by the court to defend or represent a child in any action to which such child may be a party").'

> "*G.C. v. G.D.,* 712 So.2d 1091, 1095 (Ala.Civ.App.1997); *see also S.D., Jr. v. R.D.,* 628 So.2d 817, 818 (Ala.Civ.App.1993) ('The guardian ad litem correctly observes that he is an officer of the court and is entitled to argue his client's case as any other attorney involved in this case.'). We decline to reconsider the longstanding use of guardians ad litem by the trial courts of this state."

879 So.2d at 1181.

In *C.J.L.,* unlike the present case, the recommendations of the guardian ad litem were before the court and were contested during the trial on the merits. *C.J.L.* leaves open the issue now before this Court of the propriety of ex parte communications between a guardian ad litem and the trial court.

[2] [3] [4] [5] Alabama appellate courts do not sit in judgment of disputed evidence presented ore tenus before the trial court. *Ex parte Perkins,* 646 So.2d 46, 47 (Ala.1994). However, questions of law are not subject to the ore tenus rule. *Reed v. Board of Trustees for Alabama State Univ.,* 778 So.2d 791, 793 n. 2 (Ala.2000). Therefore, the presumption of correctness in this ore tenus proceeding applies only to the trial court's findings of fact. *Ex parte Beckham,* 643 So.2d 1373, 1374 (Ala.1994). Whether a guardian ad litem may communicate ex parte with the court in a child-custody case is a question of law, and the trial court's decision on a question of law is accorded no presumption of correctness. *See id.* We review its conclusion de novo.

[6] If a guardian ad litem is to argue the case " 'as any other attorney involved in [the] case,' " *C.J.L.,* 879 So.2d at 1181, then it follows that rules of ethics applicable to lawyers and the fundamental principles **\*104** of due process apply to the conduct of a guardian ad litem in a court proceeding.

Rule 3.5 of the Alabama Rules of Professional Conduct prohibits lawyers from engaging in an ex parte communication with a judge.[2] Canon 3 A(4) of the Canons of Judicial Ethics similarly prohibits judges from engaging in ex parte communications concerning a pending case. The Alabama State Bar Association has issued an opinion, highlighting the ethical concerns that arise when a guardian ad litem in a child-custody case engages in ex parte communications with the judge hearing the case. The opinion states, in pertinent part:

[2]  See also Rule 3.7, Ala. R. Prof. Cond., which limits the ability of a lawyer to be an advocate at a trial in which the lawyer is likely to be a necessary witness.

> "[I]t is the opinion of the Disciplinary Commission of the Alabama State Bar that an attorney who serves as a guardian ad litem may not have ex parte communications with the trial judge regarding any substantive issue before the court."

ASBA, Formal Ethics Op. RO–00–02 (June 2000).

[7] In *Ex parte Berryhill,* 410 So.2d 416, 418 (Ala.1982), we held: "The fundamental principle is that the decision of a court must be based on evidence produced in open court lest the guarantee of due process be infringed." *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) ("The essential requirements of due process ... are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement.").

In the present case, the trial court's order of October 2, 2002, contained findings of fact, conclusions of law, and a final judgment. The findings of fact stated, in part:

>> "The Court finds that [K.L.S.] has performed an excellent job in acting as the Guardian ad Litem in this matter. [K.L.S.] has made every effort to be

fair and reasonable and to obtain all the necessary information to make a proper recommendation in this matter as to what is best for the minor child. She has made three (3) trips to visit the child in ... Florida with his Mother, the Respondent, and she has also visited the minor child in Alabama with his Father, the Petitioner. The Court finds that the Guardian ad Litem's recommendation is that the minor child remain in custody of the Respondent, Mother."

The guardian ad litem's recommendation that the child remain with the mother was not presented as evidence produced in open court and was based on information that may or may not have been properly presented to the court. [3] As a result, the father was denied the opportunity to respond with rebuttal evidence and to present reasons why the recommendation of the guardian ad litem should not be followed. The mother was also denied the opportunity to respond and present reasons why the guardian ad litem's recommendation should be followed.

[3]    Rule 43(a), Ala. R. Civ. P., requires that "[i]n all trials the testimony of witnesses shall be taken orally in open court, unless otherwise provided in these rules."

The guardian ad litem made no recommendation on the record either by testimony or in a written report before or during the July 2002 hearing. The guardian ad litem apparently formed and expressed her opinion on the merits before the case was presented on the merits [4] and stated **\*105** conclusions openly hostile to the father's position. There is no evidence in the record indicating that the guardian ad litem had any recognized qualifications that demonstrated that she had a unique ability to make a recommendation on child custody. Consequently, the right to contest the accuracy, substance, impartiality, and quality of the guardian ad litem's recommendation to the court concerning the custody of the child was a procedural right denied the father in this case.

[4]    According to her brief to this Court, which is not part of the record, the guardian ad litem met in private with the judge and made her recommendation that the child remain with the mother three years before the case was heard on the merits.

The court, in its discretion, disagreed with the recommendation of its court-appointed professional in evaluating the custody issue and chose to follow the guardian ad litem's recommendation that custody remain with the mother. Additionally, the court denied the father's request that his visitation rights be expanded or modified to account for the substantial travel time and expense involved in exercising his visitation with the child, who lives out of state. Therefore, we cannot conclude that the father's rights were not prejudiced by the court's error.

Under *Ex parte Berryhill, supra,* and *Cleveland Board of Education, supra,* we hold that, in these circumstances, the trial court's ex parte communications with the guardian ad litem and its reliance upon her recommendation, given to the court as part of an ex parte communication, violated the fundamental right of the father to procedural due process under the Alabama and United States Constitutions.

## II.

 [8]    In its final order issued October 2, 2002, the trial court ruled:

> "The Court determines that Guardian ad Litem fees hereby submitted in the amount of $18,000.00 are reasonable and are to be taxed as costs in this case [and] ... that all costs in this matter (including the Guardian ad Litem fees) are taxed to the Petitioner."

No hearing was held in open court to allow either party to contest the reasonableness of the attorney fee requested by the guardian ad litem. The trial court's order says that the fee was "submitted," but there is no "submission" in the record. According to the guardian ad litem's brief to this Court, the submission of her attorney-fee request took place ex parte after the close of evidence on July 26, 2002. [5]

[5]    It is not possible to reconstruct the number, nature, or extent of ex parte communications between the guardian ad litem and the trial court while this matter was pending before the trial court.

The father was entitled to an evidentiary hearing for the purpose of determining a reasonable fee for the guardian ad litem and an order setting forth "with some particularity the findings from the evidence adduced." *Lolley v. Citizens*

*Bank,* 494 So.2d 19, 21 (Ala.1986); *see also Van Schaack v. AmSouth Bank,* 530 So.2d 740, 750 (Ala.1988) (absence of testimony concerning the services of the guardian ad litem was a factor in decision to remand for an evidentiary hearing to determine a reasonable fee).

We address only the procedural irregularities that occurred involving the guardian ad litem in this case; we do not reach the question whether the trial court exceeded the limits of its discretion in ordering the father to pay the entire fee of the guardian ad litem.

For the foregoing reasons, the judgment of the Court of Civil Appeals is reversed, and the case is remanded for that court to **\*106** enter an order remanding the case to the trial court for further proceedings consistent with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.

SEE, LYONS, HARWOOD, WOODALL, STUART, SMITH, BOLIN, and PARKER, JJ., concur.

**All Citations**

918 So.2d 100

---

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment

**Superseded by Statute as Stated in**     Texas Dept. of Parks and Wildlife v. Miranda,     Tex.,     April 2, 2004

951 S.W.2d 401
Supreme Court of Texas.

FEDERAL SIGN, Petitioner,

v.

TEXAS SOUTHERN UNIVERSITY, Respondent.

No. 94–1317.    |    Argued Nov. 28, 1995.    |    Decided June 20, 1997.    |    Rehearing Overruled Oct. 2, 1997.

Sign maker brought action against state university for claims arising out of contract for construction of basketball arena scoreboards. University filed plea to jurisdiction, asserting sovereign immunity. The 215th District Court, Harris County, Eugene Chambers, J., entered judgment for sign maker and university appealed. The Court of Appeals, 889 S.W.2d 509, reversed and remanded with instructions. Upon granting writ of error, the Supreme Court, Baker, J., held that: (1) sign maker's state law claims against university did not dispense with need for legislative consent to sue university for damages for breach of contract; (2) sign maker who did not receive legislative permission to sue university could not maintain breach of contract suit; (3) contract between sign maker and university was supported by consideration; (4) university's immunity from suit did not constitute lack of mutuality of remedy; (5) university's immunity from suit did not violate open courts provision; and (6) university's immunity from suit did not deny sign maker due course of law.

Affirmed.

Hecht, J., filed concurring opinion in which Phillips, C.J., Cornyn and Owen, JJ., joined.

Enoch, J., filed dissenting opinion in which Spector and Abbott, JJ., joined.

West Headnotes (31)

**[1]**    **States**

          Necessity of Consent

Private litigant does not need legislative permission to sue State for state official's violations of state law.

6 Cases that cite this headnote

**[2]**    **States**

          What are suits against state or state officers

State official's illegal or unauthorized actions are not acts of state, and thus, action to determine or protect private party's rights against state official who has acted without legal or statutory authority is not suit against State that sovereign immunity bars.

33 Cases that cite this headnote

**[3]**    **Education**

          Rights and remedies of contractors

      **Public Contracts**

          Defenses

Sign maker's claims against state university alleging potential state law violations did not dispense with necessity that sign maker secure legislative consent to sue university for damages for breach of contract.

1 Cases that cite this headnote

**[4]**    **States**

          Necessity of Consent

Sovereign immunity, unless waived, protects State, its agencies and its officials from lawsuits for damages, absent legislative consent to sue State.

110 Cases that cite this headnote

**[5]**    **Municipal Corporations**

          Nature and grounds of liability

Sovereign immunity embraces immunity from suit and immunity from liability.

64 Cases that cite this headnote

**[6]**    **States**

🔑 Liability and Consent of State to Be Sued in General

State retains immunity from suit, without express legislative consent, even if State's liability is not disputed and State retains immunity from liability though legislature has granted consent to suit.

42 Cases that cite this headnote

**[7]** **States**
🔑 Mode and Sufficiency of Consent

**States**
🔑 Resolutions and private acts

State may consent to suit by statute or by legislative resolution.

4 Cases that cite this headnote

**[8]** **States**
🔑 Mode and Sufficiency of Consent

Legislative consent for suit or any other sovereign immunity waiver must be by clear and unambiguous language.

75 Cases that cite this headnote

**[9]** **States**
🔑 Particular Actions

When State contracts, State is liable on contracts made for its benefit as if it were private person and waives immunity from liability.

10 Cases that cite this headnote

**[10]** **States**
🔑 Liability and Consent of State to Be Sued in General

State or other sovereignty, when it becomes litigant in its own courts, must have its rights determined, with certain exceptions, by same principles applicable to other litigants.

Cases that cite this headnote

**[11]** **States**
🔑 Particular Actions

When State contracts with private citizens, State waives only immunity from liability, but private citizen must have legislative consent to sue State on breach of contract claim as act of contracting by itself does not waive the State's immunity from suit.

70 Cases that cite this headnote

**[12]** **Education**
🔑 Rights and remedies of contractors

**Public Contracts**
🔑 Defenses

Sign maker who did not receive legislative permission to sue state university could not maintain action for damages against university based on breach of contract as State did not waive sovereign immunity.

9 Cases that cite this headnote

**[13]** **Contracts**
🔑 Necessity in general

Contract must be based upon valid consideration, i.e. mutuality of obligation.

26 Cases that cite this headnote

**[14]** **Contracts**
🔑 Nature and Elements

"Consideration" is bargained for exchange of promises.

28 Cases that cite this headnote

**[15]** **Contracts**
🔑 Nature and Elements

Consideration consists of benefits and detriments to contracting parties; detriments must induce parties to make promises and promises must induce parties to incur detriments.

22 Cases that cite this headnote

**[16]** **Contracts**
🔑 Necessity in general

Contract that lacks consideration lacks mutuality of obligation and is unenforceable.

34 Cases that cite this headnote

**[17]**  **Specific Performance**
🗝 Mutuality of remedy

"Mutuality of remedy" is right of both parties to contract to obtain specific performance.

11 Cases that cite this headnote

**[18]**  **Contracts**
🗝 Mutuality of Obligation

Unlike contract lacking mutuality of obligation, contract lacking mutuality of remedy is not illusory and void as mutuality of remedy does not concern contractual formation and does not imply that one party lacks remedy of any kind.

25 Cases that cite this headnote

**[19]**  **Education**
🗝 Contracts
**Public Contracts**
🗝 Validity and Sufficiency of Contract

Consideration supported binding contract between sign maker and state university, where sign maker promised to build basketball arena scoreboards in exchange for university's promise to pay for them.

4 Cases that cite this headnote

**[20]**  **Public Contracts**
🗝 Authority and capacity of particular governmental bodies to contract
**States**
🗝 Powers of Particular Boards or Officers to Contract
**States**
🗝 Express contracts in general

Inability of private individuals to enforce through courts their contractual rights against State, by reason of inability to sue State without its consent, does not affect binding force of State obligations nor deprive legislature of power to delegate to appropriate agency authority to create binding contractual obligations against State.

Cases that cite this headnote

**[21]**  **Education**
🗝 Rights and remedies of contractors
**Public Contracts**
🗝 Defenses

State university's immunity from sign maker's breach of contract suit under doctrine of sovereign immunity did not constitute lack of mutuality of remedy.

8 Cases that cite this headnote

**[22]**  **States**
🗝 Power to Waive Immunity or Consent to Suit

It is legislature's sole province to modify sovereign immunity if it is inclined to do so.

90 Cases that cite this headnote

**[23]**  **Appeal and Error**
🗝 Failure to Urge Objections

Although failure to brief argument ordinarily waives claimed error, when fact issues are not germane to issue on appeal and issue is law question involving constitutional ramifications, reviewing court should decide issue on merits. Rules App.Proc., Rule 74(f).

19 Cases that cite this headnote

**[24]**  **Constitutional Law**
🗝 Right of access to the courts and a remedy for injuries in general

Open courts provision of State Constitution requires courts to actually be open and operating, mandates that citizens have access to courts unimpeded by unreasonable financial barriers and requires that law afford meaningful legal remedies to citizens, so legislature may not abrogate right to assert well–established common law cause of action. Vernon's Ann.Texas Const. Art. 1, § 13.

8 Cases that cite this headnote

**[25]**  **Constitutional Law**
 Conditions, Limitations, and Other Restrictions on Access and Remedies

Open courts provision of State Constitution applies only to statutory restrictions of cognizable common law cause of action. Vernon's Ann.Texas Const. Art. 1, § 13.

11 Cases that cite this headnote

**[26]**  **Constitutional Law**
 Abrogation, modification, or recognition of remedies

**Education**
 Rights and remedies of contractors

**Public Contracts**
 Defenses

State university's immunity from sign maker's breach of contract suit under doctrine of sovereign immunity did not violate open courts provision of State Constitution as no legislative action prevented sign maker from maintaining its suit. Vernon's Ann.Texas Const. Art. 1, § 13.

42 Cases that cite this headnote

**[27]**  **Constitutional Law**
 Notice and Hearing

Due course of law provision of State Constitution exists to prevent government from depriving persons of property without notice and hearing. Vernon's Ann.Texas Const. Art. 1, § 19.

Cases that cite this headnote

**[28]**  **Constitutional Law**
 Questions of law or fact

Claim of denial of due course of law is question of law for Supreme Court's determination. Vernon's Ann.Texas Const. Art. 1, § 19.

Cases that cite this headnote

**[29]**  **Constitutional Law**

 Immunity in general

State's immunity to suit is, purely as matter of sovereignty, impervious to due process concerns. Vernon's Ann.Texas Const. Art. 1, § 19.

3 Cases that cite this headnote

**[30]**  **Constitutional Law**
 Immunity in general

State Constitution's guarantee of due course of law does not obligate state to provide judicial relief from all its actions, but rather, it may retain for itself, through its legislature, exclusive power to determine its liabilities, bound by its conscience. Vernon's Ann.Texas Const. Art. 1, § 19.

2 Cases that cite this headnote

**[31]**  **Constitutional Law**
 Immunity in general

**Education**
 Rights and remedies of contractors

**Public Contracts**
 Defenses

State university's immunity from sign maker's breach of contract action pursuant to doctrine of sovereign immunity did not deny sign maker due course of law as statute providing procedures for private party to obtain legislature's consent to bring suit against State provided sufficient relief under due course of law clause. Vernon's Ann.Texas Const. Art. 1, § 19.

67 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*403**  Robert A. Plessala, Houston, for Petitioner.

Patrick J. Feeney, Carey E. Smith, Austin, for Respondent.

## Opinion

BAKER, Justice, delivered the opinion of the Court in which PHILLIPS, Chief Justice, GONZALEZ, HECHT, CORNYN and OWEN, Justices, join.

The issue in this case is whether the sovereign immunity doctrine precludes Federal Sign, a private party, from suing Texas Southern University, a state institution, for breach of contract without legislative permission. The trial court denied TSU's plea to the jurisdiction, which was based on sovereign immunity from suit. Following a jury trial, the trial court rendered judgment on the verdict for Federal Sign. TSU appealed, urging as its sole point of error that the trial court erred by denying its plea to the jurisdiction. TSU asserted that sovereign immunity bars contract claims against the State. The court of appeals agreed and reversed the trial court and remanded the case to the trial court with instructions to dismiss. We agree with the court of appeals. Accordingly, we affirm the court of appeals' judgment.

### I. FACTS AND PROCEDURAL BACKGROUND

In late 1988, TSU began accepting bids for the construction and delivery of basketball scoreboards for its new Health and Physical Education facility. Federal Sign submitted a bid for the contract. Federal Sign secured the Pepsi–Cola Company as sponsor. In early 1989, TSU accepted Federal Sign's bid. TSU instructed Federal Sign to begin building the scoreboards. Following TSU's instructions, Federal Sign began building the scoreboards. However, in September 1989, before Federal Sign delivered anything to TSU, TSU notified Federal Sign that Federal Sign's bid was unacceptable and told Federal Sign that TSU intended to pursue other avenues to secure the scoreboards. Later, TSU contracted with Spectrum Scoreboards and Coca–Cola for the scoreboards.

In early 1990, Federal Sign sued TSU. Federal Sign alleged TSU breached the contract and violated the competitive bidding and open meeting laws. Federal Sign sued for damages of $67,481 in lost profits and $22,840 in expenses. TSU answered Federal Sign's suit and filed a plea to the jurisdiction. TSU asserted that its sovereign immunity **\*404** barred Federal Sign's suit. The trial court originally abated Federal Sign's action until Federal Sign obtained legislative consent to sue.

Rather than obtaining legislative consent to sue, Federal Sign moved for rehearing. Federal Sign asserted that it did not need legislative consent to sue TSU under the facts of the case. The trial court granted Federal Sign's motion and set aside the abatement order. The parties tried the case to a jury. The trial court rendered judgment for Federal Sign based on the jury's finding of a breach of contract and awarded Federal Sign the damages the jury found.

TSU appealed, contending that the trial court erred by overruling TSU's plea to the jurisdiction. TSU argued that sovereign immunity barred Federal Sign's contract claims. The court of appeals agreed and reversed the trial court's judgment. The court of appeals remanded the case to the trial court with instructions to dismiss Federal Sign's suit.

We granted writ of error to determine Federal Sign's claims that the court of appeals erred in holding that, absent legislative consent, TSU was immune from suit because: (1) Federal Sign's allegation that TSU violated state laws in connection with the Federal Sign contract stated a claim for which specific legislative consent to sue was not necessary; (2) TSU waived immunity from suit and legislative consent was unnecessary when TSU entered into a contract with a private citizen; and (3) sovereign immunity from contract claims violates the Texas Constitution's Open Courts and Due Course of Law provisions.

### II. FEDERAL SIGN'S STATE LAW CLAIMS

Federal Sign first asserts that because it alleged causes of action for which it did not need legislative permission to sue TSU, the trial court correctly set aside the abatement order and allowed the case to proceed to trial. Federal Sign argues that it did not need legislative consent to sue TSU because its claims included allegations of TSU's state law violations. In its original petition, in addition to its breach of contract claim, Federal Sign alleged that TSU officials violated the Competitive Bidding on Contracts Statute, TEX. EDUC.CODE § 51.907, and the Open Meetings Act, TEX.REV.CIV. STAT. art. 6252–17 (Vernon 1970), *repealed by* Act or Apr. 30, 1983, 73rd Leg., R.S., ch. 268, § 46(1), 1993 Tex. Gen. Laws 583, 986.

### A. APPLICABLE LAW

 **[1]** **[2]** A private litigant does not need legislative permission to sue the State for a state official's violations of state law. *Director of the Dept. of Agric. & Env't v. Printing Indus. Ass'n of Texas,* 600 S.W.2d 264, 265–66 (Tex.1980)(holding legislative consent not required for suit for injunctive relief against state agency to halt unauthorized printing equipment and printing activities); *Texas Highway Comm'n v. Texas Ass'n of Steel Importers, Inc.,* 372 S.W.2d 525, 530 (Tex.1963)(holding legislative consent not required for declaratory judgment suit against Highway Commission to determine the parties' rights); *Cobb v. Harrington,* 144 Tex. 360, 190 S.W.2d 709, 712 (1945)(holding legislative consent not required for declaratory judgment suit against State Comptroller to determine parties' rights under tax statute). A state official's illegal or unauthorized actions are not acts of the State. *See, e.g., Director of the Dep't of Agric. & Env't,* 600 S.W.2d at 265–66; *Texas Highway Comm'n,* 372 S.W.2d at 525; *Cobb,* 190 S.W.2d at 712. Accordingly, an action to determine or protect a private party's rights against a state official who has acted without legal or statutory authority is not a suit against the State that sovereign immunity bars. *See Cobb,* 190 S.W.2d at 712. In other words, we distinguish suits to determine a party's rights against the State from suits seeking damages. A party can maintain a suit to determine its rights without legislative permission. *See Cobb,* 190 S.W.2d at 712.

### B. APPLICATION OF LAW TO FACTS

 **[3]** Here, Federal Sign argues that the trial court correctly overruled TSU's plea to the jurisdiction because its live pleadings, when the trial court lifted the abatement order, included Competitive Bidding and Open Meetings Acts violations—potential **\*405** state law violations. *See Director of Dept. of Agric. and Env't,* 600 S.W.2d at 265–66; *Texas Highway Comm'n,* 372 S.W.2d at 530; *Cobb,* 190 S.W.2d at 712. However, even though Federal Sign may not have needed legislative permission to sue TSU on these claims, Federal Sign still sought damages for its breach of contract claim. Consequently, because Federal Sign's suit sought monetary damages from the State, its breach of contract claim did not fit under the rule established in *Cobb, Director of Department of Agriculture and Environment,* and *Texas Highway Commission.* Therefore, Federal Sign's state violation claims did not dispense with the necessity that Federal Sign secure legislative consent to sue TSU for damages for breach of contract.

### III. SOVEREIGN IMMUNITY

Federal Sign next argues that the court of appeals erred by reversing the trial court's judgment based on sovereign immunity. Federal Sign first argues that the State waives its sovereign immunity protection when it enters into a contract with a private citizen. Then Federal Sign argues that, if sovereign immunity protects the State from breach of contract suits, any contract the State enters into with a private citizen is illusory and void because it lacks mutuality. Lastly, Federal Sign contends that if sovereign immunity is the law in Texas, then "this court should act to declare in clear and unmistakable language that the doctrine of sovereign immunity does not apply in any form when the State enters into a contract with a citizen."

### A. SOVEREIGN IMMUNITY
### AND STATE CONTRACTS

#### 1. Applicable Law—Sovereign Immunity

 **[4]** **[5]** **[6]** This Court has long recognized that sovereign immunity, unless waived, protects the State of Texas, its agencies and its officials from lawsuits for damages, absent legislative consent to sue the State. *Director of the Dep't of Agric. & Env't,* 600 S.W.2d at 265; *Griffin v. Hawn,* 161 Tex. 422, 341 S.W.2d 151, 152–53 (1960); *Hosner v. DeYoung,* 1 Tex. 764, 769 (1847). Sovereign immunity embraces two principles: immunity from suit and immunity from liability. *Missouri Pac. R.R. Co. v. Brownsville Navigation Dist.,* 453 S.W.2d 812, 813 (Tex.1970). First, the State retains *immunity from suit,* without legislative consent, even if the State's liability is not disputed. *Missouri Pac. R.R.,* 453 S.W.2d at 813. Second, the State retains *immunity from liability* though the Legislature has granted consent to the suit. *Missouri Pac. R.R.,* 453 S.W.2d at 813.

 **[7]** **[8]** *Immunity from suit* bars a suit against the State unless the State expressly gives its consent to the suit. *Missouri Pac. R.R.,* 453 S.W.2d at 813; *see also* TEX. CIV. PRAC. & REM.CODE § 101.025; TEX. CIV. PRAC. & REM.CODE §§ 107.001–.005. In other words, although the claim asserted may be one on which the State acknowledges liability, this rule precludes a remedy until the Legislature consents to suit. *Missouri Pac. R.R.,* 453 S.W.2d at 813. The State may consent to suit by statute or by

legislative resolution. *Missouri Pac. R.R.*, 453 S.W.2d at 814. Legislative consent for suit or any other sovereign immunity waiver must be "by clear and unambiguous language." *University of Texas Med. Branch at Galveston v. York,* 871 S.W.2d 175, 177 (Tex.1994); *Duhart v. State,* 610 S.W.2d 740, 742 (Tex.1980).

 **[9]** *Immunity from liability* protects the State from judgments even if the Legislature has expressly given consent to the suit. *Missouri Pac. R.R.*, 453 S.W.2d at 813. In other words, even if the Legislature authorizes suit against the State, the question remains whether the claim is one for which the State acknowledges liability. *State v. Isbell,* 127 Tex. 399, 94 S.W.2d 423, 425 (1936); *see also Governmental Immunity From Suit and Liability in Texas,* 27 TEX. L. REV. 337, 342 (1949). The State neither creates nor admits liability by granting permission to be sued. TEX. CIV. PRAC. & REM.CODE § 107.002 ("A resolution granting permission to sue does not waive to any extent immunity from liability."); *Isbell,* 94 S.W.2d at 424–25. However, when the State contracts, the State is liable on contracts made for its benefit as if it were a private person. *State v. Elliott,* 212 S.W. 695, 697–98 (Tex.Civ.App.—Galveston 1919, writ ref'd). Consequently, when **\*406** the State contracts with private citizens it waives *immunity from liability*.

### 2. Conflict of Authority—*Fristoe v. Blum*

However, there is a conflict among the courts of appeals on whether the State, by entering into a contract with a private citizen, waives *immunity from suit* by the fact that it has made the contract and thus legislative consent for suit is not necessary. A majority of the cases that have considered the issue hold that when the State contracts with a private citizen, it waives *immunity from liability,* but retains *immunity from suit. See, e.g., Alcorn v. Vaksman,* 877 S.W.2d 390, 403 (Tex.App.—Houston [1st Dist.] 1994, writ denied); *Green Int'l, Inc. v. State,* 877 S.W.2d 428, 432–33 (Tex.App.—Austin 1994, writ dism'd by agr.); *Courtney v. University of Texas Sys.,* 806 S.W.2d 277, 282–83 (Tex.App.—Fort Worth 1991, writ denied); *Atchison, Topeka & Santa Fe Ry. v. Texas State Dep't of Highways and Pub. Transp.,* 783 S.W.2d 646, 648 (Tex.App.—Houston [14th Dist] 1989, no writ); *Texas Dep't of Human Servs. v. Trinity Coalition, Inc.,* 759 S.W.2d 762, 764 (Tex.App.—El Paso 1988), *cert. dism'd,* 493 U.S. 1020, 110 S.Ct. 719, 107 L.Ed.2d 739 (1990); *Miller v. Hood,* 536 S.W.2d 278, 284 (Tex.Civ.App.—Corpus Christi 1976, writ ref'd n.r.e.).

However, other cases hold that the State waives its sovereign immunity, including immunity from suit, when it contracts with private citizens. *See, e.g., Ntreh v. University of Texas at Dallas,* 936 S.W.2d 649, 654 (Tex.App.—Dallas 1996, writ requested); *Texas Dept. of Health v. Texas Health Ent.,* 871 S.W.2d 498, 506 (Tex.App.—Dallas 1993, writ denied); *Couch v. Ector County,* 860 S.W.2d 659, 661 (Tex.App.—El Paso 1993, no writ); *Industrial Constr. Management v. DeSoto Indep. Sch. Dist.,* 785 S.W.2d 160, 163–164 (Tex.App.—Dallas 1989, no writ); *Board of Regents of Univ. of Texas v. S & G Constr. Co.,* 529 S.W.2d 90, 97 (Tex.Civ.App.—Austin 1975, writ ref'd n.r.e.); *Cummins v. Board of Trustees of Eanes Indep. Sch. Dist.,* 468 S.W.2d 913, 917 (Tex.Civ.App.—Austin 1971, no writ).

Despite the different conclusions these courts reached, all relied on *Fristoe v. Blum,* 92 Tex. 76, 45 S.W. 998 (1898), for their authority. Yet, *Fristoe* did not involve a breach of contract claim against the State nor did it directly involve sovereign immunity. In fact, *Fristoe* does not explicitly discuss either immunity from liability or immunity from suit. Recognizing that *Fristoe* did not involve the issue before the Court, we nonetheless discuss *Fristoe* because the conflicting courts of appeals and the parties base their conclusions upon their interpretations of *Fristoe.*

*Fristoe* involved a trespass to try title suit by Leon Blum against J.W. Fristoe. *Fristoe,* 45 S.W. at 999. In 1883, I.M. Bennick bought land from the State under a contract to purchase. In 1891, Bennick transferred the land to D.P. Gay. Then, in 1894 Blum purchased the land from Gay. No one paid the interest on the purchase money under Bennick's original purchase for 1892. In mid–1895, the commissioner of the land office declared the contract of purchase forfeited. Fristoe purchased the land from the State in late 1895. Consequently, Fristoe and Blum each claimed title to the land that originated with the State. In discussing the property's rightful owner, the Court stated "[a] clear understanding of the relation in which the [S]tate stands to the purchasers in these contracts will greatly facilitate a proper solution of the questions upon which this case depends." *Fristoe,* 45 S.W. at 999. Despite this avowed goal, this discussion in *Fristoe* has led to anything but a "clear understanding" of sovereign immunity in the breach of contract context. Because the discussion was not necessary to resolve the issue the *Fristoe* Court faced, it is dicta.

The conflicting courts of appeals, as well as the parties in this case, have tried to fashion the *Fristoe* dicta into support for each side's respective view of sovereign immunity. Although one may read parts of *Fristoe* to support the conflicting views, *Fristoe* taken as a whole, says nothing about whether the State waives or retains its sovereign immunity when it contracts with private citizens.

 [10] *Fristoe* stated that when the State "becomes a suitor in its own courts, or a **\*407** party to a contract with citizens, the same law applies to it as under like conditions governs the contracts of an individual." *Fristoe, 45 S.W. at 999.* The *Fristoe* Court relied upon three Texas cases for this proposition. *See State v. Snyder, 66 Tex. 687, 18 S.W. 106 (1886); State v. Purcell, 16 Tex. 305 (1856); State v. Kroner, 2 Tex. 492 (1847).* None of these cases involved breach of contract suits against the State or the sovereign immunity doctrine. These cases stand only for the unremarkable proposition that "a State or other sovereignty, when it becomes a litigant in its own courts, must have its rights determined by the same principles applicable to other litigants." *Snyder, 66 Tex. at 700, 18 S.W. 106; Purcell, 16 Tex. at 309–10* (holding that the State must comply with statute of limitations like other litigants); *Kroner 2 Tex. at 493* (holding the State is not immune from transcript filing deadlines on appeal). Further, this statement is true, at least with certain exceptions which need not be detailed here (such as, the State cannot contract away its police power). *See City of Arlington v. City of Fort Worth, 844 S.W.2d 875, 878 (Tex.App.—Fort Worth 1992, writ denied); Pittman v. City of Amarillo, 598 S.W.2d 941, 945 (Tex.Civ.App.—Amarillo 1980, writ ref'd n.r.e.).* This statement, however, has nothing to do with immunity from suit. To state what happens *if* the State consents to be sued says nothing about whether the State consents to be sued.

*Fristoe* then quoted from three out-of-state opinions. *Carr v. State, 127 Ind. 204, 26 N.E. 778, 779 (1891); People v. Stephens, 71 N.Y. 527, 549–50 (1978)* (Allen, J., concurring); and *Morton, Bliss & Co. v. Comptroller Gen., 4 S.C. 430, 448 (1873).* Each of these cases includes language that can be used to support or dispute whether the State waives immunity from suit when it contracts. However, when read together, these cases show only that the *Fristoe* Court did not intend to speak on the sovereign immunity issue.

*Carr* involved a suit on certificates, similar to bonds, which the court held that the State was required to pay because the Legislature had appropriated the funds to pay them. *Fristoe*

quoted *Carr* as holding a State's contracts "are interpreted as the contracts of individuals are, and the law which measures individuals' rights and responsibilities measures, with few exceptions, those of a state whenever it enters into an ordinary business contract." *Carr, 26 N.E. at 779.* However, *Fristoe* did not include *Carr* 's language that qualified this passage. The *Carr* court stated:

> There is one essential and far-reaching difference between the contracts of citizens and those of sovereigns; not, indeed, as to the meaning and effect of the contract itself, but as to the capacity of the sovereign to defeat the enforcement of its contract. The one may defeat enforcement, but the other cannot. This result flows from the established principal that a state cannot be sued.

*Carr, 26 N.E. at 779.* Accordingly, *Carr* cannot stand for the proposition that the State waives immunity from suit by entering into a contract.

*Stephens* involved a suit by the State for conspiracy, not a suit against the State. Further, the *Fristoe* Court only quoted from a concurring opinion. Consequently, *Stephens* neither supports nor contradicts either position. *See Stephens, 71 N.Y. at 549–550.*

*Morton* involved a bondholder's suit to force local officials to levy a tax to pay bonds because the State Legislature had required it by statute. Therefore, *Morton* involved an issue more akin to suits in which an individual sues a State official that has not complied with a statute or law. As we discussed in Part II of our opinion, this type of suit is allowed without legislative permission. *See Director of the Dept. of Agric. & Env't, 600 S.W.2d at 265–66.* Consequently, any language in *Morton* on waiver of immunity from suit is dicta and cannot be used to support an argument that the State either waives or retains immunity from suit when it contracts with private citizens.

While the courts of appeals and the parties here quote *Fristoe* for the parts they like, when read as a whole, we cannot read *Fristoe* as deciding whether the State retains or waives immunity from suit in breach of contract cases. Therefore, it is simply impossible to base our decision on *Fristoe.*

**\*408  3. Immunity from Suit**

*Fristoe* aside, this Court has directly and affirmatively considered this issue without citing *Fristoe.* The three times this Court considered sovereign immunity in the breach of contract context, we held that the State is immune from suit arising from breach of contract suits. *Missouri Pac. R.R. Co. v. Brownsville Navigation Dist.,* 453 S.W.2d 812, 813–14 (Tex.1970); *W.D. Haden Co. v. Dodgen,* 158 Tex. 74, 308 S.W.2d 838, 839–41 (1958); *Herring v. Houston Nat'l Exch. Bank,* 114 Tex. 394, 269 S.W. 1031, 1033 (1925).

This Court first considered the sovereign immunity issue in the breach of contract arena in *Herring v. Houston Nat'l Exch. Bank.* In *Herring,* Houston National Exchange Bank sued the Texas Prison Commission to recover money that the bank alleged the Commission had not paid for the purchase of three acres of land. *Herring,* 269 S.W. at 1031. This Court held: "It is an attribute of sovereignty, and it is well established and generally conceded that the sovereignty cannot be sued in its courts without its consent." 269 S.W. at 1031.

In *Haden,* the W.O. Haden Company operated under a State permit to take mudshell from Galveston Bay. When the Game & Fisheries Commission of Texas changed the terms of the permit, W.O. Haden sued for a declaration of its rights under what it contended to be a contract. *Haden,* 308 S.W.2d at 839. This Court held that a suit "seeking enforcement of contract rights is necessarily a suit against the State which cannot be maintained without legislative permission." *Haden,* 308 S.W.2d at 842.

Then, in *Missouri Pacific R.R.,* Missouri Pacific sought indemnity from the Brownsville Navigation District for its liability in a wrongful death suit under a "written track agreement" with the Brownsville Navigation District. *Missouri Pac. R.R.,* 453 S.W.2d at 813. This Court again recognized that the State is generally immune from suit for breach of contract. However, the Court held that a statute that provided that the Navigation District could "sue and be sued" met the legislative permission requirement. *Missouri Pac. R.R.,* 453 S.W.2d at 813.

 **[11]**   Therefore, when the State contracts with private citizens, the State waives only *immunity from liability.* However, a private citizen must have legislative consent to sue the State on a breach of contract claim. The act of contracting does not waive the State's *immunity from suit.*

Accordingly, we expressly overrule any cases that hold to the contrary.

**4. Application of Law to Facts**

 **[12]**   Here, Federal Sign did not receive legislative permission to sue TSU. Therefore, the State did not waive its immunity from suit and Federal Sign could not maintain a breach of contract suit against TSU. *See Missouri Pac. R.R.,* 453 S.W.2d at 813; *W.D. Haden & Co.,* 308 S.W.2d at 842. Accordingly, the court of appeals correctly held that sovereign immunity precluded Federal Sign's suit. [1]

[1]   We hasten to observe that neither this case nor the ones on which it relies should be read too broadly. We do not attempt to decide this issue in any other circumstances other than the one before us today. There may be other circumstances where the State may waive its immunity by conduct other than simply executing a contract so that it is not always immune from suit when it contracts.

**B. Contracts Between The State And Private Citizens**

Federal Sign also asserts that, if the State is immune from suit, then any contract the State enters is void because it lacks mutuality. Federal Sign argues the contracts are void because they lack both mutuality of obligation and mutuality of remedy.

**1. Applicable Law**

 **[13]**    **[14]**    **[15]**    **[16]**   A contract must be based upon a valid consideration, in other words, mutuality of obligation. *See Texas Gas Util. Co. v. Barrett,* 460 S.W.2d 409, 412 (Tex.1970); *Langley v. Norris,* 141 Tex. 405, 173 S.W.2d 454, 458 (1943); *Texas Farm Bureau Cotton Ass'n v. Stovall,* 113 Tex. 273, 253 S.W. 1101, 1105 (1923). Consideration is a bargained for exchange of promises. *Roark v. Stallworth* **\*409**  *Oil & Gas, Inc.,* 813 S.W.2d 492, 496 (Tex.1991). Consideration consists of benefits and detriments to the contracting parties. *Roark,* 813 S.W.2d at 496. The detriments must induce the parties to make the promises and the promises must induce the parties to incur the detriments. *Roark,* 813 S.W.2d at 496. A contract that lacks consideration, lacks mutuality of obligation and is unenforceable. *See Texas Farm Bureau,* 253 S.W. 1101 at 1105.

**[17]** **[18]** Mutuality of remedy is the right of both parties to a contract to obtain specific performance. *See Adams v. Abbott,* 151 Tex. 601, 254 S.W.2d 78, 80 (1952); *Langley v. Norris,* 173 S.W.2d at 458; *Sanderson v. Sanderson,* 130 Tex. 264, 109 S.W.2d 744, 748 (1938). Unlike a contract lacking mutuality of obligation, a contract lacking mutuality of remedy is not illusory and void. *See W.D. Haden & Co.,* 308 S.W.2d at 842. Mutuality of remedy does not concern contractual formation and does not imply that one party lacks a remedy of any kind. *See* Dobbs, HANDBOOK ON THE LAW OF REMEDIES 49–52 (1973).

### 2. Application of Law to Facts

**[19]** Federal Sign promised to build the scoreboards in exchange for TSU's promise to pay for them. These promises represented the respective benefits and detriments, or the bargained for exchange, necessary to satisfy the consideration requirement. *See Roark,* 813 S.W.2d at 496. Accordingly, valid consideration supported a binding contract between Federal Sign and TSU. *See Roark,* 813 S.W.2d at 496; *Texas Gas Util. Co.,* 460 S.W.2d at 412–13.

**[20]** **[21]** Mutuality of remedy does not apply here because specific performance is not an issue. *Adams,* 254 S.W.2d at 80; *Langley,* 173 S.W.2d at 458. That a private citizen must get permission to sue the State for breach of contract has never rendered a State contract illusory in Texas. *See W.D. Haden & Co.,* 308 S.W.2d at 842. "The impotence of private individuals to enforce through the courts their contractual rights against the State, by reason of inability to sue the State without its consent, inheres in every such contract. This impotence, however, does not affect the binding force of State obligations; nor does it deprive the Legislature of the power to delegate to an appropriate agency authority to create binding contractual obligations against the State." *Ferguson v. Johnson,* 57 S.W.2d 372, 376 (Tex.Civ.App.— Austin 1933, writ dism'd). Secondly, Federal Sign actually has a remedy against TSU—it may sue and recover its damages, if it first obtains legislative permission to do so. *See generally* TEX. CIV. PRAC. & REM.CODE §§ 107.001–.005. Therefore, the court of appeals correctly held that a valid and binding contract existed between Federal Sign and TSU.

### C. LEGISLATIVE CONTROL OF SOVEREIGN IMMUNITY

**[22]** Lastly, Federal Sign asks this Court to pronounce that sovereign immunity does not preclude private citizens from suing the State for breach of contract. Litigants have repeatedly asked this Court to abrogate one or more aspects of the State's sovereign immunity. However, this Court has uniformly held that it is the Legislature's sole province to waive or abrogate sovereign immunity. *See Guillory v. Port of Houston Auth.,* 845 S.W.2d 812, 813 (Tex.), *cert. denied,* 510 U.S. 820, 114 S.Ct. 75, 126 L.Ed.2d 43 (1993); *Barr v. Bernhard,* 562 S.W.2d 844, 846 (Tex.1978); *Lowe v. Texas Tech Univ.,* 540 S.W.2d 297, 298 (Tex.1976); *See also* Greenhill, *Should Governmental Immunity for Torts be Re–Examined, and, If So, by Whom?* 31 Tex. B.J. 1036, 1070 (1968). Today, we again hold that it is the Legislature's province to modify sovereign immunity if it is inclined to do so and therefore refuse Federal Sign's invitation to undertake that task.

### IV. OPEN COURTS AND DUE COURSE OF LAW VIOLATIONS

Federal Sign asserts that if sovereign immunity precludes its breach of contract claim, then applying sovereign immunity violates the Texas Constitution's Open Courts and Due Course of Law Clauses.

**[23]** Initially, we note that Federal Sign only cited authority supporting its Open **\*410** Courts argument. TSU argues that Federal Sign waived any Due Course arguments because it did not cite supporting authority for that argument. We agree that ordinarily failure to brief an argument waives the claimed error. *See* TEX.R.APP. P. 74(f); *Fredonia State Bank v. American Life Ins. Co.,* 881 S.W.2d 279, 284–85 (Tex.1994). However, when fact issues are not germane to the issue on appeal, and the issue is a law question involving constitutional ramifications, we believe the reviewing court should decide the issue on the merits because of the importance to the issue to the State's jurisprudence. *See Williams v. Khalaf,* 802 S.W.2d 651, 658–59 (Tex.1990). Accordingly, we discuss Federal Sign's Open Courts and Due Course of Law claims.

### A. Open Courts

[24] [25] The Open Courts provision provides that "[a]ll courts shall be open, and every person for any injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law." TEX. CONST. art. I, § 13. The Open Courts provision affords three distinct protections. First, courts must actually be open and operating. *See Runge & Co. v. Wyatt,* 25 Tex.Supp. 291 (1860). Second, citizens must have access to the courts unimpeded by unreasonable financial barriers. *See LeCroy v. Hanlon,* 713 S.W.2d 335, 342 (Tex.1986). Third, our law must afford meaningful legal remedies to our citizens, so the Legislature may not abrogate the right to assert a well-established common law cause of action. *Texas Ass'n of Bus. v. Air Control Bd.,* 852 S.W.2d 440, 448 (Tex.1993); *Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348, 355–357 (Tex.1990). The Open Courts provision "applies only to statutory restrictions of a cognizable common law cause of action." *Peeler v. Hughes & Luce,* 909 S.W.2d 494, 499 (Tex.1995); *Moreno,* 787 S.W.2d at 355–56.

[26] Federal Sign's Open Courts argument implicates the provision's third guarantee—whether sovereign immunity unconstitutionally deprived Federal Sign of a meaningful legal remedy. Federal Sign complains that this Court, by upholding established sovereign immunity law, would violate the Open Courts provision. Federal Sign does not complain of any legislative action that prevents it from maintaining its suit. Because Federal Sign does not challenge a legislative act that abridges a cognizable common law claim, its Open Courts challenge is without merit. *See Peeler,* 909 S.W.2d at 499.

### B. DUE COURSE OF LAW

In its brief, Federal Sign argues that the court of appeals' opinion, as applied to the facts in this case, denies Federal Sign its rights under the Due Course of Law provision of our constitution. Federal Sign's assertion is that the doctrine of sovereign immunity from suit denies Federal Sign its *remedy* under the Due Course of Law provision.

[27] [28] Our Constitution provides that "[n]o citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disinfranchised, except by the due course of the law of the land." TEX. CONST. art. I, § 19. Due course of law exists to prevent government from depriving persons of property without notice and hearing. *See Nelson v. Clements,* 831 S.W.2d 587, 589 (Tex.App.—Austin

1992, writ denied). A claim of denial of due course of law is a question of law for the Court's determination. *Nelson,* 831 S.W.2d at 590.

This Court has never directly decided whether requiring legislative consent to sue on a breach of contract in order to waive sovereign immunity to sue is or is not a denial of due course of law under the Texas Constitution. However, decisions interpreting the United States Constitution are instructive and we turn the United States Supreme Court's decisions for guidance in applying the Due Course of Law's guarantees under the Texas Constitution.

The United States Supreme Court has held that where Congress, by statute, had expressly granted beneficiaries of insurance policies permission to sue the United States for benefits, but a subsequent statute repealed all laws granting or pertaining to the insurance that Congress could not repudiate the contract, but it could withdraw consent to **\*411** the suit. *See Lynch v. United States,* 292 U.S. 571, 580–82, 54 S.Ct. 840, 844, 78 L.Ed. 1434 (1934). In *Lynch,* beneficiaries of insurance policies issued under a federal statute sued for benefits. The statute as originally passed granted the beneficiaries the right to sue the United States for benefits. A later statute repealed all laws pertaining to the insurance policies. The Supreme Court held:

> Contracts between individuals or corporations are impaired within the meaning of the Constitution whenever the right to enforce them by legal process is taken away or materially lessened. A different rule prevails in respect to contracts of sovereigns. The contracts between a Nation and an individual are only binding on the conscience of the sovereign and have no intentions of compulsive force. They conferred no right of action independent of the sovereign will. The rule that the United States may not be sued without its consent is all embracing.

* * * * * *

> Although consent to sue was thus given when the policy issued, Congress retained power to withdraw the consent at any time. For consent to sue the United States is a privilege accorded; not the grant of a property right protected by the Fifth Amendment. The consent may be withdrawn, although given after much deliberation and for a pecuniary consideration. The sovereign's immunity from suit exists whatever the character of the proceeding or the source of the right sought to be enforced.

*Lynch,* 292 U.S. at 580–82, 54 S.Ct. at 844 (citations omitted).

The Court then held that Congress, merely by repudiating its contractual obligation had not withdrawn consent to suit and that it had not done so otherwise. *Lynch,* 292 U.S. at 582, 585–87, 54 S.Ct. at 844, 846–47. Under those circumstances, the Court allowed the plaintiffs to sue for benefits.

In another case involving gold bonds, a bondholder sued the United States as obligor for payment in gold coin as required by the bond's terms rather than in currency as required by a statute passed after the bond issued. *See Perry v. United States,* 294 U.S. 330, 346–47, 55 S.Ct. 432, 433, 79 L.Ed. 912 (1935). Chief Justice Hughes' plurality opinion observed that the United States does not, by executing a contract, consent to be sued for its breach. The Court held:

> When the United States with constitutional authority makes contracts, it has rights and incurs responsibilities similar to those of individuals who are parties to such instruments. There is no difference, except the United States cannot be sued without its consent.

\* \* \* \* \* \*

> The fact that the United States may not be sued without its consent is a matter of procedure which does not affect the legal and binding character of its contracts. While the Congress is under no duty to provide remedies to the courts, the contractual obligation still exists and, despite infirmities of procedure, remains binding upon the conscience of the sovereign.

*Perry,* 294 U.S. at 352–54, 55 S.Ct. at 435–36 (citations omitted). The Supreme Court has recently cited both *Lynch* and *Perry* with approval. *See United States v. Winstar Corp.,* 518 U.S. 839, ——, 116 S.Ct. 2432, 2455, 135 L.Ed.2d 964 (1996).

 **[29]**    We believe we should reach the same conclusion under our State Constitution. The State's immunity to suit is, purely as a matter of sovereignty, impervious to due process concerns. Moreover, a party contracting with the State is not denied *all* process, or even *due* process, but only *judicial* process.

 **[30]**    **[31]**    Federal Sign, as with any other who contracts with the State, has a remedy—it may seek the Legislature's consent to sue. Our Constitution's guarantee of due course

of the law does not obligate the State to provide judicial relief from all its actions. It may retain for itself, through its Legislature, the exclusive power to determine its liabilities, bound by its conscience. Our Legislature has provided the procedure for consent to sue the State. *See* TEX. CIV. PRAC. & REM.Code, §§ 107.001–005. Federal Sign chose not to avail itself of such relief. We conclude **\*412** the legislative procedures provide sufficient relief and do not deny constitutional due course of law guarantees. Accordingly, we reject Federal's arguments that TSU's sovereign immunity from suit denies it due course of law.

## V. CONCLUSION

Absent legislative permission to proceed, sovereign immunity precludes Federal Sign's breach of contract suit against TSU. We expressly disapprove of any court of appeals' cases holding to the contrary. We hold that when a contract exists between the State and a private citizen, the same law applies to the State as governs the individual's contract. We hold that sovereign immunity from suit without legislative consent applies to contract claims against the State. We hold that applying sovereign immunity from suit to contract claims against the State does not violate either the Open Courts Provision or the Due Course of Law Provision of the Texas Constitution. We hold that it is the Legislature's province to modify, if at all, the sovereign immunity doctrine. Accordingly, we affirm the court of appeals' judgment.

HECHT, Justice, joined by PHILLIPS, Chief Justice, CORNYN and OWEN, Justices, concurring.

I concur in the Court's opinion. I write separately for three reasons. First, I wish to make plain that the Court's opinion is limited, despite some occasional broad language. Second, while today's decision is supported by precedent, the Court does not explain why it refuses to depart from that precedent despite strong arguments that it should do so. The parties, and the public, are owed this explanation. Third, a word should be said in response to the dissent. The dissent would completely abolish immunity although the Legislature has not only repeatedly refused to do so but has within the past few days crafted mediation and administrative procedures to resolve certain contract disputes with the State.

# I

The immunity issue in this case is a narrow one. It is this: should a court hold that the State, merely by entering into a contract for goods and services, waives immunity from suit for breach of the contract before the other party has tendered performance? That is all we can, and do, decide.

The Court's succinct summary of the facts concerning the parties' dispute omits the following important details that limit the legal issue to be decided. Texas Southern University solicited bids for the manufacture and installation of basketball arena scoreboards to be financed by a corporate sponsor in exchange for advertisement and concession rights. Federal Sign bid $182,506. After several weeks of negotiations, the Pepsi–Cola Company agreed to be the sponsor, and Federal Sign reduced its offer to $158,404. TSU formally accepted the proposal and instructed Federal Sign to begin work immediately so that the scoreboards would be finished as soon as possible. Seven months later, before Federal Sign had delivered anything to TSU, TSU terminated the agreement and contracted instead with Spectrum Scoreboards and Coca–Cola. Federal Sign sued for breach of contract to recover $67,481 lost profits and $22,840 expenses. At trial, a jury found that TSU breached its agreement and that Federal Sign suffered the damages it alleged.

These facts are important for two reasons. First, the subject contract is for goods and services. We do not address whether the State is immune from suit on debt obligations, such as bonds. Second, at the time of TSU's breach (as found by the jury), Federal Sign had not performed. To be sure, Federal Sign purchased equipment for the contract that it could not otherwise use and lost profits it had bargained for. But Federal Sign never tendered performance, never performed services on TSU's property, and never delivered TSU any materials. Would the result be different if Federal Sign had already installed the scoreboards and TSU refused to pay the agreed price? Or if TSU had accepted the scoreboards, acknowledged that Federal Sign had fully complied with the contract, but refused to pay the agreed price? Or if TSU refused to pay in order to force Federal Sign to make a concession on another contract? We do not attempt to decide such hypotheticals today, but they do **\*413** suggest that the State may waive immunity by conduct other than simply executing a contract, so that it is not always immune from contract suits.

Categorical statements in the Court's opinion must be read in this context. For example, the Court states that "when the state contracts with private citizens, the state waives only *immunity from liability*." *Ante* at 406. Later it states: "We hold that sovereign immunity from suit without legislative consent applies to contract claims against the state." *Ante* at 412. These statements do not apply to all contracts—state bonds, for example—or to all circumstances. In short, today's decision does not hold that the State is always immune from suit for breach of contract absent legislative consent; it holds only that the mere execution of a contract for goods and services, without more, does not waive immunity from suit.

# II

I agree with the Court that its decision is supported by *Herring v. Houston National Exchange Bank,* 114 Tex. 394, 269 S.W. 1031 (1925), *W.D. Haden Co. v. Dodgen,* 158 Tex. 74, 308 S.W.2d 838 (1958), and *Missouri Pacific Railroad v. Brownsville Navigation District,* 453 S.W.2d 812 (Tex.1970). But we did not grant Federal Sign's application for writ of error simply to reaffirm past decisions and affirm the court of appeals. Rather, we took the case, while applications for writ of error in two similar cases were pending (*Green International, Inc. v. State,* 877 S.W.2d 428 (Tex.App.— Austin 1994), *writ granted,* 38 Tex. Sup.Ct. J. 404 (March 30, 1995), *writ dism'd,* 39 Tex. Sup.Ct. J. 96 (Nov. 16, 1995) (settled); *Firemen's Insurance Co. v. Board of Regents of the University of Texas System,* No. 95–0924 (filed Sept. 19, 1995, 38 Tex. Sup.Ct. J. 1209)), to consider whether the Court should abolish governmental immunity from suits on contract. The Court does not discuss this issue, except to say that we have repeatedly and recently held that the waiver of governmental immunity—in the sense of granting consent to sue, as opposed to conduct constituting waiver—is a matter addressed to the Legislature. *Ante* at 409; *City of LaPorte v. Barfield,* 898 S.W.2d 288, 291 (Tex.1995); *Guillory v. Port of Houston Auth.,* 845 S.W.2d 812, 813 (Tex.1993), *cert. denied,* 510 U.S. 820, 114 S.Ct. 75, 126 L.Ed.2d 43 (1993); *Lowe v. Texas Tech Univ.,* 540 S.W.2d 297, 298 (Tex.1976). Federal Sign argues that we should no longer adhere to such precedents. This argument deserves response; it is, after all, the main argument in the case.

There are compelling reasons for this Court to continue to defer to the Legislature. First, the handling of contract claims against the government involves policy choices more complex than simply waiver of immunity. Last year the Texas

House of Representatives Committee on Civil Practices surveyed the law of all the other states and concluded that Texas had eight options: retain governmental immunity; waive immunity; waive immunity but exclude awards for attorney fees and consequential damages; waive immunity but prohibit liens on state property; waive immunity for claims under a certain amount; adopt an alternative dispute resolution system for all agencies; resolve all claims by administrative hearing; and create a new special claims court or administrative claims board. TEXAS HOUSE OF REPRESENTATIVES, INTERIM REPORT TO THE 75TH LEGISLATURE 6–8 (1996). The committee's survey of other states' laws shows that most states waive immunity from suit on contracts, but that in only five states was that waiver by the judiciary. *Id*. at 18–29. The committee noted that until 1987 the Legislature freely granted consent to sue on contract claims, but that since then the Legislature has had "to reexamine the financial impact these suits could have on the limited resources of the state." *Id*. at 9. In four legislative sessions from 1989 through 1995, 173 resolutions were introduced for consent to sue under chapter 107 of the Civil Practice and Remedies Code; only nine were passed. *Id*. Thus, the Legislature has taken a more active role in determining what claims have sufficient merit that they should be prosecuted.

The Legislature has repeatedly considered whether to waive all governmental immunity for contract suits and has refused to do so, although as *MOPAC* demonstrates, it may have done so in certain situations, such as by **\*414** authorizing particular agencies to be sued. *MOPAC,* 453 S.W.2d at 813. In 1991 two bills were introduced to waive all governmental immunity for contract actions. Tex. S.B. 1072, 72nd Leg., R.S. (1991); Tex. H.B. 2154, 72nd Leg., R.S. (1991). They did not pass. In 1995 a bill was introduced to require state agencies to mediate construction contract disputes. Tex. H.B. 1369, 74th Leg., R.S. (1995). It also did not pass. In the legislative session just ended two bills were introduced to waive or modify governmental immunity for all contract actions. Tex. S.B. 846, 75th Leg., R.S. (1997); Tex. H.B. 2737, 75th Leg., R.S. (1997). Neither was reported from committee. Two bills requiring arbitration of prison construction contract disputes were not reported from committee. Tex. S.B. 1443, 75th Leg., R.S. (1997); Tex. H.B. 3352, 75th Leg., R.S. (1997). Another bill that, as originally introduced, would have waived governmental immunity for contract actions but, as amended, provided for administrative hearings and decisions on most contract disputes also did not pass. Tex. H.B. 172, 75th Leg., R.S. (1997).

One bill that did pass this session shows that the Legislature continues to assert governmental immunity from contract suits while crafting other procedures to resolve contract disputes with the State. Senate Bill 694, entitled the Governmental Dispute Resolution Act, to be codified as chapter 2008 of the Government Code, authorizes state agencies to provide for alternative dispute resolution of contract disputes. Tex. S.B. 694, 75th Leg., R.S. (1997). The bill expressly provides that it "does not waive immunity from suit". *Id*. § 2008.005(a). The bill, which awaits the Governor's signature, demonstrates the complex and competing policies involved in resolving the State's contract disputes. Simply abolishing immunity cannot accommodate those policies.

Second, not all the factors that weigh in determining the State's liability on its contracts can be assessed in a judicial proceeding. Must the State honor all long-term contracts when they no longer serve the public interest, continuing to spend tax revenues on matters that no longer benefit the people? If so, then the government's ability to respond to changing conditions for the welfare of the people as a whole is impaired. Moreover, each succeeding administration may become increasingly bound by the contracts of prior administrations with no way of escape except payment of public resources. Harold J. Krent, *Reconceptualizing Sovereign Immunity,* 45 VANDERBILT L. REV. 1529, 1530 (1992). Would state officials be unduly anxious to conform to judicial policy wishes if they knew that judges could determine the State's liability for millions of dollars? *See id*. Would the prospect of liability smother policy initiatives based upon truly changed circumstances? *See id*. at 1530–1531. Governmental immunity rests on such concerns and not simply on the archaic idea that "the king can do no wrong". Such political concerns pertain to the nature of democratic government and cannot be assessed by a jury in a contract suit. They are best determined by the people's representatives in the Legislature.

Third, even if the Court were to abolish governmental immunity from contract suits, successful plaintiffs still could not be paid without legislative appropriation. Each appropriation bill passed by the Legislature typically contains a section on judgments. As an example, the 1995 bill provides in part:

> None of the funds appropriated by this Act may be expended for payment of any judgment or settlement prosecuted by or defended by the Attorney

General and obtained against the State of Texas or any state agency, except pursuant to this section or where it is specifically provided in an item or items of appropriation that the funds thereby appropriated or expenditures therein authorized may be used for the payment of such judgments.

Act of May 25, 1995, 74th Leg., R.S., ch. 1063, art. IX, § 56, 1995 Tex. Gen. Laws 5242, 6097. To abolish immunity for contract actions would not allow recovery against the government without its consent.

Finally, the Legislature has long provided a means of redress for contract claimants against the State by allowing petitions for consent to sue the State for breach of contract. Ten years ago the Legislature formalized the procedure for such petitions by **\*415** adopting chapter 107 of the Civil Practice and Remedies Code. It "applies to resolutions granting permission to sue the state or any of the agencies of government that collectively constitute the government of this state, including ... institutions of higher learning", like TSU. TEX. CIV. PRAC. & REM.CODE § 107.001. While the judiciary is better suited to resolve factual and legal issues in contract disputes, the Legislature is not incapable of considering such issues, and is better suited to deciding the kinds of political issues that also attend claims against the State. For this Court to invade matters so laden with political policy concerns and, by abolishing immunity from suit, to disrupt the procedures the Legislature has fashioned, would be not only contrary to our precedents but also unsound jurisprudence.

### III

Finally, I must say a word in response to the dissenting opinion. The main premise of the dissent is that a state contract is not enforceable unless an individual party can sue the State in its courts. The premise is faulty for two reasons.

First, it simply assumes without explanation that the Legislature's decision to waive immunity from suit on a case-by-case basis rather than across the board is not an adequate remedy for contract claimants. Petitions for waivers of immunity under chapter 107 of the Civil Practice and Remedies Code are, in the dissent's view, no remedy at all. Why does legislative consent as a prerequisite to suit render

the contract unenforceable? Certainly, the contracts of parties who received legislative consent to sue, sued, and collected were enforceable.

The presumption tacit in the dissent's position is that a party can obtain justice only in the courts, not in the Legislature. This view of the Second Department of Government is unwarranted. Though the courts are better suited to resolving factual and legal disputes in contract actions, the Legislature is better suited to resolving matters of political policy. As shown above, contract claims against the State can involve both. The United States Supreme Court observed in *Lynch v. United States,* 292 U.S. 571, 580, 54 S.Ct. 840, 844, 78 L.Ed. 1434: " 'The contracts between a Nation and an individual are only binding on the conscience of the sovereign and have no pretensions to compulsive force. They confer no right of action independent of the sovereign will.' " *Accord, Perry v. United States,* 294 U.S. 330, 346–347, 55 S.Ct. 432, 433, 79 L.Ed. 912 (1935). The same is true of the State as respects her own courts. Whether to remedy the State's contractual breaches is a matter addressed to the Legislature's conscience. The Judicial Department does not possess a monopoly on conscience. The State may not take property without compensation, but it may determine how its Branches will participate in deciding its contractual disputes.

Second, a waiver of immunity would not provide the full redress the dissent contends is essential for a contract with the State to be enforceable. Even if the State is held liable in a suit for breach of contract, it cannot be forced to pay the judgment. The Legislature may simply refuse to appropriate the funds. There is no reason why requiring legislative consent to sue makes a contract unenforceable but requiring legislative consent to collect does not. The dissent's terse response to this point is: "not relevant". *Post* at 418.

The dissenting opinion faults the Court for not explaining why a waiver of immunity from liability does not entail a waiver of immunity from suit. *Post* at 416. *Lynch* and *Perry* both distinguish between the government's obligation and its consent to suit. This Court in *MOPAC* stated that "[i]t is necessary to distinguish between two different governmental immunities: (1) immunity from suit without consent even though there is no dispute as to liability of the sovereign; and (2) immunity from liability even though consent to the suit has been granted." 453 S.W.2d at 813. If the State did not waive immunity from liability by executing a contract, then it would have no obligation at all to the contracting party for its breach. The State can waive immunity from

liability, thus recognizing its obligation, but retain immunity from suit, thereby requiring that the party present its claim of obligation to the Legislature for its consent to sue. The dissenting opinion may feel that the State *ought* to **\*416** waive immunity from suit by executing a contract, but there is nothing in the mere execution of a contract that expressly waives immunity from suit or is inconsistent with its assertion.

The "modern justification" for governmental immunity is not, as the dissent states, "that suits against the state would deplete resources of treasury and tax funds necessary to operate the government." *Post* at 417. I have explained some of the considerations above, and they are not simply pecuniary. They involve the political structure of government and the allocation of responsibility among its Branches for resolving disputes involving the State.

The dissent states: "Today, Federal Sign has lost any recourse to enforce its contract with the State." *Post* at 418. This is simply untrue. Federal Sign lost its recourse to enforce its contract when it *refused* to petition the Legislature for consent to sue under chapter 107 of the Civil Practice and Remedies Code.

By waiving all immunity from suit for contract claims, the dissent would disregard the Legislature's clear intent not to do so, expressed as recently as a few days ago. Tex. S.B. 694, 75th Leg., R.S. (1997). Apart from the reasons for immunity from suit explained above, the Court should be very reluctant to disregard the consistent, recent, unmistakable intent of the Legislature on the issue of waiver of immunity.

Finally, the dissent states: "Today, the Court holds that the State cannot be sued for its breach of contract unless the Legislature gives permission for the plaintiff to bring suit against the State." *Post* at 418. The suggestion that the Court's holding is a new idea is incorrect. One hundred fifty years ago the Court stated that "no state can be sued in her own courts without her consent, and then only in the manner indicated by that consent." *Hosner v. DeYoung,* 1 Tex. 764, 769 (1847). What the Court does *today* is adhere to one and one-half centuries of consistent precedent.

ENOCH, Justice, joined by SPECTOR and ABBOTT, Justices, dissenting.

Today, the Court holds that the State cannot be sued for its breach of contract unless the Legislature independently gives permission for the plaintiff to bring suit against the State. This holding calls into question the enforceability of State contracts and goes counter to the national trend recognizing that the State waives sovereign immunity when it enters contracts.

### I. Immunity from Liability/Immunity from Suit

The Court notes two different types of sovereign immunity: immunity from liability and immunity from suit. 951 S.W.2d at 405. The Court then holds that by entering a contract with a private party, the State waives immunity from liability but not immunity from suit. *Id*. However, the Court fails to explain with any clarity why the State waives one but not the other. *Cf*. TEX. CIV. PRAC. & REM.CODE § 101.021 et al. (waiving both immunity from liability and immunity from suit for certain tort claims against the State). I agree that the State's act in entering a contract waives immunity from liability, but I would also hold that this same act waives immunity from enforcement of the contract by suit.

The Court primarily relies on three Texas cases to support its position that the State does not waive immunity from suit. 951 S.W.2d at 408 (citing *Herring v. Houston Nat'l Exch. Bank,* 114 Tex. 394, 269 S.W. 1031 (1925); *W.D. Haden Co. v. Dodgen,* 158 Tex. 74, 308 S.W.2d 838 (1958); *Missouri Pac. R.R. Co. v. Brownsville Navigation Dist.,* 453 S.W.2d 812 (Tex.1970)). However, only *Herring,* decided over seventy years ago, touches the issue before the Court today.

In *Herring,* the Houston National Exchange Bank sued the Texas Prison Commission for money owed under a contract. *Herring,* 269 S.W. at 1031. The Court concluded that such a suit against the State could not be maintained without the State's consent. *Id*. at 1032. The Court conceded that Houston National "should be accorded a hearing before a tribunal capable of passing upon the legal issues involved, to wit, a court of competent jurisdiction," but then concluded that **\*417** "the fixing of the governmental policy in this regard rests with the Legislature." *Id*. at 1032–33. Regardless, the Court left open the possibility that a government agency, performing extra-governmental functions and existing for extra-governmental purposes, could be sued for breach of contract. *Id*. at 1033. Notably, none of the parties argued, as is argued today, that the State's act in entering the contract waived its immunity from suit.

Thirty years after *Herring,* this Court decided *W.D. Haden Co. v. Dodgen,* 158 Tex. 74, 308 S.W.2d 838 (1958). In *Haden,* the W.D. Haden Co. sued the Game and Fisheries Commission for changing the terms of its state permit to remove mudshell from Galveston Bay. *Haden,* 308 S.W.2d at 839. The main issue in *Haden* was whether Haden was actually suing the State within the meaning of the sovereign immunity doctrine. *Id.* The Court concluded that Haden's suit to determine its rights under the permit was a suit against the State. *Id.* at 840–41. Both parties and the Court assumed that Haden could not bring suit against the State without legislative permission. No one argued, and the Court did not address, whether the State's act of entering a contract waived its immunity from suit.

Finally, in *MOPAC,* this Court held that a statute enabling a state agency to "sue or be sued" expressly waived the State's immunity from suit. *Missouri Pac. R.R.,* 453 S.W.2d 812, 813 (Tex.1970). *MOPAC* did not involve the issue presented in this case of whether by its act in entering the contract, the State waived its immunity from suit. Thus, the Court relies on three Texas cases, none of which was asked to address the principal issue presented today.

## II. Sovereign Immunity

The Court defers to the Legislature and refuses to allow Federal Sign to sue the State for its breach of contract claim. However, I contend that the better approach would be to hold that the State, by entering a contract with a private party, waives its sovereign immunity, including its immunity from suit.

The doctrine of sovereign immunity is a common law creation. *See Hosner v. DeYoung,* 1 Tex. 764, 769 (1847) (adopting the doctrine of sovereign immunity without citation). Despite its common law roots, issues of sovereign immunity are generally addressed by the Legislature. *University of Texas Medical Branch v. York,* 871 S.W.2d 175, 177 (Tex.1994) (citing *Lowe v. Texas Tech Univ.,* 540 S.W.2d 297, 298 (Tex.1976)). To waive sovereign immunity, the Legislature must use clear and unambiguous language. *York,* 871 S.W.2d at 177 (citing *Duhart v. State,* 610 S.W.2d 740, 742 (Tex.1980)).

The concept of sovereign immunity derives from the ancient belief that "the King can do no wrong." *See* Glen A. Majure et al., *The Governmental Immunity Doctrine in Texas—An*

*Analysis and Some Proposed Changes,* 23 SW. L.J. 341, 341 (1969); Louis L. Jaffe, *Suits Against Governments and Officers: Sovereign Immunity,* 77 HARV. L. REVV. 1, 1 (1963). The modern justification for sovereign immunity is that suits against the state would deplete resources of treasury and tax funds necessary to operate the government. *See* Elizabeth K. Hocking, *Federal Facility Violations of the Resource Conservation and Recovery Act and the Questionable Role of Sovereign Immunity,* 5 ADMIN. L.J. 203, 211 (1991) ("Sovereign immunity protects the public fisc, and, therefore, the public welfare by limiting assaults on the public fisc."). Because the Legislature appropriates, in advance, sufficient funds to meet the State's contractual obligations, it would appear that the modern justification for sovereign immunity is without merit in this context.

I note that Justice Hecht discusses additional political and financial concerns underlying the sovereign immunity doctrine. *See* 951 S.W.2d at 414 (Hecht, J., concurring). However, many, if not all, of these political and financial concerns can be satisfied through the legislative appropriation process.

## III. Waiver

The Court concedes that the State, by entering a contract, waives its immunity from **\*418** liability. In fact, the Court holds only that the State is immune from suit. Nevertheless, the Court's holding renders the State's contract with TSU unenforceable.

In our modern society, commercial entities and individuals, as well as our local, state, and federal government, contract with other parties every day. TSU could not function without countless day-to-day contractual dealings with private parties. TSU expects these parties to honor their obligations, and it can and does seek redress when they fail to do so. Similarly, these parties expect TSU to honor its obligations and to have recourse when it fails to do so.

Specifically, the Legislature granted TSU authority to enter into contracts for permanent improvements such as the construction of a scoreboard. *See* TEX. EDUC.CODE § 51.907 (authorizing competitive bidding for contracts for the construction of permanent improvements at institutions of higher education). Unquestionably, the Legislature intended for TSU to enter into valid and enforceable contracts.

A valid contract exists when each party promises an obligation, and such promise is enforceable by law. 1 SAMUEL WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 1 (4th ed.1990). Today, Federal Sign has lost the right to enforce by suit its contract with the State. This result is undesirable and ignores fundamental tenets of contract law.

The Court argues that Chapter 107 of the Civil Practice and Remedies Code provides a remedy to private parties. 951 S.W.2d at 409; *see* TEX. CIV. PRAC. & REM.CODE §§ 107.001–.005 (allowing a private party to petition the Legislature for permission to sue the State); *but see* TEXAS HOUSE OF REPRESENTATIVES, INTERIM REPORT TO THE 75TH LEGISLATURE 9 (1996) (noting that only six percent of the requests to sue have been granted in the past eight years). Admittedly, requiring legislative consent to sue does provide the Legislature an opportunity to resolve matters of public policy. But, as I previously mentioned, these political concerns may also be resolved through the legislative appropriation process.

The issue here is whether a private party has recourse to enforce by suit its contract with the State and to determine the amount of the State's liability, if any. The concurrence acknowledges that "the courts are better suited to resolving factual and legal disputes in contract actions." 951 S.W.2d at 415 (Hecht, J., concurring). Furthermore, such disputes should be resolved free from the political considerations that the concurrence recognizes accompany the Legislature's decision to permit suit.

The concurrence argues that sovereign immunity should prohibit suit because even if we were to conclude that the State waives suit immunity by entering into a contract, plaintiffs could not be assured of obtaining their judgments without legislative appropriation. 951 S.W.2d at 414 (Hecht, J., concurring). I simply point out that whether the Legislature ultimately appropriates the funds necessary to satisfy a judgment is not relevant to the issue of whether the Legislature has waived sovereign immunity. *See Texas Dep't of Human Servs. v. Green,* 855 S.W.2d 136, 145 (Tex.App.—Austin 1993, writ denied) (concluding that the Whistleblower Act waived the State's immunity from suit and liability but noting that the plaintiff still had to seek a legislative appropriation to recover the damages awarded to him).

All things considered, the Court's conclusion that the State retains sovereign immunity from suit renders Federal Sign's

contract unenforceable. *See* RESTATEMENT (SECOND) OF CONTRACTS § 8 cmt. c (1979) (recognizing that "where the only direct remedy is by legislative approval of a private bill or by unreviewable administrative action, the contract is within the present definition of unenforceable contracts"). In my view, the more reasoned approach would be for the Court to carry its waiver of liability immunity determination to its logical conclusion: the Legislature, by authorizing TSU to enter into contracts, intended the contracts to be enforceable and waived *both* the State's immunity from liability and immunity from suit for breach of contract claims. *See George & Lynch, Inc. v. State,* 197 A.2d 734, 736 (Del.1964); **\*419** *Pan–Am Tobacco Corp. v. Department of Corrections,* 471 So.2d 4, 5 (Fla.1985); *V.S. DiCarlo Constr. Co. v. State,* 485 S.W.2d 52, 54 (Mo.1972) (all recognizing that invoking the State's sovereign immunity, including immunity from suit, renders a contract invalid and holding that the Legislature's authorizing the State to enter valid contracts has waived the State's immunity from liability and suit for breach of contract).

The Court's holding also runs counter to the nationwide trend recognizing that states, through contracting, waive immunity from suit for breach of contract claims. In fact, the majority of states does not permit sovereign immunity as a defense against private parties seeking redress from the State for breach of contract. I realize that not all of these states allow private parties to litigate their claims in general jurisdiction courts. For example, in 1855, the federal government established a Court of Claims for the sole purpose of hearing breach of contract claims against the United States. *See* 28 U.S.C. §§ 171, 1491. Several states have adopted a similar approach. *See* ARK.CODE §§ 19–10–201, 19–10–204 (creating a state claims commission to hold an abbreviated trial for breach of contract claims against the State); 705 ILL. COMP. STAT. 505/8 (conferring on the State Court of Claims exclusive jurisdiction to hear and determine all claims against the state founded upon any contract entered into with the state); N.Y. CT. CL. ACT § 9 (conferring on the Court of Claims jurisdiction to hear breach of contract claims brought against the state); OHIO REV.CODE § 2743.02(A)(1) (providing the Court of Claims jurisdiction to determine the liability of the state for breach of contract claims); 72 PA. CONS.STAT. § 4651–1 (creating Board of Claims to arbitrate breach of contract claims against the Commonwealth); TENN.CODE § 9–8–307(a)(1)(L) (providing the Tennessee Claims Commission jurisdiction to determine actions for breach of written contract between claimant and state); W. VA.CODE §§ 14–2–4, 14–

2–13 (establishing a court of claims with jurisdiction to hear breach of contract claims brought against the state).

However, a significant number of states have opened their courts to hear breach of contract claims against the State. Many of these states have judicially recognized the State's waiver of sovereign immunity, including immunity from suit, when the State enters a contract. *See State Highway Dep't v. Milton Constr. Co.,* 586 So.2d 872, 875 (Ala.1991); *Souza & McCue Constr. Co. v. Superior Court,* 57 Cal.2d 508, 20 Cal.Rptr. 634, 370 P.2d 338, 339 (1962); *Ace Flying Serv., Inc. v. Colorado Dep't of Agric.,* 136 Colo. 19, 314 P.2d 278, 280 (1957); *George & Lynch, Inc. v. State,* 197 A.2d 734, 736 (Del.1964); *Pan–Am Tobacco Corp. v. Department of Corrections,* 471 So.2d 4, 5 (Fla.1985); *Regents of Univ. Sys. v. Blanton,* 49 Ga.App. 602, 176 S.E. 673, 675 (1934); *Grant Constr. Co. v. Burns,* 92 Idaho 408, 443 P.2d 1005, 1010 (1968); *Kersten Co. v. Department of Social Servs.,* 207 N.W.2d 117, 120 (Iowa 1973); *J.A. Sullivan Corp. v. Commonwealth,* 397 Mass. 789, 494 N.E.2d 374, 377 (1986); *Hersey Gravel Co. v. State,* 305 Mich. 333, 9 N.W.2d 567, 569 (1943); *State Highway Comm'n v. Wunderlich,* 194 Miss. 119, 11 So.2d 437, 438 (1943); *V.S. DiCarlo Constr. Co. v. State,* 485 S.W.2d 52, 55 (Mo.1972); *Meens v. State Bd. of Educ.,* 127 Mont. 515, 267 P.2d 981, 984–85 (1954); *Smith v. State,* 289 N.C. 303, 222 S.E.2d 412, 423–24 (1976); *State Bd. of Pub. Affairs v. Principal Funding Corp.,* 542 P.2d 503, 505–06 (Okla.1975); *Kinsey Constr. Co. v. South Carolina Dep't of Mental Health,* 272 S.C. 168, 249 S.E.2d 900, 903 (1978); *Wiecking v. Allied Med. Supply Corp.,* 239 Va. 548, 391 S.E.2d 258, 261 (1990). Other states have judicially abolished sovereign immunity in the breach of contract context. *See Stone v. Arizona Highway Comm'n,* 93 Ariz. 384, 381 P.2d 107, 109 (1963); *Brown v. Wichita State Univ.,* 217 Kan. 279, 540 P.2d 66, 84–86 (1975); *Todd v. Board of Educ. Lands and Funds,* 154 Neb. 606, 48 N.W.2d 706, 710 (1951); *P. T. & L. Constr. Co. v. Commissioner, Dep't of Transp.,* 60 N.J. 308, 288 A.2d 574, 578 (1972). And for a large number of states, the issue of waiver is moot because their legislatures have statutorily waived or abolished sovereign immunity for breach of contract claims. *See* ALASKA STAT. § 09.50.250; ARK.CODE §§ 19–10–201–210; CONN. GEN. STAT. § 4–61(a); HAW. REV. STATT. § 661–1; 705 ILL. COMP. STATT. 505/8; IND.CODE § 34–4–16–1.1; KY. REV. STAT. § 45A.245; LA. CONST. art. 12, § 10(A); ME. **\*420** REV. STAT. tit. 5 § 1510–A; MD.CODE, STATE GOV'T § 12–201(a); MINN. STAT. § 3.751; NEV. REV.

STAT. § 41.031; N.H. REV. STAT. § 491:8; N.M. STAT. § 37–1–23; N.Y. CT. CL. ACT § 8; N.D. CENT.CODE § 32–12–02; OHIO REV.CODE § 2743.02(A)(1); OR. REV. STAT. § 30.320; 72 PA. CONS.STAT. § 4651–1; R.I. GEN. LAWS § 37–13.1–1; TENN.CODE § 9–8–307(a)(1)(L); S.D. CODIFIED LAWS §§ 21–32–2, 21–32–10; UTAH CODE § 63–30–5; WASH. REV.CODE § 4.92.010; W. VA.CODE §§ 14–2–4, 14–2–13; WYO. STAT. § 1–39–104. In fact, only two states provide no relief for breach of contract claims against the state other than legislative approval of a private bill. *See* VT. STAT. tit. 12, § 5601 (statute waiving tort liability does not apply to any claim for "damages caused by the fiscal operations of any state officer or department"); WIS. STAT. § 16.007 (establishing a Claims Board to hear breach of contract claims against the state with the only remedy of proposing a private bill to the legislature).

Perhaps all these other States recognize the inherent problems of concluding that sovereign immunity precludes suits on contracts. Notably, the concurrence would carefully narrow the Court's holding to leave open the possibility of suit against the State by private parties who have tendered performance, performed services on State property, delivered materials to the State, or loaned the State money. *See* 951 S.W.2d at 412 (Hecht, J., concurring).

This Court had the opportunity to align this State with the vast majority of other states in permitting suits against the State for breach of contract claims. However, the Court declined the opportunity, leaving Texas in the distinct minority.

## IV. CONCLUSION

Today the Court holds that the State waives just immunity from liability when it enters a contract—a decision that can only be described as a catch–22. According to the Court, the State can *be* liable for its breach of contract, but it cannot be *held* liable.

I respectfully dissent.

**All Citations**

951 S.W.2d 401, 121 Ed. Law Rep. 394, 40 Tex. Sup. Ct. J. 676

---

2007 WL 2774166
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**
Court of Appeals of Texas,
Dallas.

HAMILTON COUNTY, Hamilton
Independent School District, City of Hamilton,
Hamilton Hospital District, and Hamilton
County Appraisal District, Appellants
v.
Jay Sandon COOPER, Appellee.

No. 05–07–00307–CV. | Sept. 25,
2007. | Rehearing Overruled Nov. 20, 2007.

On Appeal from the 192nd Judicial District Court, Dallas
County, Texas, Trial Court Cause No. 05–11916–K, Craig
Smith, J.

**Attorneys and Law Firms**

F. Duane Force, Edward Lopez, Jr., James Edward Pritchard,
Austin, Thomas G. Yoxall, Locke Liddell & Sapp LLP, W.

Pruitt Ashworth, Steven E. Clark, Clark & Associates, Dallas,
for Appellant.

Jay Sandon Cooper, Plano, pro se.

Before Justices WHITTINGTON, WRIGHT, and
FITZGERALD.

**MEMORANDUM OPINION**

Opinion by Justice WRIGHT.

**\*1** Hamilton County, Hamilton Independent School
District, City of Hamilton, Hamilton Hospital District, and
Hamilton County Appraisal District bring this interlocutory
appeal complaining of the trial court's issuance of a temporary
injunction. While the interlocutory appeal has been pending,
the district court rendered a final judgment in the case.
If, while on the appeal of the granting or denying of the
temporary injunction, the trial court renders final judgment,
the case on appeal becomes moot. *Isuani v. Manske–Sheffield
Radiology Group, P.A.,* 802 S.W.2d 235, 236 (Tex.1991).
Accordingly, we dismiss this appeal as moot.

**All Citations**

Not Reported in S.W.3d, 2007 WL 2774166

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

684 S.W.2d 210
Court of Appeals of Texas,
Houston (1st Dist.).

Sheriff Jack HEARD, Appellant,

v.

The HOUSTON POST COMPANY
d/b/a the Houston Post, Appellee.

No. 01–84–00393–CV.   |   Dec. 27,
1984.   |   Rehearing Denied Jan. 24, 1985.

Sheriff appealed from a permanent injunction issued by the 234th District Court, Harris County, Ruby Sondock, J., ordering him to make access to or a copy of an offense report available to newspaper whenever requested pursuant to newspaper's statutory rights under Open Records Act. The Court of Appeals, Doyle, J., held that: (1) the Act did not exclude portions of police offense report from disclosure to public; (2) sheriff was not precluded from filing an appeal bond on basis of statutory exemption for certain acts of officers and employees, since the exemption did not apply to newspaper's action seeking access to information wrongfully and without justification denied them by sheriff; and (3) trial court should have ordered sheriff to release complainant's name to newspaper along with other portions of sheriff's offense report.

As reversed and modified, judgment affirmed.

West Headnotes (8)

[1]     **Records**
        ☛ Investigatory or Law Enforcement Records
        Open Records Act did not exclude from disclosure to public those portions of police offense report containing information as to offense committed, location of crime, premises involved, time of occurrence, property involved, vehicles involved, description of weather, detailed description of offense in question, and names of investigating officers. Vernon's Ann.Texas Civ.St. art. 6252–17a.

        Cases that cite this headnote

[2]     **Courts**
        ☛ Previous Decisions as Controlling or as Precedents
        Attorney General's opinions construing Open Records Act are not binding on courts, but are to be given great weight because legislature has required a written opinion when a determination is requested from Attorney General. Vernon's Ann.Texas Civ.St. art. 6252–17a.

        7 Cases that cite this headnote

[3]     **Records**
        ☛ Investigatory or Law Enforcement Records
        Although sheriff's brief outlined steps in criminal justice system, the Texas Open Records Act did not preclude disclosure of certain portions of an offense report sought by newspaper, since there was nothing specific in sheriff's brief to indicate that litigation was reasonably anticipated with respect to those items. Vernon's Ann.Texas Civ.St. art. 6252–17a, § 3(a)(3).

        2 Cases that cite this headnote

[4]     **Records**
        ☛ Persons Entitled to Disclosure;  Interest or Purpose
        Although the press has no constitutional right to have access to particular government information different from or greater than that accorded the public generally, such would not preclude newspaper from receiving copy of police officer's offense report, since newspaper was not seeking a special right of access, but the same access as general public to information about crime in the community.

        Cases that cite this headnote

[5]     **Records**
        ☛ Judicial Enforcement in General
        Sheriff failed to present facts or law which would require finding that information in a sheriff's offense report already held to be public should not be disclosed to newspaper.

Cases that cite this headnote

**[6]** **Appeal and Error**

👈 States, Political Divisions, Boards, and Officers

Statutory exemption from filing bond for appeal of liability of a political subdivision for certain acts of officers and employees was inapplicable in an action for temporary injunction not based upon allegations of proof of negligence. Vernon's Ann.Texas Civ.St. art. 6252–19b.

Cases that cite this headnote

**[7]** **Appeal and Error**

👈 States, Political Divisions, Boards, and Officers

Sheriff was not precluded from filing an appeal bond on basis of statutory exemption for certain acts of officers and employees, since exemption did not apply to newspaper's action seeking access to information wrongfully and without justification denied them by sheriff. Vernon's Ann.Texas Civ.St. art. 6252–19b.

Cases that cite this headnote

**[8]** **Records**

👈 Investigatory or Law Enforcement Records

Trial court should have ordered sheriff to release complainant's name to newspaper along with other portions of sheriff's offense report, since such information was not protected by an exception to the Open Records Act. Vernon's Ann.Texas Civ.St.art. 6252–17a, § 3(a)(8).

Cases that cite this headnote

**Attorneys and Law Firms**

**\*211** Mike Driscoll, County Atty. for Harris County, Molly D. Shannon, Bill E. Lee, Harris County Asst. County Attys., Houston, for appellant.

A. Frank Koury, Alton J. Hall, Jr., Fulbright & Jaworski, Houston, for appellee.

Before DOYLE, BASS and BULLOCK, JJ.

**OPINION**

DOYLE, Justice.

This is an appeal from a permanent injunction against Sheriff Jack Heard (the Sheriff) ordering him to make available to the Houston Post (the Post) access to or a copy of the Offense Report whenever the Post requests it pursuant to its statutory rights under the Texas Open Records Act.

On April 12, 1984, the Houston Post reported allegations that four Harris County Sheriff's Deputies had brutalized Richard Allen Brittain during his arrest on April 9. The Post requested from the Sheriff's office on April 12 a copy of the offense report on Brittain's arrest. The Sheriff's office denied the request, contending that the report was excepted from disclosure by the Texas Open Records Act, Tex.Rev.Civ.Stat.Ann. art. 6252–17a (Vernon Supp.1984).

On April 13, 1984, the Houston Post requested and was granted a temporary injunction, which ordered Sheriff Heard to provide the newspaper with a copy of the first page of Brittain's offense report. A show cause hearing for a temporary injunction was originally scheduled for April 23, 1984. Both parties agreed that the submissions at this hearing would be for an application for a permanent injunction, because the Sheriff indicated he would deny future requests for similar offense report information in all cases.

On May 1, 1984, the court signed a permanent injunction ordering the Sheriff to provide the Post, within three hours of its request, a copy of the Sheriff's Department offense report containing the following information: 1) the offense committed; 2) the location of the crime; 3) the premises involved; 4) the time of the occurrence; 5) the property involved; 6) the vehicles involved; 7) the description of the weather; 8) a detailed description of the offense in question; and, 9) the names of the investigating officers. The identification and description of the complainant was ordered released only in cases not under active investigation; in cases where the complainant is also the victim of the offense committed; in cases where the identification and description of the complainant are evident from the abovementioned nine categories; and in all other cases except where there is an active investigation and the Sheriff's Department applies to a court and asserts a reasonable likelihood of

serious physical harm to the complainant if the complainant's identity or description were **\*212** revealed to other than law enforcement agencies.

On May 23, 1984, the Houston Post filed a motion to modify judgment, objecting to that portion of the judgment that limited the release of the identity and description of the complainant. The motion was denied.

On May 25, 1984, Sheriff Heard filed his notice of appeal without an appeal bond, pursuant to Tex.Rev.Civ.Stat.Ann. art. 6252–19b (Vernon Supp.1984). However, the docket sheet of the court shows a $1,000 bond filed on June 11, 1984, apparently fixed by the court.

Appellant now brings two points of error. Appellee has filed a cross-point based on its motion to modify judgment. Appellant's second point, objecting to the issuance of the permanent injunction, will be discussed first.

In his second point of error, appellant urges that it was error for the trial court to order the Sheriff to deliver a copy of an offense report to the Post and to deliver future copies when requested. Appellant's brief presents two arguments to support this allegation.

[1]    His first argument is that sec. 3(a) of the Texas Open Records Act excludes the offense report from disclosure to the public. It is to be noted that only portions of the offense report were ordered disclosed and not the entire report. These portions are public information as determined by the decision in *Houston Chronicle Publishing Co. v. City of Houston,* 531 S.W.2d 177, 187 (Tex.Civ.App.—Houston [14th Dist] 1975, writ ref'd n.r.e.), 536 S.W.2d 559 (Tex.1976) (*Chronicle I* ). The information requested by the Houston Post is the same information with which *Chronicle I* was concerned. Eighteen exceptions are listed in sec. 3(a), and appellant relies on three of them. The exception found in sec. 3(a)(1) is based on confidentiality. The appellant brings forward this exception for the first time on appeal. Arguments raised for the first time on appeal are not properly preserved and cannot be considered by an appellate court. *Gray-Taylor, Inc. v. Tennessee,* 587 S.W.2d 668, 671 (Tex.1979).

[2]    The next exception appellant has relied on is sec. 3(a)(3):

> (3) information relating to litigation of a criminal or civil nature and settlement negotiations, to which the state or political subdivision is, or

may be, a party, or to which an officer or employee of the state or political subdivision, as a consequence of his office or employment, is or may be a party, that the attorney general or the respective attorneys of the various political subdivisions has determined should be withheld from public inspection;

Section 7 of the Act provides that the Attorney General make a determination as to the status of information within the exceptions, when a governmental body requests a determination that has not previously been made. This section also states that if a decision is not requested, there is a presumption that the information is public. The Attorney General's opinions construing the Open Records Act are not binding on the courts, but are to be given great weight because the legislature has required a written opinion when a determination is requested from the Attorney General. *City of Houston v. Houston Chronicle Publishing Co.,* 673 S.W.2d 316, 322 (Tex.App.—Houston [1st Dist.] 1984, no writ) (*Chronicle II* ).

[3]    The opinions construing sec. 3(a)(3) indicate that this exception applies only when a lawsuit has been filed or if litigation is reasonably anticipated. Op.Atty.Gen., No. ORD–350 (1983); No. ORD–288 (1981); No. ORD–143 (1976). Although appellant's brief outlines the steps in the criminal justice system, there is nothing specific to indicate that litigation is reasonably anticipated with respect to these nine items.

Appellant next relies on sec. 3(a)(8):

> (8) records of law enforcement agencies that deal with the detection and investigation of crime and the internal records and notations of such law enforcement agencies which are maintained **\*213** for internal use in matters relating to law enforcement;

Appellant also relies on *Ex parte Pruitt,* 551 S.W.2d 706 (Tex.1977). This case centered on an active arson investigation, and appellant mistakenly concludes that the district court could not order the production of records because of the investigation. The court could not order the production of detailed, investigatory records. However, the court could under the release of basic information, similar to

that in *Chronicle I. Ex parte Pruitt,* 551 S.W.2d at 709–10. Appellant disapproves of the decision in *Chronicle I* because it holds the offense report was excluded by sec. 3(a)(8), but then balances the competing interests and orders information from the report released.

Opinions of the attorney general construing sec. 3(a)(8) indicate that information is protected by this exception if there is a showing that release of the information would unduly interfere with law enforcement. Op.Atty.Gen., No. ORD–252 (1980); No. ORD–333 (1983).

Appellant, however, does make an argument, which is not supported by any law, that releasing portions of the offense report may result in harm to the individual under investigation.

In discussing the potential for massive and unjustified damage to the individual, the court in *Chronicle I* found that the right of privacy is not an unlimited one and that newsworthy occurrences may justify the invasion of the lives of private citizens. *Chronicle I,* 531 S.W.2d at 188.

 **[4]**    Appellant's second argument is that the press has no constitutional right to have access to particular government information. The case relied on is *Houchins v. KQED, Inc.,* 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978) and involved a broadcaster seeking access to inmates in a county jail. The holding in that case was that "the media have no special right of access ... different from or greater than that accorded the public generally." *Id*. at 16, 98 S.Ct. at 2597. In a concurring opinion, it was noted that "[f]orces and factors other than the Constitution must determine what government-held data are to be made available to the public." *Id*. The Post is not seeking a special right of access, but the same access due the general public to information about crime in the community.

Appellant uses a federal statute, which is similar to the Texas statute, and the cases construing the federal statute to further support its position for denying access to government records. Appellant failed to note the section in the Freedom of Information Act which upholds disclosing portions of records. *See Industrial Foundation of the South v. Texas Industrial Board,* 540 S.W.2d 668 (Tex.1976).

 **[5]**    Appellant contends *Chronicle I* is inapplicable to this case. We disagree. The same items of information are at issue. These items are contained in records of law enforcement

agencies, and construction of the Texas Open Records Act and the constitutional right of access to information concerning crime in the community are in issue. Appellant has failed to present facts or law that would require a finding that information already held to be public should not be made public in this case. Appellant's second point of error is overruled.

Appellant, in his first point of error, contends that the trial court erred in requiring him to file an appeal bond. In order to perfect an appeal, Rule 354 of the Texas Rules of Civil Procedure requires a cost bond payable to the appellee or a deposit with the clerk. The rule allows for statutory exemptions.

Appellant bases his claim of statutory exemption on Tex.Rev.Civ.Stat.Ann. art. 6252–19b (Vernon Supp.1984). This Act, "an Act relating to the liability of a political subdivision for certain acts of officers and employees," is applicable where damages arise out of a cause of action for negligence. In such a cause of action, no cost bond is required.

 **[6]**    **[7]**    Appellant contends that the cause of action herein is one for negligence. This **\*214** argument is not supported by the facts. Where a temporary injunction is not based upon any allegations or proof of negligence, art. 6252–19b has been held inapplicable. Attorney General Opinion No. MW–158 (1980). Article 6252–19b specifically distinguishes a wilful or wrongful act from negligence. In its original pleading, the Post sought "access to the information wrongfully and without justification denied them by defendant." Thus, the statute clearly is not applicable. Appellant's first point of error is overruled.

In appellee's cross-point, it complains that the trial court was bound to fully follow the decision in *Chronicle I* and order the release of the complainant's name in all cases. In our case, the trial court created four categories of cases in which the identification and description of the complainant should be released:

> (a) in all cases not under active investigation; (b) in all cases where the complainant is also the victim of the offense committed; (c) in all cases where the identification and description of the complainant is otherwise evident from the other nine categories of information ordered to be produced above; and (d)

in all other cases except cases of active investigation in which the Harris County's Sheriff's Department within twenty-four (24) hours of the request applies to a court of competent jurisdiction and asserts in a verified pleading its genuine belief that there is a reasonable likelihood that serious physical harm would occur to the complainant if the complainant's identity or description was revealed to other than law enforcement agencies.

Categories (a) and (d) are already established as exceptions under sec. 3(a)(8) of the Texas Open Records Act, through the opinions of the Attorney General and the cases applying the opinions, *e.g., Ex parte Pruitt,* 551 S.W.2d 706 (Tex.1977); ORD No. 350 (1983); ORD No. 371 (1983). Categories (b) and (c) are apparent and need not be enumerated. Occasions may arise when the release of complainant's identity would be harmful. On those occasions, it would be proper for the Sheriff, within 24 hours of the request, to apply to a court of competent jurisdiction setting out the harm.

**[8]** The court found in *Chronicle II* that "[t]he question of the type of information which is subject to disclosure by reason of the Open Records Act was determined in *Chronicle I.* The passage of time will not change the type of information which must be disclosed." *Chronicle II,* 673 S.W.2d at 321. Because this information has already been found not to be protected by an exception, the trial court should have followed the decision in *Chronicle I.* Appellee's cross-point is sustained.

We accordingly reverse that portion of the trial court's judgment which restricts the release of the complainant's name in only the four enumerated situations. We modify the judgment to require the Sheriff or his duly authorized representative to provide the Post, within three (3) hours after the information is available with the name and description of the complainant in all cases not subject to the statutory exception.

As reversed and modified, the judgment of the trial court is affirmed.

**All Citations**

684 S.W.2d 210, 11 Media L. Rep. 1359

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4699480
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

Court of Appeals of Texas,
Houston (14th Dist.).

In the Interest of G.S., a Child.

No. 14–14–00477–CV. | Sept. 23, 2014.

On Appeal from the 309th District Court, Harris County, Texas, Trial Court Cause No.2012–74334.

**Attorneys and Law Firms**

Sandra D. Hachem, for Texas Department of Family and Protective Services.

Panel consists of Justices McCALLY, BROWN, and WISE.

## MEMORANDUM OPINION

MARC W. BROWN, Justice.

**\*1** Appellant G. B.C. (the Father) appeals from the decree terminating his parental rights to a daughter, G.S. (the Child). The Father brings four issues arguing that (1) the trial court erred in denying his motion for new trial; (2) the evidence is insufficient to support termination; (3) the Texas Department of Family and Protective Services (the Department) failed to make reasonable efforts to reunite him with the Child; and (4) the trial court erred in ordering reimbursement for his court-appointed counsel's fees. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On December 17, 2012, the Department received a referral alleging physical abuse of the Child shortly after her birth. The referral alleged that at the time of the Child's birth, M.C.S. (the Mother) tested positive for amphetamines and methamphetamines and the Child tested positive for amphetamines and methadone. On December 19, 2012, the Department filed suit for protection of the Child, naming the Father as the Child's alleged father. The following day, the trial court issued emergency temporary orders granting the Department temporary managing conservatorship, and the Child was placed in foster care.

The record reflects that the Father was a party in a previous suit for termination of the Mother's child, A. D.S. (the Brother), who was born in 2008. The Father was alleged to be the Brother's biological father. The Brother was placed in the Department's custody after it was learned that the Mother drank while pregnant and the Brother suffered from Fetal Alcohol Syndrome. In 2009, both the Mother's rights and any rights the Father had to the Brother were terminated. The decree, which was admitted in evidence at trial in this proceeding, recited that the Father was duly cited, but failed to appear or answer and his rights were terminated pursuant to Family Code Section 161.002. *See* Tex. Fam.Code § 161.002.[1] The Brother was placed in the care of his maternal grandmother (the Grandmother), who later formally adopted him.

[1] Section 161.002 provides:
> (b) The rights of an alleged father may be terminated if:
> (1) after being served with citation, he does not respond by timely filing an admission of paternity or a counterclaim for paternity under Chapter 160.

Tex. Fam.Code § 161.002(b)(1). By filing an admission or counterclaim for paternity, the alleged father is given the right to require the State to prove by clear and convincing evidence that he engaged in one of the types of conduct listed in section 161.001(1) and that termination is in the best interest of the child. *See Phillips v. Tex. Dep't of Protective & Regulatory Servs.,* 25 S.W.3d 348, 357 (Tex.App.-Austin 2000, no pet.).

The trial court conducted an adversary hearing in the underlying proceeding on January 3, 2013. The record reflects the Father was present at the hearing and was personally served with process. The court signed an order finding, among other matters, that the Father was not indigent. The court ordered the Father to comply with each requirement set out in the Department's service plan, which was filed with the court February 4, 2013. The plan required the Father to submit to DNA testing to confirm his parentage and to random drug testing. In addition, the Father was ordered to pay child support, complete domestic violence, anger management, and parenting classes, among other tasks.

On February 14, 2014, a status hearing was held. At that time, the Father signed an affidavit of indigence, claiming he was

paid $998 in his last paycheck, he paid $700 per month in rent, he had $500 in his bank account, and he paid $2,600 per month to an attorney. The parties agree that Susan Solis was appointed as attorney ad litem to represent the Father at the conclusion of the hearing, but our record does not contain a written order appointing her. On June 13, 2013, Solis filed an answer on behalf of the Father denying the allegations in the Department's petition. The record reflects Solis appeared on behalf of the Father at the permanency hearings held June 27, 2013 and October 3, 2013.

**\*2** At the hearing held October 3, 2013, the Father acknowledged that he had completed DNA testing that confirmed he is the Child's biological father. The Father also testified about completion of some of his required services and testified he had been employed for three years. On cross-examination, the Father admitted that he had been working as an engineer for the past three years, he made $70,000 per year, he had been living with his sister since January, he did not pay anything for rent, and he had not paid any child support. At the conclusion of the hearing, the court removed the Father's appointed counsel and urged the Father to retain counsel before the trial setting in December. There is no written order discharging Solis.

At the same hearing, the trial court signed an order permitting the Child's maternal grandparents (the Grandparents) to have unsupervised visits with the Child. The Grandparents later filed a petition in intervention seeking conservatorship of the Child. [2]

2     Another party who knew the Mother when she resided in California had intervened earlier in the case, seeking conservatorship of the Child. This intervention was non-suited before trial.

The court conducted a permanency hearing on December 12, 2013, when the case was originally set for trial. The record reflects the Father appeared with retained counsel, David Rushing. At the request of the Attorney Ad Litem for the Child, the court granted an extension of the statutory dismissal date and reset trial to January 23, 2014.

New counsel for the Father, Jerry Acosta, was granted leave to substitute for Rushing on January 23, 2014, the first day of trial. Acosta then made an oral request for a continuance, which was denied. Trial to the court briefly commenced. Acosta was assisted during the trial by co-counsel, James Pons. Trial resumed February 27 and 28, 2014, and concluded on March 6, 2014. The trial court signed

a final judgment on March 27, 2014, adjudicating the Father's parentage, terminating his parental rights to the Child, and appointing the Grandparents as the Child's sole managing conservators. The judgment recited the trial court's findings that parental termination is in the Child's best interest and that the Father committed acts establishing the predicate termination grounds set out in subsections E, N, and O of Texas Family Code Section 161.001(1).Tex. Fam.Code §§ 161.001(1)(E), (N) & (O); 161.001(2). [3] The decree also recited that appointment of a parent as conservator would not be in the Child's best interest because the appointment would significantly impair the Child's physical health or emotional development. SeeTex. Fam.Code § 153.131. The trial court's judgment also recited that the Father is not indigent and ordered the Father to reimburse Harris County for the appointed ad litem attorney's fees in the amount of $2,750 and to pay $4,500 in attorney's fees to the Grandparents' attorney. The Father filed a timely motion for new trial, which was denied after a hearing on May 6, 2014. The Father also filed a timely notice of appeal.

3     The Mother's parental rights were also terminated, but she did not contest the termination and has not appealed.

## II. ISSUES ON APPEAL

In his first issue, the Father claims the trial court should have granted him a new trial because his appointed counsel was wrongfully released close to trial and the court erred in denying his subsequent continuance requests. In his motion for new trial, he alleged he was entitled to appointed counsel, his appointed counsel was improperly released, and his appointed counsel provided ineffective assistance of counsel, depriving him of a fair trial. In his second issue, the Father generally challenges the legal and factual sufficiency of the evidence to support parental termination. He specifically challenges both the predicate finding under Family Code section 161.001(1)(N) and the trial court's best interest finding. In the Father's third issue, he alleges that the Department failed to make reasonable efforts to return the Child to him. In his fourth issue, the Father claims the trial court erred in ordering him to reimburse the county for the fees owed to his court-appointed attorney because he was entitled to appointed counsel.

**\*3** If disposition of an issue would result in a rendition of judgment, an appellate court should consider that issue before addressing any issues that would only result in a

remand for a new trial. *See Natural Gas Pipeline Co. of Am. v. Pool,* 124 S.W.3d 188, 201 (Tex.2003); *see also In re K.W.,* 138 S.W.3d 420, 428 (Tex.App.-Fort Worth 2004, pet. denied)* (applying this rule in a termination appeal and first addressing legal sufficiency challenges). Accordingly, we will first consider the Father's challenges to the legal sufficiency of the evidence, followed by a review for factual sufficiency.

## III. BURDEN OF PROOF AND STANDARD OF REVIEW

Due to the severity and permanency of the termination of parental rights, the burden of proof at trial is heightened to the clear and convincing standard. *See* Tex. Fam.Code § 161.001; *In re J.F.C.,* 96 S.W.3d 256, 263 (Tex.2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam.Code § 101.007; *accord In re J.F.C.,* 96 S.W.3d at 264. While proof by clear and convincing evidence must be more than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed. *See R.H. v. Tex. Dep't of Family & Protective Servs.,* —— S.W.3d ——, 2013 WL 1281775, at *5 (Tex.App.-El Paso 2013, no pet.). This heightened burden of proof results in a heightened standard of review. *In re C.M.C.,* 273 S.W.3d 862, 873 (Tex.App.-Houston [14th Dist.] 2008, no pet.).

In reviewing the legal sufficiency of the evidence in a parental termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.,* 283 S.W.3d at 344; *In re J.F.C.,* 96 S.W.3d at 266. We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved. *In re J.O.A.,* 283 S.W.3d at 244; *In re J.F.C.,* 96 S.W.3d at 266.

In our review of termination findings for factual sufficiency of the evidence, we consider and weigh all of the evidence including disputed or conflicting evidence. *In re J.O.A.,* 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* We give due deference to the fact finder's findings and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.,* 209 S.W.3d 105, 108 (Tex.2006). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109. We are not to "second-guess the trial court's resolution of a factual dispute by relying on evidence that is either disputed, or that the court could easily have rejected as not credible." *In re L.M.I.,* 119 S.W.3d 707, 712 (Tex.2003) (explaining that in a termination case, an appellate court should not reweigh disputed evidence or evidence that depends on a witness's credibility).

## IV. ANALYSIS

### A. Sufficiency of the Evidence to Support Termination
**\*4** Parental rights can be terminated upon proof by clear and convincing evidence that (1) the parent has committed an act prohibited by section 161.001(1) of the Family Code; and (2) termination is in the best interest of the child. Tex. Fam.Code § 161.001(1), (2); *In re J.O.A.,* 283 S.W.3d 336, 344 (Tex.2009). Only one predicate finding under section 161.001 is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.V.,* 113 S.W.3d 355, 362 (Tex.2003).

### 1. Predicate Termination Grounds under Section 161.001(1)
The trial court found three predicate grounds for termination: subsections E, N, and O of section 161.001(1).*See* Tex. Fam.Code §§ 161.001(1)(E), (N) & (O). On appeal, the Father raises a broad issue challenging the legal and factual sufficiency of the evidence. He specifically asserts the Department failed to prove termination was in the Child's best interest, and that the record does not support constructive abandonment, which is described in subsection N. The Father has not specifically challenged the finding under subsection E, which provides a ground for termination when the parent engaged in conduct, or knowingly placed the child with persons who engaged in conduct, that endangers the physical or emotional well-being of the child. *See* Tex. Fam.Code § 161.001(1)(E). He also did not specifically challenge the finding under subsection O, which provides a ground for termination when the parent failed to comply with a court order establishing the actions necessary for return of the child. *See* Tex. Fam.Code § 161.001(1)(O).

In his reply brief, the Father argues that we should construe his broad issue to encompass a challenge to all the court's termination findings. Rule 38.1(f) of the Rules of Appellate Procedure states that courts will treat the statement of an issue or point "as covering every subsidiary question that is fairly included." *Tex.R.App. P. 38.1(f)*; *see In re M.N.*, 262 S.W.3d 799, 801 (Tex.2008) (construing complaint that the intermediate court erred in holding mother waived her points for appeal as a challenge to the holding that the trial court could not grant her motion to extend time to file her statement of points on appeal); *see also Fletcher v. Dep't of Family & Protective Servs.*, 277 S.W.3d 58, 63 (Tex.App.-Houston [1st Dist.] 2009, no pet.)(construing the father's issue to include a challenge to predicate findings not listed in statement of points).

A court may construe a broadly phrased issue that does not specifically reference any of the trial court's findings when it is clear from the substance of the brief that the appellant is challenging the legal and factual sufficiency of the evidence to support the trial court's determination that the Department established each of the predicate grounds for termination. *In re A . W.*, 2–03–349–CV, 2004 WL 1799893 (Tex.App.-Fort Worth Aug. 12, 2004, no pet.)(mem.op.); *see also Zagorski v. Zagorski*, 116 S.W .3d 309, 315 n. 2 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (rejecting contention that appellant waived her appellate complaint due to the failure of her points to expressly challenge specific findings of fact or conclusions of law because her argument addressed the findings and conclusions).

**\*5** Rule 38.1(i) of the Texas Rules of Appellate Procedure provides that a brief must contain clear and concise argument for the contentions made, with appropriate citations to authorities and to the record. *Tex.R. A pp. P. 38.1(i)*. It is well-established that failure to cite authority or provide substantive analysis waives an issue on appeal. *See Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 410 (Tex.1997); *King v. Tex. Dep't of Protective & Regulatory Serv.*, No. 08–03–00100–CV, 2004 WL 1505703, at \*5 (Tex.App.-El Paso July 2, 2004, no pet.)(mem.op.).

In this case, we may not construe the Father's broadly worded issue to encompass a challenge to all of the trial court's termination findings because the Father made no argument or analysis and cited no authority relevant to the findings under sections E and O. With regard to section O, the Father did not dispute that he did not complete individual therapy required under his service plan, but instead offered an excuse for his non-compliance by blaming the Department for the delay in setting up appointments for his required services. He also did not dispute he failed to pay child support as ordered. The Father testified he did not believe he should have to pay child support, even though he had been determined to be the Child's father. The Father also acknowledged that he had moved into his own apartment shortly before trial, much less time than required by the Department to establish and maintain stable housing for six months.

To succeed on appeal from a termination decree, an appellant must establish that the findings on all of the termination grounds found by the trial court are unsupported by the evidence. *In re A.V.*, 113 S.W.3d at 361 (holding that father's failure to challenge sufficiency of evidence to support finding under one subsection of section 161.001(1) made it unnecessary to address father's challenges to other grounds for termination); *see also In re B.K.D .*, 131 S.W.3d 10, 16 (Tex.App.-Fort 2003, pet. denied) (holding that because the jury found four grounds for termination under section 161.001(1) and the father challenged only three of those grounds, appellate court was not required to address his argument that the evidence was insufficient on the three challenged grounds). In *Fletcher,* despite recognizing that issues may be construed broadly, the court ultimately determined it could not address father's issue because he had not properly challenged all predicate grounds. *Fletcher,* 277 S.W.3d at 63.

Unchallenged findings of fact are binding unless the contrary is established as a matter of law or there is no evidence to support the finding. *See In re E.C.R.*, 402 S.W.3d 239, 249 (Tex.2013) (holding parental conduct under subsection O was conclusively established where the parent did not dispute she failed to comply with numerous provisions in court orders specifying compliance was necessary to avoid termination). The record contains evidence supporting subsection O. Therefore, the trial court's finding that appellant failed to comply with subsection O is binding.

**\*6** The only specific challenge the Father has raised is to an element of section 161.001(1)(N), which provides that a person's parental rights may be terminated if he:

> (N) constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Protective and Regulatory Services or an authorized agency for not less than six months, and:

(i) the department or authorized agency has made reasonable efforts to return the child to the parent;

(ii) the parent has not regularly visited or maintained significant contact with the child; and

(iii) the parent has demonstrated an inability to provide the child with a safe environment.

Tex. Fam.Code § 161.001(1)(N). In his third issue, the Father alleged the Department failed to make reasonable efforts to return the Child to him. Because the Father raised this specific challenge in his third issue, we will address it in the interest of justice.

A family service plan is designed to reunify a parent with a child who has been removed by the Department. *Liu v. Dep't of Family & Protective Servs.*, 273 S.W.3d 785, 795 (Tex.App.-Houston [1st Dist.] 2008, no pet.). Implementation of a family service plan by the Department is ordinarily considered a reasonable effort to return a child to its parent. *In re N.R.T.*, 338 S.W.3d 667, 674 (Tex.App.-Amarillo 2011, no pet.); *see also In re M.R.J.M.*, 280 S.W.3d 494, 505 (Tex.App.-Fort Worth 2009, no pet.)(holding that the State made reasonable efforts to return the child to the parent under section 161.001(1)(N) when it prepared several service plans for the parent and made special arrangements for him to attend parenting classes near his home and to transport him to his psychological assessment); *In re K.M.B.*, 91 S.W.3d 18, 25 (Tex.App.-Fort Worth 2002, no pet.)(holding the State showed that it made reasonable efforts to return the child to the parent when it prepared service plans and made efforts to work with the parent on the service plans).

On February 4, 2013, the Department filed its family service plan for the Father with the court. *See* Tex. Fam.Code. § 263.101 (requiring the Department to file a service plan within 45 days after the trial court appoints the Department as the temporary managing conservator). The Department also filed a status report with the court confirming the Father had received and signed his family service plan. A copy of the plan bearing the Father's signature was admitted in evidence at trial. The Father's service plan detailed the actions the Father was required to complete in order to be reunited with the Child, and it included contact information to schedule appointments for evaluations and classes. In addition, the trial court signed a permanency order after the status hearing adopting the service plan requirements.

Specifically, to be reunited with the Child, the Father was required to:

participate and successfully complete domestic violence classes and will be able to discuss learned behaviors with the caseworker. The Father] may contact [Battering Intervention and Prevention Program] BIPP Client Registrar at 713–224–9911 for an appointment. The fees for these services will be paid by [the Father].

**\*7** successfully participate and complete anger management classes. [The Father] will provide a certificate of completion to the caseworker no later than 30 days from the last class. [The Father] will be able to demonstrate learned behaviors through actions and or discussions with the caseworker. [The Father] may contact the United Way at 713–957–4357 for providers in their area. [The Father] may also contact Center Point Counseling Services at 713–528–7007, Counsel of Alcohol and Drug Abuse at 713–942–4100 extension 113, Wholistic Counseling Services at 281–403–0838....

participate in DNA testing to determine if he is the father to the child/children. This testing may be done by National Screening or by the Attorney General. The parent will be notified as to the location for the testing by the court or caseworker.

provide child support while [his] child is in the care of the agency. This child support is to be determined by the court based on minimum wage. This support is to continue while the case is ongoing. Child support may also include the purchase of new clothes, shoes, gifts for the child.

acquire and maintain a working telephone whether it is a residence or cell in order for the caseworker and or service providers to be able to make contact with him. [The Father] will provide the caseworker with updated numbers at all times.

acquire and maintain housing that is stable for more than 6 months. This housing is to be safe, clean and free of hazards to ensure the child's well-being. All the utilities in the home such as electricity, water, and gas must be operational and he must apply basic homemaking skills in his daily chores such as sweeping, dusting, mopping, washing dishes and doing laundry. [The Father] is to provide a copy of the lease agreement or mortgage in his name to the caseworker 10 days after signing this Family Plan of Service. Caseworker will make unannounced home visits to his residence to document progress in this area. [The Father] is to contact

the caseworker by phone or in person within five days of changing residents and provide the change in address.

maintain contact with [the Child] during one hour visits, two times a month at the CPS [Children's Protective Services] office located at 9333 Bryant St Houston, TX 77075; these visits will be scheduled when the parent makes contact with the agency to set up his visits. [The Father] must be on time for each visit. If [the Father] is late 15 minutes or more the visit will be canceled. [The Father] must notify the caseworker 24 hours in advance if not able to make the visit. Canceled visits by [the Father] will not be re-scheduled. Visits will be re-scheduled if [the Child] is sick or have appointments to attend. [The Father] may bring nutritious snacks to the visit.

attend all court hearings, permanency conference meetings and family visits. [The Father] will be responsible for his own transportation to all appointments. [The Father] will maintain contact with [his] caseworker at 9333 Bryant Street Houston, TX 7705 via telephone or in person at least once a week.

 **\*8** participate in parenting classes in person and may not participate via the Internet. [The Father] will attend, participate in, and successfully complete parenting classes and provide the caseworker with a certificate of completion no more than 30 days after the last class date. [The Father] must be able to demonstrate learned behaviors during family visits with [the Child] and through discussions with the caseworker. [The Father] will be responsible for contacting one of the providers listed below. [The Father] must pay any and all fees associated with the parenting classes. DFPS will not pay for these classes. [The Father] must complete the classes within four months of signing the [Family Plan of Service].

submit to random urinalysis drug testing and must test negative at all times. [The Father] will be contacted by the caseworker the morning the UA is to be taken. [The Father] will have until 3 PM of that day to submit to the drug testing. A no show will be taken as a positive drug test. This service will be funded by CPS. Should [the Father] fail to present [himself] for 2 scheduled appointments, [the Father] will be responsible for any fees associated with this service.

participate fully in a drug and alcohol assessment administered by Kinghaven Counseling Group located at 9100 Southwest Freeway Houston, TX (713–457–4372), Turning Point located at 10175 Harwin Dr. Houston,

TX (713–773–3280). [The Father] will follow all the recommendations including inpatient and or outpatient drug treatment, individual, group and or family therapy, and or random urine analysis. [The Father] will be contacted by the services provider to schedule the appointment. If after 2 weeks from the date the referral was submitted and the provider has not contacted [the Father] then [the Father] should contact the provider to schedule the appointment. The evaluation is to be completed by 02/28/2013.

participate fully in a psycho-social assessment to address his emotional or mental needs. The assessment may be administered by Newsom Psychological located at 2626 South Loop West, Suite # 181, Houston TX (855–640–1700). [The Father] will be contacted by the service provider to schedule the appointment. If after 2 weeks from the date the referral was submitted the provider has not contacted [the Father], he should contact the provider to schedule the appointment. The fee associated with this service will be paid for by the agency. If [the Father] misses two (2) scheduled appointments, he will then be responsible for any fees associated with this service. The evaluation is to be completed by 02/28/2013. [The Father] will follow all recommendations from the evaluation that may include a psychological and or psychiatric evaluation, individual therapy, family therapy, and or group therapy.

The Department filed a progress report with the court on May 7, 2013. The report does not reflect that the Father had completed any of the required tasks, and it repeated the above list of required tasks. The deadline for completing the required evaluations was extended to July 1, 2013. On June 23, 2013, the trial court conducted a permanency hearing. In the order signed June 27, 2013, the court again expressly approved and adopted the service plan as set out in the permanency progress report, specifying the actions the Father must perform to regain custody of the Child. On September 11, 2013, the Department filed another progress report, which again did not reflect the Father had completed any of the required tasks. The Department's next progress report was filed November 7, 2013, and the report again provided notice that the Father had not completed his service requirements.

 **\*9** On appeal, the Father complains that the record does not show that the Department's caseworker went over the service plan with him, pointing out that the caseworker signed the plan before the date of the Father's signature. The record does not show that the Father made this complaint in the court below, and he has waived it. *See* Tex.R.App. P. 33.1(a).

Moreover, the record does not support this contention. Not only does the record reflect the Father signed the plan, it appears that the caseworker discussed aspects of the plan with the Father based on the recitations in the plan. The plan recited that the Father "hopes to have [the Child] placed back under his care and raise her. [The Father] wishes the best for her, and to provide her with the best support so that she can become whatever she wants to be later in life. [The Father] also said that he wishes that she grows up being a positive person in life." In his trial testimony, the Father acknowledged that he had contact with the Department caseworker when he signed his service plan.

The Father also asserts that the Department's delay in scheduling his services resulted in his inability to complete the required individual therapy before trial. The record reflects caseworker Dana Lora Charles provided the Father the information to schedule his psychosocial evaluation in October of 2013. After first completing a questionnaire, the Father submitted it to the counselor a few weeks later and met with the counselor on November 13, 2013. The counselor's report, which recommended additional individual therapy, was filed December 11, 2013, the day before the first trial setting. The Father complains on appeal that the previous caseworker, Daisy Cantu, did not schedule his appointments or return his calls. The Father acknowledged at trial that at some point after he signed his service plan, he lost contact with Cantu. He admitted that he was not "working" on his services during that time. He stated Cantu did not set up these services, but he did not ask her to. The Father agreed that after Cantu was replaced by Charles as caseworker, Charles returned his calls, helped him set up visitation with the Child, and gave him a phone number to set up his psychosocial evaluation.

The Father's service plan provided detailed contact information to arrange for completion of the required services. The Father acknowledged he did not alert the trial court that he was unable to schedule these services without the Department's assistance. The Father signed his service plan on February 5, 2013, and trial did not commence until January 23, 2014. The record clearly demonstrates the Father had almost a full year to complete his required services, and he did not start the process until close to trial. *Cf. In re A.Q.W.,* 395 S. W.3d 285, 288 (Tex.App.-San Antonio 2013, no pet.)(holding the evidence was insufficient to support a finding the Department made reasonable efforts to return child to father where he received Department's service plan 34 days before the termination hearing and father did not have

a reasonable opportunity to complete any requirements of the service plan due to his incarceration).

**\*10** The Father cites *In re K.G.,* 350 S.W.3d 338 (Tex.App.-Fort Worth 2011, pet. denied). In *K.G.,* the court held the evidence was legally and factually sufficient to establish that the Department made reasonable efforts to return the child to the mother, as required for termination of the mother's parental rights based on constructive abandonment. *Id.* at 354. The caseworker testified that she had tried to facilitate reunification by providing services to the mother, encouraging the mother to seek help for her mental health problems, and making efforts to ensure that the mother and child had good visits. *Id.* This case likewise has evidence that caseworker Charles assisted the Father by arranging for his services and arranging visits with the Child. Although the Father alleged at trial that his first caseworker did not return his calls, the record contains no evidence the Father brought any complaints before trial about the lack of assistance from his previous caseworker. In addition, when the service plan was first implemented in February of 2013, the Department provided very detailed information in the service plan to facilitate the Father's ability to complete his services. The record demonstrated that the Father was intelligent and well-educated. The factfinder could reasonably have determined the Father had the ability to schedule services, even without additional assistance from a caseworker.

Reviewing all the evidence in the light most favorable to the termination findings under subsection N, we conclude that a reasonable fact finder could have formed a firm belief or conviction as to the truth of the finding that the Department made reasonable efforts to return the Child to him. *See In re M.R.J.M.,* 280 S.W.3d at 505. In light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the termination finding that the Department made reasonable efforts to return the Child is not so significant that a fact finder could not reasonably have formed a firm belief or conviction as to the truth of this termination finding. *See In re H.R.M.,* 209 S.W.3d at 108. We overrule the Father's third issue.

**2. Best Interest under Section 161.001(2)**
There is a strong presumption that the best interest of a child is served by keeping the child with his or her natural parent. *In re R.R.,* 209 S.W.3d 112, 116 (Tex.2006); *In re D.R.A.,* 374 S.W .3d 528, 533 (Tex.App.-Houston [14th Dist.] 2012, no pet.). Prompt and permanent placement of the child in a safe

environment is also presumed to be in the child's best interest. Tex. Fam.Code § 263.307(a).

The following factors, among others, should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment: the child's age and physical and mental vulnerabilities; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities. Tex. Fam.Code § 263.307(b); *R.R.,* 209 S.W.3d at 116.

**\*11** In addition, courts may consider other nonexclusive factors in reviewing the sufficiency of the evidence to support the best interest finding, a court examines several factors, including (1) the desires of the child, (2) the present and future physical and emotional needs of the child, (3) the present and future emotional and physical danger to the child, (4) the parental abilities of the persons seeking custody, (5) the programs available to assist those persons seeking custody in promoting the best interest of the child, (6) the plans for the child by the individuals or agency seeking custody, (7) the stability of the home or proposed placement, (8) acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate, and (9) any excuse for the parent's acts or omissions. *Holley v. Adams,* 544 S.W.2d 367, 372 (Tex.1976). This list is not exhaustive, and evidence is not required on all of the factors to support a finding terminating a parent's rights. *Id.; In re D.R.A.,* 374 S.W.3d at 533.

### a. The Child's Needs and Desires

The Child was only slightly over one year old when trial began. Because of her young age, the Child was completely dependent on her caregiver. The Father acknowledged that he has not paid child support during the pendency of these proceedings. There was evidence that the Father provided some support for the Child by bringing formula, diapers, and wipes to one visit.

The Child was also unable to communicate her desires because of her young age. When children are too young to articulate their wishes, courts may consider their bond with the parents and foster parents. *See E.F. v. Tex. Dep't Family & Protective Servs.,* No. 03–11–00325–CV, 2011 WL 6938496, at \*3 (Tex.App.-Austin Dec. 30, 2011, no pet.)(mem.op.).

The Grandmother testified that the Child has bonded with the foster parents. The record reflects the Father had not bonded with the Child. The Father testified about his visits with the Child, acknowledging that he was "required to visit two hours within a month" and he had "been doing what they required." He testified he had been visiting the Child "since the beginning" of these proceedings, but then acknowledged the Child, who was taken into the Department's custody a few days after her birth, was "a few months old" when he first visited her. The Father almost never identified the Child by her name, but instead referred to her as "the kid." Caseworker Charles testified that the Father had a total of four or five visits with the Child during the over one-year period that she was in the Department's care, and only two of those visits were before trial. She testified that she observed the Father's visits with the Child. At the first visit, the child tried to walk away from the Father. She described the Child as "fussy" and "crying reaching out for [her] to take her away" for the first ten to fifteen minutes of each visit. She acknowledged on cross-examination that the Child later played with the Father. Charles testified that the Father did not comply with the foster parent's written request that he feed the Child during one two-hour visit. At the Father's most recent visit during trial, the Child was fussy and cried for an hour and a half, and the Father then fed her. She testified to her belief that the Child does not know the Father. Charles also testified she found it odd that the Father wore glasses with dark lenses during his visits. The Father later explained that he wore the glasses because he had an unspecified medical condition. The Father testified that he had inquired about what size clothing the Child wore, but he did not ask how much she weighed. He explained that the diapers he purchased for her that were the incorrect size were based on her age, according to the package. He acknowledged he does not know what the Child eats on a daily basis and has not asked.

**\*12** This evidence showing the Child has not bonded with the Father supports the court's best-interest finding.

### b. Endangerment, Including Criminal History and Drug Use

The unchallenged predicate findings under section 161.001(1)(E), endangering conduct, are binding and may be considered as evidence related to the court's best interest

finding. *See In re K.L.G.,* No. 14–09–00403–CV, 2009 WL 3295018, at \*2 (Tex.App.-Houston [14th Dist.] 2009, no pet.) (mem.op.) (because the predicate and best interest findings were not challenged, they were binding on the appellate court); *see also In re C.H.,* 89 S.W.3d 17, 28 (Tex.2002) (holding that the same evidence may be probative of both section 161.001(1) predicate grounds and best interest).

Not only is the finding that the Father engaged in endangering conduct or knowingly left the Child with persons who engaged in endangering conduct unchallenged, the record contains ample evidence of this ground that the trial court could reasonably have considered in making its best interest determination. The Father's criminal records were admitted at trial, and these included several violent offenses. *See Tex. Dep't Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex.1987) (holding that a parent's repeated criminal acts may constitute sufficient evidence of conduct that endangers the well-being of a child); *In re D.J.H.,* 381 S.W.3d 606, 613 (Tex.App.-San Antonio 2012, no pet.)(recognizing that a fact-finder may infer from past endangering conduct that similar conduct will recur if the child is returned to the parent).

In 1997, the Father pled no contest to a misdemeanor assault charge alleging domestic violence, and he was placed on deferred adjudication probation. The victim of this offense was not identified, but it was not asserted that the assault was against the Mother. One of the terms of the Father's probation required that he attend anger management classes.

On May 20, 2007, the Father was convicted of misdemeanor assault against the Mother, and he was again placed on deferred adjudication probation. The Father was charged a second time with assaulting the Mother in November 2007, and the record contains an order prohibiting him from having any contact with the Mother as a condition of his bail. The plea documents in the record show the Father pled guilty to assaulting the Mother by choking her until she lost consciousness and punching her in the head several times. The record reflects that the Mother gave birth to the Brother about four months after the assault. On February 1, 2010, the Father was sentenced to 180 days in jail for the November 2007 assault. As part of his plea bargain, the State agreed to reduce the charge from a third degree felony to a Class A misdemeanor, and it abandoned the enhancement.

On April 11, 2012, the Father was charged as a second offender with assaulting the Mother. The Mother's complaint stated the Father grabbed her face so hard that it caused her

to bite her tongue and he struck her in the head with his fist with such force that it left a bruise on the right side of her forehead. The Father introduced in evidence an order signed August 29, 2013, dismissing the 2012 case with a notation that the Father had "completed BIPP," which is the Battering Intervention and Prevention Program.

**\*13** The Grandmother also testified about acts of violence that the Father committed against her daughter. She first observed the Mother with bruises and a black eye in 2007. The Mother indicated to her that the Father caused the injuries. Later in 2007, when the Mother was pregnant with the Brother, the Mother was hospitalized when her intestines ruptured. The Grandmother testified her daughter told her the Father sexually assaulted her with an object, causing the injuries. When questioned about this incident at trial, the Father invoked his Fifth Amendment right not to answer. [4] The Grandmother also observed bruising on the Mother's neck and a cut across her face that her daughter told her had been caused by the Father. In addition, the Grandmother testified to her daughter's head injury from a vehicle accident, which she claimed was caused when the Father tried to run the Mother off the road. Caseworker Charles testified the Mother told her she did not want the Child to be with the Father because of all the physical violence in the parents' relationship. Despite this evidence, the Father denied he "beat" the Mother.

[4]     In a civil case, the factfinder may draw an adverse inference with respect to a party's claim of the privilege against self-incrimination. *See* Tex.R. Evid. 513(c); *Wil–Roye Inv. Co. II v. Washington Mut. Bank, FA,* 142 S.W.3d 393, 404 (Tex.App.-El Paso 2004, no pet.).

The Grandmother testified her daughter suffered from depression and was bipolar. She was aware that the Mother drank heavily. The Grandmother also described her daughter's drug use, stating the Mother used methamphetamines and party drugs. The Grandmother believed her daughter had been a chronic drug user since 2006.

The Father denied knowing the Mother used drugs or that she was described as a "chronic" drug user. Although the Father denied recreational drug use, the Grandmother testified that her daughter told her she often did drugs with the Father, including when she was pregnant with the Child. The Father later acknowledged that he knew the Mother used drugs and he knew drug use during pregnancy endangers a child. The record contains the Father's drug test report dated January 15,

2014, which was negative for ingestion of narcotics during the previous ninety days. The Father testified that he had completed a "drug assessment" as part of his services, and the drug counselor told him she would notify the caseworker. He stated it was his understanding that the counselor would advise the caseworker whether or not it would be necessary for him to take a drug test. The Father later acknowledged that he was aware the court had ordered a drug test on the first court date, and he did not submit to testing at that time. He explained that he had only a half day off from work that day and it was too late for him to stay and undergo testing.

The Father's repeated acts of violence, primarily against the Child's Mother, support a finding that termination of the Father's parental rights is in the best interest of the Child. The trial court reasonably could have considered that the Father's repeated acts of violence would continue in the future. *See Walker v. Tex. Dep't Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex.App.-Houston [1st Dist.] 2009, pet. denied). Caseworker Charles also testified that the Father had not demonstrated an ability to be protective of the Child.

 **\*14** In addition, the evidence that the Father joined the Mother in her drug use, even while she was pregnant, supports a finding that termination is in the Child's best interest. A parent's drug use supports a finding that termination is in the best interest of the child. *See In re M.R.*, 243 S.W.3d 807, 821 (Tex.App.-Fort Worth 2007, no pet.). Parental drug use during pregnancy weighs against the parent in the best interests analysis. *Robinson v. Tex. Dep't of Protective & Regulatory Servs.*, 89 S.W.3d 679, 688 (Tex.App.-Houston [1st Dist.] 2002, no pet.). The Father acknowledged he was aware the Mother used drugs during her pregnancy and he took no steps to protect the unborn child. The factfinder can give "great weight" to the "significant factor" of drug-related conduct. *In re K.C.*, 219 S.W.3d 924, 927 (Tex.App.-Dallas 2007, no pet.).

### c. Failure to Comply with Service Plan and Reasons for the Failure

As noted above, the Father has not challenged the finding that he failed to comply with his service plan, and that finding is binding. *See In re K.L.G.*, No. 14–09–00403–CV, 2009 WL 3295018, at \*2. The failure to comply with a service plan can support the trial court's best-interest finding. *In re E.C.R.*, 402 S.W.3d at 249. In connection with this factor, we also may consider the Father's willingness and ability to seek out, accept, and complete counseling services and to effect positive changes. *See* Tex. Fam.Code § 263.307(b).

We first consider the report of the Father's psychosocial assessment that was admitted in evidence. The Father did not submit to the assessment until the case had been on file for almost a year. Before attending the session with the counselor, Thomas Whitehead, the Father completed a questionnaire, and he acknowledged he did not return the questionnaire for several weeks. In response to a question about how he became involved with Children's Protective Services (CPS), the Father answered with question marks, suggesting he had no idea. In his report, Whitehead noted that the Father "appeared to be minimizing his role in the CPS case" and "playing dumb." The Father answered all questions about his parenting "in an unrealistically positive manner," presenting himself as the "perfect" parent. The evaluator assessed that the Father had a pattern of "talking the talk," without necessarily "walking the walk." Whitehead opined that the Father "may tend to focus on appearances more than consistently following through with requirements."

The Father acknowledged in his psychosocial evaluation that he had a conviction for assault. The Father denied to the counselor that he knew the Mother used drugs, and stated he first learned about her drug use when the Child was born and both the Mother and Child tested positive for drugs. He claimed that he did not know until the Child's birth that the Mother had also tested positive when the Brother was born. Contradicting his previous denial of knowledge of the Mother's drug use, he explained the assault conviction by stating that his "girlfriend is histrionic, and she was doing drugs."When questioned about whether he had been incarcerated, he acknowledged he was in jail for about five months for a domestic violence conviction. The Father explained that he did not hit the Mother and the case was based on false allegations. He did not admit that there had been a series of convictions.

 **\*15** Whitehead, the counselor, recommended the following for the Father: "referral to a domestic violence class, cautions concerning possible manipulation, and referral for goal directed individual counseling."It is undisputed the Father did not complete individual counseling as recommended in his psychosocial evaluation. Caseworker Charles testified on December 12, 2013, that the Father had that day provided her documents to show completion of services, with the exception of his individual therapy. She had not been able to verify completion of the required services with the providers,

however. At trial, Charles confirmed that the Father provided documentation that he had completed the domestic violence program, BIPP, and an anger management class. She also confirmed he had completed a parenting class and a drug assessment. Charles was unable to confirm the Father's housing situation because the phone number on the copy of the apartment lease that the Father provided was incorrect. The Father also admitted he had not supported the Child during the pendency of this case other than to provide formula, diapers, and wipes at one of his visits. The Father admitted he had spent over $30,000 in attorney's fees in criminal cases.

The Father primarily exercised his visitation rights when the trial date was near. Caseworker Charles testified that before the trial commenced, the Father had only two visits with the Child, and he did not request a visit until she had been on the case for three months, which was in November of 2013. She stated there was no evidence in her records that the Father had been prevented from seeing the Child. The Father argued that his failure to make regular visits and maintain significant contacts with the Child was the Department's fault for failing to schedule the visits. The Father's service plan expressly provided, however, that his visits with the Child were to "be scheduled when the parent makes contact with the agency to set up his visits."

The Father blamed his early failure to visit the Child and late compliance with his service plan on the first caseworker, Cantu, who is no longer employed by the Department. He complained that she did not return his calls and did not make arrangements for his classes, evaluations, or visits. He acknowledged that he never brought up the caseworker's alleged non-responsiveness at hearings in January, February, or June, before a new caseworker was assigned in August 2013. He asserted his appointed counsel brought the matter up once, but he did not know the date. The Father had no complaints about the new caseworker, Charles. Charles explained that she attempted to contact the Father to assist him in completing his services in August when she was first assigned the case. The phone number for the Father in the Department's system was not his current number and she did not obtain the correct number until October. The Father's service plan required him to "provide the caseworker with updated numbers at all times."

**\*16** The Father did not present any evidence to demonstrate he had learned from his services how to control his violent behavior. The Father attended the Batterers Intervention Prevention Program (BIPP) once a week for eighteen weeks. When asked the reason, he stated, "because it was part of my Service Plan." He later acknowledged his attendance at BIPP was also a requirement imposed by the criminal court. However, despite the eighteen-week class, the Father could not articulate any behavior, character trait, or pattern that led him to violent behavior. When asked what his triggers were that led to domestic violence, the Father made reference to his "emotions" without further explanation. When asked to explain, he answered, "Well if we were talking—if we were referencing the will then it's the same people react to emotions. So it will be no different from anybody reacting to certain emotions like if you are happy you smile. You giggle or laugh. Those kind of triggers." Further inquiry produced no clarification.

The Father testified he attended a domestic violence class both because of the recent assault charge and also because of his service plan. He also testified he completed a parenting class. The Father's partial, or even substantial, compliance with service requirements set out in a court order is not enough to avoid a termination finding. *See In re M.C.G.,* 329 S. W.3d 674, 675–76 (Tex.App.-Houston [14th Dist.] 2010, pet. denied); *In re T.T.,* 228 S.W.3d 312, 319 (Tex.App.-Houston [14th Dist.] 2007, pet. denied). In sum, the factfinder could have reasonably determined the evidence supports a finding that the Father was not willing to seek out, accept, and complete counseling services and to effect positive changes to his behavior, and that termination is in the Child's best interest.

### d. Parenting Abilities, including Other Children

The record demonstrated that the Father was intelligent. Whitehead, the counselor, noted that the Father's strengths were his above-average intelligence, stable employment, and his stated desire to fulfill his parental obligations to the Child. The Father stated in his evaluation that he has a bachelor's degree in mechanical engineering. He stated he had been employed full time as an engineer by the same company for about three years. Whitehead acknowledged that the Father was more intelligent than many of the parents he evaluates for CPS, and he appeared to know more about parenting than the average CPS client.

The Father never made an effort to learn about his Child's diet and feeding regimen and he did not learn her diaper size until trial. There was no evidence of his ability to care for the Child. Caseworker Charles testified the Father had not demonstrated an ability to properly parent the Child.

The Father's rights to the Mother's five-year old son, the Brother, were terminated. He acknowledged he had received the termination documents, but he did not appear at the termination proceedings or otherwise contest the termination. He later admitted he did not read the documents. The Father claimed at trial that he sought to have DNA testing done to confirm his parentage to the Brother, but the Grandparents never responded to his request. The Grandmother denied that the Father ever asked to have DNA testing done. The Father acknowledged he never provided any support for the Brother. The record showed the Father assaulted the Mother when she was pregnant with the Brother. When asked why he never helped the Grandparents with the Brother, he replied, "I haven't had a DNA test of my five-year-old child."The Father admitted in his interview with the counselor that he is the father of the Mother's five-year old son. He told the counselor the Brother lived with his grandparents and denied that there was a previous CPS case. He also acknowledged his parentage of the Brother several times during these termination proceedings. The Father had not seen the Brother since "early going of the kid." He did not know the Grandparents had raised the Brother since shortly after his birth or that the Brother and the Child had a relationship.

**\*17** The Grandmother testified that she and her husband contacted CPS about the Mother's neglect of the Brother, leading to the termination proceedings. The Grandmother had raised the Brother since shortly after his birth. She rushed to the hospital after the Child was born and the Mother notified her CPS planned to take custody. She testified none of the Father's family came forward seeking to care for the Child. The Grandmother had attended every hearing in this case.

The Grandmother also testified that the Mother again became pregnant after the Brother's birth, and the Father asked her to terminate that pregnancy. The Mother was pregnant again during these proceedings, and the Father acknowledged that it was possible he was the biological father of the unborn child. He expressed little interest, but stated he would pursue custody "after the DNA test."

### e. Plans for the Child and Support Systems
The Father described few definite plans or preparations for taking custody of the Child. The Father had not shown the Department that any family support was available to him until the trial, and the Department had not had an opportunity to interact with the Father's family. Even during trial, when

asked about his support system, the Father answered, "there's no need I can—I got the means to do it on my own."The Father then testified that if the need arose, his two sisters would help him if he were awarded custody of the Child. One sister had two children, and the Father testified that if he were granted custody he would get advice from that sister, and she could take care of the Child while he was at work. He testified that he had a car seat for the Child. The Father also testified that he had his own two-bedroom apartment and could get a crib and other items for the Child from his sister.

His other sister (the Aunt) lived with his parents and cared for his disabled mother. She had no children. She had no contact with the Child or the Brother. There was evidence the Aunt also has violent tendencies. On April 10, 2013, police responded to a family violence report at the Father's family residence.[5] The Father's mother told police that her daughter, the Aunt, hit her with a metal pipe on the left side of her body and she was afraid of further attacks. The officer observed bruising, and filed a charge of assault on a family member against the Aunt. The assault charge against the Aunt was later dismissed. At trial, the Aunt denied the assault. The Father claimed that he was not aware of the assault. He acknowledged, however, that he knew there had been a criminal case.

| 5 | At trial, the Father testified that he lived with his mother, father and sister. He then said he moved out of that home in November of 2013. He later acknowledged that the house was jointly held in his and his parents' names. |
|---|---|

The Grandmother testified at the December hearing that she was entering the case to ensure the Child has a safe environment. Her goal in intervening in the case was to prevent the Father from obtaining custody. She testified that after the previous termination proceeding, she adopted the Brother, who was born to her daughter and the Father. The Grandmother testified that in her opinion both parents' rights to the Child should be terminated.

**\*18** The Grandmother reported that the Child's foster parents were very supportive of her and her husband's efforts to establish a relationship with the Child. They have met many times at each other's homes. The Grandparents and the foster parents believe it is important for the Child to have a relationship with her Brother. If the foster parents were not granted custody of the Child, the Grandmother and her husband requested custody. She testified she would maintain a relationship with the caregivers, and that the Child would be able to continue her relationship with her Brother.

In sum, the record contains sufficient evidence to support the best interest finding based on the Father's criminal history of domestic violence, his failure to fully comply with the court-ordered services for reunification, his continued relationship with the drug-using Mother, his limited interactions with the Child, and his failure to support her or bond with her. Viewing all the evidence in the light most favorable to the judgment, we conclude that a fact finder could have formed a firm belief or conviction that termination of the Father's parental rights is in the Child's best interest. *See J.F.C.,* 96 S.W.3d at 265–66. In light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the best-interest finding is not so significant that a fact finder could not reasonably have formed a firm belief or conviction that termination of the Father's parental rights is in the Child's best interest. *See In re H.R.M.,* 209 S.W.3d at 108. Based on the numerous inconsistencies in the Father's testimony, the factfinder was entitled to discredit the Father's self-serving statements that he did not assault the Mother, he did not use drugs, and he was not aware the Mother used drugs. After considering the relevant factors under the appropriate standards of review, we hold the evidence is legally and factually sufficient to support the trial court's finding that termination of the parent-child relationship is in the Child's best interest. Therefore, we overrule the Father's second issue.

### B. Motion for New Trial

In his first issue, the Father argues the trial court erred in denying his motion for new trial, in which he alleged ineffective assistance of counsel, improper dismissal of his appointed counsel, and abuse of discretion in denying his motion for continuance.[6] The Father first asserts his appointed counsel was wrongfully released, claiming he was indigent and entitled to appointed counsel. The Father claims his appointed counsel failed to conduct discovery during the eight moths she represented him, rendering ineffective assistance of counsel. After the allegedly improper release of his appointed counsel, the Father claims it was too late for his new counsel to conduct discovery, depriving him of a fair trial. He also claims the trial court denied his requests for a continuance. We first address whether the Father's appointed counsel was improperly dismissed.

---

[6] The Father also alleged in his motion for new trial that the six-month extension of the dismissal deadline was unlawfully granted outside section 263.401. *See* Tex. Fam.Code § 263.401 (permitting

retention of case beyond one-year anniversary of the Department's conservatorship if the court finds extraordinary circumstances necessitate that the child remain in the Department's temporary custody). He has not carried this complaint forward on appeal.

### 1. Appointed Counsel

**\*19** Texas has adopted a statutory scheme for providing counsel to assist indigent parents, mandating the appointment of an attorney ad litem for an *indigent* parent who opposes the termination of the parent-child relationship in a suit filed by a governmental entity. Tex. Fam.Code § 107.013(a)(1) (emphasis supplied); *see In re E.A .F.,* 424 S.W.3d 742, 747 (Tex.App.-Houston [14th Dist.] 2014, pet. filed). Specifically, the Family Code provides that in suits filed by a governmental entity the trial court "shall appoint an attorney ad litem to represent the interests of: (1) an *indigent* parent of the child who responds in opposition to the termination...." Tex. Fam.Code Ann. § 107.013(a)(1) (emphasis supplied); *see also In re C.D.S.,* 172 S.W.3d 179, 186 (Tex.App.-Fort Worth 2005, no pet.)(holding the trial court was required to appoint an attorney ad litem to represent an indigent parent in a government-initiated termination proceeding, and the failure to do so constituted reversible error).

The appointment of an attorney ad litem is required whether or not the indigent parent requests an attorney. *See In re J.M.,* 361 S.W.3d 734, 739 (Tex.App.-Amarillo 2012, no pet.)(holding the trial court committed reversible error by proceeding without appointing an attorney ad litem, even though indigent mother did not request an attorney). A parent's filing of an affidavit of indigency "trigger[s] the process for mandatory appointment of an attorney ad litem." *In re V.L.B.,* —— S.W.3d ——, No. 01–14–00201–CV, 2014 WL 4373567, at \*3 (Tex.App.-Houston [1st Dist.] Sept. 4, 2014, no pet. h.) (quoting *In re K.L.L.H.,* No. 06–09–00067–CV, 2010 WL 87043, at \*5 (Tex.App.-Texarkana Jan. 12, 2010, pet. denied) (mem.op.)). After a parent has filed an affidavit of indigence, the court may, but is not required to, conduct a hearing to determine whether the parent is indigent. *See* Tex. Fam.Code § 263.061(b).

On February 14, 2013, the Father completed a pre-printed form "Indigency Affidavit," in which he asked the court to appoint an attorney to represent him in the termination proceeding. The Father acknowledged in the affidavit that he was employed as an engineer and worked 40 hours per week. He left blank the space for his hourly, weekly, or monthly salary. He acknowledged that he had received a paycheck

in the amount of $998 the week before and expected to receive another paycheck the next day. The form does not identify whether the $998 amount was gross or net, weekly or monthly. The Father swore that he paid $700 per month in "rent/house payment." He also stated he had about $500 in his checking account, and he owned a 1998 automobile with a fair market value of $2,500. He also modified the form to include a payment of $2,500 per month in legal fees. No reporter's record of a hearing to determine indigence is included in our record.

The parties agree that the trial court appointed counsel to represent appellant shortly thereafter. Months later, on October 3, 2013, while testifying at a status hearing, the Father acknowledged his salary was $70,000 per year and that his net monthly salary was about $3,500. He acknowledged that he paid no rent and had been living with his sister since January, before the affidavit of indigence was signed. He did not claim that he continued to pay $2,500 monthly in legal fees, as his criminal case had been dismissed after completion of BI PP. He confirmed he had no debts and was not "poor."

**\*20** The Department then requested that the court remove appointed counsel because the Father is not indigent. The court informed the Father "your testimony, sir, does not match your Affidavit. Your Affidavit shows that you make less than half of what you just testified that you earn."[7] The court then found that the Father is not indigent. The court granted appointed counsel's request to be excused. The trial court informed appellant that he represented himself until he hired an attorney, and the court strongly recommended that the Father hire an attorney before the trial setting on December 12, 2013.

[7] The trial court's statement indicates that court had considered the $998 paycheck shown on the Father's affidavit as covering a two-week pay period, when he apparently was paid weekly.

The Father argues on appeal that the record does not rebut the presumption that he remained indigent throughout the proceedings. We disagree. *See In re P.E.*, No. 05–12–00944–CV, 2012 WL 5378250, at *2 (Tex.App.-Dallas Nov. 1, 2012, no pet.)(mem.op.) (finding no abuse of discretion in trial court's order sustaining contest to indigence based on discrepancies between the father's affidavit and his testimony). The Father's testimony is sufficient for the trial court to have determined he was not indigent.

The Father also frames his complaint as an allegation that the trial court abused its discretion by "the forced discharge of counsel." The record reflects that the court did not "discharge" appointed counsel, but rather, the court reconsidered the Father's claim of indigence. The Father also complains there is no written motion for the removal of appointed counsel, but he has cited no authority that a written motion is required under the facts presented here. The Department's oral request was sufficient. *See* Tex. Fam.Code § 107.013(e) (permitting the court to reconsider indigence "on the motion of the parent, the attorney ad litem for the parent, or the attorney representing the governmental entity"); *cf.* Tex.R. Civ. P. 12 (requiring "sworn, written motion" to show authority).

We review the trial court's determination of indigency in a parental termination case under an abuse of discretion standard. *In re C.D.S.,* 172 S.W.3d 179, 184 (Tex.App.-Fort Worth 2005, no pet.). We will conclude the trial court abused its discretion if it acted without reference to any guiding rules or principles or in an arbitrary and unreasonable manner. *Id.* (citing *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 242 (Tex.1985)). As the fact-finder, the trial court is the sole judge of the credibility of the witnesses and evidence. *In re A.R.,* 236 S.W.3d 460, 471 (Tex.App.-Dallas 2007, no pet.). We may not reverse the trial court's decision simply because we might have reached a different result. *See Downer,* 701 S.W.2d at 242.

Generally, the test for indigency requires the claimant to prove, by a preponderance of the evidence, that he would be unable to pay the costs if he really wanted and made a good faith effort to do so. *Few v. Few,* 271 S.W.3d 341, 345 (Tex.App.-El Paso 2008, pet. denied). Family Code Section 107.013 does not define "indigent." One court has defined "indigent" in section 107.013(a)(1) as "a person who does not have the resources, nor is able to obtain the resources, to hire and retain an attorney for representation in the termination case." *See In re C.D.S.,* 172 S. W.3d at 185. The burden of proof rests on the individual seeking to establish indigent status to prove that he could not pay attorney's fees or costs associated with the suit. *In re D.L.W.,* No. 14–04–00703–CV, 2005 WL 486613, at *1 (Tex.App.-Houston [14th Dist.] Mar. 3, 2005, no pet.) (mem.op.) (holding appellant did not meet her burden to establish she was entitled to appointed counsel in a termination proceeding, citing *Allred v. Lowry,* 597 S.W.2d 353, 355 (Tex.1980)).

**\*21** In making an indigence determination, the court can consider the purported indigent's income, source of income, assets, property owned, outstanding obligations, necessary expenses, number and ages of dependents, and spousal income available to the defendant. *In re C.D.S.,* 172 S.W.3d at 185. Here, the trial court heard and considered evidence through the Father's own testimony that the Father makes over $70,000 per year and has no debts. While the Father asserts he completed the affidavit truthfully, it is less than clear and is arguably misleading. The only expenses shown on the affidavit were the payments to an attorney and a monthly rent expense that appellant later acknowledged he did not pay. The Father provided no testimony or supporting documentation.[8]

[8] The record reflects the Father was ordered to provide additional information about his financial status at the beginning of the case. In the emergency order awarding temporary custody of the Child to the Department, the court ordered the Father to "furnish to the Department and the Court information sufficient to accurately identify [his] net resources and ability to pay child support along with copies of income tax returns for the past two years, any financial statements, bank statements, and current pay stubs, pursuant to Rule 196, Texas Rules of Civil Procedure and § 154.063, Texas Family Code." There is no indication in the record that the Father complied with this order.

The Family Code provides that the appointed attorney ad litem's duties continue until the termination proceedings are dismissed or finally concluded unless the attorney is relieved or replaced "after a finding of good cause is rendered by the court on the record." Tex. Fam.Code § 107.016(2). Based on the evidence recited above, the court determined the Father was not indigent and therefore was not entitled to appointed counsel. The trial court made findings on the record showing good cause to remove the appointed attorney ad litem. Therefore, the court complied with section 107.016(2).

There is no written order removing counsel; the court granted appointed counsel's request to be excused at the conclusion of the October 3, 2013, hearing. The court advised the Father that trial was scheduled in December, and strongly recommended the Father retain counsel before trial. The Father could have made arrangements to retain the same counsel, which he claimed he attempted to do. In his affidavit supporting his motion for new trial, the Father stated that he spoke with Solis immediately after she was released about remaining on the case as his retained attorney. She instructed him to call her office, which he stated in the affidavit he

did. Although the Father stated he left messages, he did not hear back from Solis. He asserted that he saved money for a new attorney's retainer and was able to find an attorney he could afford in early December. The Father's retained attorney, Rushing, appeared at the December trial setting. Our record contains no request for a continuance. Nonetheless, trial was postponed until January 27, 2014. At the beginning of trial on January 27, 2014, new retained counsel, Acosta and Pons, appeared for the Father, and our record contains no explanation for the Father's decision to change attorneys. Trial began briefly but was continued for another month. On the record before us, the Father has not established that the trial court's decision denying his entitlement to an appointed attorney ad litem prejudiced his ability to prepare for trial. We hold the trial court did not abuse its discretion.

### 2. Ineffective Assistance of Counsel

**\*22** As part of his first issue, the Father asserts his appointed counsel provided ineffective assistance. The Father's motion for new trial was supported by the Father's affidavit in which he stated he learned Solis would no longer represent him at the October 3, 2013, hearing. He alleged he was not told Solis had not requested discovery. He further stated, "Had I known that I was up against such a tight deadline, I would have asked the judge for more time, I also would have had [*sic*] made every effort to have obtained a lawyer so that my new lawyer would have been able to request discovery."

The statutory right to counsel in parental rights termination cases includes a guarantee that counsel will perform effectively. *In re B.G.,* 317 S.W.3d 250, 253–54 (Tex.2010). In parental rights termination cases, the Supreme Court of Texas has adopted the *Strickland* test that establishes the standards for effective assistance in criminal cases. *See In re M.S.,* 115 S.W.3d 534, 544–45 (Tex.2003) (citing *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052 74 (1984)). Under the well-established *Strickland* test, proving ineffective assistance of counsel requires a showing that (1) counsel made errors so serious that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment, and (2) the deficient performance prejudiced the defense, which requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial whose result is reliable. *In re H.R.M.,* 209 S.W.3d 105, 111 (Tex.2006).

In adopting the *Strickland* test for parental termination cases, the Supreme Court of Texas explained that courts must primarily focus on whether counsel performed in a reasonably effective manner. *In re M.S.,* 115 S.W.3d at 545.

Reviewing courts must give great deference to counsel's performance, indulging a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, including the possibility that counsel's actions are strategic. *Id*. An appellant bears the burden to overcome this presumption. *See Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. When the record is silent concerning the reasons for trial counsel's actions, we do not engage in speculation to find ineffective assistance of counsel. *Walker,* 312 S.W.3d at 623 (citing *Gamble v. State,* 916 S.W.2d 92, 93 (Tex.App.-Houston [1st Dist.] 1996, no pet.)). Accordingly, ineffective assistance claims must be firmly found in the record, and the record must affirmatively show the alleged ineffectiveness. *Walker,* 312 S.W.3d at 622–23; *see also In re L.C.W.,* 411 S.W.3d 116, 127 (Tex.App.-El Paso 2013, no pet.). Challenged conduct constitutes ineffective assistance only when it is "so outrageous that no competent attorney would have engaged in it."*In re H.R.M.,* 209 S.W.3d at 111 (citing *Garcia v. State,* 57 S.W.3d 436, 440 (Tex.Crim.App.2001)).

Under the second prong of the *Strickland* test, an appellant must establish that there is a reasonable probability that but for his attorney's deficient performance, the outcome of his case would have been different. *See Strickland,* 466 U.S. at 694, 104 S.Ct. 2052; *In re M.S.,* 115 S.W.3d at 550. A "reasonable probability" is one that is "sufficient to undermine confidence in the outcome."*Strickland,* 466 U.S. at 694, 104 S.Ct. 2052; *Jackson v. State,* 973 S.W.2d 954, 956 (Tex.Crim.App.1998). If the *Strickland* test is not met, an appellant's ineffective assistance of counsel claim is defeated. *See In re M.S.,* 115 S.W.3d at 545; *see also Strickland,* 466 U.S. at 700, 104 S.Ct. 2052.

 **\*23**  In this case, the Father complains that his appointed counsel failed to conduct discovery to determine the status of his compliance with his service plan. The Father asserts that he was harmed by the lack of discovery because he was not aware he had not complied with the terms of his service plan, and the failure to conduct discovery was "structural" error amounting to a complete denial of counsel.[9] "Structural" errors are federal constitutional errors so labeled by the United States Supreme Court. *Cain v. State,* 947 S.W.2d 262, 264 (Tex.Crim.App.1997). The total deprivation of counsel to an indigent defendant at trial is structural error. *Johnson v. U.S.,* 520 U.S. 461, 468–69, 117 S.Ct. 1544, (1997) (citing *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792 (1963)).

[9]     The Father cites *Olguin v. Jungman,* 931 S.W.2d 607, 611 (Tex.App.-San Antonio 1996, no writ), a probate

case addressing failure to disqualify a trustee from serving as the independent executor. *Olguin* has no application to the issues here.

In support of his argument, the Father cites *Johnson v. State,* 169 S.W.3d 223, 231–32 (Tex.Crim.App.2005), addressing counsel's violation of a defendant's right to testify. Automatic reversal without a harm analysis applies only when the trial court has committed structural error. *Id*. at 232. If the complained of deprivation is caused by defense counsel, the *Strickland* analysis applies. *Id*.

Here, the Father was not deprived of counsel. He was represented by two lawyers at trial, and the record reflects these lawyers actively participated in the trial, making appropriate objections and examining witnesses. The failure to conduct discovery is not structural error, and courts have found that the failure may be trial strategy, absent proof to the contrary. *See, e.g., Martin v.. State,* 265 S.W.3d 435, 441 (Tex.App.-Houston [1st Dist.] 2007, no pet.)(stating counsel may have failed to request breath test results as strategy to allow the jury to believe the State had "conveniently lost" exculpatory evidence). In criminal cases, the failure to investigate will require reversal only if the accused's only viable defense was not advanced and there is a reasonable probability that but for this failure, the result would have been different. *Id*.

The Father has not alleged how any discovery would have changed the evidence presented at trial. *See In re K.M.H.,* 181 S.W.3d 1, 9 (Tex.App.-Houston [14th Dist.] 2005, no pet.) (rejecting ineffective assistance issue where there was no showing in the record that discovery directed to CPS would have factually changed any of the proof at trial). The record demonstrates that the Father had ample means available to determine what actions were required to comply with the service plan. The Father was aware of the plan's requirements; he signed the plan on February 5, 2013. The plan had detailed information about scheduling services. The plan expressly provides: "For information about the Family Service Plan or your child(ren), please contact:" the case worker, whose name and phone number were provided in the plan. The Father was present at regular status hearings at which his progress in completing the requirements of his service plan was discussed. The Father did not complain to the court until trial that he had difficulty scheduling services due to his previous caseworker's failure to return his calls.

 **\*24**  In addition, the Father did not present his former attorney Solis at the hearing on his motion for new trial to

testify about her actions and the reasons for those actions. There is nothing in the record before us showing counsel's trial strategy or that it was unreasonable. The Father's original trial counsel was not presented to advise the court whether she informed appellant about discovery issues or deadlines. Likewise, the Father's retained trial attorneys did not testify about what steps they took to prepare for trial or any difficulties they had in those preparations. The record reflects the Father was represented by counsel at every hearing after he was served with the termination suit, and he was represented by two attorneys at trial.

Although the record contains no evidence that any written discovery was propounded, there is likewise no evidence that such written discovery would have produced any fruits or that there was a necessity for it. *In re K.S.,* 420 S.W.3d 852, 856 (Tex.App.-Texarkana 2014, no pet.)(holding trial counsel's failure to file formal discovery in termination case did not prejudice the father). Without an explanation from trial counsel for her actions, we may not, in the face of the strong presumption in favor of reasonable representation, conclude that trial counsel lacked sound strategic reasons for her conduct. *See In re B.M.,* No. 14–13–00599–CV, 2013 WL 6506659, at *11 (Tex.App.-Houston [14th Dist.] Dec. 10, 2013, no pet.) (mem.op.) (citing *M.S.,* 115 S.W.3d at 549).

The Father's complaint is not firmly established by the record; we may only speculate about why counsel may not have conducted formal discovery or what such discovery may have revealed. *See In re R.E.T.R.,* No. 14–13–00640–CV, 2013 WL 6506689, at *11 (Tex. App .-Houston [14th Dist.] Dec. 10, 2013, no pet.) (mem.op.) (rejecting claim that counsel's failure to engage in discovery constituted ineffective assistance). The Father has failed to show counsel's performance was deficient in this regard and that the alleged deficient performance prejudiced his defense. *See In re K.M.H.,* 181 S.W.3d at 9–10.

In sum, the Father has not made the showing required under *Strickland* and failed to overcome the strong presumption that counsel's alleged deficiencies prejudiced the case, deprived him of a fair trial, or produced an unreliable result. We hold the Father has not established he received ineffective assistance of counsel.

### 3. Denial of Continuance

In his motion for new trial, the Father also alleged the trial court abused its discretion and deprived him of due process by denying his motion for continuance. The decision to grant or deny a motion for continuance is within the trial court's sound discretion. *See*Tex.R. Civ. P. 251. The trial court's action in denying a continuance will not be disturbed unless the record discloses a clear abuse of discretion. *State v. Wood Oil Distrib. Inc.,* 751 S.W.2d 863, 865 (Tex.1988).

**\*25** First, our record contains no written motion for continuance. Appellant's first retained counsel, Rushing, appeared at the permanency hearing on December 12, 2014, the date trial had first been scheduled to commence. The record of that hearing does not reflect Rushing requested a continuance. In fact, at the conclusion of the hearing, when the trial court set the new trial date for January 23, 2014, Rushing replied, "That's fine."

The Father's new counsel, Acosta, orally requested a continuance at the start of trial on January 23, 2014. His stated reasons were that he needed time to subpoena a witness and review pictures of the Father's home that he had just received. He also stated he would "perhaps" do some witness preparation and some discovery, but he did not specify what he sought to discover. Absent a specific showing of what additional trial preparation might have been made, no abuse of discretion in denying a continuance is shown. *In re L .D.W.,* No. 14–11–00438–CV, 2013 WL 2247383, at *10 (Tex.App.-Houston [14th Dist.] May 21, 2013, no pet.) (mem.op.) (finding no abuse where motion for continuance did not identify witnesses to be subpoenaed, what testimony was expected to be elicited from them, or why such testimony was material). All other parties were opposed to the motion. The Department's counsel noted that only one witness out of several she planned to call was scheduled for that day and the Father's counsel would have ample time to subpoena any witnesses he might need. The motion was denied. The Department called the Father as its first witness. The Father asserts his counsel re-urged his motion for continuance when presented with documents he had not reviewed. The documents in question were a certified copy of the Father's 2010 judgment of conviction for assaulting the Mother and the complaint relating to that judgment. The Father was certainly aware of the conviction, and the court denied the oral motion. The Father's testimony was not concluded that day, and the trial was continued for over a month until February 27, 2014.

The law is well settled that a motion for continuance must be in writing, state the specific facts supporting the motion, and be verified or supported by affidavit. *See*Tex.R. Civ. P. 251, 252; *In re E.L.T.,* 93 S.W.3d 372, 375 (Tex.App.-Houston

[14th Dist.] 2002, no pet.) (citing *Villegas v. Carter,* 711 S.W.2d 624, 626 (Tex.1986)). If a motion for continuance is not made in writing and verified, it is presumed that the trial court did not abuse its discretion in denying it. *E.L.T.,* 93 S.W.3d at 375 (holding that no abuse of discretion was shown where appellant did not comply with Rule 251); *see also Green v. Tex. Dep't of Protective & Regulatory Servs.,* 25 S.W.3d 213, 218 (Tex.App.-El Paso 2000, no pet.)(holding the denial of an oral request for a continuance does not constitute an abuse of discretion).

In *Villegas,* which the Father cited, the Supreme Court of Texas found that this presumption did not apply to a lay movant who, without fault, had his attorney withdraw his representation two days before trial and refuse to turn over the case file. 711 S.W.2d at 626. The court stated that when the reason for a continuance is the withdrawal of counsel, the party moving for the continuance must show that his failure to be represented at trial was not due to his own fault or negligence. *Id. Villegas* may be distinguished from this case in several respects. Here, the Father was not without counsel at trial. In addition, the court did not grant counsel's motion to withdraw; the court determined the Father was not entitled to appointed counsel. Moreover, the trial court clearly determined that removal of appointed counsel was due to the Father's fault in misrepresenting his financial status. The court declared, "he committed a fraud on this court."

**\*26** We also find *Harrison v. Harrison,* 367 S.W.3d 822 (Tex.App.-Houston [14th Dist.] 2012, pet. denied), cited by the Father, does not control the disposition of this issue. This court held in *Harrison* that the trial court abused its discretion in denying the wife's motion for continuance after permitting her counsel to withdraw over her objection forty days before trial, based on his unsupported claim that the wife had not paid all of his fees. *Id.* at 835. We also found that the wife was not at fault. *Id.* at 833–35 (citing *Villegas,* 711 S.W.2d at 626). The wife testified to her unsuccessful efforts to find a new attorney, and when her request for a continuance was denied, she proceeded to trial without counsel. *Id.* at 831–32.

Here, the Father had time to, and in fact did, retain counsel before trial. Counsel did not allege or establish any specific trial preparation that required additional time. In addition, the record supports the trial court's determination that the Father was at fault. *See Qurashi v. Jabeen,* No. 14–12–00858–CV, 2013 WL 2644182, at \*5 (Tex.App.-Houston [14th Dist.] June 11, 2013, no pet .) (mem.op.) (finding no abuse of discretion in denying continuance where appellant

failed to show the lack of representation was not due to his own fault or negligence). We conclude the trial court did not abuse its discretion in denying the Father's oral request for a continuance. Accordingly, we overrule the Father's first issue.

**C. Reimbursement for Attorney's Fees**

Finally, in his fourth issue, the Father asserts that the trial court erred in ordering him to reimburse the county for the attorney's fees incurred by his court-appointed counsel. The Department asserts, and we agree, that the Father has waived this complaint by failing to bring it to the trial court's attention. *See* Tex.R.App. P. 33.1; *Harris Cnty. Children Protective Servs. v. Richker,* 2 S.W.3d 741, 743 (Tex.App.-Houston [14th Dist .] 1999, no pet.) (holding that because there was no claim in any document in the trial court that the judgment should not have ordered payment of appointed attorney fees without evidence on indigence, the complaint was waived). Nonetheless, we briefly address the issue.

The Family Code provides that a court-appointed attorney ad litem for a parent is to be paid by the parents of the child unless the parents are indigent. Tex. Fam.Code § 107.015(a). In its petition, the Department asked that the Father reimburse the county for fees paid to the attorney ad litem if he had the money to pay those fees. Section 107.015 clearly authorizes a court to require a parent to defray the cost of attorneys appointed in the case if the court determines the parent is "able." Tex. Fam.Code § 107.015(b). Only if indigency of the parents is shown may the county be ordered to pay fees for an attorney at litem for a parent. *Id.* at § 107.015(c). "The court may not award attorney ad litem fees under this chapter against the state, a state agency, or a political subdivision of the state except as provided by this subchapter." *Id.*

**\*27** The Father argues that having determined he was indigent based on his affidavit, the trial court's discretion to reverse that decision was limited. We disagree. As discussed above, the Father acknowledged he was not "poor," he earned $70,000 annually, and he was not in debt. He confirmed, however, that he requested that the court appoint an attorney for him, and he testified he did not believe he should have to pay for his court-appointed attorney. The record supports the trial court's determination that the Father is not indigent. Accordingly, the court was required to order the Father to pay the court-appointed attorney ad litem's fees. *See* Tex. Fam.Code § 107.015(c).

We overrule the Father's fourth issue.

## V. CONCLUSION

Having overruled the Father's issues, we order the judgment of the trial court affirmed.

**All Citations**

Not Reported in S.W.3d, 2014 WL 4699480

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** [Wells Fargo Bank, N.A. v. Ballestas,](#) Tex.App.-Hous. (1 Dist.), May 12, 2011

2007 WL 2034913
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

### MEMORANDUM OPINION
Court of Appeals of Texas,
Houston (14th Dist.).

In the Interest of H.B.N. S., a Child.
Dwight Bolton and Paula Bolton, Appellants
v.
David Schultz and Deborah Schultz, Appellees.

Nos. 14-05-00410-CV,
14-06-00102-CV. | July 17, 2007.

On Appeal from the 387th District Court, Fort Bend County, Texas, Trial Court Cause Numbers 00CV114743 & 05CV142097.

**Attorneys and Law Firms**

[Holly Crampton](#), [Dawn Renee Meade](#) and [Joseph J. Finkel](#), for Dwight Bolton and Paula Bolton.

[Melody B. Royall](#), [Danny Lynn Hoke](#) and [Ellen Yarrell](#), for David Duane Schultz and Deborah Lynn Schultz.

Panel consists of Justices [YATES](#), [ANDERSON](#), and [HUDSON](#).

### MEMORANDUM OPINION

[JOHN S. ANDERSON](#), Justice.

**\*1** In this consolidated appeal, we address multiple issues arising out of the efforts by two, unrelated couples to adopt H.B.N. S., a minor child. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

H.B.N.S. was born on July 23, 1998. For reasons not relevant to this appeal, the birth mother, Christina Smith, allowed H.B.N.S. to go home from the hospital with appellants, Dwight and Paula Bolton (the "Boltons"). Smith had originally met Paula Bolton when Paula Bolton handled a foreclosure for Smith's father. While the Boltons agreed to take H.B.N.S. home, they did not do so with the intention of eventually adopting her.

In the fall of 1998, Danielle Schultz started babysitting H.B.N.S. for the Boltons. The Boltons, through their church, sought out Danielle as a babysitter. At that time, Danielle was a teenager living with her parents and she brought H.B.N.S. to her parents' home. Danielle's parents are appellees, David and Deborah Schultz (the "Schultzes"). H.B.N. S.'s initial stay with the Schultzes, which was supposed to last a single night, extended to several days. From that start, H.B.N.S. spent large amounts of time with the Schultzes and they came to consider her a member of the family. The Schultzes purchased the equipment to care for H.B.N.S. in their home. In addition, as H.B.N.S. got older, she was given her own room at the Schultzes' home as well as at their lake house. The Schultzes provided H.B.N.S. with food and clothing as well as medical and dental care. H.B.N.S. participated in holiday and other special celebrations with the Schultzes and traveled extensively with them on family vacations.

In 2000, when H.B.N.S. was almost two years old, Smith executed a Revocable Mother's Affidavit of Relinquishment of Parental Rights designating the Boltons as the Managing Conservators of H.B.N.S. The Boltons then filed an Original Petition for Termination of the Parent-Child Relationship and Adoption in July 2000. During the summer of 2003 the Boltons attempted to finalize their adoption of H .B.N. S., but the court expressed concerns about a pending criminal charge against Dwight Bolton and declined to go forward with the adoption at that time. [1]

1 Dwight Bolton has prior convictions for unlawful carrying of a weapon (December 5, 1983); possession of marijuana with the intent to sell (November 27, 1991); and for retaliation (May 21, 1992). During the course of the litigation, Mr. Bolton admitted to having physical confrontations with Paula Bolton's teenaged sons, the most serious of which involved Mr. Bolton picking Paula Bolton's thirteen year old son up by the neck and pinning him to the wall with his feet barely touching the floor. Mr. Bolton also testified he believed this was an appropriate method to deal with a thirteen year old boy. Mr. Bolton also admitted to an incident where he assaulted a husband

and wife following an automobile accident. Finally, Mr. Bolton admitted that he is angry all the time and it is possible that, when he is angry, be becomes assaultive. Mr. Bolton's Veterans' Administration medical records from July 2003, reveal that he used marijuana daily, had problems with chronic anger, and tried to choke Paula Bolton on three separate occasions.

Paula Bolton went to prison when she was eighteen for violating the provisions of her probation following her March 1981 conviction for possession of a controlled substance. Ms. Bolton admitted she pled guilty to a charge of aggravated solicitation of prostitution. In July 2004, Ms. Bolton was convicted of theft.

As they learned more about the Boltons, the Schultzes became concerned about the stability of the Boltons' home and decided to take legal action regarding H.B.N.S. On August 22, 2003 the Schultzes filed two original proceedings respecting H.B.N.S. The first suit, Cause No. 03-CV-131572, was an Original Petition for Termination and Adoption of a Child. In the second action, Cause No. 03-CV-131574, titled Original Petition in Suit Affecting the Parent-Child Relationship, the Schultzes sought primary conservatorship of H.B.N.S. The Boltons answered the conservatorship suit and challenged the Schultzes' standing. The Boltons also answered the termination suit and requested that the court abate the case until the issue of the Schultzes' standing was addressed. In response, the Schultzes filed a motion to consolidate all of the cases related to H.B.N. S.

 **\*2**  On October 14, 2003 the trial court commenced a hearing to address the Schultzes' request to consolidate the three cases and the Boltons' challenge to the Schultzes' standing. The trial court heard testimony on both October 14, 2003 and October 30, 2003. On October 30, 2003 the Schultzes filed with the trial court a petition in intervention seeking termination and adoption of H.B.N.S. After the hearing, the trial court dismissed the Schultzes' two original proceedings, Cause Numbers 03-CV-131574 and 03-CV131571, but found the Schultzes had standing to intervene in the Boltons' adoption suit to seek managing conservatorship of H.B.N.S. On November 25, 2003, the trial court entered an interim order terminating the parental rights of H.B.N. S.'s birth parents.

On November 19, 2004, the Schultzes filed an Intervenors' Amended Petition and Original Answer in which they asked the trial court to (1) finalize its interim order terminating the parental rights of H.B.N. S.'s birth parents, (2) deny the Boltons' request to adopt H.B.N. S., and (3) name the Schultzes as the Sole Managing Conservators of H.B.N. S.

Following another unsuccessful attempt by the Boltons to have the Schultzes' intervention dismissed based on lack of standing, trial of the Boltons' requested termination and adoption suit, as well as the Schultzes' intervention, commenced on November 29, 2004. On December 28, 2004, the trial court entered an Order In Suit Affecting the Parent-Child Relationship in which it (1) confirmed the interim order terminating the parental rights of H.B.N. S.'s birth parents, (2) denied the Bolton's request to adopt H.B.N. S., and (3) appointed the Schultzes as H.B.N. S.'s Sole Managing Conservators and the Boltons as her Possessory Conservators.

On April 7, 2005 the Schultzes filed suit for the adoption of H.B .N.S. At the time the Schultzes filed suit to adopt, H.B.N.S. had lived continuously in the Schultzes' home for more than three months. Prior to the trial of the Schultzes' adoption suit, the Boltons filed several motions. A Motion to Deny Relief in Suit to Adopt was contained in the Boltons' Original Answer. In this motion, the Boltons challenged the Schultzes' standing to file a suit to adopt H .B.N.S. The second motion filed by the Boltons was a Motion to Abate or Stay the Case Pending Appellate Review of the trial court's December 28, 2004 order. Finally, the Boltons filed a Motion to Dismiss based upon the legal theory of either res judicata or collateral estoppel. The trial court denied each of these motions and the adoption suit went to trial on November 9, 2005.

The only evidence from the adoption trial found in the appellate record consists of three reports filed by social workers Helen Kerlick and Denise Fenwick. These reports contained the social workers' findings that H.B.N.S. appeared to be tightly bonded to the Schultz family and, based upon their investigation, they highly recommended that the Schultzes be approved to adopt H.B.N.S. At the conclusion of the evidence, the Schultzes' request to adopt H.B.N.S. was granted and the trial court signed a Decree of Adoption on December 12, 2005. As part of that decree, the trial court found that any prior orders designating the Boltons as possessory conservators of H.B.N.S. were no longer in her best interest and terminated all provisions granting the Boltons possession and access to H.B.N. S.

 **\*3**  The Boltons appealed the December 28, 2004 order in appellate cause number 14-05-00410-CV.[2] The Boltons appealed the December 12, 2005 order in appellate cause number 14-06-00102-CV. We subsequently consolidated the Boltons' appeals.

[2] While the Boltons have appealed the trial court's December 28, 2004 order, they have not raised any issues on appeal contesting the trial court's denial of their request to adopt H.B.N.S. Instead, the Boltons have addressed their appeal exclusively at the trial court's handling of the Schultzes' intervention and its division of responsibilities in the December 28, 2004 final order.

## DISCUSSION

In appellate cause number 14-05-00410-CV, the Boltons challenge the trial court's handling of the Schultzes' intervention into the Boltons' termination and adoption suit as well as the December 28, 2004 order defining the rights and duties of the individual conservators.[3] The Boltons also raise three issues in appellate cause number 14-06-00102-CV. In their second appeal, the Boltons initially argue the trial court erred when it denied their motion to dismiss or abate the Schultzes' adoption suit pending the outcome of their appeal in 14-05-00410-CV. Next, the Boltons contend the Schultzes did not have standing to adopt H.B.N.S. Finally, the Boltons assert the Schultzes are barred by res judicata and collateral estoppel from adopting H.B.N.S. We turn first to the Boltons' issues raised in cause number 14-05-00410-CV.

[3] In their appellants' brief in cause number 14-05-00410-CV, the Boltons raise three issues. In addition, in the argument and authorities section of their brief, the Boltons pose eight questions, some of which are related to one of the original three issues, while two raise entirely new points not found in the original issues. Where the Boltons' issues and questions intersect, we address them together. Accordingly, under the Boltons' first issue, we also address their fourth and fifth questions. Within the Boltons' second issue, we address their first, second, and third questions. We handle the Boltons' third issue together with their eighth question. Finally, we address the Boltons' sixth and seventh questions separately.

## I. Cause Number 14-05-00410-CV

### A. The Boltons Lack Standing to Question Service on Other Parties.

In their first issue, the Boltons challenge the trial court's December 28, 2004 order based on the Boltons' view the Schultzes' intervention was never perfected because they did not serve H.B.N. S .'s birth parents. However, the Boltons do not have standing to challenge the validity of service on other parties to a suit. *See Southwest Const. Receivables, Ltd.*

*v. Regions Bank,* 162 S.W.3d 859, 864 (Tex.App.-Texarkana 2005, pet. denied) ("Generally, only the entity that has not been properly served has standing to challenge the lack of due process."); *see also In re D. C.,* 128 S.W.3d 707, 713 (Tex.App.-Fort Worth 2004, no pet.)(holding mother did not have standing on appeal to raise issue concerning service by publication on unknown biological father who did not appeal). As the Boltons do not have standing to challenge the validity of service on H.B.N. S.'s birth parents, we overrule their first issue, as well as their fourth and fifth questions.

### B. The Schultzes Had Standing to Intervene in the Boltons' Pending Termination and Adoption Suit

In their second issue, as well as questions one, two, and three, the Boltons argue the trial court abused its discretion when it found the Schultzes had standing to intervene in the Boltons' termination and adoption suit. We disagree.

### 1. The Standard of Review

In termination cases, the trial court enjoys discretion when deciding a motion to strike an intervention. *In re A. M.,* 60 S.W.3d 166, 168 (Tex.App.-Houston [1st Dist.] 2001, no pet.). To constitute an abuse of discretion, the trial court's decision must be arbitrary or unreasonable. *Id*.

### 2. Standing to Intervene is Measured at the Time the Intervention is Filed

Initially, in question number one, the Boltons contend the date on which the Schultzes' standing to intervene must be judged is not the date the Schultzes filed their intervention, but the date the Boltons originally filed their suit. In support of their contention, the Boltons cite *In re Garcia,* 944 S.W.2d 725 (Tex.App.-Amarillo 1997, no writ)*.* In *Garcia,* the father challenged the standing of non-parents who brought an original suit seeking custody of his child. *Id*. at 726.The non-parents had asserted standing based on section 102.003(9) of the Texas Family Code, which permitted an original suit by persons who had actual care, custody, and control of a child for six months preceding the filing of the suit. *Id*. The court in *Garcia* determined that the six-month period, and therefore the issue of the non-parents' standing, was to be determined as of the date the original suit was filed. *Id*. at 727.The Boltons' reliance on *Garcia* is misplaced as *Garcia* did not involve an intervention but the filing of an original lawsuit in which standing was asserted based on an entirely different statute from the statute at issue here.

**\*4** In their petition in intervention, the Schultzes, because of their substantial past contact with H.B.N. S., asserted they had standing to intervene pursuant to section 102.004(b) of the Texas Family Code. Under that statute, the trial court had discretion to permit the Schultzes' intervention if they could establish their substantial past contact with the child. TEX. FAM.CODE ANN. § 102.004(b) (Vernon 2002). That determination is to be made at the point in time when the Schultzes filed their petition in intervention. *See In re A. M.*, 60 S.W.3d at 169 (analyzing the intervenors' contacts with the child as of the time they filed their petition in intervention).

The Boltons also challenge the evidence supporting the trial court's finding that the Schultzes had substantial past contact with H.B.N.S. sufficient to allow them to intervene in the Boltons' original termination and adoption suit. The trial court conducted a two-day evidentiary hearing to address the question of the Schultzes' standing to intervene, among other issues. The evidence introduced during this hearing established that the Schultzes had a close relationship with H.B.N.S. that commenced in the fall of 1998 and continued up through the time of the evidentiary hearing. [4] The evidence also established that the Boltons initiated this relationship and encouraged its continued development. The evidence demonstrates that the trial court acted within its discretion when it denied the Boltons' motion to dismiss the Schultzes' intervention in the Boltons' termination and adoption suit based on their substantive past contact with H.B.N. S.

[4]     This evidence includes (1) testimony that the Schultzes provided ongoing care for H.B.N.S. in their home for extensive and repeated periods of time beginning in the fall of 1998 and have treated her as a member of their family; (2) H.B.N.S. accompanied the Schultzes on numerous family vacations; (3) H.B.N.S. participated in Schultz family celebrations of birthdays and holidays; (4) H.B.N.S. had her own rooms at the Schultzes' home and lake house; and (5) the Schultzes took H.B.N.S. to school, were on the list of people authorized to pick her up from school, and even met with H.B.N. S.'s teachers regarding her education.

### 3. The Requirements to Intervene Are More Relaxed Than The Requirements to File an Original Suit

In questions two and three, the Boltons argue that since the requirements to intervene in a termination and adoption suit are the same as the requirements to institute an original suit and since the trial court found that the Schultzes did not have standing to file their original lawsuits regarding H.B.N.

S., they cannot establish their standing to intervene in the Boltons' termination and adoption suit. We disagree with each of the Boltons' contentions.

Initially, intervening and filing an original suit are distinct legal actions. *In re A. M.*, 60 S.W.3d at 168.Standing to intervene in a suit and filing an original suit are not necessarily the same. *Id*. Here, the Schultzes assert they had standing to intervene in the Boltons' original suit based on their substantial past contact with H.B.N. S., as authorized by section 102.004(b) of the Texas Family Code. Tex. Fam.Code Ann. § 102.004(b). In statutory standing cases, such as this one, the analysis is a straight statutory construction of the relevant statute to determine upon whom the Texas legislature conferred standing and whether the claimant in question falls in that category. [5] *In re Sullivan,* 157 S.W.3d 911, 915 (Tex.App.-Houston [14th Dist.] 2005, orig. proceeding). As addressed above in section B(2), the evidence demonstrated the Schultzes had substantial past contact with H.B.N.S. and therefore the trial court did not abuse its discretion in finding the Schultzes had standing, pursuant to section 102.004(b) of the Texas Family Code, to intervene in the Boltons' termination and adoption suit.

[5]     The Boltons' citation to *Mendez v. Brewer,* 626 S.W.2d 498 (Tex.1982), and *Guaranty Fed. Sav. Bank v. Horseshoe Oper. Co.,* 793 S.W.2d 652 (Tex.1990), do not change this result. In *Mendez,* the Texas Supreme Court, construing section 11.03 of the Texas Family Code, the predecessor to the current section 102.004, held that foster parents had no justiciable interest and therefore no standing to intervene in a termination suit. *Mendez,* 626 S.W.2d at 500.However, the *Mendez* case was decided before section 11.03 of the Texas Family Code was amended to permit a person with substantial past contact with a child, such as the Schultzes, to bring a termination and adoption suit and therefore has no precedential value here. *Rodarte v. Cox,* 828 S.W.2d 65, 70 (Tex.App.-Tyler 1991, writ den.).*Guaranty* addresses common law intervention pursuant to Rule 60 of the Texas Rules of Civil Procedure and is not applicable to this case. *Guaranty,* 793 S.W.2d at 657.

**\*5** As the trial court did not abuse its discretion when it denied the Boltons' motion to dismiss the Schultzes' intervention, we overrule the Boltons' second issue, as well as their first, second, and third questions.

### C. The Bolton's Third Issue, Arguing The Trial Court's Final Order is Invalid Because it Does Not Adequately

**Define the Rights and Duties of the Managing and Possessory Conservators, is Moot**

In their third issue, as well as their eighth question, the Bolton's contend the trial court's December 28, 2004 order improperly designated both David and Deborah Schultz as sole managing conservators of H.B.N.S. However, since we affirm the trial court's December 12, 2005 Decree of Adoption granting the Schultzes' request to adopt H.B.N.S., this issue, challenging the trial court's December 28, 2004 designation of both David and Deborah Schultz as sole managing conservator of H.B.N.S., is moot. Accordingly, we overrule the Boltons' third issue and eighth question.

**D. The Schultzes' Intervention Was Not Barred by The Doctrines of Res Judicata and Collateral Estoppel**

In their sixth question, the Boltons assert the Schultzes were barred by the doctrines of res judicata and collateral estoppel from intervening in the Boltons' termination and adoption lawsuit. The Boltons base their argument on the trial court's dismissal, based on lack of standing, of the Schultzes' Original Petition for Termination and Adoption and Original Petition in Suit Affecting Parent-Child Relationship. We disagree.

Res judicata precludes re-litigation of claims that have been finally adjudicated, or that arise out of the same subject matter and could have been litigated in a prior action. *Shirvanian v. Defrates,* 161 S.W.3d 102, 111 (Tex.App.-Houston [14th Dist.] 2004, pet. denied). Res judicata requires proof of the following elements: (1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of the parties or those in privity with them; and (3) a second action based on the same claims as were raised or could have been raised in the first action. *Id*. A prior final judgment on the merits is lacking here. A decision concerning whether a party has standing is not a decision deciding the merits of a case. *In re C.M. C.,* 192 S.W.3d 866, 869-70 (Tex.App.-Texarkana 2006, no pet.). Dismissal, as happened here to the Schultzes' two original lawsuits, is the appropriate disposition when a party lacks standing; it is not a decision on the merits. *Id*. at 870. As there was no final disposition on the merits of the Schultzes' original lawsuits, they are not barred by the doctrine of res judicata from intervening in the Boltons' termination and adoption lawsuit.

The doctrine of collateral estoppel is used to prevent a party from re-litigating an issue that it previously litigated and lost. *James v. City of Houston,* 138 S.W.3d 433, 437 (Tex.App.-Houston [14th Dist.] 2004, no pet.). To successfully invoke collateral estoppel, a party must establish the following

elements: (1) the facts sought to be litigated in the second action were fully and fairly litigated in the first action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action. *Id*. Here, there was no full and fair litigation of the facts sought to be litigated in the second action (the Schultzes' intervention in the Boltons' termination and adoption suit) in the first action (the Schultzes' two original lawsuits). In the first action, the issue litigated was the Schultzes' standing to file two original lawsuits. In the second action, the issue litigated was the Schultzes' standing to intervene in a lawsuit already filed pursuant to section 102.004(b) of the Texas Family Code.TEX. FAM.CODE ANN. § 102.004(b). As addressed above in section B(3), the standing requirements to file an original lawsuit and the requirements to intervene in an existing lawsuit are not the same. Because there was no prior full and fair litigation of the facts sought to be litigated in the second action, the doctrine of collateral estoppel does not apply. We overrule the Boltons' sixth question.

**E. The Boltons' Constitutional Rights Were Not Violated by the Trial Court's Appointment of the Schultzes as Sole Managing Conservator of H.B.N. S.**

**\*6** In their seventh question, the Boltons contend the trial court's finding, pursuant to section 153.374(b) of the Texas Family Code, that Christina Smith's designation of the Boltons as H.B.N. S.'s managing conservators was against H.B.N. S.'s best interest, violates the Fourteenth Amendment to the United States Constitution and Article I, Section 19 of the Texas Constitution as it does not recognize the constitutionally protected presumption in favor of the birth parent's choice.[6] In support of their argument, the Boltons cite the United States Supreme Court's opinion in *Troxel v.. Granville*. 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).

6     To the extent question seven can be construed as arguing the trial court's decision violated any federal and state constitutional protections the Boltons are entitled to as "parents" of H.B.N. S., that argument is based on a false premise. The Boltons are not parents as defined by the Texas Family Code. A parent is defined as a child's mother, presumed father, legally determined father, adjudicated father, acknowledged father, or adopted mother or father. TEX. FAM.CODE ANN. § 101.024(a) (Vernon Supp.2006). The Boltons do not fall into any of these categories and therefore are not entitled to the constitutional protections afforded parents. In addition, to the extent question seven can

be interpreted as seeking to assert any constitutional protections guaranteed Christina Smith, the Boltons do not have standing to assert rights she herself has chosen not to pursue. *See In re D. C.,* 128 S.W.3d 707, 713 (Tex.App.-Fort Worth 2004, no pet.)(holding mother had no standing on appeal to raise issue concerning service of process on unknown biological father who did not appeal).

The Boltons misapply the *Troxel* case. In *Troxel,* paternal grandparents, following the death of their grandchildren's father, filed suit, pursuant to a Washington statute, to obtain increased court ordered visitation with their grandchildren. *Id.,* 530 U.S. at 60-61, 120 S.Ct. at 2057-58. The mother believed the amount of visitation sought by the grandparents was excessive. *Id.* The Supreme Court held that the statute providing: (1) that any person may petition a court for visitation at any time; and (2) that a court may order visitation rights for any person when it finds visitation may be in the best interest of the child; violated the substantive due process rights of the mother. *Id.,* 530 U.S. at 67, 120 S.Ct. at 2060-61. The Supreme Court held the statute was unconstitutionally overbroad as it gave the state the power to order visitation rights for a third party without any deference to a parent's decision as to whether that visitation would not be in the child's best interest. *Id.* The Supreme Court went on to state that the trial court's order was not founded on any special factors that might justify the State's interference with the parent's fundamental right to make decisions concerning the rearing of her children. *Id.,* 530 U.S. at 68, 120 S.Ct. at 2061. The Supreme Court noted there was no allegation or finding that the surviving parent was unfit. *Id.* Finally, the Supreme Court stated: "so long as a parent adequately cares for his or her children (*i.e.* is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Id.,* 530 U.S. at 68-69, 120 S.Ct. at 2061. *Troxel* prohibits state interference with a parent's fundamental right to make decisions concerning the rearing of her children. The Supreme Court's decision in *Troxel* does not extend such constitutional protection to the situation found here, where the birth parent relinquishes her parental rights, designates a family as her preference for adopting the child, and that family initiates a lawsuit to terminate the birth parents' rights and adopt the child. Because the birth parent relinquished her rights, this case involves exactly those special factors the Supreme Court noted were missing in *Troxel,* thus no improper state interference occurred.

**\*7** As mandated by statute, the best interest of the child is the court's primary consideration in determining issues of conservatorship and access. TEX. FAM.CODE ANN. § 153.002 (Vernon 2002). The United States Supreme Court has expressly recognized that the best interest of the child is a proper standard for resolving disputes between parents on custody issues. *Reno v. Flores,* 507 U.S. 292, 303-04, 113 S.Ct. 1439, 1448, 123 L.Ed.2d 1 (1993). While this is not a suit between parents, the trial court was still statutorily charged with making a ruling that was in the best interest of the child. *See* Tex. Fam.Code Ann. § 153.374(b). In addition, Texas courts have repeatedly recognized that the best interest of the child standard does not violate federal or state constitutional principles. *In re J.R. D.,* 169 S.W.3d 740, 744 (Tex.App.-Austin 2005, pet. denied) (holding best interest of the child standard does not infringe father's fundamental constitutional right to parent his children); *In re R.D. Y.,* 51 S.W.3d 314, 324 (Tex.App.-Houston [1st Dist.] 2001, pet. denied) (mother was not denied due process of law or equal protection of law based on the court's finding that the child's best interest weighed against the mother receiving overnight visitation with child); *In re H.D. O.,* 580 S.W.2d 421, 424 (Tex.App.-Eastland 1979, no writ) (holding best interest of the child standard does not violate the due process clause or the equal protection clause of the Fourteenth Amendment and does not violate Article I, Section 19 of the Texas Constitution). As the best interest of the child standard does not violate federal or state constitutional protections, we overrule the Boltons' seventh question.

**II. Cause Number 14-06-00102-CV**

**A. The Trial Court Did Not Abuse Its Discretion When it Denied the Boltons' Motion to Dismiss or Abate the Schultzes' Adoption Lawsuit**

On April 7, 2005 the Schultzes filed an Original Petition for Adoption. Soon thereafter, the Boltons filed two identical motions to dismiss or abate the adoption lawsuit pending the outcome of their appeal of the trial court's previous Termination and Custody Order. The trial court denied those motions. In their first issue in this appeal from the trial court's adoption decree, the Boltons claim the trial court erred when it denied their motions to dismiss or abate as this court had jurisdiction over the parties and subject matter of the order of termination. We disagree.

An appeal from a final order rendered in a suit affecting the parent-child relationship, when allowed by law, shall be as

in other civil cases. *See*Tex. Fam.Code Ann. § 109.002(a). An appeal from a final order, with or without a supercedeas bond, does not suspend the final order unless the trial court rendering the final order, orders the suspension. *Id.* § 109.002(c); *see also*TEX.R.APP. P. 24.2(a)(4). We review a trial court's decision under an abuse of discretion standard. *In re S. A.,* No 14-98-00586-CV, 1999 WL 397890, at * 4 (Tex.App.-Houston [14th Dist .] June 10, 1999, no pet.)(not designated for publication); *Wright v. Wright,* 867 S.W.2d 807, 817 (Tex.App.-El Paso 1993, writ denied); *Morris v. Morris,* 654 S.W.2d 789, 790-91 (Tex.App.-Tyler 1983, no writ). A trial court abuses its discretion if its decision is arbitrary, unreasonable, and without reference to any guiding rules and principles. *In re E.L. T.,* 93 S.W.3d 372, 375 (Tex.App.-Houston [14th Dist.] 2002, no pet.).

**\*8** The entire record on appeal relevant to this issue consists exclusively of the two identical motions filed by the Boltons. No evidence is attached to the Boltons' motions. The only argument raised by the Boltons in their motions repeats of their argument the Schultzes did not have standing to intervene in the Boltons' termination and adoption lawsuit. Based on this record, we cannot conclude the trial court abused its discretion when it denied the Boltons' motions. We overrule the Boltons' first issue.

### B. The Schultzes Had Standing to Initiate a Suit to Adopt H.B.N. S.

In their second issue in this appeal, the Boltons contend the trial court did not have subject matter jurisdiction because the Schultzes did not have standing to adopt H.B.N.S. We once again disagree.

Subject matter jurisdiction is essential to the authority of a court to decide a case. *Tex. Ass'n of Bus. v. Tex. Air Control Bd .,* 852 S.W.2d 440, 443 (Tex.1993). Standing is implicit in the concept of subject-matter jurisdiction. *M.D. Anderson Cancer Ctr. v. Novak,* 52 S.W.3d 704, 708 (Tex.2001). Standing focuses on who may bring an action. *Waco Indep. Sch. Dist. v. Gibson,* 22 S.W.3d 849, 851 (Tex.2000). Standing may be predicated on either statutory or common law authority. *Everett v. TK-Taito, L.L.C.,* 178 S.W.3d 844, 850 (Tex.App.-Fort Worth 2005, no pet.). A party's standing to pursue and maintain a cause of action is a question of law. *Coons-Andersen v. Andersen,* 104 S.W.3d 630, 634 (Tex.App.-Dallas 2003, no pet.). We review the question of standing de novo. *Id.* In our review, we take the factual allegations in the petition as true and construe them in favor of the pleader.*Tex. Ass'n of Bus.,* 852 S.W.2d at 446.In addition to the pleadings, we may also consider relevant evidence and must do so when necessary to resolve the jurisdictional issues raised. *Bland Indep. Sch. Dist. v. Blue,* 34 S.W.3d 547, 555 (Tex.2000).

In their petition, the Schultzes asserted they had standing to adopt H.B.N.S. pursuant to section 102.005(3) of the Texas Family Code. This section provides that an adult who has had actual possession and control of the child for not less than two months during the three-month period proceeding the filing of the petition, has standing to request adoption. TEX. FAM.CODE ANN. § 102.005(3) (Vernon 2002). Within their petition, the Schultzes stated they would have had possession of H.B.N.S. for at least six months by the time the trial court heard their request to adopt. There is no reporter's record in this appeal. However, the clerk's record contains the following reports: (1) Prescreening Adoptive Home Study; (2) Post Placement Report to the Court; and (3) the Updated Post Placement Report to the Court. Helen Kerlick and Denise Fenwick, the social workers handling the adoption, signed these reports. Each of these reports establishes that H.B.N.S. has resided in the Schultzes' home since December 2004. The suit for adoption was filed on April 7, 2005. As H.B.N.S. had resided with the Schultzes for at least two months in the three months prior to the filing of the adoption suit, the Schultzes had standing to adopt H.B.N.S. *See id*.We overrule the Boltons' second issue in this appeal.

### C. The Schultzes' Suit to Adopt H.B.N.S. Is Not Barred by Res Judicata or Collateral Estoppel

**\*9** In their third and final issue in this appeal, the Boltons argue the Schultzes' April 2005 suit to adopt H.B.N.S. is barred by either res judicata or collateral estoppel. Neither doctrine bars the Schultzes' suit.

As explained above in section D of part I of this opinion, res judicata precludes re-litigation of claims that have been finally adjudicated or that arise out of the same subject matter and could have been litigated in a prior action. *Shirvanian,* 161 S.W.3d at 111.One of the elements of res judicata is proof of a prior final judgment on the merits by a court of competent jurisdiction. *Id*. A prior final judgment on the merits is lacking here. A decision concerning whether a party has standing is not a decision deciding the merits of a case. *In re C.M. C.,* 192 S.W.3d at 870.Dismissal, as happened here to the Schultzes' original adoption lawsuit, Cause No. 03-CV-131572, is the appropriate disposition when a party lacks standing. *Id*. A dismissal based on lack of standing is not a decision on the merits. *Id*. As there was no final judgment on the merits of the

Schultzes' original adoption lawsuit, they were not barred by the doctrine of res judicata from filing their April 2005 suit seeking to adopt H.B.N. S.

As previously discussed, the doctrine of collateral estoppel is used to prevent a party from re-litigating an issue that it previously litigated and lost. *James,* 138 S.W.3d at 437. To successfully invoke collateral estoppel, the first element a party must establish is that the facts sought to be litigated in the second action were fully and fairly litigated in the first action. *Id.* The Boltons' collateral estoppel argument fails because the facts sought to be litigated in the Schulzes' April 2005 adoption suit are not the same facts litigated in the Schultzes' original adoption suit filed in August 2003. In the first adoption suit, the issue litigated was the Schultzes' standing to initiate a suit to adopt H.B.N.S. in August 2003, while in the second adoption suit, the issue litigated was the Schultzes' standing to initiate a suit to adopt H.B.N.S. in April 2005. [7] As the Boltons conceded during oral argument, a party's standing can change over time, thus, there was no prior full and fair litigation of the facts supporting the Schultzes' standing to initiate the April 2005 adoption suit and the doctrine of collateral estoppel does not apply. As neither res judicata nor collateral estoppel bar the Schultzes' April 2005 adoption suit, we overrule the Boltons' third issue.

[7]    In the August 2003 suit, the Schultzes alleged they had standing to adopt H.B.N.S. under section 102.005(4) of the Texas Family Code. See Tex. Fam.Code Ann. § 102.005(4) of the Texas Family Code. See TEX. FAM.CODE ANN. § 102.005(4) (standing based on substantial past contact with the child). In April 2005, the Schultzes based their standing to adopt H.B.N.S. on section 102.005(3) of the Texas Family Code. See *id.*(Standing based on actual possession and control of the child for not less than two months during the three month period preceding the filing of the petition).

### CONCLUSION

Having overruled all of the Boltons' issues and questions in both appeals, we affirm the trial court's December 28, 2004 Order in Suit Affecting the Parent-Child Relationship and December 12, 2005 Decree of Adoption.

### All Citations

Not Reported in S.W.3d, 2007 WL 2034913

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 953491
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**
Court of Appeals of Texas,
Houston (14th Dist.).

In re Marybell LEON, Relator.

No. 14–13–01134–CV. | March 11, 2014.

Original Proceeding Writ of Mandamus, 309th District Court, Harris County, Texas, Trial Court Cause No.2010–35140.

**Attorneys and Law Firms**

Christian Landry, for Marybell Leon.

Panel Consists of Chief Justice FROST and Justices JAMISON and WISE.

**MEMORANDUM OPINION**

PER CURIAM.

**\*1** On December 20, 2013, relator Marybell Leon filed a petition for writ of mandamus in this Court. *See* Tex. Gov't Code § 22.221; *see also* Tex.R.App. P. 52. In the petition, relator asks this Court to compel the Honorable Sheri Y. Dean, presiding judge of the 309th District Court of Harris County, to vacate her temporary orders signed November 25, 2013, appointing real party in interest Jaime Cesar Aceves as temporary sole managing conservator of the minor children V.M.A. and D.MA.

On January 15, 2014, the trial court signed superseding temporary orders in which it explicitly vacated its temporary orders of November 25, 2013. The present petition for writ of mandamus has been rendered moot by the January 15, 2014 orders. *See In re Dow Hamm III Corp.*, No 01–08–00235–CV, 2009 WL 2232009, *1–2 (Tex. App .-Houston [1st Dist.] July 23, 2009, orig. proceeding) (mem. op. per curiam); *In re Office of the Attorney Gen.*, 276 S.W.3d 611, 617 (Tex.App.-Houston [1st Dist.] 2008, orig. proceeding); *see also Dow Chem. Co. v. Garcia,* 909 S.W.2d 503, 505 (Tex.1995) (orig.proceeding). If any party intends to seek mandamus relief from the superseding orders issued by the trial court in the underlying matter, a new petition for writ of mandamus is required.

Accordingly, the petition for writ of mandamus is dismissed as moot.

**All Citations**

Not Reported in S.W.3d, 2014 WL 953491

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works. 1

2010 WL 4324434
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

Court of Appeals of Texas,
Dallas.

In re Luther SMITH, an
Alleged Incapacitated Person.

No. 05–09–00913–CV.    |    Nov. 3, 2010.

West KeySummary

1    **Mental Health**
    Review

The "capable of repetition yet evading review"
exception to the mootness doctrine did not
apply to the appeal of the Texas Department
of Aging and Disability Services (DADS) of an
order appointing it the temporary guardian of
the person of an elderly man diagnosed with
dementia, and thus the appeal was dismissed as
moot after a permanent guardian was appointed.
DADS's evidence failed to show that it had
a reasonable expectation of being appointed
as temporary guardian without notice in other
cases.

1 Cases that cite this headnote

On Appeal from the Probate Court No. 2, Dallas County,
Texas, Trial Court Cause No. PR–09–0871–P2.

**Attorneys and Law Firms**

Greg Abbott, Atty. Gen., David S. Morales, Erika Kane,
Robert B. O'Keefe, Office of Atty. Gen., for Appellant.

Michael Duran, The Duran Firm, Dallas, David D. Kelton,
Addison, Mary C. Burdette, Calloway, Norris, Burdette &
Weber, Dallas, for Appellee.

Before Justices BRIDGES, FITZGERALD, and
FILLMORE.

**MEMORANDUM OPINION**

Opinion by Justice FITZGERALD.

**\*1** The trial court appointed the Texas Department of
Aging and Disability Services (DADS) temporary guardian
of the person of Luther Smith. DADS appealed that order.
Subsequently, the trial court signed an order appointing
permanent guardians for the person and the estate of Smith.
We conclude that the appeal is moot and that DADS has
not shown the applicability of any exception to the mootness
doctrine. Accordingly, we dismiss the appeal.

**I. BACKGROUND**

In April 2009, a probate court investigator filed a referral
report in Probate Court No. 2 of Dallas County. The
investigator averred, among other facts, that Luther Smith
was 85 years old and had been diagnosed with dementia. The
investigator recommended that the court appoint a guardian
ad litem for Smith to further investigate the possible need for
a temporary guardianship.

The court appointed a guardian ad litem for Smith. The
guardian ad litem filed an application for appointment of a
temporary guardian for Smith, requesting that David Jackson
Wilburn II be appointed. On June 29, 2009, the guardian
ad litem filed an amended application for appointment of
a temporary guardian in which he omitted Wilburn's name
and instead requested only that "a suitable person or suitable
persons" be appointed as Smith's temporary guardian. That
same day, the probate court held a hearing and signed an
order appointing DADS as the temporary guardian of Smith's
person and David Kelton as the temporary guardian of Smith's
estate. The order expired on July 28, 2009.

DADS filed a motion to vacate the order appointing it as
temporary guardian of Smith's person. DADS averred that
it had received no notice of the hearing of the application
for temporary guardianship and no notice that the court
intended to appoint DADS as Smith's temporary guardian.
DADS argued that the order was void for lack of jurisdiction
and should be vacated. The guardian ad litem responded to
DADS's motion and also moved to extend the temporary
guardianship. On July 28, 2009, the court signed an order
extending the temporary guardianship for 30 days. On July

31, 2009, DADS filed a notice of appeal from the temporary-guardianship order and the order extending the temporary-guardianship order. The probate court later signed an order extending the temporary guardianship indefinitely pending the final hearing of the matter.

About three weeks after DADS filed its appellate brief in this matter, the probate court signed an order appointing Senior Citizens of Greater Dallas as the permanent guardian of Smith's person and Michael A. Duran as the permanent guardian of his estate. Those two parties filed bonds and oaths, and the probate court approved the bonds.

We directed DADS to file a supplemental brief addressing the finality of the order establishing temporary guardianship. DADS filed a letter brief addressing both that issue and the possibility that the permanent-guardianship order had rendered the appeal moot.

## II. ANALYSIS

 **\*2**  We conclude that the appointments of a permanent guardian for Smith's person and a permanent guardian for his estate have rendered this appeal moot. Accordingly, we express no opinion whether the order establishing a temporary guardianship was final for purposes of appeal.

An appeal is moot when a court's action on the merits cannot affect the rights of the parties. *Zipp v. Wuemling,* 218 S.W.3d 71, 73 (Tex.2007) (per curiam); *In re J.G.,* 301 S.W.3d 376, 379 (Tex.App.-Dallas 2009, no pet.). Appellate courts are prohibited from deciding moot controversies. *Nat'l Collegiate Athletic Ass'n v. Jones,* 1 S.W.3d 83, 86 (Tex.1999). The mootness doctrine implicates subject-matter jurisdiction. *Trulock v. City of Duncanville,* 277 S.W.3d 920, 923 (Tex.App.-Dallas 2009, no pet.).

Complaints about an order regarding temporary guardianship ordinarily become moot if a permanent guardian is appointed. *See In re Guardianship of Berry,* 105 S.W.3d 665, 666 (Tex.App.-Beaumont 2003, no pet.)(per curiam) ("The appointment of the temporary guardian is moot now that the temporary guardian has been replaced with a permanent guardian."); *accord In re Guardianship of Humphrey,* No. 12–06–00222–CV, 2008 WL 2445503, at \*2 (Tex.App.-Tyler June 18, 2008, pet. denied) (mem.op.); *see also In re Guardianship of Erickson,* 208 S.W.3d 737, 740 (Tex.App.-Texarkana 2006, no pet.)(observing that proper appointment

of permanent guardian would moot issues regarding removal of temporary guardian); *cf. Hamilton Cnty. v. Cooper,* No. 05–07–00307–CV, 2007 WL 2774166, at \*1 (Tex.App.-Dallas Sept.25, 2007, no pet.)(mem.op.) (dismissing appeal from temporary injunction as moot after trial court rendered final judgment in the case). In this case, the record establishes that a permanent guardian of Smith's person has been appointed, and DADS does not dispute that this appointment terminated any temporary guardianship.

DADS contends that its appeal is not moot because the signing of the permanent-guardianship order did not "cure" the invalid entry of the temporary-guardianship order, implying that there is some ongoing harm flowing from the temporary-guardianship order. But it does not explain what this harm is, or how a judgment from this Court could remedy it. DADS also contends that we always retain jurisdiction to determine subject-matter jurisdiction. The case DADS cites for this proposition actually states, "Courts always have jurisdiction to determine *their own* subject matter jurisdiction."*Dolenz v. Vail,* 200 S.W.3d 338, 341 (Tex.App.-Dallas 2006, no pet.)(emphasis added). We have found no authority supporting the proposition that we can consider alleged jurisdictional defects in a trial court's order after an appeal has become moot. We reject DADS's contentions and conclude that any issues attacking the propriety of the order appointing DADS as Smith's temporary guardian are moot.

Finally, DADS contends that its appeal comes within an exception to the mootness doctrine. An issue does not become moot if the challenged act is of such short duration that the appellant cannot obtain review before the issue becomes moot and there is a reasonable expectation that the same action will occur again if the court does not consider the issue. *See Blum v. Lanier,* 997 S.W.2d 259, 264 (Tex.1999). This exception applies only in rare circumstances. *Trulock,* 277 S.W.3d at 924.“The mere physical or theoretical possibility that the same party may be subjected to the same action again is not sufficient to satisfy the test."*Id . at 924–25.*DADS argues that it has a reasonable expectation of facing the same problem in the future based on the legislative history of section 875 of the probate code. *See* Senate Comm. on Human Services, Bill Analysis, Tex. H.B. 2795, 76th Leg., R.S. (1999). We conclude that this legislative history from over a decade ago does not show that DADS currently has a reasonable expectation of being appointed as temporary guardian without notice in other cases. At oral argument, DADS advised us of two particular instances in which allegedly similar events have taken place in other Texas trial courts. But there is no

evidence of these instances in the record, and we conclude it would not be proper to take judicial notice of those alleged facts. *See generally* TEX.R. EVID. 201 (governing judicial notice). Thus, DADS has not demonstrated the applicability of the exception to the mootness doctrine.

### III. DISPOSITION

**\*3** We dismiss the appeal as moot.

### All Citations

Not Reported in S.W.3d, 2010 WL 4324434

---

**End of Document**                              © 2015 Thomson Reuters. No claim to original U.S. Government Works.

931 S.W.2d 581
Court of Appeals of Texas,
El Paso.

In the Matter of J.B.K., Attorney, Relator.

No. 08–96–00064–CV. | March 15, 1996.

Addressing possible disciplinary rules violations by attorney, the Court of Appeals, Barajas, C.J., held that allegations that attorney engaged in ex parte contact with member of court's staff for purpose of inquiring as to what his "chances" were in pending case and whether he should "settle" case prior to issuance of opinion, if true, raised substantial question as to attorney's honesty, trustworthiness or fitness as lawyer, thereby triggering mandatory disciplinary responsibility on part of Court of Appeals to refer matter to office of general counsel of state bar.

Ordered accordingly.

West Headnotes (8)

**[1]** **Attorney and Client**
 🗝 Attorney's conduct and position in general
Lawyers owe to courts duties of scrupulous honesty, forthrightness and highest degree of ethical conduct, and inherent in that high standard of conduct is compliance with both spirit and express terms of established rules of conduct and procedure.

4 Cases that cite this headnote

**[2]** **Attorney and Client**
 🗝 Attorney's conduct and position in general
**Attorney and Client**
 🗝 Candor, and disclosure to opponent or court
Conduct of lawyer should be characterized at all times by honesty, candor and fairness.

1 Cases that cite this headnote

**[3]** **Attorney and Client**
 🗝 Limitations on duty to client, in general

In fulfilling his or her primary duty to client, lawyer must be ever mindful of profession's broader duty to legal system.

Cases that cite this headnote

**[4]** **Attorney and Client**
 🗝 Relations, dealings, or communications with witness, juror, judge, or opponent
Any attempt to solicit or receive information on merits of pending case from member of appellate court's staff is impermissible ex parte communication with chambers. V.T.C.A., Penal Code § 39.06(c); Rules App.Proc., Rule 6; State Bar Rules, V.T.C.A., Government Code Title 2, Subtitle G App., Art. 10, § 9, Rules of Prof.Conduct, Rule 3.05(b)(3).

Cases that cite this headnote

**[5]** **Trial**
 🗝 Ex Parte Communications
Individual judges are charged with task of adjudicating claims in manner that protects rights of all parties to litigation and, for that reason, ex parte communications between parties to pending litigation and members of judiciary tasked to resolve those claims undermine public's right to evaluate whether justice is being done; ex parte communications frustrate judiciary's responsibility to promote and provide fair and equal treatment to all parties. V.T.C.A., Government Code Title 2, Subtitle G App., Code of Jud.Conduct, Canon 3, subd. B(8).

Cases that cite this headnote

**[6]** **Attorney and Client**
 🗝 Grounds for Discipline
Allegations that attorney engaged in ex parte contact with member of appellate court's staff for purpose of inquiring as to what his "chances" were in pending case and whether he should "settle" case prior to issuance of opinion, if true, raised substantial question as to attorney's honesty, trustworthiness or fitness as lawyer, thereby triggering mandatory disciplinary responsibility on part of Court of

Appeals to refer matter to Office of General Counsel of State Bar. V.T.C.A., Penal Code § 39.06(c); Rules App.Proc., Rule 6; State Bar Rules, V.T.C.A., Government Code Title 2, Subtitle G App., Art. 10, § 9, Rules of Prof.Conduct, Rule 3.05(b)(3); V.T.C.A., Government Code Title 2, Subtitle G App., Code of Jud.Conduct, Canon 3, subd. D(2).

Cases that cite this headnote

[7]  **Contempt**
      Existence of other remedy

**Judges**
      Standards, canons, or codes of conduct, in general

**Judges**
      Judicial powers and functions in general

Canon of Code of Judicial Conduct providing that, if information received by judge raises substantial question as to lawyer's honesty, trustworthiness or fitness as lawyer in other respects, judge "shall" inform Office of General Counsel of State Bar or take other appropriate action is mandatory in nature, not directory, though language of Canon is not exclusive in that it does not prohibit independent judiciary from exercising its inherent power to protect jurisdiction of courts and insure that necessary court security provisions are complied with, or to exercise its authority to punish by contempt or otherwise. V.T.C.A., Government Code Title 2, Subtitle G App., Code of Jud.Conduct, Canon 3, subd. D(2).

Cases that cite this headnote

[8]  **Judges**
      Judicial powers and functions in general

Judges of Court of Appeals are not merely gatekeepers who monitor and patrol conduct of members of Bar; while judges owe duty to legal system as whole and to administration of justice, they also have duty to lawyers who appear before them, to public at large which elects them, and even to other members of judiciary to ensure that democracy is preserved and protected and professionalism reigns supreme. V.T.C.A.

Government Code Title 2, Subtitle G App., Code of Jud.Conduct, Canon 3, subd. D(2).

Cases that cite this headnote

**\*582**  Before BARAJAS, C.J., and McCLURE and CHEW, JJ.

*OPINION ON ORDER REFERRING DISCIPLINARY MATTER TO OFFICE OF THE GENERAL COUNSEL, STATE BAR OF TEXAS*

BARAJAS, Chief Justice.

Relator, J.B.K., an attorney licensed to practice law in the State of Texas, has been ordered to appear before this Court on March 6, 1996. It has come to this Court's attention that Counsel may have committed violations of the Texas Disciplinary Rules of Professional Conduct. Such alleged violations raise a substantial question as to his honesty, trustworthiness, and fitness as a **\*583** lawyer. Specifically, this Court has been advised as follows:

> After submission of a matter before this Court in which J.B.K. served as counsel for a party and presented oral argument, but prior to the date of issuance of the opinion in that matter, J.B.K. engaged in *ex parte* contact with the Eighth District Court of Appeals by communicating directly with a member of the Court's staff who was his acquaintance. The *ex parte* communication occurred on Monday, February 26, 1996. The opinion was delivered on February 29, 1996. The telephonic communication with the staff member was for the purpose of inquiring, among other things, as to what his "chances" were in the then pending case and whether he should "settle" his case prior to the issuance of the opinion.

**A. Lawyer's Duty to the Courts**

**[1]** It is axiomatic that, as an integral part of our system of government, the legal system depends on the relationship between Bench and Bar. An honest and ethical lawyer has long been part of the foundation for the historically elevated and well-deserved role that lawyers have played in our culture. Lawyers, then, owe to the courts duties of scrupulous honesty, forthrightness, and the highest degree of ethical conduct. Inherent in that high standard of conduct is compliance with both the spirit and express terms of established rules of conduct and procedure.

**[2]** **[3]** The conduct of a lawyer should be characterized at all times by honesty, candor, and fairness. In fulfilling his or her primary duty to a client, a lawyer must be ever mindful of the profession's broader duty to the legal system. ORDER OF THE SUPREME COURT OF TEXAS AND THE COURT OF CRIMINAL APPEALS, promulgating and adopting "*The Texas Lawyer's Creed—A Mandate for Professionalism*," Nov. 7, 1989. The Appellate and Advocacy Section of the State Bar of Texas has become so concerned with the standards [or lack thereof] of ethics and professionalism in the appellate courts that the Chair has formulated a committee to draft "*Standards of Conduct for Appellate Lawyers, *" an appellate attorney's creed similar in nature to the one referenced above. Not only has the Chair requested input from the courts, he has announced that each court will be asked to adopt the Creed when it is completed. The Eighth District Court of Appeals is determined to be among the first to approve such innovative measures. The concept, simply stated, is that the justices themselves are in the unique position of putting a stop to unethical and unprofessional behavior. As one commentator has phrased the concern:

> Appellate judges hold the key to what appellate lawyers do. If counsel cannot derive any meaningful benefits from a given course of conduct, the conduct probably will not take place. That is, the bench can save us from ourselves.

David M. Gunn, Why Appellate Law is so Appealing, *in* STATE BAR OF TEXAS PROF. DEV. PROGRAM, ADVANCED CIVIL APPELLATE PRACTICE COURSE, M, M–1 (1994).

**[4]** The Texas Rules of Appellate Procedure, in the clearest of terms, provides that correspondence or other communications relative to any matter before the court must be conducted with the clerk and shall not be addressed to or conducted with any of the justices or judges or other members of the court's staff. TEX.R.APP.P. 6. Except as otherwise provided for by law and not prohibited by applicable rules of practice or procedure, a lawyer shall not communicate *ex parte* with a court for the purpose of influencing the court or person concerning a pending matter other than orally upon adequate notice to opposing counsel or to the adverse party if he is not represented by a lawyer. TEX. DISCIPLINARY R. PROF. CONDUCT, 3.05(b)(3) (1995), *reprinted in* TEX.GOV'T CODE ANN. tit. 2, subtit. G, app. A (Vernon Supp.1996). *Ex parte* communications are "those that involve fewer than all of the parties who are legally entitled to be present during the discussion of any matter. They are barred in order to ensure that every person who is legally interested in a proceeding [is given the] full right to be heard according to law." JEFFREY M. SHAMAN ET AL., JUDICIAL CONDUCT AND ETHICS § 6.01, at 145 (1990); *see also* **\*584** *In re Thoma,* 873 S.W.2d 477, 496 (Tex.Rev.Trib.1994). Private communications between a lawyer in a pending action and a staff member of an appellate court before whom the case is pending concerning the merits of the then pending appeal are "*ex parte* communications" not authorized by law. *See* TEX.R.APP.P. 6; TEX. DISCIPLINARY R. PROF. CONDUCT 3.05(b)(3); *see also In re Thoma,* 873 S.W.2d at 496. Accordingly, we find as a matter of law that any attempt to solicit or receive information on the merits of a pending case from a staff member of an appellate court constitutes an impermissible *ex parte* communication with chambers. *See In re Intermagnetics Am., Inc.,* 101 B.R. 191, 193 n. 2 (C.D.Cal.1989); *see also Vanzant v. R.L. Prods., Inc.,* 139 F.R.D. 435, 438 n. 4 (S.D.Fla.1991). To suggest otherwise would undermine the integrity of courts, breed skepticism and distrust, and thwart principles on which our judicial system is based. *See In re Thoma,* 873 S.W.2d at 496. Moreover, no one, whether lawyer or otherwise, may solicit or receive information from a public servant that the public servant has access to by means of employment and has not been made public if the information is sought for the purpose of obtaining a benefit or to harm or defraud another.[1] *See* TEX.PENAL CODE ANN. § 39.06(c) (Vernon 1994).

---

[1] We note that employees of the appellate courts of this state are employees of the State of Texas and thus "public servants" as that term has been statutorily defined. TEX.PENAL CODE ANN. § 1.07(a)(41)(A) (Vernon 1994).

**B. Duty of the Judiciary**

**[5]** Individual judges are charged with the task of adjudicating claims in a manner that protects the rights of all parties to the litigation. It is for that reason that *ex parte* communications between parties to pending litigation and members of the judiciary tasked to resolve those claims undermine the public's right to evaluate whether justice is being done. *Ex parte* communications frustrate the judiciary's responsibility to promote and provide fair and equal treatment to all parties. *See In re Thoma,* 873 S.W.2d at 496. It is perhaps for that reason, among others, that the Texas Code of Judicial Conduct provides that, except as authorized by law, a judge shall not initiate, permit, or consider *ex parte* or other private communications made to the judge outside the presence of the parties. Further, a judge **shall** require compliance with this subsection by court personnel subject to the judge's direction and control. TEXAS SUPREME COURT, CODE OF JUDICIAL CONDUCT, Canon 3B(8), Amended to Sept. 1, 1994, reprinted at TEX.GOV'T CODE ANN. tit. 2, subtit. G, app. B (Vernon 1994 and Supp.1996).

**[6]** **[7]** Not only does the Bar encourage the active participation of the judiciary in monitoring attorney conduct, the Code of Judicial Conduct mandates action. A judge who receives information clearly establishing that a lawyer has committed a violation of the Texas Rules of Professional Conduct should take appropriate action. If the information received by that judge raises a substantial question as to the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, the judge **shall** inform the Office of the General Counsel of the State Bar of Texas or take other appropriate action. TEXAS SUPREME COURT, CODE OF JUDICIAL CONDUCT, Canon 3D(2), Amended to Sept. 1, 1994, reprinted at TEX.GOV'T CODE ANN. tit. 2, subtit. G, app. B (Vernon Supp.1996). We find that the allegations set forth above, if true, raise a substantial question as to Counsel's honesty, trustworthiness or fitness as a lawyer. Accordingly we interpret the language of Canon 3D(2) to be mandatory in nature, not directory. We note, however, that while the language of Canon 3D(2) is mandatory, it is

not exclusive in that it does not **prohibit** an independent judiciary from exercising its inherent power to protect the jurisdiction of the courts, insure that necessary court security provisions are complied with or to exercise its authority to punish by contempt or otherwise. We view this Court's action in ordering J.B.K. to appear before this Court on March 6, 1996 as an exercise of that inherent authority.

**[8]** We recognize our obligation not only to ensure the proper administration of justice in this Court but also our duty to the system of justice as a whole. We hasten to add that **\*585** we are not merely the gatekeepers who monitor and patrol the conduct of members of the Bar. While we owe a duty to the legal system as a whole and to the administration of justice, we are ever mindful that the judiciary also has a duty to the lawyers who appear before them, to the public at large which elects them, and even to other members of the judiciary to ensure that our democracy is preserved and protected and that professionalism reigns supreme. We take this duty seriously.

### C. Conclusion

While the communication took place between Counsel and a staff member of this Court, this Court makes no findings of fact as to the above allegation of impropriety, nor should any fact findings be implied. Nonetheless, in accordance with this Court's mandatory disciplinary responsibilities pursuant to Canon 3(D)(2) of the Texas Code of Judicial Conduct, we order that Barbara Dorris, Clerk of this Court, forward a copy of this opinion to the Office of the General Counsel, State Bar of Texas, for investigation and any action it deems warranted. TEXAS SUPREME COURT, CODE OF JUDICIAL CONDUCT, Canon 3D(2).

**All Citations**

931 S.W.2d 581

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** LaGloria Oil and Gas Co. v. Carboline Co., Tex.App.-Tyler, December 21, 2001

499 S.W.2d 87
Supreme Court of Texas.

Dr. Ruth JACKSON, Petitioner,

v.

FONTAINE'S CLINICS, INC., Respondent.

No. B—3472. | July 11, 1973.
| Rehearing Denied Oct. 10, 1973.

Plaintiff brought unfair trade practices suit against defendants who had allegedly interfered with plaintiff's contractual relations with its employees and secretly copied plaintiff's list of customers and used the list in operation of rival business. The District Court No. 95, Dallas County, Hall G. Peurifoy, J., rendered judgment against two of four defendants for exemplary damages and against one defendant for actual damages, and defendant against whom judgment for actual damages was rendered appealed. The Waco Court of Civil Appeals, Tenth Supreme Judicial District, 481 S.W.2d 934, McDonald, C.J., reformed judgment by reducing judgment for exemplary damages against the appealing defendant and holding all four defendants liable for actual damages and affirmed and defendant who had appealed brought error. The Supreme Court, McGee, J., held that special issue pertaining to actual damages was fatally defective for failure to guide jury to a finding on any proper legal measure of damages, but that where nonappealing co-defendants were not named as obligees in appeal bond filed by appealing defendant, Court of Civil Appeals had no jurisdiction to consider appealing defendant's claim that new trial should be granted in order that she might establish joint liability of all defendants for actual damages.

Judgment of Court of Civil Appeals reversed; trial court's judgment against one defendant reversed, severed and remanded, and trial court's judgment against nonappealing defendants left undisturbed.

West Headnotes (12)

**[1]** **Damages**

 Preparation and Form of Interrogatories or Findings

The phrase "monetary reward" in special issue pertaining to actual damages to a business by reason of a defendant's activity, does not describe "net profits."

9 Cases that cite this headnote

**[2]** **Damages**
 Preparation and Form of Interrogatories or Findings

Special issue asking what sum of money would fairly and reasonably compensate plaintiff for any injury received by reason of competitor's acts and instructing jury that they could consider reasonable value, if any, of loss of monetary reward was fatally defective in that it failed to guide jury to a finding on any proper legal measure of damages.

47 Cases that cite this headnote

**[3]** **Evidence**
 Statements in General

Testimony of employees of plaintiff, in suit against former employees and another who had entered into competition against plaintiff after allegedly committing acts designed to wrongfully damage business and reputation of plaintiff, to effect that patients of plaintiff's electrolysis clinic had told employees that former employees had made derogatory remarks about services available at plaintiff's clinic was objectionable as hearsay when offered to prove truth of what the patients told the witnesses.

Cases that cite this headnote

**[4]** **Evidence**
 Writings

Where proper predicate was not shown for admissibility of summaries of business records, the summaries, which were offered to prove the acts, events or conditions recorded in the original business records that the exhibits purported to summarize, were objectionable as hearsay.

4 Cases that cite this headnote

**[5]  Damages**
   Questions to Be Submitted

Where, in suit by business against former employees and another who allegedly conspired to commit acts designed to wrongfully damage plaintiff's business and reputation, there was evidence that decline in plaintiff's business was due to causes unrelated to activity of defendants, defendants' contentions that plaintiff's business losses were sole proximate result of acts or conduct of plaintiff or conditions beyond control of any party should have been presented to jury in form of instructions accompanying damage issue rather than in form of separate special issues.

6 Cases that cite this headnote

**[6]  Appeal and Error**
   Errors Between Coparties

Where jury found that all defendants in unfair trade practices suit had entered into conspiracy to embark upon plan calculated to damage plaintiff's business, but trial court entered judgment for actual damages against only one defendant, and where other defendants were not named as obligees in appeal bond filed by defendant against whom judgment was entered, appellate court had no jurisdiction to consider claim by appealing defendant that new trial should be granted in order that that defendant might establish joint liability of all defendants for actual damages. Vernon's Ann.Civ.St. art. 2212.

1 Cases that cite this headnote

**[7]  Appeal and Error**
   Objections to Appeal to Intermediate Court

Action of Court of Civil Appeals in rendering judgment by reformation against defendants over whom that court had no jurisdiction was fundamental error for which Supreme Court could reverse.

Cases that cite this headnote

**[8]  Release**
   Nature and Requisites in General

Where jury found that all four defendants in unfair trade practices suit had entered into conspiracy to embark upon plan calculated to damage plaintiff's business, but judgment for actual damages had been entered against only one defendant, failure of plaintiff to attack trial court's judgment did not amount to a release of liability of the one defendant as to three-fourths of the actual damages.

Cases that cite this headnote

**[9]  Release**
   Nature and Requisites in General

A release of liability partakes of certain elements of a contract, such as a mutual intent.

5 Cases that cite this headnote

**[10]  Appeal and Error**
   Judgment

Where trial court's judgment for exemplary damages against codefendants did not in any way affect judgment rendered against sole appealing defendant for actual damages, appealing defendant could not complain on appeal that judgment against codefendants for exemplary damages was erroneous.

5 Cases that cite this headnote

**[11]  Appeal and Error**
   Error Not Affecting Appellant or Plaintiff in Error

A petitioner for writ of error may not complain of errors which do not injuriously affect him or which merely affect the rights of others.

31 Cases that cite this headnote

**[12]  Appeal and Error**
   Reversal as to Parties Not Appealing

Where, although conduct of defendants which gave rise to unfair trade practices suit may have been interwoven, rights of defendants

following judgment against one of them for actual and exemplary damages, against two others for exemplary damages and return of no judgment at all against fourth defendant were very distinct, and trial court's judgments with respect to three nonappealing codefendants would not be reversed, on ground that rights of all defendants were interwoven and dependent on one another, merely because petitioner against whom judgment for actual damages was rendered had demonstrated reversible error as to judgment against her.

4 Cases that cite this headnote

**Attorneys and Law Firms**

**\*88** Burford, Ryburn & Ford, Logan Ford, David Ford Hunt, John F. Harrison, Dallas, for petitioner.

Jerry W. Biesel and George E. Flannigan, Dallas, for respondent.

**Opinion**

McGEE, Justice.

Fontaine's Clinics, Inc., brought this suit against Dr. Ruth Jackson, Catherine Ward, Gwynne Gambrell, Margaret Hanson, and A.S.E. Dermatetics Clinic, Inc. Fontaine's is a corporation engaged primarily in the business of removing unwanted hair from the human body by means of electrolysis. **\*89** Dr. Jackson, a former patient of Fontaine's, is the president of A.S.E., which is a corporation in competition with Fontaine's. Ward, Gambrell and Hanson were once employees of Fontaine's, but they left the employ of Fontaine's and became associated with A.S.E.

For cause of action Fontaine's alleged that the individual defendants conspired to commit acts and that the defendants jointly and individually committed acts designed to wrongfully damage the business and reputation of Fontaine's. Among the various overt acts charged against the defendants, it was specifically alleged that Ward, Gambrell and Hanson, while they were employees of Fontaine's but at the urging of Jackson, intentionally made false disparaging statements about the services received at Fontaine's to their patients for the purpose of inducing these patients to take their business to A.S.E. Fontaine's alleged further that Jackson and Ward

(while an employee of Fontaine's) surreptitiously copied from Fontaine's files trade secrets consisting of the names and addresses of patients and confidential data pertaining to those patients, for the purpose of advertising to them the merits of A.S.E. Fontaine's prayed for judgment against all defendants jointly and severally.

The jury found that Jackson, Ward, Gambrell and Hanson conspired to damage Fontaine's business; that the conspiracy was accompanied by overt acts designed to accomplish the purpose of the conspiracy; and that Jackson, Ward and Gambrell were motivated by malice. The jury also found that the patient data, which was copied from Fontaine's files, constituted trade secrets and that Defendant Ward used such data to solicit business for A.S.E. As actual damages it was found that the sum of $25,000 would reasonably compensate Fontaine's for the injury received.

The trial court rendered judgment for Fontaine's as follows: against Ruth Jackson for $90,000 ($25,000 plus $65,000, which the jury awarded as exemplary damages against Jackson); against Catherine Ward for $1000, which the jury awarded as exemplary damages against Ward; and against Gwynne Gambrell for $250, which the jury awarded as exemplary damages against Gambrell. A.S.E.'s motion for judgment non obstante veredicto was sustained by the trial court. Defendant Ruth Jackson is the only party who appealed from the trial court's judgment.

The court of civil appeals affirmed the trial court's judgment against Jackson after reforming it to the extent of reducing the exemplary damages recovered against her by $32,500. 481 S.W.2d 934.

The special issue pertaining to actual damages was submitted as follows:
'What sum of money, if any, if paid now in cash, do you find from a preponderance of the evidence, will fairly and reasonably compensate Fontaine's Clinics for injury, if any, received by reason of the overt acts inquired about in Special Issue No. 3, if you have so found, and/or the use of the list of names compiled from plaintiffs' clientele cards, if you have so found?

'In answering this issue you are instructed that you may take into consideration the following matters or elements as you find are established by a preponderance of the evidence, and none other:

'(a) the reasonable cash value, if any, of the loss of Monetary reward from Fontaine's Clinics, Inc.'s business activities.'

'(b) you are further instructed that you will not allow any sum of money for loss of monetary reward from Fontaine's Clinics, Inc.'s business activities resulting from decreased advertising and time devoted to the preparation of this suit for submission to the jury, if either happened.' (Emphasis added)

Petitioner contends that this submission was reversible error because the issue is so broad and general that it permits the jury to speculate and to find losses not pleaded or not supported by evidence. We sustain this contention.

**\*90** **[1]** **[2]** Damages must be measured by a legal standard, and that standard must be used to guide the fact finder in determining what sum would compensate the injured party. Fontaine's pleaded that the acts of the defendants 'would prevent plaintiff from deriving the normal pecuniary reward from its business activities that it otherwise would have been entitled to attain.' Although it is not entirely clear from a reading of Fontaine's pleadings, it appears from the foregoing quotation that Fontaine's sought recovery based on its loss of net profits. However, the jury was given no guideline for determining a loss of net profits. Manifestly, the phrase 'monetary reward' does not describe net profits, and no other instruction was given connecting that phrase with net profits or with any other recognized measure of damages.

We hold that this submission was fatally defective, because it simply failed to guide the jury to a finding on Any proper legal measure of damages. International-Great Northern R. Co. v. Casey, 46 S.W.2d 669 (Tex.Com.App.1932, holding adopted).

Although the above error alone requires reversal of the judgments below against Ruth Jackson, in view of possible retrial, we will briefly discuss other of petitioner's points on which the writ of error was granted.

**[3]** Witnesses Sandor, Harrison and Travis who at the time of trial were employees of Fontaine's testified that patients of Fontaine's had told them that Defendants Ward, Gambrell and Hanson had made derogatory remarks about the services available at Fontaine's. Petitioner objected to the admissibility of this testimony on the ground that it was hearsay. The objections were overruled, and the respondent argues properly so because the testimony was offered merely to show that the defendants had made the remarks rather than to show the truth of the substance of the defendants'

remarks. Respondent's own argument demonstrates that the witnesses' testimony was offered to prove the truth of what the patients told the witnesses, i.e., that the defendants made the derogatory remarks about Fontaine's. Thus, the testimony of the witnesses was clearly hearsay, and the objections should have been sustained.

**[4]** Petitioner contends that certain of plaintiff's documentary evidence, exhibits 42—51, should not have been admitted because the exhibits were hearsay. The exhibits were admitted as exceptions to the rule of hearsay exclusion on the theory that they were business records or summaries of business records. Since the cause against petitioner must be reversed on points previously discussed, we will not treat this point at length. The summaries were offered to prove the acts, events or conditions recorded in original business records which the exhibits purported to summarize. We are not satisfied from this record that a proper predicate was shown for the admissibility of the summaries. The hearsay objections should have been sustained.

**[5]** There was evidence that the decline in Fontaine's business was due to causes unrelated to the activity of the defendants. Petitioner requested special issues inquiring if the business losses of Fontaine's, if any, were the sole proximate result of (1) acts or conduct of Fontaine's and (2) conditions beyond the control of any party. The trial court refused to submit those issues, and petitioner contends that such action was error. This is not a question of the sole proximate cause issue as contained in the negligence cases cited by petitioner. To illustrate, a defendant's issue in a negligence case that the occurrence was proximately caused solely by something other than the defendant's acts or omissions rebuts that particular defendant's liability. In this intentional tort case, the issues requested would rebut the damages resulting from the defendants' acts. We have concluded that if the evidence raises these matters on a new trial, they should be **\*91** presented to the jury in the form of instructions accompanying the damage issue rather than in the form of separate special issues. See Yarborough v. Berner, 467 S.W.2d 188 (Tex.1971), and Southwest Bank & Trust Co. v. Executive Sportsman Association, 477 S.W.2d 920 (Tex.Civ.App.1971, writ ref'd n.r.e.).

**[6]** As noted above, the trial court judgment against Ward and Gambrell was for only sums which the jury awarded as exemplary damages against them. It is evident that the judgment did not conform to the verdict with respect to the rendering of actual damages against only one of the

four individual defendants. The Plaintiff, Fontaine's, did not complain of that fact in the court of civil appeals. However, in the court of civil appeals the Defendant Jackson assigned as error the failure of the trial court to render judgment on the verdict against her co-defendants for the reason that the judgment deprived her of the right of contribution among joint tortfeasors.[1] Although Jackson prayed for a Rendition in her favor or a Remand of the cause for a new trial, in ruling on this point the court of civil appeals held that the trial court's judgment should have been against the four conspirators jointly and severally for actual damages, and the court Reformed the trial court's judgment accordingly.

1    Art. 2212, Vernon's Ann.Tex.Rev.Civ.Stat. provides in part that 'any person against whom, with one or more others, a judgment is rendered an any suit on an action arising out of, or based on tort, except in causes wherein in the right of contribution or of indemnity, or of recovery, over, by and between the defendants is given by statute or exists under common law, shall, upon payment of said judgment, have a right of action against his co-defendant or co-defendants and may recover from each a sum equal to the proportion of all of the defendants named in said judgment rendered to the whole amount of said judgment.'

Petitioner Jackson urges that the court of civil appeals erred in reforming the trial court's judgment, or in other words, that the court of civil appeals erred in failing to sustain its contention that the trial court erred in failing to render judgment for actual damages against Ward, Gambrell and Hanson because such failure deprived Jackson of contribution.

It is undisputed that Fontaine's did not appeal from the trial court's judgment. Petitioner's point of error to the court of civil appeals that the trial court erred in not rendering judgment against Ward, Gambrell and Hanson was apparently assigned in an attempt to gain a retrial of Fontaine's claim against Jackson. However, the error asserted, if error, does not affect that part of the judgment rendered for Fontaine's against Jackson. Consequently, petitioner's point on appeal to the court of civil appeals and to this court urges nothing but an Adverse claim against her co-defendants, i.e., that a new trial should be granted in order that Jackson might establish their joint liability for the actual damages suffered by Fontaine's.

Since Ward, Gambrell and Hanson were not named as obligees in the appeal bond filed by Jackson, the court of civil appeals had no jurisdiction to consider Jackson's claim against them on appeal. Classen v. Benfer, 144 S.W.2d 633 (Tex.Civ.App.1940, writ dism'd jdgmt cor.). For the same reason, Jackson's point in this regard cannot be considered by this court.

[7]    Ward, Gambrell and Hanson are not petitioners before this court and consequently there is no proper assignment of error that the court of civil appeals erred in rendering the judgment for $25,000 against them. However, the action of the court of civil appeals in rendering judgment by reformation against these defendants, over whom that court had no jurisdiction, was fundamental error for which this court may reverse the court of civil appeals' judgment, even in the absence of a proper assignment. McCauley v. Consolidated Underwriters, 157 Tex. 475, 304 S.W.2d 265 (1957). We will reverse the court of civil appeals' judgment against Ward, Gambrell and Hanson.

[8]    [9]    Petitioner argues that the failure of Fontaine's to attack the trial court's *92 judgment amounts to a release of liability as to three-fourths of the actual damages. If that were true, Jackson would be liable for only one-fourth of the actual damages. We cannot accept this view. A release of liability partakes of certain elements of contract, e.g., a mutual intent. Loy v. Kuykendall, 347 S.W.2d 726 (Tex.Civ.App.1961, writ ref'd n.r.e.). There is no evidence of such an element in this record.

[10]    [11]    Petitioner additionally contended in the court of civil appeals (apparently for the benefit of her non-appealing co-defendants Ward and Gambrell) that the trial court's judgment against Ward and Gambrell for exemplary damages was erroneous because there had been no judgment against them for actual damages. With the reformation as to actual damages, the court of civil appeals held that the trial court's judgment as to exemplary damages against Ward and Gambrell was not error. Jackson complains to this court of the lower courts' rulings in this regard. The trial court's judgment for exemplary damages against Ward and Gambrell does not in any way affect the judgment rendered against Jackson. A petitioner may not complain of errors which do not injuriously affect him or which merely affect the rights of others. Shell Petroleum Corporation v. Grays, 131 Tex. 515, 114 S.W.2d 869 (1938).

[12]    Petitioner contends that the rights of all the defendants are so interwoven and dependent on one another that the cause against the non-appealing defendants should also be remanded.[2] Although the conduct of the defendants which gave rise to this suit may have been interwoven, it would appear that the rights of the parties at this point are very

distinct. For example, Defendant Hanson has no judgment against her and a new trial would be of no benefit to her. Defendants Ward and Gambrell suffered judgments for only relatively small sums, and a new trial could result in judgments against them for a substantially larger sum. We conclude that the trial court's judgment against Ward, Gambrell and Hanson should not be reversed merely because the single petitioner, Jackson, has demonstrated reversible error as to the judgment against her.

2      See Lockhart, State Treasurer et al. v. A. W. Snyder & Co. et al., 139 Tex. 411, 163 S.W.2d 385 (Tex.1942).

The judgment of the court of civil appeals is reversed. The trial court's judgment against Jackson is reversed, and the cause against Jackson is severed and remanded to the trial court. The trial court's judgment against the non-appealing Defendants Ward, Gambrell and Hanson and in favor of Defendant A.S.E. remains undisturbed.

**All Citations**

499 S.W.2d 87

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

142 S.W.3d 380
Court of Appeals of Texas,
Houston (14th Dist.).

Lorraine M. MAÑON, Appellant
v.
Manuel E. SOLIS, Appellee.

No. 14–03–00463–CV.    |    May 25, 2004.
|    Rehearing En Banc Overruled    Sept. 9, 2004.

**Synopsis**
**Background:** Former employee brought action against former employer, alleging that former employer made fraudulent and negligent misrepresentations during course of pre-employment negotiations. The 295th District Court, Harris County, Tracy Kee Christopher, J., granted former employer's motion for summary judgment. The Court of Appeals reversed and remanded. Following a jury trial on remand, the 295th District Court, Harris County, granted judgment to former employer. Former employee appealed.

**Holdings:** The Court of Appeals, Adele Hedges, C.J., held that:

[1] effect of earlier appellate decision was to remand case for new trial on all issues of fact;

[2] judicial estoppel could not be applied against former employer;

[3] evidence supported a finding that former employer both had no knowledge of the alleged falsity of his representations and did not make such statements with reckless disregard for the truth;

[4] former employer's alleged misrepresentations concerning conditions under which former employee would be employed concerned promises of future conduct and thus did not support negligent-misrepresentation claim;

[5] former employer's alleged statement that employer was in process of hiring additional attorneys was not proven false;

[6] former employee failed to show that former employer's alleged statement that contested divorce cases were referred to outside counsel was false; and

[7] fiduciary relationship did not exist between former employee and former employer during pre-employment negotiations.

Affirmed.

West Headnotes (39)

**[1]**    **Appeal and Error**
      Construction and Operation in General
    **Appeal and Error**
      Directions in Remittitur

Effect of Court of Appeals's decision reversing summary judgment in favor of former employer and remanded case was to remand case to trial court for new trial on all issues of fact in former employee's action concerning fraudulent and negligent misrepresentations that allegedly were made during course of pre-employment negotiations, and thus action was reopened in its entirety; mandate from Court of Appeals was not limited by special instructions.

3 Cases that cite this headnote

**[2]**    **Appeal and Error**
      Directions in Remittitur

When an appellate court reverses and remands a case for further proceedings and the mandate is not limited by special instructions, the effect is generally to remand the case to the lower court for a new trial on all issues of fact, and the case is reopened in its entirety.

4 Cases that cite this headnote

**[3]**    **Estoppel**
      Claim Inconsistent with Previous Claim or Position in General

Former employer did not successfully maintain his initial position in former employee's action concerning fraudulent and negligent misrepresentations that allegedly were made during course of pre-employment negotiations,

and thus judicial estoppel could not be applied against former employer on remand; while former employer's motion for summary judgment was initially granted by trial court, it was reversed on appeal.

Cases that cite this headnote

**[4]    Estoppel**
        Claim Inconsistent with Previous Claim or Position in General

Judicial estoppel applies if all of the following elements are present: (1) a sworn, prior inconsistent statement was made in a judicial proceeding, (2) the party now sought to be estopped successfully maintained the prior position, (3) the prior inconsistent statement was not made inadvertently or because of mistake, fraud, or duress, and (4) the statement was deliberate, clear, and unequivocal.

Cases that cite this headnote

**[5]    Judgment**
        Propriety of Judgment in General

Motion for judgment notwithstanding the verdict (JNOV) should be granted when the evidence is conclusive and one party is entitled to judgment as a matter of law.

Cases that cite this headnote

**[6]    Appeal and Error**
        Extent of Review Dependent on Nature of Decision Appealed from

Court of Appeals reviews a denial of a motion for judgment notwithstanding the verdict (JNOV) under a legal sufficiency standard.

4 Cases that cite this headnote

**[7]    Appeal and Error**
        Judgment

When reviewing a denial of a motion for judgment notwithstanding the verdict (JNOV), Court of Appeals views the evidence in the light most favorable to the trial court's findings,

considering only the facts and inferences that support them.

1 Cases that cite this headnote

**[8]    Appeal and Error**
        Extent of Review Dependent on Nature of Decision Appealed from

When reviewing a denial of a motion for judgment notwithstanding the verdict (JNOV), if more than a scintilla of evidence exists supporting trial court's findings, motion was properly denied.

4 Cases that cite this headnote

**[9]    Fraud**
        Falsity of Representations and Knowledge Thereof

Evidence supported a finding that former employer both had no knowledge of the alleged falsity of his representations to former employee during pre-employment negotiations for attorney position with law firm and did not make such statements with reckless disregard for the truth, and thus former employee could not prevail on claims for fraud and fraud by omission; evidence indicated that former employer was genuinely concerned with former employee's welfare and working conditions and permitted the trier of fact to question whether former employer would either knowingly or recklessly mislead a friend and potential employee into accepting a position at the firm.

Cases that cite this headnote

**[10]   Fraud**
        Elements of Actual Fraud

To recover on an action for fraud, a party must prove: (1) a material representation was made, (2) the representation was false, (3) when the speaker made the representation, he knew it was false or made it recklessly without knowledge of the truth as a positive assertion, (4) the speaker made it with the intention that it should be acted upon by the party, (5) the party acted in reliance upon it, and (6) the party thereby suffered injury.

3 Cases that cite this headnote

**[11]** **Fraud**

👉 Fraudulent Concealment

Fraud by omission or non-disclosure is simply a subcategory of fraud because the omission or non-disclosure may be as misleading as a positive misrepresentation of fact where a party has a duty to disclose.

8 Cases that cite this headnote

**[12]** **Fraud**

👉 Falsity of Representations and Knowledge Thereof

Proof that a defendant made a statement knowing of its falsity or recklessly without knowledge of its truth may be proved in action for fraud by either direct or circumstantial evidence.

Cases that cite this headnote

**[13]** **Fraud**

👉 Statements Recklessly Made; Negligent Misrepresentation

To recover on an action for negligent misrepresentation, a party must prove: (1) a representation was made by the defendant in the course of business or in a transaction in which he has a pecuniary interest, (2) the defendant supplied false information for the guidance of others in their business, (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information, and (4) the plaintiff suffered pecuniary loss by justifiably relying on the defendant's representation.

2 Cases that cite this headnote

**[14]** **Fraud**

👉 Existing Facts or Expectations or Promises

Employer's alleged misrepresentations concerning conditions under which prospective employee would be employed as an attorney at employer's law firm concerned promises of future conduct, not statements of existing fact,

and thus alleged misrepresentations did not support negligent-misrepresentation claim.

2 Cases that cite this headnote

**[15]** **Fraud**

👉 Statements Recklessly Made; Negligent Misrepresentation

The sort of false information contemplated in a negligent misrepresentation case is a misstatement of existing fact, not a promise of future conduct.

2 Cases that cite this headnote

**[16]** **Fraud**

👉 Reliance on Representations and Inducement to Act

Employee could not have justifiably relied to her detriment on employer's alleged misrepresentation during pre-employment negotiations that employer had discharged employee's predecessor prior to those negotiations, and thus alleged misrepresentations did not support claim for negligent misrepresentation; alleged misrepresentation provided employee with a more accurate picture of the workload that employee would be expected to assume by accepting attorney position with employer's law firm.

Cases that cite this headnote

**[17]** **Fraud**

👉 Statements Recklessly Made; Negligent Misrepresentation

Employer's alleged statement during pre-employment negotiations that employer was in process of hiring additional attorneys for employer's law firm was not proven false by employee and thus did not support claim for negligent misrepresentation; statement was not made false by employer telling employee after accepting employment that employer was not going to hire additional attorneys or by employer's failure to hire any additional attorneys.

Cases that cite this headnote

**[18] Fraud**

🔑 Statements Recklessly Made; Negligent Misrepresentation

Employee, who accepted attorney position with employer, failed to show that employer's alleged statement during pre-employment negotiations that employer did not advertise for family law cases was false, and thus alleged statement did not support negligent misrepresentation claim; employer presented evidence that his law firm generated family law cases through advertising intended to generate immigration law cases.

Cases that cite this headnote

**[19] Fraud**

🔑 Statements Recklessly Made; Negligent Misrepresentation

Employee, who accepted attorney position with employer, failed to show that employer's alleged statement during pre-employment negotiations that contested divorce cases were referred to outside counsel was false, and thus alleged statement did not support negligent misrepresentation claim; employer testified that an experienced lawyer was available for referrals at time of pre-employment negotiations, and employer recalled referring one contested divorce case to another lawyer.

Cases that cite this headnote

**[20] Fraud**

🔑 Fiduciary or Confidential Relations

Fiduciary relationship did not exist between employee and employer during pre-employment negotiations for attorney position in employer's law firm, and thus employee could not prevail on claim for breach of fiduciary duty, although employee and employer met during law school and resumed their friendship after establishing separate career paths; employer and employee did not exchange a single phone call over a period of two or three years, and friendship could best be described as a casual friendship.

Cases that cite this headnote

**[21] Fraud**

🔑 Fiduciary or Confidential Relations

To recover on a claim for breach of fiduciary duty, a party must prove the existence of a fiduciary relationship.

Cases that cite this headnote

**[22] Fraud**

🔑 Fiduciary or Confidential Relations

While an informal fiduciary duty may arise from a purely personal relationship of trust and confidence, a fiduciary relationship is an extraordinary one and will not be created lightly.

Cases that cite this headnote

**[23] Fraud**

🔑 Fiduciary or Confidential Relations

Confidential or fiduciary relationship may arise when the parties have dealt with each other in such a manner over a long period of time that one party is justified in expecting the other to act in its best interest.

Cases that cite this headnote

**[24] Fraud**

🔑 Fiduciary or Confidential Relations

Mere subjective trust, without more, does not indicate that the person places confidence in another in the sense demanded by a fiduciary relationship, especially in the context of arm's length dealing.

Cases that cite this headnote

**[25] Appeal and Error**

🔑 Refusal of New Trial

Court of Appeals reviews trial court's denial of motion for new trial for abuse of discretion.

1 Cases that cite this headnote

**[26] Appeal and Error**

 Insufficient Discussion of Objections

Employee waived for appellate review her claim that jury's findings were factually insufficient in employee's action against employer for fraudulent and negligent misrepresentation, where employee cited no legal authorities, and argument merely incorporated part of appellate brief that had little, if anything, to do with a factual sufficiency review of the evidence. Rules App.Proc., Rule 38.1(h).

1 Cases that cite this headnote

**[27] Appeal and Error**

 Insufficient Discussion of Objections

Issue not supported by legal authority is waived on appeal.

Cases that cite this headnote

**[28] Appeal and Error**

 References to Record

Appellate court has no duty to search a voluminous record without sufficient guidance from an appellant to determine whether an assertion of reversible error is valid.

2 Cases that cite this headnote

**[29] Appeal and Error**

 Scope and Effect of Objection

**Appeal and Error**

 Objections to Evidence and Witnesses

Employee's claim that employer made improper jury arguments did not preserve for appellate review employer's statements that occurred during voir dire or witness examination, and thus any issues related to those statements were waived for appellate review in employee's action for fraudulent and negligent misrepresentation concerning pre-employment negotiations for attorney position with employer's law firm. Rules App.Proc., Rule 38.1(h).

Cases that cite this headnote

**[30] New Trial**

 Necessity of Objection

It is only when the probable harm or the resulting prejudice from improper arguments of counsel cannot be eliminated or cured by retraction or instruction that a new trial will be awarded in the absence of timely objection.

Cases that cite this headnote

**[31] Appeal and Error**

 Arguments and Conduct of Counsel

Even if instances of improper jury argument constitute incurable harm, Court of Appeals must determine whether the jury argument, by its nature, degree, and extent, constitutes reversibly harmful error.

1 Cases that cite this headnote

**[32] Appeal and Error**

 Comments on Character or Conduct of Parties or Counsel

Employer's statements during closing arguments concerning employee's unemployment claim and employee's unwillingness or inability to find suitable employment after resigning from attorney position with employer's law firm did not constitute improper jury argument that would amount to reversible error in employee's action for fraudulent and negligent misrepresentation; statements were relevant only to issue of damages, and jury did not reach issue of damages.

Cases that cite this headnote

**[33] Appeal and Error**

 Comments on Character or Conduct of Parties or Counsel

Employer's statement during closing arguments charging employee with bringing abusive lawsuit did not constitute improper jury argument that would amount to reversible error in employee's action for fraudulent and negligent misrepresentation, although statement was prejudicial and inflammatory; statement

would not have persuaded a juror of ordinary intelligence to reach a verdict contrary to that which he would have reached but for the argument.

2 Cases that cite this headnote

**[34]** **Appeal and Error**
⚷ Depositions, Affidavits, or Discovery

Court of Appeals would review for abuse of discretion trial court's discovery ruling refusing to order production of certain documents in employee's action alleging that employer made fraudulent and negligent misrepresentations during pre-employment negotiations regarding attorney position with employer's law firm.

Cases that cite this headnote

**[35]** **Appeal and Error**
⚷ Rulings on Admissibility of Evidence in General

Court of Appeals would review for abuse of discretion trial court's evidentiary rulings excluding employee's testimony concerning anything construed as legal opinion and testimony concerning employer's business practices or reputation or both in employee's action alleging that employer made fraudulent and negligent misrepresentations during pre-employment negotiations regarding attorney position with employer's law firm.

Cases that cite this headnote

**[36]** **Appeal and Error**
⚷ Insufficient Discussion of Objections

Employee waived for appellate review her claim that trial court erred in refusing to order production of certain documents during discovery in employee's action alleging that employer made fraudulent and negligent misrepresentations during pre-employment negotiations regarding attorney position with employer's law firm, where employee failed to cite any legal authority in support of claim. Rules App.Proc., Rule 38.1(h).

Cases that cite this headnote

**[37]** **Appeal and Error**
⚷ Damages

Any error that trial court may have committed in refusing to allow employee to testify as to anything construed as a legal opinion did not amount to reversible error in employee's action against employer for fraudulent and negligent misrepresentation; employee sought to testify about legal basis for damages, and jury did not reach issue of damages. Rules App.Proc., Rule 44.1(a)(1).

Cases that cite this headnote

**[38]** **Appeal and Error**
⚷ Particular Actions or Issues

Trial court's exclusion of evidence concerning employer's business practices or reputation or both did not amount to reversible error in employee's action against employer for fraudulent and negligent misrepresentation; employee failed to explain how excluded evidence was controlling on a material issue in case or how that excluded evidence would not have been cumulative of other admitted evidence. Rules App.Proc., Rule 44.1(a)(1).

1 Cases that cite this headnote

**[39]** **Records**
⚷ Court Records

Employee waived for appellate review her claims that trial court erred in denying motion to seal records containing sensitive personal information and in failing to impose sanctions on employer in employee's action for fraudulent and negligent misrepresentation, where employee cited no legal authority in support of claims. Rules App.Proc., Rule 38.1(h).

Cases that cite this headnote

**Attorneys and Law Firms**

**\*385** Lorraine Margarita Ma#non, for appellant.

Jacob Montilijo Monty, Carlos Leon, Houston, for appellee.

Panel consists of Chief Justice ADELE HEDGES and Justices FROST and GUZMAN.

# OPINION

ADELE HEDGES, Chief Justice.

Appellant Lorraine M. Mañon appeals from the trial court's January 23, 2003 order granting judgment to appellee Manuel E. Solis on all claims. This case arises from a dispute concerning the information appellee disclosed during his recruitment of appellant for an attorney position at his law firm. Appellant alleges that appellee made fraudulent and negligent misrepresentations during the course of pre-employment negotiations between the parties.[1] The trial court initially granted summary judgment in favor of appellee, but the Eleventh Court of Appeals reversed the trial court's judgment and remanded the case for trial.[2] On remand, a **\*386** jury found appellant's allegations to be unfounded. This appeal followed.

[1] Appellant also brought claims for breach of fiduciary duty and publication of private information, but neither was submitted to the jury.

[2] See *Mañon v. Solis,* No. 11–00–00086–CV, 2000 WL 34234419 (Tex.App.-Eastland October 19, 2000, no pet.).

## The Issues

Appellant raises seven issues in this appeal: (1) whether she has procedurally established her claims as a matter of law, (2) whether the evidence conclusively establishes her claims, (3) whether there is no evidence to support appellee's affirmative defenses, (4) whether the trial court erred in denying her motion for judgment notwithstanding the verdict, (5) whether the trial court erred in denying her motion for new trial, (6) whether the trial court erred in denying her motion to seal records, and (7) whether the trial court erred in failing to impose sanctions upon appellee. Because appellant's second and fourth issues implicate the same arguments and authorities, we address them together. We also discuss appellant's sixth and seventh issues together. We affirm.

### *Procedural Establishment of Claims as a Matter of Law*

 [1]     [2]     In her first issue, appellant argues that she has procedurally established her claims as a matter of law. In connection with this issue, she raises a number of grounds upon which this assertion is based, including: (1) the trial court lacked jurisdiction/plenary power, (2) the law of the case doctrine, (3) waiver/election of remedies doctrine, (4) statutory bar (citing section 10.006 of the Texas Civil Practice and Remedies Code), and (5) judicial estoppel.[3] Appellant's basis for grounds (1) through (4) is that the trial court's initial finding that no genuine issue of material fact exists remains binding even after the Eleventh Court of Appeals reversed that finding. Consequently, she argues, appellee cannot now contest any facts before the trial court upon remand. We disagree. The general rule, of course, is that when an appellate court reverses and remands a case for further proceedings and the mandate is not limited by special instructions, the effect is to remand the case to the lower court for a new trial on all issues of fact, and the case is reopened in its entirety. *Hudson v. Wakefield,* 711 S.W.2d 628, 630 (Tex.1986). The opinion and mandate issued by the Eleventh Court of Appeals do not provide any special instructions to the trial court upon remand; therefore, the case was remanded for a new trial on all issues of fact, and the case was reopened in its entirety. Appellant's arguments concerning the trial court's lack of jurisdiction/plenary power, the law of the case doctrine, waiver/election of remedies, and statutory bar are thus without merit.

[3] Appellant also raises claims concerning judicial admissions and conclusive trial admissions in connection with this issue, but we address these claims below under her second and fourth issues to facilitate our discussion.

 [3]     [4]     Moreover, the doctrine of judicial estoppel is inapplicable in this case as well. Judicial estoppel applies if all of the following elements are present: (1) a sworn, prior inconsistent statement was made in a judicial proceeding, (2) the party now sought to be estopped successfully maintained the prior position, (3) the prior inconsistent statement was not made inadvertently or because of mistake, fraud, or duress, and (4) the statement was deliberate, clear, and unequivocal. *Spera v. Fleming, Hovenkamp & Grayson, P.C.,*

25 S.W.3d 863, 871 (Tex.App.-Houston [14th Dist.] 2000, no pet.). While appellee's motion for summary judgment was initially granted by the trial court, the Eleventh Court of Appeals reversed that judgment; therefore, appellee did not successfully maintain his initial position. Because, at a minimum, the second element has not been **\*387** satisfied, the doctrine of judicial estoppel does not apply. Accordingly, appellant's first issue is overruled.

### *Conclusive Establishment of Claims and Judgment Notwithstanding the Verdict*

 **[5]**    In her second issue, appellant argues that her claims are conclusively established by the evidence. In her fourth issue, she argues that the trial court erred in denying her motion for judgment notwithstanding the verdict. A motion for judgment notwithstanding the verdict should be granted when the evidence is conclusive and one party is entitled to judgment as a matter of law. *Mancorp, Inc. v. Culpepper,* 802 S.W.2d 226, 227–28 (Tex.1990). Because these two issues raise essentially the same question (*i.e.,* whether appellant is entitled to judgment as a matter of law), we address them together here.

 **[6]**    **[7]**    **[8]**    We review a denial of a motion for judgment notwithstanding the verdict under a legal sufficiency standard. *Navarette v. Temple Independent School Dist.,* 706 S.W.2d 308, 309 (Tex.1986). We view the evidence in the light most favorable to the trial court's findings, considering only the facts and inferences that support them. *Id.* If more than a scintilla of evidence exists supporting the trial court's findings, the motion for judgment notwithstanding the verdict was properly denied. *Culpepper,* 802 S.W.2d at 228. Evidence supporting a finding amounts to more than a scintilla if reasonable minds could arrive at the finding given the facts proved in a particular case. *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995). Our review of the evidence below yields the conclusion that reasonable minds could arrive at the trial court's findings as to fraud, fraud by omission, negligent misrepresentation, and breach of fiduciary duty.[4]

[4]     The trial court did not submit appellant's claim for breach of fiduciary duty to the jury. Because the record is unclear as to whether the trial court refused to submit this claim or appellant voluntarily withdrew it, we consider it here.

 **[9]**    **[10]**    **[11]**    To recover on an action for fraud, a party must prove: (1) a material representation was made, (2) the representation was false, (3) when the speaker made the representation, he knew it was false or made it recklessly without knowledge of the truth as a positive assertion, (4) the speaker made it with the intention that it should be acted upon by the party, (5) the party acted in reliance upon it, and (6) the party thereby suffered injury. *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 524 (Tex.1998). Fraud by omission or non-disclosure is simply a subcategory of fraud because the omission or non-disclosure may be as misleading as a positive misrepresentation of fact where a party has a duty to disclose. *Schlumberger Technology Corp. v. Swanson,* 959 S.W.2d 171, 181 (Tex.1997).

 **[12]**    In this case, one could reasonably conclude based on the evidence that appellant has not satisfied the third element. Proof that a defendant made the statement knowing of its falsity or recklessly without knowledge of its truth may be proved by either direct or circumstantial evidence. *Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 435 (Tex.1986). A wealth of circumstantial evidence presented at trial tends to support the conclusion that appellee had no knowledge of the alleged falsity of his representations and did not make such statements with reckless disregard for the truth. Testimony indicates that appellee routinely gave appellant Fridays off. When asked whether she wished to be compensated for the extra work she **\*388** performed on certain occasions, appellant responded in the negative and that she and appellee "broke even." Appellant was even paid for the week she was on sick leave despite the fact that, at the time, she had only worked at the firm for approximately one month. Appellee also agreed to provide appellant with a cell phone for her personal use.

Further, testimony supports the fact that appellant rarely, if ever, made her dissatisfaction with her working conditions (*i.e.,* her schedule, docket, secretarial and outside counsel arrangements, etc.) known to appellee, despite his "open door policy" and willingness to accommodate employees with family obligations. While appellant alleges that required attendance at "mandatory" meetings was not disclosed, testimony indicates that appellee was quite willing to accommodate those employees who were unable attend if they spoke to him about it beforehand. Shortly before resigning from the firm, appellant was extended an offer by appellee to remain employed with the firm for several months to allow her to locate new employment opportunities.

Appellee even offered to assist appellant with the process of seeking unemployment compensation. The sum total of this circumstantial evidence tends to support the conclusion that appellee was genuinely concerned with appellant's welfare and working conditions, and certainly permits the trier of fact to question whether such an employer would either knowingly or recklessly mislead a friend and potential employee into accepting a position at the firm. Appellee's evidence is therefore inconsistent with appellant's allegation that appellee made misrepresentations with either knowledge or reckless disregard of the truth. We therefore find that appellant did not satisfy the burden of establishing her claims for fraud and fraud by omission as a matter of law.

 **[13]** To recover on an action for negligent misrepresentation, a party must prove: (1) a representation was made by the defendant in the course of business or in a transaction in which he has a pecuniary interest, (2) the defendant supplied false information for the guidance of others in their business, (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information, and (4) the plaintiff suffered pecuniary loss by justifiably relying on the defendant's representation. *Henry Schein, Inc. v. Stromboe,* 102 S.W.3d 675, 706 n. 24 (Tex.2003). To facilitate our analysis of appellant's allegation concerning numerous instances of negligent misrepresentation, we consider those which relate to promises of future conduct first, followed by those which do not.

 **[14]** **[15]** Appellant alleges that appellee negligently misrepresented the conditions under which she would be employed by appellee's firm. Specifically, she claims that appellee misrepresented facts relating to (1) her work schedule, (2) her ability to bring her young son to the classroom maintained for appellee's children at the office, (3) her responsibility for only waiver divorce cases, (4) her access to a full-time secretary, (5) her obligation to attend late-night meetings, and (6) her right to have her privacy maintained. However, the sort of false information contemplated in a negligent misrepresentation case is a misstatement of existing fact, not a promise of future conduct. *Allied Vista, Inc. v. Holt,* 987 S.W.2d 138, 141 (Tex.App.-Houston [14th Dist.] 1999, pet. denied). Because these allegations concern promises of future conduct, they cannot form the basis for a tenable negligent misrepresentation claim.

 **[16]** **[17]** Appellant also alleges that appellee negligently misrepresented facts relating to (1) appellee's discharge of her **\*389** predecessor, John Needham, prior to appellee's negotiations with appellant, (2) appellee's statement that he was in the process of hiring additional attorneys, (3) appellee's statement that he does not advertise for family law cases, and (4) appellee's outside counsel arrangements. However, appellee has presented sufficient evidence in each instance to support the jury's finding against appellant on her negligent misrepresentation claim. First, even assuming the allegation that Needham was fired subsequent, rather than prior, to the time appellant accepted employment with appellee is true, it is difficult to understand how appellant could have justifiably relied on this misrepresentation to her detriment. If anything, the misrepresentation provided appellant with a more accurate picture of the workload she would be expected to assume. Second, appellee's statement that he was in the process of hiring additional attorneys is not proved false, as appellant suggests, by the mere facts that (1) she was told by appellee after accepting employment that he was not going to hire additional attorneys, and (2) appellee did not in fact hire any additional attorneys. Therefore, the evidence suggests that appellee did not provide false information regarding his recruitment of additional employees.

 **[18]** Similarly, as to appellant's third allegation relating to appellee's representation that he does not advertise for family law cases, appellant has failed to conclusively establish the falsity of that statement. By appellant's own admission, appellee presented evidence that his firm generated family law cases through advertising intended to generate immigration law cases. While appellant may question appellee's distinction between advertisements specifically appealing for family law clients and those that advertise for immigration law clients yet also have the effect of bringing in family law clients, this concern does not necessarily render appellee's distinction meaningless in the eyes of the trier of fact. Appellee's evidence thus suggests that he did not provide false information regarding advertisements for family law cases. Moreover, appellant does not establish, and indeed it is difficult to understand, how this representation induced justifiable reliance on her part. Appellant makes no effort to explain how or to what extent the firm's advertisements effected her decision to join the firm.

 **[19]** Appellant's fourth allegation relates to the firm's outside counsel arrangements for contested divorce cases. Appellant claims she was told that contested divorce cases were referred to outside counsel but, in fact, no such arrangement existed. Appellee testified, however, that Arturo Euresti, an experienced lawyer in contested divorce cases, was certainly

available for consultation and referrals regarding such cases at the time appellee and appellant were engaged in pre-employment negotiations. Moreover, appellee specifically recalled referring one contested divorce case to Bill Morris. Appellant has thus failed to conclusively establish the falsity of appellee's representation relating to outside counsel arrangements. In sum, we find that appellant did not satisfy her burden of proving appellee's alleged negligent misrepresentations as a matter of law.

 [20]   [21]   [22]   [23]   [24]   To recover on a claim for breach of fiduciary duty, a party must prove the existence of a fiduciary relationship. *Crim Truck & Tractor Co. v. Navistar International Transportation Corp.,* 823 S.W.2d 591, 594 (Tex.1992), *superseded by statute on other grounds as stated in Subaru of America, Inc. v. David McDavid Nissan, Inc.,* 84 S.W.3d 212 (Tex.2002). While an informal fiduciary duty may arise **\*390** from a purely personal relationship of trust and confidence, a fiduciary relationship is an extraordinary one and will not be created lightly. *Associated Indemnity Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 287–88 (Tex.1998). A confidential or fiduciary relationship may arise when the parties have dealt with each other in such a manner over a long period of time that one party is justified in expecting the other to act in its best interest. *Insurance Co. of North America v. Morris,* 981 S.W.2d 667, 674 (Tex.1998). However, mere subjective trust, without more, does not indicate that the person places confidence in another in the sense demanded by a fiduciary relationship, especially in the context of arm's length dealing. *See Swanson,* 959 S.W.2d at 177; *Hoggett v. Brown,* 971 S.W.2d 472, 488 (Tex.App.-Houston [14th Dist.] 1997, pet. denied).

The evidence presented at trial fails to conclusively establish the existence of a fiduciary relationship between appellant and appellee at the time the parties were engaged in negotiations. According to the testimony, appellant and appellee met during law school and maintained what can best be considered a casual friendship. They visited socially on several occasions during law school and prior to entering the legal profession. After establishing separate career paths, the parties did not exchange a single phone call over a period of two to three years. At some point, they reconnected and resumed their friendship, but little evidence was presented concerning the nature and extent of the relationship from that point until the employment negotiations began. Thus, while appellant may subjectively believe that the parties shared "absolute trust" in each other due to their friendship, appellant

failed to satisfy her burden to establish the existence of a fiduciary relationship between the parties as a matter of law.

Because appellant failed to establish her entitlement to judgment as a matter of law on her claims for fraud, fraud by omission, negligent misrepresentation, and breach of fiduciary duty, the trial court did not err in denying her motion for judgment notwithstanding the verdict. Accordingly, appellant's second and fourth issues are overruled.

### *Motion for New Trial*

 [25]   In her fifth issue, appellant argues that the trial court erred in denying her motion for new trial. She raises several grounds in support of this claim, including: (1) the jury's findings are against the great weight and preponderance of the evidence and are manifestly unjust, (2) there are overwhelming instances of improper jury argument made by appellee, and (3) the trial court erred in making numerous discovery and evidentiary rulings.[5] We review the trial court's denial of her motion for new trial for abuse of discretion. *See Director, State Employees Workers' Compensation Division v. Evans,* 889 S.W.2d 266, 268 (Tex.1994).

5    Appellant also raises a claim concerning the sufficiency of the evidence supporting appellee's affirmative defenses in connection with this issue, but we address this claim below under her third issue to facilitate our discussion.

 [26]   [27]   [28]   First, appellant argues that the findings are against the great weight and preponderance of the evidence and are manifestly unjust. As the basis for this argument, she cites no legal authority and merely incorporates by reference the first 41 pages of her brief—most of which have little, if anything, to do with a factual sufficiency review of the evidence. An issue not supported by legal authority is waived. **\*391** *Fredonia State Bank v. General American Life Insurance Co.,* 881 S.W.2d 279, 284 (Tex.1994). Moreover, an appellate court has no duty to search a voluminous record without sufficient guidance from an appellant to determine whether an assertion of reversible error is valid. *Nguyen v. Kosnoski,* 93 S.W.3d 186, 188 (Tex.App.-Houston [14th Dist.] 2002, no pet.). Appellant has waived this issue because it has been inadequately briefed. *See* TEX.R.APP. P. 38.1(h). Even assuming she did not waive this issue, however, appellant's claim still fails. We hold that the evidence is factually sufficient to support the jury's findings

because appellant's evidence, as detailed in our discussion of appellant's second and fourth issues, is neither so weak as to undermine confidence in the jury's verdict nor so greatly outweighed by appellant's evidence. *See Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex.1998), *cert. denied,* 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998).

 **[29]**     Second, appellant argues that there are overwhelming instances of improper jury argument made by appellee. She identifies numerous statements in which appellee advanced "unfounded accusations of perjury/lies" or "attack[ed] the claims and the process." However, appellant concedes that many of the statements she identifies occurred during either voir dire or witness examination; her contentions relating to those particular statements are therefore waived because they do not constitute claims relating to improper jury argument. *See* TEX.R.APP. P. 38.1(h). The remainder of the statements we consider below.

 **[30]**     **[31]**     Appellant did not object at trial during appellee's closing argument to the jury. It is only when the probable harm or the resulting prejudice cannot be eliminated or cured by retraction or instruction that a new trial will be awarded in the absence of timely objection. *Texas Employers' Ins. Ass'n v. Haywood,* 153 Tex. 242, 266 S.W.2d 856, 858 (1954). Assuming, as appellant argues, that the instances she identifies constitute (either standing individually or cumulatively) incurable harm, we must determine whether the jury argument, by its nature, degree, and extent, constitutes reversibly harmful error. *Standard Fire Ins. Co. v. Reese,* 584 S.W.2d 835, 839 (Tex.1979).[6]

[6]     We note that some of our sister courts have equated *incurable harm* with *reversible harm. See, e.g., Lyondell Petrochemical Co. v. Kirkland,* No. 01–98–01128–CV, 1999 WL 1208506 at *5, (Tex.App.-Houston [1st Dist.] 1999, pet. denied); *Amelia's Automotive, Inc. v. Rodriguez,* 921 S.W.2d 767, 773 (Tex.App.-San Antonio 1996, no pet.); *Texas Employers' Ins. Ass'n v. Guerrero,* 800 S.W.2d 859, 863–67 (Tex.App.-San Antonio 1990, writ denied). The genesis of this equation appears to have been in *Guerrero,* which cites *Reese* as controlling authority (and rightly so). *See* 800 S.W.2d at 863–64. It is clear, however, that the equation of *incurable harm* with *reversible harm* has been foreclosed by the very case *Guerrero* cites. In *Reese,* the Supreme Court of Texas stated:

In the case of improper jury argument, the complainant must prove a number of things. He has to prove (1) an error (2) that was not invited

or provoked, (3) that was preserved by the proper trial predicate, such as an objection, a motion to instruct, or a motion for mistrial, and (4) was not curable by an instruction, a prompt withdrawal of the statement, or a reprimand by the judge. There are only rare instances of incurable harm from improper argument. *The complainant has the further burden to prove (5) that the argument by its nature, degree and extent constituted reversibly harmful error.... All of the evidence must be closely examined to determine (6) the argument's probable effect on a material finding. (7) Importantly, a reversal must come from an evaluation of the whole case.... ... From all of these factors, the complainant must show that the probability that the improper argument caused harm is greater than the probability that the verdict was grounded on the proper proceedings and evidence.*

584 S.W.2d at 839–40 (emphasis added). In other words, *incurable harm* does not necessarily equate with *reversible harm,* and an appellate court must engage in a harm analysis as detailed above in *Reese* to determine whether the harm is sufficient as to require reversal.

 ***392** **[32]**     **[33]**     While appellant's allegation of improper jury argument contains statements too numerous to detail here, the comments made by appellee essentially attack either her unemployment claim or her arguable unwillingness or inability to find suitable employment after her resignation from appellee's firm. Further, appellee's jury argument can be fairly read to charge appellant with bringing an abusive lawsuit against him. Under *Reese,* we must consider the argument's probable effect on a material finding. *See* 584 S.W.2d at 840. The statements relating to appellant's unemployment claim and her unwillingness or inability to find suitable employment are relevant only to appellant's damages issue and therefore have no effect on a material finding made by the jury because it did not reach the issue of damages. Further, we cannot say that the single statement charging appellant with bringing an abusive lawsuit, though undoubtedly prejudicial and inflammatory, would have persuaded a juror of ordinary intelligence to reach a verdict contrary to that which he would have reached but for the argument. *See Gannett Outdoor Co. of Texas v. Kubeczka,* 710 S.W.2d 79, 86–87 (Tex.App.-Houston [14th Dist.] 1986, no pet.). Moreover, we find that the probability of prejudice flowing from the cumulative effect of the alleged instances of improper jury argument does not outweigh the probability that the jury verdict was grounded on the proceedings and

factually sufficient evidence. Appellant's claim of improper jury argument is without merit.

 **[34]**   **[35]**   Third, appellant argues that several discovery and evidentiary rulings made by the trial court require a new trial. Appellant raises three claims in connection with this issue by arguing that the trial court erred: (1) in refusing to order the production of certain documents during discovery, (2) in excluding her own testimony concerning "anything construed as a legal opinion," and (3) in excluding testimony concerning appellee's business practices and/or reputation. She argues that these errors probably caused the rendition of an improper judgment. We review these rulings for abuse of discretion and address these claims below in that order. *See Dillard Department Stores, Inc. v. Hall,* 909 S.W.2d 491, 492 (Tex.1995) (discovery rulings); *Texas Department of Transportation v. Able,* 35 S.W.3d 608, 617 (Tex.2000) (evidentiary rulings).

 **[36]**   First, appellant claims that the trial court erred in refusing to order the production of documents pertaining to her docket, attorney turnover, commencement of Saturday immigration hearings, and other requested items. She fails, however, to identify precisely the documents to which she is referring and to cite any legal authority in support of her argument. Appellant's claim of discovery error is therefore waived. *See* TEX.R.APP. P. 38.1(h); *Fredonia State Bank,* 881 S.W.2d at 284; *Nguyen,* 93 S.W.3d at 188.

 **[37]**   Second, appellant claims that the trial court erred in excluding her own testimony concerning "anything construed as a legal opinion." She argues that she was entitled to testify about the legal basis for her damages claim. The jury, however, did not reach the issue of damages in reaching its verdict. Therefore, any error did not result in the rendition of an improper judgment. *See* **\*393** TEX.R.APP. P. 44.1(a)(1). Appellant's second claim is without merit.

 **[38]**   Third, appellant claims that the trial court erred in excluding her own testimony as well as that of John Needham regarding appellee's business practices and/or reputation. She asserts that such testimony was intended to impeach appellee's testimony and to address the issue relating to appellant's concern for her license due to appellee's unethical practices. Appellant fails to explain, however, how the excluded testimony is controlling on a material issue in the case and would not have been cumulative of other admitted evidence. *See Able,* 35 S.W.3d at 617. Moreover, based upon

our own review of the case, we cannot conclude that the exclusion of such testimony probably caused the rendition of an improper judgment. *See* TEX.R.APP. P. 44.1(a)(1). Appellant's third claim is without merit.

We therefore find that the trial court did not abuse its discretion in denying appellant's motion for new trial. Accordingly, her fifth issue is overruled.

### No Evidence to Support Affirmative Defenses

In her third issue, appellant argues that there is no evidence to support appellee's affirmative defenses. Because the jury's verdict that appellee was not liable to appellant on any of her claims is based upon factually sufficient evidence, however, we do not reach this issue. Accordingly, appellant's third issue is overruled.

### Sealing of Records and Sanctions

 **[39]**   In her sixth issue, appellant argues that the trial court erred in denying her motion to seal records containing sensitive personal information. In her seventh issue, appellant argues that the trial court erred in failing to impose sanctions upon appellee. Appellant, however, does not appeal the decisions rendered by the trial court with respect to these issues; she merely resubmits by incorporation the respective motions presented to the trial court for our consideration. Appellant therefore presents nothing for review concerning these issues. *See* TEX.R.APP. P. 38.1(e), (h). Moreover, appellant has failed to adequately brief, and has therefore waived, her sixth and seventh issues because she cites no legal authority in support of her arguments. *See* TEX.R.APP. P. 38.1(h); *Fredonia State Bank,* 881 S.W.2d at 284; *Nguyen,* 93 S.W.3d at 188. Accordingly, appellant's sixth and seventh issues are overruled.

### Conclusion

The judgment of the trial court is affirmed.

### All Citations

142 S.W.3d 380

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment

**Disapproved of by** Roberts v. Williamson, Tex., July 3, 2003

946 S.W.2d 580
Court of Appeals of Texas,
Houston (14th Dist.).

PARKWAY HOSPITAL, INC. and Epic
Healthcare Group, Inc., Appellants,
v.
Lisa LEE, Individually, and as Next
Friend of Alexander Lee, Appellees.

No. 14–96–00277–CV. | May 22,
1997. | Rehearing Overruled June 19, 1997.

Patient brought medical malpractice action against obstetrician and hospital, claiming that their negligence caused injuries she and her child sustained during delivery. Upon jury verdict, the 151st District Court, Harris County, Carolyn Garcia, J., entered judgment for obstetrician, and against hospital awarding plaintiffs over $16 million in damages. Hospital appealed. The Court of Appeals, O'Neill, J., held that: (1) trial court properly allowed in-court demonstration by physician of child's neurological injuries; (2) fact that hospital's judicial admission was controverted did not prevent use of admission for impeachment or as substantive evidence on material issue; (3) hospital did not establish good cause for its failure to timely designate patient's ex-husband as witness; (4) trial court lacked discretion to refuse plaintiffs' post-verdict motion to amend petition to increase amount of damages claimed for child's future care to $10 million found by jury; and (5) award of $125,000 for guardian ad litem's fee was not abuse of discretion.

Affirmed.

West Headnotes (21)

**[1]** **Evidence**
Exhibition of person or object in general

**Trial**
Conflicting evidence

Admission and exclusion of evidence, including demonstrative evidence, is committed to trial court's sound discretion.

Cases that cite this headnote

**[2]** **Appeal and Error**
Evidence in General

**Appeal and Error**
Prejudicial Effect

To obtain reversal based upon error in admission or exclusion of evidence, appellant must show trial court did in fact commit error, and error was reasonably calculated to cause and probably did cause admission of improper judgment. Rules App.Proc., Rule 81(b).

4 Cases that cite this headnote

**[3]** **Appeal and Error**
By other evidence in general

Judgment will not be reversed for erroneous rulings on admissibility of evidence where evidence in question is cumulative and not controlling on material issue dispositive of case.

Cases that cite this headnote

**[4]** **Trial**
Comments on failure to produce evidence or call witness

Rule of civil procedure prohibiting party whose condition is in controversy from commenting to jury on failure of other party to seek physical examination was designed to prevent adverse party from being forced to seek medical evaluation or risk opening his failure to do so to comment before jury, not to prevent party whose physical condition is in dispute from demonstrating their injuries to jury. Vernon's Ann.Texas Rules Civ.Proc., Rule 167a.

Cases that cite this headnote

**[5]** **Trial**
Comments on failure to produce evidence or call witness

Medical malpractice plaintiffs did not violate rule of civil procedure prohibiting party whose condition is in controversy from commenting to court or jury on his willingness to submit to physical examination, or right of any other party to request such examination, by asking whether physician would be willing to do limited evaluation of child patient before jury to exhibit child's neurological injuries in medical malpractice action against hospital; hospital placed child's current medical status in issue, and exchange between plaintiffs' counsel and physician did not reflect upon hospital's failure to request medical evaluation. Vernon's Ann.Texas Rules Civ.Proc., Rule 167a.

Cases that cite this headnote

**[6]    Evidence**
    Wounds and other injuries

Admission of demonstrative evidence rests within sound discretion of trial court, and court may permit demonstration of plaintiff's injuries to jury so long as demonstration is not conducted in such manner as to pass beyond limits of introducing proof of extent and nature of injury and become merely method of inflaming minds of jury.

Cases that cite this headnote

**[7]    Trial**
    Experiments and tests

Trial court properly allowed in-court demonstration of child's neurological injuries through examination by physician, in medical malpractice action claiming neurological injuries were caused during delivery.

Cases that cite this headnote

**[8]    Evidence**
    Corroboration

Party is free to support opinion testimony of expert by proof of facts which tend to show its accuracy, unless facts and circumstances relate to special transaction outside case on trial for purpose of allowing jury to compare results of

such transactions, with object of impressing jury with soundness of expert's opinion.

1 Cases that cite this headnote

**[9]    Appeal and Error**
    Nature of evidence in general

**Appeal and Error**
    Admission of evidence in general

Hospital could not complain on appeal that it was surprised and unduly prejudiced, in medical malpractice action involving neurological injuries to child patient, by in-court demonstration by physician of child's injuries on ground that demonstration formed basis for new opinions from physician, where hospital failed to object at trial that demonstration improperly bolstered physician's testimony, and hospital later introduced into evidence a tape recording of similar examination by physician conducted before the judge prior to actual in-court demonstration.

2 Cases that cite this headnote

**[10]    Appeal and Error**
    Admission of evidence in general

Party may not complain of admission of improper evidence offered by other side when it introduces same evidence or evidence of similar character.

Cases that cite this headnote

**[11]    Pretrial Procedure**
    Use

Fact that medical malpractice plaintiffs introduced evidence that controverted defendant hospital's judicial admissions, which were made in response to requests for admissions, did not prevent use of hospital's admissions for impeachment or as substantive evidence on material issue; when plaintiffs allowed admission of controverting evidence without objection, they only waived right to rely on conclusive effect of hospital's admissions. Vernon's Ann.Texas Rules Civ.Proc., Rule 169, subd. 2; Rules of Civ.Evid., Rules 613, 803(2).

1 Cases that cite this headnote

**[12]　Trial**
　　⚷ Effect of Failure to Object or Except

Party asserting conclusive effect of opponent's judicial admissions of fact must protect record by objecting to introduction of controverting evidence and submission of any issue bearing on facts admitted. Vernon's Ann.Texas Rules Civ.Proc., Rule 169, subd. 2; Rules of Civ.Evid., Rules 613, 803(2).

3 Cases that cite this headnote

**[13]　Pretrial Procedure**
　　⚷ Facts taken as established or denial precluded; preclusion of evidence or witness

Party offering testimony of witness who was not timely designated has burden of showing good cause for its failure to supplement discovery, and trial court has discretion to determine whether offering party met its burden of showing good cause. Vernon's Ann.Texas Rules Civ.Proc., Rules 166b, subd. 6, par. a, 215, subd. 5.

Cases that cite this headnote

**[14]　Pretrial Procedure**
　　⚷ Identity and location of witnesses and others

Hospital's claim that is was unaware until shortly before trial that medical malpractice plaintiff's former husband had knowledge of facts relevant to claim, that hospital's negligence during delivery caused child's neurological injuries, did not establish good cause for hospital's failure to timely designate former husband as witness, where plaintiff, child's mother, provided ex-husband's name in answers to interrogatories, and there was no evidence that hospital attempted to locate him prior to trial. Vernon's Ann.Texas Rules Civ.Proc., Rules 166b, subd. 6, par. a, 215, subd. 5.

1 Cases that cite this headnote

**[15]　Health**

　　⚷ Admissibility

Evidence that mother's oldest child suffered from grand mal seizures was not relevant, in medical malpractice action claiming hospital's negligence during delivery caused neurological injuries in mother's youngest child, to hospital's theory that child's injuries were caused by congenital malformations in womb or genetic disorder, where there was no evidence of medical causes of oldest child's seizures, and there was no expert testimony linking seizures to hospital's causation theory.

Cases that cite this headnote

**[16]　Pleading**
　　⚷ As to relief prayed

Trial court must allow post-verdict trial amendment that increases amount of damages sought in pleadings to that found by jury unless opposing party presents evidence of prejudice or surprise. Vernon's Ann.Texas Rules Civ.Proc., Rules 63, 66.

Cases that cite this headnote

**[17]　Pleading**
　　⚷ Subject-matter of amendment in general

Trial court lacked discretion to refuse medical malpractice plaintiff's post-verdict motion to amend petition to increase amount of damages claimed for child's future medical, nursing, educational, and custodial care to the $10 million found by jury, where defendant hospital presented no evidence of surprise or prejudice, and in fact, cross-examined plaintiffs' economist who testified without objection that projected cost of child's future care was in excess of $10 million. Vernon's Ann.Texas Rules Civ.Proc., Rules 63, 66.

Cases that cite this headnote

**[18]　Health**
　　⚷ Measure and elements

Injury to family relationship was worthy of compensation in medical malpractice action.

Cases that cite this headnote

**[19]** **Infants**
 Costs and Fees

**Infants**
 Discretion of lower court

Award of guardian ad litem fees is in sound discretion of trial court, and absent evidence illustrating clear abuse of discretion will not be set aside by reviewing court.

1 Cases that cite this headnote

**[20]** **Infants**
 Costs and Fees

**Infants**
 Attorney fees

Relevant factors in determining reasonableness of guardian ad litem's fees are difficulty and complexity of case, amount of time spent by attorney, benefit derived by client, and skill and experience reasonably needed to perform service.

Cases that cite this headnote

**[21]** **Infants**
 Compensation and expenses

**Infants**
 Costs and Fees

Trial court's award of $125,000 as guardian ad litem fees was not abuse of discretion in medical malpractice action brought on behalf of child who allegedly sustained neurological injuries during delivery, where guardian ad litem stated that he recorded 244 hours of time, but requested fees for 300 hours due to fact that he did not record all of his time, guardian stated case was very complex, and defendant hospital did not present evidence that award was arbitrary or unreasonable.

1 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*582** Kevin J. Keith, Dallas, Thomas P. Sartwelle, Houston, for appellants.

Jim M. Perdue, Mark D. Clore, Denice Smith, R. Tate Young, Houston, for appellees.

Before LEE, AMIDEI and O'NEILL, JJ.

## OPINION

O'NEILL, Justice.

Lisa Lee was in active labor when a nurse at Parkway Hospital, Inc. ("Parkway") gave her an injection of Pitocin, a drug used to accelerate labor. Shortly thereafter Lisa's uterus ruptured and her son, Alexander, was born with severe neurological injuries. Immediately after the delivery, Lisa underwent an emergency hysterectomy. Lisa filed suit against her obstetrician, Dr. Chin Lee (no relation), and the hospital, alleging that their negligence caused the injuries she and her son sustained. At trial, the cause of the plaintiffs' injuries was hotly contested. The Lees claimed the negligent administration of Pitocin was the proximate cause of their injuries. The hospital claimed the tetanic contractions that ruptured Lisa's uterus were not precipitated by the administration of Pitocin, and Alexander's cerebral palsy was the result of congenital abnormalities and genetic disorders. It was also disputed whether the Pitocin was administered with or without a doctor's order.

The jury found no negligence on the part of Dr. Lee, and determined that the hospital's negligence proximately caused the plaintiffs' injuries. The jury awarded over $16 million in damages, and the trial court entered judgment on the verdict.[1] In eight points of error, Parkway contends the trial court erred in (1) making various evidentiary rulings, (2) allowing the Lees to amend their **\*583** petition post-verdict, (3) allowing an award for "damage to the family relationship," and (4) awarding excessive guardian ad litem fees. Finding no abuse of discretion, we affirm the judgment of the trial court.

[1] The trial court entered judgment against Parkway and Epic Healthcare Group, Inc. The parties stipulated that Epic would pay any final, nonappealable judgment

against Parkway. Epic's liability is not an issue in this appeal.

### Evidentiary Rulings—Standard of Review

 [1]  The hospital's first five points of error complain of evidentiary rulings made by the trial court. The admission and exclusion of evidence, including demonstrative evidence, is committed to the trial court's sound discretion. *Hur v. City of Mesquite,* 893 S.W.2d 227, 231 (Tex.App.—Amarillo 1995, writ denied)*;* s*ee also Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396 (Tex.1989). A trial court abuses its discretion when it acts without regard to any guiding rules or principles. *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753–754 (Tex.1995*); Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). The supreme court has defined "abuse of discretion" as "a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916, 917 (Tex.1985).

 [2]   [3]  To obtain reversal of a judgment based upon error in the admission or exclusion of evidence, the appellant must show (1) the trial court did in fact commit error, and (2) the error was reasonably calculated to cause and probably did cause rendition of an improper judgment. *Bridges v. City of Richardson,* 163 Tex. 292, 354 S.W.2d 366, 368 (1962); TEX.R. APP. P. 81(b). Appellant need not prove that but for the evidentiary error a different judgment would necessarily have been rendered, but only that the error probably resulted in an improper judgment. *McCraw v. Maris,* 828 S.W.2d 756, 758 (Tex.1992); *King v. Skelly,* 452 S.W.2d 691, 696 (Tex.1970). A judgment will not be reversed for erroneous rulings on admissibility of evidence where the evidence in question is cumulative and not controlling on a material issue dispositive of the case. *Whitener v. Traders and General Ins. Co.,* 155 Tex. 461, 289 S.W.2d 233, 236 (1956); *see also Turner v. Monsanto Co.,* 717 S.W.2d 378, 381 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.). A successful challenge to evidentiary rulings usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted. *See GT & MC, Inc. v. Texas City Ref., Inc.,* 822 S.W.2d 252, 257 (Tex.App.—Houston [1st Dist.] 1991, writ denied); *Atlantic Mut. Ins. Co. v. Middleman,* 661 S.W.2d 182, 185 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.). We must review the entire record to determine whether the case turns on the erroneously admitted evidence. *See Boothe v. Hausler,* 766 S.W.2d 788, 789 (Tex.1989); *Gee,* 765 S.W.2d at 396.

### Points of Error One and Two

In its first two points of error, Parkway contends the trial court erred in allowing the Lees' medical expert, Dr. Robert Yetman, to conduct an evaluation of Alexander before the jury. It is helpful in addressing these points to understand the sequence of events preceding introduction of the contested evidence. During voir dire and opening statement, the defense emphasized that there was no current neurological information about the child. Counsel stated that no such medical information would be presented "unless somebody goes out and does it before this trial ends." Counsel also queried whether Alexander's condition was "as bad as it sounds" and whether he "might, in fact, be improving?" To counter these remarks, the Lees called Dr. Yetman, a pediatrician with the University of Texas at Hermann Hospital, who attended Alexander shortly after birth. Dr. Yetman had been timely designated as Alexander's treating physician to testify "on issues of causation regarding Alexander Lee's injuries, damages associated with his condition, including necessary medical, educational, nursing therapy, expenses and intervention."

Because Alexander's neurological deficiencies are not readily visible, Dr. Yetman was asked to conduct a brief evaluation of the child to demonstrate his injuries to the jury. Parkway objected to any new opinions from Dr. Yetman, and claimed that such an evaluation was not within the plaintiffs' designation. Parkway further complained that the witness violated Rule 167a by indicating his willingness to conduct such an examination. The **\*584** trial court overruled Parkway's objections, but ordered Dr. Yetman to conduct an in-camera preview of the demonstration so that the parties could see "the full breadth of what's being offered" and make their objections to any new opinions in advance. The preliminary in-camera evaluation was videotaped, and is hereafter referred to as the "preview tape."

The preview tape is approximately eleven minutes in length and shows Dr. Yetman directing Alexander to walk forward, walk backward, draw on a piece of paper, put blocks in a cup, stack blocks on top of each other, place a raisin in a small bottle, give a doll a bottle, and talk. During this process, Dr. Yetman asked Lisa questions about Alexander's verbal and physical capabilities. When the preview was completed, the Lees limited their offer of Dr. Yetman's evaluation for the purpose of "exhibit[ing] the child's injuries, that is the

nature of his motor dysfunction, his problems walking ... his inability to use his hands, fingers ... his problem with trunk control or incoordination, that is the inability for him to stand up and control his movements....” The court accepted the limited offer, stating that “the sole purpose [of the evaluation] is to demonstrate the child's function,” and instructed Lisa not to volunteer information during the demonstration to be conducted before the jury. The defense was told that if Dr. Yetman offered new opinions or testified beyond the scope of his designation during the in-court evaluation, objections could be lodged at that time. The trial then resumed, and Dr. Yetman proceeded with the in-court evaluation.

Dr. Yetman explained to the jury that his demonstration would give “a brief overview of how [Alexander] currently functions.” Due to the child's young age, the evaluation took place in the privacy of the court's chambers and was simultaneously viewed by the jury through closed-circuit television. The in-court demonstration was approximately three and a half minutes shorter than the preview and showed Alexander performing the same activities, but without Lisa's input. During the in-court demonstration and Dr. Yetman's subsequent testimony, there were no objections that Dr. Yetman was offering new opinions or testifying beyond the scope of his designation. In fact, Dr. Yetman stated that he formed his opinions about Alexander's condition after reviewing a “day-in-the-life video” made approximately one year earlier, which showed Alexander performing most of the same functions he demonstrated during the in-court evaluation. The “day-in-the-life video” was admitted into evidence without objection.

In its first point of error, the hospital claims the Lees violated Rule 167a by expressing a willingness to submit Alexander to an evaluation. TEX.R. CIV. P. 167a(c). Rule 167a provides that if the mental or physical condition of a party is in controversy, the trial court may, on motion and with notice to the person to be examined, “order the party to submit to a physical or mental examination by a physician or psychologist” at a specific time and place. *Id*. The order shall also specify the “manner, conditions, and scope of the examination and the person or persons by whom it is to be made.” *Id*. If no examination is sought or ordered by the trial court, the party whose condition is in controversy “shall not comment to the court or jury on his willingness to submit to an examination, on the right of any other party to request an examination or move for an order, or on the failure of such other party to do so.” *Id*.

Parkway claims this rule was violated in the following exchange between the Lees' counsel and Dr. Yetman:

Q. (Mr. Clore) Dr. Yetman, if there are some suggestions in this case that, well, we don't have a current evaluation of the child, that without a current evaluation you can't really get enough information, is that something that we could rectify here today, I mean to have some better understanding or a better picture of a current evaluation of the child?

A. (Dr. Yetman) You could do another evaluation on him would be the easiest thing to do.

Q. So everybody will know, have you and I talked about that?

A. Yes.

Q. We talked about that on Saturday?

**\*585** A. Yes.

Q. Dr. Yetman, are you willing to do like a limited evaluation of the child today if there's been some suggestion that we don't have a current evaluation?

Parkway contends the trial court erred in denying its motion for mistrial because the Lees violated the Rule 167a(c) mandatory prohibition of commenting to the jury on their willingness to submit Alexander to an examination. We disagree.

 **[4]** Rule 167a provides a procedure by which another party to the suit, typically a defendant, may require a party whose physical condition is in dispute to submit to a physical examination. The primary purpose of subparagraph (c) is to ensure that the defendant is not penalized for failing to seek a physical examination as allowed by the rule:

> Subdivision (c) provides that the party whose physical or mental condition is in controversy may not mention at the trial the failure of his adversary to move for an examination under Rule 167a, his right to so move, or his (the injured party's) willingness to submit to an examination. Apparently the philosophy motivating this provision is that the opportunity for an examination, offered by Rule 167a, is a privilege that may or may not

be exercised, and that no penalty should attach to a party's failure, for whatever reason, to take advantage of the opportunity.

*C.E. Duke's Wrecker Service, Inc. v. Oakley,* 526 S.W.2d 228, 232 (Tex.Civ.App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.) (quoting 1 W. Jordan, Modern Texas Discovery, Section 813, at 536–37 (1974)). The rule was not designed to prevent a party whose physical or mental condition is in dispute from demonstrating their injuries to the jury, but to prevent an adverse party from being forced to seek a medical evaluation or risk opening his failure to do so to comment before the jury. *Id.*

 [5] The colloquy between the Lees' counsel and Dr. Yetman violated neither the letter nor the spirit of Rule 167a. Dr. Yetman was simply asked whether he would be willing to do a limited evaluation of the child before the jury, and counsel emphasized that he was offering Dr. Yetman's interaction with Alexander only to "exhibit the child's injuries." This exchange in no way reflected upon the hospital's failure to request a medical evaluation, as contemplated by Rule 167a. The hospital itself placed the child's current medical status in issue during voir dire and opening statement. By seeking to exclude Dr. Yetman's testimony under Rule 167a, the hospital attempts to use the rule as a sword rather than a shield, as contemplated by the rule, by challenging the child's current medical condition, then objecting to evidence of his current medical condition on the ground that the hospital had not sought a medical evaluation under the rule. We decline to so apply Rule 167a(c). Point of error one is overruled.

In its second point of error, Parkway contends the trial court erred in overruling its objections to the in-court evaluation and Dr. Yetman's opinion testimony about the child's medical condition and prognosis. Parkway claims the doctor's testimony was based on the in-court demonstration, and that it was unduly prejudiced because it had no prior notice. Resolution of this point turns upon (1) whether the evaluation went beyond a mere demonstration of Alexander's injuries to the jury, and (2) whether Dr. Yetman offered new opinions based upon the evaluation that surprised or unduly prejudiced the hospital.

 [6]  [7] The admission of demonstrative evidence rests within the sound discretion of the trial court, and the court may permit a demonstration of the plaintiff's injuries to the jury "so long as the demonstration is not conducted in such a manner as to pass beyond the limits of introducing proof of the extent and nature of the injury and become merely a method of inflaming the minds of the jury." *Gray v. L–M Chevrolet Co.,* 368 S.W.2d 861, 864 (Tex.Civ.App.—El Paso 1963, writ ref'd n.r.e.) (citing *Coca Cola Bottling Co. v. Hankins,* 245 S.W.2d 740 (Tex.Civ.App.—Fort Worth 1952), *rev'd on other gr.,* 151 Tex. 303, 249 S.W.2d 1008 (1952); *Travelers Ins. Co. v. Epps,* 191 S.W.2d 100 (Tex.Civ.App.—Fort Worth 1945, writ ref'd n.r.e.)). Parkway does not challenge the **\*586** general proposition that a plaintiff may exhibit his injuries to a jury, but claims the evaluation in the present case went beyond a simple demonstration and became an improper pediatric "examination." However, Parkway fails to articulate in what manner the evaluation went beyond a simple demonstration of Alexander's injuries. The jury observed Alexander performing activities that demonstrated the nature of his neurological deficits by showing the extent of his motor problems, his ability to perform simple tasks and his communication skills. The examination was limited by the trial court and was, as demonstrated by the video and confirmed by Dr. Yetman, "purely objective." Indeed, it is difficult to imagine any other way in which Alexander could have exhibited his cognitive and physical abilities to the jury. We agree with the Alabama Supreme Court that in evaluating neurological injuries in a minor child

> ... it would be difficult to exhibit cognition without a demonstration of vocal expression, physical response, or a combination of both, and thus it would not be, as a matter of law, erroneous to have such a demonstration guided by a witness skilled in ascertaining such relevant responses and explaining their meaning. The accuracy of such a demonstration, of course, is to be tested by the requirements of relevancy, and such a demonstration is to be disallowed when its probative worth is exceeded by its capacity for prejudice.

*Ensor v. Wilson,* 519 So.2d 1244, 1257–58 (Ala.1987). *See Heidbreder v. Northampton Township Trustees,* 64 Ohio App.2d 95, 411 N.E.2d 825, 829 (1979) (finding no error in allowing child to demonstrate extent of motor paralysis and ability to communicate and do simple tasks to jury); *Seattle–First Nat'l Bank v. Rankin,* 59 Wash.2d 288, 367 P.2d 835, 841 (1962) (finding no error in allowing minor plaintiff to show extent of mental ability to jury).

The trial court did not err in allowing the in-court demonstration of Alexander's injuries. The demonstration by Dr. Yetman was properly limited, and took approximately nine minutes in a trial that lasted twenty-eight days. Parkway never lodged a Rule 403 objection claiming that the prejudicial effect of the demonstration outweighed its probative value, nor has it claimed that the jury's verdict was excessive. Thus, Parkway has failed to show that the demonstration went beyond the limit of showing the nature and extent of the injury and became a mere method to inflame the minds of the jury. *Gray,* 368 S.W.2d at 864.

 **[8]** **[9]** Parkway also claims the demonstration formed the basis for new opinions from Dr. Yetman which surprised and unduly prejudiced the hospital. Again, however, Parkway has failed to articulate what opinions voiced by Dr. Yetman were new, surprising or prejudicial. The trial court informed Parkway that it could lodge objections to any new opinions given by Dr. Yetman during the demonstration, but Parkway made no such objections. Dr. Yetman's testimony related to "damages associated with [Alexander's] condition" and was clearly within the plaintiffs' designation. The tenor of the hospital's complaint appears to be that the in-court demonstration improperly bolstered Dr. Yetman's testimony, however, Parkway failed to so object at trial and waived error on this basis. Nevertheless, a party is free to support the opinion testimony of an expert by proof of facts which tend to show its accuracy, unless the facts and circumstances relate to a special transaction outside the case on trial for the purpose of allowing the jury to compare the results of such transactions, with the object of impressing the jury with the soundness of the expert's opinion. *City of Hawkins v. E.B. Germany & Sons,* 425 S.W.2d 23, 28 (Tex.Civ.App.—Tyler 1968, writ ref'd n.r.e.). Parkway has wholly failed to demonstrate that the in-court evaluation improperly bolstered Dr. Yetman's opinion testimony.

 **[10]** Neither has Parkway shown that it was surprised or unduly prejudiced by the in-court demonstration. Dr. Yetman's testimony was merely cumulative of properly admitted testimony and evidence, including Lisa's testimony, testimony of other expert witnesses and documentary evidence. *See Luna v. So. Pac. Transp. Co.,* 724 S.W.2d 383, 385 (Tex.1987). In fact, the demonstration was substantially similar to Alexander's **\*587** "day-in-the-life video" reviewed by Dr. Yetman. The video was made approximately one year earlier, and showed the child's speech, gross motor and fine motor deficits. Finally, the

record reflects that, two days after the in-court demonstration, Parkway cross-examined Lisa and introduced the preview tape into evidence. A party may not complain of the admission of improper evidence offered by the other side when it introduces the same evidence or evidence of a similar character. *McInnes v. Yamaha Motor Corp., U.S.A.,* 673 S.W.2d 185, 188 (Tex.1984), *cert denied,* 469 U.S. 1107, 105 S.Ct. 782, 83 L.Ed.2d 777 (1985). Point of error two is overruled.

### Points of Error Three and Four

Parkway's third and fourth points of error contend the trial court erred in (1) permitting the Lees to rely on judicial admissions that were waived by their failure to object to controverting evidence, and (2) refusing to instruct the jury to disregard the conclusive effect of the judicial admissions.

At trial, the defendants hotly contested whether or not the injection of Pitocin was given on the orders of Lisa's obstetrician, Dr. Chin Lee. At the beginning of their case, the Lees read to the jury the following judicial admissions made by the hospital in its response to a series of requests for admissions:

1. Dr. Chin Lee did not verbally authorize Gloria Johnson, R.N. to administer Pitocin to Lisa Lee on June 24, 1992.

2. Gloria Johnson, R.N. did not receive orders from Dr. Chin Lee at approximately 5:30 a.m. on June 24, 1992 directing her to administer Pitocin to augment Ms. Lee's delivery.

3. Gloria Johnson, R.N. did not receive orders from Dr. Chin Lee at approximately 5:30 a.m. on June 24, 1992 directing her to administer Pitocin to induce Ms. Lee's delivery.

The Lees then presented Nurse Johnson's video deposition in which she testified Dr. Lee did not give her an order to administer Pitocin, but instructed that his routine orders should be followed. When the shift changed, she in turn told the other nurses, including Nurse Tarriman (who gave the injection), that Dr. Lee's routine orders were to be followed. Nurse Johnson testified she did not tell anyone that Dr. Lee had ordered Pitocin. Nurse Tarriman's video deposition was then played for the jury. She testified that Nurse Johnson told her Pitocin had been ordered by the doctor. Dr. Lee testified that he was sure he did not order Pitocin. During

its case in chief, the hospital presented testimony from Nurses Johnson, Tarriman and Samuels (who had testified by video deposition that Nurse Tarriman was negligent in administering the Pitocin) that conflicted with their prior testimony and controverted the requests for admissions. The hospital presented such evidence without objection.

 [11]    Parkway complains that the Lees "sought to enhance the effect of the admissions by eliciting controverting testimony from the hospital's nurses and then using the admission to impeach and embarrass" the witnesses. Despite Parkway's protestations, the rules clearly allow the use of admissions for just this purpose. TEX.R. CIV. EVID. 613; TEX.R. CIV. EVID. 803(2). Parkway cites Rule 169(2), which states that "[a]ny matter admitted under this rule is conclusively established as to the party making the admission unless the court on motion permits withdrawal or amendment of the admission." TEX.R. CIV. P. 169(2). Parkway does not claim the trial court erred in denying its motion to withdraw or amend its admissions, but claims the Lees waived their right to rely on the admissions because they allowed the introduction of controverting evidence.

 [12]    It is true that an admission once admitted, deemed or otherwise, is a judicial admission, and a party may not then introduce testimony to controvert it. *Marshall v. Vise,* 767 S.W.2d 699, 700 (Tex.1989); *see also Shaw v. Nat'l County Mut. Fire Ins. Co.,* 723 S.W.2d 236, 238 (Tex.App. —Houston [1st Dist.] 1986, no writ). A party asserting the *conclusive* effect of an opponent's judicial admissions of fact must protect the record by objecting to the introduction of controverting evidence and the submission of any issue bearing on the facts admitted. *Marshall,* 767 S.W.2d at 700; *Houston First Am. Sav.* **\*588** *v. Musick,* 650 S.W.2d 764, 769 (Tex.1983). When the Lees allowed the admission of controverting evidence without objection, they waived their right to rely on the *conclusive* effect of Parkway's admissions. However, because the admissions were properly entered into evidence and not withdrawn or amended, they still constituted valid, probative evidence that could be appropriately considered by the jury in its deliberations. *See* TEX.R. CIV. P. 169(2). As explained by the supreme court:

> A party's testimonial declarations which are contrary to his position are quasi-admissions. They are merely some evidence, and they are not conclusive upon the admitter. [citations omitted] The weight to be given such admissions is decided by

the trier of fact. These are to be distinguished from the true judicial admission which is a formal waiver of proof usually found in pleadings or the stipulations of the parties. A judicial admission is conclusive upon the party making it, and it relieves the opposing party's burden of proving the admitted fact, and bars the admitting party from disputing it. [citations omitted].

*Mendoza v. Fidelity & Guar. Ins. Underwriters, Inc.,* 606 S.W.2d 692, 694 (Tex.1980); *see also Hennigan v. I.P. Petroleum Co., Inc.,* 858 S.W.2d 371, 372 (Tex.1993). The fact that the hospital's admission was controverted did not prevent its use for impeachment or as substantive evidence on a material issue. *Mendoza,* 606 S.W.2d at 694. Point of error three is overruled.

In point of error four, Parkway claims the trial court erred by refusing to submit the following remedial instruction to the jury:

> You are instructed that you are to disregard the request for admissions regarding whether or not the nurses had an order from Dr. Lee, and you are not to consider the admissions for any purposes whatsoever.

To obtain a reversal based upon the court's failure to submit an instruction, a substantially correct instruction on the law must have been requested in writing and tendered by the complaining party. TEX.R. CIV. P. 278; *J.V. Harrison Truck Lines, Inc. v. Larson,* 663 S.W.2d 37, 41 (Tex.App. —Houston [14th Dist.] 1983, writ ref'd n.r.e.). For the reasons discussed in point of error three, Parkway's proposed instruction was not a substantially correct statement of the law. *Mendoza,* 606 S.W.2d at 694; *Hennigan,* 858 S.W.2d at 372. Such an instruction would have improperly allowed the hospital to, in effect, withdraw its admissions. *See* TEX.R. CIV. P. 169(2). We overrule Parkway's fourth point of error.

**Point of Error Five**

In point of error five, Parkway claims the trial court erred in excluding the testimony of Lisa's ex-husband, Stephen Heiman. Parkway sought to call Lisa's former husband to testify regarding the medical history of their children,

purportedly to support its theory that Alexander's problems were the result of congenital malformations in the womb or a genetic disorder. Specifically, Parkway sought to present evidence that Lisa's and Stephen's oldest child had suffered from grand mal seizures since the age of fifteen. The trial court did not allow Stephen to testify because he had not been timely designated by the defendants as a person with knowledge of relevant facts. Parkway contends the trial court abused its discretion because the hospital conclusively established good cause for its failure to designate the witness.

 **[13]**    A party is obligated to designate any witness it expects to call and to disclose the substance of his testimony as soon as practical, but not less than thirty days before trial. TEX.R. CIV. P. 166b(6)(a); *Sharp v. Broadway National Bank,* 784 S.W.2d 669, 671 (Tex.1990). If a party fails to designate a witness pursuant to Rule 166b(6)(a), the witness may not testify "unless the trial court finds that good cause sufficient to require admission exists." TEX.R. CIV. P. 215(5). The party offering the testimony has the burden of showing good cause for its failure to supplement. *Sharp,* 784 S.W.2d at 671; *Gee,* 765 S.W.2d at 395; *Yeldell v. Holiday Hills Retirement & Nursing Ctr., Inc.,* 701 S.W.2d 243, 246 (Tex.1985). The trial court has the discretion to determine whether the offering party met its burden of showing good cause. *Alvarado v. Farah Mfg. Co.,* **\*589** *Inc.,* 830 S.W.2d 911, 914; *Morrow v. H.E.B., Inc.,* 714 S.W.2d 297, 298 (Tex.1986) (citing *Smithson v. Cessna Aircraft Co.,* 665 S.W.2d 439, 442 (Tex.1984)).

In response to interrogatories, Lisa identified Stephen Heiman as her ex-husband and the father of her three older children. She listed his address and phone number as "unknown" because, according to her testimony, he frequently changed addresses. She explained that she did not amend her answers to provide this information when it became available because she forgot and the defendants never asked again. Lisa further testified that she did not identify Stephen as a person with knowledge of relevant facts because she did not think he knew anything relevant to the case. Parkway claims that Lisa's failure to provide such information established good cause for its failure to designate Stephen as a witness. We disagree.

 **[14]**    As the party offering Stephen's testimony, Parkway bore the burden to establish good cause as to why he was not timely designated as a witness. A party who is aware of a witness' name must demonstrate on the record their unsuccessful efforts to locate the witness or show an inability

to anticipate the use of the testimony. *See Clark v. Trailways, Inc.,* 774 S.W.2d 644, 647 (Tex.1989). Unless the party thus establishes "good cause," the trial court must automatically exclude the testimony of an untimely designated witness. TEX.R. CIV. P. 215(5). Lisa provided her ex-husband's name in her answers to interrogatories, but the record is devoid of evidence showing that Parkway attempted to locate him prior to trial. Parkway knew Lisa had three children by Stephen before she gave birth to Alexander, and had ample time to pursue this line of investigation. The mere claim that Parkway was unaware Stephen had knowledge of relevant facts until shortly before trial is not sufficient in itself to establish good cause. *See Macedonia Baptist Church v. Gibson,* 833 S.W.2d 557, 560 (Tex.App.—Texarkana 1992, writ denied).

 **[15]**    Parkway further claims that the trial court's failure to allow the defendants to rebut or impeach Lisa with evidence of her oldest child's seizures "greatly discounted Defendants' causation theory of congenital malformations in the womb and genetic disorders." However, without knowing the medical cause of the seizures, and without expert testimony linking the seizures to the defendants' causation theory, Stephen's testimony regarding his son's seizures was irrelevant and completely speculative. We find the trial court did not abuse its discretion in excluding Stephen's testimony and overrule Parkway's fifth point of error

### Point of Error Six

In its sixth point of error, Parkway claims the trial court erred in granting the Lees' post-verdict motion to amend their petition to increase the amount of damages claimed for Alexander's future medical, nursing, educational and custodial care (hereinafter collectively "future care"). Parkway complains that it was prejudiced by the amendment because it relied on the figure claimed for future medical expenses in their settlement negotiation and trial strategy decisions.

The Lees' sixth amended petition sought a total of $17.6 million in damages for Alexander, $10 million of which was for future care. The Lees' eighth amended petition, upon which they proceeded to trial, also sought a total of $17.6 million for Alexander, but only requested $7 million for future care. The jury awarded a total of $11.3 million in damages for Alexander, $10 million of which was for future care. While the jury allocated damages differently than pled for in the Lees' petition, its total damage award was supported

by the evidence and was less than the total amount of damages pled by the Lees prior to trial. The Lees filed a motion for leave to supplement their petition to increase the amount claimed for Alexander's future care from $7 million to $10 million, which the trial court granted.

[16] A trial court *must* allow a trial amendment that increases the amount of damages sought in the pleadings to that found by the jury unless the opposing party presents evidence of prejudice or surprise. *Greenhalgh v. Service Lloyds Ins. Co., 787 S.W.2d 938, 939 (Tex.1990).* The trial court has no discretion to refuse such an amendment **\*590** unless evidence of surprise or prejudice is presented or the amendment asserts a new cause of action or defense and thus is prejudicial on its face. *Id.* (citing TEX.R. CIV. P. 3 and 66; *Hardin v. Hardin,* 597 S.W.2d 347, 350–351 (Tex.1980) (Campbell, J., concurring); *Food Source, Inc. v. Zurich Ins. Co.,* 751 S.W.2d 596, 599 (Tex.App.—Dallas 1988, writ denied)); *see also Chapin & Chapin, Inc. v. Texas Sand and Gravel Co., Inc.,* 844 S.W.2d 664, 665 (Tex.1992). The burden is upon the party opposing an amendment increasing damages to "*present evidence* to show that the increase resulted in surprise." *See Greenhalgh,* 787 S.W.2d at 940 (emphasis added).

[17] Parkway's attorney argued to the trial court that it "relied heavily on the plaintiffs' pleadings" and "[to allow amendment] at this late date after trial, after the evidence is in, not only operates as a surprise but also as prejudicial." Parkway's counsel stated that he relied on the plaintiff's eighth amended petition and chose not to go forward with any evidence that he could have produced. However, the Lees' economist testified without objection that the projected cost of Alexander's future care was in excess of $10 million, and he was cross-examined on those projections by counsel for the hospital. Parkway presented no evidence to support its bare allegations of surprise and prejudice. Because the Lees' amendment raised no new substantive matters and changed only the allocation, and not the amount, of damages, and Parkway presented *no evidence* of surprise or prejudice, we overrule Parkway's sixth point of error.

### Point of Error Seven

In its seventh point of error, Parkway contends the trial court erred in entering judgment on the jury's award for "damage to the family relationship" because such an element of damages is not recognized in a personal injury action in Texas. Its argument, however, is based upon cases that have failed to recognize a cause of action for "interference with family relationships." Parkway has obviously confused two very different avenues for recovery.

[18] The definition given to the jury for "[d]amage to the family relationship" is, with a few minor additions, virtually identical to the Texas Supreme Court's definition of loss of consortium as "loss of love, advice, comfort, companionship and society." *Sanchez v. Schindler,* 651 S.W.2d 249, 252 (Tex.1983). In *Sanchez,* the court held that "injuries to the familial relationship are significant injuries and are worthy of compensation." *Id.* at 252; *see also Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549, 551 (Tex.1985). The Lees did not plead "interference with the family relationship," as disapproved in *Transportation Ins. Co. v. Archer,* 832 S.W.2d 403, 405 (Tex.App.—Fort Worth 1992, writ denied). Rather, the Lees pled for "damage to the family relationship" or loss of filial consortium, an element of damage clearly recognized in Texas. [2] *See Salinas v. Fort Worth Cab & Baggage Co., Inc.,* 725 S.W.2d 701, 703–04 (Tex.1987); *Sanchez,* 651 S.W.2d at 252 (Tex.1983); *see also Cavnar,* 696 S.W.2d at 551. In any event, Parkway did not object to the question and definition on the ground that "interference with family relationships" was not a viable theory of recovery in Texas, and thus did not properly preserve error. TEX.R. CIV. P. 274; *Castleberry v. Branscum,* 721 S.W.2d 270, 276–77 (Tex.1986). Accordingly, we overrule Parkway's seventh point of error.

[2]    Question 8(d) of the Jury Charge reads as follows:
> If you find that Alexander Lee's injuries are severe, permanent and disabling, and only in that event, then answer question 8(d). Otherwise, do not answer Question 8(d).
> d. Damage to the family relationship ____
>> "Damage to the family relationship: means the mutual right of a mother and son to the love, comfort, affection, emotional support, companionship, care and society which Lisa Lee would, in reasonable probability, have received from Alexander Lee had he not received the injuries he sustained."

### Point of Error Eight

In its eighth and final point of error, Parkway claims the guardian ad litem fee awarded by the court was in excess of a reasonable amount charged for like services in the community.

**\*591** [19] [20] The award of guardian ad litem fees is in the sound discretion of the trial court, and absent evidence illustrating a clear abuse of discretion will not be set aside by a reviewing court. *Simon v. York Crane & Rigging Co., Inc.,* 739 S.W.2d 793, 794–95 (Tex.1987). In general, the same factors used to determine the reasonableness of attorney's fees are employed to ascertain the reasonableness of a guardian ad litem's fees. *Id.* Relevant factors are (1) the difficulty and complexity of the case, (2) the amount of time spent by the attorney, (3) the benefit derived by the client, and (4) the skill and experience reasonably needed to perform the service. *Id.*

Paul Waldner was appointed guardian ad litem for Alexander on June 6, 1994. Waldner testified that he recorded 244 hours of time, but was requesting fees for 300 hours because he did not start recording his time until January, 1995. Waldner and his staff spent extensive time on the case, which he described as raising "virtually every conceivable medical issue" and "the most complex" in which he had ever been involved. Waldner attended depositions and reviewed the discovery in the case, including the depositions and medical reports. He also attended the mediation and, after it failed, initiated further settlement negotiations. He suggested experts, worked with experts and assisted in trial strategy. The problems in the case were complicated by the change in Parkway's attorneys "very close to the trial date." Due to his responsibilities as guardian ad litem, Waldner had to defer important legal matters, causing his practice and clients to suffer. Additionally, his fiduciary obligation to Alexander put him in a position "of considerable personal legal liability." While Waldner did not attend the six-week trial, he did attend several hearings. Waldner requested a fee of $200,000 for his services, but the trial court reduced his award to $125,000.

An appellate court may reverse a trial court for abuse of discretion only if, after searching the record, it is clear that the trial court's decision was arbitrary and unreasonable. *Simon,* 739 S.W.2d at 795; *Landry v. Travelers Ins. Co.,* 458 S.W.2d 649, 651 (Tex.1970). The party contending abuse of discretion, however, has the burden to bring forth a record showing such abuse. *See Id; Englander Co. v. Kennedy,* 428 S.W.2d 806, 807 (Tex.1968); TEX.R.APP. P. 50(d). Absent such a record, the reviewing court must presume that the evidence before the trial judge was adequate to support the decision. *Simon,* 739 S.W.2d at 795; *Mays v. Pierce,* 281 S.W.2d 79, 82, 154 Tex. 487 (1955).

[21] Other than cross-examining Waldner on customary attorney's fees in Houston, and pointing out that some of his work overlapped with work performed by the Lees' attorneys, Parkway failed to present any evidence that the guardian ad litem's award was arbitrary or unreasonable. While an award of $125,000 might be considered excessive in some situations, our review of the record does not show that the trial court's award amounted to an abuse of discretion in this case. Therefore, we overrule Parkway's eighth point of error.

The judgment of the trial court is affirmed.

### All Citations

946 S.W.2d 580

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 4611533
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**
Court of Appeals of Texas,
Houston (1st Dist.).

PEARLAND CAPITAL GROUP, LP, Appellant

v.

HORIZON UNITED GROUP INTERNATIONAL,
LLC d/b/a Horizon Group International,
Brinkmann Roofing & Sheetmetal Company,
Brinkmann Investements, Inc., and
Nationwide Metal Buildings, LLC, Appellees.

No. 01–11–00324–CV.  |  Sept. 30, 2011.

On Appeal from the 125th District Court, Harris County,
Texas, Trial Court Case No.2009–60160.

**Attorneys and Law Firms**

William F. Harmeyer, for Pearland Capital Group, LP.

William B. Westcott, George T. Jackson, Steven D.
Naumann, for Horizon United Group International, LLC
d/b/a Horizon Group International, Brinkmann Roofing &
Sheetmetal Company, Brinkmann Investements, Inc., and
Nationwide Metal Buildings, LLC.

Panel consists of Justices JENNINGS, SHARP, and
BROWN.

**MEMORANDUM OPINION**

TERRY JENNINGS, Justice.

 **\*1**  Appellant, Pearland Capital Group, LP ("PCG"), brought
this interlocutory appeal [1] to challenge the trial court's April
13, 2011 order denying its motion to sever and compel
arbitration. In its sole point of error, PCG contended that
the trial court erred in denying its motion to sever and
compel arbitration of the claims brought against it by
appellee, Horizon United Group International, LLC doing
business as Horizon Group International ("Horizon"), that
are "based upon the AIA construction contract between" it

and Horizon or, alternatively, in denying its and Horizon's
"respective alternative motions to compel arbitration of
all claims in dispute," including those claims by and
against PCG, Horizon, and appellees Brinkmann Roofing
& Sheetmetal Company, Inc., Brinkmann Investments,
Inc. (collectively, "Brinkmann"), and Nationwide Metal
Buildings, LLC ("Nationwide"). [2]

[1]  TEX. CIV. PRAC. & REM.CODE ANN. § 171.098(a)
(1) (Vernon 2005).

[2]  Both Brinkmann and Nationwide have elect ed not to file
appellate briefs.

**Background**

During the pendency of this interlocutory appeal,
neither party sought temporary orders from this Court.
SeeTEX.R.APP. P. 29.3. After both PCG and Horizon filed
their briefing in this Court, the trial court, on August 31,
2011, signed an Order Reconsidering Court's Prior Ruling
Regarding Arbitration, in which it effectively dissolved
its original order and compelled to arbitration "those
claims arising under the Horizon/[PCG] AIA construction
contract."The trial court made additional orders severing
certain claims into a separate cause number.

Not made aware of the trial court's new order, this Court, on
September 7, 2011, sent the parties notice that this appeal
would be set for submission on September 28, 2011. On
September 13, 2011, nearly two weeks after the trial court
effectively dissolved the order being appealed and entered
its new order, PCG filed in this Court a Motion to Dismiss
Appeal of Interlocutory Order Denying Arbitration. In this
motion, PCG contended that, as a result of the trial court's
new order granting it the relief that it had requested in its
application and compelling arbitration of certain contract
claims, this Court should dismiss the appeal. On the same day,
Horizon filed in this Court a Motion to Vacate Subsequent
Order of Trial Court, arguing that the trial court did not have
jurisdiction to reconsider its April 13, 2011 order denying
arbitration. Horizon asked that we vacate the trial court's new
order and proceed to address PCG's appeal of the original
order.

**Motion to Dismiss**

In its motion to dismiss, PCG argues that we must dismiss the interlocutory appeal because the trial court entered a new order granting its motion to compel arbitration and compelling arbitration of certain claims.

It is undisputed that we have jurisdiction over PCG's appeal of the trial court's original order denying PCG's application to compel arbitration. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 171.098(a)(1) (Vernon 2005) (providing that party may appeal order denying application to compel arbitration). The parties dispute, however, whether the trial court had jurisdiction to enter its new order and, if so, the affect of the new order on this appeal.

**\*2** Texas Rule of Appellate Procedure 29.5 provides,

> While an appeal from an interlocutory order is pending, the trial court retains jurisdiction of the case and unless prohibited by statute may make further orders, including one dissolving the order complained of on appeal. If permitted by law, the trial court may proceed with a trial on the merits. But the court must not make an order that:
>
> (a) is inconsistent with any appellate court temporary order; or
>
> (b) interferes with or impairs the jurisdiction of the appellate court or effectiveness of any relief sought or that may be granted on appeal.

TEX.R.APP. P. 29.5. Here, the trial court's new order, in which it reconsidered its prior ruling and granted PCG's application, was clearly permitted under the rules. *See id.* The trial court's new order was not inconsistent with any temporary orders, as neither party requested such orders during the pendency of the appeal. *See id.; see also* TEX.R.APP. P. 29.3.

The trial court's new order rendered the appeal of the original order moot. *See Providian Bancorp Servs. v. Hernandez,* No. 08–04–00186–CV, 2005 WL 82197, at \*1 (Tex.App.-

El Paso Jan. 13, 2005, no pet.)(mem.op.) (dismissing as moot interlocutory appeal from order denying motion to compel arbitration after trial court reconsidered its prior ruling and entered order compelling arbitration); *Mobil Oil Corp. v. First State Bank of Denton,* No. 2–02–119–CV, 2004 WL 1699928, at \*1 (Tex.App.-Fort Worth July 29, 2004, no pet.)(dismissing as moot interlocutory appeal from class certification order after trial court vacated order and dismissed class action); *Board of Trustees, Galveston Wharves v. Galveston Waterfront Ventures, Inc.,* No. 14–03–00265–CV, 2003 WL 21026383, at \*1 (Tex.App.-Houston [14th Dist.] May 8, 2003, no pet.)(mem.op.) (dismissing as moot appeal of temporary injunction after trial court entered permanent injunction); *see also Roccaforte v. Jefferson County,* 341 S.W.3d 919, 924 & n. 9 (Tex.2011) (discussing cases "in which further proceedings mooted the issues raised" in interlocutory appeal).

To the extent that Horizon suggests that Texas Rule of Appellate Procedure 29.5(b) precluded the trial court from reconsidering the order being appealed, we note that the rule expressly and specifically authorizes a trial court to dissolve an order that is being appealed. Finally, PCG, the only party that appealed the trial court's original order, is now seeking dismissal of its appeal. Thus, we conclude that the trial court's new order has not interfered with or impaired the effectiveness of any relief sought or that may be granted on appeal.

Accordingly, we dismiss the appeal as moot. We also deny Horizon's motion to vacate the trial court's subsequent order.

### Conclusion

We dismiss the appeal as moot.

### All Citations

Not Reported in S.W.3d, 2011 WL 4611533

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

249 S.W.3d 607
Court of Appeals of Texas,
Houston (1st Dist.).

Raymon POLAND, Individually and as Independent
Administrator of the Estate of Jessie Poland,
Robert Martin, and Frank Martin, Appellants
v.
Dr. Alina GRIGORE and Dr. Arthur
S. Keats & Associates, Appellees.

No. 01–07–00197–CV.   |   Feb. 1, 2008.

**Synopsis**
**Background:** Husband, individually and as administrator of deceased patient's estate, brought negligence, breach of fiduciary duty and malpractice action against anesthesiologist and anesthesiology practice. The 152nd District Court, Harris County, Kenneth P. Wise, J., granted defendants' motion to dismiss for failure to serve a timely expert report, and husband appealed.

**Holdings:** The Court of Appeals, Tim Taft, J., held that:

[1] first amended petition raised health-care-liability claims against defendants, thus triggering 120-day period during which husband was required to serve expert report;

[2] anesthesiology practice did not waive its objection to the late serving of the expert report by not objecting to the report within 21 days; and

[3] husband did not preserve for appeal his appellate objections to attorney fees award.

Affirmed.

West Headnotes (3)

**[1]**    **Health**
      Affidavits of Merit or Meritorious Defense; Expert Affidavits

First amended petition filed by husband of deceased patient alleged health-care-

liability claims against anesthesiologist and anesthesiology practice that employed her, and thus 120-day period during which husband was required to serve an expert report and curriculum vitae (CV) on anesthesiologist and the practice commenced when such petition was filed rather than on husband's filing of the second amended petition, though second amended petition contained more specific factual allegations, where the allegations in the first amended petition asserted a negligence cause of action for the treatment of patient and alleged that anesthesiologist and the practice departed from the accepted standards of medical care in that treatment. V.T.C.A., Civil Practice & Remedies Code § 74.001(a)(13); § 74.351 (2004).

6 Cases that cite this headnote

**[2]**    **Health**
      Affidavits of Merit or Meritorious Defense; Expert Affidavits

Anesthesiology practice did not waive any objection to husband of deceased patient serving expert report and expert's curriculum vitae (CV) beyond 120-day deadline for such reports, in husband's negligence and medical malpractice action, by not objecting to the report and the CV within 21 days of having been served with them, as a defendant in a health-care-liability action was only required to object to the sufficiency of an expert report within 21 days, such requirement did not apply to challenges based on belated service, and no cure existed for an untimely report. V.T.C.A., Civil Practice & Remedies Code §§ 74.001(a)(13), 74.351.

8 Cases that cite this headnote

**[3]**    **Appeal and Error**
      Fees
   **Appeal and Error**
      Failure to Urge Objections

Court of Appeals would not consider appellate challenges by husband of deceased patient to trial court's award of attorney fees to anesthesiologist and anesthesiology practice

when husband's claims were dismissed for failure to serve a timely expert report, as husband had not preserved the challenges for appeal and inadequately briefed the challenges in his appeal; husband did not object in the trial court to the award of attorney fees, and husband provided absolutely no briefing or argument on such appellate challenges in his appeal. V.T.C.A., Civil Practice & Remedies Code § 74.351; Rules App.Proc., Rule 38.1(h).

7 Cases that cite this headnote

**Attorneys and Law Firms**

**\*608** Andrew Lee Payne, Sandrice M. McGlown, Payne & Payne & Associates, Houston, TX, for Appellants.

Cynthia D. Rendon, Melanie Ann Rubinsky, Frank A. Doyle, Tamara M. Madden, Lauren B. Harris, Johnson, Spalding, Doyle, West & Trent, LLP, John R. Strawn, Jr., Chetna Gosain Koshy, Cruse, Scott, Henderson & Allen, L.L.P., Leah Ann Greene, Dale Burrus Frisby, Kroger, Myers, Frisky & Hirsch, Houston, TX, for Appellees.

Panel consists of Justices TAFT, KEYES, and ALCALA.

**OPINION**

TIM TAFT, Justice.

Appellants, Raymon Poland, individually and as independent administrator of the estate of Jessie Poland, Robert Martin, and Frank Martin ("the Poland parties"), appeal from a judgment dismissing their health-care-liability and related claims against appellees, Dr. Alina Grigore and Dr. Arthur S. Keats & Associates. We determine whether the trial court erred in granting appellees' motion to dismiss the claims against them for the Poland parties' failure timely to serve an expert report on them. We affirm.

**Background**

The factual recitations come mainly from the Poland parties' petition. Appellant Raymon Poland was the husband of Jessie Poland; the remaining appellants were his natural children.

In August 2003, Jessie Poland, under the care of Dr. James Willerson (an appellee in a related appeal) and Dr. Ott (an appellee in another related appeal), was hospitalized at St. Luke's Episcopal Hospital and the Texas Heart Institute (both appellees in another related appeal) for an elective surgical procedure to repair her heart's mitral valve. Appellee Dr. Alina Grigore, who was employed by appellee Dr. Arthur S. Keats & Associates, was the anesthesiologist for the surgical procedure. The Poland parties alleged that, at the time of surgery, Jessie Poland's blood contained a level of Coumadin that the health-care providers should have known rendered her blood fully anti-coagulated and, thus, rendered surgery dangerous. The surgery was nonetheless performed; Jessie Poland bled internally; and she died several days later of multi-system organ failure.

In their original and first amended petitions, both of which were filed on October 24, 2005, the Poland parties sued, among other defendants, St. Luke's Episcopal Hospital, the Texas Heart Institute, the University of Texas Health Science Center at Houston, Dr. Arthur S. Keats & Associates, and Drs. Ott, Grigore, and Willerson for Jessie Poland's wrongful death, for her pain and suffering and medical costs before her death, and for her burial expenses. By the time of the trial court's complained-of ruling, the Poland parties had amended their petition two more times to allege the following causes of action or theories of recovery against all defendants, including appellees: (1) negligence, (2) gross negligence, (3) actual and constructive fraud, (4) intentional infliction of emotional distress, (5) assault and battery, (6) intentional and negligent abandonment, (7) breach of fiduciary duties, (8) "negligent breach of fiduciary duties," (9) malpractice, (10) "lack of proper informed consent," **\*609** (11) "tampering with official medical records," (12) "forgery," (13) violations of the Texas Deceptive Trade Practices–Consumer Protection Act ("DTPA"), [1] and (14) conspiracy among all defendants. This "live," third amended petition also added allegations that the defendants had altered Jessie Poland's medical records and forged Raymon Poland's signature on unspecified hospital documents. The Poland parties sought actual and exemplary damages.

[1]  *See* TEX. BUS. & COM.CODE ANN. §§ 17.41–.63 (Vernon 2002 & Supp.2007).

Appellees moved to dismiss, under Texas Civil Practice and Remedies Code section 74.351(b), the Poland parties' health-care-liability claims against them for failure to serve an expert report upon them or their attorneys within 120

days of the filing of the claims against them. [2] *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(b) (Vernon Supp.2007) (providing that trial court must dismiss health-care-liability claim against defendant if claimant fails to serve expert's report and *curriculum vitae* on that defendant within period specified by section 74.351(a)); Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.01, 2003 Tex. Gen. Laws 847, 875 (providing that claimant must serve each defendant against whom health-care-liability claim is asserted with expert's report and *curriculum vitae* not later than 120 days of claim's filing) [hereinafter, "former section 74.351(a)"], *amended by* Act of May 18, 2005, 79th Leg., R.S., ch. 635, § 1, 2005 Tex. Gen. Laws 1590, 1590 (current version at TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a) (Vernon Supp.2007)). Appellees, like several other defendants, also objected to or moved to strike the Poland parties' live petition to the extent that it attempted to recast health-care-liability claims as other causes of action.

[2]    Before Dr. Arthur S. Keats & Associates had answered or appeared in the suit, Dr. Grigore had separately twice moved to dismiss the claims against her for untimely service of an expert report. She and Dr. Arthur S. Keats & Associates then filed a joint motion to dismiss the claims against them on June 29, 2005, which predated the dismissal hearing. After the dismissal hearing, but before the trial court had ruled on their June 29 joint dismissal motion, appellees filed another joint dismissal motion on the same grounds. For simplicity's sake, unless it is otherwise necessary to distinguish between appellees' pre-hearing and post-hearing dismissal motions, we refer simply to appellees' "motion" to dismiss.

Appellees' motion to dismiss alleged that the Poland parties had served the report of their expert, Dr. Dennis Moritz, [3] on Dr. Grigore's attorney 123 days after their claims had been filed against her and that the Poland parties had never served their report on Dr. Arthur S. Keats & Associates. The motion further asserted an additional, independent basis for dismissing the claims against Dr. Arthur S. Keats & Associates: because the claims against Dr. Arthur S. Keats & Associates were based solely on respondeat superior for Dr. Grigore's actions, the claims against it had to be dismissed when the claims against Dr. Grigore were dismissed for failure timely to serve the expert report on her.

[3]    This first unsigned report of Dr. Moritz was dated May 2, 2005.

The hearing on appellees' motion to dismiss and their objections to the live petition occurred on July 14, 2006.

Other defendants' motions to dismiss, objections to the expert report, and motions to strike the live petition were heard simultaneously. No additional evidence was presented at the hearing. At the hearing, the Poland parties did not deny that they had served Dr. Moritz's May 2, 2005 expert report and *curriculum vitae* ("CV") on appellees' counsel 123 days after the filing of their first amended petition, the petition that **\*610** appellees alleged had triggered the 120–day–service deadline, but instead argued that they had not alleged health-care-liability (or any) claims against either appellee until their second amended petition, which was filed and served along with a second unsigned report of Dr. Moritz, dated May 19, 2006. [4]

[4]    The Poland parties also served a report of a nurse, Rachel Cartwright, on at least some of the defendants in their lawsuit in May 2006. The trial court struck the May 2006 expert report of Cartwright for its having been untimely served. The Poland parties do not complain in this appeal of the striking of Cartwright's report.

On October 30, 2006, the trial court rendered an interlocutory order that, among doing other things, dismissed the claims against appellees with prejudice:

On July 14, 2006 ... CAME TO BE HEARD all parties, by and through counsel, Dr. Aline Grigore and Arthur S. Keats & Associates' [sic] Motion to Dismiss and Objections to Plaintiff's [sic] Expert Report.... The Court, having considered such Motions and Objections, having reviewed the file herein, and heard the argument of counsel, makes the following FINDINGS OF FACTS and ORDERS:

1. Plaintiffs ... filed their Original Petition on October 24, 2005. The 120–day deadline by which Plaintiffs were required to serve their expert reports pursuant to Section 74.351 of the TEX. CIV. PRAC. & REM.CODE was February 21, 2006. The earliest date that Plaintiffs served an expert report to any Defendant, after the filing of their lawsuit, was on February 24, 2006.

...

6. With respect to Defendants Dr. Alina Grigore and Arthur S. Keats & Associates Plaintiffs served Dr. Alina Grigore and Arthur S. Keats & Associates with an unsigned expert report from Dennis Moritz, M.D., on February 24, 2006. The deadline to serve an expert report pursuant to § 74.351 of TEX. CIV. PRAC. & REM.CODE was February 21, 2006. The Court

hereby finds that Plaintiff's [sic] expert report was untimely served as to Dr. Alina Grigore and Arthur S. Keats & Associates. The Court further finds that Arthur S. Keats & Associates is a party to the suit under the theory of vicarious liability and because all claims against Dr. Alina Grigore must be dismissed with prejudice due to a failure to provide an expert report, Dr. Alina Grigore and Arthur S. Keats & Associates must also be dismissed. Based on the foregoing, it is ORDERED that Defendants Dr. Alina Grigore and Arthur S. Keats & Associates' Motion to Dismiss and Objections to Plaintiff's [sic] Expert Report [be] GRANTED, and that Defendants Dr. Alina Grigore and Arthur S. Keats & Associates [be and] are hereby DISMISSED with prejudice.

...

   7. It is further ORDERED that pursuant to Section 74.351 of the TEX. CIV. PRAC. & REM.CODE that ... Defendants Dr. Alina Grigore and Arthur S. Keats & Associates [be] awarded attorney's fees in the amount of $34,373.00.... The collection of these attorney's fees is stayed pending outcome of any interlocutory appeal.

This same order also (1) denied St. Luke's Episcopal Hospital and the Texas Heart Institute's motion to dismiss under **\*611** Texas Civil Practice and Remedies Code section 74.351 and (2) granted Dr. Ott's motion to dismiss under section 74.351(b). Finally, the trial court signed a separate interlocutory order that granted Dr. Willerson's motion to dismiss based upon Texas Civil Practice and Remedies Code section 101.106. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 101.106 (Vernon 2005).

The Poland parties appealed the adverse rulings dismissing all of their claims against Drs. Ott, Willerson, and Grigore and Arthur S. Keats & Associates, and St. Luke's Episcopal Hospital and the Texas Heart Institute appealed the denial of their motion to dismiss—all under the same appellate cause number. Although the interlocutory order appealed by St. Luke's Episcopal Hospital and the Texas Heart Institute was permitted by statute, this was not true of every appealed order. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a) (Vernon 1997 & Supp.2007). On December 18, 2006, this Court, upon the parties' motion, abated the appeal and remanded the cause for the trial court—upon various parties' motions, filed in the trial court after appeal, to sever the interlocutory orders rendered in favor of Dr. Ott,

of Dr. Willerson, and of Dr. Grigore and Dr. Arthur S. Keats & Associates—to render final and appealable those interlocutory rulings that had not been appealable on an interlocutory basis. Upon remand, the trial court severed the rulings against the specified defendants from the underlying cause, rendering a final judgment in the newly severed cause numbers involving Dr. Ott, Dr. Willerson, and Dr. Grigore and Dr. Arthur S. Keats & Associates. On March 15, 2007, this Court reinstated the appeal, assigning different appellate cause numbers to the appeal of what had by then become four separate rulings in four separate trial-court cause numbers. This opinion and judgment concern the Poland parties' appeal of the dismissal order rendered in favor of Dr. Grigore and Dr. Arthur S. Keats & Associates.

**Service on Appellees**

In their first issue, the Poland parties argue that the trial court erred in granting appellees' dismissal motion and dismissing their claims against Dr. Grigore with prejudice because they first asserted claims against Dr. Grigore in an amended petition that was filed fewer than 120 days before they served their expert report on her (and Dr. Arthur S. Keats & Associates's) attorney. In their second issue, the Poland parties assert that the trial court erred in dismissing their claims against Dr. Arthur S. Keats & Associates because Dr. Arthur S. Keats & Associates waived any objections to the Poland parties' expert report, including its timeliness, by not having objected within 21 days of the report's (belated) service. Finally, the Poland parties assert that the trial court erred, for various reasons, in awarding Dr. Grigore and Dr. Arthur S. Keats & Associates $34,373 in attorney's fees.[5]

[5]  The trial court dismissed all of the Poland parties' claims against Dr. Grigore and Dr. Arthur S. Keats & Associates, even those couched as something other than health-care-liability claims. However, the Poland parties do not complain on appeal of the dismissal of these additional claims. We thus do not consider whether the trial court properly dismissed the claims couched as anything other than health-care-liability claims.

"We generally review rulings on a motion to dismiss under section 74.351(b) for abuse of discretion." *Univ. of Tex. Health Sci. Ctr. at Houston v. Gutierrez,* 237 S.W.3d 869, 871 & 871 n. 1 (Tex.App.-Houston [1st Dist.] 2007, pet. filed); *accord Intracare Hosp. N. v. Campbell,* 222 S.W.3d 790, 794 (Tex.App.-Houston [1st Dist.] 2007, no pet.).

**\*612 A. Dismissal of Claims Against Dr. Grigore**

The version of section 74.351(a) that applies to this case provides as follows concerning service of the expert report and CV:

### § 74.351. Expert Report

(a) In a health care liability claim, a claimant shall, not later than the 120th day after the date the claim was filed, serve on each party or the party's attorney one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted. The date for serving the report may be extended by written agreement of the affected parties. Each defendant physician or health care provider whose conduct is implicated in a report must file and serve any objection to the sufficiency of the report not later than the 21st day after the date it was served, failing which all objections are waived.

*See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.01, 2003 Tex. Gen. Laws 847, 875, *amended by* Act of May 18, 2005, 79th Leg., R.S., ch. 635, § 1, 2005 Tex. Gen. Laws 1590, 1590. The statute continues:

(b) If, as to a defendant physician or health care provider, an expert report has not been served within the period specified by Subsection (a), the court, on the motion of the affected physician or health care provider, shall, subject to Subsection (c), enter an order that:

(1) awards to the affected physician or health care provider reasonable attorney's fees and costs of court incurred by the physician or health care provider; and

(2) dismisses the claim with respect to the physician or health care provider, with prejudice to the refiling of the claim.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(b).

In their first issue, the Poland parties do not dispute that they did not serve Dr. Grigore's counsel with their expert's report within 120 days of their first amended petition's filing. Rather, they argue that the first amended petition did not allege health-care-liability (or any) claims against Dr. Grigore (or against Dr. Arthur S. Keats & Associates) and that they "for the first time" alleged that Dr. Grigore "was directly and vicariously [sic] liable ... for the surgery that lead [sic] to Jessie Poland's death" in their second amended petition,

which was filed on May 19, 2006, fewer than 120 days before they served their expert report on appellees' counsel.

**[1]** The appellate record undisputedly refutes the Poland parties' factual representations and argument. The first amended petition, filed on October 24, 2005, alleged in pertinent part as follows:

COME NOW Plaintiffs ..., complaining of [various defendants and] ... *Dr. Alina Grigore, Arthur S. Keats, M.D., Associates* [sic], ..., who *for cause of action,* would respectfully show the following:

II.

This suit is brought under and by virtue of the law of the State of Texas to recover those damages that Plaintiffs are justly entitled to receive as compensation for the wrongful death of Jessie Poland *which was brought about directly and proximately by reason of the negligence of the Defendants herein,* as set out more fully hereinafter.

...

III.

Plaintiffs would show that Jessie Poland was under the care of Drs. James Willerson and David Ott, who hospitalized **\*613** Jessie Poland in order to perform an elective medical procedure in August, 2003. While Mrs. Poland had been taking Coumadin prior to her admission, *the Defendants* herein were well aware of that fact and indeed, had her check into the hospital sometime before the surgery was to take place to monitor her chemical blood levels, knowing that it was dangerous and risky to perform surgery on an individual who was prescribed this particular drug. Nonetheless, despite *Defendants'* actual knowledge of Mrs. Poland's anticoagulation levels as they existed on the morning of the surgery, Drs. Willerson, and Ott, *together with anesthesiologist Dr. Alina Grigore, who was acting in the course and scope of her employment, for Dr. Arthur Keats, M.D., Associates [sic],* proceeded to operate. Mrs. Poland's anticoagulation levels, resulting from the prescribed Coumadin, were well known *to these Defendants,* as well as to [various other defendants].... *All of the Defendants* should have prevented the surgical procedure from going forward with Mrs. Poland's Coumadin and anticoagulation levels being what they were and *the Defendants were negligent in proceeding with the surgery under these facts and circumstances.*

*As a result of performing surgery* on Mrs. Poland at the time of her elevated Coumadin levels, she suffered a regrettably predictable series of medical complications that ultimately led to her death on August 20, 2003. *The negligence of the Defendants* in performing the procedure constituted a proximate cause of the wrongful death of Jessie Poland.

IV.

...

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that *the Defendants* be duly cited to appear and answer herein, and that Plaintiffs have judgment against *Defendants*, jointly and severally....

(Emphasis added.)

Former section 74.351(a) requires that the report and CV be served not later than the 120th day after the date that "*the claim* [is] filed." *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.01, 2003 Tex. Gen. Laws 847, 875 (emphasis added), *amended by* Act of May 18, 2005, 79th Leg., R.S., ch. 635, § 1, 2005 Tex. Gen. Laws 1590, 1590. In section 74.351, "claim" means "health care liability claim." TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(2) (Vernon Supp.2007). "Health care liability claim," in turn, is defined in chapter 74 as "a cause of action against a ... physician for the treatment, lack of treatment, or other claimed departure from accepted standards of medical care ... which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract." TEX. CIV. PRAC. & REM.CODE ANN. § 74.001(a)(13) (Vernon 2005).

The allegations in the first amended petition quoted above meet this definition because they allege a cause of action (negligence) against appellees (and all defendants) for the treatment of Jessie Poland, as well as their departure from the accepted standards of medical care in that treatment, which proximately resulted in Jessie Poland's death. The 120–day deadline to serve the expert report and CV on appellees was thus triggered by the filing of the first amended petition that contained the above allegations. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.01, 2003 Tex. Gen. Laws 847, 875, *amended by* Act of May 18, 2005, 79th Leg., R.S., ch. 635, § 1, 2005 Tex. Gen. Laws 1590, 1590; *Poland v. Ott*, No. 01–07–00199–CV, slip op. at 12, **\*614** —— S.W.3d ——, ——, 2008 WL 257382 \*5 (Tex.App.-Houston [1st Dist.]

Jan. 31, 2008, no pet. h.) (holding that filing of health-care-liability claim against particular defendant triggers start of 120–day period in which to serve former section 74.351(a) expert report and CV on that defendant, regardless of whether report and CV were provided to defendant before filing date). That petition was filed more than 120 days before the Poland parties served the report and CV on either appellee. Accordingly, the trial court did not abuse its discretion in dismissing with prejudice the claims against Dr. Grigore; indeed, the statute *required* that the court do so. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(b).

The Poland parties nonetheless urge that they did not allege a health-care-liability claim against Dr. Grigore until their second amended petition because that later petition contained, allegedly for the first time, "specific causes of action against [Dr. Grigore], for direct and vicarious liability pre-operation." The gist of the Poland parties' assertion appears to be that no health-care-liability claim was asserted against Dr. Grigore (or either appellee) until more specific factual allegations were asserted in the second amended petition.

We disagree. First, as demonstrated above, the first amended petition clearly alleged a health-care-liability claim against Dr. Grigore (and both appellees). This was all that was required for the 120–day expert-report deadline to start running because the statute requires simply that each physician "against whom a [health-care-]liability claim is asserted" be served no later than 120 days after "the [health-care-liability] claim" is filed. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.01, 2003 Tex. Gen. Laws 847, 875, *amended by* Act of May 18, 2005, 79th Leg., R.S., ch. 635, § 1, 2005 Tex. Gen. Laws 1590, 1590. The statute does not tie the obligation to serve the report and CV to the specificity of the allegations supporting the health-care-liability claim against a physician or health-care provider; that is, if the claim asserted against such a defendant fits the definition of a health-care liability claim, then the expert-report service obligation is triggered. Moreover, it is commonplace to amend a petition's allegations against a particular defendant to render them more specific as more facts become known about the complained-of occurrence. "[T]he purposes behind former section 74.351(a)'s adoption were, among other things, to remove unwarranted delay and expense, to accelerate the disposition of non-meritorious cases, and *to give hard-and-fast deadlines for the serving of expert reports*." *Campbell,* 222 S.W.3d at 797. The goal of creating hard-and-fast deadlines for service of expert reports would be completely undermined if parties had to guess how

detailed the allegations in support of a health-care-liability claim had to be before the service requirement was triggered. Neither the plain language of former section 74.351(a), nor the legislative purpose behind it, supports such a reading. *See Gutierrez,* 237 S.W.3d at 873 (providing, in construing former section 74.351(a), that "[s]tatutes must be construed as written, and legislative intent determined, if possible, from their express terms" and that "[e]ven if a statute is unambiguous, courts may consider the statute's objective; circumstances of its enactment; its legislative history; ... [and] consequences of a particular construction....").

We hold that the trial court did not abuse its discretion in dismissing the Poland parties' claims against Dr. Grigore. We thus overrule the Poland parties' first **\*615** issue.[6]

[6]   We distinguish *Puls v. Columbia Hospital at Medical City Dallas Subsidiary, L.P.,* on which the Poland parties rely. *See* 92 S.W.3d 613 (Tex.App.-Dallas 2002, pet. denied). In *Puls,* the plaintiff filed a claim based on a perfusionist's negligence, for which it alleged that the hospital-employer was vicariously liable, in its original petition; in an amended petition, the plaintiff added claims based on nurses' negligence, for which it also alleged that the hospital-employer was vicariously liable. *See id.* at 615. The expert report concerning the nurses' negligence was served within 180 days of the amended petition's filing (the deadline at that time), but more than 180 days from the original petition's filing. *See id.* The perfusionist was nonsuited. *See id.* The *Puls* court rejected the hospital's contention that the expert report concerning the nurses' actions was untimely because it had been served more than 180 days from the filing of the original petition, in which the hospital had first been made a party through vicarious liability for another employee's actions: the claim against it for vicarious liability based on different employees' actions was a new "claim." *See id.* at 617–18. Here, in contrast, the Poland parties *actually alleged health-care-liability claims* against each appellee in their first amended petition, simply embellishing those claims in later amendments.

## B. Dismissal of Claims Against Dr. Arthur S. Keats & Associates

 **[2]**    The reasons set out above also demonstrate that the trial court did not abuse its discretion is dismissing with prejudice the claims against Dr. Arthur S. Keats & Associates. However, in their second issue, the Poland parties nonetheless argue that the trial court abused its discretion in dismissing their claims against Dr. Arthur S. Keats & Associates because

this appellee waived any objection to the expert report and CV by not having objected within 21 days of having been served with them.

Former section 74.351(a) establishes the following procedure after an expert report and CV have been served:

> Each defendant physician or health care provider whose conduct is implicated in a report must file and serve any objection *to the sufficiency of the report* not later than the 21st day after the date it was served, failing which all objections are waived.

*See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.01, 2003 Tex. Gen. Laws 847, 875 (emphasis added), *amended by* Act of May 18, 2005, 79th Leg., R.S., ch. 635, § 1, 2005 Tex. Gen. Laws 1590, 1590. The plain language of former section 74.351(a) provides that a defendant whose conduct is implicated in an expert report need object only to the report's *sufficiency* within the 21–day period.

The term "sufficiency" as used in former section 74.351(a)'s 21–day–objection deadline does not mean timeliness, as can be seen from other parts of section 74.351. For example, section 74.351(c) permits the trial court to allow the claimant a one-time extension to cure the objected-to deficiency in the expert report. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(c) (Vernon Supp.2007) ( "If an expert report has not been served within the period specified by Subsection (a) *because elements of the report are found deficient,* the court may grant one 30–day extension to the claimant in order to cure the deficiency.") (emphasis added). Section 74.351(c) necessarily establishes the procedure for challenges other than those based on belated service—for instance, objections to deficiencies in the report's content—because once a report is late, it remains late: no "cure" exists to render an untimely report timely. *See Herrera v. Seton Northwest Hosp.,* 212 S.W.3d 452, 460 (Tex.App.-Austin 2006, no pet.) ("[S]ection 74.351(c) ... permits [30–day] extensions for expert reports that the court finds deficient in substance, not for reports that are filed untimely."); **\*616** *Thoyakulathu v. Brennan,* 192 S.W.3d 849, 853 (Tex.App.-Texarkana 2006, no pet.) ("Section 74.351(c) applies only when 'an expert report has not been served within' the 120–day period '*because elements of the report have been found deficient.*' This clearly requires a timely-served report that is deficient.") (emphasis in original; citation omitted; quoting TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(c)).

Likewise, section 74.351(*l* ) provides that the trial court "shall grant a motion challenging *the adequacy* of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6)." TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(*l* ) (Vernon Supp.2007) (emphasis added). "[A] motion challenging the adequacy of an expert report" (section 74.351(*l* )) is the equivalent of an "objection to the sufficiency of the report" (section 74.351(a)). *See, e.g.,* RANDOM HOUSE WEBSTER'S UNABRIDGED DICT. at 24 (2nd ed.2001) (providing that "adequate" and "sufficient" are synonyms). Therefore, section 74.351(*l* )'s procedure applies to former section 74.351(a)'s objection. That procedure refers to section 74.351(r)(6), which, in turn, defines an expert report in terms of its content. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(5)(6) (Vernon Supp.2007). Accordingly, the "objection to the sufficiency of the report" in former section 74.351(a) means an objection to the report's substance, not to the timeliness of its service. Former section 74.351(a)'s 21–day deadline thus does not apply to an objection to an expert report based on belated service.

In contrast, section 74.351(b)—which establishes the consequences for failure timely to serve an expert report —contains no deadline by which a defendant physician or health-care provider may complain. *See id.* § 74.351(b). Dr. Arthur S. Keats & Associates's complaint was that it was not timely served any report at all, not that a timely served report was deficient. This kind of complaint is not subject to the 21–day–objection deadline of former section 74.351(a). [7]

[7] *See Ogletree v. Matthews,* No. 06–0502, ─── S.W.3d ───, ───, 2007 WL 4216606, at *4–5 (Tex. Nov. 30, 2007) (appearing implicitly to accept petitioner's position that total failure to serve expert report would not require defendant's objection within 21–day window, although rejecting petitioner's complaint that insufficient report was, in effect, no report at all and thus holding that petitioner had waived objections thereto); *Francis v. Select Specialty Hosp.,* No. 01–04–01186–CV, 2005 WL 2989489, at *3 (Tex.App.-Houston [1st Dist.] Nov. 3, 2005, no pet.) (memo. op.) ("[B]ecause there is no evidence in the record that Sharon filed her expert report with the trial court or otherwise provided Select Specialty with an expert report, the 21–day deadline by which a health care provider must file and serve its objections to the sufficiency of such a report was not triggered."); *Smith v. Hamilton,* No. 09–07–128–CV,

2007 WL 1793754, at *4 (Tex.App.-Beaumont June 21, 2007, no pet.) (memo. op.) ("[A] health care defendant's 21–day deadline explicitly refers to an 'objection to the sufficiency' of an expert report, not to the fact that an expert report was not served within the mandatory 120–day deadline.") (memo. op.); *see also Empowerment Options, Inc. v. Easley,* No. 09–06–148–CV, 2006 WL 3239527, at *4 (Tex.App.-Beaumont Nov. 9, 2006, pet. denied) (memo. op.) (noting in dictum that "[c]hapter 74 imposes no deadline for filing a motion to dismiss" for failure timely to serve an expert report); *Packard v. Miller,* No. 07–06–0454–CV, 2007 WL 1662279, at *2 (Tex.App.-Amarillo, May 31, 2007, pet.denied) (memo. op.) (holding that defendant who waited almost 18 months to move to dismiss health-care-liability claim asserted against him for failure timely to serve expert report was not equitably estopped from seeking dismissal because "[t]he Legislature did not include an explicit deadline for the filing of a motion to dismiss" under section 74.351); *cf. Pena v. Methodist Healthcare Sys. of San Antonio, Ltd.,* 220 S.W.3d 52, 53–54 (Tex.App.-San Antonio 2006, no pet.) (holding that section 74.351(a)'s 21–day objection deadline did not apply to timely served expert report that was unaccompanied by CV because failure timely to serve CV rendered service of entire report untimely).

 **\*617** We hold that the trial court did not abuse its discretion in dismissing the Poland parties' claims against Dr. Arthur S. Keats & Associates. We thus overrule this portion of the Poland parties' second issue. [8]

[8] Given our disposition, we need not determine if the trial court properly dismissed the Poland parties' claims against Dr. Arthur S. Keats & Associates because the claims against it were based on respondeat superior for Dr. Grigore's actions and Dr. Grigore was properly dismissed for failure timely to serve an expert report.

### Award of Attorney's Fees to Appellees

Under their second issue, the Poland parties argue that the trial court erred in awarding $34,373 in attorney's fees to appellees because

> [t]here has been no hearing on attorney [sic] fees. [The Poland parties] were denied the opportunity to cross-examine [appellees] on attorney fee [sic]. The attorney fees for both Dr. Alina Grigore and Dr. Arthur S. Keats

& Associates are one combined figure, not detailing any particular amount for either. Appellees have failed to meet the standard as set forth above,[9] which must be adhered to, in their requests for attorney fees.

[9] The Poland parties rely on Texas Disciplinary Rule of Professional Conduct 1.04(b), which establishes factors that may be considered in determining a fee's reasonableness, and on the opinion of the El Paso Court of Appeals in *Marquez v. Providence Memorial Hospital,* in which the court adopted the factors of rule 1.04. *See* TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04(b), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A (Vernon 2005) (STATE BAR R., art. X, § 9); *Marquez v. Providence Mem'l Hosp.,* 57 S.W.3d 585, 596 (Tex.App.-El Paso 2001, pet. denied).

The record shows the following. In their June 29, 2006 joint motion to dismiss and objection to the Poland parties' second amended petition, appellees requested attorney's fees totaling $34,373 for Dr. Grigore and Dr. Arthur S. Keats & Associates together. No affidavit was attached to the motion in support of the requested fees. The hearing on appellees' June 29 joint motion occurred on July 14, 2006. At that hearing, counsel for appellees expressly asked for attorney's fees under section 74.351, though no amount was mentioned. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(b)(1) (requiring trial court to award "to the affected physician or health care provider reasonable attorney's fees and costs of court incurred by the physician or health care provider" when court grants dismissal motion based on claimant's failure timely to file expert report). It appears, however, that an affidavit supporting "costs" was tendered to the court at that hearing:

> Counsel for appellees: I would also—
> I failed to file the affidavit for costs.
> If I may file that with the Court....

On August 16, 2006, while their June 29 joint motion was pending and more than a month before the court would rule on it, appellees filed another joint motion that raised the same arguments and requested the same relief as the as the June 29 joint motion had. The August 16 joint motion again requested $34,373 in attorney's fees for Dr. Grigore and Dr. Arthur S. Keats & Associates together, but this time attached the affidavit of their trial counsel, Dale Burrus Frisby, in support:

Attorney [sic] fees incurred by Kroger, Myers, Frisby & Hirsch during the course of responding to Plaintiff's [sic] **\*618** Petition ... are ... on behalf of Dr. Alina Grigore and Arthur S. Keats & Associates [sic], the amount of $34,373.00.

That affidavit was dated July 14, 2006, the same date as the hearing on appellees' June 29 joint motion to dismiss; it is unclear whether this affidavit was a copy of the affidavit for "costs" to which appellees' counsel referred and that he tendered at the July 14 hearing. The trial court signed the order granting appellees' motion to dismiss, which also awarded appellees their attorney's fees, on October 30, 2006.

[3] First, the Poland parties have provided absolutely no briefing or argument to support the following appellate challenges concerning attorney's fees: "[t]here has been no hearing on attorney [sic] fees. [The Poland parties] were denied the opportunity to cross-examine [appellees] on attorney [sic] fee. The attorney fees for both Dr. Alina Grigore and Dr. Arthur S. Keats & Associates [sic] are one combined figure, not detailing any particular amount for either." We decline to consider these challenges because they are inadequately briefed. *See* TEX.R.APP. P. 38.1(h); *Stephens v. Dolcefino,* 126 S.W.3d 120, 130 (Tex.App.-Houston [1st Dist.] 2003), *pet. denied,* 181 S.W.3d 741 (Tex.2005).

Additionally, the Poland parties did not object below to the attorney's fees award on any of the grounds asserted on appeal —either during the July 14 hearing, when appellees' counsel appears to have tendered an affidavit of "costs"; during the month and a half between the time that appellees' filed their August 16 joint motion, which attached the complained-of affidavit, and the court signed the dismissal order that awarded fees; or after that order was rendered. These types of challenges must be preserved to be asserted on appeal. *See* TEX.R.APP. P. 33.1(a)(1); *City of San Antonio v. Longoria,* 04–04–00063–CV, 2004 WL 2098074, at \*4 (Tex.App.-San Antonio Sept. 22, 2004, no pet.) (memo. op.) (holding that following complaints concerning attorney's fees were waived for not having been raised in trial court: "the affiants did not state they are licensed attorneys in good standing in the State of Texas; no evidence was presented regarding their reputation, experience, or abilities; a foundation for the affiants to testify on the reasonableness of their fees was not established; and there is no evidence the fees are reasonable

in Bexar County, Texas or that two attorneys were necessary at an arbitration.").

We overrule this portion of the Poland parties' second issue.

**Conclusion**

We affirm the judgment of the trial court.

We deny appellees' request for sanctions on appeal.

**All Citations**

249 S.W.3d 607

**End of Document**                                                © 2015 Thomson Reuters. No claim to original U.S. Government Works.

461 S.W.3d 577
Court of Appeals of Texas,
Houston (14th Dist.).

Mary Riggins, Appellant

v.

Ronald E. Hill, Linda C. Hill, West Columbia Plaza,
Ltd., and Lucky Lindy Development, Appellees

NO. 14–13–00604–CV    |    December 23, 2014
|    Substitute Opinion filed January 22, 2015
|    Rehearing Overruled February 24, 2015    |
Rehearing En Banc Overruled April 28, 2015

**Synopsis**
**Background:** Tenant brought action against landlord and
associated parties arising out of a fall at landlord's apartment
complex. The 412th District Court, Brazoria County, entered
judgment enforcing a settlement between the parties, and
awarding landlord and associated parties trial and appellate
attorney fees. Tenant appealed, and the Court of Appeals
modified the judgment to make appellate attorney fees
conditional on success on appeal, and affirmed the judgment
as modified. Tenant filed petition for review, which was
denied by the Supreme Court. Thereafter, the case was
transferred and tenant filed various motions, including motion
for determination of attorney fees. The 239th District Court,
Brazoria County, entered order enforcing the judgment, and
finding that it lacked jurisdiction over tenant's motions.
Tenant appealed.

**Holdings:** The Court of Appeals, Kem Thompson Frost, C.J.,
held that:

[1] original judgment was not void, and thus trial court lacked
jurisdiction over tenant's post-appellate mandate motions;

[2] landlord and associated parties were entitled to $4,000 in
appellate attorney fees arising out of petition for review by
the Supreme Court; and

[3] appeal was a frivolous appeal, warranting award of
frivolous appeal damages against tenant's attorney.

Affirmed; damages awarded.

West Headnotes (10)

**[1]**    **Appeal and Error**
    Collateral actions or proceedings

    **Judgment**
    Form and requisites of judgment

    Judgment in which trial court enforced a
    settlement of tenant's lawsuit against landlord
    and associated parties and awarded trial and
    appellate attorney fees to landlord and associated
    parties was not void, and thus trial court lacked
    jurisdiction over tenant's motion for sanctions,
    motion for determination of attorney fees and
    release of money held in the court registry,
    and motion for attorney fees, which were filed
    after issuance of appellate mandate affirming the
    judgment as modified; any error by trial court in
    adjudicating the merits in the judgment did not
    deprive trial court of jurisdiction to render the
    judgment, or make the judgment void.

    Cases that cite this headnote

**[2]**    **Courts**
    In general; nature and source of judicial
    authority

    "Jurisdiction" refers to a court's authority to
    adjudicate a case.

    Cases that cite this headnote

**[3]**    **Courts**
    Loss or divestiture of jurisdiction

    If a court has jurisdiction to resolve a dispute,
    an error in its resolution of the merits does not
    deprive the court of jurisdiction.

    Cases that cite this headnote

**[4]**    **Judgment**
    Judgments enforceable in general

    **Judgment**
    Proceedings to Enforce Judgment

    After a trial court's plenary power over a
    judgment expires, the trial court has an

affirmative duty to enforce its judgment, and the trial court retains statutory and inherent authority to do so; but, after its plenary power over a judgment expires, the trial court may not issue an order that is inconsistent with the judgment or that otherwise constitutes a material change in the substantive adjudicative portions of the judgment. Tex. R. Civ. P. 308.

Cases that cite this headnote

**[5]    Costs**

 Attorney fees on appeal or error

Landlord and associated parties were entitled to $4,000 in appellate attorney fees arising out of tenant's petition for review by the Supreme Court, filed after Court of Appeals affirmed as modified a judgment enforcing a settlement agreement, even though landlord and associated parties did not file a brief or response in the Supreme Court, where underlying judgment, as modified, conditionally awarded landlord and associated parties $4,000 in appellate attorney fees if tenant appealed to the Supreme Court, conditioned on their success on appeal, and judgment did not require filing of a response or brief in order for landlord and associated parties to be entitled to these attorney fees.

Cases that cite this headnote

**[6]    Appeal and Error**

 Fees

Tenant failed to preserve for appellate review her claim that trial court that previously awarded attorney fees to landlord and associated parties in tenant's action against them erred in ordering disbursement of the fees directly to law firm that represented landlord and associated parties, rather than to landlord and associated parties, where tenant did not voice this complaint and obtain an adverse ruling in the trial court. Tex. R. App. P. 33.1(a).

Cases that cite this headnote

**[7]    Costs**

 Right and Grounds

Court of Appeals may award just damages under appellate rule governing frivolous appeal damages if, after considering everything in its file, Court of Appeals makes an objective determination that the appeal is frivolous. Tex. R. App. P. 45.

Cases that cite this headnote

**[8]    Costs**

 What constitutes frivolous appeal or delay

To determine whether an appeal is objectively frivolous, so as to support an award of frivolous appeal damages, Court of Appeals reviews the record from the viewpoint of the advocate and decides whether the advocate had reasonable grounds to believe the case could be reversed. Tex. R. App. P. 45.

Cases that cite this headnote

**[9]    Costs**

 Discretion of court

Appellate rule governing frivolous appeal damages does not mandate that Court of Appeals award just damages in every case in which an appeal is frivolous; the decision to award such damages is a matter within the court's discretion, which Court of Appeals exercises with prudence and caution after careful deliberation. Tex. R. App. P. 45.

Cases that cite this headnote

**[10]   Costs**

 Nature and form of judgment, action, or proceedings for review

Tenant's appeal from order enforcing an earlier judgment enforcing a settlement with landlord and associated parties, in which trial court found it lacked jurisdiction over tenant's motions filed after issuance of appellate mandate affirming the judgment as modified, was a frivolous appeal, warranting award to landlord and associated parties of frivolous appeal damages against tenant's attorney; tenant did not show any reasonable ground for concluding that judgment was void or make any other argument that

WestlawNext® © 2015 Thomson Reuters. No claim to original U.S. Government Works.

would allow her to obtain relief inconsistent with judgment, tenant did not show error in trial court's enforcement of judgment, and tenant did not respond to the request for damages. Tex. R. App. P. 45.

Cases that cite this headnote

**\*579** On Appeal from the 239th District Court, Brazoria County, Texas, Trial Court Cause No. 35931, Patrick Edward Sebesta, Judge

**Attorneys and Law Firms**

Veronica L. Davis, West Columbia, TX, for Appellant.

L. Cullen Moore, Houston, TX, for Appellee.

Panel consists of Chief Justice Frost and Justices Jamison and Wise.

## SUBSTITUTE OPINION [1]

1   The memorandum opinion issued on December 23, 2014, is withdrawn, and this opinion is issued in its place to address appellees' motion for damages under Texas Rule of Appellate Procedure 45.

Kem Thompson Frost, Chief Justice

This appeal involves a challenge to an order in which the trial court enforced a judgment that was final by appeal. At issue is whether the trial court erred in **\*580** determining that it lacked jurisdiction over post-mandate motions to alter the attorney's fees awarded in the judgment, whether the trial court's enforcement order was proper, and whether damages under Texas Rule of Appellate Procedure 45 should be imposed against appellant's counsel. We affirm the trial court's judgment and grant appellees' motion for Rule 45 damages.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Nearly a decade ago, appellant/plaintiff Mary Riggins filed suit against various parties, including appellees/defendants Ronald E. Hill, Linda C. Hill, West Columbia Plaza, Ltd.,

and Lucky Lindy Development (hereinafter collectively the "West Columbia Parties"). Riggins asserted various claims against the West Columbia Parties, including that their failure to provide her with reasonable accommodations for her disability caused her to fall and suffer injuries. A few years later, Riggins and the West Columbia Parties entered into an agreement under Texas Rule of Civil Procedure 11, in which they agreed to settle Riggins's claims. After the parties entered into the Rule 11 agreement in May 2008, but before the trial court rendered judgment based on it, Riggins informed the West Columbia Parties that she was withdrawing her consent to the settlement agreement. In response, the West Columbia Parties filed a counterclaim seeking to enforce the settlement agreement.

In the following year, the trial court granted the West Columbia Parties' summary-judgment motion and rendered judgment enforcing the settlement agreement and awarding the West Columbia Parties attorney's fees (hereinafter the "Judgment"). In the Judgment, signed in February 2009, the trial court awarded the West Columbia Parties $3,000 as "attorney's fees and expenses for the filing and hearing on [their summary-judgment motion]." The trial court also awarded the West Columbia Parties $4,000 as additional attorney's fees "if [Riggins] should appeal ... to the Court of Appeals," as well as $3,500 as additional attorney's fees "if [Riggins] should appeal ... to the Texas Supreme Court."

Riggins appealed the Judgment to this court (hereinafter the "First Appeal"). *See Riggins v. Hill,* No. 14–09–00495–CV, 2011 WL 5248347, at \*1 (Tex.App.—Houston [14th Dist.] Nov. 3, 2011, pet.denied) (mem.op.). On appeal, this court sustained one of Riggins's issues, modified the Judgment to condition the award of appellate attorney's fees on the West Columbia Parties' success on appeal, and affirmed the Judgment as modified. *See id.* at \*12. This court did not reverse any part of the Judgment or remand the case for further proceedings in the trial court. *See id.* Riggins then filed a petition for review in the Supreme Court of Texas. *See id.* at \*1. The high court denied review, and this court issued its mandate. *See id.*

In July 2012, Riggins filed a motion in the trial court requesting disbursement of the funds in the registry of the court. In her motion, Riggins requested that the trial court order that only $3,000 of the funds be disbursed to counsel for the West Columbia Parties. In response, the West Columbia Parties filed a motion in which they requested that $10,500 plus interest be disbursed to their counsel based on the

attorney's fees awarded to the West Columbia Parties in the Judgment.

Later that year, Riggins filed a motion to transfer the case to the 239th Judicial District Court. The West Columbia Parties did not oppose this motion, and the **\*581** case was transferred. [2] The parties engaged in post-judgment discovery. In late 2012 and early 2013, Riggins filed a motion for sanctions against the West Columbia Parties, a motion for determination of attorney's fees and for release of the money in the registry of the court, and a motion for attorney's fees (hereinafter collectively the "Post–Mandate Motions"). Riggins also filed a "counterclaim," in which she purported to assert claims for breach of contract and intentional infliction of emotional distress.

[2]     The propriety of this transfer is not at issue in this appeal.

In April 2013, the trial court signed an order enforcing the Judgment, as modified by this court, and ordering the court clerk to disburse $7,500 to counsel for the West Columbia Parties. In its order, the trial court also found that it did not have jurisdiction over Riggins's Post–Mandate Motions. In June 2013, Riggins perfected an appeal from this order, which we resolve today.

## II. ISSUES AND ANALYSIS

In six appellate issues, Riggins asserts various arguments in support of her contention that the trial court erred in granting the West Columbia Parties awards of attorney's fees and in failing to grant her an award of attorney's fees. Riggins asserts, among other things, that the trial court erred in awarding the West Columbia Parties attorney's fees because (1) the West Columbia Parties were not prevailing parties; (2) attorney's fees are not available for defendants in civil rights and torts actions and because seeking to enforce a settlement agreement did not change the nature of the action; (3) the West Columbia Parties' attorneys did not file a brief or response in the Supreme Court of Texas; (4) awarding attorney's fees for appellate work violates an indigent person's right of access to the courts; (5) a Rule 11 agreement containing prospective language is not a contract; and (6) Riggins is entitled to attorney's fees.

### A. Jurisdiction Over the Post–Mandate Motions
In the order from which Riggins appeals, the trial court determined that it lacked jurisdiction over the Post–Mandate

Motions. The West Columbia Parties argue that the trial court was correct in making this determination. Construing Riggins's appellate brief liberally, we conclude that Riggins asserts on appeal that the trial court had jurisdiction over the Post–Mandate Motions because the Judgment is void. Though Riggins's briefing lacks clarity and precision, she appears to **\*582** be asserting that the Judgment is void because the trial court allegedly erred in enforcing the Rule 11 agreement, ordering attorney's fees, and rendering the Judgment. [3]

[3]     Riggins asserts that "[t]he judgment awarding attorney's fees to Appellee's [sic] counsel was in all things void for the foregoing referenced reasons, as well as those set out below."

[1]     [2]     [3]  Jurisdiction refers to a court's authority to adjudicate a case. *Reiss v. Reiss,* 118 S.W.3d 439, 443 (Tex.2003). If a court has jurisdiction to resolve a dispute, an error in its resolution of the merits does not deprive the court of jurisdiction. *See Reiss,* 118 S.W.3d at 443 (holding that a judgment is not void merely because the court erred in adjudicating the merits). Riggins does not argue that the trial court lacked jurisdiction to determine whether to enforce the Rule 11 agreement and to determine whether any of the parties were entitled to attorney's fees. Instead, Riggins appears to be asserting that the Judgment is void because the trial court allegedly made the wrong decision. Riggins has not cited any authority that supports this proposition. Any error by the trial court in adjudicating the merits in the Judgment did not deprive the trial court of jurisdiction to render the Judgment, nor did it make the Judgment void. *See id.* Though Riggins states in a conclusory manner that the Judgment is void or void ab initio, Riggins has not provided any analysis in support of this statement. We conclude that the Judgment is neither void ab initio nor void.

In the remainder of her appellate brief, Riggins does not raise any other challenge to the trial court's conclusion that it lacked jurisdiction over the Post–Mandate Motions. Riggins's argument challenging the trial court's decision based on a purported lack of jurisdiction over the Post–Mandate Motions is without merit. To the extent that Riggins challenges the trial court's determination that it lacked jurisdiction over the Post–Mandate Motions in her six appellate issues, those issues are overruled.

### B. Challenges to Enforcement of the Judgment

[4] The Texas Rules of Civil Procedure limit a trial court's jurisdiction in the period after the trial court has rendered a final judgment. *Custom Corporates, Inc. v. Security Storage, Inc.,* 207 S.W.3d 835, 839 (Tex.App.—Houston [14th Dist.] 2006, no pet.). After a trial court's plenary power over a judgment expires, the trial court has an affirmative duty to enforce its judgment, and the trial court retains statutory and inherent authority to do so. *See* Tex. R. Civ. P. 308; *In re Crow–Billingsley Air Park, Ltd.,* 98 S.W.3d 178, 179 (Tex.2003); *BancorpSouth Bank v. Prevot,* 256 S.W.3d 719, 724 (Tex.App.—Houston [14th Dist.] 2008, no pet.). But, after its plenary power over a judgment expires, the trial court may not issue an order that is inconsistent with the judgment or that otherwise constitutes a material change in the substantive adjudicative portions of the judgment. *Custom Corporates, Inc.,* 207 S.W.3d at 839.

[5] Under her third issue, Riggins argues that the West Columbia Parties are not entitled to attorney's fees because they did not file a brief or a response in the Supreme Court of Texas. Under the language of the Judgment, as modified by this court in the First Appeal, the West Columbia Parties are entitled to an additional $4,000 in appellate attorney's fees "if [Riggins] should appeal ... to the Texas Supreme Court," conditioned on the West Columbia Parties' success on appeal. Under the unambiguous language of the Judgment, as modified by this court, the West Columbia Parties were not required to file a response or a brief to be entitled to recover these additional appellate fees. Riggins has not cited any authority in which a court concludes that a judgment creditor must file an appellate brief or response to be entitled to recover appellate attorney's fees awarded to the judgment creditor, even though that condition is not contained in the judgment. Riggins has not shown that the trial court erred to the extent the trial court ordered the disbursement of the additional attorney's fees from the registry of the court.[4]

[4] Riggins does not assert that the West Columbia Parties were not entitled to these fees because Riggins filed a petition for review rather than an appeal in the Supreme Court of Texas. Even if Riggins had made such an argument, we would conclude it lacks merit.

[6] Under her first issue, Riggins also asserts that the trial court erred in ordering disbursement of attorney's fees directly to the law firm representing the West **\*583** Columbia Parties rather than to the West Columbia Parties. Riggins does not explain how she preserved error as to this complaint. A review of the record reveals that Riggins did not lay the proper predicate for appeal by voicing this complaint and obtaining an adverse ruling in the trial court. Therefore, Riggins failed to preserve error as to this appellate complaint. *See* Tex. R. App. P. 33.1(a); *Gammill v. Fettner,* 297 S.W.3d 792, 801–02 (Tex.App.–Houston [14th Dist.] 2009, no pet.). This portion of her first issue is thus waived.

We have addressed all of Riggins's appellate arguments that constitute a challenge to the manner in which the trial court enforced the Judgment rather than an attempt to relitigate the Judgment after the trial court lost plenary power over the Judgment. We conclude that, in these arguments, Riggins has not shown that the trial court erred in the manner in which it enforced the Judgment. Having concluded that all of Riggins's arguments lack merit, we overrule Riggins's appellate issues.

**C. Damages Under Texas Rule of Appellate Procedure 45**

[7] [8] [9] Texas Rule of Appellate Procedure 45, entitled "Damages for Frivolous Appeals in Civil Cases," provides for the assessment of just damages if the court of appeals determines that a civil appeal is frivolous. *See* Tex. R. App. P. 45 (stating that, "[i]f the court of appeals determines that an appeal is frivolous, it may—on motion of any party or on its own initiative, after notice and a reasonable opportunity for response—award each prevailing party just damages"); *Hatton v. Grigar,* No. 14–09–00630–CV, 2011 WL 175501, at *3 (Tex.App.—Houston [14th Dist.] Jan. 20, 2011, no pet.) (ordering appellant and appellant's attorney to pay Rule 45 damages to appellee) (mem.op.); *Lookshin v. Feldman,* 127 S.W.3d 100, 107 (Tex.App.—Houston [1st Dist.] 2003, pet. denied) (ordering only appellant's attorney to pay Rule 45 damages to appellee). Based on this rule, the West Columbia Parties have moved for just damages against Veronica L. Davis, counsel of record for Riggins. This court may award just damages under Rule 45 if, after considering everything in its file, this court makes an objective determination that the appeal is frivolous. *Glassman v. Goodfriend,* 347 S.W.3d 772, 782 (Tex.App.—Houston [14th Dist.] 2011, pet. denied) (en banc). To determine whether an appeal is objectively frivolous, this court reviews the record from the viewpoint of the advocate and decides whether the advocate had reasonable grounds to believe the case could be reversed. *Id.* But, Rule 45 does not mandate that this court award just damages in every case in which an appeal is frivolous. *Id.* The decision to award such damages is a matter within this court's discretion, which this court exercises with prudence and caution after careful deliberation. *Id.*

In the First Appeal, Riggins had the opportunity to show that the trial court reversibly erred in rendering the Judgment. In that appeal, this court addressed the arguments that Riggins made, found merit in only one of her arguments, and affirmed the Judgment as modified. *See Riggins,* 2011 WL 5248347, at \*1–12. The Supreme Court of Texas denied Riggins's petition for review and motion for rehearing of the denial of that petition. This court issued its mandate commanding the trial court to observe and execute the Judgment as modified. Nonetheless, after issuance of this mandate, Riggins, represented by Davis, sought to relitigate the issues determined by the Judgment in the trial court. Riggins, through Davis, filed a "counterclaim," in which Riggins purported to assert claims for breach of contract **\*584** and intentional infliction of emotional distress. The trial court signed an order enforcing the Judgment, as modified by this court. In its order, the trial court found that it did not have jurisdiction over Riggins's Post–Mandate Motions. Riggins perfected an appeal from this order.

 **[10]** In most of her appellate arguments, Riggins, through her counsel Davis, seeks to relitigate the issues already resolved by the Judgment, which was final by appeal before Riggins perfected this appeal. Riggins has not shown, and the record does not reflect, any reasonable ground for concluding that the Judgment is void. Riggins has not made any other argument that, if successful, would allow her to obtain relief inconsistent with the Judgment, as modified by this court. As to Riggins's challenges to the enforcement of the Judgment as modified by this court, the record does not show any reasonable ground for concluding that the West Columbia Parties were required to file a response or a brief to be entitled to recover the appellate fees awarded in that judgment. Nor does the record reveal any reasonable ground for concluding that Riggins preserved error in the trial court regarding her other challenge to the enforcement of the Judgment as modified. The West Columbia Parties filed a Rule 45 motion asking this court to assess against Davis more than $54,000 in damages. At no time during the pendency of this appeal has Davis or Riggins filed any response in opposition to this motion. Nor has either Riggins or Davis undertaken to refute the stated reasons for the Rule 45 damages sought, though each has had ample notice of the relief sought and opportunity to be heard. Considering everything in this court's file and

reviewing the record from the viewpoint of Davis, Riggins's attorney, we conclude that Davis had no reasonable grounds to believe that the case could be reversed. Accordingly, we make an objective determination that this appeal is frivolous. *See Glassman,* 347 S.W.3d at 782–83. We also conclude that the West Columbia Parties should be awarded Rule 45 damages against Davis. *See id.; Hatton,* 2011 WL 175501, at \*3; *Lookshin,* 127 S.W.3d at 107.

The West Columbia Parties seek damages based upon the attorney's fees and expenses they have incurred since the trial court rendered the Judgment. Although Rule 45 does not prescribe a method for determining the amount of the "just damages," courts have awarded just damages based on proof of expenditures incurred by the appellee as a result of the frivolous appeal. *See Chapman v. Hootman,* 999 S.W.2d 118, 123–25 (Tex.App.—Houston [14th Dist.] 1999, no pet.); *Lookshin,* 127 S.W.3d at 105–07. In this case, we conclude that just damages should be calculated based upon the West Columbia Parties' attorney's fees and expenses incurred as a result of this appeal. *See Chapman,* 999 S.W.2d at 123–25; *Lookshin,* 127 S.W.3d at 105–07. Therefore, we calculate just damages based on the West Columbia Parties' attorney's fees and expenses in this case from the point Riggins perfected appeal in June 2013. The West Columbia Parties have submitted uncontroverted proof of reasonable attorney's fees during this period in the amount of $12,175.50 and of $161.28 in expenses, for a total of $12,336.78.

### III. CONCLUSION

We affirm the trial court's order. In addition, under Rule 45, we order Veronica L. Davis to pay the West Columbia Parties **\*585** $12,336.78 in just damages.[5]

5     The West Columbia Parties have not asked that Riggins be ordered to pay any damages under Rule 45, and we do not order Riggins to pay any Rule 45 damages.

### All Citations

461 S.W.3d 577

---

KeyCite Yellow Flag - Negative Treatment

**Distinguished by**    City of Houston v. Student Aid Foundation Enterprises,  Tex.App.-Hous. (14 Dist.),    July 8, 2010

298 S.W.3d 321
Court of Appeals of Texas,
Houston (14th Dist.).

Adrian ROBINSON, Appellant,

v.

ALIEF INDEPENDENT SCHOOL
DISTRICT and Louis Stoerner, in
his Official Capacity only, Appellees.

No. 14–08–00949–CV.    |    Aug. 25, 2009.

**Synopsis**
**Background:** Teacher brought action against school district and its superintendent, seeking declaratory and injunctive relief from alleged violations of his equal rights, freedom of speech, and due process. The 80th District Court, Harris County, Lynn M. Bradshaw–Hull, J., granted defendants' plea to jurisdiction, finding that teacher's resignation, combined with district's expungement of teacher's employee file, rendered the action moot. Teacher appealed.

**Holdings:** The Court of Appeals, Adele Hedges, C.J., held that:

[1] district's expungement of teacher's employee file rendered his action for injunctive relief moot;

[2] teacher's resignation rendered his action for declaratory relief moot; and

[3] teacher waived right to amend his pleadings as to cure jurisdictional defects.

Affirmed.

Kem Thompson Frost, J., issued dissenting opinion.

West Headnotes (12)

**[1]**    **Pleading**
     Plea to the Jurisdiction
A plea to the jurisdiction seeks dismissal of a cause based on lack of subject-matter jurisdiction.

Cases that cite this headnote

**[2]**    **Appeal and Error**
     Cases Triable in Appellate Court
Whether a court has subject-matter jurisdiction and whether a plaintiff has affirmatively demonstrated subject-matter jurisdiction are questions of law that are reviewed de novo.

2 Cases that cite this headnote

**[3]**    **Pleading**
     Scope of inquiry and matters considered in general
**Pleading**
     Merits
In deciding a plea to the jurisdiction, courts may not weigh the merits of the plaintiff's claim, but must consider only the plaintiff's pleadings, construed in favor of the plaintiff, and the evidence pertinent to the jurisdictional inquiry.

2 Cases that cite this headnote

**[4]**    **Pleading**
     Amendments following sustaining of pleas
When a plaintiff fails to plead facts establishing jurisdiction, but the petition does not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency and the plaintiff should be afforded the opportunity to amend; however, if the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiff an opportunity to amend.

4 Cases that cite this headnote

**[5]**    **Injunction**

     Mootness and ripeness; ineffectual remedy

     **Injunction**

      Employment matters

Teacher's action against school district and its superintendent seeking injunctive relief to expunge portions of his employee file relating to controversy over which he resigned his position was rendered moot upon district's decision to expunge portions of teacher's employee file; there was no more action that a court could enjoin to satisfy teacher's request to expunge his records.

1 Cases that cite this headnote

**[6]**    **Constitutional Law**

     Advisory Opinions

The mootness doctrine precludes a court from rendering an advisory opinion in a case where there is no live controversy.

9 Cases that cite this headnote

**[7]**    **Declaratory Judgment**

     Termination or settlement of controversy

     **Declaratory Judgment**

      Necessity

A declaratory judgment is appropriate when a justiciable controversy exists concerning the rights and status of the parties and the controversy will be resolved by the declaration sought.

3 Cases that cite this headnote

**[8]**    **Declaratory Judgment**

     Moot, abstract or hypothetical questions

     **Declaratory Judgment**

      Future or contingent questions

A declaratory judgment action does not vest a court with the power to decide hypothetical or contingent situations or to determine questions not essential to the decision of an actual

controversy, even if such question may require adjudication in the future.

Cases that cite this headnote

**[9]**    **Action**

     Moot, hypothetical or abstract questions

A case becomes moot when: (1) it appears that a party seeks to obtain a judgment upon some controversy, when in reality none exists, or (2) a party seeks a judgment upon some matter which cannot have any practical legal effect upon a then existing controversy.

6 Cases that cite this headnote

**[10]**    **Declaratory Judgment**

     Education

Teacher's resignation from employment with school district rendered his claim for declaratory relief from school district's alleged constitutional violations moot; after his resignation, teacher no longer faced the alleged misconduct about which he complained.

Cases that cite this headnote

**[11]**    **Declaratory Judgment**

     Moot, abstract or hypothetical questions

Past exposure to illegal conduct does not in itself amount to a present controversy for declaratory relief if unaccompanied by any continuing, present, adverse effects.

1 Cases that cite this headnote

**[12]**    **Declaratory Judgment**

     Answer, counterclaim and reply

Teacher who asserted claims for declaratory judgment and injunctive relief against school district and superintendent, which were rendered moot by teacher's resignation and district's expungement of teacher's employee file, waived his right to cure the jurisdictional defects by amendment of pleadings, where, after defendants filed their plea to the jurisdiction, teacher neither responded to the plea with additional jurisdictional facts reflecting a live controversy

nor requested an opportunity to replead or amend his pleadings.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*322** Larry Watts, Missouri City, TX, for appellant.

Jon Erik Nichols, Jonathan Griffin Brush, Paul Andrew Lamp, Houston, for appellees.

Panel consists of Chief Justice HEDGES, and Justices YATES and FROST.

## MAJORITY OPINION

ADELE HEDGES, Chief Justice.

Appellant, Adrian Robinson, brings this accelerated appeal challenging the trial court's order granting the plea to the jurisdiction filed by appellees, Alief Independent School District ("AISD") and Louis Stoerner. In his sole issue, Robinson contends **\*323** that the trial court erroneously granted the plea to the jurisdiction because his claims against AISD and Stoerner were not moot. We affirm.

## I. BACKGROUND

Robinson was employed by AISD as a teacher during the 2004–2005 school year. Robinson contends that in the fall of 2004, he had a brief romantic relationship with a fellow employee, Lenetta Freeman. He claims that after he ended the relationship, Freeman and Dwight Brannon, an employee in AISD's human resources department, began a campaign against Robinson to tarnish his reputation as an educator. Robinson contends that Brannon placed him on administrative leave in February 2005 for making "inappropriate comments regarding a coworker" without divulging the substance of the alleged inappropriate statements. Moreover, Robinson claims that while he was on leave, an email was sent to AISD employees indicating that Robinson suffered from AIDS and was attempting to maliciously spread the disease. Robinson claims that in August 2005, he was forced to resign due to a stress-related

medical disorder. Freeman resigned from AISD in 2006, and Brannon resigned in 2007.

In February 2007, appellant filed the underlying lawsuit against AISD, AISD's superintendent, Stoerner, in his official capacity, Freeman, and Brannon. Against AISD and Stoerner, Robinson alleged equal rights, freedom of speech, and due process violations under Article I, Sections 3, 8, and 19 of the Texas Constitution. Against Freeman and Brannon, Robinson claimed that they "conspired to and each intentionally inflicted him with emotional distress, interfered with his business relationship, and invaded his constitutional right to privacy." Robinson sought declaratory and injunctive relief, requesting that the trial court: (1) "declare that [AISD] violated [his] constitutional rights"; (2) "[e]njoin [AISD] through its Superintendent of Schools to expunge his records of all references to Brannon's acts ... against him"; and (3) "order that Brannon, Freeman and all other employees of [AISD] cease violating or infringing upon [his] protected rights and liberties."

AISD and Stoerner answered the lawsuit and subsequently filed a plea to the jurisdiction contending that Robinson's claims against them were moot. AISD and Stoerner first argued that Robinson's request for injunctive relief regarding expungement of his employee file was moot because AISD, sua sponte, had agreed to expunge the specific portions of Robinson's personnel file that he requested to be removed. After Robinson filed his lawsuit, AISD voluntarily agreed to expunge all references to Brannon's acts against Robinson from the employee file as requested in Robinson's original petition and forwarded a letter to Robinson notifying him of its decision to expunge those records. Accordingly, AISD and Stoerner argued in their plea to the jurisdiction that the voluntary decision to expunge all references to Brannon's acts against Robinson from the personnel records mooted Robinson's request that the trial court order AISD, through Stoerner, to expunge the same.

AISD and Stoerner further argued that Robinson's remaining requests for declaratory and injunctive relief were moot. Specifically, AISD and Stoerner argued that because Robinson resigned from AISD in 2005, he was no longer subjected to the alleged unconstitutional conduct. Consequently, there was no live controversy. AISD and Stoerner urged the trial court to dismiss Robinson's claims against them because the trial court did not have subject-matter jurisdiction over the moot claims.

**\*324** With no response from Robinson, the trial court signed an order granting AISD and Stoerner's plea to the jurisdiction and dismissed Robinson's claims against them. On appeal, Robinson argues that the trial court erred in granting the plea to the jurisdiction and dismissing his claims against AISD and Stoerner because those claims were not moot.[1] In the alternative, Robinson argues that the trial court should have afforded him the opportunity to amend his pleadings to cure any jurisdictional defects.

[1]    Robinson appeals only the dismissal of his request for a declaration that his constitutional rights were violated by AISD and his request for injunctive relief ordering AISD to expunge his employee file. He does not challenge the dismissal of his claim for injunctive relief to order Brannon, Freeman, and all AISD employees to cease violating or infringing upon his constitutional rights.

## II. STANDARD OF REVIEW

**[1]** **[2]** **[3]** **[4]** A plea to the jurisdiction seeks dismissal of a cause based on lack of subject-matter jurisdiction. *Harris County v. Sykes,* 136 S.W.3d 635, 638 (Tex.2004); *Ahmed v. Metropolitan Transit Auth.,* 257 S.W.3d 29, 31 (Tex.App.-Houston [14th Dist.] 2008, no pet.). Whether a court has subject-matter jurisdiction and whether a plaintiff has affirmatively demonstrated subject-matter jurisdiction are questions of law that we review *de novo. Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 226 (Tex.2004). In deciding a plea to the jurisdiction, we may not weigh the merits of the plaintiff's claim, but must consider only the plaintiff's pleadings, construed in favor of the plaintiff, and the evidence pertinent to the jurisdictional inquiry. *County of Cameron v. Brown,* 80 S.W.3d 549, 555 (Tex.2002); *Saturn Capital Corp. v. City of Houston,* 246 S.W.3d 242, 244–45 (Tex.App.-Houston [14th Dist.] 2007, pet. denied). When a plaintiff fails to plead facts establishing jurisdiction, but the petition does not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency. In that instance, the plaintiff should be afforded the opportunity to amend. *Brown,* 80 S.W.3d at 555. However, if the pleadings affirmatively negate the existence of jurisdiction, dismissal is proper without allowing the plaintiff an opportunity to amend. *Id.*

## III. MOOTNESS

**[5]** In his sole issue, Robinson contends that his requests for injunctive and declaratory relief were not moot despite his resignation from AISD and AISD's decision to expunge portions of his employee file. In response, AISD and Stoerner argue that because there is no live controversy, any judicial action on the merits of Robinson's claims would merely be advisory.

**[6]** **[7]** **[8]** **[9]** The mootness doctrine precludes a court from rendering an advisory opinion in a case where there is no live controversy. *Camarena v. Tex. Employment Comm'n,* 754 S.W.2d 149, 151 (Tex.1988); *Scurlock Permian Corp. v. Brazos County,* 869 S.W.2d 478, 487 (Tex.App.-Houston [1st Dist.] 1993, writ denied) ("Courts may not give advisory opinions or decide cases upon speculative, hypothetical, or contingent situations."). A declaratory judgment is appropriate when a justiciable controversy exists concerning the rights and status of the parties and the controversy will be resolved by the declaration sought. But an action does not vest a court with the power to decide hypothetical or contingent situations or to determine questions not essential to the decision of an actual controversy, even if such question may require adjudication in the future. *Harris* **\*325** *County Mun. Util. Dist. No. 156 v. United Somerset Corp.,* 274 S.W.3d 133, 139–40 (Tex.App.-Houston [1st Dist.] 2008, no pet.) (quoting *Tex. Health Care Info. Council v. Seton Health Plan, Inc.,* 94 S.W.3d 841, 846 (Tex.App.-Austin 2002, pet. denied)). A case becomes moot when: (1) it appears that a party seeks to obtain a judgment upon some controversy, when in reality none exists; or (2) a party seeks a judgment upon some matter which cannot have any practical legal effect upon a then existing controversy. *Mollinedo v. Tex. Employment Comm'n,* 662 S.W.2d 732, 738 (Tex.App.-Houston [1st Dist.] 1983, writ ref'd n.r.e.); *Scholl v. Firemen's & Policemen's Civil Serv. Comm'n,* 520 S.W.2d 470, 471 (Tex.Civ.App.-Corpus Christi 1975, no writ) (per curiam).

### A. Injunctive Relief: Expunging Employee File

Robinson argues that AISD's "unilateral decision to expunge" his employee record did not moot his request for injunctive relief to expunge his records. Relying heavily upon *Lakey v. Taylor,* Robinson argues that without a judicial admission of wrongdoing or extrajudicial action preventing AISD from reversing its decision to expunge his personnel file in the future, AISD is capable of retracting its expungement of the records. 278 S.W.3d 6 (Tex.App.-Austin 2008, no pet.).

*Lakey* involved a due-process constitutional challenge to a departmental policy implemented by the Texas Department of Health Services. *Id.* at 10. Texas law required defendants determined to be incompetent to stand trial but ineligible for bail to be committed to a mental health facility for competency-restoration treatment. *Id.* These particular commitments were referred to as forensic commitments. The Department operated the state mental health hospital system, which housed and treated a number of forensic-commitment defendants. *Id.* In 2005, the number of persons required to be committed under the statute increased dramatically and exceeded the number of available hospital beds for forensic commitments. *Id.* In response, the Department developed a "clearinghouse list," which was essentially a wait list for forensic commitments; the list made all forensic commitments to state hospitals contingent on the availability of space. Consequently, individuals on the clearinghouse list remained in county jail until a state hospital bed was available for competency-restoration treatment. *Id.*

Thereafter, a group of plaintiffs brought suit against the commissioner seeking declaratory and injunctive relief. The plaintiffs requested an injunction requiring the Department to provide competency-restoration treatment within a reasonable period of time, not to exceed three days, and a declaration that the Department's current policies, procedures, and practices regarding the clearinghouse list violated the Texas Constitution. *Id.* at 11. The commissioner responded, in part, by arguing that the plaintiffs' claims had been mooted by recent legislative funding and policy changes to the clearinghouse list. Specifically, the Department had revised its clearinghouse-list policy so that the waiting period for forensic commitments had dropped significantly. The *Lakey* Court rejected the commissioner's mootness argument, concluding that a controversy still existed, despite the policy changes resulting in a decline in the waiting period, because the changes did not **eliminate** the waiting period. *Id.* at 12 ("While the Commissioner asserts that the number of criminal defendants on the clearinghouse list has been reduced, he does not contend that it has been eliminated."). The *Lakey* Court further opined that the Department could not moot the appeal by voluntarily abandoning the challenged policy "without **\*326** any binding admission or extrajudicial action that would prevent a recurrence of the challenged action." *Id.* Accordingly, the court held that the plaintiffs' injunctive and declaratory claims were not moot. *Id.*

*Lakey* can be distinguished on two dispositive points. First, the *Lakey* Court held that the injunctive claim was not moot

because the Department's actions did not fully satisfy the plaintiffs' injunctive request. *See id.* The plaintiffs in *Lakey* requested that competency-restoration treatment be provided within a reasonable time period not exceeding three days. *Id.* at 11. The Department's unilateral policy changes fell short of this request because the changes did not decrease the waiting period to three days or less. Rather, the waiting period was reduced to six months. *Id.* at 12. Accordingly, the plaintiffs' request for injunctive relief had not fully been satisfied by the Department's policy changes. In contrast, Robinson requested in the instant case that his employee file be expunged, and AISD fully agreed to comply with this injunctive request. Accordingly, there is no more action that a court can enjoin to satisfy Robinson's request to expunge his records. *See Scholl, 520 S.W.2d at 471* (concluding that because actions requested in suit for declaratory and injunctive relief were taken, no controversy remained to be resolved).

Furthermore, unlike *Lakey,* a case involving the cessation of an *ongoing injury* caused by an unconstitutional departmental *policy,* there is no present or immediate injury in the case before us. Robinson seeks an injunction ordering AISD to remove documents that AISD has already agreed to expunge *in the event AISD reinstates the documents sometime in the future*. Without any evidence of an existing or continuing present injury, or a reasonable expectation that AISD will reinstate the expunged documents in his employee file, Robinson's request is merely conjunctural and hypothetical.[2] Accordingly, any **\*327** judicial action would be advisory. *See id.* Because Texas courts are not vested with the authority to render advisory opinions,[3] we hold that Robinson's injunctive request to expunge his employee file is moot.

[2]    Robinson neither argues that AISD has not expunged the documents nor identifies a present ongoing injury. Rather, he argues only that in the future, AISD may decide to resurrect the expunged documents. The dissent contends that Robinson "remains vulnerable" because AISD "might not honor" its agreement to expunge the records. However, granting relief on the possibility of noncompliance is advisory.

      The dissent asserts arguments not raised, explicitly or implicitly, by Robinson: Robinson's request for expungement is not moot because, *inter alia,* (1) AISD was required to expunge all records within their possession, not exclusively Robinson's personnel file, (2) AISD "only offer[ed] to take documents from Robinson's personnel file and move them to another file," and (3) AISD "ha[d] not expunged the items requested by Robinson." Not only did Robinson fail

to make these arguments on appeal, they are without merit. In his petition, Robinson requested AISD to expunge "his records of all references to Brannon's acts against him." Liberally construing the petition, Robinson requests that only *his* records be expunged, not any and all other files within AISD's possession. As for the dissent's "agreement to merely transfer" argument, AISD's letter did not indicate that AISD would merely transfer the documents from one file to another. Specifically, the letter indicates:

> Part of the relief Adrian Robinson seeks in this lawsuit is for the Court to enter an injunction requiring AISD to "expunge [Mr. Robinson's] records of all references to [Dwight] Brannon's acts as against him[.]" As an initial matter, my clients adamantly dispute engaging in any unlawful acts against Mr. Robinson, and maintain that Mr. Robinson's claims in this case are unfounded. Moreover, AISD does not believe that it has any obligation to expunge Mr. Robinson's records as requested.
>
> Nevertheless, in order to moot the issue and avoid incurring additional expenses related to this issue, AISD is enclosing with this letter Mr. Robinson's personnel file from AISD (labeled AISD 1 through AISD 109), as well as all other non-privileged documents of which it is aware relating to the allegations in this lawsuit (labeled AISD 110 through AISD 214 and AISD 381–382). AISD agrees to *expunge* any of these records that Mr. Robinson believes reflect Dwight Brannon's "acts as against him" as requested in his lawsuit. Additionally, if Mr. Robinson believes that AISD maintains any other records that reflect Mr. Brannon's "acts as against him" as alleged in his lawsuit (of which AISD is unaware), AISD requests that Mr. Robinson identify any such documents and AISD agrees to *expunge* them.

The letter in no way indicates that AISD is merely transferring the relevant documents to another file. Rather, the letter explicitly reflects AISD's agreement to *expunge* the records.

Finally, contrary to the dissent's argument that AISD has not in fact expunged the records and only made a unilateral offer to expunge, Robinson has made no complaint that AISD has not actually expunged his records or that the letter makes a mere unilateral offer. His only complaint is that in the future, a person without knowledge of the underlying litigation may inadvertently resurrect the already-expunged records. We cannot address the substantive arguments raised by the dissent because they were not asserted or briefed by Robinson. *See Zamarron v. Shinko Wire*

*Co.,* 125 S.W.3d 132, 139 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (complaint waived because it was not raised in initial brief); *Stevens v. Nat'l Educ. Ctrs., Inc.,* 990 S.W.2d 374, 378 n. 1 (Tex.App.-Houston [14th Dist.] 1999, pet. denied) (appellate court will not address an issue that is not raised on appeal by an appellant).

3   See *Valley Baptist Med. Ctr. v. Gonzalez,* 33 S.W.3d 821, 822 (Tex.2000).

### B. Declaratory Relief: Violation of Robinson's Constitutional Rights

**[10]  [11]**   Next, Robinson argues that his claim for declaratory relief regarding the violation of his constitutional rights was not moot. As stated above, Robinson's claim for declaratory relief is justiciable only if the pleadings articulate an existing controversy. *See Bonham State Bank v. Beadle,* 907 S.W.2d 465, 467 (Tex.1995). Past exposure to illegal conduct does not in itself amount to a present controversy for declaratory relief if unaccompanied by any continuing, present, adverse effects. *See Williams v. Lara,* 52 S.W.3d 171, 184 (Tex.2000). The pleadings before us reflect that Robinson is no longer employed with AISD. Thus, he is not currently subjected to the allegedly unconstitutional activity for which he seeks declaratory relief. The Supreme Court of Texas has held that a claim for declaratory relief is moot if the party is no longer subject to the alleged illegal conduct. *See id. at 184–85.*

In *Lara,* former inmates sued Tarrant County and other defendants for operating a religious-education program instructing inmates about Christianity. *Id.* at 175. The former inmates complained that the religious instruction violated the Establishment, Free Exercise, and Equal Protection Clauses of the United States and Texas Constitutions and violated their civil rights under 42 U.S.C. § 1983. *Id.* The *Lara* court held that the former inmates lacked standing to assert claims for injunctive and declaratory relief because they no longer were subjected to the unconstitutional conduct about which they were complaining. *Id.* at 184. Accordingly, their claims for injunctive and declaratory relief were moot.[4] *Id.*

4   The Texas Supreme Court reasoned that past illegal conduct without a present ongoing injury is moot for declaratory and injunctive relief. *Lara,* 52 S.W.3d at 184. Nevertheless, if a party also seeks damages, the damages claim is not moot. *Id.* at 185. Robinson, however, does not seek damages in his suit against AISD and Stoerner.

Similar to the former inmates in *Lara,* Robinson, as a former AISD employee, no **\*328** longer faces the alleged misconduct about which he complains. Following *Lara,* we hold that Robinson's claim for declaratory relief regarding the violation of his constitutional rights is moot. *See id*. at 184–185.

## IV. OPPORTUNITY TO AMEND

 **[12]**  In the alternative, Robinson complains that the trial court erred in dismissing his claims without first affording him the opportunity to amend his pleadings to cure any jurisdictional defect. While the general rule expresses a preference to allow a plaintiff the opportunity to amend, a plaintiff can waive this opportunity through inaction. *See Kassen v. Hatley,* 887 S.W.2d 4, 13–14 n. 10 (Tex.1994); *Dahl v. State,* 92 S.W.3d 856, 862–63 n. 6 (Tex.App.-Houston [14th Dist.] 2002, no pet.) (noting that plaintiffs arguably waived complaint that the trial court failed to provide them with an opportunity to amend their pleadings when they did not seek leave to amend); *Gray v. City of Galveston,* No. 14–03–00298–CV, 2003 WL 22908145, at \*2 (Tex.App.-Houston [14th Dist.] Dec. 11, 2003, no pet.) (mem. op.) ("[A]ppellant did not request an opportunity to amend in the trial court, so she has waived any complaint that she has been denied this opportunity.").

After AISD and Stoerner filed their plea to the jurisdiction, Robinson neither responded to the plea with additional jurisdictional facts reflecting a live controversy nor requested an opportunity to replead or amend his pleadings. Despite ample notice of AISD and Stoerner's jurisdictional argument, Robinson did not attempt to replead. Accordingly, Robinson has waived his right to cure any jurisdictional defects by amendment.

We overrule appellant's sole issue and affirm the trial court's order granting AISD and Stoerner's plea to the jurisdiction.

*FROST,* J., Dissenting.

*KEM THOMPSON FROST,* Justice, dissenting.
The plaintiff, a former employee of the defendant school district, sought an injunction ordering the school district and its superintendent to expunge from all of their records all references to another employee's acts against the plaintiff.

The majority concludes that the plaintiff received this requested relief because the school district, in a letter, offered to move files selected by the plaintiff out of the plaintiff's personnel file and into other files maintained by the school district. The school district's offer did not include an agreement to expunge all documents requested and is not equivalent to an injunction ordering the school district and its superintendent to permanently erase all objectionable references from all of their records. Therefore, the school district's offer did not moot the plaintiff's claims.

A trial court must have subject matter jurisdiction to decide a case. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 443 (Tex.1993). Mootness is a threshold issue affecting a trial court's subject matter jurisdiction. *See In re H & R Block Fin. Advisors, Inc.,* 262 S.W.3d 896, 899 (Tex.App.-Houston [14th Dist.] 2008, no pet.). The existence of jurisdiction is a question of law, which this court reviews de novo. *Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 928 (Tex.1998). We examine the pleadings to determine whether the facts pleaded affirmatively demonstrate that jurisdiction exists and construe the pleadings liberally, looking to the pleader's intent. *State v. Holland,* 221 S.W.3d 639, 642–43 (Tex.2007) (involving plea to jurisdiction). A fact question as to jurisdiction prevents a trial court from granting a party's  **\*329** plea to the jurisdiction. *City of Waco v. Lopez,* 259 S.W.3d 147, 150 (Tex.2008).

### The Request for Injunctive Relief

In his petition, appellant/plaintiff Adrian Robinson asked the trial court to "enjoin the [Alief Independent School] District through its Superintendent of Schools to expunge his records of all references to [Dwight] Brannon's acts as against him." Under normal rules of grammar, "his records" presumably refers to the superintendent's records.[1] But even if "his records" meant "Robinson's records," liberally construing the petition,[2] as we must, this phrase would mean any record of appellee Alief Independent School District (the "District") relating to Robinson and would not be limited to Robinson's personnel file.

---

[1] Under common rules of English grammar, to be unambiguous, a pronoun typically refers to the last antecedent in the same sentence. THE CHICAGO MANUAL OF STYLE 155 (15th ed., 2003).

2    Because no special exceptions were sustained against the petition, this court must construe Robinson's petition liberally to contain any claims that reasonably may be inferred from the specific language used in the petition. *See SmithKline Beecham Corp. v. Doe,* 903 S.W.2d 347, 354–55 (Tex.1995).

### The Standard for Evaluating Mootness

Mootness is determined based on the status of the claims as of the time of the ruling on the plea to the jurisdiction rather than on what the status might be at some moment in the future. *See Fed. Deposit Ins. Corp. v. Nueces County,* 886 S.W.2d 766, 767 (Tex.1994). Thus, in evaluating Robinson's claims for mootness, this court must focus on the status of the claims at the time of the trial court's order of dismissal. Likewise, the mootness determination must be made with stringent reference to Robinson's request for relief as set forth in his pleadings, without regard to the merits of his claims or the likelihood of their success. A litigant should not be deprived his day in court unless his claims are truly moot.

The doctrine of mootness is based on the prohibition against courts issuing advisory opinions. *See Patterson v. Planned Parenthood of Houston and Southeast Texas, Inc.,* 971 S.W.2d 439, 442 (Tex.1998). Courts have articulated various legal standards for determining when a case is moot.[3] In this case, the District argues and the majority concludes that Robinson's request for injunctive relief is moot because the District "fully agreed to comply with this injunctive request" and therefore "there is no more action that a court can enjoin to satisfy Robinson's request to expunge his records."[4] The majority relies on the theory that the District has performed all the actions that Robinson asked the trial court to order the District to undertake.[5]

3    For example, courts have stated that a case is moot when (1) a controversy ceases to exist between the parties, (2) the parties lack a legally cognizable interest in the outcome, (3) when a party seeks a ruling on some matter which, when rendered, would not have any practical legal effect on a then-existing controversy, or (4) the plaintiff seeks a court order commanding the defendant to perform certain acts and the defendant performs all these acts without a court order. *See Allstate Ins. Co. v. Hallman,* 159 S.W.3d 640, 642 (Tex.2005); *In re H & R Block Financial Advisors, Inc.,* 262 S.W.3d 896, 900 (Tex.App.-Houston [14th Dist.] 2008, orig. proceeding);

*Houston Chronicle Publ'g Co. v. Thomas,* 196 S.W.3d 396, 401 (Tex.App.-Houston [1st Dist.] 2006, no pet.).

4    *See ante* at p. 326.

5    *See id.*

### The School District's Offer

The trial court concluded that Robinson's request for injunctive relief is moot **\*330** based on Robinson's receipt of a letter from the District, dated August 26, 2008 (the "District's Letter"). In the District's Letter, without admitting liability or agreeing to enter into an injunction or other agreed court order and for the stated purpose of mooting Robinson's claims, the District enclosed a copy of Robinson's personnel file and other "non-privileged documents of which it is aware relating to the allegations in this lawsuit." The District stated that it "agree[d] to expunge" any of its records that Robinson believes reflect "Brannon's acts against him." Significantly, however, rather than stating that the expunged records would no longer be part of the District's records, the District stated only that "the expunged records will no longer be part of the records that [the District] maintains for Mr. Robinson."[6] Robinson, who sought injunctive relief with respect to a larger scope of documents, did not accept the terms set forth in the District's Letter and that offer did not ripen into a contract. The trial court found that this unaccepted offer alone mooted Robinson's request for relief.

6    The District also submitted an affidavit from one of its employees, Rose Benitez; however, Benitez simply said that she agreed to the terms of the District's Letter.

### Arguments on Appeal

In challenging the trial court's dismissal of his claims as moot, Robinson asserts several arguments. Robinson could have made these arguments more clearly and more thoroughly; better briefing would have enhanced this court's ability to effectively review the issues presented. However, even if Robinson had not sufficiently briefed the issue, because the disposition of this case turns on a jurisdictional issue—mootness—this court is duty-bound to examine jurisdictional grounds, and may do so sua sponte. *See M.O. Dental Lab v. Rape,* 139 S.W.3d 671, 673 (Tex.2004) (stating that a reviewing court is obligated to review sua sponte issues affecting jurisdiction). Construing Robinson's appellate brief liberally, as this court must, Robinson argues that (1) his

claims are not moot; (2) the District's Letter is a "unilateral offer" that is not binding on the District; (3) Robinson's request for expungement was directed at all of the District's records and not just Robinson's personnel file; (4) in the District's Letter, the District offers only to take documents from Robinson's personnel file and move them to another file; and (5) the District has not expunged the items requested by Robinson.[7] *See Ditta v. Conte,* 298 S.W.3d 187, 189–90 (Tex.2009).[8]

[7] The majority indicates that Robinson did not explicitly or implicitly assert these arguments. *See ante* at pp. 326–27 n. 2. In his appellate brief, Robinson summarizes his argument as follows:

> The trial court erred in granting Defendants AISD and Stoerner's Plea to the Jurisdiction and finding that Plaintiff's claims against these Defendants were moot simply because Defendants unilaterally offered a portion of the relief being sought by Plaintiff.
> ...
> Because AISD and Stoerner's unilateral decision to expunge Plaintiff's record was not coupled with any binding judicial admission or some extrajudicial action that would prevent the recurrence of their unconstitutional actions, Robinson's claims against these Defendants are not moot and the trial court erred in finding it did not have subject matter jurisdiction over Robinson's claims against AISD and Stoerner.

> Additional quoted references to specific arguments raised by Robinson in his appellate brief are contained in footnotes specific to the issues.

[8] The majority indicates that Robinson does not challenge the dismissal of his claim for injunctive relief to order Brannon and Freeman to cease violating or infringing upon his rights. *See ante* at p. 324 n. 1. However, the trial court did not dismiss Robinson's request as to Brannon and Freeman. As such, that request is not part of this appeal.

### *331  The Reasons the Claims Are Not Moot

The trial court's finding of mootness is unsupportable for several reasons, each of which is grounded on the fundamental concept that when Robinson's request for relief (as set forth in his pleadings) is measured against the District's offer, unsatisfied requests for relief clearly remain.

### *An offer to perform an act is not the same as performing the act.*

Robinson argues on appeal that the District's Letter is not a binding contract, that it does not provide him with any recourse against the District, and that nothing would prevent the District from moving the documents in question back to Robinson's personnel file. Robinson's arguments have merit.

Even if the District had offered to expunge all the information that Robinson asked the court to order expunged, such an offer would not be the same as a court order commanding the District to expunge all of this information. Under its unambiguous language, the District's Letter is not a contract but rather an offer that is not binding on the parties unless and until Robinson accepts the District's offer by designating documents that Robinson believes reflect "Brannon's acts against him." *See Johnston v. Kruse,* 261 S.W.3d 895, 898 (Tex.App.-Dallas 2008, no pet.) (holding that no unilateral contract was formed because promisee did not accept the offer by performing the act the promissor requested). Mootness is determined based on the status of the claims as of the time of the ruling on the plea to the jurisdiction rather than on what the status might be at some moment in the future, in which Robinson might have accepted the District's offer by performance or in which the District might expunge information from its records regarding Robinson. *See Fed. Deposit Ins. Corp.,* 886 S.W.2d at 767. The contingencies on which the mootness finding is premised have not yet occurred, and therefore the claims are not moot.

As Robinson correctly points out, even though his claims were dismissed as moot because he purportedly received all the relief he requested, he remains vulnerable to receiving nothing. For example, after this appeal is over, the District might not honor its offer and then might argue successfully that it has governmental immunity against Robinson's suit for enforcement of the promise of expungement.[9] Because Robinson's claims are being declared moot even though he did not receive the injunctive relief he requested, he is effectively left without a remedy or enforcement mechanism. More importantly, the court's mootness finding deprives him of the opportunity to even seek this relief.

[9] See *Tooke v. City of Mexia,* 197 S.W.3d 325, 332 (Tex.2006); *Nat'l Surety Corp. v. Friendswood Indep. Sch. Dist.,* 433 S.W.2d 690, 694 (Tex.1968). The parties have not cited any applicable exception to governmental immunity. A four-justice plurality of the Supreme Court

of Texas stated that immunity is waived as to a suit against a government entity for breach of a settlement agreement that resolved a lawsuit for which the entity had no immunity. *See Tex. A & M Univ.-Kingsville v. Lawson,* 87 S.W.3d 518, 520–23 (Tex.2002) (plurality op.). In *Lawson,* four dissenting justices concluded that immunity applied even under those facts. *See id.* at 524 (Rodriguez, J., dissenting). Presuming that the *Lawson* plurality correctly stated Texas law, this exception does not apply to the District's Letter. The *Lawson* plurality stressed the narrow nature of the exception in question, which it limited, among other things, to suits for breach of a settlement agreement. *See id.* at 522–23 (plurality op.). Under its unambiguous language, the District's Letter is not a settlement agreement. The parties have not cited any statute waiving the District's governmental immunity from a suit by Robinson seeking to enforce the District's Letter.

**\*332** An offer or agreement to expunge information is fundamentally different from a court order commanding the District to expunge information. This is true when none of the parties is a governmental entity, but it is even more significant when one of the parties involved is a political subdivision of the State that generally enjoys governmental immunity. However, if Robinson were awarded the injunctive relief he sought—an order compelling the District to expunge the records—then Robinson would have a means of enforcing this injunction against the District. Violation of a court order would subject the District to being held in contempt of court for failure to comply. Therefore, a significant difference exists between the injunction that Robinson requested and the District's offer. On this basis alone, Robinson has not received all the relief he requested, and this claim is not moot.

*Moving documents from one file to another is not the same as expunging references contained in them.*

Robinson sought an injunction commanding the District to expunge from its records all references to Brannon's allegedly improper allegations against Robinson. The plain meaning of the word "expunge" is "to erase or destroy." *See* BLACK'S LAW DICTIONARY 603 (7th ed. 1999); *see also Tex. Dep't of Public Safety v. J.H.J.,* 274 S.W.3d 803, 809 (Tex.App.-Houston [14th Dist.] 2008, no pet.) (construing "expungement" as promoting "destruction" of records under the Texas Code of Criminal Procedure). If the District were to erase or destroy all of the references of which Robinson complains, then its records would contain none of these references at all. In one part of the District's Letter, the District states that it "agrees to expunge" any of its records

that Robinson believes reflect "Brannon's acts against him." However, after stating that the District reserves the right to use any and all of Robinson's records in this lawsuit, the District states that "the expunged records will no longer be part of the records that [the District] maintains for Mr. Robinson." This language strongly suggests that the District may believe that it has "expunged" the references in question if it merely removes them from its files regarding Robinson and puts them in another one of its files. [10] This action is not expungement. In his petition, Robinson sought erasure or destruction of the references in question from all of the District's files; he did not seek the transfer of documents containing such references from one part of the District's files to another. [11] Such a transfer could be undone easily and would not eliminate or erase the references from the District's files. Expungement is permanent, and it would prevent the District from communicating these references **\*333** to third parties in the future and from having more of the District's employees learn the contents of these references. For this reason, Robinson has not received all the relief he requested.

[10]  The majority also indicates that after expunging documents, the District could "reinstate" the documents in the future. *See ante* at p. 326. This is contrary to the plain meaning of the word "expunge."

[11]  Robinson argues specifically in his appellate brief, "The trial court found that Plaintiff's claims against Defendants AISD and Stoerner were moot because AISD agreed more than 18 months after Robinson filed suit to expunge his AISD personnel records of whatever documents that Plaintiff maintained were the basis of the lawsuit against them. Within that finding is the trial court's and defendants' acknowledgment that but for the defendants' *unilateral, non-binding and reversible removal of certain documents from* or expungement of Robinson's personnel file, Robinson's claims were not moot, and the trial court had jurisdiction over those claims." (internal citations to record omitted and emphasis added). Robinson argued that without a binding agreement as to the District's offer in the District's Letter, "nothing would prevent them from *reinserting* the harmful documents into his AISD personnel file...."

*Documents not held back from discovery as privileged are not the same as all of the District's documents.*

Robinson did not limit his requested relief to the documents not held back by the District under assertion of privilege. Yet, in the District's Letter, the District asks Robinson to select

the information to which he objects from "non-privileged documents of which the District is aware relating to the allegations in this lawsuit." This group of documents does not include all of the District's records. Because the District is holding back documents under claim of privilege, there may be documents that the District has held back that contain references to Brannon's acts or accusations. These documents are not subject to the offer in the District's Letter but were part of the relief Robinson sought in his pleadings. This is another reason why Robinson has not received all the relief he requested.

### *The District has not taken the action that Robinson asked the trial court to order.*

The majority concludes that there is nothing left for the trial court to order the District to do because the District already has taken the action sought by Robinson. It is on this basis that the majority distinguishes the *Lakey* case. *See ante* at p. 326; *see also Lakey v. Taylor ex rel. Shearer,* 278 S.W.3d 6, 11–12 (Tex.App.-Austin 2008, no pet.). As shown above, Robinson has not received all the relief he requested, and, even under the District's Letter, the District later could decide with seeming impunity to move the documents in question back to Robinson's personnel file. Therefore, *Lakey* is on point. *See Lakey,* 278 S.W.3d at 11–12. Robinson's claims are not moot because the District has not taken the action that Robinson requested the trial court to order. *See Allstate Ins. Co. v. Hallman,* 159 S.W.3d 640, 642–43 (Tex.2005) (holding that issues of whether insurer owed defense and indemnity were not moot, even though insurer could no longer be liable for defense or indemnity, because insured still sought attorney's fees under the Texas Declaratory Judgment Act); *Lakey,* 278 S.W.3d at 11–12 (holding that petitioner's challenge was not mooted by defendant's voluntary policy changes because the previous policy that gave rise to the dispute could be reimplemented at any given time); *Tex. Health Care Info. Council v. Seton Health Plan, Inc.,* 94 S.W.3d 841, 847–848 (Tex.App.-Austin 2002, pet. denied) (concluding that petitioner's challenge to the assessment of a penalty was not mooted by a letter withdrawing that penalty because the letter was non-binding and did not prevent re-assessment of

the disputed penalty); *Del Valle Indep. Sch. Dist. v. Lopez,* 863 S.W.2d 507, 511 (Tex.App.-Austin 1993, writ denied) (concluding that a declaratory-judgment action regarding the constitutionality of an election system was not rendered moot by the voluntary adoption of a new election system because petitioner's request for the permanent elimination of the prior election system was not satisfied); *Turner v. Chandler,* 304 S.W.2d 687, 688–689 (Tex.Civ.App.-Texarkana 1957, no writ) (asserting that when a party seeks specific relief and that relief has not been granted, then a proceeding is not moot because the question of whether the specific relief sought should be granted remains undecided). Thus, even if the District's offer ripened into a contract, the resulting agreement would not give Robinson all of the relief he requested in his pleadings. As long as some of the relief Robinson requested remains, his claims are not moot.

### *334  Conclusion

The District did not offer to enter into an agreed injunction or to expunge all of the documents Robinson requested, and Robinson did not accept the offer for lesser relief that the District *did* make. The trial court and this court conclude that the making of an offer for less than full relief renders the claims moot. It does not. Even if the majority were correct in its premise, that an unaccepted offer rather than performance is sufficient to moot Robinson's claims, such a determination would moot only part of the requested relief. On its face, the District's Letter does not cover documents withheld from discovery under claim of privilege or documents moved from one file location to another, all of which fell within Robinson's request for relief. For all of these reasons, the trial court erred in ruling that Robinson's request for an injunction regarding expungement is moot. At the very least, fact questions remain that should have precluded the granting of the plea to the jurisdiction. Because this court affirms rather than reverses the trial court's dismissal, I respectfully dissent.

### All Citations

298 S.W.3d 321, 251 Ed. Law Rep. 942

---

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

869 S.W.2d 478
Court of Appeals of Texas,
Houston (1st Dist.).

SCURLOCK PERMIAN CORPORATION, Appellant,

v.

BRAZOS COUNTY, Texas; The Commissioners
Court of Brazos County, Texas; R.J. Holmgreen,
County Judge of Brazos County, Texas; Gary
Norton, Walter Wilcox, Randy Sims and Milton
Turner, County Commissioners of Brazos County,
Texas; Ron Miller, Sheriff of Brazos County,
Texas; Holland Winder, County Road Engineer of
Brazos County, Texas; and Raymond Day, Johnny
Burkhalter, Derik B. Matejka, Louis Garcia, Jr.,
Frankie J. Nemec, Jr., and Winfred Pittman,
Constables of Brazos County, Texas, Appellees.

No. 01–93–00080–CV. | Nov. 10,
1993. | Rehearing Denied Dec. 23, 1993.

Oil marketing company brought action for declaratory judgment that state law providing for permitting of overweight vehicles preempted power of county to require separate county permit. The 361st District Court, Brazos County, Carolyn Ruffino, J., entered judgment against company, and it appealed. The Court of Appeals, Oliver-Parrott, C.J., held that: (1) statute establishing statewide uniformity in permitting overweight vehicles was not special law in violation of State Constitution; (2) statute was exception to general provisions authorizing counties to regulate traffic on county roads; and (3) county may not issue permit or restrict operation of vehicle with statewide permit.

Reversed and remanded.

West Headnotes (26)

[1] **Declaratory Judgment**
⚷ Service on Attorney General

Trial court had jurisdiction to consider constitutional issue in declaratory judgment action without notice to State Attorney General, where neither party challenged constitutionality of statute in pleadings. Vernon's Ann.Texas

Civ.St. art. 6701d–11; V.T.C.A., Civil Practice & Remedies Code § 37.006(b).

2 Cases that cite this headnote

[2] **Constitutional Law**
⚷ Notice to Attorney General

Failure to notify Attorney General of pendency of declaratory judgment action in which constitutional ability of statute, ordinance, or franchise is challenged deprives trial court of jurisdiction to proceed. V.T.C.A., Civil Practice & Remedies Code § 37.006(b).

1 Cases that cite this headnote

[3] **Declaratory Judgment**
⚷ Service on Attorney General

When neither party challenges constitutionality of statute, ordinance, or franchise, neither party is required to serve Attorney General with copy of pleadings; failure to serve Attorney General will not deprive trial court of jurisdiction. V.T.C.A., Civil Practice & Remedies Code § 37.006(b).

1 Cases that cite this headnote

[4] **Pleading**
⚷ Necessity for defense

Unconstitutionality of statute is affirmative defense that must be pled. Vernon's Ann.Texas Rules Civ.Proc., Rule 94.

2 Cases that cite this headnote

[5] **Appeal and Error**
⚷ Scope and Effect of Objection

Objection at trial that is not same as objection urged on appeal presents nothing for appellate review.

17 Cases that cite this headnote

[6] **Constitutional Law**
⚷ Presumptions and Construction as to Constitutionality

**Constitutional Law**
☞ Clearly, positively, or unmistakably unconstitutional

When evaluating constitutionality of statute, statute is presumed to be constitutional and should not be struck down by Intermediate Appellate Court except on clear and certain grounds.

2 Cases that cite this headnote

[7] **Constitutional Law**
☞ Burden of Proof

Party asserting unconstitutionality of statute has burden of persuasion.

Cases that cite this headnote

[8] **Statutes**
☞ Laws of Special, Local, or Private Nature

Statute is not local or special law prohibited by State Constitution if persons or things throughout state are affected by it, or if it operates upon subject in which people at large are interested. Vernon's Ann.Texas Const. Art. 3, § 56.

Cases that cite this headnote

[9] **Constitutional Law**
☞ Class Legislation; Discrimination and Classification in General
**Statutes**
☞ Uniformity of Operation

State legislature has broad power to make classifications for legislative purposes and to enact laws for regulation of those classifications, provided that legislation applies uniformly to all within classification, and classification is broad enough to include substantial class and based on characteristics legitimately distinguishing class from others regarding public purpose sought to be accomplished by legislation.

Cases that cite this headnote

[10] **Statutes**
☞ General laws compared and distinguished

Statute that relates to persons or things as a class is general law, while statute that relates to particular persons or things as class is special, prohibited by Constitution. Vernon's Ann.Texas Const. Art. 3, § 56.

Cases that cite this headnote

[11] **Statutes**
☞ General laws compared and distinguished

Primary and ultimate test of whether state law is general or special under State Constitution is whether there is reasonable basis for classification it makes and whether law operates equally to all within its class. Vernon's Ann.Texas Const. Art. 3, § 56.

Cases that cite this headnote

[12] **Statutes**
☞ Government property, facilities, and funds

State statute regulating weight and size of vehicles using state highways was not special law in violation of State Constitution; purpose of statute was to establish statewide uniformity in permitting overweight vehicles. Vernon's Ann.Texas Civ.St. art. 6701d–11; Vernon's Ann.Texas Const. Art. 3, § 56.

Cases that cite this headnote

[13] **Automobiles**
☞ Concurrent and conflicting regulations

Statute providing for statewide uniformity in permitting overweight vehicles removed from county authority granted by County Road and Bridge Act to enact and implement its own permit system. Vernon's Ann.Texas Civ.St. arts. 6701d–11, 6701d–11, § 2(b)(1), 6702–1, § 2.301(a)(1).

Cases that cite this headnote

[14] **Automobiles**
☞ Concurrent and conflicting regulations

County Road and Bridge Act, authorizing county to regulate traffic on county roads, was not irreconcilable with statute regulating weight and

size of vehicles using state highways; specific provisions of permit statute were exception to general provisions of County Road and Bridge Act. Vernon's Ann.Texas Civ.St. art. 6701d–11.

Cases that cite this headnote

**[15]**   **Statutes**
   Prior or existing law in general

Statute is presumed to have been enacted by legislature with complete knowledge of existing law and with reference to it.

1 Cases that cite this headnote

**[16]**   **Statutes**
   Subject or purpose

When two statutes concern same subject matter, they are to be construed to give meaning to both.

Cases that cite this headnote

**[17]**   **Statutes**
   General and specific statutes
   **Statutes**
   Earlier and later statutes

Special or specific act is properly regarded as exception to, or qualification of, general law on same subject previously enacted.

1 Cases that cite this headnote

**[18]**   **Automobiles**
   Concurrent and conflicting regulations

County may not require that oversized vehicle have county permit, though county was authorized to require permits, where vehicle had valid statewide overweight permit; carrier's failure to provide county with notice of permit did not authorize county to require permit of vehicle holding statewide permit. Vernon's Ann.Texas Civ.St. arts. 6701d–11, 6701d–11, §§ 2(b)(1), 5B, 5B(d).

Cases that cite this headnote

**[19]**   **Declaratory Judgment**

   Termination or settlement of controversy

Trial court may refuse to render or enter declaratory judgment if judgment will not terminate uncertainty or controversy giving rise to proceeding. V.T.C.A., Civil Practice & Remedies Code § 37.008.

8 Cases that cite this headnote

**[20]**   **Declaratory Judgment**
   Limitation of discretion
   **Declaratory Judgment**
   Termination or settlement of controversy

In suit for declaratory relief, trial court has limited discretion to refuse declaratory judgment, and may do so only where judgment would not remove uncertainty giving rise to proceedings.

7 Cases that cite this headnote

**[21]**   **Declaratory Judgment**
   Necessity

Declaratory judgment is appropriate when real controversy exists between parties, and entire controversy may be determined by judicial declaration.

11 Cases that cite this headnote

**[22]**   **Action**
   Moot, hypothetical or abstract questions

To be justiciable controversy, there must exist real and substantial controversy involving genuine conflict of tangible interests and not merely theoretical dispute.

10 Cases that cite this headnote

**[23]**   **Constitutional Law**
   Advisory Opinions

Courts may not give advisory opinions or decide cases upon speculative, hypothetical, or contingent situations.

2 Cases that cite this headnote

**[24]     Declaratory Judgment**
👉 Determination and disposition of cause

Court of Appeals has duty to render judgment that trial court should have rendered in declaratory judgment action.

4 Cases that cite this headnote

**[25]     Injunction**
👉 On ground of invalidity

Court of equity may not enjoin enforcement of penal ordinance unless ordinance is unconstitutional or otherwise void, and enforcement of ordinance causes irreparable injury to vested property rights.

Cases that cite this headnote

**[26]     New Trial**
👉 Necessity of objection

Appellant did not have to raise issue of constitutionality of statute in motion for judgment before filing its motion for new trial, where trial court raised issue of constitutionality sua sponte.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*480** Charles W. Schwartz, James D. Thompson III, Dana C. Livingston, Vinson & Elkins L.L.P., Houston, for appellant.

A.W. Davis, Vaughan E. Waters, Davis & Davis, Houston, for appellees.

Before OLIVER–PARROTT, C.J., and HUTSON–DUNN and WILSON, JJ.

**\*481  OPINION**

OLIVER–PARROTT, Chief Justice.

Plaintiff, Scurlock Permian Corporation (Scurlock), brought suit against Brazos County and a number of Brazos County officials (collectively, "Brazos County") seeking

a declaratory judgment, injunctive relief, damages, and attorney's fees. Scurlock appeals the take-nothing judgment entered against it.

**Factual background**

This case involves the interpretation of certain provisions of TEX.REV.CIV.STAT.ANN. art. 6701d–11 (Vernon 1977 & Supp.1993) and the County Road and Bridge Act, TEX.REV.CIV.STAT.ANN. art. 6702–1 (Vernon Supp.1993). Article 6701d–11 regulates the weight and size of vehicles using Texas highways, and provides for the permitting of overweight vehicles by the State Department of Highways and Public Transportation. The County Road and Bridge Act authorizes county commissioners courts to regulate and restrict traffic on county roads and allows commissioners courts to establish load limits for any road or bridge. TEX.REV.CIV.STAT.ANN. art. 6702–1, § 2.301(a)(1), (b)(2) (Vernon Supp.1993). The County Road and Bridge Act does not expressly authorize counties to require overweight vehicle to have a county permit.

In 1981, the Brazos County Commissioners Court, pursuant to the then-current version of art. 6701d–11 [1] enacted the Brazos County Traffic Regulations. These regulations established weight and size limits for vehicles travelling on Brazos County roads, and provided a permitting system for overweight vehicles.

[1]     Act of March 31, 1971, 62nd Leg., R.S., ch. 49, § 1, 1971 Tex.Gen.Laws 87, 87–88, *amended by* Act of May 27, 1989, 71st Leg., R.S., ch. 488, § 4, 1989 Tex.Gen.Laws 1661, 1664.

In 1989, the legislature enacted House Bill 2060 and amended article 6701d–11. The amendment established a statewide permitting system for vehicles that exceed the statute's weight limitations. The amended statute specifically provides:

> The Commissioners Courts through the County Judges of the several counties of this State may issue permits limited to periods of ninety (90) days or less for the transportation over highways of their respective counties other than State highways and public roads within the boundaries of an incorporated municipality, overweight or oversize

or overlength commodities which cannot be reasonably dismantled, or for the operation over these highways of superheavy or oversize equipment for the transportation of oversize or overweight or overlength commodities which cannot be reasonably dismantled, or for the operation over these highways of vehicles or combinations of vehicles that exceed the weights authorized under Section 5 or Section 5 1/2 of this Act. If a vehicle has a permit under Section 5B of this Act, a Commissioners Court may not issue a permit under this Subsection, charge any additional fee for, or otherwise regulate or restrict the operation of the vehicle with a gross weight or axle weight that exceeds the weights authorized by Section 5 or Section 5 1/2 of this Act, or require the owner or operator to execute or comply with a road use agreement or indemnity agreement, to make any filings or applications, or to provide a bond or letter of credit other than the bond or letter of credit provided for in Section 5B.

Article 6701d–11, § 2(b)(1). Section 5B of the statute provides for the issuance of permits ("2060 permits") for vehicles that exceed the allowable gross weight by a tolerance allowance of five percent. *Id.* at § 5B(b). The "overall gross weight may not exceed eighty thousand (80,000) pounds, including all enforcement tolerances." *Id.* at § 5(a)(1). The fee for the permit is $75 and the permit is valid for one year. *Id.* at § 5B(e). The applicant must file a letter of credit or post a bond. *Id.* at § 5B(g). The liability of an applicant for damages to roads and highways is not limited to the amount of the bond or letter of credit, however. *Id.* at § 5B(h). The statute prescribes the procedures by which a permit holder must notify the counties in which that person intends to operate the overweight vehicle. *Id.* at § 2(b)(2). It also specifies the venue for any suits brought **\*482** by a county seeking to recover for damages caused by a permit holder. *Id.* at § 2(b)(6).

In 1991, Brazos County re-enacted its traffic regulations, this time ostensibly pursuant to the authority granted under the County Road and Bridge Act. The 1991 regulations limit the weight of vehicles travelling on county roads to 58,420 pounds, and provide for the issuance of permits for vehicles exceeding that weight. The traffic regulations authorize the issuance of 90–day, 30–day, and 72–hour permits. Applicants for such permits are required to pay a fee and post a bond.

Scurlock is a crude oil marketing and oil field service company. It buys and sells crude oil from the leases of various producers. Its trucks transport bulk crude oil throughout the state. Until mid–1991, Scurlock (and its predecessor corporations) regularly purchased Brazos County permits for overweight vehicles. In 1991, the company determined that the 2060 permits it purchased from the State were effective throughout the state. It therefore stopped purchasing Brazos County permits. Brazos County, however, continued to require county permits, and issued citations to commercial vehicles weighing more than 58,420 pounds that traveled its county roads without a county permit. Scurlock drivers received several citations.

In its suit against Brazos County, Scurlock sought injunctive relief as well as a judgment declaring, among other things, that article 6701d–11 "preempted" Brazos County's power to require a vehicle with a 2060 permit to also have a county permit and that the Brazos County traffic regulations were null and void. The trial court granted a temporary injunction on April 16, 1992. However, on September 29, the trial court dissolved the temporary injunction and ordered that Scurlock take nothing. It found that the 1989 amendments to article 6701d–11 were in irreconcilable conflict with the County Road and Bridge Act to the extent that the amended statute "purports to remove from the Commissioners Court the authority to regulate, on county roads, bridges, and culverts, those overweight vehicles which are issued a statewide permit under Article 6701d–11, § 5B." The court, *sua sponte,* further found that the amendments violated the Texas Constitution.

The trial court's conclusions of law included the following:

(1) Section 2.301 of the County Road and Bridge Act impliedly grants Brazos County the power to implement its permit system, regardless of any other permit issued.

(4) To be entitled to the benefits of article 6701d–11, section 2(b)(1), a carrier must comply with the notice requirements of section 2(b)(2) of that article.

(5) Section 2(b)(1) of article 6701d–11 does not purport to restrict the power or authority of the commissioners

court to regulate vehicles operating at gross weights under 80,000 pounds.

(7) Article 6701d–11 does not purport to remove from Brazos County or the commissioners court the authority granted by the County Road and Bridge Act to enact and implement its permit system, regardless of whether a carrier holds a 2060 permit.

(8) If, and to the extent that article 6701d–11 does purport to remove such authority from Brazos County or the commissioners court, it is in irreconcilable conflict with the County Road and Bridge Act.

(9) If, and to the extent that article 6701d–11 does purport to remove such authority from Brazos County or the commissioners court, it violates TEX. CONST. art. III, § 56, "as a special law regulating the affairs of counties and changing the venue in civil cases, to the benefit of motor carriers carrying overweight loads and to the detriment of the citizens of the various counties of Texas."

(10) If article 6701d–11 is deemed constitutional, then "it is to be strictly construed as being in derogation of the powers and authorities granted to counties and the commissioners courts" under the County Road and Bridge Act.

(11) Scurlock was not entitled to injunctive relief because it did not demonstrate that its overweight vehicles operated on Brazos County roads at gross weights in excess of 80,000 pounds, "the minimum weight at **483** which Article 6701d–11, V.T.C.S., purports to exempt a carrier from compliance with a county permit system."

(12) Scurlock was not entitled to declaratory relief because it did not demonstrate that its overweight vehicles operated on Brazos County roads at gross weights in excess of 80,000 pounds, "the minimum weight at which Article 6701d–11, V.T.C.S., purports to exempt a carrier from compliance with a county permit system"; declaratory relief would therefore be purely advisory.

(13) Scurlock was not entitled to injunctive relief because it did not comply with the notice provisions contained in article 6701d–11, § 2(b)(2), (3), "an essential prerequisite to that article's exemption of motor carriers from compliance with county permit systems."

(14) Scurlock was not entitled to declaratory relief because it did not comply with the notice provisions contained in article 6701d–11, § 2(b)(2), (3), "an essential prerequisite to that article's exemption of motor carriers from compliance with county permit systems"; declaratory relief would therefore be purely advisory.

## Jurisdiction of trial court

In its first two points of error, Scurlock asserts that the trial court erred in addressing the constitutionality of article 6701d–11. Specifically, Scurlock argues that because the attorney general of Texas was not served pursuant to section 37.006(b) of the Civil Practice and Remedies Code and because neither party raised the issue of constitutionality, the trial court lacked jurisdiction to rule on the constitutionality of article 6701d–11.

### 1. Service on the attorney general

 [1]     In declaratory judgment actions, "if [a] statute, ordinance, or franchise is *alleged* to be unconstitutional, the attorney general of the state must also be served with a copy of the proceedings and is entitled to be heard." TEX.CIV.PRAC. & REM.CODE ANN. § 37.006(b) (Vernon 1986) (emphasis added). Neither Scurlock nor Brazos County alleged that article 6701d–11 was unconstitutional; understandably, neither party served the attorney general with a copy of the pleadings. Scurlock argues that because the attorney general did not receive notice of this action, the trial court did not have jurisdiction to consider the constitutional issue.

 [2]     [3]     Brazos County asserts, however, that section 37.006(b) does not apply when the unconstitutionality of a statute is not expressly raised in the pleadings. We agree. Failure to notify the attorney general of the pendency of a declaratory judgment action in which the constitutional validity of a statute, ordinance, or franchise is challenged deprives the trial court of jurisdiction to proceed. *Commerce Indep. Sch. Dist. v. Hampton,* 577 S.W.2d 740, 741 (Tex.Civ.App.—Eastland 1979, no writ); *Commissioners Court of Harris County v. Peoples Nat'l Util. Co.,* 538 S.W.2d 228, 229 (Tex.Civ.App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.). However, when neither party challenges the constitutionality of a statute, ordinance, or franchise, neither party is required to serve the attorney general with a copy of the pleadings; the failure to serve the attorney general will not, therefore, deprive a trial court of jurisdiction. *City of Willow Park v. Bryant,* 763 S.W.2d 506, 508 (Tex.App.—Fort Worth 1988, no writ); *Webb v. L.B. Walker and Assoc.,*

544 S.W.2d 952, 957 (Tex.Civ.App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.). Here, neither party raised the issue of constitutionality; the attorney general's lack of notice of the pendency of this suit did not deprive the trial court of jurisdiction.

**2. Failure to plead affirmative defense**

 [4]    Scurlock correctly notes that the unconstitutionality of a statute is an affirmative defense that must be pled. *Houston Chronicle Publishing Co. v. City of Houston,* 531 S.W.2d 177, 183 (Tex.Civ.App.—Houston [14th Dist.] 1975, writ ref'd n.r.e.);* see also* TEX.R.CIV.P. 94. Scurlock asserts that because Brazos County never pled unconstitutionality as an affirmative defense, the issue was not properly before the trial court. In the absence of an appropriate pleading raising the issue of unconstitutionality, a trial court is without the authority to include such findings in its judgment. **\*484** *Webb,* 544 S.W.2d at 957; *Houston Chronicle Publishing Co.,* 531 S.W.2d at 183.

 [5]    Brazos County argues that Scurlock raises this issue for the first time on appeal, and has therefore waived appellate review. Scurlock asserts that this issue was raised in its motion for new trial. Scurlock's motion does indeed state that neither party raised the issue of unconstitutionality. However, Scurlock addressed the issue of unconstitutionality in connection with its assertion that the trial court's actions violated section 37.006 of the Civil Practice and Remedies Code and deprived Scurlock of the participation of the attorney general; Scurlock never specifically mentioned the failure of Brazos County to plead unconstitutionality as an affirmative defense. An objection at trial that is not the same as the objection urged on appeal presents nothing for appellate review. *Exxon Corp. v. Allsup,* 808 S.W.2d 648, 655 (Tex.App.—Corpus Christi 1991, writ denied); *see also Pfeffer v. Southern Texas Laborers' Pension Trust Fund,* 679 S.W.2d 691, 693 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.) (an appellant may not, on appeal, enlarge a ground of error to include an objection not asserted at trial). We need not determine whether Scurlock has preserved this complaint for review, however. Our discussion and ruling under points of error three and four dispose of any complaint under points one and two.

**Unconstitutionality**

In points of error three and four, Scurlock asserts the trial court erred in finding provisions of article 6701d–11 unconstitutional. The trial court held that article 6701d–11 and its venue provisions [2] violate TEX. CONST. art. III, § 56 as a special law regulating the affairs of counties and changing the venue in civil cases, to the benefit of motor carriers carrying overweight loads and to the detriment of the citizens of the various counties of Texas.

[2]    Article 6701d–11, section 2(b)(6), addresses the venue of a suit brought by a county, and provides in part:

Venue for a suit brought by a county to recover on the bond or letter of credit is in district court in the county in which the defendant resides, except that if the defendant is a corporation or partnership, venue is in the county in which the defendant has its principle place of business in this state. If a corporation or partnership does not have a principle place of business in this state, venue is in the district court in the county in which the damage occurred.

Section 5B(h) governs the venue of suits brought by the State Department of Highways and Public Transportation. It is similar to section 2(b)(6), except that it provides that if a corporation or partnership does not have a principle place of business in Texas, venue is in the district court in Travis County.

Section 56 provides, in part:

The Legislature shall not, except as otherwise provided in this Constitution, pass any local or special law ...:

....

Regulating the affairs of counties, cities, towns, wards or school districts;

....

Changing the venue in civil and criminal cases;

And in all other cases where a general law can be made applicable, no local or special law shall be enacted....

 [6]    [7]    When evaluating the constitutionality of a statute, the statute is presumed to be constitutional and should not be struck down by an intermediate appellate court except on clear and certain grounds. *Cronen v. City of Pasedena,* 835 S.W.2d 206, 210 (Tex.App.—Houston [1st Dist.] 1992, no writ); *Pedraza v. Tibbs,* 826 S.W.2d 695, 697 (Tex.App.—Houston [1st Dist.] 1992, writ dism'd w.o.j.). The party who asserts the statute is unconstitutional therefore has the

burden of persuasion. *Cronen,* 835 S.W.2d at 210; *Holloway v. Butler,* 828 S.W.2d 810, 811 (Tex.App.—Houston [1st Dist.] 1992, writ denied).

[8]    As noted, the trial court, sua sponte, determined that article 6701d–11 is a "special law" and therefore violates the Texas Constitution. The constitutional prohibition of article III, section 56 was intended to prevent the legislature from enacting laws granting special privileges to particular persons, groups, or locales in the state; to encourage uniform law in the state; and to discourage horsetrading or "logrolling" legislation between **\*485** members of the legislature. *Miller v. El Paso County,* 136 Tex. 370, 150 S.W.2d 1000, 1001 (1941); *Public Util. Comm'n v. Southwest Water Serv., Inc.,* 636 S.W.2d 262, 264 (Tex.App.—Austin 1982, writ ref'd n.r.e.). A statute is not local or special if persons or things throughout the state are affected by it, or if it operates upon a subject in which the people at large are interested. *Lower Colorado River Auth. v. McCraw,* 125 Tex. 268, 83 S.W.2d 629, 636 (1935).

[9]    The legislature has broad power to make classifications for legislative purposes and to enact laws for the regulation thereof. *Grimes County Taxpayers Ass'n v. Texas Municipal Power Agency,* 565 S.W.2d 258, 266 (Tex.Civ.App.—Houston [1st Dist.] 1978, writ dism'd). Such legislation must apply uniformly to all who may come within the classification, and the classification must be broad enough to include a substantial class and must be based on characteristics legitimately distinguishing the class from others with respect to the public purpose sought to be accomplished by the legislation. *Id.* If there could exist a state of facts justifying the classification or restriction complained of, we will assume that it existed. *Inman v. Railroad Comm'n,* 478 S.W.2d 124, 127 (Tex.Civ.App.—Austin 1972, writ ref'd n.r.e.).

[10]    [11]    A statute that relates to persons or things as a class is a general law, while a statute that relates to particular persons or things as a class is special. *Southwest Water Serv., Inc.,* 636 S.W.2d at 265. The class created by the statute must be a real class, and not a "pretended" class created by the legislature to evade the constitutional restriction. "A 'pretended' class would be one which 'manifest[s] a purpose to evade the constitution.' " *Id.* (quoting *Clark v. Finley,* 93 Tex. 171, 54 S.W. 343, 346 (1899)). The primary and ultimate test of whether a law is general or special is whether there is a reasonable basis for the classification it makes and whether the law operates equally on all within its class. *Robinson*

*v. Hill,* 507 S.W.2d 521, 525 (Tex.1974); *Grimes County Taxpayers Ass'n,* 565 S.W.2d at 266.

[12]    Scurlock presented evidence that the purpose of the amendments to article 6701d–11 was to establish statewide uniformity in the permitting of overweight vehicles. One of the purposes of article III, section 56, is to promote uniform law in the state. We find that there is a reasonable basis for the classification created by the amendments and that the statute operates equally on all within the classification. We further find the 6701d–11 is not a special law and does not violate TEX. CONST. art. III, § 56. We sustain points of error three and four.

### Brazos County's authority under the County Road and Bridge Act

[13]    The trial court held that article 6701d–11 does not purport to remove from Brazos County the authority granted by the County Road and Bridge Act to enact and implement its permit system, regardless of whether a carrier has a 2060 permit. In its fifth point of error, Scurlock asserts that this conclusion contradicts the express language of article 6701d–11.

The County Road and Bridge Act provides: "The commissioners court of any county may regulate and restrict traffic on county roads and on other county-owned land under its jurisdiction." TEX.REV.CIV.STAT.ANN. art. 6702–1, § 2.301(a)(1) (Vernon Supp.1993). The Act also provides that a commissioners court may establish load limits for any road or bridge. The County Road and Bridge Act contains no specific grant of authority to issue permits for overweight vehicles.

Article 6701d–11 2(b)(1) specifically sets forth a county's power to issue permits for certain overweight or oversized commodities, equipment, and vehicles. The extent of a county's authority is detailed within the provisions of the statute.

Section 2(b)(1) circumscribes a commissioners court's power to issue and require permits for overweight vehicles. The County Road and Bridge Act contains only a general grant of authority to regulate and restrict traffic on county roads. Article 6701d–11 contains a specific and limited grant of authority to issue permits for described items including overweight vehicles. Point of error five is sustained.

**\*486  Irreconcilable conflict**

 [14]    In its sixth point of error, Scurlock asserts that the trial court erred in holding that article 6701d–11 and the County Road and Bridge Act are in irreconcilable conflict. In its seventh point of error, Scurlock asserts that the trial court erred in holding that article 6701d–11 should be construed as being in derogation of the powers and authorities granted to counties and commissioners courts under the County Road and Bridge Act.

 [15]    A statute is presumed to have been enacted by the legislature with complete knowledge of the existing law and with reference to it. *Acker v. Texas Water Comm'n,* 790 S.W.2d 299, 301 (Tex.1990). We may presume that the legislature enacted the amendments to article 6701d–11 with knowledge of and reference to the County Road and Bridge Act.

 [16]    [17]    When two statutes concern the same subject matter, they are to be construed in such a way as to give meaning to both. *J. & J. Beverage Co. v. Texas Alcoholic Beverage Comm'n,* 810 S.W.2d 859, 860 (Tex.App.—Dallas 1991, no writ). A special or specific act is properly regarded as an exception to, or qualification of, a general law on the same subject previously enacted. *Sam Bassett Lumber Co. v. City of Houston,* 145 Tex. 492, 198 S.W.2d 879, 881 (1947); *Olson v. Central Power & Light Co.,* 803 S.W.2d 808, 811 n. 3 (Tex.App.—Corpus Christi 1991, writ denied).

The County Road and Bridge Act deals generally with a county's authority to regulate traffic on county roads. Article 6701d–11 specifically authorizes the state to issue permits for overweight vehicles, and grants counties *limited* power to issue permits for overweight vehicles. We find that the two statutes are not irreconcilable; that the specific provisions of article 6701d–11 are an exception or qualification to the general provisions of the County Road and Bridge Act; and that article 6701d–11 prevails over the County Road and Bridge Act. Points of error six and seven are sustained.

**Declaratory relief**

 [18]    [19]    [20]    In points of error eight, 10, 11, 12, and 13, Scurlock asserts that the trial court erred in denying declaratory relief. The trial court concluded that a declaratory judgment would not be appropriate because: (1) Scurlock

"failed to demonstrate that its overweight vehicles operate on Brazos County roads at gross weights in excess of 80,000 lbs., the minimum weight at which Article 6701d–11, V.T.C.S., purports to exempt a carrier from compliance with a county permit system"; and (2) Scurlock "failed to comply with the notice provisions of Article 6701d–11, § (2)(b)(2) and (3), V.T.C.S., an essential prerequisite to that article's exemption of motor carriers from compliance with county permit systems."

The Civil Practice and Remedies Code provides:

> A person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

TEX.CIV.PRAC. & REM.CODE ANN. § 37.004(a) (Vernon 1986). A trial court may refuse to render or enter a declaratory judgment if the judgment will not terminate the uncertainty or controversy giving rise to the proceeding. TEX.CIV.PRAC. & REM.CODE ANN. § 37.008 (Vernon 1986). In suits for declaratory relief, a trial court has limited discretion to refuse a declaratory judgment, and may do so only where judgment would not remove the uncertainty giving rise to the proceedings. *James v. Hitchcock Indep. Sch. Dist.,* 742 S.W.2d 701, 704 (Tex.App.—Houston [1st Dist.] 1987, writ denied).

 [21]    [22]    [23]    A declaratory judgment is appropriate when a real controversy exists between the parties, and the entire controversy may be determined by judicial declaration. *Board of Water Eng'rs v. City of San Antonio,* 155 Tex. 111, 283 S.W.2d 722, 724 (1955); **\*487** *Public Util. Comm'n v. City of Austin,* 728 S.W.2d 907, 911 (Tex.App.—Austin 1987, writ ref'd n.r.e.). To constitute a justiciable controversy, there must exist a real and substantial controversy involving a genuine conflict of tangible interests and not merely a theoretical dispute. *Bexar–Medina–Atascosa Counties Water Control and Improvement Dist. No. 1 v. Medina Lake Protection Ass'n,* 640 S.W.2d 778, 779–80 (Tex.App.—San Antonio 1982, writ ref'd n.r.e.). Courts may not give advisory

opinions or decide cases upon speculative, hypothetical, or contingent situations. *Coalson v. City Council of Victoria,* 610 S.W.2d 744, 747 (Tex.1980).

### 1. Vehicle weight

The trial court concluded that article 6701d–11 "does not purport to restrict the power or authority of the commissioners courts to regulate vehicles operating at gross weights under 80,000 lbs." We disagree.

We have already held that the County Road and Bridge Act contains only a general grant of authority to counties to regulate and restrict traffic on county roads and that article 6701d–11 contains a specific and limited grant of authority to counties to issue permits for overweight vehicles. We therefore look to the language in article 6701d–11 to determine the extent of—and limitations on—a county's authority to issue such permits.

Section 2(b)(1) authorizes commissioners courts to issue permits in three circumstances. A county may issue permits for:

(1) overweight, oversize or overlength *commodities* which cannot be reasonably dismantled;

(2) superheavy or oversize *equipment* for the transportation of oversize, overweight or overlength commodities that cannot be reasonably dismantled; and

(3) "*vehicles* or combinations of vehicles that exceed the weights authorized under Section 5 or Section 5 1/2 of this Act." [3]

[3]   "Commodities" is not defined by art. 6701d–11. In common usage, however, "commodity" means "an economic good." *See* WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 265 (9th ed. 1991). Unless a word is a word of art, the word will be given its ordinary meaning. TEX.GOV'T CODE ANN. § 312.002 (Vernon 1988). "Vehicle" is defined by the statute as:

> Every mechanical device, in, upon or by which any person or property is or may be transported or drawn upon a public highway, including motor vehicles, commercial motor vehicles, truck-tractors, trailers, and semi-trailers ... but excepting devices moved by human power of used exclusively upon stationary rails or tracks.

> Article 6701d–11, § 1(1). It is clear from these definitions that "commodities," "equipment for

the transportation of commodities," and "vehicles" comprise separate categories for which a county may issue permits.

(Emphasis added.) In this last category, the legislature has given counties the authority to issue permits for the same vehicles for which the state may issue 2060 permits. Section 2(b)(1) goes on to limit a county's authority to issue those permits:

> If a vehicle has a permit issued under Section 5B of this Act [a 2060 permit], a commissioners court may not issue a permit under this subsection, charge any additional fee for, or otherwise regulate or restrict the operation of the vehicle with a gross weight or axle weight that exceeds the weights authorized by Section 5 or Section 5 1/2 of this Act, or require the owner or operator to execute or comply with a road use agreement or indemnity agreement, to make any filings or applications, or to provide a bond or letter of credit other than the bond or letter of credit provided for in Section 5B.

We think it is clear that a county has unfettered authority to require permits of overweight, oversize, or overlength commodities that cannot reasonably be dismantled, and for the equipment used to transport those commodities. It is equally clear that both the state and county commissioners courts have the authority to issue permits to vehicles that weigh more than the weights authorized by section 5B; however, if the State has issued a 2060 permit to such a vehicle, a county may not require that vehicle to have a county permit. Put another way, a vehicle with a valid 2060 permit does not have to get a Brazos County overweight permit.

**\*488  2. Notice requirements**

The trial court also concluded that for a carrier to be entitled to the benefits of section 2(b)(1), it must comply with the notice requirements contained in section 2(b)(2) and (3) of article 6701d–11. The trial court further held that declaratory relief would be advisory because of Scurlock's failure to comply with the notice requirements.

Subsections (2) and (3) provide:

(2) Not later than the 14th day after the date a person receives a permit under Section 5B of the Act, the person shall notify by certified or registered mail, return receipt requested, the county clerk of each county in which the person intends to operate or cause to operate the vehicle. The notification must include:

(A) the name and address of the registered owner or operator of the vehicle;

(B) the vehicle identification number and licence plate number of the vehicle;

(C) a statement that the person intends to operate or cause to operate the vehicle on, over, or across the county roads, bridges, and culverts with a gross weight, axle weight, or wheel load that exceeds the limitations established under Section 5 or Section 5 1/2 of this Act: and

(D) a statement that the notification is given pursuant to this subsection.

(3) A copy of the permit issued and bond or letter of credit required under Section 5B of this Act shall accompany the notification required under Subsection (2) of this subsection.

Subsection (5) provides that a carrier who has filed the required notification "is liable to the county only for the actual damages to the county roads, bridges or culverts with load limitations established under Section 5 or Section 5B of this Act caused by the operation of the vehicle in excess of those limitations."

Although Scurlock trucks held 2060 permits, Scurlock stopped sending Brazos County notice of the permits in 1990. The last permit of which Scurlock notified the county expired in September 1991. Scurlock stopped sending the required notice to Brazos County because the commissioners court, at its November 1990 meeting concerning its traffic regulations, made it clear that 2060 permits were not valid on its county roads and that it would continue to require county permits for overweight vehicles.

Scurlock asserts that its lack of compliance with the notice provisions is irrelevant to the declaratory relief requested because: (1) lack of notice does not invalidate a 2060 permit, and (2) the county's stated position—that 2060 permits were not valid on county roads—made compliance with the notice requirements pointless. Brazos County asserts that, absent strict compliance with the notice requirements, a carrier is subject to the unrestricted enforcement of a county's permit system. We find that Scurlock's lack of compliance with the notice provisions is irrelevant to the declaratory relief requested because Brazos County refused to recognize the validity of 2060 permits on its county roads and because nothing in the statute conditions its limits on a county's permitting authority on a carrier's compliance with the notice requirements.

Section 2(b)(1) provides, "If a vehicle *has* a permit issued under Section 5B of this Act, a commissioners court may not issue a permit...." (Emphasis added.) A permit must be carried in the vehicle. Article 6701d–11, § 5B(d). The owner or operator of a vehicle that has a 2060 permit and has fulfilled the notification requirements is liable to a county only for the actual damages caused to county roads, bridges, or culverts by the operation of a vehicle that weighs more than the limits imposed by article 6701d–11. Thus, while the statute does tie the notice requirements to a limitation on damages, it does not authorize a county to require a permit of a vehicle that holds a 2060 permit if the carrier has not complied with the statute's notice requirements.

A justiciable controversy exists between the parties which may be determined by judicial declaration. The trial court erred in holding that declaratory relief would be advisory. Points of error eight, 10, 11, 12, and 13 are sustained.

 **[24]**    A court of appeals has a duty to render such judgment as the trial court **\*489** should have rendered in a declaratory judgment action. *Cobb v. Harrington,* 144 Tex. 360, 190 S.W.2d 709, 715 (1945); *Mitchell v. Rancho Viejo, Inc.,* 736 S.W.2d 757, 762 (Tex.App.—Corpus Christi 1987, writ ref'd n.r.e.). We therefore hold that section 2(b)(1) of article 6701d–11 limits the power of a commissioners court to issue permits for overweight vehicles, and that a commissioners court may not issue a permit, charge any additional fee for, or otherwise regulate or restrict the operation of a vehicle with a permit issued under section 5B of the statute.

### Injunctive relief

Scurlock sought to enjoin Brazos County from issuing citations for violations of the county weight regulations to Scurlock vehicles with 2060 permits. The trial court denied injunctive relief on the same bases that it denied declaratory relief: because (1) Scurlock "failed to demonstrate that its

WestlawNext' © 2015 Thomson Reuters. No claim to original U.S. Government Works.

overweight vehicles operate on Brazos County roads at gross weights in excess of 80,000 lbs, the minimum weight at which Article 6701d–11, V.T.C.S., purports to exempt a carrier from compliance with a county permit system"; and (2) Scurlock "failed to comply with the notice provisions of Article 6701d–11, §§ 2(b)(2) and (3), V.T.C.S., an essential prerequisite to that article's exemption of motor carriers from compliance with county permit systems." We have already determined that the trial court erred in concluding that 80,000 pounds is the minimum weight at which article 6701d–11 exempts a carrier from compliance with county permit systems, and that the statute does not authorize a county to require a permit of a vehicle that holds a 2060 permit if the carrier has not complied with the statute's notice requirements. We must therefore determine if injunctive relief is appropriate in this case.

 **[25]**    A court of equity may not enjoin the enforcement of a penal ordinance unless: (1) the ordinance is unconstitutional or otherwise void, and (2) the enforcement of the ordinance causes irreparable injury to vested property rights. *Passel v. Fort Worth Indep. Sch. Dist.*, 440 S.W.2d 61, 63 (Tex.1969); *City of Houston v. MEF Enterprises, Inc.*, 730 S.W.2d 62, 63 (Tex.App.—Houston [14th Dist.] 1987, no writ). Scurlock did not contend that the County Road and Bridge Act (under which Brazos County purported to have the authority to issue permits) was unconstitutional, and has not argued that a vested property right is being irreparably injured. Point of error nine is overruled.

### Damages

Scurlock sought compensation for permit fees paid to Brazos County after September 1, 1989, the effective date of the amendments to article 6701d–11, for Brazos County permits, and for attorney's fees incurred in defending Scurlock drivers who had been cited for driving an overweight truck without a county permit. On appeal, however, Scurlock has abandoned its claim for attorney's fees incurred in defending its drivers.

Because we find that Brazos County was without authority to require county permits for those vehicles holding 2060 permits, we find that Scurlock is entitled to recover the fees paid to Brazos County for such county permits issued after September 1989. Point of error 14 is sustained. The record is devoid of evidence of these amounts, however. We therefore reverse and remand for a determination of these amounts.

 **[26]**    Brazos County asserts that this Court may not reverse and render judgment for Scurlock in whole or in part because Scurlock first complained of the trial court's finding that article 6701d–11 was unconstitutional in its motion for new trial. Brazos County asserts that Scurlock should have filed a motion for judgment, requesting a reconsideration of the court's findings, before filing its motion for new trial. Brazos County relies upon *Horrocks v. Texas Dep't of Transp.*, 852 S.W.2d 498, 498–99 (Tex.1993), in which the supreme court found that a court of appeals could not render judgment based on a no evidence point preserved solely in a motion for new trial. Here, however, because the trial court raised the issue of constitutionality sua sponte, Scurlock had no opportunity before rendition of the judgment in which to complain of this issue. We do not read *Horrocks* to require Scurlock to have raised the issue of constitutionality in a motion **\*490** for judgment before filing its motion for new trial.

We reverse that part of the trial court's judgment entering a take-nothing judgment against Scurlock; we render judgment that Brazos County may not require an overweight vehicle to have a Brazos County permit if that vehicle has a valid permit issued by the state pursuant to article 6701d–11; we remand to the trial court for a determination of damages; and we affirm the trial court's denial of injunctive relief.

### All Citations

869 S.W.2d 478

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

739 S.W.2d 793
Supreme Court of Texas.

Richard U. SIMON, Jr., Petitioner,

v.

YORK CRANE & RIGGING
COMPANY, INC., Respondent.

No. C–6408.    |    Oct. 28, 1987.
|    Rehearing Denied Dec. 16, 1987.

Subsequent to settlement of wrongful death action and allowance of guardian ad litem fees, motion for new trial was brought, seeking alteration of judgment on ad litem fee or grant of remittitur. The 96th District Court, Tarrant County, Hal M. Lattimore, J., denied motion and appeal was brought. The Court of Appeals found ad litem fees unreasonable and excessive and reversed. Appeal was brought. The Supreme Court, Hill, C.J., held that absent record showing alleged abuse of discretion, Supreme Court would presume that trial court had adequate evidence before it to justify award of guardian ad litem fees in amount of $25,000 plus $12,000 in event of appeal.

Reversed and ad litem award reinstated.

West Headnotes (7)

**[1]**    **Costs**
👈 Compensation of Guardian Ad Litem or Next Friend

The award of guardian ad litem fees is in the sound discretion of a trial court.

27 Cases that cite this headnote

**[2]**    **Costs**
👈 Compensation of Guardian Ad Litem or Next Friend

The discretion of a trial court in setting guardian ad litem fees is not unbridled and, in general, the same factors as are used to determine the reasonableness of attorney's fees are controlling.

34 Cases that cite this headnote

**[3]**    **Costs**
👈 Compensation of Guardian Ad Litem or Next Friend

Factors used to determine reasonableness of guardian ad litem fee include difficulty and complexity of the case, amount of time spent by the attorney, benefit derived by the client, and skill and experience reasonably needed to perform the service.

16 Cases that cite this headnote

**[4]**    **Appeal and Error**
👈 Abuse of Discretion

An appellate court may reverse a trial court for abuse of discretion only if, after searching the record, it is clear that the trial court's decision was arbitrary and unreasonable.

108 Cases that cite this headnote

**[5]**    **Appeal and Error**
👈 Burden of Showing Grounds for Review

A party complaining of abuse of discretion in the trial court has the burden to bring forth a record showing such abuse. Rules App.Proc., Rule 50(d).

63 Cases that cite this headnote

**[6]**    **Appeal and Error**
👈 Failure to Set Forth Evidence in General

Absent record showing trial court's alleged abuse of discretion, the reviewing court must presume that the evidence before the trial judge was adequate to support the decision. Rules App.Proc., Rule 50(d).

85 Cases that cite this headnote

**[7]**    **Appeal and Error**
👈 Costs and Allowances

Absent an adequate record showing alleged abuse of discretion in award of guardian ad litem fee in wrongful death action, Supreme Court would presume that trial court had adequate

evidence before it to justify award of $25,000 plus $12,000 in event of appeal.

72 Cases that cite this headnote

**Attorneys and Law Firms**

**\*793** John Henry McBryde, Nora J. Toohy, McBryde & Bennett, Fort Worth, for petitioner.

R. Brent Cooper, Cowles & Thompson, Dallas, for respondent.

**OPINION**

HILL, Chief Justice.

This is an appeal from a judgment by the Court of Appeals that guardian ad litem fees allowed by the trial court were unreasonable and excessive. Richard U. Simon was appointed guardian ad litem to protect the interests of a minor child in a wrongful death suit. The trial court awarded Simon $25,000 ad litem fees at the trial level and up to $12,000 in additional fees in the event of appeal. The Court of Appeals, in an unpublished opinion held the amount excessive and that the trial court abused its discretion. It remanded the cause to the **\*794** trial court to reassess the amount of the fee. We hold there was no abuse of discretion by the trial court, and we reverse the judgment of the Court of Appeals and reinstate the ad litem award.

The underlying case involved a crane accident in which Thomas Jobe was killed when a crane owned by York Crane & Rigging came into contact with high voltage electrical wires. A settlement was eventually reached involving a lump sum payment to Jobe's wife of $675,000 and annuities for his parents and minor son, for whom a trust was created in the Settlement Agreement. The total value of the settlement was approximately $2,415,000 over the expected term of the annuity. Simon was appointed guardian ad litem of the minor child.

At a hearing, in January 1986, the trial court did not approve the settlement because it was not satisfied as to the financial responsibility of the insurance company that was to fund the annuity for the minor. The court requested Simon to investigate the solvency of the company. A second hearing

took place in March 1986. For that hearing, Simon had secured the services of a certified public accountant who testified as to the solvency of the company. On the basis of this testimony and certain assurances by Simon, the trial court approved the settlement. In approving the settlement and rendering judgment, the trial court interlined an award of $25,000 for the ad litem fee. Counsel for York recorded no objection to the amount of the fee at that time.

York subsequently filed a timely Motion for New Trial urging the court to alter its judgment on the ad litem fee or to grant a remittitur. A hearing was held on the Motion. Despite the fact that the purpose of the hearing was to challenge the ad litem fee issue, and that York knew no other evidence on the fees was in the record, York did not request the court reporter to make a statement of facts for this hearing. York did seek to introduce a stipulation signed by both parties as to the amount of time spent by Simon on the case. The stipulation was apparently handed to the judge, but not filed. Counsel for York concede they made no effort to check with the judge or the court clerk to determine if the document was in fact filed. A certificate by the clerk indicates that the stipulation was found "loose and unfile-marked" in the file jacket for the case. The clerk presented the document to the trial judge, who declined to file-mark it.

Following the new trial hearing, the trial court signed an order denying the relief sought in the Motion for New Trial and assessed an additional $12,000 in guardian ad litem fees in the event of appeal. In an unpublished opinion, the court of appeals held the ad litem fees unreasonable and excessive. We reverse.

**[1]** The award of guardian ad litem fees is in the sound discretion of the trial court. *Pratt v. Texas Dept. of Human Resources,* 614 S.W.2d 490, 496 (Tex.App.—Amarillo 1981, writ ref'd n.r.e.). Absent evidence illustrating a clear abuse of discretion, a reviewing court will not set aside an allowance. *Cypress Creek Utility Services v. Muller,* 624 S.W.2d 824, 827. (Tex.App.—Houston [14th Dist.] 1981) *aff'd,* 640 S.W.2d 860 (1982).

**[2]** **[3]** The discretion of the trial court in setting an ad litem fee is not unbridled. In general the same factors as are used to determine the reasonableness of attorney's fees are controlling. *See Phillips Petroleum Co. v. Welch,* 702 S.W.2d 672 (Tex.App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.). Such factors include the difficulty and complexity of the case, the amount of time spent by the attorney, the benefit derived

by the client, and finally, the skill and experience reasonably needed to perform the service. *Tuthill v. Southwestern Public Service Co.,* 614 S.W.2d 205, 212–13 (Tex.Civ.App. —Amarillo 1981, writ ref'd n.r.e.).

An award of $25,000, augmented by $12,000 in the event of an appeal, could be excessive as a guardian ad litem fee. York, however, has brought forward no evidence whatsoever in the record that might show on what grounds the trial court made its award.

**\*795** **[4]** **[5]** **[6]** An appellate court may reverse a trial court for abuse of discretion only if, after searching the record, it is clear that the trial court's decision was arbitrary and unreasonable. *Landry v. Travelers Ins. Co.,* 458 S.W.2d 649, 651 (Tex.1970). Hence, the party that complains of abuse of discretion has the burden to bring forth a record showing such abuse. *See, Englander Co. v. Kennedy,* 428 S.W.2d 806, 807 (Tex.1968); Tex.R.App.P. 50(d). Absent such a record, the reviewing court must presume that the evidence before

the trial judge was adequate to support the decision. *Mays v. Pierce,* 281 S.W.2d 79, 154 Tex. 487 (1955).

**[7]** York had ample opportunity to see that an adequate record was made. Instead, it failed to make an objection when the court first granted the ad litem fees. It failed to obtain a statement of facts at the hearing at which the fees were discussed. As to the one piece of evidence it did have, the stipulation of facts regarding Simon's work on the case, York failed to see that the document was properly filed and made a part of the record.

This Court must accordingly presume that the trial court had adequate evidence before it to justify its award of guardian ad litem fees. The judgment of the Court of Appeals is reversed. The trial court's award of $25,000 plus $12,000 in event of appeal for guardian ad litem fees is reinstated.

**All Citations**

739 S.W.2d 793

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

 KeyCite Yellow Flag - Negative Treatment

**Declined to Extend by** HSBC Bank USA, N.A. v. Watson, Tex.App.-Dallas, June 15, 2012

162 S.W.3d 859
Court of Appeals of Texas,
Texarkana.

SOUTHWEST CONSTRUCTION
RECEIVABLES, LIMITED, et al., Appellants,

v.

REGIONS BANK, f/k/a First
Commerce Bank, et al., Appellees.

No. 06–03–00083–CV.  |  Submitted
Feb. 16, 2005.  |  Decided April 26, 2005.

**Synopsis**
**Background:** Purchasers of accounts receivable brought claims, as intervenors, against defendants for fraud, aiding and abetting breach of fiduciary duty, and civil conspiracy. The 202nd Judicial District Court, Bowie County, Bill Peek, J., determined one of the individual defendants had not been properly served and granted summary judgment on some claims against other defendants, and plaintiffs nonsuited the remaining claims. Plaintiffs appealed.

**Holdings:** The Court of Appeals, Donald R. Ross, J., held that:

[1] other defendants lacked standing to assert that individual defendant had not been properly served with petition;

[2] amended petition was properly served on individual defendant by certified mail;

[3] individual defendant's conduct made issuance and service of new citation unnecessary; and

[4] summary judgment order was interlocutory and therefore it was not immediately appealable.

Appeal dismissed.

West Headnotes (12)

[1] **Constitutional Law**
 Due Process

Generally, only the entity that has not been properly served with a petition has standing to challenge the lack of due process. U.S.C.A. Const.Amend. 14.

5 Cases that cite this headnote

[2] **Constitutional Law**
Due Process

One exception to the general principle that only the entity that has not been properly served with a petition has standing to challenge the lack of due process is that an insurance company may challenge the propriety of service as to the company's insured. U.S.C.A. Const.Amend. 14.

6 Cases that cite this headnote

[3] **Constitutional Law**
 Due Process

Only the defendant on whom a petition allegedly had not been properly served, and not his codefendants, had standing to raise a due process claim regarding the alleged lack of proper service, in civil suit brought by purchasers of accounts receivable alleging fraud, aiding and abetting breach of fiduciary duty, and civil conspiracy. U.S.C.A. Const.Amend. 14.

3 Cases that cite this headnote

[4] **Process**
Conclusiveness of Return or Certificate in General

If service of process is effected via the Secretary of State pursuant to Texas' long-arm service statute, then, absent evidence of fraud or mistake, the Secretary of State's certificate of service conclusively establishes that process was served. V.T.C.A., Civil Practice & Remedies Code § 17.044(a)(1), (b).

Cases that cite this headnote

**[5]** **Pleading**
👉 Notice of Application and Presentation and Service of Amendment

**Process**
👉 After Amendment of Pleading or Other Proceeding

**Process**
👉 Mailing as Constructive Service

Service of amended petition, on a defendant who had not yet appeared in the civil case against multiple defendants, could be made by certified mail, even if the amended petition added new plaintiffs, new claims, and new damages; thus, it was not necessary to have a new citation issued and served on the non-appearing defendant. Vernon's Ann.Texas Rules Civ.Proc., Rules 21, 21a.

Cases that cite this headnote

**[6]** **Pleading**
👉 Notice of Application and Presentation and Service of Amendment

**Process**
👉 After Amendment of Pleading or Other Proceeding

A plaintiff who amends its petition may serve the defendant, without regard to whether the amendment seeks a more onerous judgment or adds a new cause of action, by complying with the filing and serving requirements for pleadings under the rules of civil procedure. Vernon's Ann.Texas Rules Civ.Proc., Rules 21, 21a.

3 Cases that cite this headnote

**[7]** **Parties**
👉 Proceedings in Cause After Intervention

**Process**
👉 After Amendment of Pleading or Other Proceeding

Issuance and service of new citation on defendant was not necessary, though defendant had not entered formal appearance in response to original citation before intervenors asked for affirmative relief against defendant, where defendant never denied his status as a defendant and instead gave testimony in form of oral deposition, at which deposition he was questioned about intervenors' claims, and he participated in full evidentiary hearing in federal bankruptcy court on intervenors' motion for relief from stay to allow trial to proceed based on the amended petition, but lack of service was not one of the grounds he asserted in opposition to relief from stay.

2 Cases that cite this headnote

**[8]** **Parties**
👉 Proceedings in Cause After Intervention

**Process**
👉 After Amendment of Pleading or Other Proceeding

A defendant who had been served with citation but had not entered a formal appearance before an intervenor asked for affirmative relief against the defendant may, by the defendant's action subsequent to the intervention, make issuance of a new citation unnecessary.

1 Cases that cite this headnote

**[9]** **Appeal and Error**
👉 Determination of Part of Controversy

Trial court's summary judgment order was interlocutory and therefore it was not immediately appealable, though order had purported to dispose of claims against all parties, where trial court had erroneously concluded that one of the defendants had not been properly served with petition and therefore that such party was not proper party to suit; upon appellate court's determination that such defendant was properly served and was a proper party, it could not be said the summary judgment had disposed of claims against all parties. V.T.C.A., Civil Practice & Remedies Code § 51.014.

Cases that cite this headnote

**[10]** **Appeal and Error**

☞ Necessity of Final Determination

The general rule, with a few mostly statutory exceptions, is that an appeal may be taken only from a final judgment. V.T.C.A., Civil Practice & Remedies Code § 51.014.

Cases that cite this headnote

[11] **Appeal and Error**
☞ Final Judgments or Decrees

A judgment is "final" and therefore immediately appealable if it disposes of all pending parties and claims in the record, except as necessary to carry out the decree.

Cases that cite this headnote

[12] **Appeal and Error**
☞ Finality as to All Parties

**Appeal and Error**
☞ Want of Jurisdiction

Except for statutory exceptions, if the judgment from which the party has appealed does not dispose of all pending parties and claims, then the judgment is deemed to be interlocutory and the court of appeals should either abate the appeal or dismiss it for want of jurisdiction. V.T.C.A., Civil Practice & Remedies Code § 51.014.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*861** John R. Mercy, Mercy, Carter, Tidwell, LLP, Texarkana, Graham Kerin Blair, David A. Brakebill, Baker & McKenzie, Houston, for appellants.

George L. McWilliams, Sean F. Rommel, Phillip N. Cockrell, Patton, Haltom, Roberts, Texarkana, William A. Waddell Jr., William H. Sutton, Friday, Eldredge & Clark, Little Rock, AR, for Regions Bank.

Stephen L. Gershner, Davidson Law Firm, Little Rock, AR, Gary D. Grimes, Law Office of Gary D. Grimes, Texarkana, for Charles William Richardson.

Ronald J. Burke, pro se.

Before ROSS, CARTER, and CORNELIUS,[*] JJ.

[*]    William J. Cornelius, C.J., Retired, Sitting by Assignment.

## OPINION

Opinion by Justice ROSS.

Dan Moore, D.D.S., and Dennis O'Banion, M.D., and their two companies, Southwest Construction Receivables, Limited (SCR) and Construction Invoice Funding, Ltd. (collectively, Appellants) sued Regions **\*862** Bank and several individuals, including Charles William Richardson, for fraud, breach of contract, and civil conspiracy. Some of the defendants, including Regions and Richardson, filed motions for partial, traditional, and no-evidence summary judgment, which the trial court ultimately granted. The trial court also ruled that, as a matter of law, one of the individual defendants, Michael McNew, had not been properly served and was, therefore, not before the court. The plaintiffs nonsuited much of the remainder of their case and appealed those rulings by the trial court.

In their third issue, Appellants contend the trial court erred by ruling, as a matter of law, that McNew had not been served with the plaintiffs' original or amended petitions and was, therefore, not properly before the trial court. We hold the trial court did so err. Because we conclude McNew is a party to this case, and because claims against him have not been resolved by way of a final judgment, the appeal is now interlocutory, and we lack jurisdiction to consider the remainder of Appellants' points of error. Accordingly, we sustain Appellants' third point of error and dismiss the remainder of the appeal for want of jurisdiction.

### I. Procedural and Factual History

In the late 1990s, Drs. Moore and O'Banion of Texarkana were introduced to the "factoring" business by McNew and Joe O'Banion (Dr. O'Banion's brother). "Factoring" is the business of "buying of accounts receivable at a discount. The price is discounted because the factor (who buys them) assumes the risk of delay in collection and loss on the accounts receivable." BLACK'S LAW DICTIONARY 630 (8th ed.2004). In this case, Drs.

Moore and O'Banion purchased accounts receivable from construction subcontractors that were owed money by their respective general contractors.

In 1997, Drs. Moore and O'Banion created SCR. The doctors borrowed money from First Commercial National Bank to fund their new company. The doctors worked with Joe O'Banion and McNew, who brokered accounts receivable to the doctors and SCR. Working through a company owned by McNew and Joe O'Banion called Funding Sources Support, Inc. (FSSI), McNew was supposed to conduct a background check on each account receivable that he brokered (a process the parties refer to as "due diligence" processing) to ensure both that the work represented by each account receivable had, in fact, been completed by the subcontractor and that the money was due to be paid by the general contractor within ninety days. As a condition of loaning money to SCR, First Commercial National Bank also required of SCR that the bank be allowed to conduct its own due diligence check of each account receivable to be purchased, as required by banking regulations and the bank's internal policies. For a while, all the parties—Drs. Moore and O'Banion, First Commercial National Bank, McNew and Joe O'Banion, and the subcontractors—seemed to be making a profit.

In July 1998, Regions Bank of Little Rock, Arkansas, acquired First Commercial National Bank. Shortly before then, McNew had encouraged the doctors to purchase, through SCR, a number of additional accounts receivable from Starkey Electric, an electrical subcontractor based in Tyler, Texas. McNew had also encouraged another investor, Richardson—who was the owner of Southwest Financial Funding (SWF) and a Regions customer—to increase SWF's factoring investment in Starkey Electric and other companies McNew had suggested.

**\*863** In August 1998, SWF applied to have its credit line increased by Regions. Regions assembled a team of executives from various branch offices to review SWF's application. One of those executives was Neil West, an official with a Regions branch in Tyler, Texas. In reviewing SWF's application, West noticed that SWF planned to buy several accounts receivable from Starkey Electric of Tyler. This concerned West because he had experienced problems with Starkey Electric when West had worked for another bank in the Tyler area.

On August 30, 1998, West apprised others within Regions of his suspicions, stating he believed Starkey—and possibly others—were engaging in fraud by trying to sell "bogus" accounts receivable to SWF. West outlined several accounts receivable that SWF's credit extension application proposed buying from Starkey Electric. West's written memorandum about the Starkey invoices then detailed why West believed certain of those invoices were fraudulent: the invoices were for work that was either not fully completed or had not yet commenced. West then concluded that, because SWF was already heavily invested in Starkey invoices, and because the value of those invoices already owned by SWF was likely to be less than the money SWF ultimately realized in payments from the general contractors, further funding by Regions of SWF's investments in Starkey Electric was not in the bank's best interest. "[A]t this point every advance we [Regions] make, particularly with Starkey as the beneficiary, widens the gap by increasing the loss exposure." "SWF is a house of cards ready to collapse without substantial capital input—maybe the entire $3.7MM [sic] Starkey owes plus any other scams that we [Regions] don't know about."

On September 4, 1998, McNew met with Regions officials and admitted that some of the Starkey invoices—for which Regions had already advanced money to Richardson (and SWF) and which Richardson had, in turn, paid to Starkey—were for work that had not yet been completed. McNew and bank officials identified approximately $695,000.00 worth of problem invoices. Regions then demanded it be paid by McNew for those identified, problem invoices within a short period of time.

Shortly thereafter, McNew obtained money from other sources. These sources were Drs. Moore and O'Banion, and SCR. Drs. Moore and O'Banion borrowed money and deposited that money into SCR's checking account, to which McNew had access. McNew then took $495,000.00 of SCR's money, added $200,000.00 of his own money, and paid $695,000.00 to Regions for the identified, problem invoices from Starkey Electric. This payment, made in response to Regions' demand, absolved Regions' potential losses associated with the previously identified $695,000.00 worth of problem invoices from Starkey Electric.

McNew was ultimately convicted on federal charges of wire fraud, bank fraud, making a false statement to a financial institution, mail fraud, and conspiracy. At the federal plea, McNew admitted he led Drs. Moore and O'Banion to believe they were buying new invoices when, in fact, he knew that representation was not true. Instead, McNew used the $495,000.00 from the doctors to repurchase the problem

invoices from SWF—invoices McNew and Regions both knew were for work that had not been completed or that they suspected to be fraudulent.

On November 18, 1998, Regions executed a "Release of Security Interest" in these Starkey Electric invoices that Regions had reason to believe had either been paid in full or were fraudulent. Regions and FSSI also mutually released **\*864** each other from any claims relating to certain Starkey Electric invoices; Regions promised not to disclose any of FSSI's activities to law enforcement, except where required by law.

## II. Did the Trial Court Err By Striking McNew As a Party to the Lawsuit?

In their third point of error, Appellants contend the trial court erred by holding, as a matter of law, McNew had not been properly served with either the plaintiffs' original petition or any amended petition. In the spring of 2003, Richardson asked the trial court to find that McNew had not been properly served with the plaintiffs' original petition. The trial court ruled May 13, 2003, that McNew was not properly before the court; it followed with a written order June 27, 2003, which stated there had been "no service on Michael L. McNew that validly makes him a party to this case." The effect of the trial court's order was to eliminate McNew as a party to the case. This ruling hurt the plaintiffs' case because McNew, the alleged primary malfeasant (and now federally convicted criminal), was a necessary party to prove the plaintiffs' claims of conspiracy against the remaining defendants. *See, e.g., Ins. Co. of N. Am. v. Morris,* 981 S.W.2d 667, 675 (Tex.1998) (element of civil conspiracy is combination of two or more persons). [1]

1     The plaintiffs had crafted their case so as to depict McNew as the critical link through which the defendants' alleged conspiracy resulted in Appellants' damages.

**[1] [2]**     Generally, only the entity that has not been properly served has standing to challenge the lack of due process. *See, e.g., Illinois v. DeLaire,* 240 Ill.App.3d 1012, 183 Ill.Dec. 33, 610 N.E.2d 1277, 1287–88 (1993) (third party has right to contest effectiveness of service, but not defendants). One exception to that general principle is that an insurance company may challenge the propriety of service as to the company's insured. *See, e.g., Koven v. Saberdyne Sys., Inc.,* 128 Ariz. 318, 625 P.2d 907, 909–10 (Ct.App.1980) (insurance company had standing to move trial court to set aside default judgment against insured based on lack of

service of plaintiff's petition for personal injuries occurring at amusement park).

**[3]**     With the single exception of an insurance company standing in the shoes of its insured, we have found nothing in our statutes or Texas caselaw that supports Richardson's position that a defendant in a civil suit has standing to challenge whether a codefendant has been properly served; nor have the parties directed this Court's attention to any such authority. Therefore, we conclude Appellants are correct: only McNew has standing to challenge whether he has or has not been properly served. *Cf. Caldwell v. Barnes,* 154 S.W.3d 93, 97–98 (Tex.2004) (burden is on nonserved party to prove nonservice in post-judgment bill of review proceeding). The remaining codefendants have no such standing. Because the trial court struck McNew as a party on the motion of a codefendant, the trial court erred.

**[4]**     Moreover, the record before us shows Appellants served the Texas Secretary of State (as the agent of process for McNew, an Arkansas resident) with the original petition.

> (a) The secretary of state is an agent for service of process or complaint on a nonresident who:
>
>> (1) is required by statute to designate or maintain a resident agent or engages in business in this state, but has not designated or maintained a resident agent for service of process;
>>
>> ....
>
> **\*865** (b) The secretary of state is an agent for service of process on a nonresident who engages in business in this state, but does not maintain a regular place of business in this state or a designated agent for service of process, in any proceeding that arises out of the business done in this state and to which the nonresident is a party.

TEX. CIV. PRAC. & REM.CODE ANN. § 17.044 (Vernon 1997) (Texas' "long-arm" statute). If service is effected via the Secretary of State pursuant to Texas' long-arm statute, absent evidence of fraud or mistake, the Secretary of State's certificate of service "*conclusively* establishes that process was served." *Campus Invs., Inc. v. Cullever,* 144 S.W.3d 464, 466 (Tex.2004) (citing *Capitol Brick, Inc. v. Fleming Mfg. Co.,* 722 S.W.2d 399, 401 (Tex.1986)); *Zuyus v. No'Mis Communications, Inc.,* 930 S.W.2d 743, 746 (Tex.App.-Corpus Christi 1996, no writ).

In this case, the Texas Secretary of State accepted service of process, as the agent for nonresident McNew, of the plaintiffs' original petition. The Secretary of State then forwarded that notice to McNew's last known address in Arkansas. The plaintiffs had similarly served FSSI, an Arkansas corporation owned by McNew, via the Texas Secretary of State. The record shows McNew's last known address and FSSI's last known address are the same location. The Secretary of State's certification of service shows the certified letter to McNew went "unclaimed" and was returned to the Secretary August 20, 1999, but the certified letter to FSSI was accepted and the return receipt was received by the Secretary August 20, 1999. Appellants contend this constitutes "selective acceptance" by McNew. We tend to agree.[2] However, such conclusion is not necessary in light of the Texas Supreme Court's holding in *Campus Investments*.

[2]  *See Gonzales v. Surplus Ins. Servs.,* 863 S.W.2d 96, 102 (Tex.App.-Beaumont 1993, writ denied), *overruled in part on other grounds, Carpenter v. Cimarron Hydrocarbons Corp.,* 98 S.W.2d 682 (Tex.2002), where the Beaumont court held:

> where it is shown ... that a party has fully complied with the notice requirements set forth in TEX. R. CIV. P. 21a ... yet fails to establish actual receipt of notice upon opposing party or counsel, such notice shall be sufficient constructive notice where it is shown that the intended recipient engaged in instances of selective acceptance/refusal of certified mail relating to the case.

 **[5]**  Regions and Richardson point out that Appellants amended their original petition multiple times, adding plaintiffs (Drs. Moore and O'Banion), new claims, and new damages. Citing *Weaver v. Hartford Accident & Indem. Co.,* 570 S.W.2d 367, 370 (Tex.1978),* they contend that, because McNew had not made an appearance in the case at the time of these amendments, Appellants were required to have a new citation issued on their "live" pleading and served on McNew. Appellants' "live" pleading at the time the trial court struck McNew as a party was Plaintiffs' fifth amended original petition, filed December 13, 2001.

 **[6]**  A plaintiff who amends its petition may serve the defendant, without regard to whether the amendment seeks a more onerous judgment or adds a new cause of action, by complying with the filing and serving requirements of Rules 21 and 21a, Texas Rules of Civil Procedure.[3] *In re* **\*866** *R.D.C.,* 912 S.W.2d 854 (Tex.App.-Eastland 1995, no writ). The record before us shows that Appellants served McNew

with Plaintiffs' fifth amended original petition by certified mail May 5, 2003.

[3]  Rule 21 provides, in relevant part:

> Every pleading, plea, motion or application to the court for an order, whether in the form of a motion, plea or other form of request, unless presented during a hearing or trial, shall be filed with the clerk of the court in writing, shall state the grounds therefor, shall set forth the relief or order sought, and at the same time a true copy shall be served on all other parties, and shall be noted on the docket.

TEX.R. CIV. P. 21.

Rule 21a provides, in relevant part:

> Every notice required by these rules, and every pleading, plea, motion, or other form of request required to be served under Rule 21, other than the citation to be served upon the filing of a cause of action and except as otherwise expressly provided in these rules, may be served by delivering a copy to the party to be served, or the party's duly authorized agent or attorney of record, as the case may be, either in person or by agent or by courier receipted delivery or by certified or registered mail, to the party's last known address ... or by such other manner as the court in its discretion may direct.

TEX.R. CIV. P. 21a.

As the Eastland court pointed out in *R.D.C., Weaver* was a liability insurance coverage case holding that the insurance company had no duty to defend a suit against the named insured's employee where the employee failed to comply with the policy provisions regarding the forwarding of citation to the insurer. The Eastland court went on to state:

> While the rule [that new citation is necessary for a party who has not appeared when the plaintiff, by amended petition, seeks a more onerous judgment than prayed for in the original pleading] was discussed in *Weaver,* it is apparent that the thrust of the opinion is directed at the failure of the "omnibus insured" to comply with the policy provisions.

*Id.* at 855.

 **[7]**  Citing *Baker v. Monsanto Co.,* 111 S.W.3d 158 (Tex.2003),* Regions and Richardson further contend that, because Drs. Moore and O'Banion were not added as plaintiffs in the case until Plaintiffs' second amended

original petition, filed February 2, 2001, these doctors were "intervenors" and were therefore required to serve McNew with a new citation. In *Baker,* the defendant, Monsanto Co., had not been served with citation by any plaintiff when the intervenors attempted to serve Monsanto's counsel. *Id.* at 159. The law firm representing Monsanto expressly stated in a letter that they would not accept service on Monsanto's behalf. Plaintiffs subsequently served citation on Monsanto. Monsanto's counsel filed an answer, but only to "the petitions of those plaintiffs who have served Monsanto." *Id.* The Texas Supreme Court held that Monsanto's subsequent appearance relieved the intervenors of serving Monsanto with a new citation. In so holding, the Texas Supreme Court quoted approvingly:

> Citation is necessary when the intervenor asks affirmative relief against a defendant who has not appeared or a plaintiff who does not, *by any action subsequent to the intervention,* appear thereon.... 1 MCDONALD AND CARLSON, TEXAS CIVIL PRACTICE § 5:81 at 609 (1992 ed.).

*Id.* at 160 (emphasis added).

 **[8]** It is apparent the "by any action subsequent to the intervention" language is directed toward plaintiffs because plaintiffs will always have already made an appearance in the case. This language is equally applicable, however, to defendants who, like McNew, have been previously served with citation but have not entered a formal appearance in the case. Such defendants may, "by [their] action subsequent to the intervention," make issuance of a new citation unnecessary. Such was the case with McNew.

 **\*867** Unlike Monsanto in *Baker,* where Monsanto unsuccessfully sought to invoke the statute of limitations because it had not been formally served with citation by the intervenors, the record before us shows that McNew never denied his status as a defendant in this case. After Drs. Moore and O'Banion were joined as plaintiffs, McNew appeared "at the instance of the plaintiffs" and gave testimony in the form of an oral deposition. Richardson's motion for summary judgment included an attached excerpt that shows McNew was questioned in that deposition concerning the claims of Drs. Moore and O'Banion.

Further, McNew participated in a full evidentiary hearing in U.S. Bankruptcy Court on Appellants' motion for relief from stay to allow the trial of the instant case to proceed based on Plaintiffs' fifth amended original petition. The bankruptcy court's order, dated July 1, 2002, granting this motion, reflects that McNew opposed the motion on various grounds, but lack of service was not one of them. Rather, the order reflects that McNew admitted and pled guilty to the specific conduct complained of in Plaintiffs' fifth amended original petition. Referring to the instant litigation, the order also contains the following judicial finding:

> [McNew] has been aware of the litigation and the complaints against him for several years, and due to his guilty plea in the criminal case and admissions in his civil deposition, it does not appear that [McNew] has a viable defense in any case.

Based on these actions by McNew after Drs. Moore and O'Banion were joined as plaintiffs, and based on the original service of citation properly served on him by the Secretary of State, we hold that a new citation was not required and that notice of the additional plaintiffs' claims, given pursuant to Rules 21 and 21a, was sufficient.[4]

[4] Plaintiffs did ultimately cause a new citation, with their fifth amended original petition, to be served on McNew by the Secretary of State. The return on this citation, however, was not filed until after the trial court had struck McNew as a party.

Therefore, even if the trial court had authority to strike McNew as a party based on the motion of a codefendant, the trial court nonetheless erred because the record affirmatively refutes the claims of Regions and Richardson that McNew had not been made a party to the suit. We sustain Appellants' third point of error.

### III. The Appeal Is Now Interlocutory

 **[9]** In their fifth amended petition, the plaintiffs sued Regions Bank, McNew, Michael Starkey (owner of Starkey Electric), Richardson, J. Ronald Burke (Richardson's business partner), and Joe O'Banion. The plaintiffs alleged the defendants were collectively and separately guilty of fraud, aiding and abetting a breach of fiduciary duty, and civil conspiracy. The plaintiffs sought actual and punitive

damages, as well as court costs and pre- and post-judgment interest.

In their notice of partial nonsuit, the plaintiffs took a nonsuit with respect only to their claims of direct fraud ("save and except those claims already adjudicated by partial summary judgment") and their claims of aiding and abetting a breach of fiduciary duty against Regions, Richardson, and a third defendant ("save and except those claims already adjudicated by partial summary judgment"). The notice of partial nonsuit did not address Appellants' claims against NcNew.

 **[10]**   **[11]**   **[12]**   "[T]he general rule, with a few mostly statutory exceptions, is that an appeal may be taken only from a final judgment." *Lehmann v. Har–Con Corp.,* 39 S.W.3d 191, 195 (Tex.2001). "A judgment **\*868**  is final for purposes of appeal if it disposes of all pending parties and claims in the record, except as necessary to carry out the decree." *Id.* Except for those statutory exceptions, if the judgment from which the party has appealed does not dispose of all pending parties and claims, then the judgment is deemed to be "interlocutory" and the court of appeals should either abate the case or dismiss it for want of jurisdiction. *Id.* at 195–96.

Because we have held the trial court erred by ruling, as a matter of law, that McNew was not a proper party to the suit, and because Appellants' notice of nonsuit did not resolve their claims against McNew, the trial court's award of summary judgment in this case does not dispose of all the parties or claims. None of the statutory exceptions that grant us jurisdiction to hear certain interlocutory appeals are applicable to this case. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014 (Vernon Supp.2004–2005). Therefore, we are without jurisdiction to consider Appellants' remaining points of error. *Cf. Brooks v. Pep Boys Auto. Supercenters,* 104 S.W.3d 656, 660–61 (Tex.App.-Houston [1st Dist.] 2003, no pet.) (order compelling arbitration not final disposition and not expressly authorized for interlocutory appeal; appellate court dismissed appeal).

## IV. Conclusion

For the reasons stated, we sustain Appellants' third point of error and dismiss the appeal for want of jurisdiction.

## All Citations

162 S.W.3d 859

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Declined to Extend by** *Seureau v. ExxonMobil Corp.,* Tex.App.-Hous. (14 Dist.), October 16, 2008

35 S.W.3d 608
Supreme Court of Texas.

TEXAS DEPARTMENT OF
TRANSPORTATION, Petitioner,

v.

Luke W. ABLE, Ben Dees and George
Hans Knoll, coexecutors of the Estate of
Margaret Able, deceased, Ramona Lee
Dees, and Sylvia Jane Knoll, Respondents.

No. 99–0108. | Argued Nov. 7,
1999. | Decided July 6, 2000. |
Rehearing Overruled Nov. 16, 2000.

Outbound driver and outbound passenger's estate and survivors sued Texas Department of Transportation (TxDOT), city, and transit authority individually and as participants in joint enterprise, after accident on high–occupancy vehicle (HOV) lane in which inbound driver was headed the wrong way. The 113th District Court, Harris County, Patricia Hancock, J., entered judgment on jury verdict against TxDOT and transit authority. TxDOT appealed and the Court of Appeals, Frank G. Evans, J. (Retired), 981 S.W.2d 765, affirmed. TxDOT petitioned for review. The Supreme Court, Gonzales, J., held that: (1) governmental unit could be liable for a premises defect under a joint enterprise theory, and (2) TxDOT and transit authority were engaged in joint venture regarding transitway project.

Affirmed.

Owen, J., filed a dissenting opinion in which Phillips, C.J., and Hecht, J., joined.

West Headnotes (15)

**[1]** **States**
👉 Necessity of Consent

The general rule is that the state has sovereign immunity unless it has been waived.

10 Cases that cite this headnote

**[2]** **States**
👉 What are suits against state or state officers

Sovereign immunity applies to both the state and its agencies.

3 Cases that cite this headnote

**[3]** **Automobiles**
👉 Government; Immunity and Waiver Thereof

**Automobiles**
👉 Nature and Grounds of Liability

**Municipal Corporations**
👉 Nature and grounds of liability of municipality as proprietor

Statute providing for government liability waives sovereign immunity in three general areas: use of publicly owned automobiles, premises defects, and injuries arising out of conditions or use of property. V.T.C.A., Civil Practice & Remedies Code § 101.021.

30 Cases that cite this headnote

**[4]** **Municipal Corporations**
👉 Nature and grounds of liability of municipality as proprietor

Governmental liability for premises defects does not depend on the actions of its employees, but is based on the standard of care owed for a premises defect. V.T.C.A., Civil Practice & Remedies Code §§ 101.021(2), 101.022(a).

5 Cases that cite this headnote

**[5]** **Municipal Corporations**
👉 Nature and grounds of liability of municipality as proprietor

Under the waiver of immunity language of Tort Claims Act, a governmental unit can be liable for a premises defect solely under a joint enterprise theory. V.T.C.A., Civil Practice & Remedies Code §§ 101.021(2).

38 Cases that cite this headnote

**[6]** **Joint Adventures**

👉 Rights and Liabilities of Parties as to Third Persons

Joint enterprise liability makes each party thereto the agent of the other and thereby holds each responsible for the negligent act of the other.

17 Cases that cite this headnote

**[7]** **Joint Adventures**

👉 Essential Elements

Elements which are essential to a joint enterprise are: (1) an agreement, express or implied, among the members of the group, (2) a common purpose to be carried out by the group, (3) a community of pecuniary interest in that purpose, among the members, and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control. Restatement (Second) of Torts § 491 comment.

37 Cases that cite this headnote

**[8]** **Appeal and Error**

👉 Sufficiency of Evidence in Support

Appellate court will uphold the jury's findings if there is more than a scintilla of evidence to support them.

1 Cases that cite this headnote

**[9]** **Joint Adventures**

👉 Evidence

Evidence supported finding that Texas Department of Transportation (TxDOT) and transit authority were engaged in community of pecuniary interest, supporting finding of joint enterprise as to highway project; master agreement plainly recognized that project involved substantial sums of money and contemplated sharing of resources to make better use of this money and to realize economic gain, monetary and personnel savings produced from pooling of resources might have been substantial, and project was not a

matter of friendly or family cooperation and accommodation.

12 Cases that cite this headnote

**[10]** **Joint Adventures**

👉 Contracts creating joint adventures

Equal right to control enterprise existed as to transitway, supporting finding of joint venture between Texas Department of Transportation (TxDOT) and transit authority, although transit authority was primarily responsible for day-to-day operation and maintenance of transitways and its employees carried out procedures of transitway management team, as master agreement provided that TxDOT and transit authority would divide responsibility for maintenance, and TxDOT had equal right to control what management team's procedures were and how they were to be carried out, that is, TxDOT had a voice and right to be heard as to matters affecting day-to-day operations.

26 Cases that cite this headnote

**[11]** **Appeal and Error**

👉 Same or Similar Evidence Otherwise Admitted

Any error in trial court's exclusion of driver's statement to officer that shortly before accident he had been outbound on high-occupancy vehicle (HOV) lane was not harmful in automobile accident case resulting from driver going inbound the wrong way on same HOV lane, as statement was merely cumulative of evidence already in record and was not controlling on a dispositive material issue, where jury heard other evidence that driver might have driven outbound on HOV lane shortly before accident, and jury also heard evidence that driver was familiar with HOV facilities and might have intentionally ignored ramp controls.

10 Cases that cite this headnote

**[12]** **Trial**

👉 Admission of evidence in general

The inclusion and exclusion of evidence is committed to the trial court's sound discretion.

20 Cases that cite this headnote

**[13]    Appeal and Error**
👈 Evidence in General

**Appeal and Error**
👈 Prejudicial Effect

A successful challenge to evidentiary rulings usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted.

63 Cases that cite this headnote

**[14]    Appeal and Error**
👈 Prejudicial Effect

In determining if the excluded evidence probably resulted in the rendition of an improper judgment, a court must review the entire record.

46 Cases that cite this headnote

**[15]    Appeal and Error**
👈 Same or Similar Evidence Otherwise Admitted

**Appeal and Error**
👈 Same or Similar Evidence Otherwise Admitted

Appellate court ordinarily will not reverse a judgment for erroneous rulings on admissibility of evidence when the evidence in question is cumulative and not controlling on a material issue dispositive to the case.

34 Cases that cite this headnote

**Attorneys and Law Firms**

**\*609** Michael C. Ratliff, Grady Click, Linda Eads, Andy Taylor, John Cornyn, Atty. Gen., Austin, for petitioner.

David L. Monroe, John W. Able, Levert J. Able, Able, Monroe & Walker, for respondent.

**Opinion**

Justice GONZALES delivered the opinion of the Court, in which Justice ENOCH, Justice BAKER, Justice ABBOTT, Justice HANKINSON and Justice O'NEILL joined.

A jury found that the Texas Department of Transportation (TxDOT) did not negligently cause a fatal automobile accident on a high occupancy vehicle lane. We must decide whether the State has waived sovereign immunity under the Texas Tort Claims Act when a state agency has entered into a joint enterprise with another governmental unit that is found to have negligently caused the accident. The jury **\*610** found that there was a joint enterprise and the trial court determined the State waived sovereign immunity. The court of appeals affirmed. 981 S.W.2d 765. We hold that a governmental unit that enters into a joint enterprise can be liable under the waiver of sovereign immunity found in the Tort Claims Act. *See* TEX. CIV. PRAC. & REM.CODE § 101.021(2). Accordingly, we affirm the judgment of the court of appeals.

## I. Background

On the evening of December 7, 1993, Dr. Luke Able and his wife Margaret were traveling in their minivan outbound from Houston, Texas on the U.S. Highway 290 high-occupancy vehicle or HOV lane. The Ables collided head-on with a vehicle driven by Jerry Huebner with its lights off, heading inbound the wrong direction, in the same HOV lane. Both Margaret Able and a passenger in Huebner's vehicle were killed. Dr. Able and Huebner were severely injured. Later that night at the hospital, Huebner gave a statement to Harris County Deputy Sheriff J. Keele about the accident. According to Officer Keele's supplemental accident report, Huebner remembered getting on the HOV lane traveling outbound, turning around in a park-and-ride, proceeding to a traffic light that turned from red to green and then continuing on his way. Huebner stated that this was the last thing he remembered.

Dr. Able, Margaret Able's estate, and Margaret Able's survivors, Ramona Lee Dees and Sylvia Jane Knoll, filed suit against TxDOT, the Houston Metropolitan Transit Authority (Metro), the City of Houston, and Harris County for negligence and gross negligence. The plaintiffs sued the governmental entities individually and as participants in a joint enterprise. They alleged a joint enterprise based on (1) agreements between the governmental entities, including a written agreement between TxDOT and Metro

entitled "Transitways Master Operations and Maintenance Agreement" (Master Agreement), (2) common law, and (3) various provisions of the Texas Civil Practice and Remedies Code. The plaintiffs non-suited Harris County before trial, and the case proceeded against the three remaining governmental entities.

At trial, the court excluded Huebner's statements in Officer Keele's supplemental accident report. But the jury heard testimony from the plaintiffs' expert on cross examination about the possibility that Huebner intentionally drove the wrong way on the HOV lane on the night of the accident. At the trial's conclusion, the jury was asked to decide which, if any, defendants were negligent and to apportion the percentage of negligence among the defendants. The jury found that (1) Metro and Huebner, who was not a defendant, were negligent, (2) Metro was grossly negligent, (3) TxDOT and the City of Houston were not negligent, and (4) TxDOT and Metro were engaged in a joint enterprise on the date of the accident. The jury apportioned fifty percent of the negligence to Metro and the remaining fifty percent to Huebner.

The jury awarded $1,000,000 to Dr. Able, $750,000 each to Ramona Dees and to Sylvia Knoll for the loss of their mother, and $200,000 to the Estate of Margaret Able. Based on the jury's findings, the trial court rendered a judgment against Metro for $200,000, the maximum award allowed under the Tort Claims Act, and a judgment that the plaintiffs take nothing from the City of Houston and Harris County. The trial court also rendered a judgment against TxDOT for the statutory maximum award of $500,000, based on the jury's finding that TxDOT and Metro were engaged in a joint enterprise. Of this $500,000, the court awarded $250,000 to Dr. Able and $250,000 jointly to Ramona Dees, Sylvia Knoll and the Estate of Margaret Able.

Only TxDOT appealed. In the court of appeals, TxDOT argued that it did not waive its sovereign immunity and that a **\*611** judgment could not be rendered against it because the jury found that TxDOT was not negligent. TxDOT further complained that there was no evidence to support the jury's finding that TxDOT and Metro were engaged in a joint enterprise and that the trial court improperly excluded statements by Huebner that resulted in harmful error. The court of appeals overruled all of TxDOT's points of error and affirmed the trial court's judgment. 981 S.W.2d 765. TxDOT petitioned this Court for review, and we granted the petition.

## II. Discussion

**[1]** **[2]** TxDOT makes the same arguments here that it asserted in the court of appeals. We turn first to TxDOT's complaint that there has been no waiver of sovereign immunity in the present case. The general rule is that the State has sovereign immunity unless it has been waived. *See Dallas County Mental Health & Mental Retardation v. Bossley,* 968 S.W.2d 339, 341 (Tex.1998); *Director of Dep't of Agric. & Env't v. Printing Indus. Ass'n,* 600 S.W.2d 264, 265–66 (Tex.1980). This immunity applies to both the State and its agencies such as TxDOT. *See Lowe v. Texas Tech Univ.,* 540 S.W.2d 297, 298 (Tex.1976); TEX. CIV. PRAC. & REM.CODE § 101.001(2).

### A. Section 101.021

**[3]** Section 101.021 of the Texas Civil Practice and Remedies Code provides a limited waiver of sovereign immunity:

A governmental unit in the state is liable for:

(1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:

> (A) the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and

> (B) the employee would be personally liable to the claimant according to Texas law; and

(2) personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

TEX. CIV. PRAC. & REM.CODE § 101.021. Section 101.021 has been interpreted to waive sovereign immunity in three general areas: "use of publicly owned automobiles, premises defects, and injuries arising out of conditions or use of property." *Lowe,* 540 S.W.2d at 298. The plaintiffs and TxDOT agree that subsection (1) of section 101.021 does not apply to this case. Therefore, the only issue before this Court involving waiver of sovereign immunity is the interpretation of subsection (2) of section 101.021.

TxDOT argues that the "so caused" language of subsection (2) allows liability only for the negligence or wrongful acts or omissions caused by its own employees. TxDOT cites this Court's construction of the "so caused" language, used in a prior version of section 101.021, to mean "when proximately caused by the negligence or wrongful act or omission of any officer or employee acting within the scope of his employment or office." *Lowe,* 540 S.W.2d at 299; *accord Salcedo v. El Paso Hosp. Dist.,* 659 S.W.2d 30, 33 (Tex.1983) (interpreting "so caused" to mean that "[t]he proximate cause of the damages for death or personal injury must be the negligence or wrongful act or omission of the officer or employee acting within the scope of his employment or office."). Because the jury found no negligence by TxDOT or its employees here, TxDOT asserts it cannot be liable as a matter of law under section 101.021(2).

Furthermore, TxDOT argues it cannot be liable for the negligent acts of Metro's employees. The Tort Claims Act defines employee as:

> a person, including an officer or agent, who is in the paid service of a governmental **\*612** unit by competent authority, but does not include an independent contractor, an agent or employee of an independent contractor, or a person who performs tasks the details of which the governmental unit does not have the legal right to control.

TEX. CIV. PRAC. & REM.CODE § 101.001(1). TxDOT contends that under this definition, Metro employees are not employees of TxDOT for purposes of section 101.021(2); accordingly, TxDOT cannot be vicariously liable for Metro's negligence.

 **[4]**  We disagree with TxDOT's interpretation of the "so caused" language in section 101.021(2). This Court has previously held that liability under subsection (2) can arise under different theories:

> [S]ubsection 2 is broader than subsection 1 in that it encompasses governmental liability based on respondeat superior for misuse of tangible personal property other than motor-driven vehicles and equipment.

Subsection 2 is also broader because it encompasses governmental liability for a *condition* of real property or tangible personal property. Thus, in addition to liability based on principles of respondeat superior, subsection 2 includes governmental liability for premise defects.

*DeWitt v. Harris County,* 904 S.W.2d 650, 653 (Tex.1995). These theories of liability are based on different standards of care owed—some of which are not dependent upon the actions of any employee. Thus, we have stated that the limiting language in subsection (1)(b), requiring the employee to be personally liable to the claimant under Texas law, would be inapposite in the context of subsection (2). *See DeWitt,* 904 S.W.2d at 654.

In this case, plaintiffs alleged a premises defect involving a state highway. Further, the jury charge, asking the jury to decide whether any defendants were negligent, tracked the elements that must be found in a premises defect case. *See Wal–Mart Stores, Inc. v. Gonzalez,* 968 S.W.2d 934, 936 (Tex.1998) (describing the four elements of a premises defect claim). In *DeWitt* we noted that in a premises defect suit against a governmental unit under section 101.021, liability is not based on the actions of the governmental unit's employees:

> With premise defects, liability is predicated not upon the actions of the governmental unit's employees but by reference to the duty of care owed by the governmental unit to the claimant for premise and special defects as specified in section 101.022 of the Texas Tort Claims Act.

*DeWitt,* 904 S.W.2d at 653. Instead, in a premises defect case the State owes the same duty a private landowner owes a licensee. *See* TEX. CIV. PRAC. & REM.CODE § 101.022(a); *State Dep't of Highways & Pub. Transp. v. Payne,* 838 S.W.2d 235, 237 (Tex.1992); *State v. Tennison,* 509 S.W.2d 560, 562 (Tex.1974). Here the jury found Metro negligent for a premises defect. This liability was not based upon the conduct of their employees but instead upon the standard of care owed for a premises defect. *See* TEX. CIV. PRAC. & REM.CODE § 101.022(a). Thus, contrary to TxDOT's argument, liability for premises defects under

section 101.021(2) does not depend on the actions of its employees.

But even if a governmental unit can be liable under section 101.021(2) without a finding of negligence by its employees, we must still consider TxDOT's argument that it cannot be liable here because of the jury's finding that TxDOT was not negligent for a premises defect. The jury found such liability based on a joint enterprise between Metro and TxDOT. We now consider whether a governmental unit can be liable for a premises defect solely under a joint enterprise theory.

### B. Waiver of Sovereign Immunity

 **[5]**    We turn first to the plain meaning of section 101.021(2). That section clearly states a governmental unit can be liable for "personal injury and death so caused ***613** by a condition ... of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." TEX. CIV. PRAC. & REM.CODE § 101.021(2). Here the trial court found a waiver of sovereign immunity because of the jury's finding that there was a joint enterprise. Because the jury found that TxDOT was not individually negligent for a premises defect, TxDOT can only be liable if the joint enterprise finding brings the liability within the waiver of sovereign immunity language in the Tort Claims Act. Section 101.021(2) waives liability for a governmental unit if "the governmental unit would, were it a private person, be liable to the claimant according to Texas law." We have stated in the context of private parties that "the theory of joint enterprise is to make each party thereto the agent of the other and thereby to hold each responsible for the negligent act of the other." *Shoemaker v. Estate of Whistler,* 513 S.W.2d 10, 14 (Tex.1974). If there is a joint enterprise here between Metro and TxDOT, and if TxDOT would have been liable for Metro's negligence had TxDOT been a private person, then we must conclude that the State has waived its immunity and that TxDOT is liable under the plain meaning of section 101.021(2).

### C. Joint Enterprise

 **[6]**    **[7]**    Joint enterprise liability makes "each party thereto the agent of the other and thereby to hold each responsible for the negligent act of the other." *Shoemaker,* 513 S.W.2d at 14. In *Shoemaker* we adopted the definition of joint enterprise as

stated in section 491, comment c of the *Restatement of Torts.* That section states:

> [t]he elements which are essential to a joint enterprise are commonly stated to be four: (1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control.

RESTATEMENT (SECOND) OF TORTS § 491 cmt. c (1965)*; see also Blount v. Bordens Inc., 910 S.W.2d 931, 933 (Tex.1995); Triplex Communications, Inc. v. Riley, 900 S.W.2d 716, 718 (Tex.1995).*

In this case the charge asked the jury whether, on the occasion in question, any of the defendants were engaged in a joint enterprise. The charge defined joint enterprise, tracking the four elements that Texas law requires in order to prove a joint enterprise. Relying upon that definition, the jury found that TxDOT and Metro were engaged in a joint enterprise. TxDOT challenges the finding, however, complaining that there is no evidence of a community of pecuniary interest and an equal right to control the enterprise.

 **[8]**    **[9]**    We will uphold the jury's findings if there is more than a scintilla of evidence to support them. *See General Motors Corp. v. Sanchez,* 997 S.W.2d 584, 588 (Tex.1999); *Continental Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex.1996). We turn first to whether there is any evidence that a community of pecuniary interest existed between TxDOT and Metro. In *Shoemaker,* we noted that some Texas courts had manifested a broad view of joint enterprise beyond a commercial or business purpose. But we also noted that other courts had limited joint enterprise to the business context: "[w]hile several courts have embraced the 'community of pecuniary interest' element set forth in the Restatement, others have articulated this element in terms such as a 'common business purpose,' a 'common financial interest,' a 'common pecuniary objective,' or a 'venture for profit in a financial or commercial sense.' " *Shoemaker,* 513 S.W.2d at 17 (citations omitted). Thus we concluded there that, "there is not the same reason for imposing liability in the non-commercial situations which are more often matters for friendly or family cooperation and accommodation." ***614**

*Shoemaker,* 513 S.W.2d at 17. We therefore limited the application of joint enterprise to those having a business or pecuniary interest. *See Shoemaker,* 513 S.W.2d at 17.

In a more recent case, we held that two men who were killed in a car accident while driving to New Mexico to pick up horses owned by one man's father and a family friend were not involved in a joint enterprise. *See Blount v. Bordens, Inc.,* 910 S.W.2d 931, 932 (Tex.1995) (per curiam). The only evidence that the defense offered in that case to prove a community of pecuniary interest was the testimony of one man's father that his son would be able to pay some bills after returning from the trip. *See Blount,* 910 S.W.2d at 933. We held that this meager circumstantial evidence could give rise to any number of inferences, and amounted to no evidence of a community of pecuniary interest. *See Blount,* 910 S.W.2d at 933.

In this case, however, TxDOT and Metro entered into the Master Agreement. Under the subheading "Use of Facilities" the agreement acknowledges that:

> the highway facilities upon which Transitways are constructed are under the ultimate control and supervision of the State, however, the parties also acknowledge that the construction, operation, and maintenance of Transitways *involve the investment of substantial sums for mass transit purposes*, by METRO and the United States Government; therefore, the State agrees that it will exercise its rights of control and supervision so as to recognize the mass transit purposes of Transitways throughout their useful lifetime.

(emphasis added). Further, plaintiffs introduced at trial a Metro document that states the Transitways program has been a joint effort between TxDOT and Metro that has used federal, state and local funds. These documents provide some evidence that show Metro and TxDOT had a community of pecuniary interest in the purpose of this joint undertaking. The Master Agreement plainly recognizes that the Transitways project involved substantial sums of money and contemplated a sharing of resources in order to make better use of this money. It may well have been that the monetary and personnel savings produced from this pooling of resources was substantial. The documents also clearly contemplate an economic gain that could be realized

by undertaking the activities in this manner. The Transitways project was not a matter of "friendly or family cooperation and accommodation" but was instead a transaction by two parties that had a community of pecuniary interest in the purpose. *See Shoemaker,* 513 S.W.2d at 17. We conclude that the evidence produced at trial is some evidence from which the jury could find that TxDOT and Metro were engaged in a community of pecuniary interest in the purpose of the joint enterprise.

[10] TxDOT also complains that there is no evidence to support the jury's conclusion that there was an equal right to control the enterprise. In *Shoemaker* we stated that the equal-right-to-control element means "that each [participant] must have an authoritative voice or, ... must have some voice and right to be heard." *Shoemaker,* 513 S.W.2d at 16.

This court has further looked at the equal right to control prong in *Triplex Communications, Inc. v. Riley,* 900 S.W.2d 716 (Tex.1995). In *Triplex,* one issue, among others, was whether a radio station could be held liable under theories of joint enterprise for personal injuries resulting from a nightclub's violations of the Texas Dram Shop Act. The plaintiff's evidence showed that the nightclub ran a promotion pricing drinks on the night of the injuries to correspond to the radio station's FM frequency. It was the nightclub, however, that was licensed to sell the alcohol, controlled how much liquor was served and to whom it was served, decided who to admit and eject from the club and was in the best position to monitor the amount of liquor that the patrons consumed. *See Triplex,* 900 S.W.2d at 719. **\*615** Further, there was no evidence that the radio station had any contractual right to control or exercised any control over who was served, admitted or rejected. *See Triplex,* 900 S.W.2d at 719. We held that this amounted to no evidence of an equal right to direct and control the enterprise sufficient to justify the imposition of joint enterprise liability. *See Triplex,* 900 S.W.2d at 719.

Unlike *Triplex,* in which there was no contractual right to control, in this case TxDOT and Metro enjoy contractual rights under the Master Agreement. That agreement states, "while METRO is the primary agency responsible for the day-to-day operation and maintenance of Transitways, such Transitways, being part of the controlled-access highways, impact freeway operation and the State therefore has an interest and responsibility in the operation and maintenance of Transitways." The Master Agreement, under the subheading "Use of Facilities," also acknowledges that "the highway facilities upon which Transitways are constructed are under

the ultimate control and supervision of the State, however, ... the State agrees that it will exercise its rights of control and supervision so as to recognize the mass transit purposes of Transitways throughout their useful lifetime."

TxDOT argues that the Master Agreement gave Metro ultimate day-to-day control of the HOV traffic. Under the sub-heading "Maintenance of Transitways" the Master Agreement provides for TxDOT and Metro to "divide the responsibility for maintenance" of the Transitways. The paragraphs that follow provide that Metro will maintain numerous items of the Transitways, including the signs, control devices, equipment, and illumination devices. Metro also agreed to maintain all park-and-ride or transit center facilities, including the pavement, striping, lighting, signing, buildings, sanitary facilities, water, storm sewers, detention ponds and facilities, telephones, utilities, signals and landscaping. A later provision of the Master Agreement states that the Metro Transit Police would assist in the opening and closing of the lanes as specified in the Master Agreement. TxDOT argues that these provisions show that Metro had the sole control over the enterprise and that there is no evidence that TxDOT had an equal right to control in the enterprise.

In essence, TxDOT invites this Court to redefine the scope of its enterprise with Metro by excluding the day-to-day maintenance and operation of the Transitways, a duty that TxDOT claims belonged to Metro. We decline the invitation for two reasons. First, allowing a member of a joint enterprise to escape liability to a third party simply by delegating responsibility for the component of the joint enterprise that caused the injury to the third party would defeat the theory of joint enterprise liability. Second, other provisions in the Master Agreement contradict TxDOT's suggestion that it did not have control over the maintenance and operation of the Transitways. While the Master Agreement provides that Metro is the primary agency responsible for the day-to-day operation and maintenance of the Transitways, the agreement also clearly provides that the State, through TxDOT, has an interest and responsibility in the operation and maintenance of the Transitways. Additionally, under the subheading "Operation of Transitways" the agreement provides that TxDOT, through the State Transitway Engineer, and Metro, through the Transitway Manager, were to serve on the "Transitway Management Team." This team was to meet monthly to:

> oversee Transitway Operations; monitor policies and procedures promulgated by Operations Plans;

interpret and implement the terms of Operations Plans; and review Transitway operating procedures, rules and regulations established pursuant to Operations Plans. On a semi-annual basis, they shall submit a report to METRO's General Manager and the State's District 12 Engineer concerning such matters as Transitway **\*616** vehicle and passenger usage, operating speeds, accident and incident data, and other matters pertaining to the safe and effective operations of Transitways. The reports may also include recommendations for design modifications of existing Transitways and suggestions regarding the design of future Transitways.

Further, Metro and TxDOT had to promulgate an Operations Plan for each Transitway not less than thirty days prior to the commencement of operations on any segment of the Transitway, and file the Operations Plan with both agencies. Amendments to the Operations Plan could be made only by the consent of both TxDOT and Metro. The Transitway Management Team also developed the Transitway rules and regulations in order to assure safe and effective operation and procedures to be implemented by agency personnel as well as the Transitways' hours of operation. The team also evaluated the effectiveness of the Transitway traffic control devices and recommended changes needed to further the goals of the Master Agreement. Thus, even though Metro employees carried out the procedures of the Transitway Management Team, TxDOT had an equal right to control what those procedures were and how they were to be carried out. In other words, TxDOT had a voice and right to be heard regarding matters affecting the day-to-day operations of the Transitways.

This is some evidence to support the jury's finding that TxDOT and Metro had the mutual right to control the direction and management of the enterprise. Accordingly, we hold that there is legally sufficient evidence to support the jury's finding that a joint enterprise existed between TxDOT and Metro. Because each party in a joint enterprise is responsible for the negligent act of the other, we conclude that the State has waived immunity and TxDOT is liable

for Metro's negligence under the plain meaning of section 101.021(2).

The Legislature plainly intended the State to waive sovereign immunity if a governmental unit would, were it a private person, be liable to the claimant according to Texas law. This waiver is clear and unequivocal, and makes no exception for joint enterprise liability. *See City of LaPorte v. Barfield, 898 S.W.2d 288, 291 (Tex.1995)* (noting that the Legislature must waive sovereign immunity with clear and unambiguous language). We conclude from the statute's plain meaning that the Legislature intended that a governmental unit enjoying the benefits and advantages of a joint enterprise would also be subject to the same obligations and liabilities that a private person would be if he or she were engaged in a joint enterprise.

### III. Exclusion of Evidence

[11] On the night of the accident, Officer Keele was dispatched to the hospital to take statements from both drivers, Huebner and Dr. Able. TxDOT argues that the trial court erred in excluding Huebner's statements to Officer Keele. During this questioning, Huebner made statements that Officer Keele later included in his supplemental accident report:

> at first ... he [Huebner] did not remember being on the HOV Lane but remembered being on the feeder road of U.S. 290. He then stated that he remembered getting on the HOV Lane at Pinemont park and ride and then going [westbound or outbound] in the HOV Lane and getting off at [West] Little York park and ride and as he was attempting to exit the park and ride he came to a traffic control gate and there was a traffic light on it that was red and he stopped and then he pulled his vehicle a little closer and the light turned green and he started to proceed but did not remember anything after that.

TxDOT contends that this evidence was admissible for three reasons. First, it was a prior inconsistent statement and therefore admissible under Rule 613(a) of the Texas Rules of Civil Evidence because Huebner **\*617** later testified at trial

that he remembered driving outbound on the main lanes of U.S. 290 instead of on the HOV lane. Second, the excluded statement was admissible because it challenged the opinion testimony of Dr. Stephen Able, who was an expert witness for the plaintiffs. Third, the statement was admissible as a public record under Rule 803(8) of the Texas Rules of Civil Evidence.

[12] [13] The inclusion and exclusion of evidence is committed to the trial court's sound discretion. *See City of Brownsville v. Alvarado, 897 S.W.2d 750, 753 (Tex.1995).* But even if we assume, for purposes of this decision, that the statement was admissible under 803(8) as an exception to the hearsay rule, and that trial court erred in not admitting it, TxDOT still must show that the error was harmful. *See* TEX.R.APP. P. 61.1. To put it another way, a successful challenge to evidentiary rulings usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted. *See Alvarado, 897 S.W.2d at 754.* TxDOT asserts that the excluded statement probably caused the rendition of an improper verdict because it was vital evidence that probably would have convinced the jury that Huebner intentionally drove the wrong way on the HOV lane on the night of the accident. Further, TxDOT contends the statement probably would have resulted in a jury finding that it was Huebner's sole negligence that proximately caused the accident.

[14] [15] In determining if the excluded evidence probably resulted in the rendition of an improper judgment, a court must review the entire record. *See McCraw v. Maris, 828 S.W.2d 756, 758 (Tex.1992); Gee v. Liberty Mut. Fire Ins. Co., 765 S.W.2d 394, 396 (Tex.1989).* This court ordinarily will not reverse a judgment for erroneous rulings on admissibility of evidence when the evidence in question is cumulative and not controlling on a material issue dispositive to the case. *See Gee, 765 S.W.2d at 396; Reina v. General Accident Fire & Life Assurance Corp., 611 S.W.2d 415, 417 (Tex.1981).* In this case, the jury heard evidence that Huebner might have driven outbound on the HOV lane and then shortly thereafter driven inbound on the same HOV lane, implying that he should have known he was traveling against the traffic. The jury also heard evidence that Huebner was familiar with the HOV facilities and might have intentionally ignored ramp controls.

In TxDOT's cross examination of Dr. Olin K. Dart, Jr., the plaintiffs' expert consulting traffic engineer, Dr. Dart stated that it was possible that Huebner was familiar with the

Pinemont park-and-ride and that he deliberately disregarded ramp controls in entering the HOV lane heading inbound, against the flow of the HOV traffic.

Q. It was your conclusion, sir, in both of your reports, that one of the possibilities for Jerry Huebner entering the HOV lane going the wrong way is that he deliberately disregarded ramp controls; is that right?

A. That's entirely possible, yes, sir.

....

Q. One of the possibilities that you considered, Doctor, did you consider the possibility that Jerry could have initially gone outbound from Pinemont to West Little York and then turned around and come back inbound?

A. That was in one of his statements, I believe, that's correct.

Q. Yes, sir. In fact, you know that Jerry Huebner lives in the Pinemont area, don't you?

A. That's what he said.

Q. And you know that Jerry Huebner is familiar with this park and ride lot?

A. Apparently so.

Q. Lived in that area for years?

A. Yes.

**\*618** TxDOT's counsel then established that Dr. Dart had read and reviewed Huebner's depositions, and again asked about the possibility that Huebner had proceeded outbound on the HOV lane and then turned around and immediately proceeded back inbound on the same HOV lane.

Q. So one possibility is he [Huebner] went outbound from Pinemont to West Little York and then came back inbound; is that correct?

A. That would be a possibility.

Q. Within a matter of a few minutes?

A. That would be possible.

....

Q. Okay. And if Jerry Huebner, in fact, was going both ways on this HOV lane within a matter of minutes, there was no excuse for him having done that, is there, Doctor?

....

Q. (By Mr. Garza) If, in fact, he did that?

A. If, in fact, he did that. You would think that he would have understood that.

Q. There would be no excuse for him having done that, would there?

A. That's correct.

....

Q. All right. And so, Doctor, if he intentionally got on this HOV lane knowing that at 10:00 o'clock at night, knowing that at 10:00 o'clock at night, that HOV lane could only be used for outbound traffic and he intentionally got on it inbound, there is no excuse for him having done that, is there?

A. That's correct.

....

Q. Let's go through some of this evidence that we've discussed today, Doctor. Although, as you tell us today, you have no more idea about how Jerry got on that HOV going the wrong way than anyone else, do you?

A. That's right.

Q. Even after readings [sic] Jerry's so-called sworn testimony about how he now claims it happened, right?

A. He claims he went in through the gate.

Q. Yes, sir. That's what he claims, right?

A. That's right.

Q. And he has given inconsistent stories at different times, hasn't he?

A. Apparently.

Q. Yes, sir. One of which has included an admission that he went both ways on an HOV lane within a few minutes?

Based on the record, we conclude Huebner's statement to Officer Keele made on the night of the accident, was merely cumulative of the evidence already in the record and was not controlling on a material issue dispositive to the case. TxDOT has failed to show that the excluded evidence probably caused the rendition of an improper judgment. Thus we conclude the trial court's ruling, even if erroneous, did not amount to harmful error.

### IV. Conclusion

For the reasons considered above, we hold that there is sufficient evidence to support the jury's finding that TxDOT and Metro were engaged in a joint enterprise and that the State has waived immunity under section 101.021 of the Tort Claims Act. We also hold that it was not harmful error to exclude Huebner's statements to Officer Keele. Because of our disposition we need not address the cross points of error brought by plaintiffs in the court of appeals. Accordingly we affirm the judgment of the court of appeals.

Justice OWEN filed a dissenting opinion, in which Chief Justice PHILLIPS and Justice HECHT joined.

**\*619** Justice OWEN, joined by Chief Justice PHILLIPS and Justice HECHT, dissenting.

I cannot join in the Court's opinion or judgment because it is based on the premise that vicarious liability can be imposed on the State of Texas for the negligence of one of its political subdivisions under the common-law theory of joint enterprise. There are two elements of a tort cause of action based on joint enterprise that are not satisfied by the relationship between the State and its political subdivisions when they are providing core governmental functions. One of those elements is that the members of a group must have an equal voice in the direction of the enterprise which gives rise to an equal right of control. The other is that there must be a common pecuniary interest in a commercial setting. Neither of those elements exists when the State is sued for the negligence of a state-created transit authority in carrying out day-to-day operations of a highway that runs through a city.

Because the jury in this case failed to find the State negligent and because joint enterprise is not a viable basis for imposing vicarious liability on the State for the negligence of its political subdivision, I must dissent.

### I

The jury in this case was asked to determine whether the State's negligence proximately caused the accident in question and whether Metro's negligence proximately caused the accident. The jury answered "no" with regard to the State, but "yes" as to Metro. Thus, the State's direct negligence was submitted to the jury. The Respondents, to whom I will refer collectively as the Ables, failed to obtain a finding that the State was negligent for its role in operating and maintaining the Highway 290 HOV lane.

The Ables nevertheless contend that Metro's negligence should be imputed to the State because, they claim, the State and Metro were engaged in a joint enterprise. A joint enterprise necessarily assumes that there are two or more individuals or distinct entities that are members of a group. This Court held in *Shoemaker v. Estate of Whistler* that one of the elements of joint enterprise is that there is an agreement, express or implied, "among the members of the group." 513 S.W.2d 10, 16 (Tex.1974). Although Metro and the State are distinct in the eyes of the law for some purposes, just as a subsidiary corporation is distinct from its parent corporation in the eyes of the law for most purposes, Metro is part of the State itself. It is a political subdivision of the State. *See Metropolitan Transit Auth. v. Plessner,* 682 S.W.2d 650, 651 (Tex.App.—Houston [1 st Dist.] 1984, no writ).

One element of a tort cause of action based on joint enterprise is that the members of the group must have "an equal right to a voice in the direction of the enterprise, which gives an equal right of control." *Shoemaker,* 513 S.W.2d at 17. The State has a superior right of control over its political subdivisions. *See City of Fort Worth v. Zimlich,* 29 S.W.3d 62, 72 (Tex.2000) (stating that a city "derives its existence and powers from legislative enactments and is subject to legislative control"). Indeed, the Operations and Maintenance Agreement between the State and Metro expressly recognizes that the State had the ultimate control of the HOV lane on which the Ables were injured. The Operations and Maintenance Agreement provides in its recitals that the "controlled-access highways ... are under the ultimate control and supervision of the State." Similarly, the Agreement provides in a paragraph entitled "Use of Facilities" that "the highway facilities upon which Transitways are constructed are under the ultimate control and supervision of the State." This Court made clear in *Triplex Communications, Inc. v. Riley,* 900 S.W.2d 716

(Tex.1995), that even when two separate entities have a common pecuniary interest in a jointly sponsored event, there cannot be a joint venture if one party has a superior **\*620** right of control. In that case, the Court stressed no less than three times that the right to control was not equal. *See id.* at 718–19. The Court held in *Triplex* that the owner of a bar had a greater right of control over the serving of alcohol than the radio station that highly publicized and co-sponsored "Ladies Night" at the bar. *Id.*

In the case before us today, the jury has decided that the State, which had the superior right of control, was not liable, but that Metro, which had some right of control but not an equal one, was negligent. The overlay of joint venture liability does not fit the facts of this case.

## II

Another element of a joint venture that is absent in this case is a pecuniary interest in the common purpose of a venture. Over twenty-five years ago, this Court reassessed the requirements for establishing a joint enterprise in the common-law tort context. *See Shoemaker,* 513 S.W.2d at 10. We disavowed earlier decisions that had held that a joint enterprise could be established merely by a showing that there was joint ownership of an instrumentality or property involved in an injury. *See id.* at 16–17. We also disavowed earlier decisions that had imposed liability when there was no pecuniary interest in the common purpose. *See id.* The Court stressed in *Shoemaker* that tort liability for a joint venture would henceforth arise only in *commercial* situations. *Id.* at 17. Providing, operating, and maintaining public highways is not a commercial enterprise.

In *Shoemaker,* two owners of an aircraft along with two passengers perished when the plane crashed during a voluntary search and rescue mission. *Id.* at 11–12. This Court held that although the two owners had "a joint interest in the purposes of the enterprise and an equal right of control," that was not enough to impute the negligence of the pilot-owner to the passenger-owner. *Id.* A pecuniary interest *in the purpose of the enterprise* was lacking. *See id.*

In the case before the Court today, the purpose of the Operations and Maintenance Agreement is to provide streets and highways for the citizens of Houston and of this state. While the State and Metro spend millions of dollars providing that service, they have no pecuniary interest in the purpose of the enterprise. They do not provide the service in order to benefit financially. They are providing a core governmental function. Their public service is no different from the public service that was at issue in *Shoemaker,* which was a civil air patrol. *Id.* at 12.

\* \* \* \* \*

Because Metro is a political subdivision of the State, because there is not an equal right of control, and because the State has no pecuniary interest in the purpose of providing, operating, and maintaining public highways, the State should not be vicariously liable under a joint venture theory. Accordingly, I dissent.

**All Citations**

35 S.W.3d 608, 43 Tex. Sup. Ct. J. 1055

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

269 S.W.3d 100
Court of Appeals of Texas,
Houston (14th Dist.).

Jack W. THOMPSON, Appellant

v.

David RICARDO & Kara K. Peak, Appellees.

No. 14–07–00333–CV.    |    Aug. 26, 2008.

**Synopsis**
**Background:** Judgment debtor filed declaratory judgment action, asserting that real property that was sold at constable's sale to satisfy judgment was homestead property. Judgment creditor and purchaser of property filed motion for sanctions against judgment debtor and attorney, alleging that action was frivolous. Following a hearing, the 164th District Court, Harris County, Martha Hill Jamison, J., granted motion. Attorney appealed.

**[Holding:]** The Court of Appeals, Wanda McKee Fowler, J., held that appeal was moot.

Order vacated in part; motion for sanctions dismissed in part.

Kem Thompson Frost, J., filed dissenting opinion.

West Headnotes (9)

**[1]**    **Constitutional Law**
     Advisory Opinions
Neither the Texas Constitution nor the Texas Legislature has vested the Court of Appeals with the authority to render advisory opinions. Vernon's Ann.Texas Const. Art. 2, § 1.

1 Cases that cite this headnote

**[2]**    **Action**
     Moot, Hypothetical or Abstract Questions
Mootness doctrine limits courts to deciding cases in which an actual controversy exists between the parties.

1 Cases that cite this headnote

**[3]**    **Appeal and Error**
     Effect of Delay or Lapse of Time in General
Under the mootness doctrine, when there ceases to be a controversy between the litigating parties due to events occurring after the trial court has rendered judgment, the decision of an appellate court would be a mere academic exercise, and the court may not decide the appeal.

Cases that cite this headnote

**[4]**    **Action**
     Moot, Hypothetical or Abstract Questions
If a judgment cannot have a practical effect on an existing controversy, the case is moot.

4 Cases that cite this headnote

**[5]**    **Appeal and Error**
     Want of Actual Controversy
When a judgment cannot have a practical effect on an existing controversy, an appellate court is required under the mootness doctrine to vacate the judgment of the trial court and dismiss the underlying cause of action.

4 Cases that cite this headnote

**[6]**    **Appeal and Error**
     Want of Actual Controversy
To invoke the collateral-consequences exception to the mootness doctrine, appellant was required to show (1) a concrete disadvantage resulted from the judgment, and (2) the disadvantage would persist even if the judgment was vacated on appeal and the case was dismissed as moot.

Cases that cite this headnote

**[7]**    **Appeal and Error**
     Want of Actual Controversy
"Capable of repetition yet evading review" exception to the mootness doctrine applies where

the challenged act is of such short duration that the appellant cannot obtain appellate review before the issue becomes moot.

1 Cases that cite this headnote

**[8]** **Appeal and Error**
👉 Want of Actual Controversy

"Collateral consequences" exception to mootness doctrine is invoked only under narrow circumstances, when vacating the underlying judgment will not cure the adverse consequences suffered by the party seeking to appeal that judgment.

Cases that cite this headnote

**[9]** **Appeal and Error**
👉 Want of Actual Controversy

Appeal of trial court's order that granted motion for sanctions under rule governing filing of frivolous actions and that required appellant, as a sanction, to take all actions necessary to release any and all liens on real property at issue in action was moot; appellant had completed all actions specified in order. Vernon's Ann.Texas Rules Civ.Proc., Rule 13.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*101** Travis Thompson, Houston, TX, for appellants.

Mark Taboada and Jack W. Thompson, Houston, TX, for appellees.

**\*102** Panel consists of Justices FOWLER, FROST, and SEYMORE.

**MAJORITY OPINION**

WANDA McKEE FOWLER, Justice.

Attorney Jack W. Thompson represented Niki Koestens in a legal proceeding to have property declared her homestead under Article XVI, section 50 of the Texas Constitution and

section 41.001 of the Texas Property Code. Appellees David Ricardo and Kara K. Peak filed a motion for sanctions under Rule 13 of the Texas Rules of Civil Procedure, (1) alleging that Thompson filed a groundless pleading and (2) requesting that the trial court hold Koestens and Thompson jointly and severally liable for attorney's fees, for the amounts due on the notes payable on two deeds of trust granted on the Property, and for punitive damages. The trial court granted the motion for sanctions, but instead of imposing a monetary sanction on Thompson, the court ordered him to "take all actions necessary to release any and all liens on the Property on or before January 31, 2007." Thompson then brought this appeal.

**Factual and Procedural Background**

According to the parties' pleadings, Ricardo was the plaintiff in a prior lawsuit against Koestens and her business, Niki's Auto Shop & Repair. On March 31, 2005, Ricardo obtained an agreed judgment against Koestens and her business in the amount of $64,320.00. Constable Jack W. Abercia subsequently levied on a parcel of real property owned by Koestens ("the Property"), which was thereafter sold at a Constable's sale to Peak.

Nearly two months later, Koestens filed a declaratory judgment action against appellees and Constable Abercia, seeking to have the Property declared her homestead under Article XVI, section 50 of the Texas Constitution and section 41.001 of the Texas Property Code. In addition, Koestens sought to have the Constable's sale set aside and the Constable's Deed declared a nullity, and requested injunctive relief to prevent appellees from evicting her from the Property. Koestens further sought to recover damages from appellees for "abuse of process, negligent and intentional infliction of emotional distress, conversion, common law tortious collection practices, and constructive fraud," as well as punitive damages and attorney's fees. Thompson represented Koestens in both the prior lawsuit and in the declaratory judgment action.

Appellees thereafter filed a motion for sanctions against Koestens and Thompson under Rule 13 of the Texas Rules of Civil Procedure. Appellees alleged that Koestens's answers to an oral deposition in the prior lawsuit directly contradicted statements contained in the petition filed in the declaratory judgment action and contradicted her affidavit filed in response to appellees' motion for summary judgment. Appellees argued that Koestens's prior deposition testimony supported only the conclusion that she had abandoned

the Property, and that her declaratory judgment action was therefore groundless. Appellees further alleged that Thompson was present and participated in this deposition, that he was aware of the facts stated in the deposition, and that he therefore knew (1) Koestens's pleading in the declaratory judgment action was groundless when it was filed; and (2) the facts contained in Koestens's sworn affidavit were false when it was filed. Appellees requested that the trial court hold Koestens and Thompson jointly and severally liable for attorney's fees, the amounts due on the notes payable on two deeds of trust that had been granted **\*103** on the Property,[1] and punitive damages.

Koestens later nonsuited her declaratory judgment action. The trial court subsequently conducted a hearing on appellees' motion for sanctions, and ultimately granted the motion. However, instead of imposing the specific sanctions requested by appellees, the trial court ordered Koestens to pay Ricardo $15,000 no later than January 31, 2007. The trial court further ordered Koestens and Thompson to "take all actions necessary to release any and all liens on the Property on or before January 31, 2007." Only Thompson appealed.

**Issues on Appeal**

In six issues, Thompson contends that the trial court erred in granting appellees' motion for sanctions. Essentially, Thompson complains that the trial court failed to comply with the requisites of Rule 13 of the Texas Rules of Civil Procedure, because the trial court (1) sanctioned him while finding that the underlying suit was not groundless; (2) sanctioned him in such vague and ambiguous terms that its order is unenforceable and void; (3) failed to state good cause for sanctions in its order; and (4) failed to identify specific acts or omissions which served as the basis for sanctions in its order. Thompson further contends that, at the hearing on appellees' motion for sanctions, the trial court refused him the opportunity to testify or otherwise address the court on his own behalf, and that this refusal constitutes a denial of due process. Finally, Thompson asserts that, because the record does not support a finding of "conscious doing of wrong," or support a finding that he "took actions for the purposes of annoying, threatening, or verbally abusing" appellees, the trial court erred in finding that he acted in bad faith and for the purposes of harassment.

In contrast, appellees assert, among other things, that Thompson's appeal is moot. Specifically, appellees argue that, because Thompson has fully complied with the sanctions

order entered by the trial court, "the action [he] was trying to prevent from happening has already happened." We agree with appellees that Thompson has completed the actions specified in the trial court's order, and that his appeal is moot. Accordingly, without reference to the merits, we vacate that portion of the trial court's order requiring Thompson to "take all actions necessary to release any and all liens on the Property on or before January 31, 2007," and we dismiss the motion for sanctions as to Thompson.

**Analysis**

**A. The Mootness Doctrine**

[1] [2] [3] [4] [5] [6] [7] [8] Neither the Texas Constitution nor the Texas Legislature has vested this Court with the authority to render advisory opinions. *See* TEX. CONST. art. II, § 1; *see also Camarena v. Tex. Employment Comm'n,* 754 S.W.2d 149, 151 (Tex.1988). The mootness doctrine limits courts to deciding cases in which an actual controversy exists between the parties. *Fed. Deposit Ins. Corp. v. Nueces County,* 886 S.W.2d 766, 767 (Tex.1994). When there ceases to be a controversy between the litigating parties due to events occurring after the trial court has rendered judgment, the decision of an appellate court would be a mere academic exercise, and the court may not decide the appeal. *See Olson v. Comm'n for Lawyer Discipline,* 901 S.W.2d 520, 522 (Tex.App.-El Paso 1995, no writ). Stated differently, if a judgment cannot have a practical effect on an existing controversy, the case is moot. *Id.* In **\*104** that situation, the appellate court is required to vacate the judgment of the trial court, and dismiss the underlying cause of action. *See Speer v. Presbyterian Children's Home & Serv. Agency,* 847 S.W.2d 227, 228 (Tex.1993); *see also Gen. Land Office v. OXY U.S.A., Inc.,* 789 S.W.2d 569, 570 (Tex.1990) (stating that if no controversy continues to exist between the parties, the appeal is moot and the court of appeal must dismiss the cause); *Guajardo v. Alamo Lumber Co.,* 159 Tex. 225, 317 S.W.2d 725, 726 (1958) (explaining that when a case becomes moot on appeal, all previous orders are set aside by the appellate court and the case is dismissed).[2]

This Court has previously held that a party's completion of the actions specified in a trial court's sanctions order renders his appeal of that sanctions order moot. *See Barrera v. State,* 130 S.W.3d 253, 260 (Tex.App.-Houston [14th Dist.] 2004, no pet) (citing *Highland Church of Christ v. Powell,* 640 S.W.2d 235, 235 (Tex.1982)). Therefore, we will examine whether Thompson has completed the actions specified in the trial court's order, thereby rendering his appeal of this issue moot.

## B. Thompson Has Completed The Actions Specified In The Trial Court's Order

 [9]    From our review of the record, it is evident that Thompson has completed the actions specified in the trial court's order. As noted above, the trial court ordered Thompson to "take all actions necessary to release any and all liens on the Property on or before January 31, 2007." There were two liens on the Property—one in the amount of $15,000, and a second in the amount of $10,000—both granted to Kubosh Bail Bonds, and a notice of lis pendens filed by Koestens. Thompson himself prepared releases for both liens and for the notice of lis pendens;[3] the release for the notice of lis pendens was executed by Koestens on December 28, 2006, and  **\*105**  the release for the $15,000 lien was executed by Paul A. Kubosh, on behalf of Kubosh Bail Bonds, on January 23, 2007. And, on February 1, 2007, Thompson submitted to the Harris County Clerk the releases that had been executed by Koestens and Kubosh, along with the required filing fee.

The record further reveals that Kubosh executed a release for the $10,000 lien on June 15, 2007.[4] Furthermore, on July 25, 2007, appellees filed in the trial court a "Notice of Sale Of Real Property Subject Of Lawsuit," in which they notified the trial court that (1) the Property had been sold to a disinterested third party; and (2) the Property was free from liens at the time of sale. Therefore, because the trial court's sanctions order required Thompson to take all necessary actions to release any and all liens on the Property, and because the Property was sold to a disinterested third party—and was free from liens at the time of sale—the record indicates that Thompson has completed the actions specified in the trial court's order. His appeal is therefore moot. Accordingly, without reference to the merits, we vacate that portion of the trial court's order requiring Thompson to "take all actions necessary to release any and all liens on the Property on or before January 31, 2007," and we dismiss the motion for sanctions as to Thompson.[5]

### Conclusion

Because we find that Thompson has completed the actions specified in the trial court's order imposing sanctions under Rule 13, we conclude that his appeal is moot. Therefore, without reference to the merits, we vacate that portion of the trial court's order requiring Thompson to "take all actions necessary to release any and all liens on the Property on or before January 31, 2007," and dismiss the motion for sanctions as it relates to Thompson.

FROST, J., dissenting.

KEM THOMPSON FROST, Justice, dissenting.

Appellant Jack W. Thompson, the attorney who represented plaintiff Niki Koestens  **\*106**  in her suit in the trial court against appellees/defendants David Ricardo and Kara K. Peak, challenges the trial court's sanction ordering him to "take all actions necessary to release any and all liens on the Property on or before January 31, 2007."[1] Rather than address the merits, the majority concludes that this appeal is moot because Thompson has completed all the actions specified in the trial court's order. However, the evidence upon which the majority relies shows otherwise. In addition, this court's action on the merits of this appeal could affect the rights of the parties, and therefore, this case is not moot. Instead of dismissing this appeal based on mootness, this court instead should reach the merits and rule on the propriety of the sanction against Thompson.

### The appeal is not moot.

When Picardo and Peak moved for sanctions under Texas Rule of Civil Procedure 13, Koestens nonsuited her claims. After a hearing, the trial court signed an order sanctioning Koestens and Thompson. The only Rule 13 sanction imposed on Thompson was the trial court's order that Thompson "take all actions necessary to release any and all liens on the Property on or before January 31, 2007." The majority concludes that Thompson has completed all the actions specified in the trial court's order and, for this reason, his appeal is now moot.

To complete the actions specified in the sanctions order, Thompson had to take all actions necessary to release all liens on the real property in question on or before January 31, 2007. The evidence shows the following relevant facts regarding the trial court's sanctions order and Thompson's compliance with it:

• The trial court signed its sanctions order on December 14, 2006.

• On or before December 26, 2006, Thompson drafted two two-page documents to release the First Lien and the Second Lien, and he also prepared a letter to his client Koestens, dated December 26, 2006, asking her to take these releases to the lienholder to have them executed.

• Koestens picked up the letter and the lien releases on December 26, 2006.

• On January 23, 2007, the lienholder on the First Lien signed a release of that lien.

• On February 1, 2007, Thompson mailed the release of the First Lien to the Harris County Clerk for recording in the Real Property Records.

• On June 15, 2007, the lienholder on the Second Lien signed a release of that lien, and this release was recorded in the Harris County Real Property Records on June 18, 2007.

If the trial court's sanctions order required Thompson to take all actions necessary to have releases of the liens both executed and recorded on or before January 31, 2007, then Thompson did not complete all the actions specified therein because that task was not accomplished until many months after the trial court's deadline. Neither release of lien was recorded on or before the deadline, and no evidence suggests Thompson did all he could do or that was necessary to get the liens released within the time frame ordered by the trial court. For example, the trial court might conclude that Thompson could have drafted the releases in fewer than 12 **\*107** days, that he could have presented the releases to the lienholder rather than delegating that task to Koestens, and that he could have followed up with the lienholder and endeavored to meet the deadline. In any event, even if the order only required that the releases be executed (and not recorded) by the lienholder by January 31, 2007, the release for the Second Lien was not signed until June 15, 2007, four-and-a-half months after the deadline.

Presuming that this appeal would be moot if Thompson had completed all the actions specified in the trial court's order, there is no evidence that Thompson completed the required actions. The trial court still has the power to hold Thompson in contempt for violating this order by not completing the tasks within the time ordered by the court. *See Cool World and Can, Inc. v. State,* No. 01–01–00966–CV, 2002 WL 31319965, at *2 (Tex.App.-Houston [1st Dist.] Oct. 17, 2002, no pet.) (not designated for publication) (holding that appeal from injunction was not moot because, if the injunction was valid, then the appellants were subject to being held in contempt). For this reason alone, this appeal is not moot.

Furthermore, an appeal is generally not moot unless the appellate court's action on the merits cannot affect the rights of the parties. *VE Corp. v. Ernst & Young,* 860 S.W.2d 83, 84 (Tex.1993). In response to Ricardo and Peak's argument that this appeal is moot, Thompson has asserted that Ricardo and Peak have sued him in a separate action that is pending at the district court level and that the Rule 13 sanctions order that Thompson challenges in this appeal is serving as the underlying basis for Ricardo and Peak's claims against him in that case. Though Thompson has not provided this court with pleadings for the other suit, he has provided this court with the cause number, and Ricardo and Peak have not denied or taken issue with Thompson's description of that litigation. If this court were to conclude that the trial court abused its discretion by sanctioning Thompson and vacate the sanctions order on the merits, Ricardo and Peak would not be able to rely on this order in their suit against Thompson. Therefore, this court's action on the merits of this appeal can affect the rights of the parties, and for this additional reason, this case is not moot. *See VE Corp.,* 860 S.W.2d at 84; *San Saba Energy, L.P. v. Crawford,* 171 S.W.3d 323, 332 (Tex.App.-Houston [14th Dist.] 2005, no pet.).

The majority states that, because Ricardo and Peak assert in this court that Thompson has complied with the sanctions order, they will be estopped from seeking contempt in the trial court below or from relying on the order in other proceedings. However, this court cannot make a binding ruling on this estoppel issue in the instant appeal. In addition, the trial court is charged with seeing that its orders and judgments are obeyed, enforced, and executed. *See* TEX.R. CIV. P. 308. Even if Ricardo and Peak were estopped from arguing that Thompson should be held in contempt, the trial court has the authority to issue a show cause order on its own motion and determine whether Thompson should be held in contempt, even without any action by Ricardo and Peak. *See Dallas County v. Mays,* 747 S.W.2d 842, 844–45 (Tex.App.-Dallas 1988), *rev'd in part on other grounds by, Mays v. Fifth Court of Appeals,* 755 S.W.2d 78 (Tex.1988). Thus, the application of estoppel principles does not render Thompson's appeal of the sanctions order moot.

For these reasons, this court should not dismiss this appeal. Instead, the court should address the merits of the Rule 13

**\*108** sanctions issues. Because it does not, I respectfully dissent.

**All Citations**

269 S.W.3d 100

Footnotes

1    The record indicates that Koestens granted two deeds of trust on the Property to Kubosh Bail Bonds to secure payment on two notes: one in the amount of $15,000, and a second in the amount of $10,000.

2    The Texas Supreme Court has recognized two exceptions to the mootness doctrine, neither of which apply here: (1) the "capable of repetition yet evading review exception"; and (2) the "collateral consequences exception." *See Gen. Land Office,* 789 S.W.2d at 571. The former applies where the challenged act is of such short duration that the appellant cannot obtain review before the issue becomes moot, and has only been used to challenge unconstitutional acts performed by the government. *Id.* The latter is invoked only under narrow circumstances, when vacating the underlying judgment will not cure the adverse consequences suffered by the party seeking to appeal that judgment. *Marshall v. Hous. Auth. of City of San Antonio,* 198 S.W.3d 782, 789 (Tex.2006). In order to invoke the collateral consequences exception, Thompson must show (1) a concrete disadvantage resulted from the judgment; and (2) the disadvantage will persist even if the judgment is vacated and the case dismissed as moot. *Id.* Thompson does not contend that either exception applies to the present appeal, nor does he attempt to demonstrate (1) a concrete disadvantage resulted from the trial court's judgment; or (2) he will continue to suffer any adverse consequences if the judgment below is vacated and the cause dismissed as moot. Therefore, neither exception applies to this appeal.

3    There is additional evidence that Thompson himself took actions to comply with the trial court's sanctions order. Apparently, Thompson also authored a letter to Koestens, dated December 26, 2006, in which he (1) explains the practical effect of the trial court's sanctions order; (2) instructs her to execute the release of the notice of lis pendens, and to have Mr. Kubosh execute the releases of liens; and (3) requests that she "take care of these matters right away." This letter, attached as Exhibit A to appellees' "Partial Withdrawal Of Motion For Enforcement Of Orders And Request To Cancel Hearing," is present in appellees' brief, but is absent from the Clerk's Record. However, in their "Request To Supplement Record For Appeal," filed on July 9, 2007, appellees specifically requested that Exhibit A be included in the record, and Thompson does not challenge the authenticity of the letter included in appellees' brief.

4    The release for the $10,000 lien that was actually executed by Kubosh was prepared by attorney Stephen Best. It is not apparent on the face of the record why Kubosh did not execute the release prepared by Thompson for this particular lien, and the parties make no attempt to otherwise explain this occurrence in their briefs.

5    Thompson contends that his appeal is not moot, because (1) the trial court's order on sanctions is still in effect; (2) there has not been a court determination as to the completion of its vague terms; (3) the potential danger posed to him by the order still exists; and (4) the trial court's order is serving as the underlying basis for a malpractice suit by appellees currently pending. To the extent that this can be construed as an attempt to invoke the collateral consequences exception to the mootness doctrine, we have two responses. *See Marshall,* 198 S.W.3d at 789. First, we have vacated that portion of the order requiring Thompson to remove the liens and have dismissed the motion for sanctions as to Thompson. As a result, nothing remains in the trial court for the appellees or the court to rely on for further contempt proceedings against Thompson. Second, appellees—the parties who brought the motion for sanctions in the trial court—claim on appeal that the appeal is moot by pointing out that Thompson has complied with the order. They would be estopped from taking a contrary position below, or for all practical purposes would have problems taking a contrary position below. *See Moore v. Jet Stream Invs., Ltd.,* 261 S.W.3d 412, 429 (Tex.App.-Texarkana, 2008, no pet. h.) (citing *Lopez v. Munoz, Hockema & Reed, L.L.P.,* 22 S.W.3d 857, 864 (Tex.2000)) (stating that the doctrine of quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken, and explaining that "[t]he doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he or she acquiesced, or from which he or she accepted a benefit.").

1    There was a lien on this property in the original principal amount of $15,000 (hereinafter "First Lien") as well as a lien on the property in the original principal amount of $10,000 (hereinafter "Second Lien").

---

                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

10 S.W.3d 730
Court of Appeals of Texas,
Houston (1st Dist.).

Glenn TILL, Appellant,

v.

Lora Williams THOMAS and Ennis
Inc. d/b/a Quik Park, Appellees.

No. 01–98–00678–CV.  |  Dec. 16, 1999.

Bus driver brought negligence action against van driver and her employer for injuries allegedly resulting from vehicle accident. The 281st Judicial District Court, Harris County, William F. Bell, J., entered take-nothing judgment based on jury verdict. Bus driver appealed. The Court of Appeals, Frank C. Price, J. (Assigned), held that: (1) van driver's admission that she misjudged distance between van and bus, in and of itself, did not show that van driver was negligent; (2) bus driver did not prove accident was proximate cause of back injuries; and (3) Court could not appraise assignment of error based on admission of testimony regarding matters not disclosed in discovery when bus driver failed to include interrogatories and answers in record.

Affirmed.

West Headnotes (19)

[1]     **Appeal and Error**
        👉 Great or overwhelming weight or preponderance

        When a party attacks a jury finding concerning an issue upon which he had the burden of proof, he must demonstrate that the adverse finding is against the great weight and preponderance of the evidence.

        Cases that cite this headnote

[2]     **Appeal and Error**
        👉 Manifest weight of evidence

        In reviewing a challenge that a jury finding is against the great weight and preponderance of the evidence, the Court of Appeals must examine the record to determine if there is some evidence

to support the finding, and then determine, in light of the entire record, whether the finding is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust.

        Cases that cite this headnote

[3]     **Appeal and Error**
        👉 Manifest weight of evidence

        When reviewing whether a jury finding is so contrary to overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust, Court of Appeals cannot reverse merely because it concludes that the evidence preponderates toward an affirmative answer.

        Cases that cite this headnote

[4]     **Appeal and Error**
        👉 Great or overwhelming weight or preponderance

        In reviewing a challenge that jury finding is against great weight and preponderance of evidence, Court of Appeals cannot substitute its opinion for that of the trier of fact and determine that it would reach a different conclusion.

        Cases that cite this headnote

[5]     **Negligence**
        👉 Happening of accident or injury

        Occurrence of an accident or a collision is not of itself evidence of negligence.

        2 Cases that cite this headnote

[6]     **Automobiles**
        👉 Care required and liability in general
        **Automobiles**
        👉 Proximate Cause of Injury

        To prevail on negligence claim arising out of automobile accident, bus driver had to prove specific acts of negligence on the part of the other driver and also prove that the accident was the proximate cause of his injuries.

Cases that cite this headnote

**[7]** **Automobiles**
👉 Care Required and Negligence

**Automobiles**
👉 Proximate Cause of Injury

Whether the plaintiff alleging negligence resulting in automobile accident succeeds in proving negligence and proximate cause by a preponderance of the evidence is within the jury's province to determine.

2 Cases that cite this headnote

**[8]** **Automobiles**
👉 Passing vehicle parked or standing

Van driver's admission that she misjudged distance between van and bus due to overhang on van's door, in and of itself, did not show that van driver was negligent with regard to overhang hitting bus' left side mirror as van passed parked bus, where van driver testified that she was not speeding and was not in any type of hurry, and that she saw bus and attempted to avoid it.

Cases that cite this headnote

**[9]** **Automobiles**
👉 Vehicles at rest or unattended

Injured bus driver did not prove that accident with van driver was proximate cause of his back injuries, where there was ample testimony from bus driver's doctor that back surgery had been recommended before accident.

Cases that cite this headnote

**[10]** **Appeal and Error**
👉 Evidence in General

**Appeal and Error**
👉 Prejudicial Effect

To obtain reversal of a judgment based upon an error of the trial court in admitting or excluding evidence, appellant must show: (1) the trial court erred, and (2) the error was reasonably calculated

to cause and probably did cause the rendition of an improper judgment.

Cases that cite this headnote

**[11]** **Appeal and Error**
👉 Evidence in General

**Appeal and Error**
👉 Prejudicial Effect

In appeal of judgment based on an error of the trial court in admitting or excluding evidence, the appellate court must examine the entire record to determine whether the disputed evidence controlled the judgment.

Cases that cite this headnote

**[12]** **Appeal and Error**
👉 Briefs

Court of Appeals cannot consider documents attached to an appellate brief that do not appear in the record.

51 Cases that cite this headnote

**[13]** **Appeal and Error**
👉 Briefs

Court of Appeals must hear and determine a case on the record as filed, and it may not consider documents attached as exhibits to briefs.

46 Cases that cite this headnote

**[14]** **Appeal and Error**
👉 Contents of documents omitted from record

Court of Appeals could not appraise bus driver's assignment of error that trial court erred in admitting expert testimony regarding matters not disclosed by van driver in interrogatory responses in suit brought by bus driver against van driver for negligence allegedly resulting in vehicle accident, and thus Court had to presume that proceedings and judgment below were regular and correct, where bus driver did not include interrogatories and answers in record.

2 Cases that cite this headnote

**[15] Appeal and Error**
🔑 Contents of documents omitted from record

Court of Appeals must presume documents missing from record would sustain trial court's ruling.

5 Cases that cite this headnote

**[16] Appeal and Error**
🔑 Briefs

Attachment of documents as exhibits or appendices to briefs is not a formal inclusion in the record on appeal and, thus, the documents cannot be considered.

33 Cases that cite this headnote

**[17] Appeal and Error**
🔑 Necessity of timely objection

**Appeal and Error**
🔑 Nature of evidence in general

**Appeal and Error**
🔑 Sufficiency and scope of motion

To have preserved error in trial court's failure to declare mistrial after jury heard irrelevant and prejudicial evidence, injured bus driver must have made valid, timely, and specific request, motion, or objection. Rules App.Proc., Rule 33.

Cases that cite this headnote

**[18] Appeal and Error**
🔑 Conduct of trial or hearing in general

Trial court's denial of a motion for mistrial will not be disturbed on appeal except on a showing of an abuse of discretion.

9 Cases that cite this headnote

**[19] Trial**
🔑 Requisites and sufficiency

Trial court did not abuse its discretion failing to declare mistrial in injured bus driver's suit against van driver for injuries allegedly sustained in accident, even though bus driver argued that testimony of doctor violated motion in limine, where bus driver's attorney did not state grounds for objection or explain for what type of "motion" he was moving.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*732** William Chu, Addison, for Appellant.

Erin E. Lunceford, Houston, for Appellees.

Panel consists of Justices O'CONNOR, HEDGES, and PRICE. [*]

[*] The Honorable Frank C. Price, former Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

**OPINION**

FRANK C. PRICE, Justice (Assigned).

Appellant, Glenn Till, drove a bus full of people from the economy parking lot at Bush Intercontinental Airport. He was parked in front of the terminal when his bus was struck by a van operated by appellee, Lora Williams Thomas, who was driving a shuttle for Quik–Park. Till appeals a take-nothing judgment based on the jury's verdict. We affirm.

**Fact Summary**

On December 23, 1993, Thomas approached the terminal with a van full of holiday travelers. She was driving up the ramp and noticed Till's City of Houston bus. As she drove past the bus, the overhang over her door hit Till's left side mirror. She testified she could not stop at that point to survey the damage, because she would be blocking the entrance to the terminal. She called the Quik Park dispatcher and circled around the terminal and came back to the scene. Thomas was not injured, and she over-heard Till tell the police he was not injured. The investigating police officer's accident report reflects there were no injuries.

Peggy Kellum, the manager for Quik Park, testified the only damage to Thomas's van was a scrape which was removed

with Compound W. There was no expense associated with the repair of the Quik Park van.

Till sued Thomas and Quik Park, alleging that Thomas's negligence proximately caused his need for back fusion surgery. At trial, Thomas presented evidence from Till's neurosurgeon, David Baskin, M.D., that Till had been advised, before the accident, he needed back surgery. Dr. Baskin also referred Till to a psychiatrist for pain management before this accident.

The jury decided Thomas was not negligent, and Till suffered no damages. Till appeals the jury's verdict.

### No Negligence

In point of error one, Till argues the jury's finding of no negligence was against the great weight and preponderance of the evidence given Thomas's repeated testimony that she misjudged the distance between the two vehicles.

 **[1]**    **[2]**    **[3]**    **[4]**    When a party attacks a jury finding concerning an issue upon which he had the burden of proof, he must demonstrate that the adverse finding is against the great weight and preponderance of the evidence. **\*733** *Honeycutt v. Billingsley,* 992 S.W.2d 570, 578 (Tex.App.—Houston [1st Dist.] 1999, pet. denied). In reviewing a challenge that the jury finding is against the great weight and preponderance of the evidence, we must examine the record to determine if there is some evidence to support the finding, and then determine, in light of the entire record, whether the finding is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *Hollander v. Capon,* 853 S.W.2d 723, 726 (Tex.App.—Houston [1st Dist.] 1993, writ denied). We cannot reverse merely because we conclude that the evidence preponderates toward an affirmative answer. *Herbert v. Herbert,* 754 S.W.2d 141, 144 (Tex.1988); *Honeycutt,* 992 S.W.2d at 578. Nor can we substitute our opinion for that of the trier of fact and determine that we would reach a different conclusion. *Hollander,* 853 S.W.2d at 726.

 **[5]**    **[6]**    **[7]**    The occurrence of an accident or a collision is not of itself evidence of negligence. *Rankin v. Nash–Texas Co.,* 129 Tex. 396, 105 S.W.2d 195, 199 (1937); *Smith v. Cent. Freight Lines, Inc.,* 774 S.W.2d 411, 412 (Tex.App.—Houston (14th Dist.) 1989, writ denied). The plaintiff must

prove specific acts of negligence on the part of the driver and must also prove proximate cause. *Smith,* 774 S.W.2d at 412. Whether the plaintiff succeeds in proving negligence and proximate cause by a preponderance of the evidence is then within the jury's province to determine. *Id.*

 **[8]**    While it is true Thomas admitted she misjudged the distance due to the overhang on the door, this admission, in and of itself, does not constitute negligence. She testified she was not speeding, and she was not in any type of hurry. She saw Till and attempted to avoid him, but simply "misjudged" the distance. She was paying attention, but misjudged the space between the two vehicles.

 **[9]**    Also, Till did not prove that the accident with Thomas was the cause of his back injuries. There was ample testimony from Dr. Baskin that the back surgery had been recommended before the accident. Till did not prove Thomas proximately caused his injuries.[1]

---

[1]    Till did not appeal the jury's decision to award him no damages.

We overrule point of error one.

### Expert Testimony

In point of error two, Till asserts the trial court erred by allowing Thomas's expert to testify about matters that were not disclosed in interrogatory responses.

**Standard of Review**

 **[10]**    **[11]**    To obtain reversal of a judgment based upon an error of the trial court in admitting or excluding evidence, appellant must show (1) the trial court erred, and (2) the error was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396 (Tex.1989). The appellate court must examine the entire record to determine whether the disputed evidence controlled the judgment. *Id.*

 **[12]**    **[13]**    We cannot consider documents attached to an appellate brief that do not appear in the record. *$429.30 v. State,* 896 S.W.2d 363, 365 (Tex.App.—Houston [1st Dist.] 1995, no writ). This Court must hear and determine a case on the record as filed, and may not consider documents attached as exhibits to briefs. *RWL Const., Inc. v. Erickson,*

877 S.W.2d 449, 451 (Tex.App.—Houston [1st Dist.] 1994, no writ).

[14]  [15]  We cannot appraise Till's assignment of error. We must presume the proceedings and judgment below were regular and correct. Till had the burden to supply us with an appellate record demonstrating the trial court abused its discretion in admitting Dr. Baskin's testimony because Thomas did not supplement her answers as required. *Christiansen v.* **\*734** *Prezelski,* 782 S.W.2d 842, 843 (Tex.1990). Till was obliged to include in the appellate record the interrogatories and answers. He did not. We must presume the missing documents would sustain the trial court's ruling. *University of Texas at Austin v. Hinton,* 822 S.W.2d 197, 202 (Tex.App.—Austin 1991, no writ).

[16]  Till has attached, as an appendix to his brief, Thomas's answers to interrogatories. The discovery responses, however, were not included in the record of this case on appeal. The attachment of documents as exhibits or appendices to briefs is not a formal inclusion in the record on appeal and, thus, the documents cannot be considered. *Perry v. Kroger Stores Store No. 119,* 741 S.W.2d 533, 534 (Tex.App.—Dallas 1987, no writ).

We overrule point of error two.

### Mistrial

In point of error three, Till asserts the trial court erred by failing to declare a mistrial after the jury heard irrelevant and prejudicial evidence against him.

[17]  [18]  To preserve error, Till must make a valid, timely, and specific request, motion, or objection. TEX.R.APP. P. 33; *Matter of Bates,* 555 S.W.2d 420, 432 (Tex.1977); *United Cab Co. v. Mason,* 775 S.W.2d 783, 785 (Tex.App.—Houston [1st Dist.] 1989, writ denied.). The court's denial of a motion for mistrial will not be disturbed on appeal except

on a showing of an abuse of discretion. *City of Jersey Village v. Campbell,* 920 S.W.2d 694, 698 (Tex.App.—Houston [1st Dist.] 1996, writ denied).

[19]  While questioning Dr. Baskin, Till's attorney asked Baskin what Till's complaints were when he was examined on June 1, 1993. Baskin responded, "Well, at that time he had been involved in a motor-vehicle accident." The exchange between Till's attorney and the trial court immediately after Baskin's response was as follows:

Till's attorney: Objection, Your Honor.

The Court:ney: Sustained.

Till's attorney: Move for a motion, Your Honor.

The Court:ney: Overruled.

Till argues Baskin's comment violated the existing motion in limine excluding testimony about earlier motor vehicle accidents. The motion in limine, however, was not included in the appellate record and shall not be considered. *See RWL Const., Inc.,* 877 S.W.2d at 451.

Till's attorney did not state the grounds for his objection or explain for what type of "motion" he was moving. *See Haney v. Purcell Co., Inc.,* 796 S.W.2d 782, 789 (Tex.App.—Houston [1st Dist.] 1990, writ denied) (holding that objection must be specific enough to inform trial court of reason for objection.) There has been no showing that the trial court abused its discretion.

We overrule point of error three.

We affirm the judgment of the trial court.

### All Citations

10 S.W.3d 730

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

981 S.W.2d 211
Court of Appeals of Texas,
Houston (14th Dist.).

James J. TRIMBLE, Appellant,
v.
TEXAS DEPARTMENT OF PROTECTIVE
& REGULATORY SERVICE, Appellee.

No. 14–97–00106–CV.  |  April 9,
1998.  |  Rehearing Overruled April 9, 1998.

Department of Protective and Regulatory Service moved to obtain permanent guardianship of ward's person and estate. The County Court at Law, Walker County, Texas Trial Court Cause No. 61461–G, Barbara Hale, J., determined that ward was incapacitated and appointed Department as permanent guardian. Ward's husband appealed. The Court of Appeals, Murphy, C.J., held that: (1) order was not defective; (2) husband was disqualified from serving as guardian; (3) evidence supported determination of incapacity; and (4) error in failing to procure updated physician's reports was harmless.

Affirmed. 958 S.W.2d 906, superseded.

West Headnotes (33)

**[1]** **Mental Health**
  Discretion of Court

Trial court has broad discretion in the selection of a guardian.

8 Cases that cite this headnote

**[2]** **Mental Health**
  Presumptions, and Discretion of Lower Court

Order appointing guardian is reviewed for abuse of discretion.

9 Cases that cite this headnote

**[3]** **Appeal and Error**
  Abuse of Discretion

Trial court abuses its discretion if it acts arbitrarily or unreasonably.

1 Cases that cite this headnote

**[4]** **Appeal and Error**
  Abuse of Discretion

To determine whether trial court abused its discretion, reviewing courts consider the record as a whole.

1 Cases that cite this headnote

**[5]** **Mental Health**
  Evidence

Undisputed evidence adduced in temporary guardianship proceedings could be considered in determining whether husband was suitable permanent guardian for incapacitated wife. V.A.T.S. Probate Code, § 649.

Cases that cite this headnote

**[6]** **Mental Health**
  Evidence

Probate court conducts its business in a continuing series of events because the nature of administration contemplates decisions to be made on which other decisions will be based; accordingly, evidence adduced at earlier hearings may be considered at later hearings. V.A.T.S. Probate Code, § 649.

1 Cases that cite this headnote

**[7]** **Evidence**
  Judicial Proceedings and Records

Trial court may take judicial notice of its own records in matters that are generally known, easily proven, and not reasonably disputed. Rules of Civ.Evid., Rule 201 (Repealed).

9 Cases that cite this headnote

**[8]** **Appeal and Error**
  Abuse of Discretion

Under an abuse of discretion standard of review, legal and factual sufficiency claims are merely factors to consider in assessing whether the trial court abused its discretion, and not independent, reversible grounds of error.

3 Cases that cite this headnote

**[9]    Appeal and Error**
    Abuse of Discretion

Under an abuse of discretion standard of review, findings of fact and conclusions of law are neither appropriate nor required.

Cases that cite this headnote

**[10]    Mental Health**
    Persons Subject to Guardianship

Probate court appoints a guardian according to the circumstances of each case and considering the best interests of the ward. V.A.T.S. Probate Code, § 677.

1 Cases that cite this headnote

**[11]    Mental Health**
    Husband or Wife

Ward's spouse is entitled to guardianship in preference to any other person if he is eligible and he is one of two or more eligible persons equally entitled to be appointed. V.A.T.S. Probate Code, § 677.

Cases that cite this headnote

**[12]    Mental Health**
    Heirs, Next of Kin, and Relatives in General

If the ward's spouse is ineligible, then the nearest related family member who is eligible is entitled to appointment. V.A.T.S. Probate Code, § 677.

Cases that cite this headnote

**[13]    Mental Health**
    Persons Who May Be Appointed

Person is ineligible to serve as a guardian, among other reasons, if he is incapable of properly and prudently managing and controlling the ward or the ward's estate because of inexperience, lack of education, or other good reason. V.A.T.S. Probate Code, § 681.

Cases that cite this headnote

**[14]    Mental Health**
    Husband or Wife

Husband who was incapable of controlling and managing wife and her estate and who was unable to comply with court orders and recommendations from Protective Services was not qualified to serve as guardian of wife's person or estate. V.A.T.S. Probate Code, § 681.

Cases that cite this headnote

**[15]    Mental Health**
    Verdict and Findings

Order appointing guardian must contain findings of fact and specify certain information regarding the guardian, the ward, and the nature of the guardianship. V.A.T.S. Probate Code, § 693(a, c).

Cases that cite this headnote

**[16]    Mental Health**
    Verdict and Findings

Order appointing Protective Services as guardian was not rendered defective by trial court's failure to make express finding that Protective Service was entitled to appointment, where ward's husband was ineligible to serve as guardian. V.A.T.S. Probate Code, § 693(a, c).

Cases that cite this headnote

**[17]    Mental Health**
    Verdict and Findings

"Entitlement," in context of statutorily required findings for orders appointing guardians, relates to right to be appointed in relation to eligibility or the family relationship to the ward, rather

than the suitability of the person as compared to another. V.A.T.S. Probate Code, § 693(a, c).

Cases that cite this headnote

**[18]** **Mental Health**
🔑 Verdict and Findings

Order appointing Protective Services as guardian was not rendered defective by trial court's failure to state in the order that it did not determine 91–year–old ward's incapacity by evidence of isolated instances of negligence or bad judgment. V.A.T.S. Probate Code, § 684(c).

Cases that cite this headnote

**[19]** **Evidence**
🔑 Degree of Proof in General

Clear and convincing standard of proof falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings.

3 Cases that cite this headnote

**[20]** **Evidence**
🔑 Degree of Proof in General

Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.

2 Cases that cite this headnote

**[21]** **Appeal and Error**
🔑 Particular Cases and Questions

Clear and convincing standard of proof does not alter the appropriate standard of appellate review.

1 Cases that cite this headnote

**[22]** **Appeal and Error**
🔑 Total Failure of Proof

When both legal and factual sufficiency challenges are raised on appeal, appellate court must first examine the legal sufficiency of the evidence.

4 Cases that cite this headnote

**[23]** **Appeal and Error**
🔑 Findings of Court or Referee

In determining a "no evidence" point, appellate court considers only the evidence and inferences that tend to support the finding and disregards all evidence and inferences to the contrary.

Cases that cite this headnote

**[24]** **Appeal and Error**
🔑 Total Failure of Proof

If there is more than a scintilla of evidence to support the finding, claim is sufficient as a matter of law, and any challenges go merely to weight accorded the evidence.

Cases that cite this headnote

**[25]** **Appeal and Error**
🔑 Clearly, Plainly, or Palpably Contrary

In reviewing factual sufficiency of the evidence, appellate court considers and weighs all the evidence, and sets aside the judgment only if it is so contrary to the overwhelming weight of the evidence to be clearly wrong and unjust.

1 Cases that cite this headnote

**[26]** **Mental Health**
🔑 Evidence

Determination of incapacity was supported by evidence that ward could not care for her physical health or manage her financial affairs, was disoriented and wandering the streets on four occasions in four months, once with feces on her, could not identify the President of the United States or her own husband, reported having visits with her deceased parents, and depended on her husband to administer her medication and to provide her with proper nourishment.

Cases that cite this headnote

**[27]** **Mental Health**
 Evidence

Temporary guardian was required to provide updated physician's report in support of its motion for permanent guardianship. V.A.T.S. Probate Code, §§ 686, 687.

1 Cases that cite this headnote

**[28]** **Mental Health**
 Evidence

Applicant for temporary guardianship must establish substantial evidence proposed ward is incapacitated. V.A.T.S. Probate Code, § 875(g).

Cases that cite this headnote

**[29]** **Mental Health**
 Evidence

Applicant for permanent guardianship must establish by clear and convincing evidence that the proposed ward is incapacitated. V.A.T.S. Probate Code, § 684(a).

Cases that cite this headnote

**[30]** **Mental Health**
 Harmless Error

Error in failing to procure updated physician's report on ward before appointment of permanent guardian was not reversible, where most recent report was only a few days out of date, that report was consistent with evidence presented at hearing that ward was incapacitated, and no one objected to failure to obtain more recent report. Rules App.Proc., Rule 81(b)(1) (Repealed).

1 Cases that cite this headnote

**[31]** **Mental Health**
 Right of Review; Parties

Ward's husband was required to object at trial in order to preserve for review his claim that Department of Protective Service's failure to amend its motion to enforce judgment or its petition for permanent guardianship precluded court from appointing it guardian of ward's

estate, as well as guardian of ward's person, after bank that Department sought to have appointed as guardian of estate declined to serve. V.A.T.S. Probate Code, § 641.

Cases that cite this headnote

**[32]** **Mental Health**
 Right of Review; Parties

Ward's husband was required to make demand for community property in order to preserve for review his claim that public guardian could not exercise control over community property. Rules App.Proc., Rule 52(a) (Repealed).

Cases that cite this headnote

**[33]** **Mental Health**
 Right of Review; Parties

Alleged improprieties to which ward's husband did not object at trial would not be reviewed on appeal from guardianship order. Rules App.Proc., Rule 52(a) (Repealed).

Cases that cite this headnote

**Attorneys and Law Firms**

**\*214** J. Timothy Sisk, Conroe, for appellant.

Kay Douglas, David P. Weeks, Huntsville, for appellees.

Before MURPHY, C.J., and HUDSON and FOWLER, JJ.

**CORRECTED OPINION**

MURPHY, Chief Justice.

Appellant, James J. Trimble (Trimble), appeals from an order appointing the Texas Department of Protective & Regulatory Service (Protective Service) the permanent guardian of the person and the estate of his wife, Edna Trimble (Edna). In six points of error appellant alleges the trial court erred in appointing Protective Service instead of him as the guardian of Edna's person and estate and in finding Edna incapacitated. We affirm.

Over a three-year period, ninety-one year old Edna was often found wandering the streets of New Waverly, Texas. On many occasions, Trimble left her home alone, and did not provide her with the proper nourishment or medication. Protective Service documented these incidents and its unsuccessful efforts to work with Trimble in providing the proper care for his wife. On June 17, 1996, the Walker County Sheriff's Department took Edna into protective custody after she was, once again, found wandering the streets of New Waverly. Protective Service filed a motion to obtain temporary guardianship of Edna's person and estate. Trimble intervened, contesting Protective Service's application and requesting the trial court to appoint him the permanent guardian of Edna's person. After hearing testimony of Edna's condition and neglect while in Trimble's care, the trial court named Protective Service the temporary guardian of Edna's person and Trimble the temporary guardian of Edna's estate. In addition, the trial court ordered Trimble to pay the fees of the attorney ad litem and court costs within sixty days. Protective Service placed Edna in a nursing home.

Trimble did not pay the ad litem's fees and expenses accruing at the nursing home where Edna was residing. Consequently, Protective Service filed a motion to enforce judgment. After a hearing, the trial court found that Trimble did not qualify as guardian of Edna's estate, and appointed Protective Service the temporary guardian of her estate. The trial court also ordered Trimble to provide an inventory of Edna's estate.

Soon thereafter, Protective Service filed an application for appointment of permanent guardian of Edna's person and estate. At the hearing on the motion, Protective Service offered, without objection, the testimony adduced at previous hearings held approximately three to four months earlier, and the testimony of Mary Matson, the guardianship worker for Protective Service. At the conclusion of the hearing, the trial court appointed Protective Service the permanent guardian of the person and estate of Edna Trimble. Trimble filed a motion for new trial, which the trial court denied after a hearing.

 **[1]** **[2]** **[3]** **[4]** In his first point of error, Trimble contends the trial court erred in appointing Protective Service, and not him, the permanent guardian of Edna's person and estate because there was no evidence presented at the permanent guardianship hearing that he was unqualified or not entitled to serve in the capacity of guardian, and no finding that Protective Service was entitled to the appointment. A trial court has broad discretion in the selection of a guardian. *See Ramirez v. Garcia de Bretado,* 547 S.W.2d 717, 718

(Tex.Civ.App.—El Paso 1977, no writ). Consequently, an appellate court will not reverse an order appointing a guardian absent a showing that the trial court abused its discretion. *See State, By and Through Texas Dept. of Mental Health and Retardation v. Ellison,* 914 S.W.2d 679, 682 (Tex.App.—Austin 1996, no writ). A trial court abuses its discretion if it acts arbitrarily or unreasonably. *Id.* To determine whether the trial court abused its discretion, we consider the record as a whole. *See* **\*215** *Youngs v. Choice,* 868 S.W.2d 850, 853 (Tex.App.—Houston [14th Dist.] 1993, writ denied).

 **[5]** **[6]** **[7]** First, Trimble claims the statement of facts from the hearing on the application for permanent guardianship contains no evidence of his inability to care for his wife because Protective Service did not offer any evidence regarding his ability at that hearing. Instead, the trial court improperly admitted evidence of his ability to care for Edna that was adduced at previous hearings without requiring Protective Service to read the transcription of the prior hearings into the record. "In a guardianship proceeding, the rules relating to witnesses and evidence that govern in the district court apply as far as practicable." TEX. PROB.CODE ANN. § 649 (Vernon Supp.1997). A probate court, however, conducts its business in a continuing series of events because the nature of administration contemplates decisions to be made on which other decisions will be based. *See Youngs,* 868 S.W.2d at 852 (citing *Christensen v. Harkins,* 740 S.W.2d 69, 74 (Tex.App.—Fort Worth 1987, no writ)); *see also Hill v. Jones,* 773 S.W.2d 55, 56 (Tex.App.—Houston [14th Dist.] 1989, no writ) (stating hearing on appointment of temporary guardian continued as to appointment of a permanent guardian). Moreover, a trial court may take judicial notice of its own records in matters that are generally known, easily proven, and not reasonably disputed. *See Tschirhart v. Tschirhart,* 876 S.W.2d 507, 508 (Tex.App.—Austin 1994, no writ); *Fajkus v. First Nat. Bank of Giddings,* 735 S.W.2d 882, 887 (Tex.App.—Austin 1987, writ denied); *see also* TEX.R. CIV. EVID. 201.

In this case, the trial court heard undisputed evidence of Trimble's inability to care for his elderly wife at the first hearing on application for temporary guardianship. At the second hearing on motion to enforce the judgment, the trial court heard undisputed evidence of Trimble's failure to pay for Edna's nursing care. At the conclusion of the hearing, the trial judge noted that "Mr. Trimble has not qualified, taken an oath, done any of the things that one is supposed to do as the guardian of the estate." Consequently, in its order dated August 16, 1996, appointing Protective Service

the temporary guardian of Edna's estate, the trial court explicitly stated that Trimble failed to qualify as guardian of Edna's estate. Furthermore, at the hearing on permanent guardianship, the trial court admitted, without objection, evidence adduced from previous hearings regarding Edna's incapacity and her daughters' inability to serve as guardian without objection. The trial court acted within its discretion in taking judicial notice of the evidence and its previous rulings, and in admitting the statement of facts from previous rulings into the record at the hearing on application for permanent guardianship.

 **[8]**   **[9]**   Next, Trimble asserts the evidence admitted at the previous hearing is factually and legally insufficient to support a finding that he was disqualified to serve as guardian. "Under an abuse of discretion standard of review, the appellate court does not review factual issues decided by the trial court under legal or factual sufficiency standards." *IKB Indust. (Nigeria) Ltd. v. Pro–Line Corp.,* 938 S.W.2d 440, 445 (Tex.1997). Under an abuse of discretion standard of review, legal and factual sufficiency claims are merely factors to consider in assessing whether the trial court abused its discretion, and not independent, reversible grounds of error. *Id.*[1]

 **[10]**   **[11]**   **[12]**   **[13]**   A probate court appoints a guardian according to the circumstances of each case and considering the best interests of the ward. TEX. PROB.CODE ANN. § 677 (Vernon Supp.1997). A person is eligible to serve as guardian if he is not disqualified from serving under section 681 of the probate code. *Id.* § 681. A ward's spouse is entitled to guardianship in preference to any other person if he is eligible and he is one of two or more eligible persons equally entitled to be appointed. *Id.* § 677. If the ward's **\*216** spouse is ineligible, then the nearest related family member who is eligible is entitled to appointment. *Id.* Only as a last resort, may the trial court appoint Protective Service as guardian. *Id.* § 691. A person is ineligible to serve as a guardian, among other reasons, if he is incapable of properly and prudently managing and controlling the ward or the ward's estate because of inexperience, lack of education, or other good reason. *Id.* § 681.

 **[14]**   Here, the record reflects that Trimble was not qualified to serve as guardian of Edna's person or estate. Trimble was incapable of controlling and managing Edna and her estate and he lacked the ability to follow through with recommendations from Protective Service and with court orders. Because Trimble was ineligible to serve as guardian

and Edna's three daughters declined to serve as guardian, the trial court did not abuse its discretion in appointing Protective Service the guardian of Edna and her estate.

 **[15]**   Finally, Trimble complains the order appointing Protective Service as permanent guardian cannot be upheld because the trial court failed to file findings of fact stating Protective Service was entitled to the appointment and he was disqualified from serving as guardian. An order appointing a guardian must contain findings of fact and specify certain information regarding the guardian, the ward, and the nature of the guardianship. *Id.* § 693(a), (c). While section 693 enumerates the specific information to be included in the order, it does not state what additional findings the trial court must include in the order appointing a guardian. Likewise, section 684 requires the trial court to make specific findings before appointing a guardian, including a finding that the proposed guardian is eligible to act as guardian and entitled to appointment. *Id.* § 684. Section 684, however, does not state where the trial court must make these findings.

 **[16]**   **[17]**   In its order appointing Protective Service the permanent guardian of Edna's person and estate dated October 17, 1996, the trial court found by a preponderance of the evidence that Protective Service was qualified to act as guardian, but did not state that Protective Service was entitled to appointment.[2] Although the better practice is to draft explicit findings following the language of section 684 in an order appointing a permanent guardian, the order is not fatally defective for want of the explicit finding of entitlement. Entitlement, in this context, relates to the right to be appointed in relation to eligibility or the family relationship to the ward, rather than the suitability of the individual as compared to another. *See Adcock v. Sherling,* 923 S.W.2d 74, 78 (Tex.App.—San Antonio 1996, no writ). In this case, Trimble was not eligible to serve as guardian and other family members declined the appointment. Without an eligible and entitled applicant, the trial court had no alternative but to appoint Protective Service as Edna's guardian. *See* TEX. PROB.CODE ANN. § 691 (Vernon Supp.1997).

The trial court did not abuse its discretion in finding Trimble disqualified to serve as guardian of his wife's person and estate, and in appointing Protective Service the guardian of Edna. Trimble's first point of error is overruled.

 **[18]**   In his second point of error, Trimble contends the trial court applied the wrong standard in finding Edna to be incapacitated and in failing to state the appropriate

standard in the order appointing the permanent guardian. Before appointing a guardian, the trial court must find by clear and convincing evidence that the proposed ward is an incapacitated person. *Id*. § 684(a)(1). An incapacitated person is "an adult individual who, because of a physical or mental condition, is substantially unable to provide food, clothing, or shelter for himself, or herself, to care for the individual's own physical health or to manage the individual's own financial affairs." *Id*. § 601(13)(B). A trial court determines the incapacity of an adult proposed ward from evidence of recurring acts or occurrences within the six-month period preceding the determination and not by isolated instances of negligence or bad judgment. *Id*. § 684(c).

**\*217** The trial court stated in its order appointing permanent guardianship that it found Edna to be incapacitated by clear and convincing evidence. The trial court further stated that its determination of incapacity was evidenced by recurring acts within the preceding six months and continuing to this date and that age was not the sole determining factor. The trial court, however, did not state in the order that it did not determine Edna's incapacity by evidence of isolated instances of negligence or bad judgment.

As noted above, the better practice is to draft explicit findings following the language of section 684. Nevertheless, the trial court's omission of language describing the type of evidence it considered in determining Edna's incapacity does not render the trial court's determination of incapacity void or voidable. Section 684 does not require the trial court to recount the evidence it considered in determining the capacity of a proposed ward in the order appointing a guardian, but directs the trial court to consider certain evidence and to exclude other evidence in making a determination of incapacity. *See id*. The trial court did not err by failing to include a statement that it did not consider isolated instances of negligence or bad judgment in making its determination of incapacity in the order appointing Protective Service the permanent guardian of Edna and her estate. Trimble's second point of error is overruled.

**[19] [20]** In his fourth point of error, Trimble maintains the evidence is legally and factually insufficient to support a finding of Edna's incapacity. The clear and convincing standard of proof falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *See Matter of R.S.C.,* 921 S.W.2d 506, 511 (Tex.App.—Fort Worth 1996, no writ). Clear and convincing evidence is that measure or degree of proof which

will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *Id*.

**[21] [22] [23] [24] [25]** The clear and convincing standard of proof does not alter the appropriate standard of appellate review. *See Spurlock v. Texas Dept. of Protective and Regulatory Servs.,* 904 S.W.2d 152, 155–56 (Tex.App. —Austin 1995, writ denied). When both legal and factual sufficiency challenges are raised on appeal, the appellate court must first examine the legal sufficiency of the evidence. *See Glover v. Texas Gen. Indem. Co.,* 619 S.W.2d 400, 401 (Tex.1981). In determining a "no evidence" point, an appellate court considers only the evidence and inferences that tend to support the finding and disregards all evidence and inferences to the contrary. *See Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994). If there is more than a scintilla of evidence to support the finding, the claim is sufficient as a matter of law, and any challenges go merely to the weight accorded the evidence. *See Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 928 (Tex.1993). In reviewing the factual sufficiency of the evidence, an appellate court considers and weighs all the evidence, and sets aside the judgment only if it is so contrary to the overwhelming weight of the evidence to be clearly wrong and unjust. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986).

**[26]** In this case, the trial court heard evidence of Edna's inability to care for her physical health and to manage her financial affairs at the first two hearings. The record reflects that Edna was reported to be disoriented and wandering the streets of New Waverly on four occasions between February and June 1996, and on one occasion dirty and with feces on her. When questioned by a case worker, Edna was unable to identify the President of the United States and her own husband. Edna reported having visits with her parents, who are deceased. Additional evidence established that Edna was dependent upon her husband to administer her medication and to provide her with proper nourishment.

At the hearing on application for appointment of permanent guardianship, the trial court admitted the records of the previous hearings into evidence, without objection. Mary Matson of Protective Service testified that Protective Service moved Edna to a personal care home, which was the least restrictive environment providing affordable **\*218** care. Matson further attested Edna was still unable to care for herself, although she seemed to be well and happy at the personal care home. No one presented any evidence at any of

the hearings to even suggest that Edna's actions were isolated instances of negligence or bad judgment. Although Trimble claimed that Edna's incapacity was partial in his petition for permanent guardianship, he presented no evidence to support his claim and made no challenge to Protective Service's claim that Edna was totally incapacitated. We find the evidence clear and convincing, and legally and factually sufficient to support the trial court's finding of Edna's total incapacity. Trimble's fourth point of error is overruled.

**[27]** In his third point of error, Trimble contends the trial court erred in appointing Protective Service as Edna's guardian because there is no evidence of Edna's current and relevant medical, psychological, and intellectual testing records. With certain exceptions, inapplicable here, section 686(a) of the probate code requires current and relevant medical, psychological, and intellectual testing records of the proposed ward to be provided to the attorney ad litem appointed to represent the proposed ward before the trial court may hold a hearing for the appointment of a guardian. TEX. PROB.CODE ANN. § 686(a) (Vernon Supp.1997). Section 687(a) further prohibits the trial court from granting an application to create a guardianship for an incapacitated person "unless the applicant presents to the court a written letter or certificate from a physician licensed in this state that is dated not earlier than the 120th day before the date of the filing of the application and based on an examination the physician performed not earlier than the 120th day before the date of the filing of the application." *Id*. § 687(a).

Trimble contends the record does not "reflect the admission into evidence of any medical, psychological or intellectual testing records." He further alleges Protective Service would have had to file a physician's certificate reflecting an examination of Edna no later than 120 days prior to the filing of Protective Service's application for permanent guardianship, specifically no later than April 22, 1996 to comply with sections 686(a) and 687(a).

The record, however, reflects that Protective Service filed a physician's report with the trial court on July 16, 1996, one day after it filed its application for appointment of temporary guardian. At the hearing on the application held on July 25, 1996, the trial court noted the report was on file but did not admit the report over objections that the report constituted hearsay. The report, signed and dated by Edna's personal physician, was based on an examination conducted on April 1, 1996, well within the 120 day window of section 687. Protective Service later attached the same physician's report

to its application for appointment of permanent guardian. At the time of Protective Service's application for permanent guardianship, the physician's examination was approximately three weeks outside the 120–day window of section 687.

**[28]** **[29]** Sections 686 and 687 do not distinguish between applications for temporary and permanent guardianships. The probate code, however, defines a guardian as a person who is appointed guardian by order of the trial court under section 693 or a temporary or successor guardian. *Id*. § 601(10). Moreover, the standard of proof necessary to establish incapacity differs according to whether the guardianship is temporary or permanent. An applicant for a temporary guardianship must establish substantial evidence the proposed ward is incapacitated. *Id*. § 875(g). An applicant for a permanent guardianship must establish by clear and convincing evidence that the proposed ward is incapacitated. *Id*. § 684(a). In either case, section 687 requires a current physician's report based on a current examination. Because Protective Service did not file a report based on a current examination, the trial court erred in granting its application to create a permanent guardianship.

**[30]** An appellate court may not reverse the judgment of the trial court on appeal because the trial court made an error of law unless the error probably caused the rendition of an improper judgment or probably prevented the appellant from properly presenting **\*219** its case on appeal. TEX.R. APP. 81(b)(1), 60 TEX. B.J. 9 (1997).[3] In this case, the error is not reversible. At the time of the hearing, the examination upon which the physician based his report was only a few weeks outside the 120–day window required in section 687. In the report, Edna's physician opined that she was incapacitated and suffered from moderate dementia and diabetes. He predicted that Edna's condition would worsen. The report is consistent with the evidence admitted at the permanent guardianship hearing regarding Edna's capacity to care for herself and her property. Furthermore, no one voiced an objection to the availability of the report or the timeliness of the examination. Trimble's third point of error is overruled.

**[31]** In his fifth point of error, Trimble asserts the trial court erred in appointing Protective Service the guardian of Edna's estate because Protective Service did not request to be named the guardian of the estate in its motion to enforce judgment or its petition for permanent guardianship. He further asserts the trial court granted Protective Service authority over Edna's entire estate although Protective Service only requested authority over two properties.

After a hearing on Protective Service's motion to enforce judgment, the trial court appointed Protective Service the temporary guardian of Edna's estate, finding that Trimble did not qualify as guardian of the estate. Within a week, Protective Service filed its application for appointment of permanent guardian requesting the trial court appoint First National Bank of Huntsville as the permanent guardian of Edna's estate. The Bank, however, declined to act, and the trial court appointed Protective Service the permanent guardian of Edna's estate even though Protective Service never amended its pleading requesting to be named permanent guardian of Edna's estate. At the hearing on the motion, Protective Service also informed the trial court that it would like to restrict the estate guardianship to two properties and allow Trimble to manage the remainder of the estate. The trial court granted Protective Service full authority over Edna's person and estate but restricted management of her estate to the two properties and the collection of her Social Security check.

"A court may not invalidate a pleading in a guardianship matter or an order based on the pleading based on a defect of form or substance in the pleading, unless the defect has been timely objected to and called to the attention of the court in which the proceeding was or is pending." TEX. PROB.CODE ANN. § 641 (Vernon Supp.1997). Because Trimble did not object to the lack of a trial amendment at the hearing on the motion and at the hearing on application for permanent guardian pleading, and did not object to Protective Service's request to manage the two properties, he waives review of this point of error on appeal. Trimble's fifth point of error is overruled.

 **[32]**    In his sixth point of error, Trimble claims the trial court erred in appointing Protective Service the guardian of Edna's estate because, under section 883 of the probate code, he had full power to manage the community estate. Section 883 provides, in pertinent part, as follows:

> When a husband or wife is judicially declared to be incapacitated, the other spouse, in the capacity of surviving partner of the marital partnership, acquires full power to manage, control, and dispose of the entire community estate, including the part of the community estate that the incapacitated spouse legally has the power to manage in the absence of the incapacitated spouse, without

an administration. If the court finds that it is in the best interest of the incapacitated spouse and that the other spouse would not be disqualified to serve as guardian under Section 681 of this code, guardianship of the estate of the incapacitated spouse may not be necessary when the other spouse is not incapacitated unless the incapacitated spouse owns separate property, and the guardianship will be of the separate property only. The qualification of a guardian of the estate of an incapacitated spouse does not deprive the competent spouse of the right to manage, **\*220** control, and dispose of the entire community estate as provided in this chapter.

*Id*. § 883.

Although Trimble's entitlement to manage, control, and dispose of the community estate is clear, the trial court did not err in appointing Protective Service the guardian of Edna's estate. At the time of the appointment, Trimble did not qualify as guardian of the estate and violated a court order requiring him to file an inventory and appraisal with the trial court and to pay ad litem's fees. Trimble further refused to pay Edna's nursing care expenses. Consequently, under section 883, the trial court found the appointment of Protective Service as guardian of Edna's estate to be in her best interest. The trial court, however, made no attempt to classify the property because Trimble proved uncooperative in providing the court with information regarding the estate.[4]

Trimble, however, is not without remedy to enforce his entitlement to the community property. "A guardian of the estate of an incapacitated married person, who, as guardian, is administering community property as part of the estate of the ward, shall deliver on demand the community property to the spouse who is not incapacitated." *Id*. § 884. In this case, there is no evidence that Trimble ever made a demand that Protective Service deliver the community property to him. Therefore, he waives review of this issue on appeal. *See* Tex.R.App. Proc. 52(a), 60 TEX. B.J. 9 (1997).[5] Appellant's sixth point of error is overruled.

 **[33]**    In his reply brief, Trimble cites other instances of procedural improprieties in the record including the failure of

the trial court (1) to appoint a court investigator as required by section 648A of the probate code; (2) to conduct a jury trial even though he requested a jury trial and paid the jury fee; and (3) to state in its order appointing Protective Service Edna's temporary guardian that it found Edna incapacitated by clear and convincing evidence. Trimble did not, however, voice an objection to any of these alleged improprieties to the trial court. Therefore, he waives appellate review of these issues. *See* Rule 52(a); *Sunwest Reliance Acquisitions Group,* *Inc. v. Provident Nat'l Assurance Co.,* 875 S.W.2d 385, 387 (Tex.App.—Dallas 1993, no writ) (holding litigant waives right to jury trial by his failure to act).

Accordingly, the judgment of the court below is affirmed.

**All Citations**

981 S.W.2d 211

Footnotes

1  "Under an abuse of discretion standard of review, findings of fact and conclusions of law are neither appropriate nor required." *IKB Indust. (Nigeria) Ltd. v. Pro–Line Corp.,* 938 S.W.2d 440, 445 (Tex.1997). Nevertheless, the Texas Legislature requires the trial court to make findings of fact in its order appointing a guardian where the proposed ward is without capacity. TEX. PROB.CODE ANN. § 693 (Vernon Supp.1997).

2  The trial court, however, explicitly stated in its orders appointing Protective Service the temporary guardian of Edna's estate that Trimble failed to qualify as guardian of Edna's estate.

3  Current version at TEX.R.APP. P. 44.1.

4  Trimble did not file an inventory with the trial court until November 1996.

5  Current version at TEX.R.APP. P. 33.1(a).

---

**End of Document**
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

📙 KeyCite Yellow Flag - Negative Treatment

**Not Followed on State Law Grounds** [Chubb Lloyds Ins. Co. v. Miller County Circuit Court, Third Div.,](#) Ark., March 11, 2010

95 S.Ct. 2197
Supreme Court of the United States

Robert WARTH, etc., et al., Petitioners,

v.

Ira SELDIN et al.

No. 73—2024. | Argued March 17, 1975. | Decided June 25, 1975.

Various organizations and individuals resident in the Rochester, New York, metropolitan area brought suit against town adjacent to Rochester, and against members of zoning, planning and town boards, claiming that town's zoning ordinance effectively excluded persons of low and moderate income from living in the town, in contravention of petitioners' constitutional rights and in violation of civil rights statutes. The United States District Court for the Western District of New York granted motion to dismiss the complaint for lack of standing and for failure to state a claim on which relief could be granted, and an appeal was taken. The Court of Appeals, Second Circuit, [495 F.2d 1187,](#) reaching only the standing question, affirmed, and certiorari was granted. The Supreme Court, Mr. Justice Powell, held that whether the rules of standing are considered as aspects of the constitutional requirement that a plaintiff must make out a 'case or controversy' within the meaning of art. III, or as prudential limitations on the courts' role in resolving disputes involving 'generalized grievances,' or third parties' legal rights or interest, none of the petitioners met the threshold requirement of such rules that to have standing a complainant must clearly allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers.

Affirmed.

Mr. Justice Douglas filed a dissenting opinion.

Mr. Justice Brennan filed a dissenting opinion in which Mr. Justice White and Mr. Justice Marshall joined.

West Headnotes (29)

**[1]**    **Federal Civil Procedure**
🔑 In general; injury or interest

In essence, the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.

[804 Cases that cite this headnote](#)

**[2]**    **Federal Civil Procedure**
🔑 In general; injury or interest

Inquiry as to standing involves both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise; in both dimensions, it is founded in concern about the proper, and properly limited, role of the courts in a democratic society.

[553 Cases that cite this headnote](#)

**[3]**    **Federal Civil Procedure**
🔑 In general; injury or interest

In its constitutional dimension, standing imports justiciability—whether the plaintiff has made out a "case or controversy" between himself and the defendant within the meaning of art. III. [U.S.C.A.Const. art. 3, § 1](#) et seq.

[232 Cases that cite this headnote](#)

**[4]**    **Federal Civil Procedure**
🔑 In general; injury or interest

As an aspect of justiciability, the standing question is whether the plaintiff has alleged such a personal stake in the outcome of the controversy to warrant his invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf. [U.S.C.A.Const. art. 3, § 1](#) et seq.

[997 Cases that cite this headnote](#)

**[5]**    **Federal Civil Procedure**
🔑 Causation; redressability

The art. III judicial power exists only to redress or otherwise protect against injury to the complaining party, even though the court's judgment may benefit others collaterally. U.S.C.A.Const. art. 3, § 1 et seq.

126 Cases that cite this headnote

**[6]** **Federal Civil Procedure**
👈 In general; injury or interest

A federal court's jurisdiction can be invoked only when the plaintiff himself has suffered some threatened or actual injury resulting from the putatively illegal action.

453 Cases that cite this headnote

**[7]** **Federal Civil Procedure**
👈 In general; injury or interest

The standing question bears close affinity to questions of ripeness—whether the harm asserted has matured sufficiently to warrant judicial intervention—and of mootness—whether the occasion for judicial intervention persists. U.S.C.A.Const. art. 3, § 1 et seq.

119 Cases that cite this headnote

**[8]** **Federal Civil Procedure**
👈 Rights of third parties or public

When the asserted harm is a "generalized grievance" shared in substantially equal measure by all or by a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction.

230 Cases that cite this headnote

**[9]** **Federal Civil Procedure**
👈 Rights of third parties or public

Even when the plaintiff has alleged injury sufficient to meet the "case or controversy" requirement of art. III, the plaintiff generally must assert its own legal rights and interests and cannot rest his claim to relief on the legal rights or interests of third parties. U.S.C.A.Const. art. 3, § 1 et seq.

1243 Cases that cite this headnote

**[10]** **Federal Civil Procedure**
👈 In general; injury or interest

Although standing in no way depends on the merits of plaintiff's contention that particular conduct is illegal, it often turns on the nature and source of the claim asserted.

257 Cases that cite this headnote

**[11]** **Federal Civil Procedure**
👈 In general; injury or interest

The actual or threatened injury required by art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing. U.S.C.A.Const. art. 3, § 1 et seq.

247 Cases that cite this headnote

**[12]** **Federal Civil Procedure**
👈 In general; injury or interest

The source of plaintiff's claim to relief assumes critical importance with respect to the prudential rules of standing that, apart from art. III's minimum requirements, serve to limit the role of the courts in resolving public disputes; essentially, the standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief. U.S.C.A.Const. art. 3, § 1 et seq.

576 Cases that cite this headnote

**[13]** **Federal Civil Procedure**
👈 Rights of third parties or public

When a litigant asserts the rights of third parties defensively, as a bar to judgment against him, there is no art. III standing problem, but the prudential question is governed by considerations closely related to the question whether a person in the litigant's position would have a right of action on the claim. U.S.C.A.Const. art. 3, § 1 et seq.

**[14]** **Federal Civil Procedure**
🗝 Rights of third parties or public

In some circumstances, countervailing considerations may outweigh the concerns underlying the usual reluctance to exert judicial power when the plaintiff's claimed relief rests on the legal rights of third parties; in such instances, it has been found, in effect, that the constitutional or statutory provision in question implies a right of action in the plaintiff.

202 Cases that cite this headnote

**[15]** **Federal Civil Procedure**
🗝 In general; injury or interest

Congress may grant an express right of action to persons who otherwise would be barred by prudential standing rules, but art. III's requirement remains: the plaintiff must still allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants. U.S.C.A.Const. art. 3, § 1 et seq.

468 Cases that cite this headnote

**[16]** **Federal Civil Procedure**
🗝 Rights of third parties or public

So long as art. III's requirement is satisfied, persons to whom Congress has granted a right of action, either expressly or by clear implication, may have standing to seek relief on the basis of the legal rights and interests of others and, indeed, may invoke the general public interest in support of their claim. U.S.C.A.Const. art. 3, § 1 et seq.

117 Cases that cite this headnote

**[17]** **Federal Civil Procedure**
🗝 Amendments

**Federal Civil Procedure**
🗝 Construction of pleadings

**Federal Civil Procedure**

🗝 Matters deemed admitted; acceptance as true of allegations in complaint

**Federal Courts**
🗝 Pleadings; Dismissal

For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party; at the same time, it is within trial court's power to allow or require plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of standing.

812 Cases that cite this headnote

**[18]** **Zoning and Planning**
🗝 Petition, complaint or application

City residents, who alleged that town zoning ordinance effectively excluded persons of low and moderate income from living in the town, thereby requiring the city to permit more than its fair share of tax-abated housing projects, and who asserted standing as persons of low or moderate income and, coincidentally, as members of minority racial or ethnic groups, failed to allege facts supporting an actionable causal relationship between town's zoning practices and such residents' alleged injury.

63 Cases that cite this headnote

**[19]** **Federal Civil Procedure**
🗝 Rights of third parties or public

When a governmental prohibition or restriction imposed on one party causes specific harm to a third party, harm that a constitutional provision or statute was intended to prevent, the indirectness of the injury does not necessarily deprive the person harmed of standing to vindicate his rights, but it may make it substantially more difficult to meet the minimum requirement of art. III: to establish that, in fact, the asserted injury was the consequence of defendants' actions, or that prospective relief will remove the harm. U.S.C.A.Const. art. 3, § 1 et seq.

104 Cases that cite this headnote

**[20]  Zoning and Planning**
    Petition, complaint or application

A plaintiff who seeks to challenge exclusionary zoning practices must allege specific, concrete facts demonstrating that the challenged practices harm him, and that he personally would benefit in a tangible way from the courts' intervention; absent the necessary allegations of demonstrable, particularized injury, there can be no confidence of a real need to exercise the power of judicial review or that relief can be framed no broader than required by the precise facts to which the court's ruling would be applied.

460 Cases that cite this headnote

**[21]  Zoning and Planning**
    Right of Review;  Standing

**Zoning and Planning**
    Validity of regulations

A plaintiff who challenges a zoning ordinance or zoning practices need not necessarily have a present contractual interest in a particular project.

8 Cases that cite this headnote

**[22]  Zoning and Planning**
    Validity of regulations

**Zoning and Planning**
    Petition, complaint or application

City taxpayers, who alleged that town zoning ordinance effectively excluded persons of low and moderate income from living in the town, and who alleged that they were suffering economic injury because said zoning practices forced city to provide additional tax-abated housing, failed to establish a line of causation between the town's actions and their injury; but even assuming that they could establish that the zoning practices harmed them, the basis of their claim was that the practices violated the constitutional and statutory rights of third parties, and their claim thus fell squarely within

the prudential standing rule that normally bars litigants from asserting the right or legal interests of others in order to obtain relief from injury to themselves.

190 Cases that cite this headnote

**[23]  Associations**
    Actions by or Against Associations

An association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy; moreover, in attempting to secure relief from injury to itself, the association may assert the rights of its members, at least so long as the challenged infractions adversely affect its members' associational ties.

172 Cases that cite this headnote

**[24]  Associations**
    Actions by or Against Associations

**Associations**
    Pleading and proof

Even in the absence of injury to itself, an association may have standing solely as the representative of its members, but the possibility of such representational standing does not eliminate or attenuate the constitutional requirement of a case or controversy; the association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit. U.S.C.A.Const. art. 3, § 1 et seq.

438 Cases that cite this headnote

**[25]  Zoning and Planning**
    Validity of regulations

Not-for-profit New York corporation, one of whose purposes was to inquire into reasons for housing shortage for low and moderate income persons in the Rochester, New York area, was without standing to challenge the constitutionality of town zoning

practices which effectively excluded persons of low and moderate income from living in the town, which was adjacent to Rochester, since, even though 9% of the corporation's membership was composed of town residents, prudential considerations strongly counseled against according such residents or the corporation standing on the basis of their complaint that they had been harmed indirectly by the exclusion of others. U.S.C.A.Const. art. 3, § 1 et seq.

19 Cases that cite this headnote

**[26]    Zoning and Planning**
　　👉 Validity of regulations

Association of firms engaged in residential construction in the Rochester, New York, metropolitan area was without standing to bring suit for damages based on alleged unconstitutionality of town zoning ordinance which effectively excluded persons of low and moderate income from living in the town, which was adjacent to Rochester, where the association alleged no monetary injury to itself and where any injury suffered was peculiar to the individual association member concerned, thus requiring individualized proof of both the fact and extent of injury and individual awards.

290 Cases that cite this headnote

**[27]    Zoning and Planning**
　　👉 Validity of regulations

Association of firms engaged in residential construction in the Rochester, New York, metropolitan area, which brought suit challenging the constitutionality of adjacent town's zoning ordinance which effectively excluded persons of low and moderate income from living in the town, was without standing to claim prospective relief, absent any allegation of facts sufficient to show the existence of any injury to association members of sufficient immediacy and ripeness to warrant judicial intervention.

472 Cases that cite this headnote

**[28]    Zoning and Planning**
　　👉 Validity of regulations

Housing council, a not-for-profit New York corporation comprised of organizations interested in housing problems, was without standing to challenge the constitutionality of town zoning ordinance which effectively excluded persons of low and moderate income from living in the town, where the complaint and record did not indicate that any of the council's members, with one exception, had made any effort involving the town, had taken any steps toward building there, or had any dealings with respondent town officials; and, with respect to the one exception, the council averred no basis for inferring that an earlier controversy between it and respondents remained a live, concrete dispute.

16 Cases that cite this headnote

**[29]    Zoning and Planning**
　　👉 Validity of regulations

Whether the rules of standing are considered as aspects of the constitutional requirement that a plaintiff must make out a "case or controversy" or as prudential limitations on the courts' role in resolving disputes involving "generalized grievances" or third parties' legal rights or interests, none of the petitioners, in suit challenging the constitutionality of town zoning ordinance which effectively excluded persons of low and moderate income from living in the town, met the threshold requirement of such rules. U.S.C.A.Const. art. 3, § 1 et seq.

1239 Cases that cite this headnote

**\*\*2200**  Syllabus [*]

[*]　　The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282—287, 50 L.Ed. 499.

**\*490**  This action for declaratory and injunctive relief and damages was brought by certain of the petitioners against respondent town of Penfield (a suburb of Rochester, N.Y.), and respondent members of Penfield's Zoning, Planning, and Town Boards, claiming that the town's **\*\*2201** zoning ordinance, by its terms and as enforced, effectively excluded persons of low and moderate income from living in the town, in violation of petitioners' constitutional rights and of 42 U.S.C. ss 1981, 1982, and 1983. Petitioners consist of both the original plaintiffs—(1) Metro-Act of Rochester, a not-for-profit corporation among whose purposes is fostering action to alleviate the housing shortage for low- and moderate-income persons in the Rochester area; (2) several individual Rochester taxpayers; and (3) several Rochester area residents with low or moderate incomes who are also members of minority racial or ethnic groups—and Rochester Home Builders Association (Home Builders), embracing a number of residential construction firms in the Rochester area, which unsuccessfully sought to intervene as a party-plaintiff, and the Housing Council in the Monroe County Area (Housing Council), a not-for-profit corporation consisting of a number of organization interested in housing problems, which was unsuccessfully sought to be added as a party-plaintiff. The District Court dismissed the complaint on the ground, inter alia, that petitioners lacked standing to prosecute the action, and the Court of Appeals affirmed. Held: Whether the rules of standing are considered as aspects of the constitutional requirement that a plaintiff must make out a 'case or controversy' within the meaning of Art. III, or, apart from such requirement, as prudential limitations on the courts' role in resolving disputes involving 'generalized grievances' or third parties' legal rights or interests, none of the petitioners has met the threshold requirement of such rules that to have standing a complainant must clearly allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers. Pp. 2205—2215.

**\*491**  (a) As to petitioner Rochester residents who assert standing as persons of low or moderate income and, coincidentally, as members of minority racial or ethnic groups, the facts alleged fail to support an actionable causal relationship between Penfield's zoning practices and these petitioners' alleged injury. A plaintiff who seeks to challenge exclusionary zoning practices must allege specific, concrete facts demonstrating that such practices harm him, and that he personally would benefit in a tangible way from the court's intervention. Here, these petitioners rely on little more than the remote possibility, unsubstantiated by allegations of fact, that their situation might have been better had respondents acted otherwise, and might improve were the court to afford relief. Pp. 2207—2210.

(b) With respect to petitioners who assert standing on the basis of their status as Rochester taxpayers, claiming that they are suffering economic injury through increased taxes resulting from Penfield's zoning practices having forced Rochester to provide more taxabated low- or moderate-cost housing than it otherwise would have done, the line of causation between Penfield's actions and such injury is not apparent. But even assuming that these petitioners could establish that the zoning practices harm them, the basis of their claim is that the practices violate the constitutional and statutory rights of third parties—persons of low and moderate income who allegedly are excluded from Penfield. Hence, their claim falls squarely within the prudential standing rule that normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves. Pp. 2210—2211.

(c) Petitioner Metro-Act's claims to standing as a Rochester taxpayer and on behalf of its members who are Rochester taxpayers or persons of low or moderate income, are precluded for the reasons applying to the denial of standing to the individual petitioner Rochester taxpayers and persons of low and moderate income. In addition, with respect to Metro-Act's claim to standing because 9% **\*\*2202** of its membership is composed of Penfield residents, prudential considerations strongly counsel against according such residents or Metro-Act standing, where the complaint is that they have been harmed indirectly by the exclusion of others, thus attempting, in the absence of a showing of any exception allowing such a claim, to raise the putative rights of third parties. Trafficante v. Metro-politan Life Ins., 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415, distinguished. Pp. 2212—2213.

**\*492**  (d) Petitioner Home Builders, which alleges no monetary injury to itself, has no standing to claim damages on behalf of its members, since whatever injury may have been suffered is peculiar to the individual member concerned, thus requiring individualized proof of both the fact and extent of injury and individual awards. Nor does Home Builders have standing to claim prospective relief, absent any allegation of facts sufficient to show the existence of any injury to members of sufficient immediacy and ripeness to warrant judicial intervention. Pp. 2213—2214.

(e) Petitioner Housing Council has no standing, where the complaint and record do not indicate that any of its members,

with one exception, has made any effort involving Penfield, has taken any steps toward building there, or had any dealings with respondents. With respect to the one exception, this petitioner averred no basis for inferring that an earlier controversy between it and respondents remained a live, concrete dispute. Pp. 2214—2215.

495 F.2d 1187, affirmed.

**Attorneys and Law Firms**

Emmelyn Logan-Baldwin, Rochester, N.Y., for petitioners.

James M. Hartman, Rochester, N.Y., for respondents.

**Opinion**

 **\*493**  Mr. Justice POWELL delivered the opinion of the Court.

Petitioners, various organizations and individuals resident in the Rochester, N.Y., metropolitan area, brought this action in the District Court for the Western District of New York against the town of Penfield, an incorporated municipality adjacent to Rochester, and against members of Penfield's Zoning, Planning and Town Boards. Petitioners claimed that the town's zoning ordinance, by its terms and as enforced by the defendant board members, respondents here, effectively excluded persons of low and moderate income from living in the town, in contravention of petitioners' First, Ninth, and Fourteenth Amendment rights and in violation of 42 U.S.C. ss 1981, 1982, and 1983. The District Court dismissed the complaint and denied a motion to add petitioner Housing Council in the Monroe County Area, Inc., as party-plaintiff and also a motion by petitioner Rochester Home Builders Association, Inc., for leave to intervene as party-plaintiff. The Court of Appeals for the Second Circuit affirmed, holding that none of the plaintiffs, and neither Housing Council nor Home Builders Association, had standing to prosecute the action. 495 F.2d 1187 (1974). We granted the petition for certiorari. 419 U.S. 823, 95 S.Ct. 40, 42 L.Ed.2d 47 (1974). For reasons that differ in certain respects from those upon which the Court of Appeals relied, we affirm.

**I**

Petitioners Metro-Act of Rochester, Inc., and eight individual plaintiffs, on behalf of themselves and all persons similarly situated,[1] filed this action on January 24, **\*494** 1972,

averring jurisdiction in the District Court under 28 U.S.C. ss 1331 and 1343. The complaint identified **\*\*2203** Metro-Act as a not-for-profit New York corporation, the purposes of which are 'to alert ordinary citizens to problems of social concern; . . . to inquire into the reasons for the critical housing shortage for low and moderate income persons in the Rochester area and to urge action on the part of citizens to alleviate the general housing shortage for low and moderate income persons.'[2] Plaintiffs Vinkey, Reichert, Warth, and Harris were described as residents of the city of Rochester, all of whom owned real property in and paid property taxes to that city.[3] Plaintiff Ortiz, 'a citizen of Spanish/Puerto Rican extraction,' App. 7, also owned real property in and paid taxes to Rochester. Ortiz, however, resided in Wayland, N.Y., some 42 miles from Penfield where he was employed.[4] The complaint described plaintiffs Broadnax, Reyes, and Sinkler as residents of Rochester and 'persons fitting within the classification of low and moderate income as hereinafter defined. . . .'[5] Ibid. Although **\*495** the complaint does not expressly so state, the record shows that Broadnax, Reyes, and Sinkler are members of ethnic or racial minority groups: Reyes is of Puerto Rican ancestry; Broadnax and Sinkler are Negroes.

[1] Plaintiffs claimed to represent, pursuant to Fed.Rule Civ.Proc. 23(b)(2), classes constituting 'all taxpayers of the City of Rochester, all low and moderate income persons residing in the City of Rochester, all black and/or Puerto Rican/Spanish citizens residing in the City of Rochester and all persons employed but excluded from living in the Town of Penfield who are affected or may in the future be affected by the defendants' policies and practices. . . .' App. 9.

[2] Id., at 8—9.

[3] Plaintiff Harris further described in the complaint as 'a negro person who is denied certain rights by virtue of her race. . . .' App. 5. We find no indication in the record that Harris had either the desire or intent to live in Penfield was suitable housing to become available. Indeed, petitioners now appear to claim standing for Harris only on the ground that she is a taxpayer of Rochester. See Brief for Petitioners 9, 12.

[4] According to Ortiz' affidavit, submitted in answer to respondents' motion to dismiss, he was employed in Penfield from 1966 to May 1972. App. 366—367.

[5] In fact, however, the complaint nowhere defines the term 'low and moderate income' beyond the parenthetical phrase 'without the capital requirements to purchase real

estate.' E.g., id., at 18. In addition to the inadequacy of this definition, the record discloses wide variations in the income, housing needs, and money available for housing among the various 'low and moderate income' plaintiffs. See Part III, infra.

Petitioners' complaint alleged that Penfield's zoning ordinance, adopted in 1962, has the purpose and effect of excluding person of low and moderate income from residing in the town. In particular, the ordinance allocates 98% of the town's vacant land to single-family detached housing, and allegedly by imposing unreasonable requirements relating to lot size, setback, floor area, and habitable space, the ordinance increases the cost of single-family detached housing beyond the means of persons of low and moderate income. Moreover, according to petitioners, only 0.3% of the land available for residential construction is allocated to multifamily structures (apartments, townhouses, and the like), and even on this limited space, housing for low and moderate income persons is not economically feasible because of low density and other requirements. Petitioners also alleged that 'in furtherance of a policy of exclusionary zoning,' id., at 22, the defendant members of Penfield's Town, Zoning, and Planning Boards had acted in an arbitrary and discriminatory manner: they had delayed action on proposals for low- and moderate-cost housing for inordinate periods of time; denied such proposals for arbitrary and insubstantial reasons; refused to grant necessary variances and permits, or to allow tax abatements; failed to provide necessary support services for low- and moderate-cost housing projects; and had **\*496** amended the ordinance to make approval of such projects virtually impossible.

In sum, petitioners alleged that, in violation of their 'rights, privileges and immunities secured by the Constitution and laws of the United States,' id., at 17, the town and its officials had made 'practically and economically impossible the construction of sufficient numbers **\*\*2204** of low and moderate income . . . housing in the Town of Penfield to satisfy the minimum housing requirements of both the Town of Penfield and the metropolitan Rochester area . . ..'[6] Petitioners alleged, moreover, that by precluding low- and moderate-cost housing, the town's zoning practices also had the effect of excluding persons of minority racial and ethnic groups, since most such persons have only low or moderate incomes.

6   App. 25—26.

Petitioners further alleged certain harm to themselves. The Rochester property owners and taxpayers—Vinkey, Reichert, Warth, Harris, and Ortiz—claimed that because of Penfield's exclusionary practices, the city of Rochester had been forced to impose higher tax rates on them and other similarly situated than would otherwise have been necessary. The low- and moderate-income, minority plaintiffs—Ortiz, Broadnax, Reyes, and Sinkler—claimed that Penfield's zoning practices had prevented them from acquiring, by lease or purchase, residential property in the town, and thus had forced them and their families to reside in less attractive environments. To relieve these various harms, petitioners asked the District Court to declare the Penfield ordinance unconstitutional, to enjoin the defendants from enforcing the ordinance, to order the defendants to enact and administer a new ordinance designed to alleviate the effects of their past actions, and to award $750,000 in actual and exemplary damages.

 **\*497**  On May 2, 1972, petitioner Rochester Home Builders Association, an association of firms engaged in residential construction in the Rochester metropolitan area, moved the District Court for leave to intervene as a party-plaintiff. In essence, Home Builders' intervenor complaint repeated the allegations of exclusionary zoning practices made by the original plaintiffs. It claimed that these practices arbitrarily and capriciously had prevented its member firms from building low- and moderate-cost housing in Penfield, and thereby had deprived them of potential profits. Home Builders prayed for equitable relief identical in substance to that requested by the original plaintiffs, and also for $750,000 in damages.[7] On June 7, 1972, Metro-Act and the other original plaintiffs moved to join petitioner Housing Council in the Monroe County Area, Inc., as a party plaintiff. Housing Council is a not-for-profit New York corporation, its membership comprising some 71 public and private organizations interested in housing problems. An affidavit accompanying the motion stated that 17 of Housing Council's member groups were or hoped to be involved in the development of low- and moderate-cost housing, and that one of its members—the Penfield Better Homes Corp.—'is and has been actively attempting to develop moderate income housing' in Penfield, 'but has been stymied by its inability to secure the necessary approvals . . ..'[8]

7   Home Builders also asked the District Court to enjoin the defendants from carrying out threatened retaliation against its members if Home Builders joined this litigation.

8      Id., at 174.

Upon consideration of the complaints and of extensive supportive materials submitted by petitioners, the District Court held that the original plaintiffs, Home Builders, and Housing Council lacked standing to prosecute **\*498** the action, that the original complaint failed to state a claim upon which relief could be granted, that the suit should not proceed as a class action, and that, in the exercise of discretion, Home Builders should not be permitted to intervene. The court accordingly denied the motion to add Housing Council as a party-plaintiff, denied Home Builders' motion to intervene, and dismissed the complaint. The Court of Appeals affirmed, reaching only the standing questions.

**\*\*2205  II**

[1]   [2]   We address first the principles of standing relevant to the claims asserted by the several categories of petitioners in this case. In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise. E.g., Barrows v. Jackson, 346 U.S. 249, 255—256, 73 S.Ct. 1031, 1034—1035, 97 L.Ed. 1586 (1953). In both dimensions it is founded in concern about the proper—and properly limited—role of the courts in a democratic society. See Schlesinger v. Reservists to Stop the War, 418 U.S. 208, 221—227, 94 S.Ct. 2925, 2932—2935, 41 L.Ed.2d 706 (1974); United States v. Richardson, 418 U.S. 166, 188—197, 94 S.Ct. 2940, 2952—2956, 41 L.Ed.2d 678 (1974) (Powell, J., concurring).

[3]   [4]   [5]   [6]   [7]   In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III. This is the threshold question in every federal case, determining the power of the court to entertain the suit. As an aspect of justiciability, the standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on **\*499** his behalf. Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). [9] The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally. A federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suffered 'some

threatened or actual injury resulting from the putatively illegal action . . ..' Linda R.S. v. Richard D., 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). See Data Processing Service v. Camp, 397 U.S. 150, 151—154, 90 S.Ct., 827, 829—830, 25 L.Ed.2d 184 (1970). [10]

9      See P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 156 (2d ed. 1973).

10     The standing question thus bears close affinity to questions of ripeness—whether the harm asserted has matured sufficiently to warrant judicial intervention —and of mootness-whether the occasion for judicial intervention persists. E.g., Lake Carriers' Assn. v. MacMullan, 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972); Hall v. Beals, 396 U.S. 45, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969). See Committee Anti-Fascist v. McGrath, 341 U.S. 123, 154—156, 71 S.Ct. 624, 639— 640, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring).

[8]   [9]   Apart from this minimum constitutional mandate, this Court has recognized other limits on the class of persons who may invoke the courts' decisional and remedial powers. First, the Court has held that when the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction. E.g., Schlesinger v. Reservists to Stop the War, supra; United States v. Richardson, supra; Ex parte Le vitt, 302 U.S. 633, 634, 58 S.Ct. 1, 82 L.Ed. 493 (1937), Second, even when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, this Court has held that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties. E.g., Tileston v. Ullman, 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943). See United States v. Raines, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960); Barrows v. **\*500** Jackson, supra. Without such limitations—closely related to Art. III concerns but essentially matters of judicial self-governance— the courts would **\*\*2206** be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights. See, e.g., Schlesinger v. Reservists to Stop the War, 418 U.S., at 222, 94 S.Ct., at 2932. [11]

11     Cf. Scott, Standing in the Supreme Court—A Functional Analysis, 86 Harv.L.Rev. 645 (1973).

**[10]** **[11]** **[12]** **[13]** **[14]** **[15]** **[16]** Although standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal, e.g., Flast v. Cohen, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968), it often turns on the nature and source of the claim asserted. The actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing . . ..' See Linda R.S. v. Richard D., supra, 410 U.S., at 617 n. 3, 93 S.Ct., at 1148; Sierra Club v. Morton, 405 U.S. 727, 732, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972). Moreover, the source of the plaintiff's claim to relief assumes critical importance with respect to the prudential rules of standing that, apart from Art. III's minimum requirements, serve to limit the role of the courts in resolving public disputes. Essentially, the standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief. [12] In some circumstances, countervailing **\*501** considerations may outweigh the concerns underlying the usual reluctance to exert judicial power when the plaintiff's claim to relief rests on the legal rights of third parties. See United States v. Raines, 362 U.S., at 22—23, 80 S.Ct., at 523—524. In such instances, the Court has found, in effect, that the constitutional or statutory provision in question implies a right of action in the plaintiff. See Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 237, 90 S.Ct. 400, 404, 24 L.Ed.2d 386 (1969). See generally Part IV, infra. Moreover, Congress may grant an express right of action to persons who otherwise would be barred by prudential standing rules. Of course, Art. III's requirement remains: the plaintiff still must allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants. E.g., United States v. SCRAP, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). But so long as this requirement is satisfied, persons to whom Congress has granted a right of action, either expressly or by clear implication, may have standing to seek relief on the basis of the legal rights and interests of others, and, indeed, may invoke the general public interest in support of their claim. E.g., Sierra Club v. Morton, supra, 405 U.S., at 737, 92 S.Ct., at 1367; FCC v. Sanders Radio Station, 309 U.S. 470, 477, 60 S.Ct. 693, 698, 84 L.Ed. 869 (1940).

12    A similar standing issue arises when the litigant asserts the rights of third parties defensively, as a bar to judgment against him. E.g., Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953); McGowan v.

Maryland, 366 U.S. 420, 429—430, 81 S.Ct. 1101, 1106 —1107, 6 L.Ed.2d 393 (1961). In such circumstances, there is no Art. III standing problem; but the prudential question is governed by considerations closely related to the question whether a person in the litigant's position would have a right of action on the claim. See Part IV, infra.

**[17]** One further preliminary matter requires discussion. For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party. E.g., Jenkins v. McKeithen, 395 U.S. 411, 421—422, 89 S.Ct. 1843, 1848—1849, 23 L.Ed.2d 404 (1969). At the same time, it is within the trial court's power to allow or to require **\*\*2207** the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing. If, after this opportunity, **\*502** the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed.

### III

**[18]** With these general considerations in mind, we turn first to the claims of petitioners Ortiz, Reyes, Sinkler, and Broadnax, each of whom asserts standing as a person of low or moderate income and, coincidentally, as a member of a minority racial or ethnic group. We must assume, taking the allegations of the complaint as true, that Penfield's zoning ordinance and the pattern of enforcement by respondent officials have had the purpose and effect of excluding persons of low and moderate income, many of whom are members of racial or ethnic minority groups. We also assume, for purposes here, that such intentional exclusionary practices, if proved in a proper case, would be adjudged violative of the constitutional and statutory rights of the persons excluded.

But the fact that these petitioners share attributes common to persons who may have been excluded from residence in the town is an insufficient predicate for the conclusion that petitioners themselves have been excluded, or that the respondents' assertedly illegal actions have violated their rights. Petitioners must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent. Unless these petitioners can thus demonstrate the requisite case or controversy between themselves personally and respondents, 'none may seek relief

on behalf of himself or any other member of the class.' O'Shea v. Littleton, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974). See, e.g., Bailey v. Patterson, 369 U.S. 31, 32—33, 82 S.Ct. 549, 550—551, 7 L.Ed.2d 512 (1962).

**\*503** In their complaint, petitioners Ortiz, Reyes, Sinkler, and Broadnax alleged in conclusory terms that they are among the persons excluded by respondents' actions.[13] None of them has ever resided in Penfield; each claims at least implicitly that he desires, or has desired, to do so. Each asserts, moreover, that he made some effort, at some time, to locate housing in Penfield that was at once within his means and adequate for his family's needs. Each claims that his efforts proved fruitless.[14] **\*504** We may assume, **\*\*2208** as petitioners allege, that respondents' actions have contributed, perhaps substantially, to the cost of housing in Penfield. But there remains the question whether petitioners' inability to locate suitable housing in Penfield reasonably can be said to have resulted, in any concretely demonstrable way, from respondents' alleged constitutional and statutory infractions. Petitioners must allege facts from which it reasonably could be inferred that, absent the respondents' restrictive zoning practices, there is a substantial probability that they would have been able to purchase or lease in Penfield and that, if the court affords the relief requested, the asserted inability of petitioners will be removed. Linda R.S. v. Richard D., supra.

13  Petitioner Ortiz also alleged that as a result of such exclusion he had to incur substantial commuting expenses between his residence and his former place of employment in Penfield; and, in supporting affidavits, each petitioner recites at some length the disadvantages of his or her present housing situation and how that situation might be improved were residence in Penfield possible. For purposes of standing, however, it is the exclusion itself that is of critical importance, since exclusion alone would violate the asserted rights quite apart from any objective or subjective disadvantage that may flow from it.

14  In his affidavit submitted in opposition to respondents' motion to dismiss, petitioner Ortiz stated:

'Since my job at that time and continuing until May of 1972 was in the Town of Penfield, I initiated inquiries about renting and/or buying a home in the Town of Penfield. However, because of my income being low or moderate, I found that there were no apartment units large enough to house my family of wife and seven children, nor were there apartment units that were available reasonably priced so that I could even afford to rent the largest apartment unit. I have been reading ads in

the Rochester metropolitan newspapers since coming to Rochester in 1966 and during that time and to the present time, I have not located either rental housing or housing to buy in Penfield.' App. 37.

Petitioner Reyes averred that, for some time before locating and purchasing their present residence in Rochester, she and her husband had searched for a suitable residence in suburban communities: '(O)ur investigation for housing included the Rochester bedroom communities of Webster, Irondequoit, Penfield and Perinton. Our search of a period of two years led us to no possible purchase in any of these towns.' Id., at 428. Petitioner Sinkler stated that she had 'searched for alternate housing in the Rochester metropolitan area,' including the Town of Penfield, and has found that 'a black person has no choice of housing . . . .' In particular, 'there are no apartments available in the town of Penfield which a person of my income level can afford.' Id., at 452—453. Petitioner Broadnax said only that she had 'bought newspapers and read ads and walked to look for apartments until I found the place where I now reside. I found that there was virtually no choice of housing in the Rochester area.' Id., at 407.

[19] We find the record devoid of the necessary allegations. As the Court of Appeals noted, none of these petitioners has a present interest in any Penfield property; none is himself subject to the ordinance's strictures; and none has even been denied a variance or permit by respondent officials. 495 F.2d, at 1191. Instead, petitioners claim that respondents' enforcement of the ordinance against third parties—developers, builders, and the like—has had the consequence of precluding the construction of housing suitable to their needs at prices they might be able to afford. The fact that the harm to petitioners may have resulted indirectly does not in itself preclude standing. **\*505** When a governmental prohibition or restriction imposed on one party causes specific harm to a third party, harm that a constitutional provision or statute was intended to prevent, the indirectness of the injury does not necessarily deprive the person harmed of standing to vindicate his rights. E.g., Roe v. Wade, 410 U.S. 113, 124, 93 S.Ct. 705, 712, 35 L.Ed.2d 147 (1973). But it may make it substantially more difficult to meet the minimum requirement of Art. III: to establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm.

Here, by their own admission, realization of petitioners' desire to live in Penfield always has depended on the efforts and willingness of third parties to build low- and moderate-cost housing. The record specifically refers to only two such

efforts: that of Penfield Better Homes Corp., in late 1969, to obtain the rezoning of certain land in Penfield to allow the construction of subsidized cooperative townhouses that could be purchased by persons of moderate income; and a similar effort by O'Brien Homes, Inc., in late 1971. [15] But **\*506** the record **\*\*2209** is devoid of any indication that these projects, or other like projects, would have satisfied petitioners' needs at prices they could afford, or that, were the court to remove the obstructions attributable to respondents, such relief would benefit petitioners. Indeed, petitioners' descriptions of their individual financial situations and housing needs suggest precisely the contrary—that their inability to reside in Penfield is the consequence of the economics of the area housing market, rather than of respondents' assertedly illegal acts. [16] In **\*507** short, the facts alleged fail to support an actionable causal relationship between Penfield's zoning practices and petitioners' asserted injury.

[15] Penfield Better Homes contemplated a series of one- to three-bedroom units and hoped to sell them—at that time—to persons who earned from $5,000 to $8,000 per year. The Penfield Planning Board denied the necessary variance on September 9, 1969, because of incompatibility with the surrounding neighborhood, projected traffic congestion, and problems of severe soil erosion during construction. Id., at 629—633, 849—859, 883—884. O'Brien Homes, Inc., projected 51 buildings, each containing four family units, designed for single people and small families, and capable of being purchased by persons 'of low income and accumulated funds' and 'of moderate income with limited funds for down payment . . ..' Id., at 634. The variance for this project was denied by the Planning Board on October 12, 1971; a revision of the proposal was reconsidered by the Planning Board in April 1972, and, from all indications of record, apparently remains under consideration. The record also indicates the existence of several proposals for 'planned unit developments'; but we are not told whether these projects would allow sale at prices that persons of low or moderate income are likely to be able to afford. There is, more importantly, not the slightest suggestion that they would be adequate, and of sufficiently low cost, to meet these petitioners' needs.

[16] Ortiz states in his affidavit that he is now purchasing and resides in a six-bedroom dwelling in Wayland, N.Y.; and that he owns and receives rental income from a house in Rochester. He is concerned with finding a house or apartment large enough for himself, his wife, and seven children, but states that he can afford to spend a maximum of $120 per month for housing. Id., at 370. Broadnax seeks a four-bedroom house or apartment for herself and six children, and can spend a maximum of about $120 per month for housing. Id., at 417—418. Sinkler also states that she can spend $120 per month for housing for herself and two children. Id., at 452—453. Thus, at least in the cases of Ortiz and Broadnax, it is doubtful that their stated needs could have been satisfied by the small housing units contemplated in the only moderate-cost projects specifically described in the record. Moreover, there is no indication that any of the petitioners had the resources necessary to acquire the housing available in the projects. The matter is left entirely obscure. The income and housing budget figures supplied in petitioners' affidavits are presumably for the year 1972. The vague description of the proposed O'Brien development strongly suggests that the units, even if adequate for their needs, would have bee beyond the means at least of Sinkler and Broadnax. See n. 15, supra. The Penfield Better Homes projected price figures were for 1969, and must be assumed—even if subsidies might still be available—to have increased substantially by 1972, when the complaint was filed. Petitioner Reyes presents a special case: she states that her family has an income of over $14,000 per year, that she can afford $231 per month for housing, and that, in the past and apparently now, she wants to purchase a residence. As noted above, see n. 5, supra, the term 'low and moderate income' is nowhere defined in the complaint; but Penfield Better Homes defined the term as between $5,000 and $8,000 per year. See n. 15, supra. Since that project was to be subsidized, presumably petitioner Reyes would have been ineligible. There is no indication that in nonsubsidized projects, removal of the challenged zoning restrictions—in 1972—would have reduced the price on new single-family residences to a level that petitioner Reyes thought she could afford.

In support of their position, petitioners refer to several decisions in the District Courts and Courts of Appeals, acknowledging standing in low-income, minority-group plaintiffs to challenge exclusionary zoning practices. [17] In those cases, however, the plaintiffs challenged zoning restrictions as applied to particular projects that would supply housing within their means, and of which they were intended residents. The plaintiffs thus were able to demonstrate that unless relief from assertedly illegal actions was forthcoming, their immediate and personal interests would be harmed. Petitioners here assert no like circumstances. Instead, they rely on little more than the remote possibility, unsubstantiated by allegations of fact, that their situation might have been better had respondents acted otherwise, and **\*\*2210** might improve were the court to afford relief.

17    See, e.g., Park View Heights Corp. v. City of Black Jack, 467 F.2d 1208 (CA8 1972); Crow v. Brown, 457 F.2d 788 (CA5 1972), aff'g 332 F.Supp. 382 (ND Ga.1971); Kennedy Park Homes Assn., v. City of Lackawanna, 436 F.2d 108 (CA2 1970), cert. denied, 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971); Dailey v. City of Lawton, 425 F.2d 1037 (CA10 1970). Cf. United Farmworkers of Florida Housing Project, Inc. v. City of Delray Beach, 493 F.2d 799 (CA5 1974).

[20]    [21]    *508  We hold only that a plaintiff who seeks to challenge exclusionary zoning practices must allege specific, concrete facts demonstrating that the challenged practices harm him, and that he personally would benefit in a tangible way from the court's intervention.[18] Absent the necessary allegations of demonstrable, particularized injury, there can be no confidence of 'a real need to exercise the power of judicial review' or that relief can be framed 'no (broader) than required by the precise facts to which the court's ruling would be applied.' Schlesinger v. Reservists to Stop the War, 418 U.S., at 221—222, 94 S.Ct., at 2932.

18    This is not to say that the plaintiff who challenges a zoning ordinance or zoning practices must have a present contractual interest in a particular project. A particularized personal interest may be shown in various ways, which we need not undertake to identify in the abstract. But usually the initial focus should be on a particular project. See, e.g., cases cited in n. 17, supra We also note that zoning laws and their provisions, long considered essential to effective urban planning, are peculiarly within the province of state and local legislative authorities. They are, of course, subject to judicial review in a proper case. But citizens dissatisfied with provisions of such laws need not overlook the availability of the normal democratic process.

## IV

[22]    The petitioners who assert standing on the basis of their status as taxpayers of the city of Rochester present a different set of problems. These 'taxpayer-petitioners' claim that they are suffering economic injury consequent to Penfield's allegedly discriminatory and exclusionary zoning practices. Their argument, in brief, is that Penfield's persistent refusal to allow or to facilitate construction of low- and moderate-cost housing forces the city of Rochester to provide more such housing than it otherwise would do; that to provide such housing, Rochester must allow certain tax abatements; and *509 that as the amount of tax-abated property increases, Rochester taxpayers are forced to assume an increased tax burden in order to finance essential public services.

'Of course, pleadings must be something more than an ingenious academic exercise in the conceivable.' United States v. SCRAP, 412 U.S., at 688, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254. We think the complaint of the taxpayer-petitioners is little more than such an exercise. Apart from the conjectural nature of the asserted injury, the line of causation between Penfield's actions and such injury is not apparent from the complaint. Whatever may occur in Penfield, the injury complained of—increases in taxation—results only from decisions made by the appropriate Rochester authorities, who are not parties to this case.

But even if we assume that the taxpayer-petitioners could establish that Penfield's zoning practices harm them,[19] their complaint nonetheless was properly dismissed. Petitioners do not, even if they could, assert any personal right under the Constitution or any statute to be free of action by a neighboring municipality that may have some incidental adverse effect on Rochester. On the contrary, the only basis of the taxpayer-petitioners' claim is that Penfield's zoning ordinance and practices violate the constitutional and statutory rights of third parties, namely, persons of low and moderate income who are said to be excluded from Penfield. In short the claim of these petitioners falls squarely within the prudential standing rule that normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves. As we have observed above, this rule of judicial self-governance is subject **2211 to exceptions, the most prominent of which is that Congress may remove it by statute. Here, however, *510 no statute expressly or by clear implication grants a right of action, and thus standing to seek relief, to persons in petitioners' position. In several cases, this Court has allowed standing to litigate the rights of third parties when enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties' rights. See, e.g., Doe v. Bolton, 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 205 (1973); Griswold v. Connecticut, 381 U.S. 479, 481, 85 S.Ct. 1678, 1680, 14 L.Ed.2d 510 (1965); Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953). But the taxpayer-petitioners are not themselves subject to Penfield's zoning practices. Nor do they allege that the challenged zoning ordinance and practices preclude or otherwise adversely affect a relationship existing between them and the persons whose rights assertedly are violated. E.g., Sullivan v. Little Hunting Park, Inc., 396 U.S., at 237, 90 S.Ct. 400, 404, 24

L.Ed.2d 386; NAACP v. Alabama, 357 U.S. 449, 458—460, 78 S.Ct. 1163, 1169—1171, 2 L.Ed.2d 1488 (1958); Pierce v. Society of Sisters, 368 U.S., at 534—536, 45 S.Ct. 571, 573—574, 69 L.Ed. 1070. No relationship, other than an incidental congruity of interest, is alleged to exist between the Rochester taxpayers and persons who have been precluded from living in Penfield. Nor do the taxpayer-petitioners show that their prosecution of the suit is necessary to insure protection of the rights asserted, as there is no indication that persons who in fact have been excluded from Penfield are disabled from asserting their own right in a proper case. [20] In sum, we discern no justification for recognizing in the Rochester taxpayers a right of action on the asserted claim.

[19]    Cf. United States v. SCRAP, 412 U.S. 669, 688—690, 93 S.Ct. 2405, 2416—2417, 37 L.Ed.2d 254 (1973). But see Roe v. Wade, 410 U.S. 113, 127—129, 93 S.Ct. 705, 714—715, 35 L.Ed.2d 147 (1973).

[20]    See generally Sedler, Standing to Assert Constitutional Jus Tertii in the Supreme Court, 71 Yale L.J. 599 (1962). Cf. Bigelow v. Virginia, 421 U.S. 809, 815—817, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975).

### V

[23]    We turn next to the standing problems presented by the petitioner associations—Metro-Act of Rochester, *511 Inc., one of the original plaintiffs; Housing Council in the Monroe County Area, Inc., which the original plaintiffs sought to join as a party-plaintiff; and Rochester Home Builders Association, Inc., which moved in the District Court for leave to intervene as plaintiff. There is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy. Moreover, in attempting to secure relief from injury to itself the association may assert the rights of its members, at least so long as the challenged infractions adversely affect its members' associational ties. E.g., NAACP v. Alabama, supra, 357 U.S., at 458—460, 78 S.Ct. 1163, 1169—1171, 2 L.Ed.2d 1488; Anti-Fascist Committee v. McGrath, 341 U.S. 123, 183—187, 71 S.Ct. 624, 654—657, 95 L.Ed. 817 (1951) (Jackson J., concurring). With the limited exception of Metro-Act, however, none of the associational petitioners here has asserted injury to itself.

[24]    Even in the absence of injury to itself, an association may have standing solely as the representative of its members. E.g., National Motor Freight Assn. v. United States, 372 U.S.

246, 83 S.Ct. 688, 9 L.Ed.2d 709 (1963). The possibility of such representational standing, however, does not eliminate or attenuate the constitutional requirement of a case or controversy. See Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). The association must allege that its members, or any one of them, are suffering immediate **2212 or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit. Id., at 734—741, 92 S.Ct., at 1365—1369. So long as this can be established, and so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction.

### *512 A

[25]    Petitioner Metro-Act's claims to standing on its own behalf as a Rochester taxpayer, and on behalf of its members who are Rochester taxpayers or persons of low or moderate income, are precluded by our holdings in Parts III and IV, supra, as to the individual petitioners, and require no further discussion. Metro-Act also alleges, however, that 9% of its membership is composed of present residents of Penfield. It claims that, as a result of the persistent pattern of exclusionary zoning practiced by respondents and the consequent exclusion of persons of low and moderate income, those of its members who are Penfield residents are deprived of the benefits of living in a racially and ethnically integrated community. Referring to our decision in Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972), Metro-Act argues that such deprivation is a sufficiently palpable injury to satisfy the Art. III case-or-controversy requirement, and that it has standing as the representative of its members to seek redress.

We agree with the Court of Appeals that Trafficante is not controlling here. In that case, two residents of an apartment complex alleged that the owner had discriminated against rental applicants on the basis of race, in violation of s 804 of the Civil Rights Act of 1968, 82 Stat. 83, 42 U.S.C. s 3604. They claimed that, as a result of such discrimination, 'they had been injured in that (1) they had lost the social benefits of living in an integrated community; (2) they had missed business and professional advantages which would have accrued if they had lived with members of minority

groups; (3) they had suffered embarrassment and economic damage in social, business, and professional activities from being 'stigmatized' as residents of a 'white ghetto." 409 U.S., at 208, 93 S.Ct., at 366. In light of the clear congressional purpose **\*513** in enacting the 1968 Act, and the broad definition of 'person aggrieved' in s 810(a), 42 U.S.C. s 3610(a), we held that petitioners, as 'person(s) who claim(ed) to have been injured by a discriminatory housing practice,' had standing to litigate violations of the Act. We concluded that Congress had given residents of housing facilities covered by the statute an actionable right to be free from the adverse consequences to them of racially discriminatory practices directed at and immediately harmful to others. 409 U.S., at 212, 93 S.Ct., at 368.

Metro-Act does not assert on behalf of its members any right of action under the 1968 Civil Rights Act, nor can the complaint fairly be read to make out any such claim.[21] In this, we think, lies the **\*\*2213** critical distinction between Trafficante and the situation here. As we have **\*514** observed above, Congress may create a statutory right or entitlement the alleged deprivation of which can confer standing to sue even where the plaintiff would have suffered no judicially cognizable injury in the absence of statute. Linda R.S. v. Richard D., 410 U.S., at 617 n. 3, 93 S.Ct., at 1148, citing Trafficante v. Metropolitan Life Ins. Co., supra, 409 U.S., at 212, 93 S.Ct., at 368. (White, J., concurring). No such statute is applicable here.

[21]   The amicus brief of the Lawyers' Committee for Civil Rights under Law argues, to the contrary, that petitioners' allegations do state colorable claims under the 1968 Act, and that Metro-Act's Penfield members are 'person(s) aggrieved' within the meaning of s 810(a). It is significant, we think, that petitioners nowhere adopt this argument. As we read the complaint, petitioners have not alleged that respondents 'refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, . . . or national origin,' or that they 'discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, . . . or national origin,' 42 U.S.C. s 3604(a) and (b) (emphasis added). Instead, the gravamen of the complaint is that the challenged zoning practices have the purpose and effect of excluding persons of low and moderate income from residing in the town, and that this in turn has the consequence of excluding members of racial or ethnic minority groups. This reading of the complaint is confirmed by petitioners' brief in this Court. Brief for Petitioners 41. We intimate no view as to

whether, had the complaint alleged purposeful racial or ethnic discrimination, Metro-Act would have stated a claim under s 804. See Park View Heights Corp. v. City of Black Jack, 467 F.2d 1208 (CA8 1972).

Even if we assume, arguendo, that apart from any statutorily created right the asserted harm to Metro-Act's Penfield members is sufficiently direct and personal to satisfy the case-or-controversy requirement of Art. III, prudential considerations strongly counsel against according them or Metro-Act standing to prosecute this action. We do not understand Metro-Act to argue that Penfield residents themselves have been denied any constitutional rights, affording them a cause of action under 42 U.S.C. s 1983. Instead, their complaint is that they have been harmed indirectly by the exclusion of others. This is an attempt to raise putative rights of third parties, and none of the exceptions that allow such claims is present here.[22] In these circumstances, we conclude that it is inappropriate to allow Metro-Act to invoke the judicial process.

[22]   Metro-Act does not allege that a contractual or other relationship protected under ss 1981 and 1982 existed between its Penfield members and any particular person excluded from residing in the town, nor that any such relationship was either punished or disrupted by respondents. See Sullivan v. Little Hunting Park, 396 U.S. 229, 237, 90 S.Ct. 400, 404, 24 L.Ed.2d 386 (1969).

**B**

 **[26]**   Petitioner Home Builders, in its intervenor-complaint, asserted standing to represent its member firms engaged in the development and construction of residential housing in the Rochester area, including Penfield. Home Builders alleged that the Penfield zoning restrictions, **\*515** together with refusals by the town officials to grant variances and permits for the construction of low- and moderate-cost housing, had deprived some of its members of 'substantial business opportunities and profits.' App. 156. Home Builders claimed damages of $750,000 and also joined in the original plaintiffs' prayer for declaratory and injunctive relief.

As noted above, to justify any relief the association must show that it has suffered harm, or that one or more of its members are injured. E.g., Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Bt, apart from this, whether an association has standing to invoke the court's remedial powers on behalf of its members depends in

substantial measure on the nature of the relief sought. If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind. E.g., National Motor Freight Assn. v. United States, 372 U.S. 246, 83 S.Ct. 688, 9 L.Ed.2d 709 (1963). See Data Processing Service v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). Cf. Fed.Rule Civ.Proc. 23(b)(2).

 **\*\*2214** The present case, however, differs significantly as here an association seeks relief in damages for alleged injuries to its members. Home Builders alleges no monetary injury to itself, nor any assignment of the damages claims of its members. No award therefore can be made to the association as such. Moreover, in the circumstances of this case, the damages claims are not common to the entire membership, nor shared by all in equal degree. To the contrary, whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized **\*516** proof. Thus, to obtain relief in damages, each member of Home Builders who claims injury as a result of respondents' practices myst be a party to the suit, and Home Builders has no standing to claim damages on his behalf.

 **[27]** Home Builders' prayer for prospective relief fails for a different reason. It can have standing as the representative of its members only if it has alleged facts sufficient to make out a case or controversy had the members themselves brought suit. No such allegations were made. The complaint refers to no specific project of any of its members that is currently precluded either by the ordinance or by respondents' action in enforcing it. There is no averment that any member has applied to respondents for a building permit or a variance with respect to any current project. Indeed, there is no indication that respondents have delayed or thwarted any project currently proposed by Home Builders' members, or that any of its members has taken advantage of the remedial processes available under the ordinance. In short, insofar as the complaint seeks prospective relief, Home Builders has failed to show the existence of any injury to its members of sufficient immediacy and ripeness to warrant judicial intervention. See, e.g., United Public Workers v. Mitchell, 330 U.S. 75, 86—91, 67 S.Ct. 556, 562—565, 91 L.Ed. 754 (1947); Maryland Cas. Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941).

 **[28]** A like problem is presented with respect to petitioner Housing Council. The affidavit accompanying the motion to join it as plaintiff states that the Council includes in its membership 'at lease seventeen' groups that have been, are, or will be involved in the development of low- and moderate-cost housing. But with one exception, the complaint does not suggest that any of these groups has focused its efforts on Penfield or has any specific **\*517** plan to do so. Again with the same exception, neither the complaint nor any materials of record indicate that any member of Housing Council has taken any step toward building housing in Penfield, or has had dealings of any nature with respondents. The exception is the Penfield Better Homes Corp. As we have observed above, it applied to respondents in late 1969 for a zoning variance to allow construction of a housing project designed for persons of moderate income. The affidavit in support of the motion to join Housing Council refers specifically to this effort, the supporting materials detail at some length the circumstances surrounding the rejection of Better Homes' application. It is therefore possible that in 1969, or within a reasonable time thereafter, Better Homes itself and possibly Housing Council as its representative would have had standing ot seek review of respondents' action. The complaint, however, does not allege that the Penfield Better Homes project remained viable in 1972 when this complaint was filed, or that respondents' actions continued to block a then-current construction project.[23] In **\*\*2215** short, neither the complaint nor the record supplies any basis from which to infer that the controversy between respondents and Better Homes, however vigorous it may once have been, remained a live, concrete dispute when this complaint was filed.

[23]  If it had been averred that the zoning ordinance or respondents were unlawfully blocking a pending construction project, there would be a further question as to whether Penfield Better Homes had employed available administrative remedies, and whether it should be required to do so before a federal court can intervene.

### VI

 **[29]** The rules of standing, whether as aspects of the Art. III case-or-controversy requirement or as reflections of prudential **\*518** considerations defining and limiting the role of the courts, are threshold determinants of the propriety of judicial intervention. It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers. We agree

with the District Court and the Court of Appeals that none of the petitioners here has met this threshold requirement. Accordingly, the judgment of the Court of Appeals is

Affirmed.

Mr. Justice DOUGLAS, dissenting.

With all respect, I think that the Court reads the complaint and the record with antagonistic eyes. There are in the background of this case continuing strong tides of opinion touching on very sensitive matters, some of which involve race, some class distinctions based on wealth.

A clean, safe, and well-heated home is not enough for some people. Some want to live where the neighbors are congenial and have social and political outlooks similar to their own. This problem of sharing areas of the community is akin to that when one wants to control the kind of person who shares his own abode. Metro-Act of Rochester, Inc., and the Housing Council in the Monroe County Area, Inc.—two of the associations which bring this suit—do in my opinion represent the communal feeling of the actual residents and have standing.

The associations here are in a position not unlike that confronted by the Court in NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). Their protest against the creation of this segregated community expresses the desire of their members to live in a desegregated community—a desire which gives standing to sue under the Civil Rights Act **\*519** of 1968 as we held in Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972). Those who voice these views here seek to rely on other Civil Rights Acts and on the Constitution, but they too should have standing, by virtue of the dignity of their claim, to have the case decided on the merits.

Standing has become a barrier to access to the federal courts, must as 'the political question' was in earlier decades. The mounting caseload of federal courts is well known. But cases such as this one reflect festering sores in our society; and the American dream teaches that if one reaches high enough and persists there is a forum where justice is dispensed. I would lower the technical barriers and let the courts serve that ancient need. They can in time be curbed by legislative or constitutional restraints if an emergency arises.

We are today far from facing an emergency. For in all frankness, no Justice of this Court need work more than four days a week to carry his burden. I have found it a comfortable burden carried even in my months of hospitalization.

As Mr. Justice BRENNAN makes clear in his dissent, the alleged purpose of the ordinance under attack was to preclude low- and moderate-income people and nonwhites from living in Penfield. The zoning power is claimed to have been used here to foist an un-American community model on the people of this area. I would let the case go to trial and have all the facts brought **\*\*2216** out. Indeed, it would be better practice to decide the question of standing only when the merits have been developed.

I would reverse the Court of Appeals.

Mr. Justice BRENNAN, with whom Mr. Justice WHITE and Mr. Justice MARSHALL join, dissenting.

In this case, a wide range of plaintiffs, alleging various kinds of injuries, claimed to have been affected by the **\*520** Penfield zoning ordinance, on its face and as applied, and by other practices of the defendant officials of Penfield. Alleging that as a result of these laws and practices low- and moderate-income and minority people have been excluded from Penfield, and that this exclusion is unconstitutional, plaintiffs sought injunctive, declaratory, and monetary relief. The Court today, in an opinion that purports to be a 'standing' opinion but that actually, I believe, has overtones of outmoded notions of pleading and of justiciability, refuses to find that any of the variously situated plaintiffs can clear numerous hurdles, some constructed here for the first time, necessary to establish 'standing.' While the Court gives lip service to the principle, oft repeated in recent years,[1] that 'standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal,' ante, at 2206, in fact the opinion, which tosses out of court almost every conceivable kind of plaintiff who could be injured by the activity claimed to be unconstitutional, can be explained only by an indefensible hostility to the claim on the merits. I can appreciate the Court's reluctance luctance to adjudicate the complex and difficult legal questions involved in determining the constitutionality of practices which assertedly limit residence in a particular municipality to those who are white and relatively well off, and I also understand that the merits of this case could involve grave sociological and political ramifications. But courts cannot refuse to hear a case on the merits merely because they would prefer not to, and it is quite clear, when

the record is viewed with dispassion, that at least three of the groups of plaintiffs have made **\*521** allegations, and supported them with affidavits and documentary evidence, sufficient to survive a motion to dismiss for lack of standing.[2]

[1] Flast v. Cohen, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968); Data Processing Service v. Camp, 397 U.S. 150, 153, 158, 90 S.Ct. 827, 830, 832, 25 L.Ed.2d 184 (1970); Schlesinger v. Reservists to Stop the War, 418 U.S. 208, 225 n. 15, 94 S.Ct. 2925, 2934, 41 L.Ed.2d 706 (1974). See Barlow v. Collins, 397 U.S. 159, 176, 90 S.Ct. 832, 843, 25 L.Ed.2d 192 (1970) (Opinion of Brennan, J.).

[2] Because at least three groups of plaintiffs have, in my view, alleged standing sufficient to require this lawsuit to proceed to discovery and trial, I do not deal in this dissent with the standing of the remaining petitioners.

## I

Before considering the three groups I believe clearly to have standing—the low-income, minority plaintiffs, Rochester Home Builders Association, Inc., and the Housing Council in the Monroe County Area, Inc.—it will be helpful to review the picture painted by the allegations as a whole, in order better to comprehend the interwoven interests of the various plaintiffs. Indeed, one glaring defect of the Court's opinion is that it views each set of plaintiffs as if it were prosecuting a separate lawsuit, refusing to recognize that the interests are intertwined, and that the standing of any one group must take into account its position vis-a -vis the others. For example, the Court says that the low-income minority plaintiffs have not alleged facts sufficient to show that but for the exclusionary practices claimed, they would be able to reside in Penfield. The Court then intimates that such a causal relationship could be shown only if 'the initial focus (is) on a particular project.' Ante, at 2210 n. 18. Later, the Court objects to the ability of the **\*\*2217** Housing Council to prosecute the suit on behalf of its member, Penfield Better Homes Corp., despite the fact that Better Homes had displayed an interest in a particular project, because that project was no longer live. Thus, we must suppose that even if the low-income plaintiffs had alleged a desire to live in the Better Homes project, that allegation would **\*522** be insufficient because it appears that that particular project might never be built. The rights of low-income minority plaintiffs who desire to live in a locality, then, seem to turn on the willingness of a third party to litigate the legality of preclusion of a particular project, despite the fact that the third party may have no economic

incentive to incur the costs of litigation with regard to one project, and despite the fact that the low-income minority plaintiffs' interest is not to live in a particular project but to live somewhere in the town in a dwelling they can afford.

Accepting, as we must, the various allegations and affidavits as true, the following picture emerges: The Penfield zoning ordinance, by virtue of regulations concerning 'lot area, set backs, . . . population density, density of use, units per acre, floor area, sewer requirements, traffic flow, ingress and egress(, and) street location,' makes 'practically and economically impossible the construction of sufficient numbers of low and moderate income' housing. App. 25. The purpose of this ordinance was to preclude low-and moderate-income people and nonwhites from living in Penfield, id., at 15, and, particularly because of refusals to grant zoning variances and building permits and by using special permit procedures and other devices, id., at 17, the defendants succeeded in keeping 'low and moderate income persons . . . and non-white persons . . . from residing within . . . Penfield.' Id., at 18.

As a result of these practices, various of the plaintiffs were affected in different ways. For example, plaintiffs Ortiz, Reyes, Sinkler, and Broadnax, persons of low or moderate income and members of minority groups, alleged that 'as a result' of respondents' exclusionary scheme, at 18, 21, 23 —24, 26, 29 (emphasis supplied), they could not live in Penfield, although they **\*523** desired and attempted to do so, and consequently incurred greater commuting costs, lived in substandard housing, and had fewer services for their families and poorer schools for their children than if they had lived in Penfield. Members of the Rochester Home Builders Association were prevented from constructing homes for low- and moderate-income people in Penfield, id., at 153, harming them economically. And Penfield Better Homes, a member of the Housing Council, was frustrated in its attempt to build moderate-income housing, id., at 174.

Thus, the portrait which emerges from the allegations and affidavits is one of total, purposeful, intransigent exclusion of certain classes of people from the town, pursuant to a conscious scheme never deviated from. Because of this scheme, those interested in building homes for the excluded groups were faced with insurmountable difficulties, and those of the excluded groups seeking homes in the locality quickly learned that their attempts were futile. Yet, the Court turns the very success of the allegedly unconstitutional scheme into a barrier to a lawsuit seeking its invalidation. In effect, the Court tells the lowincome minority and building company

plaintiffs they will not be permitted to prove what they have alleged—that they could and would build and live in the town if changes were made in the zoning ordinance and its application—because they have not succeeded in breaching, before the suit was filed, the very barriers which are the subject of the suit.

## II

### *Low-income and Minority Plaintiffs*

As recounted above, plaintiffs Ortiz, Broadnax, Reyes, and Sinkler alleged **\*\*2218** that 'as a result' of respondents' exclusionary practices, they were unable, despite attempts, **\*524** to find the housing they desired in Penfield, and consequently have incurred high commuting expenses, received poorer municipal services,[3] and, in some instances, have been relegated to live in substandard housing.[4] The Court does not, as it could not, suggest that **\*525** the injuries, if proved, would be insufficient to give petitioners the requisite 'personal stake in the outcome of the controversy as to assure the concrete adverseness which sharpens the presentation of issues,' Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962); Flast v. Cohen, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968). Rather, it is abundantly clear that the harm alleged satisfies the 'injury in fact, economic or otherwise,' Data Processing Service v. Camp, 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970), requirement which is prerequisite to standing in federal court. The harms claimed—consisting of out-of-pocket losses as well as denial of specifically enumerated services available in Penfield but not in these petitioners' present communities, see nn. 3 and 4, supra—are obviously more palpable and concrete than those held sufficient to sustain standing in other cases. See United States v. SCRAP, 412 U.S. 669, 686, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973); Sierra Club v. Morton, 405 U.S. 727, 735 n. 8, 738, and n. 13, 92 S.Ct. 1361, 1366, 1368, 31 L.Ed.2d 636 (1972). Cf. Data Processing, supra, 397 U.S., at 154, 90 S.Ct., at 830.

[3]     Specifically, petitioner Ortiz claims, among other things, that the Penfield schools offer a much broader curriculum, including vocational education, than the school his children attend, as well as special tutoring and counseling programs not available to his children. Penfield also provides a comprehensive recreational program, while his community offers very little, and a full-time, comprehensive public library, while his

community has only limited library services. App. 377—400.

Petitioner Broadnax claimed that if she lived in Penfield, there would be playgrounds for her children, effective police protection, and adequate garbage disposal, all of which are lacking in her present community. Id., at 419. As a result, her children are not safe and there are mice, rats, and roaches in her house. Id., at 416—417, 419.

Petitioner Reyes stated, similarly, that she is currently living with inadequate police protection, id., at 426, and sending her children to inferior schools, id., at 433.

Finally, petitioner Sinkler also said that in her current home, police protection is inadequate, id., at 443, there are no play areas for children, id., at 449, and the schools are totally inadequate. Id., at 454.

These are only summaries of the affidavits, which are quite specific in detailing the inadequacies of petitioners' current communities and the injuries suffered thereby as well as, in Ortiz' affidavit, the services provided by Penfield which would alleviate many of these problems.

[4]     Petitioner Broadnax said that because of the poor choice of housing available at her income, she was forced to rent an apartment which has 'many leaks in the roof, bad wiring, roach infestation, rat and mice infestation, crumbling house foundation, broken front door, broken hot water heater, etc.' Id., at 410. As a result, aside from the ordinary dangers such conditions obviously present, one son's asthma condition has been exacerbated. Id., at 413.

Petitioner Sinkler stated that, again because only housing in Rochester central city is available to moderate-income, minority people, she is living in a seventh-floor apartment with exposed radiator pipes, no elevator, and no screens, and violence, theft, and sexual attacks are frequent. Id., at 441—446.

Once again, the above are short summaries of long, detailed accounts of the harms suffered.

Instead, the Court insists that these petitioners' allegations are insufficient to show that the harms suffered were caused by respondents' allegedly unconstitutional practices, because 'their inability to reside in Penfield (may be) the consequence of the economics of the area housing market, rather than of respondents' assertedly illegal acts.' Ante, at 2209.

**\*\*2219** True, this Court has held that to maintain standing, a plaintiff must not only allege an injury but must also assert a "direct' relationship between the alleged injury **\*526** and the claim sought to be adjudicated,' Linda R.S. v. Richard D., 410 U.S. 614, 618, 93 S.Ct. 1146, 1149, 35 L.Ed.2d 536 (1973)—that is '(t)he party who invokes (judicial) power must be able to show . . . that he has sustained or is immediately in danger

of sustaining some direct injury as the result of (a statute's) enforcement.' _Massachusetts v. Mellon, 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078, (1923)_ (emphasis supplied); _Linda R.S., supra, 410 U.S., at 618, 93 S.Ct., at 1149._ But, as the allegations recited above show, these petitioners have alleged precisely what our cases require—that because of the exclusionary practices of respondents, they cannot live in Penfield and have suffered harm.[5]

[5] This case is quite different from Linda R.S. v. Richard D. In Linda R.S., the problem was that even if everything alleged were proved, it was still quite possible that petitioner's husband would not be prosecuted for nonsupport, or that, if prosecuted, he would still not contribute to his children's support. Nothing which could be proved at trial could possibly show otherwise. Here, if these petitioners prove what they have alleged, they will have shown that respondents' actions did cause their injury.

Thus, the Court's real holding is not that these petitioners have not alleged an injury resulting from respondents' action, but that they are not to be allowed to prove one, because 'realization of petitioners' desire to live in Penfield always has depended on the offorts and willingness of third parties to build low- and moderate-cost housing,' ante, at 2208, and 'the record is devoid of any indication that . . . (any) projects, would have satisfied petitioners' needs at prices they could afford.' Ante, at 2208—2209.

Certainly, this is not the sort of demonstration that can or should be required of petitioners at this preliminary stage. In SCRAP, supra, a similar challenge was made: it was claimed that the allegations were vague, _412 U.S., at 689 n. 15, 93 S.Ct., at 2417,_ and that the causation theory **\*527** asserted was untrue, _id., at 689, 93 S.Ct., at 2417._ We said: 'If * * * these allegations were in fact untrue, then the appellants should have moved for summary judgment on the standing issue and demonstrated to the District Court that the allegations were sham and raised no genuine issue of fact. We cannot say . . . that the appellees could not prove their allegations which, if proved, would place them squarely among those persons injured in fact.' _Id., at 689—690, 93 S.Ct., at 2417._[6] See also _Jenkins v. McKeithen, 395 U.S. 411, 421—422, 89 S.Ct. 1843, 1848—1849, 23 L.Ed.2d 404 (1969)._

[6] There is some suggestion made in the briefs that, by virtue of the inclusion in the record of affidavits and documents, the motion to dismiss was, under _Fed.Rule Civ.Proc. 12(b)_, converted into a Rule 56 motion for summary judgment. In terms, the portion of _Rule 12(b)_ concerning conversion to a Rule 56 motion applies only to a motion to dismiss for failure to state a cause of action, and not to a motion to dismiss for other reasons. At any rate, respondents filed no counter-affidavits proper under Rule 56(e), so, that even if Rule 56 were applied, respondents have not at this stage disproved the allegations.

Here, the very fact that, as the Court stresses, these petitioner's claim rests in part upon proving the intentions and capabilities of third parties to build in Penfield suitable housing which they can afford, coupled with the exclusionary character of the claim on the merits, makes it particularly inappropriate to assume that these petitioners' lack of specificity reflects a fatal weakness in their theory of causation.[7] Obviously **\*\*2220** they cannot be expected, **\*528** prior to discover and trial, to know the future plans of building companies, the precise details of the housing market in Penfield, or everything which has transpired in 15 years of application of the Penfield zoning ordinance, including every housing plan suggested and refused. To require them to allege such facts is to require them to prove their case on paper in order to get into court at all, reverting to the form of fact pleading long abjured in the federal courts. This Court has not required such unachievable specificity in standing cases in the past, see SCRAP, supra, and Jenkins, supra, and the fact that it does so now can only be explained by an indefensible determination by the Court to close the doors of the federal courts to claims of this kind. Understandably, today's decision will be read as revealing hostility to breaking down even unconstitutional zoning **\*529** barriers that frustrate the deep human yearning of low-income and minority groups for decent housing they can afford in decent surroundings, see nn. 3 and 4, supra.

[7] The Court, glancing at the projects mentioned in the record which might have been built but for the exclusionary practices alleged, concludes that petitioners Ortiz and Broadnax earned too little to afford suitable housing in them, and that petitioner Reyes earned to much. Ante, at 2209, n. 16. As the Court implicitly acknowledges, petitioner Sinkler at least may well have been able to live in the Better Homes Project. Further, there appears in the record as it stands a report of the Penfield Housing Task Force on Moderate Income _Housing, App. 487—581_, prepared for the Penfield Town Board itself, which defines 'moderate income families as families having incomes between $5,500 and $11,000 per year, depending on the size of the family,' id., at 492, and moderate-income housing as housing 'priced below $20,000 or (carrying) a rental price of less

than $150 a month,' id., at 493. See also, with respect to 'low income,' id., at 527. Thus, while the Court might not know what was meant by 'low' and 'moderate' income housing, ante, at 2203 n. 5, and 2209 n. 16, respondents clearly did. The petitioners here under discussion fell within the Board's own definition of moderate-income families, except for petitioner Reyes, who alleges that she could afford a house for $20,000 but not more. App. 428. And the Task Force Report does set out, id., at 503—516, changes in the zoning ordinance and its application which could result in housing which moderate-income people could afford, even to the extent of setting out a budget provided by a builder for a house costing $18,900, id., at 507. The causation theory which the Court finds improbable, then, was adopted by a task force of the Town Board itself. Of course, we do not know at this stage whether the particular named plaintiffs would certainly have benefited from the changes recommended by the task force, but at least there is a good chance that, after discovery and trial, they could show they would.

### III

#### *Associations Including Building Concerns*

Two of the petitioners are organizations among whose members are building concerns. Both of these organizations, Home Builders and Housing Council, alleged that these concerns have attempted to build in Penfield low- and moderate-income housing, but have been stymied by the zoning ordinance and refusal to grant individual relief therefrom.

Specifically, Home Builders, a trade association of concerns engaged in constructing and maintaining residential housing in the Rochester area, alleged that '(d)uring the past 15 years, over 80% of the private housing units constructed in the Town of Penfield have been constructed by (its) members.' App. 147. Because of respondents' refusal to grant relief from Penfield's restrictive housing statutes, members of Home Builders could not proceed with planned low- and moderate-income housing projects, id., at 157, and thereby lost profits. Id., at 156.

Housing Council numbers among its members at least 17 groups involved in the development and construction of low- and middle-income housing. In particular, one member, Penfield Better Homes, 'is and has been actively attempting to

develop moderate income housing in . . . Penfield.' (emphasis supplied), id., at 174, but has been unable to secure the necessary approvals. Ibid.

The Court finds that these two organizations lack standing to seek prospective **2221** relief for basically the same reasons: none of their members is, as far as the allegations show, currently involved in developing a particular *530 project. Thus, Home Builders, has 'failed to show the existence of any injury to its members of sufficient immediacy and ripeness to warrant judicial intervention,' ante, at 2214 (emphasis supplied), while 'the controversy between respondents and Better Homes, however vigorous it may once have been, (has not) remained a live, concrete dispute.' Ante, at 2215.

Again, the Court ignores the thrust of the complaints and asks petitioners to allege the impossible. According to the allegations, the building concerns' experience in the past with Penfield officials has shown any plans for low- and moderate-income housing to be futile for, again according to the allegations, the respondents are engaged in a purposeful, conscious scheme to exclude such housing. Particularly with regard to a low- or moderate-income project, the cost of litigating, with respect to any particular project, the legality of a refusal to approve it may well be prohibitive. And the merits of the exclusion of this or that project is not at the heart of the complaint; the claim is that respondents will not approve any project which will provide residences for low-and moderate-income people.

When this sort of pattern-and-practice claim is at the heart of the controversy, allegations of past injury, which members of both of these organizations have clearly made, and of a future intent, if the barriers are cleared, again to develop suitable housing for Penfield, should be more than sufficient. The past experiences, if proved at trial, will give credibility and substance to the claim of interest in future building activity in Penfield. These parties, if their allegations are proved, certainly have the requisite personal stake in the outcome of this controversy, and the Court's conclusion otherwise is only a conclusion that this controversy may not be litigated in a federal court.

I would reverse the judgment of the Court of Appeals.

**All Citations**

422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343

---

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

813 S.W.2d 481
Supreme Court of Texas.

Owen G. WEAVER and
Johnnie N. Weaver, Petitioners,
v.
SOUTHWEST NATIONAL BANK, Respondent.

No. D–0852.    |    June 5, 1991.    |
Rehearing Overruled Sept. 11, 1991.

Bank filed action against borrowers to recover deficiency judgment following nonjudicial foreclosure sale of two fourplexes. Borrowers counterclaimed alleging breach of contract, fraud, negligence, breach of fiduciary duty, and violations of Texas Deceptive Trade Practices Act. The District Court Number 201, Travis County, Jon N. Wisser, J., entered judgment for bank, and borrowers appealed. The Austin Court of Appeals, Third Supreme Judicial District affirmed and denied borrowers' motions for leave to file amended brief and for rehearing. Borrowers filed petition applying for writ of error. The Supreme Court held that an appellate brief which contained all points of error relied upon, arguments and authorities under each point of error, and all facts relied upon for the appeal with references to pages in the record where those facts could be found, but did not restate the facts and record references under each point of error, adequately complied with requirement that briefs include a fair, condensed statement of the facts.

Writ granted, judgment reversed and remanded.

West Headnotes (1)

**[1]    Appeal and Error**
    👉 Statement of Case or of Facts

    An appellate brief which contained all points of error relied upon, arguments and authorities under each point of error, and all facts relied upon for the appeal with references to pages in the record where those facts could be found, but did not restate the facts and record references under each point of error, adequately complied with requirement that briefs include a fair, condensed statement of the facts. Rules App.Proc., Rule 74(f, p).

17 Cases that cite this headnote

**Attorneys and Law Firms**

Jerry D. Porter, Austin, for petitioners.

Mark S. Cruzcosa, Robert E. Black, Austin, for respondent.

**Opinion**

PER CURIAM.

Southwest National Bank brought suit against Owen and Johnnie Weaver to recover a deficiency judgment following the nonjudicial foreclosure sale of two fourplexes. The Weavers counterclaimed, alleging breach of contract, fraud, negligence, breach of fiduciary duty, and violations of the Texas Deceptive Trade Practices Act by the bank. Trial was before a jury, which found that $113,526.46 was still owed to the bank. The jury also found that Southwest had materially breached its obligations under the notes, renewals, and deeds of trust; that Southwest failed to act in good faith; and that Southwest's failure to act in good faith was the proximate cause of damages to the Weavers. The trial court entered judgment in favor of Southwest, disregarding the adverse jury findings.

The Weavers appealed, presenting five points of error in their brief to the court of appeals. The brief submitted to the court of appeals consists of a preliminary statement of the case, a section entitled "Fact Statement," and a section containing each of the five points of error, with the argument and authorities supporting each point set forth thereunder. The "Fact Statement" section includes all facts relied upon for the appeal, with references to the pages in the record where each of the facts can be found. The Weavers did not restate under each point of error, the facts and record references contained in the "Fact Statement."

The court of appeals considered the merits of only one of the Weavers' five points of error, on the basis that the Weavers' brief was inadequate under Rule 74(f) of the Texas Rules of Appellate Procedure. The court overruled the one point of error considered on the merits, found that the Weavers waived a second point because of inadequate briefing, and, based upon its disposition of the first two points of error, refused to consider the remaining points. Within fifteen days of the issuance of the court of appeals' opinion, the Weavers

filed a motion for leave to file an amended brief and tendered an amended brief to the court of appeals. The court denied the Weavers' request for leave to file the amended brief. The Weavers filed a motion for rehearing in the court of appeals, and that motion was denied as well.

Rule 74(f) of the Texas Rules of Appellate Procedure provides that an appellant's argument shall include:

> (1) a fair, condensed statement of the facts pertinent to such points, with reference to the pages in the record where the same may be found; and

> (2) such discussion of the facts and authorities relied upon as may be requisite to maintain the point at issue.

Subsection (p) of Rule 74 states that the briefing rules are to be construed liberally and that substantial compliance with the rules will suffice in the interests of justice. Tex.R.App.P. 74(p). In the case of a flagrant violation of the briefing rules, the court may require the party to rebrief. *Id*.

The brief the Weavers filed in the court of appeals contains all points of error relied upon, argument and authorities under each point of error, and all facts relied upon for the appeal with references to the pages in the record where those facts can be found. The only "inadequacy" of the brief is the Weavers' failure to restate the facts and record references under each point of error.

A majority of the court concludes that the Weavers complied with the briefing requirements of Rule 74(f) of the Texas Rules of Appellate Procedure. Therefore, we grant petitioner's application for writ of error, and, without oral argument, reverse the judgment of the court of appeals and remand for consideration of the four points **\*483** of error that the court of appeals has not considered on the merits.

**All Citations**

813 S.W.2d 481

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

302 S.W.3d 314
Court of Appeals of Texas,
Houston (14th Dist.).

Dawn Johnson WHATLEY, Individually and as
Executrix of The Estate of Perry Lee Whatley,
Deceased, and Michael Easton, Appellants,
v.
Mylus James WALKER, Jr., Jeanie Anderson,
and Robert Daniel Whatley, Appellees.

No. 14–06–00970–CV.    |    June 18, 2009.
|    Rehearing En Banc Overruled Jan. 14, 2010.

**Synopsis**
**Background:** Niece and nephew initiated a guardianship
proceeding, seeking a guardianship over the person and estate
of their 82 year old uncle, to which uncle and his wife of
four months filed responses opposing the application and
requesting in the alternative the appointment of new wife
as the guardian. The Probate Court No. 2, Harris County,
Michael James Wood, J., signed an order finding uncle
incapacitated and appointing niece as the permanent guardian
of his person and a third party as the permanent guardian of
uncle's estate appealed. Uncle appealed and, after he died,
his wife was added, individually and as executrix of uncle's
estate, as an appellant.

**Holdings:** The Court of Appeals, Adele Hedges, C.J., held
that:

[1] probate court's jurisdiction over uncle, his estate, and wife
as executor, was invoked by service of citation;

[2] attorney ad litem and temporary guardian waived service
of citation even if it were required for them;

[3] termination of guardianship appointments did not mean
entire proceeding was terminated so as to deprive probate
court of jurisdiction;

[4] trial level judge could rule on a motion to recuse probate
judge notwithstanding existence of direct appeal on another
matter in case;

[5] visiting judge's order denying motion to recuse the judge
was not void although signed outside county seat;

[6] purported assignee from ward who was not a party to
guardianship proceedings had no standing to file motion to
recuse judge; and

[7] probate judge's error in ruling himself on motion to
disqualify him did not require reversal where movant was not
a party.

Affirmed.

West Headnotes (20)

**[1]    Guardian and Ward**
 Review

On death of ward, any appeal of the order
appointing a permanent guardianship over his
person had become moot, but because there was
a continuing dispute over who should settle the
estate, his death did not moot the issue of the
guardianship of his estate.

1 Cases that cite this headnote

**[2]    Appeal and Error**
 Cases Triable in Appellate Court

A trial court's jurisdiction is a question of law
an appellate court reviews de novo by examining
the pleadings and any other evidence relevant
to the determination. Vernon's Ann.Texas Rules
Civ.Proc., Rule 124.

Cases that cite this headnote

**[3]    Guardian and Ward**
 Application, parties, and notice

Failure to serve a proposed ward with citation
is jurisdictional, and a court's subsequent order
appointing a guardian without proper service on
the ward is void. V.A.T.S. Probate Code, § 633.

3 Cases that cite this headnote

**[4]    Guardian and Ward**
 Application, parties, and notice

The Probate Code prohibits waiver of service by the proposed ward in a guardianship proceeding, but permits waiver of citation by other persons entitled to service of process. V.A.T.S. Probate Code, § 633(e).

1 Cases that cite this headnote

**[5]    Guardian and Ward**
    Application, parties, and notice

Probate court's jurisdiction over 82 year old uncle, and his estate and wife as executor, was properly invoked in guardianship proceeding initiated by his niece and nephew; after several attempts to locate uncle, he was personally served with citation by a constable in a Massachusetts hospital, and wife was personally served with citation by a constable. V.A.T.S. Probate Code, § 633.

1 Cases that cite this headnote

**[6]    Guardian and Ward**
    Application, parties, and notice

Attorney ad litem and temporary guardian waived service of citation even if it had been required for them, by filing multiple pleadings and personally appearing before the probate court without objecting to any lack of service of citation, in guardianship proceeding for 82 year old uncle initiated by his niece and nephew. V.A.T.S. Probate Code, § 633.

Cases that cite this headnote

**[7]    Guardian and Ward**
    Jurisdiction of courts

**Guardian and Ward**
    Removal

Termination of guardianship appointments did not mean that the entire proceeding was terminated or that the application for a guardianship had been dismissed, so as to deprive probate court of jurisdiction over the parties to make new appointments, although judge did refer at the next hearing to "new guardianship proceedings"; neither a nonsuit nor other order to terminate or remove the cause

from the lower court's docket was signed, and the proceeding maintained the same cause number.

Cases that cite this headnote

**[8]    Courts**
    Review and vacation of proceedings

**Judges**
    Determination of objections

Judge assigned to rule on motion by uncle's wife to recuse probate judge hearing niece's and nephew's guardianship proceeding concerning uncle, could rule on the motion to recuse notwithstanding the existence of direct appeal, inasmuch as the direct appeal involved a claim by wife that the Probate Court had no jurisdiction over the person and estate of uncle because of an alleged lack of personal service of citation; in other words, the lower court could continue its Probate Court duties because the appeal did not involve those actions.

Cases that cite this headnote

**[9]    Judges**
    Determination of objections

Visiting judge's order denying a guardianship litigant's motion to recuse the probate judge was effective and not void, although the order reflected that the judge signed it in a city other than the county seat; the judge did not conduct any proceedings outside of the county seat.

1 Cases that cite this headnote

**[10]    Judges**
    Determination of objections

Probate litigant's motion to disqualify judge, as the fourth motion filed by her against him, satisfied the definition of a tertiary recusal motion and did not prevent judge from moving the case to final disposition as though a tertiary recusal motion had not been filed, as provided by Practice and Remedies Code. V.T.C.A., Civil Practice & Remedies Code § 30.016.

Cases that cite this headnote

**[11]  Judges**
  👉 Determination of objections

Probate judge's error in ruling himself on a motion to recuse him did not require vacating of final order in guardianship proceeding, where the judge's only actions thereafter were to "move the case to final disposition as though a tertiary recusal motion had not been file" as allowed under the Practice and Remedies Code after a tertiary recusal motion was filed, while the final order appealed from in the case was not signed during pendency of the recusal motion which was ultimately sustained. V.T.C.A., Civil Practice & Remedies Code § 30.016(e).

Cases that cite this headnote

**[12]  Judges**
  👉 Objections to Judge, and Proceedings Thereon

Purported assignee from ward's wife who was not a party to guardianship proceedings in probate court had no standing to file a motion to recuse any judge in the guardianship proceeding, and thus the judge was not required to rule on the ineffective motion, regardless of whether the assignee had capacity to sue; assignee had no standing in the case because there was no real controversy between him and the guardian of estate with respect to the guardianship itself that would be determined in the guardianship proceeding. Vernon's Ann.Texas Rules Civ.Proc., Rule 18a.

Cases that cite this headnote

**[13]  Judges**
  👉 Objections to Judge, and Proceedings Thereon

A motion to recuse filed by a non-party does not satisfy rule permitting parties to file such motions, and thus need not be referred before proceeding with the case. Vernon's Ann.Texas Rules Civ.Proc., Rule 18a.

Cases that cite this headnote

**[14]  Appeal and Error**
  👉 Nature or Form of Remedy

Probate judge's error in ruling himself on a motion to disqualify him in his capacity as an individual judge and as the administrative judge did not require reversal, where the purported assignee of ward's wife who filed the motion was not a party to the proceedings and thus had no standing to file the motion. V.T.C.A., Government Code § 74.057(a); Vernon's Ann.Texas Rules Civ.Proc., Rule 18a(g).

Cases that cite this headnote

**[15]  Contempt**
  👉 Notice or other process; attachment

  **Judges**
  👉 Effect on acts and proceedings of judge

Probate court's show-cause order issued against assignee of claims of wife of ward in guardianship proceedings, for violating judge's order to not send ex parte email to the judge's personal email address was not void based on any motions to recuse pending against the judge, and assignee had no right to relief because he was never held in contempt, suffered no adverse ruling, nor could he suffer an adverse ruling because the writ of attachment had expired. Vernon's Ann.Texas Rules Civ.Proc., Rule 18a(d).

Cases that cite this headnote

**[16]  Attachment**
  👉 Service of writ or warrant

A writ of attachment that is not served before it expires becomes "functus officio," meaning it is without legal force or effect.

Cases that cite this headnote

**[17]  Guardian and Ward**
  👉 Review

Any claim made by assignee of wife of ward in guardianship proceedings, regarding a writ of attachment issued against him by the judge

for violating an order to not send ex parte email to the judge's personal email address, was moot; there was no adverse ruling against the assignee, the judge never held assignee in contempt nor assessed any punishment, and the writ of attachment was returned to the court unserved and expired.

Cases that cite this headnote

**[18] Guardian and Ward**
👉 Review

Any alleged error of judge in issuing a writ of attachment against an assignee of the wife of a ward in guardianship proceedings, for violating the judge's order to not send ex parte email to the judge's personal email address, was harmless, inasmuch as there had been no rendition of an improper judgment against assignee. Rules App.Proc., Rule 44.1(a)(1).

Cases that cite this headnote

**[19] Costs**
👉 Nature and Grounds of Right

Sanctions would be denied against a probate judge that were based on a claim that the judge "lied" to the Court of Appeals in his opposition to a motion to dismiss by his assertion that appellants, who were the wife of a ward in guardianship proceedings and wife's assignee of certain claims, did not have record support for their argument, although it was true that some of the items the judge claimed were missing from the record were in fact in it; clerk's record in case was large, voluminous, and convoluted, with 17 volumes, most of which were groups of supplemental volumes with indices only in the first volume, while many documents were attachments, such that it was easy to overlook documents in such a record.

1 Cases that cite this headnote

**[20] Appeal and Error**
👉 Matters not included or shown in general

Appointment of a special master to conduct a hearing into the truth of assertions contained in

affidavits filed in response to motions on appeal was unnecessary, in an appeal disposed of on the basis of the record only, inasmuch as any alleged misstatements contained in documents outside the appellate record were irrelevant to the issues on appeal.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*317** Peter J. Riga, Michael Easton, Houston, TX, for appellants.

Mylus James Walker Jr., pro se.

Kevin F. Risley, Houston, TX, Roy L. Fuller, Baytown, TX, for appellees.

Panel consists of Chief Justice HEDGES and Justices YATES and BROWN.

**\*318 OPINION**

ADELE HEDGES, Chief Justice.

This is an appeal from the probate court's final order appointing a guardian over the person and estate of Perry Lee Whatley ("Perry"). Perry died after the probate court signed the final order at issue in this appeal, and his widow, Dawn Johnson Whatley ("Dawn"), individually and as the executrix of Perry's estate, now challenges that final appointment order. Dawn raises four procedural issues challenging the probate court's jurisdiction to sign the final order of appointment. Appellee, Michael Easton ("Easton"), who claims to be an assignee of certain claims not before this Court, challenges a show-cause order signed by the probate court against him. We affirm.

**I. BACKGROUND**

This case has a complex and lengthy history. There have been multiple mandamus proceedings and a direct appeal from prior orders signed by the probate court.[1] We discuss only the portion of the case history that is relevant to the issues before us.

[1] Additionally, the parties in this case have filed other litigation against each other in both state and federal court, some of which are still pending. Those related causes have been assigned different cause numbers. *See In re Easton,* Nos. 01–07–00488–CV, 01–07–00490–CV, 2007 WL 1953883 (Tex.App.-Houston [1st Dist.] July 6, 2007, orig. proceeding) (mem. op.); *In re Norman,* 14–06–00488–CV, 2006 WL 2947845 (Tex.App.-Houston [14th Dist.] Oct. 13, 2006, orig. proceeding) (mem. op.); *In re Whatley,* 14–06–00843–CV, 2006 WL 2882789 (Tex.App.-Houston [14th Dist.] Oct. 12, 2006, orig. proceeding) (mem. op.); *In re Whatley,* 14–06–00079–CV, 2006 WL 2771879 (Tex.App.-Houston [14th Dist.] Sept. 28, 2006, no pet.) (mem. op.); *In re Whatley,* 14–06–00699–CV, 2006 WL 2689701 (Tex.App.-Houston [14th Dist.] Sept. 21, 2006, orig. proceeding) (mem. op.); *In re Easton,* 203 S.W.3d 438 (Tex.App.-Houston [14th Dist.] 2006, orig. proceeding); *In re Whatley,* No. 14–05–01222–CV, 2006 WL 2257399 (Tex.App.-Houston [14th Dist.] Aug. 8, 2006, orig. proceeding) (supp. mem. op. on reh'g.); *In re Whatley,* 14–05–01222–CV, 2006 WL 1490161 (Tex.App.-Houston [14th Dist.] June 1, 2006, orig. proceeding) (mem. op.), *withdrawn and superceded by, In re Whatley,* No. 14–05–01222–CV, 2006 WL 2948230 (Tex.App.-Houston [14th Dist.] Oct. 13, 2006, orig. proceeding) (mem. op.); *In re Whatley,* No. 14–05–00826–CV, 2005 WL 3005730 (Tex.App.-Houston [14th Dist.] Nov. 10, 2005, orig. proceeding) (mem. op.). Because these related causes do not impact our disposition, we do not address the issues raised in those causes. The instant appeal involves only the guardianship orders specifically challenged in the notice of appeal under cause no. 355,095.

On April 15, 2005, Jeanie Anderson ("Jeanie") and Robert Daniel Whatley ("Robert") initiated this guardianship proceeding under Section 682 of the Texas Probate Code, seeking a guardianship over the person and estate of their 82 year-old uncle, Perry. On May 10, 2005, Perry and Dawn, his wife of four months, filed responses opposing the application and requesting in the alternative the appointment of Dawn as Perry's guardian. Beginning in August 2005, Dawn began a series of motions to recuse and disqualify the probate court judge, Michael Wood, as well as the administrative judge, Guy Herman. Initially, Dawn filed motions against Judge Wood on August 3, 2005 (amended on August 8, 2005), September 9, 2005, and September 12, 2005. The case was also removed to federal court several times and remanded back to the probate court.

On September 29, 2005, Judge Wood appointed appellee, Mylus James Walker, Jr. ("Walker"), as the temporary guardian over the person and estate of Perry. On October 13, 2005, Judge Wood signed an order reaffirming the appointment of **\*319** Walker as Perry's temporary guardian. On December 12, 2005, Dawn filed a petition for writ of mandamus with this court challenging Judge Wood's September and October 2005 orders (collectively "temporary guardianship orders"). Two days later, on December 14, 2005, Judge Wood signed a final order appointing Walker as the permanent guardian of Perry's estate and Jeanie permanent guardian over Perry's person ("permanent guardianship order"). Dawn and Perry filed a direct appeal attacking the permanent guardianship order.

On June 1, 2006, this court granted mandamus relief on Dawn's December 12, 2005 petition for writ of mandamus.[2] In the mandamus proceeding, this court reviewed the temporary guardianship orders as well as the permanent guardianship order. We concluded that Judge Wood erroneously signed all three orders while a motion to recuse Judge Wood was pending. We further concluded that the September 29, 2005 temporary guardianship order was signed after the case had been removed to federal court. Accordingly, we declared all three appointment orders void.[3] On June 6, 2006, five days after we issued our mandamus opinion on the appointment orders, Judge Gladys Burwell, the judge assigned to hear the pending motion to recuse Judge Wood, denied the September 9, 2005 recusal motion.[4] On September 28, 2006, the direct appeal challenging the permanent guardianship order was dismissed in light of our mandamus opinion declaring the order void. *See In re Whatley,* No. 14–05–1222–CV, 2006 WL 2948230 (Tex.App.-Houston [14th Dist.] Oct. 13, 2006, orig. proceeding).

[2] *See In re Whatley,* 2006 WL 1490161. This opinion was supplemented and later withdrawn and superceded by our October 13, 2006 memorandum opinion nunc pro tunc. *See In re Whatley,* 2006 WL 2948230.

[3] In our memorandum opinion nunc pro tunc that superseded the June 2006 memorandum opinion, we affirmed once more that the appointment orders were void, concluding that "the orders signed by Judge Wood on September 29, 2005, October 13, 2005, and December 14, 2005, are void. Additionally, the September 29, 2005, order issued by Judge Wood is void because Judge Wood

had no jurisdiction to enter it while the case was removed to federal court." *Whatley,* 2006 WL 2948230, at \*4.

4    In light of Judge Burwell's ruling, Walker and Ray Black, attorney ad litem for Perry, filed motions for rehearing in the mandamus proceeding. The rehearing motions were denied, and we issued a supplemental opinion confirming that Judge Wood had erroneously signed the appointment orders while a recusal motion remained pending. Shortly after we issued our opinion, Dawn filed another motion to disqualify Judge Wood. Dawn also filed a motion to disqualify Judge Herman on July 21, 2006, and Easton filed a motion to disqualify Judge Herman on April 27, 2006. On August 13, 2006, Dawn filed another motion to disqualify Judge Wood.

Judge Wood set the case for a final hearing and notified the parties of the hearing date, which was set for October 16, 2006.[5] As scheduled, Judge Wood conducted the final hearing on October 16, 2006. Neither Dawn nor Perry, nor their counsel, appeared at this hearing.[6] After considering the evidence, Judge Wood signed an order finding Perry incapacitated and appointing Jeanie the permanent guardian of Perry's person and Walker the permanent guardian of Perry's estate. Jeanie timely filed a motion to modify the final appointment order to include a finding, pursuant to **\*320** Texas Rule of Civil Procedure 18a, that good cause existed to proceed with trial even if a motion to recuse remained pending. On January 11, 2007, the trial court signed a modified appointment order that included a "good cause" finding ("final appointment order"). Perry, Dawn, and Easton filed a notice of appeal challenging, among other orders, the final appointment order.

5    On October 13, 2006, this Court issued its mandate in the direct appeal so that the hearing scheduled for October 16, 2006 could go forward.

6    The attorney ad litem served the order setting the hearing on counsel for Perry and Dawn.

On January 16, 2007, Perry, Dawn, and Easton filed an amended notice of appeal and a motion for new trial, which included another motion to recuse Judge Wood. On February 14, 2007, Perry died, and Dawn, thereafter, filed a second amended notice of appeal, removing Perry as an appellant and adding Dawn, individually and as executrix of Perry's Estate, as an appellant.[7] Dawn then either joined or filed two additional motions to recuse Judge Wood, on April 19, 2007 and November 17, 2007.[8] On February 5, 2008, Judge Olen Underwood signed an order recusing Judge Wood from the

case. The crux of this appeal involves the propriety of Judge Wood's final appointment order signed January 11, 2007 and other orders signed prior to his recusal.

7    In the Second Amended Notice of Appeal, Dawn is listed individually and as executrix of Perry's estate, and Perry is no longer listed as a party.

8    The recusal motions that were filed after the final appointment order were amended or supplemented on January 4, 2008, January 8, 2008, and January 27, 2008.

## II. ISSUES PRESENTED [9]

9    Dawn and Easton jointly raise four issues in their brief. However, as explained in detail below, only Dawn has standing and an interest in issues one through three, while only Easton has standing to raise the fourth issue.

Dawn does not challenge the probate court's finding that Perry was incapacitated or its selection of the guardian. Instead, Dawn brings three procedural issues challenging the probate court's authority to sign the final appointment order. Dawn states the following three issues on appeal:

1. Did the Probate Court ever acquire jurisdiction over the person and the estate of Perry Lee Whatley which allowed it to appoint a temporary, and then permanent, guardian?

2. Could a disqualified trial judge in exercising "discretion" enter a new judgment one working day after he reacquired jurisdiction, as the case was in the Court of appeals until October 13, 2006?

3. Could a visiting Judge overrule his own motion to recuse and disqualify and then enter orders and judgments from outside the County seat?

Easton has challenged a show-cause order signed by Judge Wood addressing emails allegedly sent by Easton and states the following as his issue for this appeal:

> Can a trial judge be a witness, an accuser, a prosecutor, and the fact-finder in a case of criminal contempt; then, after admitting that the person he is personally accusing of the contempt was not served with a show cause order, can that judge issue a writ of attachment commanding the

arrest of the accused without bond—in violation of both the State and the Federal Constitutions—and while the judge is laboring under constitutional disqualification?

### III. ANALYSIS [10]

[10]    We note that, due to the death of Perry, any appeal of the order appointing a permanent guardianship over his person has become moot. *Zipp v. Wuemling,* 218 S.W.3d 71, 74 (Tex.2007). Because there is a continuing dispute over who should settle the estate, however, Perry's death does not moot the issue of the guardianship of his estate. *Id.* Accordingly, we dismiss the issues and arguments relevant to guardianship over the person of Perry.

 [1]    In her first issue, Dawn challenges the probate court's jurisdiction to sign the  **\*321**  final order of appointment and any other orders by claiming that Perry, Dawn, Walker, and Black were not properly served.

#### A. Service of Process

 [2]    Before a court may enter judgment against a party, the court must have obtained jurisdiction over that party pursuant to applicable rules or statutes. *See* Tex.R. Civ. P. 124; *Ross v. Nat'l Center for the Employment of the Disabled,* 197 S.W.3d 795, 796–97 (Tex.2006); *Vance v. Davidson,* 903 S.W.2d 863, 866 (Tex.App.-Houston [14th Dist.] 1995, orig. proceeding). A trial court's jurisdiction is a question of law an appellate court reviews *de novo* by examining the pleadings and any other evidence relevant to the determination. *In re Erickson,* 208 S.W.3d 737, 740 (Tex.App.-Texarkana 2006, no pet.). In general, jurisdiction over a party is acquired by voluntary appearance, service of process as provided by law, or waiver of service. *See* Tex.R. Civ. P. 124 ("In no case shall judgment be rendered against any defendant unless upon service, or acceptance or waiver of process, or upon an appearance by the defendant, as prescribed in these rules, except where otherwise expressly provided by law or these rules."); *Werner v. Colwell,* 909 S.W.2d 866, 869–70 (Tex.1995).

 [3]    [4]    In addition to the civil service of process requirements articulated under the civil procedure rules, the Probate Code prescribes further service requirements specific to guardianship proceedings. Specifically, Section 633 of the Probate Code provides in relevant part:

(a) On the filing of an application for guardianship, notice shall be issued and served as provided by this section.

...

(c) The sheriff or other officer shall personally serve citation to appear and answer the application for guardianship on:

(1) a proposed ward who is 12 years of age or older;

...

(3) any court-appointed conservator or person having control of the care and welfare of the proposed ward;

(4) a proposed ward's spouse if the whereabouts of the spouse are known or can be reasonably ascertained; and

(5) the person named in the application to be appointed guardian, if that person is not the applicant.

Tex. Prob.Code § 633(a), (c). Failure to serve the proposed ward with citation is jurisdictional, and a court's subsequent order appointing a guardian without proper service on the ward is void. *See In re Erickson,* 208 S.W.3d at 740 ("only through compliance with Section 633 of the Texas Probate Code is the trial court's jurisdiction invoked"). The Code further provides that a person *other than the proposed ward* may waive receipt of notice or the issuance and personal service of citation. Section 633(e) provides:

> A person other than the proposed ward who is entitled to receive notice or personal service of citation under Subsections (c) and (d) of this section may choose, in person or by attorney ad litem, **\*322** by writing filed with the clerk, to waive the receipt of notice or the issuance and personal service of citation.

Tex. Prob.Code § 633(e). The Probate Code prohibits waiver of service by the proposed ward, but permits waiver of citation by other persons entitled to service of process. *See id*.

[5] Dawn argues that the probate court never invoked jurisdiction over herself, Perry, Ray Black, or Walker because they were not properly served. With respect to Perry, the record reflects that after several attempts to locate him, he was personally served with citation by a constable on September 20, 2005 in a Massachusetts hospital. Likewise, the record before us reflects that Dawn was personally served with citation by a constable on May 11, 2005. Thus, the probate court's jurisdiction over Perry and his estate was properly invoked.

[6] Moreover, Black, the attorney ad litem, was not required to be served because he did not fall within the list of those upon whom citation must be served. *See* Tex. Prob.Code Ann. § 633(c)(1)-(5). Likewise, Walker was not required to be served because he was not "the person named in the application to be appointed guardian." Tex. Prob.Code Ann. § 633(c)(4), (5). Even if Black and Walker were required to be served, however, both Black and Walker filed multiple pleadings with, and personally appeared before, the probate court without objecting to any lack of service of citation. A general appearance in the case is a waiver of service of process. *See* Tex.R. Civ. P. 121 (stating that an answer shall constitute an appearance "so as to dispense with the necessity for the issuance or service of citation"); *Adcock v. Sherling,* 923 S.W.2d 74, 79 (Tex.App.-San Antonio 1996, no pet.). The lower court, therefore, had jurisdiction to hold the guardianship hearing.

### B. "Second" Guardianship Proceeding

Although her briefing is not entirely clear, Dawn appears to additionally argue that the probate court lacked jurisdiction over the parties in this case because our opinion voiding the temporary guardianship orders and permanent guardianship order of December 14, 2005 terminated the guardianship proceeding that was originally filed on April 15, 2005 and in turn, created a second guardianship proceeding requiring service of process, once again, on Perry, Dawn, Black, and Walker. To support this particular argument, Dawn relies on a letter dated October 19, 2006 and statements made by Judge Wood at the August and October 2006 hearings.

On October 19, 2006, Judge Wood sent a letter to this Court notifying us that he was in receipt of our mandamus opinion, and states in relevant part:

> All parties have given full effect to the June 1, 2006 Order. The guardianship terminated that day. Neither the guardian nor the attorney ad litem for the ward have seen him since that day; the ward's present whereabouts and condition are unknown.

[7] Dawn also points to statements made by Judge Wood at the August and October 2006 hearings that the case was a "new guardianship proceeding." We do not interpret either statement to mean that the entire proceeding was terminated or that the application for a guardianship had been dismissed. Instead, Judge Wood indicated that the guardianship *appointments* had been terminated. The probate court's statements in the letter simply reassured this Court that the probate court was in compliance with our ruling set forth in the mandamus opinion. Additionally, neither a nonsuit nor other order to terminate or remove the cause from the lower **\*323** court's docket was signed, and the proceeding maintained the same cause number, 355,095.

Accordingly, the probate court had jurisdiction over Perry, Dawn, Black, and Walker in cause number 355,095, the only guardianship proceeding before the lower court.[11] We overrule Dawn's first issue.

11    Without citing relevant authority, Dawn insists that the mandamus proceeding voided any order by the probate court from September 9, 2005 forward. Such statement misrepresents our mandamus opinion. We held that the mandamus proceeding resulted in the declaration that three orders of the probate court, the temporary appointment order, the order reaffirming the temporary appointment, and the permanent appointment order, were void. *In re Whatley,* 2006 WL 2948230, at \*4. This Court did not declare all subsequent orders in the proceeding void.

### C. Ruling on the Motion to Recuse While The Direct Appeal Was Pending

In her second issue, Dawn challenges Judge Burwell's authority to rule on the September 9, 2005 motion to recuse Judge Wood on the following bases: (1) Judge Burwell lacked authority to deny the motion to recuse while the direct appeal

remained pending with this Court; (2) there was not an order of assignment authorizing Judge Burwell to rule on the motion; (3) Judge Burwell acknowledged in an affidavit that her involvement in the case terminated on November 3, 2005; and (4) Judge Burwell erroneously signed the recusal order outside of the county seat.

**1.** *The Pending Appeal*

Dawn is correct that there was a direct appeal filed from the probate court's December 14, 2005 order appointing a guardian. In dismissing that appeal, this Court held that we lacked jurisdiction over the appeal because the December 14, 2005 order was declared void in our prior mandamus proceeding. *In re Guardianship of Whatley,* No. 14–06–0079–CV, 2006 WL 2771879 (Tex.App.-Houston [14th Dist.]. Sept. 28, 2006, no pet.) (mem. op.). Dawn relies on the general rule that once an appeal is perfected, an appellate court, with certain exceptions, has exclusive jurisdiction over the cause. *See, e.g., Saudi v. Brieven,* 176 S.W.3d 108, 113–14 (Tex.App.-Houston [1st Dist.] 2004, pet. denied). However, the cases on which Dawn relies do not support the proposition that a trial court has no authority to continue probate proceedings while a voided order is appealed in a separate appeal. These cases are not on point, and under our set of facts, do not mandate that a probate court's authority is so restricted.

In a proceeding governed by the Texas Probate Code, there are often multiple phases and stages of the case that must be resolved. This fact has often made it difficult for courts and parties to determine when a final order has been entered that can be appealed. *See DeAyala v. Mackie,* 193 S.W.3d 575, 578 (Tex.2006)* (noting justification for allowing review of intermediate decisions in probate case so that error does not harm later phases of proceeding). In a guardianship case, in particular, there are multiple stages to the proceeding, and the appointed guardian and probate court have continuing duties even after an appeal is filed. *See, e.g.,* Tex. Prob.Code § 655 (pending appeal from order appointing a guardian, appointee shall continue to act as guardian and shall continue prosecution of pending suit in favor of guardianship); Tex. Prob.Code § 671(a), (b) (judge has duty to examine, at least annually, well-being of ward); Tex. Prob.Code § 672 (court must review annually whether guardianship should be continued, modified, or terminated).

 **\*324** **[8]** The facts of this case are similar to those in *Mellinger v. Nicholson,* 142 S.W.2d 307 (Tex.Civ.App.-Galveston 1940, writ dism'd judgm't cor.). In *Mellinger,* the

county court sitting in probate appointed an administrator of the estate of the deceased. 142 S.W.2d at 307. The administrator later filed an application to resign. *Id.* at 307–08. The county court accepted the resignation, approved the administrator's final accounting, and ordered the estate turned over to another individual. *Id.* at 308. Certain parties interested in the estate appealed the county court's order to the district court. *Id.* While the appeal was pending, the county court appointed a successor administrator, who later resigned, and then appointed another temporary and permanent administrator. *Id.* On appeal, the question before the court was whether the lower court had the "authority, power, and jurisdiction" to appoint the successor administrator. *Id.* at 309. The court found that it did because, *inter alia,* the appeal did not involve the validity of the resignation of the prior administrator but only the acceptance of the final account and his discharge from liability. *Id.* In other words, the lower court could continue its probate court duties because the appeal did not involve those actions.

Likewise, Judge Burwell could rule on the September 9, 2005 motion to recuse notwithstanding the existence of the direct appeal. The direct appeal did not involve the September 9, 2005 motion to recuse on which Judge Burwell ruled. The direct appeal involved a claim by Dawn that the probate court had no jurisdiction over the person and estate of Perry because of an alleged lack of personal service of citation. We hold that, under the unique facts of this case, Judge Burwell could rule on the September 9, 2005 motion. *See id.*

**2.** *Order of Assignment to Judge Burwell and Her Affidavit.*

Contrary to Dawn's argument, Judge Burwell acted pursuant to a valid order of assignment. Shortly after the September 9, 2005 motion to recuse was filed, Judge Steve King, Presiding Judge of the Statutory Probate Courts of Texas, issued a Minute Order assigning Judge Burwell to hear the September 9, 2005 motion. The order of assignment expressly states:

> IT IS THEREFORE ORDERED that the HONORABLE GLADYS B. BURWELL, Statutory Probate Judge of the Probate Court of Galveston County, Texas, is hereby assigned to hear [Perry Lee Whatley and Dawn Johnson Whatley's Motion to Disqualify/Recuse The Honorable Mike Wood] in the above-referenced and numbered cause with all rights,

powers and privileges held by the regular judge of the court assigned.

The order does not impose a deadline or time limit for Judge Burwell to rule on the motion to recuse. The order remained in force at the time Judge Burwell ruled on the September 9, 2005 motion. Therefore, there was a valid order of assignment authorizing Judge Burwell to rule on the recusal motion.

Dawn, however, does not acknowledge Judge King's order of assignment, but relies on an affidavit filed by Judge Burwell on March 1, 2006, which states that she was appointed on September 9, 2005 and September 12, 2005 to preside over a motion to recuse and that she ruled on November 2, 2005. Although Judge Burwell thought, at the time this affidavit was drafted, that she had completed her rulings, our court issued an opinion in the mandamus proceeding finding that she had ruled only on the September 12, 2005 motion. After our opinion issued, Judge Burwell ruled on the September 9, 2005 motion. The affidavit of Judge Burwell does not establish that her appointment to hear the September 9, 2005 motion had lapsed; **\*325** it establishes only that she was mistaken as to whether both motions had been ruled upon. Her subsequent ruling on the September 9, 2005 motion acknowledges this fact and was permitted by the Minute Order appointing her to hear the motion.

### 3. *Signing the Order in Clear Lake*

 **[9]** Finally, Dawn argues that Judge Burwell's order denying the September 9, 2005 motion was not effective because the order reflects that she signed the order in Clear Lake City, Texas, outside the county seat. This argument is also without merit. Because the record reflects that Judge Burwell did not conduct any proceedings outside of the county seat, her order is not void.

In *Mellon Service Co. v. Touche Ross & Co.,* this Court addressed whether a visiting judge assigned to hear a case in Harris County, Texas could hear oral argument on a motion for summary judgment in Galveston County, Texas consistent with article V, § 7 of the Texas Constitution. 946 S.W.2d 862, 863 (Tex.App.-Houston [14th Dist.] 1997, no writ). We held that a summary judgment hearing met the definition of a proceeding for purposes of article V, § 7 and thus had to be conducted in the county seat. *Id*. at 869. However, in *Burns v. Bishop,* we clarified what acts constitute article V, § 7 proceedings that must be heard in the county seat. 48 S.W.3d 459, 464 (Tex.App.-Houston [14th Dist.] 2001, no pet.). We

explained that not every act taken or thought pondered by a visiting or assigned judge must be carried out in the county seat. *Id*. "We do not believe *Mellon* means to include mental processes of judges in its interpretation of 'proceedings.' " *Id*. Nor does it include the task of signing orders on motions. *Id*. at 465. "Appellants's interpretation of 'proceedings' would require the State of Texas to pay judges to travel from county to county merely to sign their names or to review copies that could be delivered, faxed, or e-mailed." *Id*. The record reflects that Judge Burwell signed an order denying the motion from Clear Lake City. Judge Burwell was not required to be at the county seat at the time she signed the order denying the September 9, 2005 motion to recuse. *See id*.

Judge Burwell had the authority to rule on the September 9, 2005 motion to recuse. She denied that motion on June 6, 2006. We overrule Dawn's second issue.

### D. *Judge Herman's Rulings On His Motions to Recuse and Disqualify*

In her third issue, Dawn argues that Judge Guy Herman erred when he ruled on the motion to disqualify filed against him by Dawn and the motion to recuse filed by Easton. Dawn further contends, without explanation, that the error is dispositive of the appeal.

### 1. *Dawn's Motion to Disqualify Judge Herman*

Dawn filed a motion to disqualify Judge Herman in his capacity as an individual judge and as the administrative judge on July 21, 2006. Judge Herman dismissed the motion on July 27, 2006 on the basis that the motion was procedurally defective. Judge Herman determined that the motion was untimely filed and that there was no statutory authority to disqualify the Presiding Judge of the Statutory Probate Courts in his administrative capacity.

This Court recently addressed a similar issue in *Guilbot v. Estate of Vallejo,* 267 S.W.3d 556 (Tex.App.-Houston [14th Dist.] 2008, pet. filed). *Guilbot* also involved an order of Judge Herman ruling on his own motion to recuse. *Id*. at 559. We stated, "Texas law is clear that, when faced with a motion to recuse, a judge has only two options: grant the motion to recuse or refer the motion to another judge for a **\*326** ruling." *Id*. at 561. When Judge Herman ruled on his own motion to recuse, he erred and should have instead referred the motion to the Chief Justice of the Texas Supreme Court. *Id*. (citing Tex. Gov't Code Ann. § 74.057(a) and Tex.R. Civ. P. 18a(g)). Likewise, Judge Herman erroneously ruled on the

motion to disqualify and should have referred the motion to the Chief Justice of the Texas Supreme Court. *Id*. Following our decision in *Guilbot,* we conclude that Judge Herman erred in ruling on Dawn's motion to disqualify him. Finding Judge Herman's ruling to be error, we must now determine if such error requires reversing this appeal. *See id*. at 562–63.

### 2. *Judge Herman's Error*

The August 3, 2005, September 9, 2005, and September 12, 2005 motions were all disposed of prior to the final order at issue in this appeal.[12] Our review of the record shows that, once any orders signed by Judge Herman after the motion to disqualify him was filed are declared void, there remained pending at the time of the final order signed by Judge Wood the following: (1) a motion to disqualify Judge Wood filed by Dawn on June 6, 2006; and (2) a motion to recuse and disqualify Judge Wood filed by Easton on September 17, 2006. Both motions are tertiary and did not prevent Judge Wood from signing the final order.[13]

[12]   Motions to recuse were also filed against Gladys Burwell and Russell Austin, the judges assigned to hear some of the recusal motions. The motions to recuse Judge Burwell and Judge Austin are not at issue in this appeal.

[13]   Dawn claims in her motion to dismiss her own appeal that there were five recusal motions pending at the time Judge Wood signed the October 16, 2006 order appointing permanent guardian. Dawn is incorrect. The record shows that only the two motions cited were pending. There were several motions filed *after* the final order in this case was signed; of course, any post-order motions could not prevent the judge from signing the final order.

 **[10]**   Section 30.016 of the Texas Civil Practice and Remedies Code provides that a trial court may continue to dispose of a case even after a motion to recuse is filed, if the motion is a tertiary motion. The version of Section 30.016 in effect at the time the final order in this case was signed, titled Recusal or Disqualification of Certain Judges, provided in pertinent part as follows:

   (a) In this section, "tertiary recusal motion" means a third or subsequent motion for recusal or disqualification filed against a district court, statutory probate court, or statutory county court judge by the same party in a case.

   (b) A judge who declines recusal after a tertiary recusal motion is filed shall comply with applicable rules for

procedure for recusal and disqualification except that the judge shall continue to:

   (1) preside over the case;

   (2) sign orders in the case; and

   (3) move the case to final disposition as though a tertiary recusal motion had not been filed.

Tex. Civ. Prac. & Rem.Code § 30.016.[14] The June 6, 2006 motion to disqualify Judge Wood was the fourth motion filed by Dawn against Judge Wood. It thus satisfies the definition of a tertiary recusal motion and did not prevent Judge Wood from moving the case to "final disposition as though a tertiary recusal motion had not been filed." *Id*.

[14]   Section 30.016 was amended after Perry's guardianship proceeding was filed. We, refer to the version of Section 30.016 in effect at the time of filing.

Furthermore, Judge Wood modified his order to reflect the good cause required **\*327** under Texas Rule of Civil Procedure 18a for proceeding with a ruling when a motion to recuse is pending. Rule 18a(d) provides that, where a judge declines to recuse himself, he must refer the motion to recuse and, except for good cause stated in the order in which further action is taken, shall make no further orders and take no further action in the case. Tex.R. Civ. P. 18a(d). Judge Wood modified his final order of appointment to reflect the necessary good cause finding.

 **[11]**   We acknowledge that Section 30.016(e) provides that if a tertiary recusal motion is finally sustained, the new judge for the case shall vacate all orders signed by the sitting judge during the pendency of the tertiary recusal motion. Tex. Civ. Prac. & Rem.Code Ann. § 30.016(e). We also recognize that Judge Olen Underwood did ultimately recuse Judge Wood on February 5, 2008 while this case was on appeal. Dawn and Easton filed a motion to dismiss the current appeal on the basis of Judge Underwood's order of recusal, claiming that the order rendered void (and thus not appealable) any order signed by Judge Wood. We disagree. Judge Underwood's recusal order states that he was ruling on the "Motion to Recuse" filed pursuant to Rule 18a. The only pending motions to recuse Judge Wood at the time Judge Underwood ruled were motions filed after the final order was signed. The final order appealed from in this case was not signed during the pendency of the recusal motion that was ultimately sustained. Thus, the final order does not have to be vacated under Section 30.016(e).

### 3. *Easton's Recusal Motion*

**[12]** Easton filed a motion to recuse Judge Herman on April 27, 2006. Easton, however, had no standing to file a motion to recuse any judge in the guardianship proceeding. Thus, his motion to recuse was ineffective, and Judge Herman was not required to rule on that motion.

**[13]** Texas Rule of Civil Procedure 18a provides that *a party* may file a motion to recuse. Tex.R. Civ. P. 18a(a). The First Court of Appeals has recently held that, under Rule 18a, a motion to recuse filed by a non-party does not satisfy Rule 18a and thus need not be referred before proceeding with the case. *Bell v. State,* No. 01–05–1180–CR, 2006 WL 3628916, at *6 (Tex.App.-Houston [1st Dist.] Dec. 14, 2006, no pet.) (mem. op.). We agree with the *Bell* court's reasoning and hold that a motion to recuse filed by a person with no justiciable interest in the case is not effective and does not have to be ruled upon or referred before a court may continue with the case.

Easton claims to have an assignment from Dawn of certain of her claims. We do not rule on the validity of this assignment as it has not been raised as an issue in this appeal. We do find, however, that, notwithstanding any assignment of certain claims, Easton does not have a justiciable interest in the guardianship proceeding and thus is not considered a party for purposes of a Rule 18a motion to recuse. On February 17, 2006, Easton stated in open court, "I don't have an interest in Mr. Whatley's guardianship." At another hearing on March 2, 2006, the following exchange occurred:

> Court: Now, saying that, I wonder what it is that you think you can have assigned to you. Do you think you can have a contest assigned to you?
>
> Easton: No, sir.
>
> Court: So, you're not here on a contest?
>
> Easton: No, sir.

These statements reflect Easton's own admissions that he has no justiciable interest in the guardianship proceeding. The guardianship proceeding is the only claim at issue in this appeal. Any motion to **\*328** recuse filed by Easton against Judge Herman or Judge Wood with respect to the guardianship proceeding was, therefore, ineffective. *See* Tex.R. Civ. P. 18a; *Bell,* 2006 WL 3628916, at *6.

**[14]** Easton additionally claims that his standing in this case cannot be challenged because no one filed a verified denial of capacity under Texas Rule of Civil Procedure 93. Easton is correct that the record does not reflect a challenge to capacity under Rule 93. Easton's right to file a motion to recuse, however, is predicated on the existence of a justiciable interest in the case. Whether Easton had the capacity to sue is not the issue. The question of whether a party has a justiciable interest in a case is a question of standing that can be raised at any time, even on appeal. *See Austin Nursing Ctr., Inc. v. Lovato,* 171 S.W.3d 845, 849 (Tex.2005). To have standing, and thus a justiciable interest in a case, there must be: "(1) a real controversy between the parties," that (2) "will be actually determined by the judicial declaration sought." *Id.* Easton has no standing in the case because there is no real controversy between him and Walker with respect to the guardianship over Perry that will be determined in the guardianship proceeding. Because Easton has no justiciable interest in the guardianship proceeding, his motions to recuse in that proceeding are ineffective.

Although we agree Judge Herman erred when he ruled on his own recusal motion, we find that the error is not reversible. Accordingly, we overrule Dawn's third issue.

### E. *Easton's Challenge to the Show-cause Order*

**[15]** In issue four, Easton challenges the probate court's show-cause order and accompanying writ of attachment issued against him. In the argument section of his brief, Easton includes many statements and allegations that do not pertain to the show-cause order, thus making it difficult to discern the exact bases of Easton's challenge. He does, however, complain that there were pending motions to recuse Judge Wood at the time that Judge Wood issued the show-cause order. He also complains that the show-cause order was not personally served on him before the arrest warrant was issued, thus making it void. We hold that the probate court's show-cause order was not void based on any motions to recuse and that Easton has no right to relief because he has never been held in contempt and has suffered no adverse ruling. Moreover, Easton will suffer no adverse ruling because the writ of attachment has expired. We, therefore, overrule Easton's issue.

### 1. *The show-cause order and writ of attachment*

On February 7, 2006, Judge Wood issued an order with the following:

> On this day the Court on its own motion orders that all counsel, specifically including Michael Easton, pro se, are to cease and desist using Judge Mike Wood's personal email address. Such action constitutes *ex parte* communication with Judge Wood.

Easton then filed a motion to vacate the order, claiming he had no advance notice, no opportunity for hearing, and he was denied due process. The court held a hearing on the motion to vacate the February 7 order and expressly told Easton in court that sending an email to the judge's personal address would be an ex parte communication and that anyone sending him an email to his personal address would be held in contempt. The very next day, Easton allegedly sent an email to Judge Wood's personal email address. The court then issued a personal citation commanding **\*329** Easton to appear at a show-cause hearing on August 3, 2006. Easton failed to appear, and the trial court then issued a writ of attachment. The sheriff was not able to locate Easton to serve the writ, and it was returned unserved and expired on December 4, 2006.

### 2. *The order was not void*

Easton's challenge to the show-cause order based on any pending motions to recuse Judge Wood was the subject of his previous writ of habeas corpus proceeding in this Court. *In re Easton,* 203 S.W.3d 438 (Tex.App.-Houston [14th Dist.] 2006, orig. proceeding). As we held in *In re Easton,* any pending motions to recuse would not prevent Judge Wood from issuing the show-cause order. Texas Rule of Civil Procedure 18a(d) states that while a recusal motion is pending "the judge shall make no further orders and shall take no further action *in the case*." Tex.R. Civ. P. 18a(d); *In re Easton,* 203 S.W.3d at 442. By issuing the show-cause order prohibiting ex parte communications, Judge Wood did not take any action in disposing, adjudicating, or resolving any aspect of the guardianship proceeding. *In re Easton,* 203 S.W.3d at 442. Thus, any pending motions to recuse would not have rendered the show-cause order void. *Id.*

Easton relies on *Jamilah v. Bass,* 862 S.W.2d 201 (Tex.App.-Houston [14th Dist.] 1993, orig. proceeding) in support of his argument. *Jamilah* is distinguishable. In that case, the trial court issued the show-cause order and set a contempt hearing. *Id.* at 201. After receiving the notice of the contempt hearing, the party filed a motion to recuse the judge from hearing the contempt proceeding. *Id.* at 201–02. The court held that the motion to recuse prevented the trial court from hearing the contempt proceeding. *Id.* at 203. It did not hold that the trial court was prevented from even issuing the show-cause order. *Id.* Nothing in *Jamilah* prevented Judge Wood from issuing the show-cause order in this case. And, Judge Wood never held a contempt hearing because Easton could not be located. Thus, *Jamilah* provides no support for Easton's claim that the show-cause order could not be issued.

### 3. *Easton's appeal is moot*

Easton also argues that Judge Wood should not have issued the writ of attachment because Easton was not personally served with the show-cause order, citing *Ex parte Briscoe,* 561 S.W.2d 26 (Tex.App.-Houston [1st Dist.] 1977, orig. proceeding) and *In re Aguilera,* 37 S.W.3d 43 (Tex.App.-El Paso 2000, orig. proceeding). These cases hold that a party must be served with a show-cause order for the court to acquire jurisdiction over the contempt proceeding. These cases, however, do not support Easton's issue on appeal. Because Easton has suffered no injury, and will suffer no injury from the writ of attachment, his issue is moot.

As we held in *In re Easton,* the mere existence of the writ of attachment did not infringe upon Easton's liberty. *In re Easton,* 203 S.W.3d at 441. Judge Wood never held Easton in contempt and never assessed any punishment. At the time we issued *In re Easton,* there was no adverse ruling against Easton from which he could pursue a writ of habeas corpus. *Id.*

 **[16]** **[17]** **[18]** There is still no adverse ruling against Easton, nor will there be. The writ of attachment was returned to the court on December 4, 2006 unserved and expired. A writ of attachment that is not served before it expires becomes functus officio, meaning it is without legal force or effect. *See Ex Parte Arapis,* 157 Tex. 627, 306 S.W.2d 884, 885–86 (1957). Any claim Easton may have regarding the writ of attachment is moot. *See* **\*330** *Allstate Ins. Co. v. Hallman,* 159 S.W.3d 640, 642 (Tex.2005) ("A case becomes moot if a controversy ceases to exist or the parties lack a legally cognizable interest in the outcome."); *see also Davison v. Lane,* 350 S.W.2d 244, 248 (Tex.Civ.App.-Waco 1961, no writ) (finding that alleged wrongful issuance of writ of attachment against cattle became moot question where cattle owner had suffered no damage). Moreover, any alleged error in issuing the writ of attachment would be harmless; there has been no rendition of an improper judgment against Easton. *See* Tex.R.App. P. 44.1(a)(1) (stating appellate court cannot

reverse based on trial court error unless error complained of "probably caused the rendition of an improper judgment."). Because Easton's challenge to the show-cause order is without merit, we overrule his issue.

### F. The Ancillary Appellate Motions are Overruled

The following motions have been filed by Dawn and Easton and remain pending: Appellants' Motion to Strike Exhibits to Appellee's Brief; Appellants' Emergency Motion to Set the Case for Submission and to Render; Appellants' Motion for Sanctions (filed August 1, 2007); Appellants' Motion to Recalendar the Cause and Dismiss the Appeal for Lack of Jurisdiction; Appellants' Motion to Dismiss (filed February 22, 2008); Appellants' Motion for Appointment of a Special Master; and Appellants' Motion for Sanctions and Reply to Appellee's Response to Dismiss Appeal (filed March 12, 2008). The Motion to Strike Exhibits to Appellee's Brief, the Motion to Recalendar the Cause, and the Emergency Motion to Set the Case for Submission and to Render are denied as moot.

Appellants' motions to dismiss the appeal and render judgment in their favor are based on the claim that Judge Underwood's order granting recusal of Judge Wood made the final order being appealed void. We overrule Appellants' motions to dismiss the appeal for the reasons set forth earlier in this opinion.

 **[19]**     Appellants also filed a request for sanctions, claiming that Walker lied to this Court in his opposition to the motion to dismiss by asserting that appellants did not have record support for their argument. It is true that some of the items Walker claimed were missing from the record are in fact in the record. Walker admitted this fact in his opposition to the request for sanctions, stating that the documents were merely overlooked. After reviewing the record, the Court can attest that the clerk's record in this case is large, voluminous, and convoluted. There are seventeen volumes of clerk's record, most of which are groups of supplemental volumes with indices only in the first volume. Many of the documents necessary for review are attachments, requiring the reader to page through documents that do not seem relevant. It is easy to overlook documents in the record, and we find no basis for imposing sanctions. The motions for sanctions are denied.

 **[20]**     Finally, Appellants ask the Court to appoint Retired Chief Justice Paul Murphy as a special master to conduct a hearing into the truth of assertions contained in affidavits filed in response to certain motions on appeal. We deny this request. Our disposition of this appeal is based on the record only. Any alleged misstatements contained in documents outside the appellate record are irrelevant to the issues on appeal. The motion to appoint a special master is denied.

### IV. CONCLUSION

The probate court had jurisdiction over the person and estate of Perry Whatley at the time the final guardianship order was **\*331** signed. There were no procedural impediments to the entry of the final order at issue in this appeal. Easton's challenge to the show-cause order and writ of attachment are without merit. We, therefore, overrule appellants' issues and affirm the probate court's order.

### All Citations

302 S.W.3d 314

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

 KeyCite Yellow Flag - Negative Treatment

**Distinguished by** In re Guardianship of Norris, Tex.App.-San Antonio, January 6, 2010

218 S.W.3d 71

Supreme Court of Texas.

Cynthia ZIPP, Petitioner,

v.

Alisa WUEMLING, Individually and as the Guardian of the Estate and Person of Jewel W. Keller, Respondent.

No. 05–0731. | March 9, 2007.

**Synopsis**

**Background:** Former guardian appealed the order of the 220th District Court, Hamilton County, James E. Morgan, J., removing her as guardian of incapacitated ward, but while the appeal was pending, the ward died. The Waco Court of Appeals, Felipe Reyna, J., 171 S.W.3d 498, dismissed appeal as moot. Review was granted.

**[Holding:]** The Supreme Court held that ward's death did not render appeal moot.

Reversed and remanded.

West Headnotes (4)

**[1] Appeal and Error**
    Want of Actual Controversy

An appeal is moot when a court's action on the merits cannot affect the rights of the parties.

14 Cases that cite this headnote

**[2] Appeal and Error**
    Effect of delay or lapse of time in general

The death of a party can, under certain circumstances, render an appeal moot.

8 Cases that cite this headnote

**[3] Guardian and Ward**
    Removal

Ward's death did not render moot former guardian's appeal of trial court decision to remove her; current or former guardian would need to present accounting of the guardianship estate to the district court, the interests of ward's estate required full consideration of former guardian's claims because estate would be best served by person deemed most qualified, ward and estate were not the real parties in interest, and former guardian's rights and duties regarding attorney fees and costs depended on determination of just cause for removal. V.A.T.S. Probate Code, §§ 665(e)(2), 668(1–2).

9 Cases that cite this headnote

**[4] Guardian and Ward**
    Death of ward

With the death of the ward, the guardianship of the person must end, but the estate must still be settled. V.A.T.S. Probate Code, § 745(a)(2).

5 Cases that cite this headnote

**Attorneys and Law Firms**

**\*72** David J. Patton, Euless, Stephanie Katriana Gonzalez, Grapevine, for Petitioner.

Wayne S. Weaver and Scott D. Allen, Stephenville, for Respondent.

Connie White, Crouch & White, Hamilton, for interested party Jewel W. Keller.

**Opinion**

PER CURIAM.

Cynthia Zipp challenges the Tenth Court of Appeals' decision to dismiss as moot her appeal of a district court's guardianship decision. We reverse the court of appeals' judgment and remand the case to the court of appeals for further proceedings consistent with this opinion.

Approximately two years after Jewel W. Keller was incapacitated, and upon the resignation of a prior guardian, the County Court of Hamilton County appointed Zipp to be the guardian of Keller's person and estate. When a dispute arose between Zipp and Keller's family, the county court transferred the case to the 220th District Court. After a bench trial, the district court ordered Zipp removed for cause and appointed Alisa Wuemling as successor guardian.[1] Zipp appealed her removal to the court of appeals. During the pendency of that appeal, Keller died of natural causes. A divided court of appeals concluded that Keller's death rendered Zipp's complaint moot and, holding no justiciable controversy existed, dismissed the appeal. 171 S.W.3d 498, 502 (Tex.App.-Waco 2005, pet. granted).

[1] The district court removed Zipp as guardian and appointed Wuemling successor guardian pursuant to section 761(c)(5), (6), and (7) of the Probate Code. The court justified Zipp's removal by stating it found: (1) Zipp moved from the area of Keller's residence; (2) she neglected to maintain Keller "as liberally as the means of [Keller] and the condition of [Keller's] estate permit"; and (3) she interfered with Keller's "progress and participation in programs in the community and her family."

Zipp raises two issues. First, she contends the court of appeals erred in dismissing her appeal as moot because, despite Keller's death, there remains a controversy between Zipp and Wuemling over who should wind up the affairs of the estate. Second, Zipp argues her appeal is not moot because she has a legally cognizable interest in guardian fees, attorney's fees, and costs.

**\*73** Wuemling argues the issue of guardianship became moot with Keller's death because a guardian of the person is no longer necessary and, as the current guardian, she is the only one who should be charged with the duty of preserving Keller's estate. The real parties in interest, Wuemling reasons, are not Zipp and Wuemling but rather Keller and her estate. Reinstating Zipp as guardian, Wuemling contends, would result in Wuemling having to prepare and file a final accounting, submit it to the court, and then turn over any remaining assets to Zipp, who would use the information to submit her own final report as successor guardian. Such needless duplication of effort and cost to the estate, Wuemling argues, would run counter to sound public policy.

Wuemling also contends Zipp waived any claim to guardian fees, attorney's fees, and costs by failing to preserve error

and argues Zipp's claim to guardian fees was forfeited when the district court removed her for cause. See TEX.R.APP. P. 33.1(a); TEX. PROB.CODE § 665(e)(2). The district court's finding of cause for removal, Wuemling argues, should stand because a district court's findings of fact should generally not be disturbed on appeal and Zipp failed to urge that the finding was against the great weight and preponderance of the evidence.

**[1]** **[2]** **[3]** An appeal is moot when a court's action on the merits cannot affect the rights of the parties. *VE Corp. v. Ernst & Young,* 860 S.W.2d 83, 84 (Tex.1993). Thus, the death of a party can, under certain circumstances, render an appeal moot. *See, e.g., Olson v. Comm'n for Lawyer Discipline,* 901 S.W.2d 520, 524–25 (Tex.App.-El Paso 1995, no writ) (holding an appeal of a judgment in an attorney disciplinary action, pursued by the attorney's widow, was moot because the judgment did not affect the property rights of the parties involved). But neither party to this controversy has died. Instead, though Keller died, the repercussions of the controversy between Zipp and Wuemling continue. Someone, whether Zipp, Wuemling, or someone else, will ultimately be required to present a final accounting of the guardianship estate to the district court. The trial court found Zipp was disqualified from doing so and appointed Wuemling. Zipp has a right to appeal that decision. Allowing her appeal, which could foreseeably result in her reinstatement as guardian, will not, as Wuemling argues, result in needless duplication of effort and cost to the estate. To the contrary, the interests of the estate require full consideration of Zipp's claims because an estate is best served by the person the courts deem most qualified to perform guardianship duties. Moreover, Wuemling is incorrect that the real parties in interest in this case are Keller and her estate. With Keller's death and the guardianship of her person no longer at issue, the parties with a remaining interest in this dispute are the parties relevant to the guardianship of Keller's estate, namely Zipp, Wuemling, and the estate itself. All of those parties' interests are best served by hearing the merits of Zipp's appeal.

At the heart of this controversy is whether there was just cause for Zipp's removal as guardian. The Probate Code makes a guardian's fees and her obligation to pay the costs and attorney's fees incurred by removal dependant on this determination. See TEX. PROB. CODE §§ 665(e)(2), 668(1)-(2). Thus, her appeal is not moot. See *Allstate Ins. Co. v. Hallman,* 159 S.W.3d 640, 643 (Tex.2005) ("Hallman's remaining interest in obtaining attorney's fees 'breathes life' into this appeal and prevents it from being moot.");

*Pinnacle Gas Treating, Inc. v. Read,* 104 S.W.3d 544, 545–46 (Tex.2003) ( "Because an appellate court's action in either affirming **\*74** or reversing the trial court's dismissal order would affect substantial rights of the parties ... there is a live issue in controversy...."). Wuemling contends the trial court's finding of cause to remove Zipp as guardian should not be disturbed on appeal and argues that, regardless, Zipp failed to preserve the issues of guardian fees, attorney's fees, and costs. But these are the very issues the court of appeals should have addressed; they in no way indicate the mootness of the underlying controversy. The court of appeals should have, at a minimum, reviewed the record to determine whether Zipp preserved error and, if so, considered the merits of Zipp's claims.

 **[4]**    It is axiomatic that, with the death of the ward, the guardianship of the person must end. *See Alford v. Halbert,* 74 Tex. 346, 12 S.W. 75, 76 (1889) ("Death of the ward necessarily terminates the guardianship.") (quoting *Fortson*

*v. Alford,* 62 Tex. 576, 580 (1884)). But the estate must still be settled. TEX. PROB.CODE § 745(a)(2). When there is a dispute as to who shall settle the estate, a justiciable controversy exists. *See Weatherly v. Byrd,* 552 S.W.2d 573, 574 (Tex.Civ.App.-Fort Worth 1977) (overruling appellant's motion to declare the case moot after the ward's death), *rev'd,* 566 S.W.2d 292 (Tex.1978) (reversing on the merits without addressing the mootness issue). In this case, two of Zipp's issues remain in controversy: (1) whether the district court properly removed Zipp as guardian, and (2) whether Zipp has a legally cognizable interest in fees and costs.

Accordingly, we reverse the court of appeals' judgment and remand the case to that court for further proceedings consistent with this opinion.

**All Citations**

218 S.W.3d 71, 50 Tex. Sup. Ct. J. 543

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.



# THE ATTORNEY GENERAL
# OF TEXAS

### AUSTIN, TEXAS 78711

JOHN L. HILL
ATTORNEY GENERAL

September 24, 1974

The Honorable Homer A. Davis
County Attorney
Hartley County
Box 1110
Dalhart, Texas 79022

Opinion No. H- 410

Re: Authority of county clerk
to issue certified copy of
letters testamentary after
estate has been closed.

Dear Mr. Davis:

Your letter to us asks:

I would like to know what authority, if any,
the County Clerk of Hartley County has to
issue a Certified Copy of Letters Testamentary
after an estate has been closed.

The duties of a county clerk as recorder of public records are
determined by the Legislature in accordance with Article 5, § 20 of the
Texas Constitution. Article 1942, V. T. C. S., provides that county clerks
shall be keepers of the records, books, papers and proceedings of their
respective courts, including matters of probate. Article 6591, V. T. C. S.,
requires the clerk to record all instruments of writing "authorized or
required to be recorded in the county clerk's office . . . ." Article 6600,
V. T. C. S., requires him to "give attested copies whenever demanded of
all papers recorded in his office . . . ." Therefore, the answer to your
question depends on whether the clerk is authorized to record letters
testamentary.

We have not found any provision in the Texas Probate Code, or any
other statute, which authorizes the clerk to record the letter testamentary
itself. However, the clerk is authorized by the Texas Probate Code to
record such facts as the name of the executor to whom letters testamentary

p. 1911

are issued, Texas Probate Code, §13, and each order, judgment, decree and proceeding of the probate court, §15. Among the orders, decrees and judgments of the Probate Code which will appear in both the Judge's Probate Docket, §13, and in the Probate Minutes, §15, will be a full and complete copy of the order granting letters testamentary.

The letters testamentary themselves, however, are not official orders, decrees or acts of the court such as the clerk is authorized to record. They are rather:

> . . . a certificate of the clerk of the court granting
> the same, attested by the seal of such court, and
> stating that the executor . . . has duly qualified as
> such as the law requires, the date of such qualifica-
> tion, and the name of the deceased. Texas Probate
> Code, §183.

The distinction between facts which are required to be recorded and a letter testamentary is recognized in §186 of the Texas Probate Code which provides:

> Letters testamentary, of administration, or of
> guardianship, or a certificate of the clerk of the
> court which granted the same, under the seal of
> such court, that said letters have been issued,
> shall be sufficient evidence of the appointment
> and qualification of the personal representative of
> an estate . . . and of the date of qualification.

The Legislature has not required the exhibit of a certified letter testamentary as evidence of an executor's appointment and qualification. It is sufficient for the clerk when requested, simply to certify that letters testamentary have been issued.

Attorney General Opinion V-575 (1948) reached the same conclusion.

> The County Clerk may not record in the probate
> minutes a copy of letters of administration,

testamentary or guardianships.   Neither is he
authorized to issue such letters to third persons.
However, after such letters have been issued to
the proper persons, the County Clerk may then
issue a certificate of such facts which may appear
of record.

Thus, the county clerk is authorized to certify from the record
that letters testamentary were issued and any other recorded facts per-
tinent to a particular estate.   However, since letters testamentary are
not authorized to be recorded in the probate records, the county clerk has
no authority to issue certified copies of such letters.

## SUMMARY

Although a county clerk can certify from the
record that letters testamentary were issued to
a personal representative, the clerk has no
authority to issue certified copies of letters
testamentary.

Very truly yours,

JOHN L. HILL
Attorney General of Texas

APPROVED:

LARRY F. YORK, First Assistant

DAVID M. KENDALL, Chairman
Opinion Committee

lg